IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Allen Systems Group, Inc., *et al.*,[1] | ) | Case No. 15-10332 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION IN SUPPORT OF FIRST DAY PLEADINGS

I hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I, John C. DiDonato, am over the age of 18 and am competent to testify.  I am a Managing Director of Huron Consulting Services LLC ("Huron").  Huron has been retained as restructuring adviser to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or the "Company").  I am the President and Chief Restructuring Officer of Allen Systems Group, Inc. ("ASG"), one of the Debtors.  I have acted in the capacity of President since January 2, 2015 and in the capacity of Chief Restructuring Officer since December 2012.  I also currently serve as Chief Restructuring Officer and President of the other Debtors.  In my capacity as President and Chief Restructuring Officer, I have detailed knowledge of, and experience with, the day-to-day operations, business and financial affairs, and books and records of the Debtors, and, as described herein, have been actively engaged in the Debtors' business and efforts to restructure their business and finances.

---

[1]      The Debtors and the last four digits of each Debtor's federal tax identification number are as follows: Allen Systems Group, Inc. (4496); ASG Federal, Inc. (1773); and Viasoft International, LLC (9761).  The mailing address for all of the Debtors is: 708 Goodlette Road North, Naples, Florida 34102.

DOCS_DE:198162.3 05511/001

2.     To minimize any adverse effects on their business as a result of the commencement of these chapter 11 cases (the "Chapter 11 Cases"), the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief, among other things, to: (a) continue the Debtors' operations while in chapter 11 with as little disruption as possible; (b) maximize the value of the Debtors' enterprise for all creditor constituents; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases. I am familiar with the contents of each First Day Motion, and I believe the relief sought therein is necessary to permit an effective transition into chapter 11. Moreover, the various types of relief requested in the First Day Motions are crucial to the success of the Debtors' reorganization efforts and will aid in the implementation of a timely and efficient chapter 11 process that will preserve and maximize the value of the Debtors' estates.

3.     I submit this declaration (the "Declaration") to provide an overview of the Debtors and these Chapter 11 Cases and to support the Debtors' petitions and First Day Motions. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge as President and Chief Restructuring Officer, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, management or advisors, or my opinion based upon my experience with the Debtors' operations and financial condition. In making the statements herein based upon my personal experience, review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, management or advisors, I have relied upon the Debtors' employees and management to accurately record, prepare and collect any such documentation and other information.

2

4.    If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion.

5.    I am authorized to submit this Declaration on behalf of the Debtors.

6.    Parts I through V of this Declaration provide: (i) background information regarding the chapter 11 filings; (ii) an overview of the Debtors' business; (iii) the Debtors' organizational structure; (iv) the capital structure of the Debtors; (v) the developments which led to the Debtors commencing these Chapter 11 Cases; and (vi) an overview of the Debtors' restructuring plan.

## I.

## Background

### A.    The Chapter 11 Filings.

7.    On the date hereof (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code").  The Debtors commenced these Chapter 11 Cases in order to effectuate a consensual balance sheet restructuring pursuant to the Plan (as defined below), which, pursuant to the Support Agreement (as defined below) is supported by the Consenting Creditors (as defined below) – representing 100% of the Debtors' first lien lenders under the Domestic Credit Facility and Foreign Credit Facility and the holders of in excess of 72% of the Debtors second lien Notes – and the holder of 100% of the existing equity interests in ASG, as well as to avoid disruption to, or the forced liquidation of, their business and to obtain the financial flexibility to restructure their operations and finances.  After an extensive review of the strategic alternatives available to the Debtors, and

3

taking into account the Debtors' constrained liquidity and the existing defaults under the Domestic Credit Facility, Foreign Credit Facility and Notes, the Debtors have determined that the balance sheet restructuring effectuated pursuant to the Plan represents the best available path for the Debtors, their customers, vendors, employees, creditors and other stakeholders. Accordingly, the Debtors have filed the *Debtors' Joint Prepackaged Chapter 11 Plan* (the "Plan")[2] concurrently herewith in order to implement the restructuring pursuant the Plan, minimize fees, preserve the value of their assets and maximize the availability of recovery for their stakeholders.

8.    I am advised by counsel that (i) this Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409 and (iii) the Debtors continue to operate their business and to manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

**II.**

**Overview of the Debtors' Business**

9.    The Debtors provide mission-critical enterprise information technology ("IT") management software solutions to large enterprises and small and medium-sized businesses in a variety of industries around the world. The Debtors' comprehensive product suite, which is typically deeply integrated within a customer's IT environment, includes solutions for managing applications, databases, and process management functions and so enables their more than 6,400 customers, including various Fortune 100 and Fortune 500 companies, to manage their complex

---

[2]    Terms not otherwise defined in this section shall have the definition ascribed to such term in the Plan.

IT environments, align IT spending and performance with their business objectives, enhance workforce productivity and reduce operating costs.

10.     The Debtors generate revenue through the sale of software licenses, software as a service, maintenance contracts and professional services.

**A.     Product Channels and Categories.**

11.     The Debtors market over 65 standalone software products in the following three major solutions areas: cloud, content, and systems.

*(i)   Cloud Solutions Suite*

12.     The Debtors' cloud solutions offer end-to-end orchestration from the core of the data center up to the end-user's workspace and are already servicing roughly 500,000 enterprise users in some of the world's largest companies.   The integrated and flexible design of the Debtors' software improves efficiency through automated processes that reduce risky, error-prone, manual IT procedures.   ASG is one of the six key leaders in the Workspace Aggregation Cloud segment, which enables IT departments to control and orchestrate the delivery of PC, Web, and mobile applications and data in a managed, secure and context-aware manner to PCs, tablets and smartphones.

*(ii)   Content Solutions Suite*

13.     Content solutions reduce cost and risk and allow users to maximize the value of their IT investments.   The suite provides for the capture and management of content (e.g. documents, reports, check images) from any data source across multiple archiving, backup, and compliance systems.   The captured content can be brought to the user for timely querying, viewing, reporting, analysis, classification, and distribution – and can be used to support business workflows, e-discovery, compliance, records management, output management, integration

5

across organizations and repositories, and customized corporate communications. The suite automatically captures context (i.e., metadata) across an organization's infrastructure, applications, data, and business processes. The suite also determines the relationships between these systems in order to create an integrated "blueprint" of how the data, process, and physical systems are interconnected. The Company's product suite enhances an organization's understanding of business processes and expedites business and technical decision making.

   (iii)  *Systems Solutions Suite*

14.    Systems software, from performance management and workload automation to application management and service quality and control, help companies reduce the cost of managing and running their systems landscape, while allowing IT investments to be shifted toward innovation, which supports business growth.

**B.    Recent Acquisitions.**

15.    ASG was founded in 1986 by Arthur L. Allen in Naples, Florida. By the end of the 1980s, ASG had accumulated a varied line of automation and performance software products supporting IBM mainframes and had opened sales and technical offices throughout the United States, Canada, Denmark, Norway, the United Kingdom and Sweden.

16.    After establishing a solid base in the mainframe marketplace, ASG sought to expand its portfolio to offer IT organizations a significant portion of their software requirements and expand into distributed environments, which were beginning to supplement mainframes. From the mid-1990s until 2012, ASG embarked on a strategic acquisition campaign in which it significantly increased its enterprise software portfolio and expanded into a number of adjacent markets, mid-range platform, and cloud markets to meet perceived shifting market demand and to create ASG's unique positioning in the enterprise software industry as a company with truly

6

differentiated solutions that could support Fortune 1000 clients. Beginning in 2004, ASG began

opening direct sales and support offices in Latin America and Asia Pacific, as well as other parts

of Europe and ending relationships with distributors who were focused on a narrow solution set

and content within the existing maintenance base. These acquisitions and the sales and support

presence expansion resulted in ASG having over 100 offices worldwide, primarily in the United

States and Europe.

**C.    Employees.**

17.    As of February 17, 2015, the Debtors employed approximately 1,054 employees

(collectively, the "Employees") in 114 locations in 25 countries (including the United States).

Approximately 48% of the Employees are located in the United States, where ASG is organized,

and 52% are located outside the United States. Approximately 41% of the Employees are

located in four European countries – France (19%), Germany (13%), Spain (6%) and the United

Kingdom (3%). Virtually all of the Employees work on a full-time basis. In addition, the

Debtors utilize the services of highly-skilled independent contractors, all of whom are paid as

vendors through the Debtors' accounts payable system. More than 98% of all of the Debtors'

Employees are salaried personnel. None of the Employees in the United States are represented

by a collective bargaining unit. As of February 17, 2015, approximately 392 of the Debtors'

Employees overseas were represented by unions, works councils, or similar organizations under

approximately 15 different agreements.

**D.    Product Development.**

18.    The Debtors are committed to innovation and dedicating resources to research and

development. Over the past four years, the Debtors have maintained research and development

expenses in the range of 11% to 14% of total revenue. The Debtors' research and development

7

department has, as of February 17, 2015, 386 employees located in the United States, Europe, and Asia. The development department is tasked with enhancing existing products and developing new offerings to bring value to clients. While maintaining and developing more than 200 products in the various product lines, the development department delivers new releases in a timely manner, ensuring high quality in a continuous effort to achieve superior customer satisfaction. This continued focus on product development helps the Debtors beat and/or replace competitors who may have scaled back resources on low growth product lines and helps the Debtors retain its existing maintenance base.

E.    **Sales & Marketing.**

19.    As of February 17, 2015, the Debtors' direct sales force was comprised of approximately 161 individuals, including 87 account executives, and a marketing organization consisting of 19 employees worldwide. The Debtors primarily sell their products through their direct sales force, working from the Debtors' 66 offices located in the Americas, Europe, the Middle East, Africa, and Asia. The Debtors also sell their products through distributors located in Colombia, China, the Czech Republic, Hungary, India, Israel, Malaysia, Puerto Rico, Turkey, South Africa and Venezuela. A number of the companies that the Debtors acquired in 2011 and 2012, including visionapp, Atempo, Trilog, and NTR, had much more significant indirect sales channels than the Debtors traditionally have had and managed.

20.    ASG has invested in routes to market development over the past few quarters to embrace and grow indirect revenue streams and develop existing channels. The Debtors have established global channel teams, tools, budgets and enablement to support channel expansion. The Debtors generate leads for their products through industry analysts, tradeshows, web marketing and contact with existing customers. In 2004, the Debtors began implementing an

8

organic sales strategy focused on increasing the number and quality of their account executives to allow for deeper penetration of their solutions into customer accounts and drive significant new license and resulting maintenance revenue. That initiative resulted in growing the Debtors' presence from 52 offices in 2004 to over 100 by 2012. In 2013, consistent with the Debtors' sales transformation plan, they began to rationalize and consolidate the number of offices down to 66. Although the Debtors' direct sales force has historically been their primary source of sales, the Debtors do use, to a lesser but increasing extent, strategic partners, value-added resellers, resellers, technology alliances, vendor alliances and referral sales partners to enhance and extend the Debtors' ability to develop, deliver and support innovative, cost-effective solutions for their customers.

**F.    Customer Support.**

21.    As of February 17, 2015, the Debtors' customer support team consisted of 94 employees. In connection with the licensing of their products, the Debtors' customers typically enter into annual maintenance contracts that provide them the right to obtain available updates, fixes, patches and telephonic and web-based technical support. The Debtors' customer support team provides customers with critical technical support to help them prevent or resolve issues within their environments relating to the Debtors' products.

22.    The Debtors' customer support group also notifies customers of errors with their solutions and available patches or fixes to resolve these errors, as well as available enhancements or updates to the technology they have licensed. The Debtors have customer support personnel to provide their customers with technical support 24 hours a day, seven days a week. The Debtors also provide customers access to their web-based support portal, on which they can download available products, enhancements, updates, fixes, patches and product manuals, and

9

access responses to frequently asked questions, to allow them to address certain issues without interaction with the Debtors' customer support personnel.

### G. Professional Services.

23.    The Debtors' professional services staff, which consisted of 65 employees as of February 17, 2015, focuses on implementing the Debtors' solutions for their customers worldwide, as well as providing those customers with education and training on the Debtors' solutions and performing consulting and project management services. The Debtors utilize their methodologies and experience to deploy their solutions at the Debtors' customer sites while transferring knowledge about the Debtors' products to allow their customers to become more self-sufficient and to productively use the Debtors' cutting-edge technology.

24.    The Debtors' professional services include: (i) *Education and Training* – the Debtors offer multiple training options for their customers, including in-person, instructor-led and on-line courses regarding the Debtors' technology, and courses designed around attendees' specific agendas because the Debtors believe that transferring knowledge about their solutions to their customers is important for them to successfully implement and productively use the Debtors' products; (ii) *Consulting* – the Debtors also offer consulting services around their solutions which include providing customers with the initial setup and configuration of their technology, a conversion strategy and routine to transition to the Debtors' products from their competitors' products, as well as integration of the Debtors' solution with the customer's existing IT infrastructure and custom enhancements or interfaces to a number of other technologies; and (iii) *Project Management* – the Debtors maintain a team of project managers that work as part of their professional services team, and when contracted by a customer, the Debtors will assign a project manager to oversee and coordinate consulting projects, working

10

with both the Debtors' team and the customer's team to organize the relevant aspects, and provide the information and metrics to help ensure a successful and efficient achievement of the customer's goals relating to the project.

## III.

### Organizational Structure

25.     The Debtors' corporate structure chart as of the Petition Date is depicted on the chart attached hereto as **Exhibit A**.  As set forth herein, the Debtors are a privately-held company.  ASG is the ultimate parent of both of the other Debtors.  The stock of ASG, which is organized in Delaware, is held entirely by Arthur Allen.  The direct, wholly-owned, debtor-subsidiaries of ASG organized in the United States include: (i) Debtor ASG Federal, Inc. (a Delaware corporation); (ii) Debtor Viasoft International, LLC (a Delaware limited liability company); and (iii) non-debtor Escrow Services, Inc. (a Florida corporation).

26.     ASG is also the direct parent of the following five foreign-organized, non-debtor subsidiaries, most of which are wholly-owned by ASG: (i) Atempo SAS (France);[3] (ii) ASG Software (Beijing) Ltd. (WOFE) (China); (iii) ASG do Brasil Tecnologia da Informação, Ltda.[4] (Brazil); (iv) ASG Canada, ULC (Canada); and (v) NTRGlobal Group Limited[5] (UK).

27.     ASG is further the indirect parent of eight foreign-organized, non-debtor subsidiaries, including: (i) two direct wholly-owned subsidiaries of Atempo SAS – Atempo Korea Co., Ltd[6] (Korea) and Atempo Deutschland GmbH[7] (Germany); (ii) two subsidiaries of

---

[3]     The respective country of organization is listed in parentheses after the name of each entity.

[4]     ASG owns 99.99% of this entity and .01% is owned by Arthur Allen.

[5]     The Company is in the process of dissolving this entity.

[6]     The Company is in the process of dissolving this entity.

[7]     The Company is in the process of dissolving this entity.

11

NTRGlobal Group Limited – Net Transmit & Receive, S.L.U.[8] (Spain), a direct, wholly-owned subsidiary of NTRGlobal Group Limited, and Net Transmit & Receive Germany GmbH (Germany),[9] a direct, wholly-owned subsidiary of Net Transmit & Receive, S.L.U.; and (iii) four subsidiaries of Viasoft International, LLC – (a) Viasoft International GmbH (Germany), a direct, wholly-owned subsidiary of Viasoft International LLC, (b) Viasoft Software Development Geschäftsführungs GmbH (Germany), a direct, wholly-owned subsidiary of Viasoft International GmbH (Germany), (c) ASG GmbH & Co. KG (Germany), a subsidiary owned by Viasoft International, LLC (50%), Viasoft International GmbH (40%) and Viasoft Software Development Geschäftsführungs GmbH (10%), and (d) visionapp GmbH (Germany), a direct, wholly-owned subsidiary of ASG GmbH & Co. KG.

## IV.

## **Capital Structure**

28.    The chart below sets forth the Debtors' consolidated funded debt obligations as of the Petition Date:

| Debt Obligation | Estimated Principal Amount Outstanding as of Petition Date | Maturity | Security Status |
|---|---|---|---|
| Domestic Credit Facility | $214.4 million (Domestic Term Loan)<br><br>$25 million (Revolver) | 12/14/2017 | Secured |
| Foreign Credit Facility | $10 million | 12/14/2017 | Secured |

---

[8]    The Company is in the process of dissolving this entity.

[9]    The Company is in the process of dissolving this entity.

DOCS_DE:198162.3 05511/001

| Notes | $300 million | 5/15/2016 | Secured |
|-------|--------------|-----------|---------|

**A.**    **Senior Secured Prepetition Credit Facilities.**

29.    ASG, as borrower, certain of its subsidiaries, as guarantors, and TPG Allison Agent, LLC, as lender and TPG Allison Agent, LLC (together with its successor Wilmington Trust, N.A., and any other successors thereto, the "First Lien Agent") are parties to a Credit Agreement, dated as of December 14, 2012 (the "Domestic Credit Agreement"), pursuant to which TPG Allison, LLC made (a) a term loan in the aggregate principal amount of $214,337,000.00 (the "Domestic Term Loan") and (b) a revolving loan in the aggregate principal amount of $25,000,000.00 (the "Domestic Revolving Loan" and together with the Domestic Term Loan, the "Domestic Credit Facility") to ASG, which loans and other Obligations (as defined in the Domestic Credit Agreement) are secured by first priority liens on, among other things, all or substantially all of the Debtors' assets, as well as the assets of certain of the Debtors' foreign non-Debtor subsidiaries that are guarantors of the Domestic Credit Facility. The Domestic Revolving Loan was fully drawn upon closing of the Domestic Credit Facility. On or about October 17, 2014, the Consenting Lenders acquired all right, title, and interest of TPG Allison, LLC as lender under the Domestic Credit Facility.  Thereafter, Wilmington Trust, N.A. succeeded TPG Allison Agent, LLC as the First Lien Agent for the Domestic Credit Facility.

30.    Atempo, a wholly-owned non-Debtor subsidiary of ASG, as borrower, certain other direct or indirect non-Debtor foreign subsidiaries of the Company, as guarantors, and Natixis, as lender, and the First Lien Agent are parties to the Foreign Credit Agreement pursuant to which Natixis, New York Branch made a term loan in the aggregate principal amount of

13

$10,000,000.00 (the "Foreign Credit Facility") to Atempo, which loans and other Obligations (as defined in the Foreign Credit Agreement) are secured by first priority liens on, among other things, all or substantially all the assets of Atempo and certain of ASG's foreign subsidiaries who are guarantors of the Foreign Credit Facility.  On or about October 17, 2014, the Consenting Lenders acquired and became the beneficial holders of all right, title and interest to the Foreign Credit Facility.  Thereafter, Wilmington Trust, N.A. succeeded TPG Allison Agent, LLC as the First Lien Agent for the Foreign Credit Facility.  While the Debtors are not borrowers under the Foreign Credit Facility, this facility includes cross-default provisions.  The lenders under the Foreign Credit Facility (the "Foreign Lenders") agreed to forbear from exercising remedies pursuant to the Support Agreement during the Chapter 11 Cases, but the Foreign Credit Facility must be repaid on the Effective Date of the Plan to avoid exercise of remedies under the facility to the detriment of the Debtors and the Reorganized Debtors, as applicable.

31.    Beginning in April 2014, the Company did not make its scheduled interest payments on the Domestic Credit Facility, and in July 2014 missed scheduled interest payments on the Foreign Credit Facility.  Since August 15, 2014, the Company has not made interest payments on these obligations.  As of January 31, 2015, unpaid/deferred interest at the default rate on these credit facilities totals approximately $44 million. In addition, pursuant to the Domestic Credit Agreement (as well as the Foreign Credit Agreement), an "Acceleration Damage Premium" equal to 12% of the amount of the credit facilities outstanding shall be due and owing upon commencement of the Chapter 11 Cases to the First Lien Agent for the benefit of the Domestic Lenders (or Foreign Lenders, as applicable).  Such Acceleration Damages Premium equals $28,720,440 under the Domestic Credit Facility and $1,200,000 under the Foreign Credit Facility.

14

32.    As of January 31, 2015, the amounts owing under the Domestic Credit Facility total approximately $315 million (which includes unpaid interest, the unpaid fees and expenses, and the "Acceleration Damage Premium") and approximately $12 million under the Foreign Credit Facility (which includes unpaid interest, unpaid fees, and the applicable "Acceleration Damage Premium").

**B.**    **Second Lien Notes.**

33.    ASG also issued $300,000,000 of 10½% Senior Secured Second Lien Notes due 2016 (the "Notes") pursuant to an Indenture, dated as of November 22, 2010 (as amended, modified, supplemented or restated from time to time, the "Notes Indenture") by and among ASG and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent (the "Indenture Trustee"). The Notes are secured by a second-priority lien on substantially all of the assets of ASG and certain of its subsidiaries, as guarantors.

34.    The Company missed its May 15, 2014, and November 15, 2014 interest payments on the Notes, totaling approximately $32 million (as of November 15, 2014). Through January 31, 2015, accrued interest on Notes totals approximately $40 million. Accordingly, as of January 31, 2015, the amounts owing on account of the Notes totals approximately $340 million.

**C.**    **Intercreditor Agreement.**

35.    ASG, ASG Federal, Inc., Viasoft International, LLC, the direct predecessor-in-interest to the First Lien Agent for the Domestic Credit Facility and the Indenture Trustee entered into an Intercreditor Agreement dated November 22, 2010 that, among other things, governs the relative priorities of liens granted to secure the Domestic Credit Facility and the Notes.

DOCS_DE:198162.3 05511/001

D.    **Unsecured Debt.**

36.    As of the Petition Date, the Debtors estimate that their unsecured obligations are roughly $197.8 million, consisting of the Notes Deficiency Claim of $166.7 million, employee compensation and related costs ($14.3 million), amounts due under the AA Settlement Agreement ($7.0 million), accrued unpaid taxes ($3.6 million), accounts payable to vendors (approximately $3.6 million), and accrued but unpaid royalties and other expenses (approximately $2.5 million). The Notes Deficiency Claims is approximately 84% of the total unsecured obligations.[10]

37.    The Company also had a number of deferred obligations arising under certain of the purchase agreements related to the Company's various acquisitions (the "Deferred Purchase Obligations"). Prior to the Petition Date, as contemplated in the Support Agreement, the Company settled the Deferred Purchase Obligations and made the payments required in connection with such settlements. The settlement of the Deferred Purchase Obligations enabled the Company to propose the Plan – with the Consenting Creditors' support – providing payment in full to holders of Other Unsecured Claims.

V.

**Events Leading to These Chapter 11 Cases and the Debtors' Restructuring Plan**

A.    **Escalating Levels of Debt**

38.    The Company historically utilized a highly leveraged capital structure to execute growth strategies during the 2000s, finishing 2008 with greater than $300 million in worldwide revenues. The Company amassed debts that required multiple refinancings beginning in 2009, and finished 2010 with more than $350 million in secured debt.

---

[10]    The percentage set forth herein regarding the Notes Deficiency Claim is merely an estimate and is subject to

16

39.    During 2011, the Company completed several acquisitions. Although some were acquired using the Company's available cash, many were financed through a combination of availability under revolving credit facilities, incremental secured term loans, and a new unsecured term loan, increasing the Company's indebtedness by more than $150 million. This additional indebtedness and pre-existing debt was replaced in 2012 with the Domestic Credit Facility.

### B.    Challenges Leading to Revenue Deterioration

#### 1.    Acquisition Integration Issues

40.    The Company struggled to integrate several of its acquisitions, particularly those undertaken in 2011 and 2012. Certain acquired cloud technologies, which involve longer sales cycles, have been adopted more slowly by customers than anticipated. Other acquisitions also experienced rapid customer losses and revenue declines, as sales staff turnover and customer support issues have impaired the Debtors' ability to sustain certain revenue streams.

#### 2.    Increased Competition

41.    In addition, the markets for the Debtors' products and services are highly competitive and diverse. New products are frequently introduced and existing products are continually enhanced. The Debtors compete against a wide range of companies in the enterprise management software market, including a number of larger companies, such as IBM, Oracle, CA Technologies, BMC Software, EMC Corporation, Hewlett-Packard, VMware, Citrix Systems, Compuware Corporation, Macro4, and Micro Focus, as well as numerous independent software companies.

---

change based upon a variety of factors.

DOCS_DE:198162.3 05511/001

42.     Although the Debtors believe that they are market leaders in certain segments of the applications, data and information, infrastructure and operations, and cloud management areas and that their ability to combine offerings to meet specific customer needs is a significant competitive strength, several of the Debtors' existing competitors have, and many of their future competitors may have, greater financial, personnel, research and development and other resources, more well-established brands or reputations, and broader customer bases than do the Debtors.   As a result, these competitors tend to be better positioned to respond quickly to potential acquisitions and other market opportunities, new or emerging technologies, and changes in customer requirements.  Competitors with greater resources may also be able to offer lower prices, additional products or services, or other incentives that the Debtors cannot offer. Furthermore, consolidations in various industries have created competitors with broader geographic coverage and the ability to reach enterprises through communications service providers.  Thus, the Debtors face competition from not only their traditional adversaries, but also established companies, who have not previously entered the enterprise management software market, and emerging software companies, as barriers to entry in the distributed systems software market are relatively low.

### 3.     Concerns About ASG's Long-Term Viability

43.     The Company's declining financial performance in 2014 accelerated as information about its financial distress spread into the marketplace and customers grew increasingly concerned about the Company's long-term viability.  The Company believes that the consummation of the Plan will stabilize the Company and mitigate this obstacle to revenue generation.

18

44.    As a result of industry challenges and other factors, the Company's revenues and earnings have declined in recent years.  Total revenue in 2013 was approximately $22 million lower than in 2012, decreasing from approximately $298 million in 2012 to approximately $276 million in 2013.    Audited financial information for 2014 is not presently available, but the Company projects a significant further reduction in total revenue for 2014 to approximately $247 million.  During the same period, the Company's earnings have also declined.  The Company's earnings before interest, taxes, depreciation and amortization ("EBITDA") declined slightly from 2012 to 2013, from approximately $53 million to approximately $52 million, before sharply declining by an estimated $32 million in 2014 to approximately $20 million.  EBITDA, after taking into account certain adjustments for non-recurring expenses and affiliate payments ("Adjusted EBITDA"), of approximately $77 million in 2012, declined in 2013 to approximately $72 million, before falling to an estimated $48 million in 2014.

45.    As a result of deteriorating financial performance and substantial secured indebtedness, the Company has faced liquidity constraints and, as noted above, has not been able to make required interest payments on its funded debt starting in April of 2014.

46.    As the Company's financial condition grew increasingly distressed, the Company engaged Rothschild, Inc. ("Rothschild") as its investment banker to evaluate strategic alternatives for the Company.  As part of this process, Rothschild conducted an extensive restructuring, recapitalization, and sale process for the Company during 2014 and the beginning of 2015.  Simultaneously, the Company entered into negotiations with the Consenting Creditors, who hold over 72% of the Company's Notes.  In October 2014, certain of the Consenting Creditors acquired (directly or indirectly) 100% of the Domestic Credit Facility Claims and

DOCS_DE:198162.3 05511/001

claims under the Foreign Credit Facility. This placed the Consenting Creditor group in control of the vast majority of the Company's overall debt.

47.    On December 10, 2014, the Company, the Consenting Creditors, and the Company's founder and then Chairman of the board, CEO and President, Arthur L. Allen (together with his affiliates, the "Allen Parties") entered into a Settlement Agreement (the "AA Settlement Agreement"), pursuant to which the Company resolved various Claims asserted by the Allen Parties and negotiated lease amendments for the buildings leased by the Allen Parties to the Company (among other things). As part of the AA Settlement Agreement, Mr. Allen resigned from the Company, released substantial claims asserted against the Company, and will receive certain payments, as well as the Warrants for 10% of the New Common Stock, each as further described herein and in the AA Settlement Agreement.

48.    After careful consideration of the various alternatives, the Debtors determined that it was in the best interests of the Company and all of their stakeholders to commence the Chapter 11 Cases to implement a restructuring supported by the Consenting Creditors, who represent its principal creditor constituencies. Accordingly, the Company negotiated and entered into the Restructuring Support Agreement, dated as of January 13, 2015, with the Foreign Lenders, the lenders under the Domestic Credit Facility (the "Domestic Lenders" and, together with the Foreign Lenders, the "Consenting Lenders"), a majority of the holders of the Notes (the "Consenting Note Holders" and, together with the Consenting Lenders, the "Consenting Creditors"), and Arthur Allen, founder and former Chairman of the board, CEO and President of ASG, and his affiliates (the "Support Agreement"). A copy of the Support Agreement is attached hereto as **Exhibit B.** Pursuant to the Support Agreement, the Plan is supported by the Consenting Lenders, who hold 100% of the Domestic Credit Facility Claims and 100% of the

Foreign Credit Facility, the Consenting Note Holders, who hold more than 72% in amount of Notes Claims, and ASG's sole stockholder.

49.     The Debtors intend to effect a balance sheet restructuring pursuant to the Plan under which, except as otherwise provided in the Plan, the Domestic Credit Facility and Foreign Credit Facility will be repaid in full on the Effective Date unless the holders of two-thirds (2/3) in amount of claims under the Domestic Credit Facility and the Foreign Credit Facility agree to less favorable treatment, and ASG will cancel the Notes Claims in exchange for the Notes Claims Stock representing 41.5% of Reorganized ASG's New Common Stock; in addition, Eligible Holders of Notes Claims will receive Subscription Rights to participate in the Rights Offering to acquire their Pro Rata share of the Rights Offering Stock, representing the remaining 58.5% of Reorganized ASG's New Common Stock (in each case, subject to dilution as set forth in the Plan).  The Debtors' general unsecured creditors, other than holders of Notes Deficiency Claims and Allen Claims, will be paid in full and existing equity securities in ASG will be cancelled.

50.     This Restructuring is expected to reduce the Company's secured debt load from over $666 million (including principal, interest, fees, and the "Acceleration Damages Premium" discussed herein) to approximately $240 million – a reduction of more than 64%.  The Company believes that the Restructuring will stabilize the Company's finances and position the Company for long-term success.

51.     In order to fund the Chapter 11 Cases, the Debtors intend to obtain and enter into the DIP Facility in an amount up to $40 million.  The DIP Facility will be secured by Liens senior to the Domestic Credit Facility and Notes.  Pursuant to the Support Agreement, the Consenting Creditors agreed that the Liens securing the Domestic Credit Facility and the Notes

would be subordinate to the Liens securing the DIP Facility, so long as the terms of the DIP

Facility are acceptable to the Required Consenting Creditors and Required Consenting Lenders.

The DIP Facility will be paid in full on the Effective Date of the Plan unless the DIP Facility

lenders agree to less favorable treatment.

     52.     In order to fund the Plan, the Debtors or Reorganized Debtors, as applicable, will:

     a.  enter into the Exit Facilities, consisting of the following:

- the First Lien Revolving Loan Exit Facility, consisting of a first lien revolving loan facility in the principal amount of twenty-five million dollar ($25,000,000.00), which is expected to be undrawn as of the Effective Date;

- the First Lien Term Loan Exit Facility, consisting of a first lien term loan facility in the minimum principal amount of one-hundred-fifty million dollar ($150,000,000.00); and

- the Second Lien Term Loan Exit Facility, consisting of a second lien term loan facility in a principal amount of up to ninety million dollars ($90,000,000.00). The Second Lien Term Loan Exit Facility shall be fully backstopped by the Consenting Creditors on the terms set forth on Exhibit 1 to the Plan and otherwise acceptable to the Company and the Required Consenting Creditors. To the extent the principal amount of the First Lien Term Loan Exit Facility exceeds $150,000,000.00, the maximum principal amount of the Second Lien Term Loan Exit Facility shall be reduced on a dollar-for-dollar basis. If the Debtors are not able to obtain binding commitments for the Second Lien Term Loan Exit

22

Facility reasonably acceptable to the Company and the Required Consenting Creditors on or before the filing of the Plan Supplement, the Second Lien Term Loan Exit Facility shall be provided by the Consenting Creditors;

b.  consummate the $130,000,000.00 Rights Offering in exchange for the Rights Offering Stock representing 58.5% of the New Common Stock (subject to dilution as set forth in the Plan); and

c.  utilize other available Cash (including proceeds of the DIP Facility).

53.    If consummated, the forgoing will substantially de-lever the Debtors, while providing cost savings, operational efficiency and additional needed liquidity.   The Debtors believe the Plan represents their best option to maximize value for their estates, exit from chapter 11 as expeditiously as possible, and provide their reorganized enterprise with the capital needed to implement their post-reorganization business plan.    The Company believes that the restructuring will stabilize the Company's finances and position the Company for long-term success.

## VI.

## First Day Motions

54.    To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient plan process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed or will file requests for various types of relief in their First Day Motions.   I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference each of the factual statements set forth in the First Day Motions.   I believe that the relief requested by the First Day

Motions is necessary to enable the Debtors to preserve and maximize value and efficiently implement their asset monetization and restructuring process with minimal disruption and delay.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

24

## 28 U.S.C. § 1746 DECLARATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 18th day of February, 2015 in Naples, Florida.

John C. DiDonato
President and Chief Restructuring Officer
Allen Systems Group, Inc.