**Exhibit B**

Restructuring Support Agreement

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of January 13, 2015 (the "**Agreement**") by and among (i) Allen Systems Group, Inc., a Delaware corporation (the "**Company**"), on behalf of itself and its subsidiary Debtors (as defined below) (ii) each of the undersigned holders (each a "**Consenting Lender**" and collectively, the "**Consenting Lenders**") of certain claims under (a) that certain Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified, the "**Credit Agreement**") by and among the Company, as borrower, TPG Allison, LLC, as lender, and TPG Allison Agent, LLC, as administrative agent (as succeeded by Wilmington Trust, N.A. and together with any other successors and assigns, the "**First Lien Agent**"), and (b) the Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified, the "**Foreign Credit Agreement**" and together with the Credit Agreement, the "**First Lien Credit Agreements**") by and among Atempo SAS ("**Atempo**"), as borrower, Natixis, New York Branch ("**Natixis**"), as lender, and the First Lien Agent, as administrative agent, (iii) each of the undersigned holders (each, a "**Consenting Noteholder**" and collectively, the "**Consenting Noteholders**" and together with the Consenting Lenders, the "**Consenting Creditors**") of certain claims under that certain Indenture dated November 22, 2010 (as amended, supplemented or otherwise modified from time to time, the "**Indenture**" and together with the First Lien Credit Agreements and other documents related thereto, the "**Prepetition Debt Documents**") by and among the Company, as issuer, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A., as trustee (together with its successors and assigns, the "**Indenture Trustee**"), and (iv) Arthur L. Allen, on behalf of himself and Allen Investment Group and ALA Services, LLC (together, "**Arthur Allen**"). The Company and each of its affiliates that may or will constitute one of the "Debtors" (as defined below), the Consenting Creditors, Arthur Allen and any person that subsequently becomes a party hereto in accordance with the terms hereof are each referred to herein as a "**Party**" and collectively as the "**Parties**." Capitalized terms used herein and not otherwise defined have the meanings assigned thereto in the term sheet attached hereto as **Exhibit A** (the "**Plan Term Sheet**").

## RECITALS

A.    **WHEREAS**, the Company, as borrower, certain subsidiaries of the Company, as guarantors, and TPG Allison, LLC, as lender, and the First Lien Agent are parties to the Credit Agreement pursuant to which TPG Allison, LLC made (a) a term loan in the aggregate principal amount of $214,337,000.00 (the "**Domestic Term Loan**") and (b) a revolving loan in the aggregate principal amount of $25,000,000.00 (the "**Domestic Revolving Loan**" and together with the Domestic Term Loan, the "**Domestic Facility**")) to the Company, which loans and other Obligations (as defined in the Credit Agreement) are secured by first priority liens on, among other things, all or substantially all the assets of the Company. On or about October 17, 2014, the Consenting Lenders acquired all right, title, and interest of TPG Allison, LLC as lender under the Domestic Facility;

B.    **WHEREAS**, Atempo, an affiliate of the Company, as borrower, certain other subsidiaries of the Company, as guarantors, and Natixis, as lender, and the First Lien Agent are parties to the Foreign Credit Agreement pursuant to which Natixis made a term loan in the aggregate principal amount of $10,000,000.00 (the "**Foreign Facility**") to Atempo, which loans

and other Obligations (as defined in the Foreign Credit Agreement) are secured by first priority liens on, among other things, all or substantially all the assets of Atempo. On or about October 17, 2014, the Consenting Lenders acquired all right, title and interest of Natixis as lender under the Foreign Facility;

C.    **WHEREAS,** the Company, as issuer, certain subsidiaries of the Company, as guarantors, and the Indenture Trustee are parties to the Indenture pursuant to which the Company issued 10.5% senior secured second lien notes in the aggregate principal amount of $300,000,000.00 (the "**Second Lien Notes**");

D.    **WHEREAS,** the Consenting Creditors have retained Paul, Weiss, Rifkind, Wharton & Garrison LLP, Young Conaway Stargatt & Taylor, LLP and Freshfields Bruckhaus Deringer LLP as legal counsel, and Blackstone Advisory Partners L.P., as financial advisor, the First Lien Agent has retained James Bates Brennan Groover LLP, as legal counsel, and such legal counsel as may be retained by the Indenture Trustee in connection with the Restructuring (collectively, the "**Consenting Creditor Professionals**");

E.    **WHEREAS,** the Consenting Creditors hold First Lien Lender Claims and Second Lien Noteholder Claims (each as defined in the Plan Term Sheet) in the principal amounts set forth on their respective signature pages hereto, which constitute "claims" as defined in section 101(5) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "**Bankruptcy Code**"), against the Company arising out of, or related to, the Prepetition Debt Documents (such claims against the Company, the "**Claims**");

F.    **WHEREAS,** the Parties have engaged in good faith, arm's-length negotiations and agreed to support a restructuring of the Company's capital structure and outstanding obligations, the principal terms of which are set forth in this Agreement and the Plan Term Sheet (the "**Restructuring**"), that is mutually acceptable to the Company and the Consenting Creditors and subject to the negotiation and execution of definitive documentation;

G.    **WHEREAS,** the Parties intend that the Company and certain of its subsidiaries listed on Schedule 1 hereto will commence voluntary chapter 11 cases (collectively, the "**Chapter 11 Cases**," and the entities filing the Chapter 11 Cases, the "**Debtors**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

H.    **WHEREAS,** the Parties contemplate that the Restructuring will be implemented through a prepackaged or pre-negotiated chapter 11 plan of reorganization (the "**Plan**") filed in the Chapter 11 Cases in accordance with the terms and conditions of the Plan Term Sheet, consistent with this Agreement and otherwise in form and substance mutually acceptable to the Company and the Required Consenting Creditors (as defined below);

I.    **WHEREAS,** on December 10, 2014, the Company, the Consenting Creditors and Arthur Allen entered into that certain Settlement Agreement (the "**AA Settlement Agreement**"), pursuant to which  the Company and Arthur Allen agreed to compromise and settle any and all claims and disputes against one another, to amend the AA Leases (as defined in the AA Settlement Agreement) and that such AA Settlement Agreement would form part of the Plan;

2

J.    **WHEREAS**, each of the Consenting Creditors and Arthur Allen has reviewed, or has had the opportunity to review, the Plan Term Sheet and this Agreement with the assistance of legal counsel and financial advisors of its own choosing; and

K.    **WHEREAS**, each Consenting Creditor and Arthur Allen desires to support and vote to accept the Plan, and the Company desires to obtain the commitment of the Consenting Creditors and Arthur Allen to support and vote to accept the Plan, in each case subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.    <u>Effectiveness of the Agreement</u>.  This Agreement shall become effective (the "**Effective Date**") upon receipt by the Company of counterparts hereof duly executed and delivered by (a) Arthur Allen and (b) the holders of (i) 100% in number and dollar amount of the First Lien Lender Claims and (ii) at least two-thirds in dollar amount of each of the Second Lien Noteholder Claims and Noteholder Deficiency Claims; <u>provided</u> that the Company and the Consenting Creditors shall continue to use their best efforts to secure counterparts from additional holders of Claims after the Effective Date.  This Agreement will remain effective until terminated pursuant to <u>Section 7</u> hereof.

Section 2.    <u>The Restructuring</u>.

(a)    The principal terms of the Restructuring are set forth in the Plan Term Sheet and the exhibits thereto, which are expressly incorporated herein by reference and made a part of this Agreement as if fully set forth herein.

(b)    All (i) documents implementing and relating to the Restructuring, including, without limitation, the Plan, a disclosure statement describing the Plan (the "**Disclosure Statement**"), any plan supplements and related exhibits, solicitation procedures, commitment agreements, definitive documentation for the DIP Facility and Exit Facilities and all ancillary documentation thereto, definitive documentation for the Rights Offering, corporate governance and other related transactional or corporate documents for the reorganized Debtors (including, without limitation, amended by-laws, stockholders agreement, and employment agreements), (ii) motions or pleadings seeking authorization for, or approval or confirmation of, any of the documents in subsection (i), including, without limitation, the motion to approve the Disclosure Statement, confirm the Plan, and ratify the solicitation procedures, and (iii) proposed and final orders authorizing or approving the documents in subsection (i) or pleadings in subsection (ii), including, without limitation, any order relating to the DIP Facility or the use of cash collateral (the "**DIP Orders**"), ratification of the solicitation procedures, and confirmation of the Plan (the "**Confirmation Order**") (the documents in subsections (i)-(iii), collectively, the "**Definitive Documents**"), shall be consistent with this Agreement and the Plan Term Sheet in all material respects and shall not contain any inconsistent provisions.  The Definitive Documents with respect to items in subsections (i), (ii) and (iii) shall be reasonably acceptable to the Debtors and the Required Consenting Creditors; <u>provided</u>, <u>however</u>, that the Definitive Documents relating to the DIP Facility and Exit Facilities, including the DIP Orders,

shall be reasonably acceptable to the Required First Lien Lenders; unless the Domestic Facility and the Foreign Facility are paid in full in cash under the Plan, in which case the Definitive Documents relating to the Exit Facilities shall be reasonably acceptable to the Required Consenting Creditors.

(c)     The Definitive Documents shall be negotiated in good faith by the Company and the Consenting Creditors.  The Parties shall use their reasonable best efforts to negotiate and execute all Definitive Documents reasonably necessary or otherwise required to commence solicitation for the Plan in order to meet the solicitation related Termination Event set forth in Section 7(b).  To the extent reasonably practicable, the Debtors shall provide substantially final copies of all Definitive Documents to counsel for the Consenting Creditors no later than twenty-four (24) hours prior to filing with the Bankruptcy Court.

(d)     For purposes of this Agreement, (i) the term "**Required Consenting Creditors**" shall be defined as Consenting Noteholders holding at least 50.1 % of the aggregate principal amount of outstanding Second Lien Noteholder Claims, and (ii) the term "**Required First Lien Lenders**" shall be defined as Consenting Lenders holding at least 50.1% of the aggregate principal amount of outstanding First Lien Lender Claims.

Section 3.    Support for the Restructuring and the Plan.

(a)     Commitment of the Debtors.  For so long as this Agreement has not been terminated in accordance with its terms, and subject to Section 3(a)(4) below the Debtors agree and covenant:

(1)     To (i) take all commercially reasonable steps to obtain orders of the Bankruptcy Court in respect of the Restructuring, including obtaining entry of the Confirmation Order, (ii) support and take all commercially reasonable steps to consummate the Restructuring in accordance with this Agreement, including the preparation, filing and execution within the time-frames provided herein of the Definitive Documents, (iii) execute and deliver any other required agreements to effectuate and consummate the Restructuring, (iv) take all commercially reasonable steps to obtain any required regulatory and/or third-party approvals for the Restructuring, (v) take all commercially reasonable steps to complete the Restructuring within the time-frame provided herein, (vi) subject to any applicable orders of the Bankruptcy Court, operate their business in the ordinary course, taking into account the Restructuring, (vii) not object to, delay, impede, or take any other action that is inconsistent with, or is intended or is likely to interfere with acceptance or implementation of the Restructuring, (viii) not seek or solicit, propose, file, support, encourage, vote for, consent to, or engage in discussions with any person or entity concerning any restructuring, workout, plan of reorganization, dissolution, winding-up, sale, merger, or liquidation of the Company and its affiliates, other than the Plan, and (ix) report financial information to the Consenting Creditors in a manner consistent with past practice.

(2)     To (i) at least five (5) business days prior to the Petition Date, pay in full in the ordinary course the actual, documented, reasonable fees and expenses then due and owing to the Consenting Creditor Professionals under the Debtors' agreements with such professionals, including, without limitation, any retainer amounts, and (ii) following the Petition

Date, pay in full in the ordinary course the actual, documented, reasonable fees and expenses of the Consenting Creditor Professionals in their respective capacities as such through consummation of the Restructuring and conclusion of the Chapter 11 Cases, subject to any applicable orders of the Bankruptcy Court.

(3)     To provide the Consenting Creditors and the Consenting Creditor Professionals reasonable access, upon reasonable notice during normal business hours, to relevant properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Debtors.

(4)     The Company reserves the right (without obligation) (i) to propose modifications, supplements, or amendments to the Plan to the Consenting Creditors that are necessary or advisable (as determined by the Company in its reasonable discretion) to address matters arising out of and as a result of the consultation of its works council(s) in respect of the Restructuring, and (ii) following reasonable consultation with the Required Consenting Creditors, including such variations or alternatives to the proposed modifications, supplements or amendments to the Plan as the Company may agree, if such modifications, supplements, or amendments to the Plan (as so varied or altered) are not accepted by the Required Consenting Creditors, to withdraw or amend the Plan or terminate its obligations under this Agreement without incurring any liability to any Party (or any other person or entity) under this Agreement; provided, however, that the Consenting Creditors shall be under no obligation to accept or support any such modifications, supplements, or amendments to the Plan that are inconsistent with the Plan Term Sheet and are not accepted by the Required Consenting Creditors.  In the event that the Company terminates this Agreement pursuant to the preceding sentence, the Company shall provide five (5) days written notice to counsel to the Consenting Creditors.

(5)     To seek approval from the Bankruptcy Court to assume the AA Settlement Agreement pursuant to the Plan.

(b)     Commitment of the Consenting Creditors.  For so long as this Agreement has not been terminated in accordance with its terms, each Consenting Creditor agrees and covenants:

(1)     To (i) following receipt of solicitation materials, exercise all votes to which it is entitled with respect to its First Lien Lender Claims, Second Lien Noteholder Claims and Noteholder Deficiency Claims to accept the Plan in the Chapter 11 Cases, (ii) not seek to change or withdraw such vote, (iii) direct the First Lien Agent and Indenture Trustee, as applicable, to consent to and support the Plan and Restructuring, (iv) not object to, delay, impede, or take any other action that is inconsistent with or is likely to interfere with acceptance or implementation of the Restructuring, and (v) not seek or solicit, propose, file, support, encourage, vote for, consent to, or engage in discussions with any person or entity concerning any restructuring, workout, plan of reorganization, dissolution, winding-up, or liquidation of the Company and its affiliates, other than the Plan.

(2)     To backstop or otherwise fulfill its commitments, if any, with respect to the DIP Facility, the Exit Facilities, and the Rights Offering, as defined in and on the terms described in the Plan Term Sheet and otherwise in form and substance reasonably

5

acceptable to the Debtors and the Required Consenting Creditors, including, without limitation, a commitment agreement, which shall be consistent with the Plan Term Sheet and applicable exhibits in all material respects and shall not contain any inconsistent provisions or additional material conditions.

(3)     Notwithstanding anything to the contrary herein, nothing in this Agreement shall limit any of the following Consenting Creditor rights:  (i) to appear and participate as a party in interest in any matter to be heard or adjudicated in the Chapter 11 Cases, provided that such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or the Plan, (ii) to take or direct any action under the Prepetition Debt Documents and related security agreements relating to the maintenance, protection or preservation of any security interest or collateral, provided that such actions or directions are not inconsistent with this Agreement or the Plan, and (iii) any rights under the Prepetition Debt Documents to the extent consistent with this Agreement and the Plan; provided, however, that from the Petition Date until the Termination of this Agreement in accordance with the terms hereof, the Consenting Creditors shall forebear, and shall cause the First Lien Agent and Indenture Trustee to forebear, from taking any enforcement action or exercising any remedy against the Debtors or their subsidiaries under the First Lien Credit Agreements or Indenture.

(4)     Not to object to, nor request that any party (including the First Lien Agent or Indenture Trustee) object to, (a) the Debtors' motions to retain, on the terms specified in their respective engagement letters, Pachulski Stang Ziehl & Jones LLP, as bankruptcy counsel, Latham & Watkins LLP, as special corporate and transactional counsel, Rothschild Inc., as investment banker and financial advisor, and Huron Consulting Group, as restructuring advisor, or (b) the payment of any fixed, transaction or success based fees included in such professionals' respective engagement letters.

(5)     To support the Company's assumption of the AA Settlement Agreement pursuant to the Plan.

(c)     Commitment of Arthur Allen.  For so long as this Agreement has not been terminated in accordance with its terms, Arthur Allen agrees and covenants to (i) comply with the obligations set forth in the AA Settlement Agreement, (ii) support and take all steps reasonably necessary or desirable to consummate the Restructuring in accordance with this Agreement, (iii) not object to, delay, impede, or take any other action that is inconsistent with, or is intended or is likely to interfere with acceptance or implementation of the Restructuring, and (iv) not seek or solicit, propose, file, support, encourage, vote for, consent to, or engage in discussions with any person or entity concerning any restructuring, workout, plan of reorganization, dissolution, winding-up, sale, merger, or liquidation of the Company and its affiliates, other than the Plan or as expressly permitted under Section 1.1(b) of the AA Settlement Agreement.

Section 4.     Representations and Warranties.

(a)     Each of the Parties severally, and not jointly, represents and warrants to each of the other Parties that the following statements are true, correct and complete as of the date hereof:

6

(1)    Power and Authority.  It has all requisite power and authority to enter into this Agreement and, subject, in the case of the Debtors, to all necessary orders of the Bankruptcy Court, to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(2)    Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part, and no consent or approval (subject, in the case of the Debtors, to all necessary orders of the Bankruptcy Court) is required by any other person or entity for it to effectuate the Restructuring contemplated by this Agreement.

(3)    No Conflicts.  The execution, delivery, and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its certificate of incorporation or bylaws (or other organizational documents) or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party or under its certificate of incorporation or bylaws (or other organizational documents), except, with respect to any Debtor or affiliate thereof, for any contractual obligation that would not have a material adverse effect on the business, assets, financial condition, or results of operations of the Company and its affiliates, taken as a whole.

(4)    Governmental Consents.  Except as expressly set forth herein, or, in the case of the Debtors, necessary anti-trust and other regulatory approvals, the execution, delivery and performance of this Agreement does not, and shall not, require any registration or filing for consent or approval of, or notice to, with or by any federal, state, or other governmental authority or regulatory body.

(5)    Binding Obligation.  This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(6)    Proceedings.  No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

(b)    Each of the Consenting Creditors represents and warrants severally, and not jointly, to each of the other Parties that the following statements are true, correct, and complete as of the date hereof:

(1)    Ownership.  It is: (i) the beneficial owner or the nominee, investment advisor, or investment manager for the beneficial owners of the Claims set forth on its signature page attached hereto, having the power to vote and dispose of such Claims on behalf of such beneficial owners, and (ii) entitled (for its own account or for the account of other persons claiming through it) to all of the rights and economic benefits of such Claims.

7

(2)    Transfers.  It has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in the Claims that are subject to this Agreement.

(3)    Sophisticated Investors.  It is: (i) a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in securities and Claims similar to the securities and Claims subject to this Agreement or contemplated in the Plan Term Sheet (including any securities that may be issued in connection with the Restructuring), making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, or (ii) a "qualified institutional buyer" within the meaning of Rule 501 of the Securities Act of 1933, as amended.

(c)    The Company represents and warrants to the Consenting Creditors that it has all requisite power and authority to (i) enter into this Agreement on behalf of each of the Debtors, and (ii) cause each of the Debtors to commence their respective Chapter 11 Cases and, subject to all necessary orders of the Bankruptcy Court, consummate the transactions contemplated in this Agreement.

Section 5.    Assignment; Transfer Restrictions.

(a)    Each Consenting Creditor individually covenants that, from the date hereof until the termination of this Agreement, such Consenting Creditor shall not, directly or indirectly, sell, pledge, hypothecate, or otherwise transfer (each, a "**Transfer**") any Claims, or any option, right to acquire, or voting, participation, or other interest therein, unless such Transfer is to another Consenting Creditor or a purchaser or other entity who executes and delivers, prior to or concurrent with the effectiveness of such Transfer, to the (a) Company and (b)(i) in the case of a Transfer of Claims arising under the First Lien Credit Agreements, to the First Lien Agent and (ii) in the case of a Transfer of Claims arising under the Indenture, to the Indenture Trustee, an agreement in writing (in a form substantially similar to **Exhibit B** hereto, a "**Joinder**") to assume and be bound by all the terms of this Agreement with respect to the relevant Claims or other interests being transferred to or otherwise held by such purchaser. Thereafter, such transferee shall be deemed to be a Consenting Lender or Consenting Noteholder, as applicable, for all purposes of this Agreement.  Upon compliance with the foregoing, the transferor shall be deemed to relinquish its rights and be released from its obligations under this Agreement solely to the extent of such transferred Claims, but shall otherwise remain party to this Agreement as a Consenting Creditor with respect to any Claims not so transferred.

(b)    Notwithstanding anything to the contrary herein, a Qualified Marketmaker (as defined below) that acquires any Claims with the purpose and intent of acting as a Qualified Marketmaker for such Claims shall not be required to execute and deliver a Joinder or otherwise agree to be bound by this Agreement if such Qualified Marketmaker Transfers such Claims within five (5) business days of its acquisition to a Consenting Creditor or a transferee that executes and delivers a Joinder.  As used herein, the term "**Qualified Marketmaker**" means an

8

entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors, and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt); provided, that, until such time as a Joinder is executed and delivered to the parties specified in Section 5(a), the Consenting Creditor shall remain liable for any action taken by a holder of such Claims that would violate the terms of this Agreement if such holder of Claims was a party hereto.

(c)     This Agreement shall in no way be construed to preclude any Consenting Creditor, or any affiliate of a Consenting Creditor, from acquiring additional Claims or other interests in any Debtor, provided, that any such additional Claims or other interests in such Debtor shall automatically be deemed to be subject to all the terms of this Agreement.

Section 6.     No Waiver of Participation and Reservation of Rights.  This Agreement and the Plan are part of a proposed settlement of disputes among the Parties.  Except as expressly provided in this Agreement or the AA Settlement Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its respective rights, remedies, claims and interests, including without limitation, the Consenting Creditors' Claims against any of the Debtors, any liens or security interests that the Consenting Creditors may have in any property, or the Consenting Creditors' full participation in the Chapter 11 Cases.  Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all rights, remedies, claims and interests.

Section 7.     Termination Events.

(a)     Automatic Termination.  This Agreement shall terminate automatically upon the day following the occurrence of any of the following events (each such event, together with the events described in subsections (b), (c), and (d), a "**Termination Event**"), unless waived by the Debtors and the Required Consenting Creditors in writing:

(1)     an order denying confirmation of the Plan is entered;

(2)     an order confirming the Plan is reversed or vacated;

(3)     any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable; or

(4)     occurrence of the effective date of the Plan (the "**Plan Effective Date**").

(b)     Termination by Consenting Creditors.  This Agreement may be terminated by the Required Consenting Creditors upon three (3) business days prior written

9

notice (the "**Notice Period**") to the Company in accordance with Section 13 upon the occurrence of any of the following events, provided that such Termination Event has not been cured before expiration of the Notice Period or waived by the Required Consenting Creditors:

(1)     the Debtors shall not have sent the information memorandum to the French works council on or before January 14, 2015;

(2)     the Debtors shall not have commenced solicitation of creditors holding Second Lien Noteholder Claims, regarding the Plan on or before January 23, 2015;

(3)     the Debtors shall not have filed petitions commencing the Chapter 11 Cases on or before February 9, 2015 (the date of such filing, the "**Petition Date**");

(4)     the Debtors shall not have filed a motion seeking approval of the Disclosure Statement, confirmation of the Plan, approval of the solicitation procedures, and scheduling a confirmation hearing on the Petition Date;

(5)     the DIP Orders are not approved (i) on an interim basis, on or before the fifth business day after the Petition Date, and (ii) on a final basis, on or before the thirty-fifth (35th) day after the Petition Date;

(6)     the order approving the assumption of this Agreement is not approved on or before the thirty-fifth (35th) day after the Petition Date;

(7)     the order approving the Disclosure Statement is not approved on or before the sixtieth (60th) day after the Petition Date;

(8)     in the event the Plan is a Non-Impairment Plan, the Confirmation Order is not approved on or before the sixtieth (60th) day after the Petition Date;

(9)     in the event the Plan is an Impairment Plan, the Confirmation Order is not approved on or before the one-hundred and twentieth (120th) day after the Petition Date;

(10)    the Plan Effective Date shall not have occurred on or before thirtieth (30th) day after entry of the Confirmation Order;

(11)    any of the Definitive Documents, including any amendments, modifications, or supplements thereto are materially inconsistent with the Plan Term Sheet or are not otherwise reasonably acceptable to the Required Consenting Creditors as provided in Section 2(b) hereof;

(12)    the occurrence of any payment event of default under the DIP Facility or DIP Orders;

(13)    the Debtors seek to sell any material assets without the prior written consent of the Required Consenting Creditors;

(14)    the Debtors lose their exclusive right to file or solicit acceptances of a chapter 11 plan;

(15)    the (i) filing by the Company of any motion or other request for relief seeking to dismiss the Chapter 11 Cases or convert the Chapter 11 Case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code, or (ii) entry of an order by the Bankruptcy Court dismissing any of the Chapter 11 Cases or converting any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(16)    the entry of an order by the Bankruptcy Court appointing (i) an examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code, or (ii) a trustee under section 1104 of the Bankruptcy Code;

(17)    the Company or any of the Debtors breach any material obligation under this Agreement or the AA Settlement Agreement that would have a material adverse impact on the confirmation or consummation of the Restructuring;

(18)    Arthur Allen breaches any obligation under the AA Settlement Agreement that would have a material adverse impact on the confirmation or consummation of the Restructuring;

(19)    the Plan and other related Definitive Documents are not amended in a manner that is reasonably acceptable to the Required Consenting Creditors in the event (i) Arthur Allen breaches any obligation under the AA Settlement Agreement, or (ii) the AA Settlement Agreement is not assumed by the Debtors.

(20)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, restricting or prohibiting the consummation of a portion of the Restructuring or affecting the recovery of any Consenting Creditor that cannot be reasonably remedied by the Debtors and would have a material adverse impact on the Restructuring;

(21)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material assets of the Debtors that would have a material adverse effect on the Restructuring; or

(22)    the Bankruptcy Court otherwise grants relief that would have a material adverse effect on the Restructuring or the recoveries of the Consenting Creditors.

(c)    Termination by the Company. This Agreement may be terminated by the Company, after providing counsel for the Consenting Creditors a three (3) business day Notice Period in accordance with Section 13, upon the occurrence of any of the following events, provided that such Termination Event has not been cured before expiration of the Notice Period or waived by the Company:

11

(1)    a Consenting Creditor breaches any material obligation under this Agreement that would reasonably be expected to have a material adverse impact on the confirmation or consummation of the Restructuring;

(2)    the Debtors or their boards of directors determine in good faith and based on the advice of counsel, that (i) taking any action, or refraining from taking any action that would breach their fiduciary obligations under applicable law, or (ii) having received an unsolicited proposal or offer for an alternative restructuring transaction, that such alternative is likely to be more favorable than the Restructuring and that continued support of the Restructuring pursuant to this Agreement would breach their fiduciary obligations under applicable law, provided that the Company may not solicit proposals or offers for alternative restructuring transactions, and that the Company shall provide copies of any offer or proposal to counsel for the Consenting Creditors within one (1) day of the Company's determination that such proposal meets the requirements set forth in the foregoing clause (ii); provided, further, that nothing herein shall prohibit or restrict the Company's participation in Alternative Negotiations (as defined in, and permitted under, the AA Settlement Agreement); .

(3)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction (including the Bankruptcy Court), of any injunction, judgment, decree, charge, ruling or order enjoining, restricting or prohibiting the consummation of a material portion of the Restructuring;

(4)    the Debtors are unable to obtain binding financing commitments for the DIP Facility or Exit Facilities contemplated by the Plan Term Sheet on terms that are reasonably acceptable to the Debtors' boards of directors; provided that the Debtors provide the Consenting Creditors ten (10) business days' notice before declaring a Termination Event on such basis; or

(5)    the Plan and other related Definitive Documents are not amended in a manner that is reasonably acceptable to the Debtors in the event (i) Arthur Allen breaches any obligation under the AA Settlement Agreement, or (ii) the AA Settlement Agreement is not assumed by the Debtors.

(d)    Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement by the Company and the Required Consenting Creditors.

Section 8.    Effect of Termination and of Waiver of Termination Event.

(a)    Effect of Termination.  Upon the valid termination of this Agreement, the rights and obligations of each of the Parties hereunder shall thereupon terminate and be of no further force and effect; provided, however, that the occurrence of a Termination Event shall not relieve any party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination; provided, further, that the occurrence of a Termination Event shall not affect the Company's obligations under Section 3(a)(2) with respect to fees and expenses accrued up to and including such date of termination, and; provided, further that the

12

occurrence of a Termination Event shall not affect any party's rights or obligations under the AA Settlement Agreement except as otherwise expressly provided in the AA Settlement Agreement.

(b) <u>Solicitation Null and Void</u>. Upon the valid termination of the Agreement, any and all consents or ballots tendered by the Consenting Creditors before the occurrence of a Termination Event shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner in connection with the Plan or otherwise.

(c) <u>Waiver of Automatic Stay</u>. The Parties agree that the automatic stay under section 362 of the Bankruptcy Code shall not prohibit any Party from taking any action necessary to effectuate the termination of this Agreement pursuant to the terms hereof.

(d) <u>Waiver of Termination Event</u>. The Required Consenting Creditors may waive the occurrence of a Termination Event under Section 7(b), and the Company may waive the occurrence of a Termination Event under Section 7(c). No such waiver shall affect any subsequent Termination Event or impair any right arising therefrom.

Section 9.    <u>Certain Additional Chapter 11 Matters</u>. Except as otherwise required pursuant to Section 2(b) of this Agreement, to the extent reasonably practicable, the Debtors shall provide draft copies of all first-day motions and all other material motions, pleadings and other documents that the Debtors intend to file with the Bankruptcy Court or other court or regulatory body relating to the Chapter 11 Cases to counsel for the Consenting Creditors at least twenty-four (24) hours prior to the date on which the Debtors intend to file such motions, pleadings and other documents, and shall consult in good faith with such counsel regarding the substance of any such proposed filing.

Section 10.    <u>Amendments</u>. This Agreement, including the Plan Term Sheet and the Plan, may not be modified, amended or supplemented except in writing signed by the Company and the Required Consenting Creditors; <u>provided, however</u>, that any modification or change that has a material, disproportionate (as compared to other Consenting Creditors holding similar Claims) and adverse effect on any Consenting Creditor shall require the consent of such affected Consenting Creditor; <u>provided, further</u>, that this Section 10 shall not be amended without the consent of each Consenting Creditor.

Section 11.    <u>Governing Law; Jurisdiction</u>.    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in either the United States District Court for the Southern District of New York or state court located in the County of New York, State of New York (the "**Chosen Courts**"), and, solely in connection with claims arising under this Agreement: (1) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (a) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; <u>provided, however</u>, upon the commencement and during

the pendency of the Chapter 11 Cases, each of the Parties hereto hereby agrees that the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

Section 12.    <u>Waiver of Jury Trial</u>.    EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.    <u>Notices</u>.    All demands, notices, requests, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by courier service, messenger, email, or by certified, registered or first-class mail, postage prepaid, and shall be deemed to have been duly given or made: (i) upon delivery, if delivered by courier service, or messenger, in each case with record of receipt, (ii) upon transmission if sent by email, or (iii) two (2) business days after being sent by certified, registered or first-class mail, postage pre-paid, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

    (a)    If to the Debtors, to:

> Allen Systems Group, Inc.
> 1333 Third Avenue South
> Naples, Florida 94102
> Attention:  Derek S. Eckelman, EVP and General Counsel
> Email:  derek.eckelman@asg.com
>
> with a copies (which shall not constitute notice or constructive notice) to:
>
> Latham & Watkins LLP
> 355 South Grand Avenue
> Los Angeles, California 90071-1560
> Attention: Peter M. Gilhuly and Ted A. Dillman
> Email: peter.gilhuly@lw.com; ted.dillman@lw.com
>
> - and -
>
> Pachulski Stang Ziehl & Jones LLP
> 919 North Market Street, 17th Floor
> P.O. Box 8705
> Wilmington, Delaware 19899-8705 (Courier 19801)
> Attention: Laura Davis Jones
> Email: ljones@pszjlaw.com

    (b)    If to a Consenting Creditor, to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP

14

1285 Avenue of the Americas
New York, NY 10019-6064
Attention: Alan W. Kornberg and Kelley A. Cornish
Email: akornberg@paulweiss.com; kcornish@paulweiss.com

-and-

Young Conway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Attention: Pauline K. Morgan
Email: pmorgan@ycst.com

(c)     If to Arthur Allen, to:

Genovese Joblove & Battista, P.A.
100 Southeast Second Street, 44th Floor
Miami, FL 33131
Attention: Paul J. Battista
Email: pbattista@gjb-law.com

Section 14.    Entire Agreement.  This Agreement (including all documents and exhibits incorporated herein or attached hereto) constitutes the full and entire understanding and agreement among the Parties with regard to the subject matter hereof, and supersedes all prior agreements with respect to the subject matter hereof; provided, however, that, for the avoidance of doubt, this Agreement does not supersede the AA Settlement Agreement; and provided, further, that any confidentiality agreements, waiver, indemnity letter, or working fee letter executed by a Consenting Creditor and the Company shall survive this Agreement and shall remain in full force and effect in accordance with its terms.

Section 15.    Headings.  The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation of any provision hereof.

Section 16.    Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors and assigns; provided, however, that nothing contained in this paragraph shall be deemed to permit sales, assignments, or transfers other than in accordance with Section 5 hereof.

Section 17.    Specific Performance.  Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach, such other Parties shall be entitled to the remedy of specific performance and injunctive and other equitable relief (without the posting of any bond and without proof of actual damages) in addition to any other remedy to which such Parties may be entitled, at law or in equity.

15

Section 18.    <u>Several, Not Joint, Obligations</u>.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

Section 19.    <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not in the alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

Section 20.    <u>No Waiver</u>.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such compliance.

Section 21.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts and by way of electronic signature and delivery, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.

Section 22.    <u>Severability</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party shall remain valid, binding, and enforceable.

Section 23.    <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

Section 24.    <u>Additional Parties</u>.  Without in any way limiting the provisions hereof, prior to the Petition Date, additional holders of Claims under the Prepetition Debt Documents may become Parties hereto by executing and delivering to the Company a counterpart hereof. Such additional holder shall become a Party to this Agreement as a Consenting Creditor in accordance with the terms of this Agreement.

Section 25.    <u>No Solicitation</u>.  This Agreement is not intended to be, and each signatory to this Agreement acknowledges that this Agreement is not, whether for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise, a solicitation for the acceptance or rejection of a plan of reorganization for any of the Debtors.

Section 26.    <u>Settlement Discussions</u>.  This Agreement and the Restructuring are part of a proposed settlement of claims, controversies and disputes among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

Section 27.    <u>Consideration</u>.  It is hereby acknowledged by the Parties hereto that, other than the agreements, covenants, representations, and warranties set forth herein and in the Plan Term Sheet, no consideration shall be due or paid to the Consenting Creditors for their agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement.

Section 28.    <u>Interpretation and Rules of Construction</u>.  This Agreement is the product of good faith, arm's-length negotiations among the Debtors and the Consenting Creditors, each of which were represented by counsel during the negotiations and drafting of this Agreement. In the enforcement or interpretation of this agreement, there shall be no presumption for or against any Party by reason of that Party having drafted this Agreement, or any portion hereof.

Section 29.    <u>Receipt of Adequate Information; Representation by Counsel</u>.  Each Party acknowledges that it has received adequate information to enter into this Agreement and that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such party shall have no application and is expressly waived.

**[Signature Pages Follow]**

17

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

**COMPANY**

**Allen Systems Group, Inc.**

By: _____

Name: JOHN C. DiDONATO

Title: PRESIDENT

Arthur L. Allen, on behalf of himself, Allen Investment
Group, and ALA Services, LLC

By: _____

Name: Arthur L. Allen
Title: Presidently

Each undersigned fund agrees to this Restructuring Support Agreement and to become a Consenting Creditor. The undersigned funds hold the following Claims:

| | |
|---|---|
| Domestic Term Loan: | $108,240,185 (principal amount) |
| Domestic Revolving Loan: | $12,625,000 (principal amount) |
| Foreign Facility: | $5,050,000 (principal amount) |
| Second Lien Notes: | $52,673,000 (principal amount) |

**LOCUST STREET LLC**

By: FS INVESTMENT CORPORATION I, as Sole Member

By: GSO/BLACKSTONE DEBT FUNDS MANAGEMENT LLC, as Sub-Advisor

By: _____
Name: Thomas Iannarone
Title: Authorized Signatory

**LEHIGH RIVER LLC**

**COBBS CREEK LLC**

By: FS INVESTMENT CORPORATION II, as Sole Member

By: GSO/BLACKSTONE DEBT FUNDS MANAGEMENT LLC, as Sub-Advisor

By: _____
Name: Thomas Iannarone
Title: Authorized Signatory

**FS INVESTMENT CORPORATION**

By: GSO/BLACKSTONE DEBT FUNDS MANAGEMENT LLC, as Sub-Advisor

By: _____

Name: Thomas Iannarone

Title: Authorized Signatory


**FS INVESTMENT CORPORATION II**

By: GSO/BLACKSTONE DEBT FUNDS MANAGEMENT LLC, as Sub-Advisor

By: _____

Name: Thomas Iannarone

Title: Authorized Signatory


**FS INVESTMENT CORPORATION III**

By: GSO/BLACKSTONE DEBT FUNDS MANAGEMENT LLC, as Sub-Advisor

By: _____

Name: Thomas Iannarone

Title: Authorized Signatory

KKR Credit Advisors (US) LLC agrees to this Restructuring Support Agreement and to become a Consenting Creditor.

KKR Credit Advisors (US) LLC is acting on behalf of certain of its managed funds and accounts; such funds and accounts hold the loans and bonds listed below:

| | |
|---|---|
| Domestic Term Loan: | $43,996,191 (principal amount) |
| Domestic Revolving Loan: | $5,131,661 (principal amount) |
| Foreign Facility: | $2,052,664 (principal amount) |
| Second Lien Notes: | $72,509,000 (principal amount) |

**CONSENTING CREDITOR:**

*Nicole J. Macarchuk*

By: KKR Credit Advisors (US) LLC
Name: Nicole J. Macarchuk
Title: Authorized Signatory
Address: 555 California Street, 50th Floor
San Francisco, CA 94104
Facsimile No.: 415-391-3330
Attn.: jeff.smith@kkr.com

Littlejohn Opportunities Master Fund L.P. agrees to this Restructuring Support Agreement and to become a Consenting Creditor.

Littlejohn Opportunities Master Fund L.P. holds the following Claims:

| | | |
|---|---|---|
| Domestic Term Loan: | $ 6,789,296.67 | (principal amount) |
| Domestic Revolving Loan: | $ 791,895.14 | (principal amount) |
| Foreign Facility: | $ 316,757.91 | (principal amount) |
| Second Lien Notes: | $ 8,132,000 | (principal amount) |

**CONSENTING CREDITOR:**

Littlejohn Opportunities Master Fund L.P.

By: _____
Name: Richard Maybaum
Title:   Managing Director
Address:  8 Sound Shore Dr Suite 303
        Greenwich, CT 06830

Facsimile No.: (203) 552-3595
Attn.: *Hondo Sen*

SG Distressed Fund, LP agrees to this Restructuring Support Agreement and to become a Consenting Creditor.

SG Distressed Fund, LP holds the following Claims:

| | | |
|---|---|---|
| Domestic Term Loan: | $_____ | (principal amount) |
| Domestic Revolving Loan: | $_____ | (principal amount) |
| Foreign Facility: | $_____ | (principal amount) |
| Second Lien Notes: | $  3,056,250_____ | (principal amount) |

**CONSENTING CREDITOR:**

SG Distressed Fund, LP

By_____

Name:  Richard Maybaum
Title:   Managing Director
Address:  8 Sound Shore Dr Suite 303
            Greenwich, CT 06830

Facsimile No.:  (203) 552-3595
Attn.:  *Hondo Sen*

Cetus Capital II, LLC agrees to this Restructuring Support Agreement and to become a Consenting Creditor.

Cetus Capital II, LLC holds the following Claims:

| | | |
|---|---|---|
| Domestic Term Loan: | $ 21,654,241.33 | (principal amount) |
| Domestic Revolving Loan: | $ 2,525,723.86 | (principal amount) |
| Foreign Facility: | $ 1,010,289.09 | (principal amount) |
| Second Lien Notes: | $ 25,936,750.00 | (principal amount) |

**CONSENTING CREDITOR:**

Cetus Capital II, LLC

By: _____

Name:  Richard Maybaum
Title:   Managing Director
Address: 8 Sound Shore Dr Suite 303
              Greenwich, CT 06830

Facsimile No.: (203) 552-3595
Attn.: *Hondo Sen*

Ellis Lake Capital, LLC agrees to this Restructuring Support Agreement and to become a Consenting Creditor.

Ellis Lake Capital, LLC holds the following Claims:

| | |
|---|---|
| Domestic Term Loan: | $33,657,086 (principal amount) |
| Domestic Revolving Loan: | $3,925,720 (principal amount) |
| Foreign Facility: | $1,570,288 (principal amount) |
| Second Lien Notes: | $43,954,000 (principal amount) |

CONSENTING CREDITOR:

By: Ellis Lake Capital, LLC
Name: Anthony Pasqua
Title: Authorized Signatory
Address: 444 Madison Avenue
40th Floor
New York, NY 10025
Facsimile No.: 646-417-7771
Attn.: scrocombe@ellislake.com

EXECUTION VERSION

# SCHEDULE 1

**Subsidiaries of the Company to File Chapter 11 Cases**

1. **ASG Federal, Inc.**

2. **Viasoft International, LLC**

**<u>Exhibit A</u>**

**Plan Term Sheet**

**(attached)**

Doc#: US1:9727935v20

EXECUTION VERSION

---

**Allen Systems Group, Inc.**
**Restructuring Term Sheet**
**Summary of Terms and Conditions**

---

This term sheet (the "**Term Sheet**") sets forth the principal terms of the proposed restructuring (the "**Restructuring**") of the Company (as defined below) to be implemented pursuant to a pre-packaged or prenegotiated chapter 11 plan (the "**Plan**") to be filed in the Chapter 11 Cases (as defined below) in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The "**Effective Date**" shall be the date on which the Restructuring is consummated pursuant to the confirmed Plan. This Term Sheet is not a complete list of all the terms and conditions of the potential Restructuring described herein, and shall not constitute an offer to sell or buy, nor the solicitation of an offer to sell or buy any of the securities referred to herein or the solicitation of acceptances of a chapter 11 plan. Any such offer or solicitation shall only be made in compliance with all applicable laws. Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of definitive documentation consistent herewith. This Term Sheet shall be attached to, and incorporated into, a restructuring support agreement (the "**RSA**") entered into by and among the Company, certain existing lenders or holders of securities that are signatories thereto (the "**Consenting Creditors**"), and Arthur L. Allen, on behalf of himself and Allen Investment Group and ALA Services, LLC (together, "**Arthur Allen**"). In the event of an inconsistency between this Term Sheet and the definitive documentation, the provisions of such definitive documentation shall govern. This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and other rules of similar import. Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the RSA, the Domestic Credit Agreement (as defined below) and the Indenture (as defined below), as applicable.

For purposes of this Term Sheet, (i) the term "**Required Consenting Creditors**" shall be defined as Consenting Creditors holding at least 50.1% of the aggregate principal amount of outstanding Second Lien Noteholder Claims (as defined below), and (ii) the term "**Required First Lien Lenders**" shall be defined as Consenting Creditors holding at least 50.1% of the aggregate principal amount of outstanding Domestic Facility Claims (as defined below).

*THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE RESTRUCTURING TRANSACTION, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING. NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL*

EXECUTION VERSION

*RIGHTS, REMEDIES, CLAIMS AND DEFENSES OF THE COMPANY AND CONSENTING CREDITORS.*

| PRINCIPAL PLAN TERMS | |
|---|---|
| **Company** | Allen Systems Group, Inc. ("**ASG**"), a Delaware company, and its direct and indirect U.S. affiliates and subsidiaries (collectively, the "**Company**;" after the Effective Date, the "**Reorganized Company**"). |
| **Current Capital Structure** | The following outstanding indebtedness of, and equity interests in, the Company shall be restructured through the Plan, consistent with the material terms and conditions described in this Term Sheet: |
| | (a) Indebtedness under the Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified, the "**Domestic Credit Agreement**") by and among ASG, as borrower, TPG Allison, LLC, as lender, and TPG Allison Agent, LLC (and its successors), as administrative agent (the "**Domestic Facility Claims**"). As of December 31, 2014, the aggregate principal amount of Domestic Facility Claims was $239,337,000.00 (as may be increased in the amount of the Pre-Filing Loan (as defined below), if any, plus interest at the contract rate). |
| | In addition, Atempo SAS, and certain of the Company's other foreign non-debtor subsidiaries, are indebted pursuant to the Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified, the "**Foreign Credit Agreement**") by and among Atempo SAS, as borrower, Natixis, New York Branch, as lender, and TPG Allison Agent, LLC (and its successors), as administrative agent (the "Foreign Facility Claims"). As of December 31, 2014, the aggregate principal amount of Foreign Facility Claims was $10,000,000.00, plus accrued and unpaid interest, premiums, including the Acceleration Damage Premium in the amount of $1,200,000.00, all unpaid fees and other accrued and unpaid amounts. For avoidance of doubt, the Foreign Facility Claims are claims against foreign non-debtor subsidiaries of the Debtors (as defined |

| | |
|---|---|
| | below) rather than the Debtors themselves. |
| | (b) Indebtedness under the Indenture dated as of November 22, 2010 for the 10.5% Senior Secured Second Lien Notes due 2016 (as further amended, supplemented or otherwise modified, the "**Indenture**") among ASG, as issuer, and the Bank of New York Mellon Trust Company, N.A., as trustee (the "**Second Lien Noteholder Claims**").  As of December 31, 2014, the aggregate principal amount outstanding under the Indenture was $300,000,000.00. |
| | (c) All equity interests in the Company and rights or options to acquire such equity interests owned by existing holders (the "**Existing Equity Interests**"). |
| **Treatment of Claims and Equity Interests** | The Restructuring, to be accomplished through the Plan and the transactions provided for thereby, contemplates, among other things, that based on an enterprise value of $500,000,000.00 of the Reorganized Company: |
| | (a) *DIP Claims*: allowed claims under the DIP Facility (as defined below) shall be paid in full in cash on the Effective Date, unless the DIP Facility lenders agree to less favorable treatment. |
| | (b) *Administrative, Priority, and Priority Tax Claims*: allowed administrative, priority, and priority tax claims will be paid in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| | (c) *Domestic Facility Claims*: |
| | (i) Deemed allowed pursuant to the Plan in the amount of all outstanding Obligations under the Domestic Credit Agreement, including principal in the amount of $239,337,000.00, pre-petition accrued and unpaid interest at the default rate in the amount of $42,764,868.12, post-petition interest accrued at the default rate, premiums, including the Acceleration Damage Premium, in the amount of $28,720,440.00, all unpaid fees in the amount of $3,647,082.00, and any other accrued and unpaid amounts; and |
| | (ii) Will be paid on the Effective Date in full, in cash, unless the holders of two-thirds (2/3rds) in amount of the Domestic Facility Claims agree to less |

favorable treatment, including the terms of such less favorable treatment, in which case such less favorable treatment shall be binding on all holders of Domestic Facility Claims.

(d) *Second Lien Noteholder Claims*:

(i) (A)  In a Non-Impairment Plan (as defined below), the Second Lien Noteholder Claims shall be allowed in the principal amount equal to $300,000,000.00, plus accrued and unpaid interest (which pre-petition interest, including interest to the extent owing under the applicable documents, totals $39,596,525.39 as of January 30, 2015) and shall receive the treatment set forth in clause (ii) hereof in full and final satisfaction of their Second Lien Noteholder Claims (for avoidance of doubt, the Noteholder Deficiency Claims (as defined below) shall not be separately classified under the Plan and any distributions thereon shall be waived), or (B) in an Impairment Plan (as defined below), the Second Lien Noteholder Claims shall be deemed allowed pursuant to the Plan in the secured amount of $170,567,012.66; and the unsecured portion of the Second Lien Noteholder Claims shall be deemed allowed in the aggregate amount of $169,029,512.73 (the "**Noteholder Deficiency Claims**")[1]; and

(ii)  Will receive on the Effective Date in full and final satisfaction of the Second Lien Noteholder Claims (a) their pro rata share of (1) 41.5% if the Plan is a Non-Impairment Plan or (2) 32.0% if the Plan is an Impairment Plan, of the new common stock to be issued by the Reorganized Company (the "**New Common Stock**"), subject to dilution from equity issued under the Management Incentive Plan (as defined below), the Warrants (as provided for and defined in the AA Settlement Agreement), and, if applicable, any equity issued to the Backstop Parties (as defined below) on account of the backstop fees, and (b) accredited investors or qualified institutional buyers ("**Eligible Holders**") who are holders of Second Lien Noteholder Claims shall receive rights to participate in the Rights Offering.

---

[1]  The allowed secured amount of the Second Lien Noteholder Claims and Noteholder Deficiency Claims assume a Pre-Filing Loan (as defined below) in the amount of $2,500,000.00 and shall be adjusted accordingly in the event the Pre-Filing Loan is less than $2,500,000.00.

EXECUTION VERSION

(e) *Unsecured Claims*:

(i) In the event the Company satisfies the GUC Settlement Condition (as defined below) on or before January 20, 2015 (or such later date as may be agreed in writing by the Company and Required Consenting Creditors), unsecured claims other than the Noteholder Deficiency Claims (the "**Other Unsecured Claims**") shall be treated as unimpaired under the Plan (such Plan, a "**Non-Impairment Plan**").

(ii) In the event the Company does not satisfy the GUC Settlement Condition (as defined below) on or before January 20, 2015 (or such later date as may be agreed in writing by the Company and Required Consenting Creditors), Other Unsecured Claims shall be impaired under the Plan (such Plan, an "**Impairment Plan**"), and holders of allowed Other Unsecured Claims, shall receive their pro-rata share of cash in the total amount of $400,000.00. For avoidance of doubt, the Noteholder Deficiency Claims shall be deemed to be waived for distribution purposes. In an Impairment Plan, holders of Other Unsecured Claims shall be deemed to reject the Plan, shall not be solicited, and the Company shall seek cramdown of general unsecured claims in connection with the confirmation of the Plan.

For purposes of this Term Sheet, the term "**GUC Settlement Condition**" shall be defined as the Company's entry, with the prior written consent of the Required Consenting Creditors, into binding agreements with the holders of claims listed on Exhibit D hereto (such claims, the "**Deferred Purchase Claims**") providing for the cash settlement of such Claims at a discount.

(f) *Existing Equity Interests*: Existing Equity Interests in ASG will not receive or retain on account of such Interests any distribution, property or other value under or pursuant to the Plan. All Existing Equity Interests in ASG will be extinguished on the Effective Date. Existing Equity Interests between a Debtor and another Debtor or the non-debtor subsidiaries of the Debtors shall be reinstated.

Doc#: US1:9802504v4

| | |
|---|---|
| **DIP Facility** | The Company will enter into a debtor-in-possession credit facility in the aggregate principal amount of up to $50,000,000.00 (the "**DIP Facility**"). The proceeds of the DIP Facility will be used (i) to fund the costs of the Chapter 11 Cases, (ii) to provide working capital to the Company as needed during the Chapter 11 Cases and (iii) to repay the Pre-Filing Loans (as defined below), if any, upon entry of an interim order by the Bankruptcy Court approving the DIP Facility. |
| | The Consenting Creditors shall consent to (and direct the First Lien Agent and the Indenture Trustee to consent to) the Debtors' entry into the DIP Facility. The DIP Facility shall be secured by first priority liens and super-priority claims on substantially all of the assets of the Debtors, which shall be senior to all liens and Claims securing the Claims arising under the Prepetition Debt Documents, and shall be on terms acceptable to the Debtors and the Required First Lien Lenders, provided that no interest shall be paid on the Domestic Facility Claims or Foreign Facility Claims as adequate protection during the Chapter 11 Cases, without prejudice to the payment of such accrued and unpaid interest as part of the allowed Domestic Facility Claims and Foreign Facility Claims. So long as the principal terms of the DIP Facility are acceptable to the Required First Lien Lenders, each Consenting Creditor agrees and covenants that: (a) it shall not, directly or indirectly, object to or otherwise commence any proceeding opposing any of the terms of the DIP Facility or the interim or final orders of the Bankruptcy Court related thereto, and each Consenting Creditor hereby consents to the attachment of the priming liens as contemplated by the DIP Facility and the interim and final orders of the Bankruptcy Court related thereto; and (b) (i) in the case of each Consenting Lender, it shall direct the First Lien Agent to do the same, and (ii) in the case of each Consenting Noteholder, it shall direct the Indenture Trustee to do the same. The terms of the DIP Facility may be supplemented, amended or modified with the consent of the Company and the Required First Lien Lenders. |

EXECUTION VERSION

| Rights Offering | Eligible Holders of the Second Lien Noteholder Claims (collectively, the "**Eligible Noteholders**" and individually, an "**Eligible Noteholder**") will receive the option to subscribe to purchase (a) 58.5% of the New Common Stock for the total amount of $130,000,000.00 if the Plan is a Non-Impairment Plan and (b) 68.0% of the New Common Stock for the total amount of $150,000,000.00 if the Plan is an Impairment Plan (the "**Rights Offering Amount**") pursuant to a rights offering that will be allocated on a pro rata basis in proportion to the aggregate principal amount of the Second Lien Noteholder Claims held by each Eligible Noteholder to the aggregate principal amount of all Second Lien Noteholder Claims (the "**Rights Offering**," the terms of which are described more particularly in Exhibit A hereto). The New Common Stock issued pursuant to the Rights Offering will be subject to dilution from equity issued under the Management Incentive Plan, the Warrants, and, if applicable, any equity issued to the Backstop Parties (as defined below) on account of the backstop fees.<br><br>The Noteholders listed in Exhibit A hereto (the "**Backstop Parties**") agree to backstop the Rights Offering in the respective amounts set forth therein on a pro rata basis in proportion to the aggregate principal amount of the Second Lien Noteholder Claims held by each Backstop Party to the aggregate principal amount of all Second Lien Noteholder Claims held by all Backstop Parties.<br><br>The Company shall pay an aggregate fee of 2% of the Rights Offering Amount, payable in cash (except as otherwise provided on Exhibit A) to the Backstop Parties *pro rata* based on the proportion of the Rights Offering Amount backstopped by each such Backstop Party. |
| --- | --- |
| Exit Facilities | (a) The Debtors shall obtain term facilities on the Effective Date, comprising (i) a first lien term loan facility in the minimum principal amount of $150,000,000.00 (the "**First Lien Term Facility**"), and (ii) a second lien term loan facility in the maximum principal amount of $90,000,000.00 (the "**Second Lien Term Facility**" and together with the First Lien Term Facility, the "**Term Facilities**"). The Second Lien Term Facility shall be fully backstopped by the Consenting Creditors on the terms set forth on Exhibit B hereto and otherwise acceptable |

EXECUTION VERSION

| | |
|---|---|
| | to the Company and the Required Consenting Creditors. The Second Lien Term Facility shall be marketed by the Company in consultation with the First Lien Term Facility lender (once selected). To the extent the principal amount of the First Lien Term Facility exceeds $150,000,000.00, the maximum principal amount of the Second Lien Term Facility shall be reduced on a dollar-for-dollar basis. If the Debtors are not able to obtain binding commitments for the Second Lien Term Facility reasonably acceptable to the Company and the Required Consenting Creditors on or before the filing of the forms of documents, agreements, schedules, and exhibits to the Plan (the "**Plan Supplement**"), the Second Lien Term Facility shall be provided by the Consenting Creditors in accordance with each Consenting Creditor's pro rata share of Domestic Facility Claims, and its terms shall be included in the Plan Supplement (unless otherwise agreed by the Debtors and Required Consenting Creditors).<br><br>(b) The Company shall also enter into a revolving credit facility in the principal amount of $25,000,000.00 (the "**Revolving Credit Facility**;" and together with the Term Facilities, the "**Exit Facilities**") on terms reasonably acceptable to the Debtors and Required Consenting Creditors. The Revolving Credit Facility shall be senior in priority to the Term Facilities.<br><br>The terms of the Exit Facilities shall be included in the Plan Supplement. |
| **Arthur Allen Settlement** | The Settlement Agreement by and among the Company, Arthur L. Allen, Allen Investment Group, ALA Services, LLC, and the Consenting Creditors dated as of December 10, 2014 (the "**AA Settlement Agreement**"), which is attached hereto as Exhibit C, shall be incorporated into and assumed as part of the confirmed Plan. |
| **Reorganized ASG Corporate Form** | Reorganized ASG will be a subchapter C corporation organized under Delaware law. |
| **Board Members/Corporate Governance** | The Board of Directors of the Company will be selected by the Required Consenting Creditors prior to the Confirmation Date, and will be composed of 7 members, one (1) of whom shall be the CEO (the "**New Board**"). The CEO shall be acceptable to the Required Consenting Creditors. The Company's Articles of Incorporation and |

| | |
|---|---|
| | Bylaws will be amended and restated in form and substance satisfactory to the Required Consenting Creditors. |
| **Management Incentive Plan** | Following the Effective Date, the New Board shall adopt a management incentive plan (the "**Management Incentive Plan**"), making up to 10% of the New Common Stock available to the participants in the Management Incentive Plan (collectively, the "**MIP Shares**") through direct equity, options, warrants and/or restricted stock awards, as determined by the New Board. The vesting, apportionment and granting of the MIP Shares shall be determined by the New Board.

Consenting Creditors shall not object to, nor request that any party object to, the timely (prepetition and postpetition) fulfillment and indefeasible payment of the Company's obligations under the following existing management incentive plans, as and when required to be paid pursuant to the terms thereof: (a) the 2014 General Management Incentive Plans approved by the Company's board of directors on September 23, 2014 providing for certain incentive payments to the plan participants named therein; (b) the 2014 Key Executive Transaction Incentive Plan approved by the Company's board of directors on August 29, 2014 providing for certain incentive payments to the plan participants named therein; and (c) the Key Employee Transaction Incentive Plan approved by the Company's board. |
| **Conditions Precedent to Consummation of the Plan** | Unless waived in writing by the Debtors, on the one hand, and the Required Consenting Creditors and Required First Lien Lenders, on the other hand, the occurrence of the Effective Date will be subject to the satisfaction of customary conditions precedent, and the satisfaction of such other conditions precedent agreed upon by the Required Consenting Creditors and Required First Lien Lenders, as applicable, and the Company, including but not limited to, the following:

• The negotiation, execution and delivery of definitive documentation with respect to the Restructuring contemplated by this Term Sheet and the RSA, reasonably acceptable to the Required Consenting Creditors and Required First Lien Lenders, as applicable, and otherwise consistent with the terms and conditions described in this Term Sheet and the RSA. |

EXECUTION VERSION

| | |
|---|---|
| | <ul><li>Confirmation of the Plan by the Bankruptcy Court on terms consistent with this Term Sheet and the RSA.</li><li>Approval of the AA Settlement Agreement by the Bankruptcy Court pursuant to and under the Plan.</li><li>Amendment of the AA Leases (as defined in the AA Settlement Agreement) on the terms set forth in the AA Settlement Agreement.</li><li>The order confirming the Plan shall have been entered and shall not have been stayed, modified or vacated on appeal.</li><li>All proceeds of the Rights Offering and (to the extent the Term Facilities will be funded in cash) the Term Facilities shall be available to the Reorganized Debtors on the Effective Date.</li><li>Payment by the Company of all accrued and unpaid fees and expenses of the Consenting Creditors in connection with the Restructuring including, without limitation, the fees and expenses incurred by (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**"), (b) Blackstone Advisory Partners L.P. ("**Blackstone**"), (c) Young Conaway Stargatt & Taylor, LLP ("**YCST**"), and (d) any other professionals that may be retained by the Consenting Creditors in connection with the Restructuring approved by the Debtors in their reasonable discretion.</li><li>The Foreign Facility Claims shall be paid in full, in cash unless otherwise agreed by the lenders under the Foreign Credit Agreement.</li><li>The French Works Council process is completed.</li></ul> |
| **Releases** | To the fullest extent permitted by applicable law, the Plan shall include a full release from liability in favor of the Consenting Creditors, the Backstop Parties, the lenders under the DIP Facility, the lenders under the Exit Facilities, ASG and its direct and indirect subsidiaries and their respective current and former officers and directors, agents, attorneys and advisors, and Arthur Allen (collectively, the "**Released Parties**"), on behalf of, and in favor of, each other and their respective affiliates, officers, directors, agents, attorneys and advisors (in their |

| | |
|---|---|
| | capacities as such) with respect to the Restructuring, the transactions contemplated hereby or thereby, and all claims (as defined in Bankruptcy Code section 101(5)). |
| **Exculpation and Injunctions** | The Plan will contain exculpation and injunction provisions customary for cases pending in Delaware. |
| **Claims of the Debtors** | The Reorganized Company will retain all rights to commence and pursue any causes of action, other than any causes of action released by the Debtors pursuant to the release and exculpation provisions outlined in this Term Sheet. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in this Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing claims or interests, including the Domestic Credit Agreement and the Indenture, shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Company will issue and execute all securities (including, without limitation, the Warrants in accordance with the AA Settlement Agreement), notes, instruments, certificates, and other documents required to be issued and executed in accordance with the Plan. |
| **Repayment of Foreign Facility Claims** | On the Effective Date, the Foreign Facility Claims shall be paid in full in cash. |

EXECUTION VERSION

| PLAN PROCESS AND RELATED MATTERS | |
|---|---|
| **Implementation of Restructuring and Definitive Documentation** | The RSA will be terminable upon the conditions contained therein.<br><br>The RSA will require Consenting Creditors, and any successors or assigns thereof, to (i) approve, support and participate in the Restructuring, as applicable, and (ii) vote to accept the Plan with respect to all claims held by such holders, subject to the receipt of appropriate disclosure and solicitation materials.<br><br>The Company and the Required Consenting Creditors and Required First Lien Lenders, as applicable, will, in good faith, negotiate definitive documentation to implement the Restructuring that is consistent with the terms set forth in this Term Sheet and any related documentation, including, without limitation, the RSA, the Plan and Disclosure Statement (as defined below), all post-Effective Date corporate organization and governance documents, and all other documents necessary to effectuate the Restructuring. |
| **Pre-Filing Funding, if Necessary** | In the event that the Company lacks adequate liquidity prior to the commencement of the Chapter 11 Cases, Consenting Creditors, in their sole discretion, will provide up to the aggregate amount of $2,500,000.00 of additional liquidity to the Company under the Domestic Credit Agreement (the "**Pre-Filing Loan**").<br><br>The proceeds of the Pre-Filing Loan may be used by the Company:<br><br>(a) to pay all pre-filing accrued and unpaid fees and expenses of the Company and the Consenting Creditors incurred in connection with the Restructuring;<br><br>(b) in the event the Company satisfies the GUC Settlement Condition, to pay amounts used to settle Deferred Purchase Claims if required under the settlements to be paid pre-filing; and<br><br>(c) upon the prior written consent of the Required First Lien Lenders, to satisfy other necessary pre-filing ordinary course of business funding requirements. |

EXECUTION VERSION

| | |
|---|---|
| **Commencement of Chapter 11 Cases** | ASG, ASG Federal, Inc., and Viasoft International, LLC (collectively, the "**Debtors**") will file voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**") in the Bankruptcy Court. The Plan and accompanying disclosure statement describing the Plan (the "**Disclosure Statement**") will be filed contemporaneously with commencement of the Chapter 11 Cases. |
| **Critical and Foreign Vendors and other First Day Motions** | The Debtors will seek to honor and pay the claims of critical domestic suppliers and vendors ("**Critical Vendor Claims**"), and the claims of foreign suppliers and vendors ( "**Foreign Vendor Claims**") through appropriate first-day motions; provided, however, that the Debtors shall provide a list of Critical Vendor Claims and Foreign Vendor Claims to the Consenting Creditors seven (7) days prior to the Petition Date, and the Critical Vendor Claims and Foreign Vendor Claims to be paid shall be reasonably acceptable to the Required Consenting Creditors.<br><br>The Debtors shall also seek to maintain their existing cash management system and other customary first-day relief pursuant to first-day motions, which will include authority to pay the claims of creditors of non-Debtor subsidiaries in the ordinary course of business. The Consenting Creditors shall not object to such motions. |
| **Chapter 11 Milestones** | Specified in the RSA. |

EXECUTION VERSION

## EXHIBIT A

### Backstop Parties/Terms of Rights Offering

| | |
|---|---|
| *Issuer*.................................................. | Allen Systems Group, Inc. (the "**Company**") |
| *Rights*................................................ | Rights to subscribe (the "**Subscription Rights**") to purchase shares of the New Common Stock to be issued by the Reorganized Company as provided herein. |
| *Rights Offering*................................... | The Company will offer as described herein Eligible Holders of Second Lien Noteholder Claims (the "**Eligible Noteholders**") the Subscription Rights (the "**Rights Offering**"). |
| *Rights Offering Amount* | If the Plan is a Non-Impairment Plan, the amount raised in the Rights Offering in exchange for the Rights Offering Shares shall be $130,000,000.00. If the Plan is an Impairment Plan, the amount raised in the Rights Offering in exchange for the Rights Offering Shares shall be $150,000,000.00 (the "**Rights Offering Amount**"). |
| *Rights Offering Shares*........................ | If the Plan is a Non-Impairment Plan, the Subscription Rights shall be 58.5% of the New Common Stock to be issued on the Effective Date in exchange for the applicable Rights Offering Amount, or if the Plan is an Impairment Plan, 68.0% of the New Common Stock to be issued on the Effective Date in exchange for the applicable Rights Offering Amount (the "**Rights Offering Shares**"), in each case, subject to dilution from equity issued under the Management Incentive Plan, the Warrants and, if applicable, any equity issued to the Backstop Parties on account of the backstop fees. |
| *Allocation*.......................................... | Each Eligible Noteholder shall receive Subscription Rights allocated on a pro rata basis in proportion to the aggregate principal amount of the Second Lien Noteholder Claims held by such Eligible Noteholder to the aggregate principal amount of all Second Lien Noteholder Claims. |

| | |
|---|---|
| *Subscription Price* ... ... ... ... ... | The purchase price per share of New Common Stock applicable to the Subscription Rights (the "**Exercise Price**") shall be determined by dividing the applicable Rights Offering Amount by the number of shares of New Common Stock that constitute the Rights Offering Shares. |
| *Expiration* ......................................... | The Subscription Rights will expire [30] days after the distribution of the Subscription Rights in the Rights Offering. |
| *Distribution of Subscription Rights; Exercise; Non-Transferable; No Revocation of Exercise* ....................... | The Subscription Rights will be distributed by Epiq Systems, Inc. or another party designated by the Debtors or Reorganized Debtors, as applicable and shares of New Common Stock purchased pursuant to the exercise of Subscription Rights will be distributed by the Reorganized Debtors or a transfer agent designated by the Debtors or Reorganized Debtors, as applicable. Each Eligible Noteholder may exercise its Subscription Rights for some or all of the shares of New Common Stock applicable to such Subscription Rights or may choose not to exercise its Subscription Rights. |
| | The Subscription Rights shall not be transferable. |
| | All exercises of Subscription Rights are irrevocable (except as required by law) and may not be withdrawn. |
| *Subscription Agreements* .................... | The purchase of shares of New Common Stock pursuant to the exercise of Subscription Rights by Eligible Noteholders will be made pursuant to subscription agreements ("**Subscription Agreements**"). The Subscription Agreements shall include, along with other customary provisions, representations, warranties, covenants and indemnification provisions, including representations and certifications that the purchaser is an Eligible Noteholder. As of the delivery of the Subscription Agreement to the Company and by virtue of a subscription acceptance notice from the Company, each Eligible Noteholder that submitted a Subscription Agreement in appropriate form shall be obligated to purchase the shares of New Common Stock |

which it subscribed to purchase, as set forth in the Subscription Agreement.

Over-Subscription.............................. Eligible Noteholders may request to subscribe for more than their pro rata share of the Rights Offering in accordance with the applicable Subscription Agreements. To the extent any Eligible Noteholder does not fully exercise its Subscription Rights, oversubscriptions shall be accepted on a pro rata basis (up to the amount of such oversubscription) before any unsubscribed portion is sold to the Backstop Parties.

Anti-dilution...................................... The Subscription Rights in the Rights Offering will be subject to standard anti-dilution adjustments.

Backstop Parties................................ GSO / Blackstone Debt Funds Management LLC and certain of its sub-advised funds and affiliates ("**GSO**"), KKR Credit Advisors (US) LLC and certain of its managed funds ("**KKR**"), Cetus Capital LLC and certain of its managed funds ("**Cetus**"), and Ellis Lake Capital, LLC and certain of its managed funds ("**Ellis Lake**", and together with GSO, KKR and Cetus, the "**Backstop Parties**").

Backstop Commitment ........................ Pursuant to the terms of a support agreement (the "**Backstop Support Agreement**"), each Backstop Party will be required to purchase shares of New Common Stock up to an aggregate amount equal to the following percentage of the Rights Offering Amount (with respect to each Backstop Party, its "**Backstop Commitment**"):

GSO: 25.5%
KKR: 35.2%
Cetus Capital: 18.0%
Ellis Lake: 21.3%

In the event that Eligible Noteholders have not exercised Subscription Rights representing the full Rights Offering Amount, and such under-subscriptions are not sold pursuant to the oversubscription provisions noted herein, each Backstop Party will be required to purchase up to the aggregate amount of shares of New Common Stock representing its Backstop Commitment. The number of shares of New Common Stock so purchased by any Backstop Party in respect of its

Backstop Commitment will be reduced by the number of shares of New Common Stock subscribed for and purchased by Eligible Noteholders. Each Backstop Party must exercise its Subscription Rights, if any, in the Rights Offering.

A Backstop Party may only transfer all or part of its Backstop Commitment to the other Backstop Parties or otherwise to a party reasonably acceptable to the Company.

*Backstop Commitment Fee .....*   The Company shall pay to each Backstop Party a fee equal to 2% of such Backstop Party's Backstop Commitment, which shall be payable in cash, unless (a) the Company's domestic cash balance on the Effective Date would be less than $1,000,000.00 (i) after taking into account the payment of such backstop fee in cash and any and all payments or reserves for obligations to be paid under the Plan on or after the Effective Date (including payments or reserves for administrative, priority or professional claims) and (ii) without the Company drawing on the Revolving Credit Facility, or (b) otherwise agreed by the Company and the Required Consenting Creditors, in which case such fee shall be paid solely in New Common Stock. For avoidance of doubt, such fee shall be paid either fully in cash or fully in New Common Stock.

EXECUTION VERSION

*Backstop Support Agreement* .............. The Backstop Support Agreement will include customary non-performance based and non-financial conditions precedent to each Backstop Party's Backstop Commitment (unless waived by the Required Consenting Creditors), including, without limitation, (i) the RSA and Backstop Support Agreement shall not have been terminated, (ii) no material adverse change, (iii) the Confirmation Order shall have been entered confirming the Plan and approving the Restructuring on terms materially consistent with this Term Sheet and otherwise reasonably acceptable to the Required Consenting Creditors, and (iv) substantial consummation of the Plan and the Restructuring shall not be enjoined or materially restricted by any order of a governmental entity of competent jurisdiction over the Debtors.

*Termination of Backstop Commitments* ..................................... The Company and the Backstop Parties have agreed to, and the Backstop Support Agreement will reflect, customary termination provisions permitting the Backstop Parties to terminate their respective Backstop Commitments in certain circumstances, including, but not limited to, if (i) any inquiry, investigation (whether formal or informal) or other proceeding is commenced by any governmental authority pursuant to applicable laws in relation to the Company or any of its subsidiaries or any of its officers or managers which operates to prevent, materially restrict or materially alter the Restructuring, including the Rights Offering, (ii) any order is issued by a governmental entity pursuant to applicable laws, or any change in law, which operates to prevent, materially restrict or materially alter the Restructuring, including the Rights Offering, and (iii) a material adverse change occurs after the RSA is executed in respect of the Company and its subsidiaries taken as a whole. Notwithstanding the foregoing, the Chapter 11 Cases or any event or circumstance resulting immediately therefrom, shall not provide a basis of termination.

EXECUTION VERSION

*Fees and Expenses* ............................. The Company will pay the reasonable fees and expenses related to the Rights Offering, including the reasonable fees and expenses of the Backstop Parties incurred in connection with the Backstop Commitment whether or not the Backstop Commitment is consummated (including fees and expenses of counsel to the Backstop Parties).

*Use of Proceeds* ................................ Proceeds from the Rights Offering will be used to pay the Domestic Facility Claims and Foreign Facility Claims on the Effective Date, with any remaining proceeds to be used to fund disbursements under the Plan and/or for general corporate purposes.

EXECUTION VERSION

## EXHIBIT B

### Terms of Second Lien Term Loan Facility

| | |
|---|---|
| *Borrower* | Allen Systems Group, Inc. (the "**Company**") |
| *Description* | A second lien term loan facility in the maximum principal amount of ninety million dollars ($90,000,000.00); provided that, the maximum principal amount of the Second Lien Term Facility shall decrease proportionally for every dollar that the principal amount of the First Lien Term Facility exceeds $150,000,000.00. |
| *Maturity* | Two (2) years after maturity of First Lien Term Loan Facility. |
| *Interest* | 11% per annum, paid in kind semi-annually until maturity. |
| *Commitment Fee* | None |
| *Amortization* | None |
| *Collateral* | A second priority perfected lien and security interest on substantially all assets of the Company (subject to customary exceptions). |
| *Guarantees* | TBD |
| *Collateral* | A second priority perfected lien and security interest on all assets of the Company. |
| *Representations/Warranties/ Covenants* | No financial covenants.  Other representations, warranties and covenants TBD. |

EXECUTION VERSION

## EXHIBIT C

## AA Settlement Agreement

EXECUTION COPY

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT is made and entered into as of December 10, 2014 (the "**Settlement Agreement**") by and among (i) Allen Systems Group, Inc., a Delaware corporation (the "**Company**"), (ii) Arthur L. Allen ("**Arthur Allen**"), (iii) Allen Investment Group ("**Investment Group**"), ALA Services, LLC ("**ALA Services**"), (iv) each of the undersigned lenders (the "**Consenting Lenders**") of the Loans (as defined below) under (a) that certain Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified, the "**Credit Agreement**") by and among the Company, as borrower, TPG Allison, LLC as lender, and TPG Allison Agent, LLC, as administrative agent, and (b) that certain Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified, the "**Foreign Credit Agreement**" and together with the Credit Agreement, the "**First Lien Credit Agreements**") by and among Atempo SAS ("**Atempo**"), as borrower, Natixis, New York Branch, as lender, and TPG Allison Agent, LLC, as administrative agent, and (v) each of the undersigned holders (the "**Consenting Noteholders**", and together with the Consenting Lenders, the "**Consenting Creditors**") of the Notes (as defined below) under that certain Indenture dated November 22, 2010 (as amended, supplemented or otherwise modified from time to time, the "**Indenture**", and together with the First Lien Credit Agreements and other documents related thereto, the "**Prepetition Debt Documents**") by and among the Company as issuer, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A., as trustee. The Company, Arthur Allen, Investment Group and the Consenting Creditors are each referred to herein as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.     **WHEREAS**, Arthur Allen is the founder, sole shareholder, Chief Executive Officer and President of the Company;

B.     **WHEREAS**, Investment Group, an entity owned and operated by Arthur Allen, and the Company entered into that certain Building Lease dated November 14, 1996 (as further amended, supplemented or otherwise modified, the "**1333 Building Lease**"), whereby the Company leased from Investment Group that certain real property located at 1333 Third Avenue South, Naples, Florida;

C.     **WHEREAS**, Arthur Allen and the Company entered into that certain Triple Net Building Lease dated November 1, 2004 (as further amended, supplemented or otherwise modified, the "**704 Building Lease**"), whereby the Company leased from Arthur Allen that certain real property located at 704 Goodlette Road, Naples, Florida;

D.     **WHEREAS**, Arthur Allen and the Company entered into that certain Triple Net Building Lease dated May 31, 2002 (as further amended, supplemented or otherwise modified, the "**708 Building Lease**"), whereby the Company leased from Arthur Allen that certain real property located at 708 Goodlette Road, Naples, Florida;

E.      **WHEREAS,** Arthur Allen and the Company entered into that certain Triple Net Building Lease dated April 1, 2005 (as further amended, supplemented or otherwise modified, the "**Hangar Lease**"), whereby the Company leased from Arthur Allen that certain real property located at 300 Freedom Way, Naples, Florida;

F.      **WHEREAS,** ALA Services, an entity owned and operated by Arthur Allen, and the Company entered into that certain Aircraft Lease Agreement dated November 17, 2005 (as further amended, supplemented or otherwise modified, the "**Aircraft Lease**" and, together with the 1333 Building Lease, the 704 Building Lease, the 708 Building Lease and the Hangar Lease, the "**AA Leases**"), whereby the Company leased an aircraft from ALA Services, LLC;

G.      **WHEREAS,** Arthur Allen asserts that as of November 30, 2014, the Company owes Arthur Allen substantial amounts under the AA Leases;

H.      **WHEREAS,** the Consenting Creditors assert that the Company has claims and causes of action against Arthur Allen and his affiliated entities arising from or related to the AA Leases and that certain Salary and Advance and Repayment Agreement dated August 19, 2013 (the "**Salary and Advance Agreement**");

I.      **WHEREAS,** Arthur Allen disputes the existence and validity of the alleged claims or causes of action that the Consenting Creditors and Company assert against Arthur Allen;

J.      **WHEREAS,** the Company asserts that as of November 30, 2014, not less than $295,648.06 remains due and owing to the Company under the Salary and Advance Agreement and for various personal services the Company provided to Arthur Allen and his family;

K.      **WHEREAS,** as of November 30, 2014, the aggregate principal amount of the loans outstanding under the First Lien Credit Agreements was $249,337,000.00 (the "**Loans**"), and the aggregate principal amount of the notes outstanding under the Indenture was $300,000,000.00 (the "**Notes**", and together with the Loans, the "**Debt**"); the Consenting Creditors hold 100% of the Loans outstanding under the First Lien Credit Agreements and approximately 68.8% of the Notes outstanding under the Indenture and various outstanding events of default exist under the Prepetition Debt Documents;

L.      **WHEREAS,** the Parties have engaged in good faith, arm's-length negotiations and have agreed to support and effectuate a restructuring (the "**Restructuring**") of the Company's capital structure and outstanding obligations under the Prepetition Debt Documents to be implemented pursuant to a pre-packaged chapter 11 plan (the "**Plan**"), the principal terms of which (i) are described in the draft Restructuring Support Agreement attached hereto as **Exhibit A** (the "**RSA**") and the draft Plan Term Sheet attached hereto as **Exhibit B** (the "**Plan Term Sheet**"), which contemplate, among other things, a deleveraging of the Company through a debt-for-equity exchange, whereby the holders of the Notes under the Indenture will receive, on account of their Notes and/or through participation in a rights offering, 100 percent of the

common stock to be issued by the reorganized Company (subject to dilution as provided in the Plan and this Settlement Agreement), and (ii) shall incorporate the terms of, and provide for the assumption or approval of, this Settlement Agreement;

M.    **WHEREAS**, the Parties intend that the Company and certain of its subsidiaries will effectuate the Restructuring by commencing voluntary chapter 11 cases (collectively, the "**Chapter 11 Cases**," and the entities filing the Chapter 11 Cases, the "**Debtors**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

N.    **WHEREAS**, the Parties desire to compromise and settle any and all claims and disputes the Parties may have against each other to avoid the risks, costs and delay of potential litigation that could be commenced between the Parties;

O.    **WHEREAS**, as a result of extensive good faith, arm's-length negotiations, the Parties have resolved to enter into this Settlement Agreement to amend the AA Leases and settle all disputes, claims and causes of action between Arthur Allen, ALA Services and Investment Group, on the one hand (the "**AA Claims**"), and the Company and the Consenting Creditors, on the other hand, including, among other things, those arising with respect to the AA Leases and the Salary and Advance Agreement; and

**NOW, THEREFORE**, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE I
## PROVISIONS REGARDING ARTHUR ALLEN RESIGNATION

1.1    **Resignation**.

(a)    On the Settlement Effective Date (as defined in Section 3.1 below), Arthur Allen shall be deemed to have resigned from any and all positions he holds with the Company and its affiliates (including non-Debtor affiliates), including, without limitation, as a director, officer, employee, representative, or agent, and any other positions held in any other capacity, and hereby acknowledges and agrees to take any further actions required or reasonably requested by the Company or the Debtors to effectuate such resignations.

(b)    As of the Settlement Effective Date, Arthur Allen shall have no authority to act on behalf of the Company or any of its affiliates (including non-Debtor affiliates), and shall not hold himself out as having such authority, nor shall he enter into any agreement or incur any obligations on behalf of the Company or any affiliates. Notwithstanding the foregoing, from the Settlement Effective Date until January 20, 2015, Arthur Allen shall have the non-exclusive right to engage in negotiations with those third parties listed in that separate side letter dated as of the date hereof (each such third party, an "**Approved Third Party**") regarding a potential

3

transaction that would refinance in full in cash all amounts due and owing under the Prepetition Debt Documents (the "**Alternative Negotiations**"); provided, however, that Arthur Allen shall notify and provide the Company and the Consenting Creditors with the opportunity, and the Company and Consenting Creditors shall have the absolute right, in their sole discretion, to participate in any Alternative Negotiations. Arthur Allen shall not, without the express written consent of the Company and the Consenting Creditors, (i) engage in any Alternative Negotiations with any third party that is not an Approved Third Party, or (ii) communicate with any current officers or employees of the Company or use any Company resources with respect to Alternative Negotiations.

(c)     Within three (3) business days after the Settlement Effective Date, Arthur Allen shall cause Carole Allen and Jean Luc Derouet to resign as employees of the Company in such a manner as to avoid all cost to the Company in connection with such separation. On the Settlement Effective Date, all employees of the Company who primarily provide personal services to Arthur Allen or his affiliates or family shall be terminated.

**1.2     Salary and Benefits**. Effective as of the Settlement Effective Date, Arthur Allen shall not be entitled to any further salary or other compensation or to participate in any Company employee benefits programs and plans (other than as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1985 or other law) and shall have no further rights to receive any salary, bonus, equity, benefits, perquisites or other compensation from the Company or any of its affiliates, except as otherwise expressly provided herein. Except as specifically provided in Section 1.8, any and all services, benefits and other support provided by the Company to Arthur Allen or his affiliates or family shall be terminated as of the Settlement Effective Date.

**1.3     The RSA**. Arthur Allen shall execute the RSA at such time as the Company and the Consenting Creditors execute the RSA, provided that the RSA shall be consistent with the terms hereof and shall be otherwise substantially in the form attached hereto as **Exhibit A**. Arthur Allen acknowledges and agrees that the Company and Consenting Creditors may, in their sole discretion, modify or amend the RSA at any time. If such modification or amendment would have a material adverse effect on Arthur Allen's rights hereunder, Arthur Allen shall have the right, upon ten (10) business days' written notice to the Company and Consenting Lenders, to terminate this Settlement Agreement. Moreover, the Company and the Consenting Creditors reserve the right to implement a restructuring outside of a chapter 11 proceeding, and Arthur Allen covenants and agrees that he shall take all actions reasonably requested by the Company and/or the Consenting Creditors, necessary or expedient to implement such out-of-court restructuring, and shall not, directly or indirectly, take any action that would delay, hinder, or obstruct such out-of-court restructuring, provided that such out-of-court restructuring does not materially and adversely affect his economic recovery provided under this Agreement. In such event, all events referenced herein that are triggered by consummation of the Plan, the Plan Effective Date, or substantially similar triggering events, shall be deemed to occur at the closing of such out-of-court restructuring.

For the avoidance of doubt, the RSA and Plan Term Sheet remain subject to negotiation by the Company and nothing herein shall be construed as an obligation on the part of the Company to enter into the RSA or Plan Term Sheet in the forms attached hereto, or to implement the Restructuring as described herein. If prior to the execution of the RSA, the Company determines that it will not be able to reach agreement on the terms of the RSA or the Plan Term Sheet, then the Company may terminate this Settlement Agreement upon ten (10) business days' notice to the other Parties without further obligation.

        **1.4**    **The Plan.** Arthur Allen shall support any actions undertaken by the Company and Consenting Creditors in furtherance of effectuating the Restructuring and shall not, directly or indirectly, take any action that would delay, hinder, or obstruct the solicitation, confirmation, or consummation of the Plan, or cause or encourage any other person or entity, directly or indirectly, to do so. Arthur Allen acknowledges and agrees that the Company and Consenting Lenders may, in their sole discretion, modify or amend the Plan at any time. If such modification or amendment would have a material adverse effect on Arthur Allen's rights hereunder, Arthur Allen shall have the right, upon ten (10) business days' written notice to the Company and Consenting Lenders, to terminate this Settlement Agreement.

        **1.5**    **Non-Solicitation; Non-Disparagement; Non-Competition.**

        (a)    **Non-Solicitation.** Arthur Allen agrees that from the Settlement Effective Date until the first anniversary thereof, he shall not, without the express written consent of the Company, directly or indirectly, on behalf of himself or any other person or entity (i) solicit, induce, or encourage the resignation of any person who is a director, officer, employee, representative, or agent of the Company or any of its affiliates, (ii) interfere in any way with the relationship between the Company or any of its affiliates and any person who is a director, officer, employee, representative, or agent of the Company or any of its affiliates, or (iii) hire any person who serves a director, officer, employee, representative, or agent of the Company or any of its affiliates, provided, however, that the restrictions set forth in this Section 1.5(a)(iii) shall not apply to Arthur Allen hiring any person who previously served as a director, officer, employee, representative, or agent of the Company or an affiliate of the Company from and after three (3) months since the date such person has ceased to be a director, officer, employee, representative, or agent of the Company or an affiliate of the Company, so long as such cessation did not result from a violation of this Section 1.5(a).

        (b)    **Non-Disparagement.** Arthur Allen agrees that he shall not at any time, without limitation, make, publish or communicate, or encourage any other person or entity to make, publish or communicate, any Disparaging (as defined below) remarks, comments, or statements concerning the Company, the Consenting Creditors, affiliates, customers and vendors of the foregoing, or any of their respective directors, officers, employees, representatives, agents, or affiliates. "**Disparaging**" remarks, comments or statements are those that impugn the character, honesty, integrity, morality, or business acumen, business strategy, or abilities, or reflect negatively upon, the individual or entity being disparaged. Nothing in this provision shall be construed to

preclude truthful disclosures in response to lawful process as required by applicable law, regulation, or order or directive of a court, governmental agency, or regulatory organization.

   (c) **Non-Competition**. Arthur Allen agrees that from the Settlement Effective Date until the first anniversary thereof, Arthur Allen shall not, directly or indirectly, without the prior written consent of the Company: (i) engage in activities or businesses (including without limitation by owning any interest in, managing, controlling, participating in, consulting with, advising, rendering services for, or in any manner engaging in the business of owning, operating or managing any business) in any geographic location in which the Company or any of its affiliates engage in activity or business, that competes directly or indirectly with the Company or any of its affiliates ("**Competitive Activities**"); (ii) solicit or attempt to solicit any customer, client, supplier, licensee, licensor or other business relation (or any actively sought prospective customer, client, supplier, licensee, licensor or other business relation) of the Company or any of its affiliates, to purchase any goods or services manufactured, sold or provided by the Company or any of its affiliates from anyone other than the Company or any of its affiliates; (iii) knowingly perform any action, activity or course of conduct which is substantially detrimental to the businesses or business reputations of the Company or any of its affiliates, including but not limited to intentionally interfering with the relationship of the Company or any of its affiliates with any customer, client, supplier, licensee, licensor or other business relation of, the Company or any of its affiliates; or (iv) assist any person in any way to do, or attempt to do, anything prohibited by Section 1.5(c)(i) above; provided, that, the provisions of Section 1.5(c) shall not be deemed breached as a result of Arthur Allen's passive ownership of less than an aggregate of 2% of any class of securities of a person engaged, directly or indirectly, in Competitive Activities, so long as Arthur Allen does not actively participate in the business of such person; provided, however, that such stock is listed on a national securities exchange.

   **1.6** **Confidential Information**. Arthur Allen acknowledges that during his employment by the Company, he had access to and possession of non-public and/or proprietary information and materials concerning the Company and its affiliates, including, but not limited to, information concerning (i) the Company, its directors, officers, partners, members, employees, clients, customers, service providers, vendors, and investors and their identities and contact information, and (ii) the Company's and its affiliates' operations, systems, services, personnel, marketing, fundraising, financial affairs, philosophies, strategies and techniques, structure, technology, legal affairs, passwords, and other proprietary information concerning the Company and its affiliates ("**Confidential Information**"). Confidential Information shall not include information that the Company or its affiliates previously have disclosed to the general public. Arthur Allen agrees that all Confidential Information is the exclusive property of the Company and its affiliates and that Arthur Allen will keep all Confidential Information confidential and will not, without the prior written consent of the Company, divulge, furnish, disclose or otherwise make available any Confidential Information to any third person. Arthur Allen agrees that, if he receives any legal, governmental or regulatory process, notice or request purporting to require disclosure of any Confidential Information, except to the extent advised by qualified counsel that such notice would be unlawful, he will give

prompt written notice to the Company of such process, notice, or request, disclose no more information than is required, and will fully cooperate with all efforts of the Company to resist, restrict, or limit the disclosure of such Confidential Information in response to such process, notice, or request.

          **1.7**    **Intellectual Property**.  Arthur Allen acknowledges and agrees that he does not, nor do any of his wholly-owned direct or indirect subsidiaries (other than the Company), have any right, title or interest in or to:

          (a)     Any of the following, as they exist anywhere in the world, whether registered or unregistered: (i) trade names, trademarks, service marks, trade dress, brand names, logos and corporate names and all goodwill related thereto, (ii) copyrights (including all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "**moral rights**"), mask works and designs, (iii) trade secrets, know-how, inventions (whether or not patentable), processes, procedures, databases, confidential business information and other proprietary information and rights, computer software programs, including all source code, object code, specifications, designs and documentation related thereto, (iv) patents, patentable inventions and other patent rights (including any divisions, continuations, continuations-in-part, reissues, reexaminations and interferences thereof), and (v) domain names, social media account identifiers, Internet addresses and other computer identifiers, in each case as owned, used by or held for use by the Company or any of its affiliates in the course of their business at any time, including, the right to sue and recover for any and all past, present, and future infringements and other violations thereof (collectively, the "**Company Intellectual Property**").

          (b)     In the event that Arthur Allen has or any of his wholly-owned direct or indirect subsidiaries have any right, title or interest in or to any Company Intellectual Property, as of the Settlement Effective Date, Arthur Allen on behalf of himself and each of his subsidiaries (other than the Company) shall and hereby do assign, sell, and transfer to the Company his, or its, entire right, title, and interest, if any, in and to any such Company Intellectual Property on a worldwide basis and Arthur Allen on behalf of himself and each of his wholly-owned subsidiaries (other than the Company) does not reserve or retain any rights in any such Company Intellectual Property.

          (c)     Arthur Allen on behalf of himself and each of his wholly-owned direct or indirect subsidiaries (other than the Company) shall not, directly or indirectly, oppose or seek to cancel or otherwise challenge or contest (collectively, "**Challenge**") any of the Company Intellectual Property, including any application or registration concerning or related to the Company Intellectual Property, or cause, assist or encourage any other person or entity, directly or indirectly, to Challenge any application or registration concerning or related to the Company Intellectual Property.

          (d)     Arthur Allen on behalf of himself and each of his wholly-owned direct or indirect subsidiaries (other than the Company) shall not, directly or indirectly, Challenge or deny the validity, ownership, or enforceability of the Company Intellectual Property and/or claim adversely or assist in any claim adverse to the

Company or any Company affiliate concerning any right, title, or interest in or to the Company Intellectual Property.

(e)    Arthur Allen on behalf of himself and each of his wholly-owned direct or indirect subsidiaries (other than the Company) shall not register or use or attempt to register or use, or aid any other person or entity in registering or using, or attempting to register or use, any Company Intellectual Property, including, without limitation, in connection with the formation or operation of any company, partnership, corporation, or any other entity. Arthur Allen on behalf of himself and each of his wholly-owned direct or indirect subsidiaries (other than the Company) shall not register or attempt to register, or use or attempt to use, any trademark identical to or confusingly similar to that of any of the Company Intellectual Property.

(f)    Arthur Allen further acknowledges and agrees that he is not nor are any of his wholly-owned direct or indirect subsidiaries (other than the Company) entitled to any compensation or other consideration as a result of the Company's ownership or use of any Company Intellectual Property pursuant to any oral or written agreement or course of dealing that may be in existence as of the date hereof and hereby disclaims and releases any claim to any such compensation or consideration.

(g)    Upon each request by the Company, without additional consideration, but at no out-of-pocket cost to Arthur Allen, Arthur Allen agrees promptly to execute documents, testify and take other acts as the Company reasonably may deem necessary or desirable to procure, maintain, perfect, evidence and enforce the full benefits, enjoyment, rights, title and interest, on a worldwide basis of the Company Intellectual Property and all rights assigned hereunder, and render all reasonable necessary assistance, but at no out-of-pocket cost to Arthur Allen, in making application for and obtaining all intellectual property rights related to the Company Intellectual Property in the Company's name and for its benefit. In the event Arthur Allen, in his individual capacity or in his capacity as an agent for any of his wholly-owned subsidiaries (other than the Company), fails to timely execute and/or deliver any such document, Arthur Allen does hereby irrevocably constitute and appoint the Company and any officer, employee or agent thereof, with full power of substitution, as Arthur Allen's true and lawful attorney-in-fact with full irrevocable power and authority to take all appropriate action and to execute any and all such documents necessary to effectuate the foregoing.

(h)    Arthur Allen hereby represents and warrants that he has all necessary authority to bind each of his wholly-owned direct or indirect subsidiaries (other than the Company) to the covenants and obligations set forth in this Section 1.7.

**1.8    Return of Company Property**. On or prior to the Settlement Effective Date, Arthur Allen shall return all property of the Company and its affiliates in his possession, custody, or control, including, without limitation, computer software or hardware, credit cards, keys, telephone cards, Company identification cards, compliance manuals, summaries of benefits, and other books or manuals issued by the Company or any of its affiliates; provided, however, that Arthur Allen may retain his laptop, cell

8

phone and blackberry; provided, further, that as of the Settlement Effective Date, Arthur Allen will not have any access to the Company's e-mail, data systems, servers or phone and data plans.  On or before the Plan Effective Date, Arthur Allen shall surrender and/or transfer to the Company or its designee any and all direct or indirect right, title or interest in or to the equity interests (as such equity interests relate solely to the Company's subsidiaries), property or assets of the Company and/or its subsidiaries. For the avoidance of doubt, and without limiting the generality of the foregoing, at any time prior to, on, or after the Settlement Effective Date, the Company may enter any of the premises leased pursuant to the AA Leases and recover any Company property or assets (including art work) located on such premises.

      **1.9**    **Consultation Services; Post-Effective Date Assistance**.  From the Settlement Effective Date through the fourth (4th) month anniversary thereof (the "**Transition Period**"), the Company shall retain Arthur Allen as a consultant to provide advice and assistance to the Company in such matters as the Company, in its sole discretion, may reasonably request.  In consideration of the services Arthur Allen agrees to provide to the Company, at its request during the Transition Period, the Company shall pay Arthur Allen four (4) equal monthly installments of $375,000.00 commencing on the first (1st) business day of the first (1st) month anniversary of the Settlement Effective Date (collectively, the "**Consultation Payments**").  The Consenting Creditors shall support the payment of the Consultation Payments from and after the commencement of the Chapter 11 Cases.  After the Transition Period, Arthur Allen shall, without additional consideration, assist the Company, the Debtors or the reorganized Debtors, as applicable, and the Consenting Creditors in such matters as they may reasonably request but at no out-of-pocket cost to Arthur Allen.  Notwithstanding anything to the contrary contained herein, if Arthur Allen breaches this Settlement Agreement, including, without limitation, the requirements and undertakings set forth in Sections 1.1 and 1.5 through 1.9 hereof, then the Company shall have no further obligation to make any further payment to Arthur Allen, and Arthur Allen shall immediately forfeit and pay over to the Company any payment previously paid to him under this Section 1.9.

      **1.10**    **Cash Payment**.  Subject to the confirmation of the Plan, which includes the assumption or approval of this Settlement Agreement, and Arthur Allen's continued compliance with the terms and conditions of this Settlement Agreement (including the restrictions and undertakings set forth in Sections 1.1 and 1.5 through 1.9 hereof), the Company shall pay the aggregate amount of $6,250,000.00 plus that portion of the Consultation Payments not paid pursuant to Section 1.9 hereof, in cash to Arthur Allen (the "**Settlement Payment**"), of which (i) $2,250,000.00, plus that portion of the Consultation Payments not paid pursuant to Section 1.9 hereof, will be payable on the effective date of the Plan (the "**Plan Effective Date**"), and (ii) the remaining $4,000,000.00 will be payable in cash in two (2) equal installments of $2,000,000.00 each on the last business day of the ninth (9th) month following the Plan Effective Date, and on the last business day of the eighteenth (18th) month following the Plan Effective Date, respectively; provided however, that if the WF Consent (as defined below) is not obtained by the WF Consent Deadline (as defined below) and the AA Leases are rejected by the Company, such $2,000,000.00 installments shall be each reduced by $500,000.00. Notwithstanding anything to the contrary contained herein, if Arthur Allen breaches this

Settlement Agreement, including, without limitation, the requirements and undertakings set forth in Sections 1.1 and 1.5 through 1.9 hereof, then the Company shall have no further obligation to make any further Settlement Payment to Arthur Allen, and Arthur Allen shall immediately forfeit and pay over to the Company any portion of the Settlement Payment previously paid to him.

      **1.11**    **Warrants**.  On the Plan Effective Date, Arthur Allen shall receive warrants of the reorganized Company containing the terms described in **Exhibit C** hereto.

      **1.12**    **Releases**.

      (a)    As of the Plan Effective Date, and subject to the assumption or approval of this Settlement Agreement in connection with the confirmation of the Plan and the Company's compliance with the terms and conditions of this Settlement Agreement on and as of the Plan Effective Date, Arthur Allen and each of his past, present, and future affiliated entities, including Investment Group and ALA Services (except the Company), representatives, attorneys, advisors, agents, successors, assigns, heirs, administrators, executors, and relatives (in their respective capacities as such, collectively, the "**Arthur Allen Releasors**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Company, the Consenting Creditors and the affiliates of the foregoing, and each of their respective past, present and future directors, officers, shareholders, members, executives, employees, representatives, attorneys, advisors, agents, parent companies, subsidiaries, divisions, affiliates, predecessors, successors, assigns, administrators, and executors (collectively, the "**Arthur Allen Releasees**") from any and all claims, demands, obligations, rights, causes of action, liabilities, losses, duties, damages, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, costs, actions, potential actions, suits, agreements, judgments, decrees, matters, issues, and controversies of any kind, nature, or description whatsoever, whether known or unknown, liquidated, unliquidated, fixed, contingent, matured, unmatured, legal, equitable, foreseen, or unforeseen, that the Arthur Allen Releasors ever had, now has, or hereinafter may have arising from or relating to the Company, the Debt, the Prepetition Debt Documents, any and all matters relating to Arthur Allen's ownership of, or employment by, the Company and the cessation thereof, the AA Leases, the Salary and Advance Agreement, the Restructuring, any indemnification obligation of the Company, and all matters arising under any federal, state, or local statute, rule, or regulation or principle of contract law or common law related thereto, including, without limitation, claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.,* the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.,* the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.,* and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.,* all as amended, and any other laws relating to express or implied breach of contract, wrongful discharge, defamation, intentional infliction of emotional distress, and any related claims for attorneys' fees and costs by reason of acts or omissions which have occurred on or prior to the Plan Effective Date, excluding any claims that may not be released as a matter of law and any claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*  It is understood that this release includes both known and

10

unknown claims, regardless of any law to the contrary. The Arthur Allen Releasors will not file, or encourage or knowingly permit another to file, any claim concerning any of the released claims described herein and if any such claim previously was filed, such litigant will take all steps necessary to cause such proceeding to be withdrawn with prejudice and without delay. Arthur Allen hereby agrees to pay all costs and expenses, including reasonable attorneys' fees, incurred by any Arthur Allen Releasee in connection with defending against any claim filed or prosecuted in violation of this Settlement Agreement. Arthur Allen acknowledges that he understands that by entering into this Settlement Agreement, he is limiting the availability of certain remedies that he may have against any Arthur Allen Releasee and limiting his ability to pursue certain claims against any Arthur Allen Releasees. Nothing in this Section 1.12 (a) shall release any obligations of the Company and Consenting Creditors under this Settlement Agreement.

(b)    On the Settlement Effective Date, the Arthur Allen Releasors shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Company and its affiliates, and their past, present and future directors, officers, shareholders, members, executives, employees, representatives, attorneys, advisors, agents, parent companies, subsidiaries, divisions, affiliates, predecessors, successors, assigns, administrators, and executors (in their respective capacities as such, collectively, the "**Settlement Effective Date Allen Releasees**") from any and all claims, demands, obligations, rights, causes of action, liabilities, losses, duties, damages, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, costs, actions, potential actions, suits, agreements, judgments, decrees, matters, issues, and controversies of any kind, nature or description whatsoever, whether known or unknown, liquidated, unliquidated, fixed, contingent, matured, unmatured, legal, equitable, foreseen, or unforeseen, that the Arthur Allen Releasors ever had, now have, or hereinafter may have arising from or relating to any and all matters relating to or arising out of the management or governance of the Company or the acts or omissions of the Settlement Effective Date Allen Releasees on or before the Settlement Effective Date. It is understood that this release includes both known and unknown claims, regardless of any law to the contrary. The Arthur Allen Releasors will not file, or encourage or knowingly permit another to file, any claim concerning any of the released claims described herein and if any such claim previously was filed, such litigant will take all steps necessary to cause such proceeding to be withdrawn with prejudice and without delay. Arthur Allen hereby agrees to pay all costs and expenses, including reasonable attorneys' fees, incurred by any Settlement Effective Date Allen Releasee in connection with defending against any claim filed or prosecuted in violation of this Settlement Agreement. Arthur Allen acknowledges that he understands that by entering into this Settlement Agreement, he is limiting the availability of certain remedies that he may have against any Settlement Effective Date Allen Releasee and limiting his ability to pursue certain claims against any Settlement Effective Date Allen Releasees. Notwithstanding anything in this Settlement Agreement to the contrary, this release and covenant not to sue will survive termination of the Settlement Agreement.

(c)    On the Plan Effective Date, and subject to the assumption or approval of this Settlement Agreement in connection with the confirmation of the Plan

11

and Arthur Allen's compliance with the terms and conditions of this Settlement Agreement on and as of the Plan Effective Date, the Company and its affiliates (including non-Debtor affiliates) and the Consenting Creditors and each of their respective past, present and future directors, officers, shareholders, members, executives, employees, representatives, attorneys, advisors, agents, parent companies, subsidiaries, divisions, affiliates, predecessors, successors, assigns, administrators, and executors (collectively, the "**Company Releasors**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged Arthur Allen and each of his past, present, and future affiliated entities (including Investment Group and ALA Services but excluding the Company), representatives, attorneys, advisors, agents, successors, assigns, heirs, administrators, executors, and relatives (in their respective capacities as such, collectively, the "**Company Releasees**") from any and all claims, demands, obligations, rights, causes of action, liabilities, losses, duties, damages, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, costs, actions, potential actions, suits, agreements, judgments, decrees, matters, issues, and controversies of any kind, nature or description whatsoever, including any claim or cause of action under Chapter 5 of the Bankruptcy Code, whether known or unknown, liquidated, unliquidated, fixed, contingent, matured, unmatured, legal, equitable, foreseen, or unforeseen, that the Company Releasors ever had, now have, or hereinafter may have arising from or relating to the Company, the Debt, the Prepetition Debt Documents, the Restructuring, any and all matters relating to or arising out of Arthur Allen's ownership of, or employment by, the Company and the cessation thereof. Nothing in this Section 1.12 (b) shall release any obligations of Arthur Allen under this Settlement Agreement.

       (d)      The Parties acknowledge that they are familiar with statutory requirements and common law principles such as California Civil Code section 1542, which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

THE PARTIES, BEING AWARE OF SAID CODE SECTION AND OTHER STATUTORY AND COMMON LAW PRINCIPLES OF SIMILAR EFFECT, AND HAVING HAD AND EXERCISED THE OPPORTUNITY TO CONSULT LEGAL COUNSEL, HEREBY EXPRESSLY WAIVE ANY RIGHTS THEY MAY HAVE THEREUNDER. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS WAIVER IS AN ESSENTIAL AND MATERIAL TERM OF THIS AGREEMENT, AND THAT WITHOUT SUCH WAIVER, THE PARTIES WOULD NOT HAVE ENTERED INTO THIS AGREEMENT.

Each of the Parties further acknowledge that he, she or it may discover facts different from, or in addition to, those facts which they now know or believe to be true, but agree

that this general release is now and shall remain effective notwithstanding the existence
or the discovery of additional or different facts. The Parties hereby intentionally waive
and relinquish all rights and benefits under any law of any jurisdiction providing to the
contrary, or any public policy that would limit or render void, voidable or unenforceable
any provision of this general release.

### ARTICLE II
### TREATMENT OF AA LEASES AND OTHER AGREEMENTS

#### 2.1    Amendment and Assumption of Certain AA Leases.

(a)    Subject to clause 2.1(c) below, on the Settlement Effective
Date, the following AA Leases shall be amended as follows:

| AA Lease | Base Rent | Lease Term | Waiver and Release |
|---|---|---|---|
| **1333 Building Lease** | Commencing on the Settlement Effective Date, base rent shall be paid in the amount of $19.00 per rentable square foot, payable in equal monthly installments. | The 1333 Building Lease shall terminate on the last calendar day of the third (3rd) full month following the Settlement Effective Date. | Arthur Allen and Investment Group, shall waive and release all claims arising under or related to the 1333 Building Lease, including all claims for unpaid rent and any other amounts due and owing by the Company through and including the Settlement Effective Date. |
| **704 Building Lease** | Commencing on the Settlement Effective Date, base rent shall be paid in the amount of $19.00 per rentable square foot, payable in equal monthly installments. | The 704 Building Lease shall terminate on the last calendar day of the third (3rd) full month following the Settlement Effective Date. | Arthur Allen shall waive and release all claims arising under or related to the 704 Building Lease, including all claims for unpaid rent and any other amounts due and owing by the Company through and including the Settlement Effective Date. |
| **708 Building Lease** | Commencing on the Settlement Effective Date, base rent shall be paid in the amount of $19.00 per rentable square foot, payable in equal monthly installments. | The 708 Building Lease shall terminate on the last calendar day of the second full 12-month period following the Settlement Effective Date, provided, however, that the Company shall | Arthur Allen shall waive and release all claims arising under or related to the 708 Building Lease, including all claims for unpaid rent and any other amounts due and owing by the |

| | | have an option, at its sole discretion, to extend the lease term for two additional two-year periods. | Company through and including the Settlement Effective Date. |
|---|---|---|---|

(b)      Subject to clause 2.1(c) below, pursuant to and under the Plan, the Company shall seek, and the Consenting Creditors shall support the Company's request, to assume the 1333 Building Lease, the 704 Building Lease and the 708 Building Lease, as amended in accordance with Section 2.1(a) above (unless, in the case of the 1333 Building Lease and 704 Building Lease, such leases as amended have terminated in accordance with their amended terms prior to confirmation of the Plan).

(c)      Arthur Allen shall use his best efforts to promptly obtain consent of Wells Fargo Bank, N.A. under the Amended and Restated Consolidated Mortgage, Assignment of Rents and Security Agreement between Arthur Allen, as mortgagor and debtor, and Wachovia Bank, National Association n/k/a Wells Fargo Bank, N.A., as mortgagee and secured party, dated May 23, 2007 to effectuate amendments of the AA Leases contemplated in clause (a) above (the "**WF Consent**"). If Arthur Allen does not obtain the WF Consent on or before December 31, 2014, or such later date as agreed to in writing by the Company and the Consenting Creditors (such date, the "**WF Consent Deadline**"), then the Company shall seek to reject the 1333 Building Lease, 704 Building Lease and 708 Building Lease on the first day of the Chapter 11 Cases, unless such later date has been agreed by the Consenting Creditors; if the WF Consent is not obtained by the WF Consent Deadline, Arthur Allen and Investment Group, pursuant to the releases set forth in Section 1.12(a) herein, shall waive and release any and all claims arising under or related to the 1333 Building Lease, 704 Building Lease and 708 Building Lease, including, without limitation, all claims for unpaid rent, rejection damages and any other amounts allegedly due by the Company thereunder.

**2.2**      **Termination of Certain AA Leases and Other Agreements.**

(a)      On the Settlement Effective Date, the Hangar Lease and the Aircraft Lease shall be terminated, and Arthur Allen, on behalf of himself and ALA Services, shall waive and release any and all claims arising under or related to the Hangar Lease and the Aircraft Lease, and any other agreements between Arthur Allen or his affiliates or family members, on the one hand, and the Company or its affiliates on the other hand, including all claims for unpaid rent, damages and any other amounts due by the Company.

(b)      On the Settlement Effective Date, the Salary and Advance Agreement shall be terminated, and the Company shall waive and release all claims arising under or related to the Salary and Advance Agreement, including any and all claims for damages or other unpaid amounts owing by Arthur Allen.

## ARTICLE III
## EFFECTIVENESS OF THE SETTLEMENT AGREEMENT
## AND MISCELLANEOUS PROVISIONS

**3.1    Effectiveness**. This Settlement Agreement shall become effective and binding upon all Parties immediately upon execution and delivery of this Settlement Agreement by each of the Parties hereto (the "**Settlement Effective Date**"). In the Chapter 11 Cases, the Company shall use its best efforts to assume or seek the approval of this Settlement Agreement pursuant to, under and as part of the Plan, and the Consenting Creditors shall support the assumption or approval of this Settlement Agreement. If the RSA is terminated or this Settlement Agreement is not approved by the Bankruptcy Court pursuant to, under and as part of the Plan, then Arthur Allen's obligations set forth in Sections 1.1 and 1.5 through 1.9 hereof shall be terminated and the releases in Section 1.12 shall not become effective.

**3.2    Incorporation of Recitals**. Each of the Parties acknowledges, declares and agrees that the Recitals contained herein are true and correct as of the Settlement Effective Date, and that such Recitals are incorporated in, and form an integral part of, this Settlement Agreement.

**3.3    Representation and Warranties**. Each of the Parties represents and warrants that:

**3.3.1**    it has full power and authority and all authorizations, consents and approvals to enter into this Settlement Agreement and to perform as required hereunder, including, but not limited to, all third party consents with respect to amendments of the AA Leases, except for the WF Consent which shall be received by the WF Consent Deadline;

**3.3.2**    this Settlement Agreement has been duly executed and delivered by such Party and constitutes the legal, valid, and binding obligations of such Party, enforceable against it in accordance with their respective terms;

**3.3.3**    it is the sole and lawful owner of all right, title and interest in and to every claim, matter and thing released herein, including, without limitation, any and all claims, rights, demands, actions, causes of action, or facts which such Party alleged or asserted or could have alleged or asserted, and it has not assigned, sold, transferred, hypothecated, pledged, encumbered, discharged or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any claims released hereunder;

**3.3.4**    execution, delivery, and performance of this Settlement Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party;

15

**3.3.5**    it has had the opportunity to have the legal effect of the provisions of this Agreement explained by independent counsel of such Party's own choice; and

**3.3.6**    it has entered into this Agreement fully and voluntarily without any threat of duress or coercion of any sort.

Each of the representations and warranties set forth in this Section shall survive in perpetuity.

**3.4    Counterparts**.  This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Settlement Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement, and each of which may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

**3.5    Amendments and Modification**.  This Settlement Agreement may not be amended, modified or supplemented except by written agreement signed by all Parties.

**3.6    Entire Agreement, Successors and Assigns, Beneficiaries**.

**3.6.1**    This Settlement Agreement, including the Exhibits annexed hereto, embodies the entire agreement and understanding among the Parties, and supersedes all prior agreements, understandings and arrangements, oral or written, among the Parties with respect to the subject matter hereof.

**3.6.2**    This Settlement Agreement inures to the benefit of, and shall be binding upon, each of the Parties hereto, and their respective successors, heirs, assigns, agents, employees, and representatives.

**3.6.3**    Nothing contained in this Settlement Agreement, express or implied, is intended to confer any rights or benefits upon any party other than the Parties and their successors and assigns, and no such third party shall be entitled to rely on this Settlement Agreement.

**3.7    Headings**.  The headings of the articles, sections and subsections of this Settlement Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

**3.8    Severability**.  If any provision of this Settlement Agreement is found by any court of competent jurisdiction to be invalid or unenforceable, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the fullest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Settlement Agreement so long as this Settlement Agreement as so modified continues to express, without material change, the original intentions of the Parties as to the subject matter hereof, and the prohibited nature, invalidity or unenforceability of the

provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the Parties or the practical realization of the benefits that would otherwise be conferred upon the Parties.

     **3.9**    **Specific Performance**. It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Settlement Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, requiring any Party to comply promptly with any of its obligations hereunder.

     **3.10**    **Remedies Cumulative**. All rights, powers, and remedies provided under this Settlement Agreement, or otherwise available in respect hereof at law or in equity, shall be cumulative and not in the alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other right, power, or remedy by such Party.

     **3.11**    **WAIVER OF JURY TRIAL**. EACH OF THE PARTIES TO THIS SETTLEMENT AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SETTLEMENT AGREEMENT.

     **3.12**    **Negotiated Agreement**. This Settlement Agreement has been fully negotiated by the Parties, and each Party acknowledges and agrees that this Settlement Agreement has been drafted jointly, and the rule that ambiguities in an agreement or contract may be construed against the drafter shall not apply in the construction or interpretation of this Settlement Agreement.

     **3.13**    **Notices**. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by email, courier, by facsimile transmission or mailed (first class postage prepaid) to the Parties at the following addresses, emails or facsimile numbers:

     **If to the Company:**

     Allen Systems Group, Inc.
     1333 Third Avenue South
     Naples, Florida 94102
     Attention:  Derek S. Eckelman, EVP and General Counsel
     Email(s):  derek.eckelman@asg.com

     with a copy to:

     Latham & Watkins LLP
     355 South Grand Avenue
     Los Angeles, California 90071-1560

Attention: Peter M. Gilhuly and Ted A. Dillman
Email(s): peter.gilhuly@lw.com; ted.dillman@lw.com

**If to Arthur Allen, Investment Group, and ALA Services:**


Genovese Joblove & Battista, P.A.
100 Southeast Second Street, 44th Floor
Miami, FL 33131
Attention: Paul J. Battista
Email(s): pbattista@gjb-law.com


**If to Consenting Creditors:**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attention: Alan W. Kornberg and Kelley A. Cornish
Email(s): akornberg@paulweiss.com;
kcornish@paulweiss.com

    **3.14**   **Further Assurances**.  Each Party hereto shall from time to time hereafter and upon any request of any other Party hereto execute and deliver, make or cause to be made, all such further acts, assurances and things as may be reasonably requested to more effectually implement and carry out the intent of this Settlement Agreement.

    **3.15**   **Governing Laws**.  This Settlement Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions.  By its execution and delivery of this Settlement Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Settlement Agreement, or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the Court of Chancery of the State of Delaware (or, only if the Court of Chancery of the State of Delaware declines to accept or does not have jurisdiction over a particular matter, any state or federal court within the State of Delaware), or in the United States District Court for the District of Delaware, and by execution and delivery of this Settlement Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  During the pendency of the Chapter 11 Cases, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Settlement Agreement.

       **3.16**   <u>**Waiver**</u>.  Failure on the part of any Party to complain of any act or the failure to act of any other Party or to declare the other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by the first mentioned Party of its rights hereunder.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Settlement Agreement as of the date first above written.

ALLEN SYSTEMS GROUP, INC.

By: _____

Name: JOHN C. DiDONATO

Title: CHIEF RESTRUCTURING OFFICER

**ARTHUR L. ALLEN**

By: _____

Name: ARTHUR L. ALLEN

Title: AUTHORIZED SIGNATURE


**ALLEN INVESTMENT GROUP**

By: _____

Name: ARTHUR L. ALLEN

Title: AUTHORIZED SIGNATURE


**ALA SERVICES, LLC**

By: _____

Name: ARTHUR L. ALLEN

Title: MANAGING MEMBER

21

ACCEPTED AND AGREED:

**FS Investment Corporation**
By: GSO / Blackstone Debt Funds Management LLC as Sub-Adviser

By:

     Name:  Thomas Iannarone
     Title:    Authorized Signatory

ACCEPTED AND AGREED:

**FS Investment Corporation II**
By: GSO / Blackstone Debt Funds Management LLC as Sub-Adviser

By: _____

       Name:  Thomas Iannarone
       Title:    Authorized Signatory

ACCEPTED AND AGREED:

**FS Investment Corporation III**
By: GSO / Blackstone Debt Funds Management LLC, as Sub-Adviser

By: _____
    Name:  Thomas Iannarone
    Title:    Authorized Signatory

ACCEPTED AND AGREED:

**Lehigh River LLC**
By: FS Investment Corporation II, as Sole Member
By: GSO / Blackstone Debt Funds Management LLC
as Sub-Adviser

By:    _____
      Name:  Thomas Iannarone
      Title:    Authorized Signatory

ACCEPTED AND AGREED:

**Locust Street Funding LLC**
By: FS Investment Corporation, as Sole Member
By: GSO / Blackstone Debt Funds Management LLC,
as Sub-Adviser

By: _____

     Name: Thomas Iannarone
     Title:   Authorized Signatory

ACCEPTED AND AGREED:

**Cobbs Creek LLC**
By: FS Investment Corporation II, as Sole Member
By: GSO / Blackstone Debt Funds Management LLC
as Sub-Adviser

By: _____
      Name: Thomas Iannarone
      Title:    Authorized Signatory

ACCEPTED AND AGREED:

**SG DISTRESSED FUND, LP**

By: _____
    Name:
    Title:

**Richard Maybaum**
**Managing Director**

40

ACCEPTED AND AGREED:

**Littlejohn Opportunities Master Fund LP**

By: _____

      Name:  **Richard Maybaum**
      Title:  **Managing Director**

ACCEPTED AND AGREED:

**Cetus Capital II, LLC**

By: _____

Name:

Title:

**Richard Maybaum**

**Managing Director**

ACCEPTED AND AGREED:

**8 Capital Holdings Ltd.**

By: _____

    Name:

    Title:    NICOLE J. MACARCHUK

            AUTHORIZED SIGNATORY

ACCEPTED AND AGREED:

**KKR Corporate Credit Partners L.P.**

By: _____

      Name:   NICOLE J. MACARCHUK

      Title:    AUTHORIZED SIGNATORY

ACCEPTED AND AGREED:

**KKR Debt Investors II (2006) (Ireland) L.P.**

By: _____

      Name:  NICOLE J. MACARCHUK
      Title:   AUTHORIZED SIGNATORY

ACCEPTED AND AGREED:

**Maryland State Retirement and Pension System**

By: _Nicole J. Macarchuk_

      Name: NICOLE J. MACARCHUK
      Title: AUTHORIZED SIGNATORY

ACCEPTED AND AGREED:

**Oregon Public Employees Retirement Fund**

By:     _Nicole J. Macarchuk_

         Name:     NICOLE J. MACARCHUK

         Title:      AUTHORIZED SIGNATORY

ACCEPTED AND AGREED:

**KKR-PBPR Capital Partners L.P.**

By: _____

    Name:   NICOLE J. MACARCHUK

    Title:    AUTHORIZED SIGNATORY

ACCEPTED AND AGREED:

**Ellis Lake Master Fund, LP**

By: _____

    Name: ANTHONY PASCENA
    Title: AUTHORIZED SIGNATORY

36

**Exhibit C**
Summary of Terms

**Issuer:**            Allen Systems Group, Inc. (the "Company").

**Warrants**           The Company will issue warrants (the "Warrants") entitling Arthur Allen
**Issued:**            (the "Holder") to purchase 10% of the common stock of the Company
                       (the "Common Stock"), assuming exercise of all Warrants, as of the plan
                       effective date.

**Strike Price:**      The strike price of the Warrants (the "Strike Price") shall be based upon
                       an assumed initial total enterprise value of the Company of $700 million
                       and assumed equity valuations of $460 million, $490 million, $520
                       million and $550 million as of the plan effective date and first, second and
                       third anniversaries of the plan effective date, respectively.

                       Assuming 10 million shares of Common Stock outstanding, not giving
                       effect to the exercise of the Warrants, the Strike Price per share will be:

                       • $46.00 from the plan effective date to the day prior to the first
                         anniversary of the plan effective date;
                       • $49.00 from the first anniversary of the plan effective date to the
                         day prior to the second anniversary of the plan effective date;
                       • $52.00 from the second anniversary of the plan effective date to
                         the day prior to the third anniversary of the plan effective date;;
                         and
                       • $55.00 from the third anniversary of the plan effective date until
                         expiration.

**Term:**              The Warrants will expire on the fourth anniversary of the plan effective
                       date.

**Rights:**            The Holder will have no right to vote or to consent as a stockholder in
                       respect of the meetings of stockholders or for the election of directors of
                       the Company or any other matter, or any rights whatsoever as stockholder
                       of the Company.

**Obligations:**       The Holder will be subject to the same obligations as those assumed by
                       stockholders of the Company under the Company's articles of
                       incorporation and by-laws (such as transfer restrictions), with such
                       restrictions built into the warrant agreement.

**Adjustments:**       The strike price shall be increased by the per share amount of incremental
                       capital invested in the Company (calculated taking into account the
                       additional capital and additional shares issued, if any).  For avoidance of
                       doubt, incremental capital shall exclude capital invested to repay already

39

invested debt or equity.

The Holder will also be entitled to adjustments to the Strike Price and the number of Warrants upon the subdivision or combination of the Common Stock underlying the Warrants, upon the payment by the Company of dividends (or other distributions) on the outstanding Common Stock of the Company payable in Common Stock of the Company and upon a recapitalization, business combination or reorganization.

**Exercise; Payment of Exercise Price:** The Warrants shall be exercisable, at the option of the Holder thereof, at any time and from time to time prior to the expiration date, in whole or in part, into Common Shares, by delivering to the Company such Warrant(s), together with a notice of exercise of such Warrant(s). The issuance of Common Shares pursuant to the exercise of Warrants (collectively, the "Warrant Common Shares") shall be subject to payment in full by the Holder of the applicable Strike Price either (i) by delivery to the Company of a certified or official bank check or by wire transfer of immediately available funds in the amount of the aggregate Strike Price for such Warrant Common Shares or (ii) if exercising in connection with a Sale Transaction (as defined below) or within thirty days of a Board Valuation (as defined below), by instructing the Company to withhold from the Warrant Common Shares issuable to the Holder upon such exercise a number of Warrant Common Shares (the "Withheld Common Shares") equal in value to the aggregate Strike Price payable with respect to such exercise.

A "Board Valuation" shall mean the fair market value per Common Share as determined by the Board of Directors of the Company (the "Board") in its sole discretion, provided that such determination shall be made in good faith, and provided further that such determination shall be final and shall be used solely for the purpose of determining the number of Withheld Common Shares and may not be disclosed to any other party and may not be relied upon by any other party for any purpose whatsoever. The Holder shall have the right to demand that the Board make such a Board Evaluation twice during the period beginning one year after the date of this Agreement and ending thirty (30) days prior to the expiration of the Warrants, and each such Board Valuation shall be valid for exercising the Warrants pursuant to clause (2) above for thirty days after the date of the Board Valuation. The number of Withheld Common Shares will be calculated based on such Board Valuation.

A "Sale Transaction" shall mean (i) a merger, consolidation or similar transaction in which the Company is not the surviving party or in which the holders of the Common Shares of the Company immediately prior to such transaction represent less than 50% of the Common Shares outstanding immediately following such transaction, (ii) the sale or other disposition of all or substantially all of the consolidated assets of the

40

Company or (iii) a sale, other disposition or issuance of 100% of the then outstanding Common Shares of the Company. The number of Withheld Common Shares will be calculated based on the fair market value implied by the consideration paid per share in the Sale Transaction (the "Sale Price"). Upon consummation of any Sale Transaction involving the sale or other disposition, solely for cash, of all of the outstanding Common Shares or all or substantially all of the assets of the Company to a purchaser that is not, as of the date of this Agreement or as of the date of the Sale Transaction, an Affiliate of the Company, or a shareholder of the Company or any of its Affiliates, the Company shall pay (or cause to be paid) to the Holder of the Warrants, with respect to each unexercised Warrant outstanding prior to the closing of such Sale Transaction, cash in an amount equal to the excess, if any, of the Sale Price over the Strike Price, and such Warrants shall be terminated and cancelled.

**Transferability:**    Non-transferable.

**Governing
Law:**    Delaware.

41

EXECUTION VERSION

# EXHIBIT D

## Deferred Purchase Claims

1. VisionApp............................$6,000,000.00

2. Perfman..............................$1,700,000.00

3. Riverglass............................ $500,000.00

4. Atempo................................ $600,000.00

5. Network Software Associates......$2,000,000.00

EXECUTION VERSION

## Exhibit B

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement between Allen Systems Group, Inc., and [**Transferor Consenting Creditor**] (the "**Transferor**"), *inter alia*, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound.

The Transferee represents and warrants that as of the date of this transfer, it has acquired the following Claims from Transferor:

| Domestic Term Loan: | $_____ (principal amount) |
| Domestic Revolving Loan: | $_____ (principal amount) |
| Foreign Facility: | $_____ (principal amount) |
| Second Lien Notes: | $_____ (principal amount) |

By:     _____
        Transferee

LA\3881006.7