## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Allen Systems Group, Inc., *et al.*,[1] | ) Case No. 15-10332 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### DEBTORS' MOTION FOR ENTRY OF ORDER: (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, COMMISSIONS, BONUSES, AND OTHER VARIABLE COMPENSATION, AND REIMBURSABLE EXPENSES, AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS; AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (the "Motion") for entry of an order, substantially in the forms attached hereto as **Exhibit A** (the "Order"), (i) authorizing the Debtors to (a) pay prepetition wages, salaries, commissions, bonuses, and other variable compensation, and reimbursable expenses and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; and (ii) granting related relief. In support of this Motion, the Debtors respectfully state as follows:[2]

### Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Allen Systems Group, Inc. (4496); ASG Federal, Inc. (1773); and Viasoft International, LLC (9761). The mailing address for all of the Debtors is: 708 Goodlette Road North, Naples, Florida 34102.

[2]    The facts and circumstances supporting this Motion are set forth in the *Declaration in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and "admin09.

3.      The statutory bases for the relief requested herein are sections 105(a), 362(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-l(m).

## Relief Requested

4.      By this Motion, the Debtors seek entry of the Order, substantially in the form attached hereto as **Exhibit A** (i) authorizing the Debtors to (a) pay prepetition wages, salaries, commissions, bonuses, and other variable compensation, and reimbursable expenses and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; and (ii) granting related relief.

## Background

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

2

**The Debtors' Workforce**

6.       The Debtors' employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  In many instances, the Debtors' employees include highly skilled and trained personnel who cannot be easily replaced.  Without the continued, uninterrupted services of their employees, effective reorganization of the Debtors will be materially impaired.

7.       At the same time, the vast majority of employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their employees compensation, providing their employees benefits, and maintaining certain programs benefiting their employees.   Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

8.       The 1,054 employees of the Debtors and the non-debtor affiliates provide mission-critical enterprise information technology management software solutions to large enterprises and small and medium-sized businesses in a variety of industries throughout the world.  Approximately forty-nine percent (49%) of the Debtors' and the non-debtor affiliates' employees work in the United States.  Of the remaining employees who work outside of the United States, a majority (approximately 436 employees or forty-one percent (41%) of the workforce), work in Germany, France, the United Kingdom, and Spain.  The total number of employees worldwide who are employed by the Debtors is 871.

9.    As of the Petition Date, the Debtors and the non-debtor affiliates employ approximately 1,018 individuals on a full-time, salaried basis (the "Full-Time Employees").  In addition to the Full-Time Employees, the Debtors' workforce includes approximately 36 individuals that are currently working part-time[3] (collectively, the "Other Employees," and together with the Full-Time Employees, the "Employees").  The Other Employees are not eligible for the Debtors' Health and Welfare Programs, as described herein, except to the extent required by law.  The Employees in the United States are not represented by a collective bargaining unit.  Overseas, 392 Employees in six countries, employed by the Debtors and non-debtor affiliates, are represented by unions, work councils, or similar organization under 15 different agreements.

## Employee Compensation and Benefits

10.    The Debtors seek to minimize the personal hardship the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected.  Thus, by this Motion, the Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, commissions, bonuses and other variable compensation, expense reimbursements, payroll services, federal, state and foreign withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, vacation time, paid sick leave, personal time off, life insurance, voluntary life insurance, short- and long-term disability coverage and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business (collectively, the

---

[3]    Part-time employees are defined as those Other Employees who are normally scheduled to work 29 hours or less per week.

4

"Employee Compensation and Benefits"). In addition, the Debtors also are seeking to pay all costs incident to the Employee Compensation and Benefits.

11.     By this Motion, the Debtors seek authority to honor prepetition ordinary course employment practices as summarized below:

| Relief Sought[4] | Amount |
|---|---|
| **Employee Compensation and Withholding Obligations** | |
| Unpaid Wages | $2,300,000 |
| Unpaid Sales Commissions and Bonuses | $6,700,000 |
| Withholding Obligations | $1,700,000 |
| Unpaid Payroll Fees | $5,000 |
| Expense Reimbursements | $200,000 |
| **Employee Benefit Programs** | |
| Health Insurance Programs | $1,500,000 |
| Life & AD&D Insurance | $0 |
| Voluntary Life & AD&D Insurance | $0 |
| Disability Benefits | $0 |
| Workers' Compensation Programs | $0 |
| 401(k)Plan | $0 |
| Paid Time Off | $2,800,000 |
| **Total** | **$15,205,000** |

12.     Subject to the Court's approval of the relief requested in this Motion, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

## I.     Employee Compensation and Withholding Obligations

13.     In the ordinary course of business, the Debtors pay Employees wages, salaries, commissions and bonuses, sales incentives, and other variable compensation (collectively, the

---

[4]     Capitalized terms in this chart shall have the meanings as ascribed to them in this Motion.

"Employee Compensation"). The combined annual Employee Compensation for all of the Debtors' and the non-debtor affiliates' Employees is approximately $120 million.[5] The salaried Employees in the United States are paid approximately $4.1 million each month, and the Debtors' portion of payroll taxes for the salaried Employees is approximately $310,000 per month. The salaried Employees in non-US locations are paid approximately $3.1 million each month, and the portion of payroll taxes for the Debtors and the non-debtor affiliates for those Employees is approximately $821,000.

A.    **Wages**

14.    As previously noted, the Debtors pay their Employees' wage and salary obligations (the "Wages"), including commissions and bonuses to Employees in the United States and in non-U.S. locations. The Full-Time Employees in the United States are paid semi-monthly, on the 15th and last day of the month and are paid current through the date of the last payroll period ended on February 15, 2015. The Full-Time Employees outside of the United States are paid primarily on a monthly basis save for Canada, the Philippines, and Australia, which are paid either semi-monthly or fortnightly. Because the vast majority of the Employees are paid in arrears, certain Employees will be owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things: (a) potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; and (b) the delay between the date when some payroll checks are issued and the date when such checks are presented to an Employee's bank for payment.

---

[5]    Annual Employee Compensation is based on the twelve months ended December 31, 2014.

15.    As of the Petition Date, the Debtors estimate that Employees are owed an aggregate of approximately $2,202,728 (excluding approximately $1,580,381 due for accrued but unpaid payroll taxes as of February 18, 2015) on account of accrued wages, salaries, overtime, and other compensation (excluding commissions, bonuses and other variable compensation, reimbursable expenses, and PTO (as defined below)) earned prior to the Petition Date ("Unpaid Wages").

16.    By this Motion, the Debtors seek authority to pay their Employees any Unpaid Wages in the ordinary course of business and consistent with past practice, and to continue their prepetition practices with respect to Wages on a post-petition basis in the ordinary course of the Debtors' business.  For the avoidance of doubt, the Debtors believe that no employee is owed Unpaid Wages in excess of the priority caps set forth in Bankruptcy Code sections 507(a)(4)-(5) and, by this Motion, are not seeking to pay Unpaid Wages to any Employee in excess of such cap.

**B.    Sales Commissions and Bonuses**

17.    The Debtors incentivize their sales and other personnel through a combination of commissions on sales (the "Sales Commissions") and bonuses and other forms of variable compensation (collectively, the "Bonuses," and, together with the Sales Commissions, the "Sales Commissions and Bonuses").

18.    Sales Commissions are a significant source of total earned income for certain of the Debtors' sales representatives.  The Sales Commissions and the timing of payment align the incentives of the sales representatives with those of the Debtors, thereby encouraging the sales personnel to maximize sales, benefiting the business as a whole.

19.    Sales Commissions are deemed earned when the sale is booked and the contract is signed. Sales Commissions are typically paid two months after the sale is booked and the

7

customer has remitted payment.  In the event an eligible Employee separates from employment with the Debtors for any reason, including resignation, such Employee will be entitled to receive Sales Commissions for all sales made and contracts signed by the Debtors for which the Employee would otherwise have received Sales Commissions if such employment had not terminated; *provided,* that the Sales Commissions are earned and accrued on or prior to the date of the Employee's termination of employment with the Debtors.

20.    The various types of Sales Commissions are memorialized in an "Individual Compensation Plan" (the "Sales Commission Plan") and cover substantially all of the sales organization responsible for the Debtors' revenue driven from new sales. The Sales Commission Plan provides for potential commissions greater than 100% of such professional's base salary for meeting quarterly or annual quotas and other criteria.

21.    Similar to Sales Commissions, Bonuses are a significant source of total earned income for certain of the Debtors' sales representatives. Bonuses are paid to certain of the Debtors' Employees when their personal achievement meets or exceeds certain defined sales targets or other objectives.    Certain of the Debtors' accrued bonuses related to 2013 performance-based incentives that were achieved in 2013 subject to two-year deferred payment schedules while certain of the bonuses were earned more recently in 2014 and are paid similarly to Sales Commissions, two months after the month in which the bonus was earned.

22.    During 2013, the Debtors paid approximately $14.3 million on account of Sales Commissions and Bonuses.  For 2014, the Debtors project approximately $15.1 million on account of Sales Commissions and Bonuses, of which a substantial amount was earned recently due to the Debtors' seasonal business and selling cycle.  By this Motion, the Debtors seek authority to pay and honor approximately $6,605,190 of unpaid prepetition Sales Commission

8

and Bonuses (the "Unpaid Sales Commissions and Bonuses")[6] in the ordinary course of business and consistent with past practice, and to continue the Sales Commissions and Bonuses practices post-petition in the ordinary course of the Debtors' business.  Insofar as December sales vastly exceed those of other months during the year, the Debtors estimate that approximately 94 employees have earned Sales Commissions and Bonuses, which will likely be due to be paid in the next 60 days, and which will exceed the cap provided for under 11 U.S.C. § 507(a)(4).  The Debtors are seeking authority to honor and pay the Unpaid Sales Commissions and Bonuses as they come due in the ordinary course of business.[7]

C.      **Withholding Obligations**

23.      During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, child support, and other pre-tax deductions payable pursuant to certain of the Health and Welfare Programs and the 401(k) Plan (each as defined below) (collectively, the "Deductions"), and forward those amounts to various third-party recipients.  The Debtors also are required by law to withhold from the Employee Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or

---

[6] The Unpaid Sales Commissions and Bonuses include required allocations of profit-sharing in the amount of $338,604 (plus related interest and taxation) due to 221 eligible Employees of the Debtors' French branch as a result of a tax reassessment.

[7] For the avoidance of doubt, the Debtors do not seek to make any payments to Insiders, as that term is defined in Bankruptcy Code section 101(31), under the on account of Unpaid Sales Commissions and Bonuses.

DOCS_DE:197449.7 05511/001

local taxing authority at the same time Employees' payroll checks are disbursed. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Payroll Taxes is approximately $1,580,381.

24.     As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $1,634,376. By this Motion, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of business during the administration of these chapter 11 cases.

### D.    Payroll Processing

25.     The Debtors process their payroll internally using licensed payroll software in the United States and France. The Debtors also utilize Ceridian, Automatic Data Processing, Inc., third-party payroll and related services, and other foreign payroll services (collectively, the "Foreign Payroll Processors" and together with Ceridian and ADP, collectively, the "Administrators") to process and administer their Employee Compensation and Withholding Obligations worldwide. The Debtors pay the Administrators approximately $23,732 per month for their services. The Debtors' payroll is by direct deposit through electronic funds transfer to nearly 100% of the worldwide Employees' bank accounts. In the ordinary course of business, approximately two to three days before each payroll issuance, the Debtors advance funds to the Administrators along with payment schedules outlining the payments to be made to the Employees. On each applicable pay day the Administrators make direct deposit disbursements and issue payroll checks to the Employees.

26.     As of the Petition Date, the Debtors estimate that they owe the Administrators approximately $5,000 on account of payroll processing fees (collectively, the "Payroll Fees" and

outstanding obligations related thereto, the "Unpaid Payroll Fees"). Failure to pay the Unpaid Payroll Fees could lead to delayed disbursement of Employee Compensation to the Employees and Withholding Obligations to the appropriate third-parties to the detriment of the Employees and the Debtors' business. As a result, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid Payroll Fees and to continue to administer the payroll and honor the Payroll Fees in the ordinary course of business.

**E.      Reimbursement Obligations**

27.      Prior to the Petition Date and in the ordinary course of their business, the Debtors reimburse Employees for certain expenses that such Employees incur in the scope of their employment (the "Expense Reimbursements"). Expense Reimbursements typically include expenses for travel, lodging, professional seminar registration fees, ground transportation, meals, and other business-related expenses related to the discharge of an Employee's duties. Expense Reimbursements are generally incurred by Employees through the use of personal funds, and the Employee may be held personally liable for any unpaid obligations. Thus, the Debtors' inability to reimburse such expenses to these Employees could impose severe hardship on such individuals where such individuals otherwise incurred obligations for the Debtors' benefit.

28.      Certain Employees have not yet been reimbursed for Expense Reimbursements previously incurred. The majority of the Expense Reimbursements have been incurred through the use of Employees' personal credit card accounts. The Employees submit receipts for reimbursement that are processed through the normal expense report and accounts payable or payroll process. It is difficult for the Debtors to estimate the amount of Expense Reimbursements outstanding as of the Petition Date because not all Employees have submitted expense reports as of the Petition Date. It is critical that the Debtors be authorized to reimburse all such expenses as and when reports are submitted. The Debtors, therefore, seek authority to

11

pay all pre-petition Expense Reimbursements in the ordinary course of business, including those incurred prior to the Petition Date.

29.    As of the Petition Date, the Debtors estimate that the outstanding Expense Reimbursements do not exceed approximately $200,000.    By this Motion, the Debtors seek authority to pay the Employees' Expense Reimbursements and to continue the Expense Reimbursements in the ordinary course of the Debtors' business.

## II.    Employee Benefit Programs

### A.    Health and Welfare Programs

30.    The Debtors offer several insurance policies to eligible Employees located in the United States for medical, dental, and vision care coverage and certain other benefits, including the Health Insurance Programs, Life and AD&D Insurance, Voluntary Life Insurance, Disability Benefits, the Workers' Compensation Program, the 401(k)Plan, and other benefit programs (each as may be defined herein, and collectively, the "Health and Welfare Programs").[8]    The following chart summarizes the Debtors' estimated aggregate amount of accrued, but unpaid, obligations with respect to the Health and Welfare Programs as of the Petition Date.

| Health and Welfare Programs | Accrued and Unpaid Obligations |
|---|---|
| Health Insurance Programs | $1,500,000 |
| Life and AD&D Insurance | $0 |
| Voluntary Life Insurance | $0 |
| Disability Benefits | $0 |
| Workers' Compensation Programs | $0 |
| 401(k)Plan | $0 |
| Paid Time Off | $2,800,000 |
| **Total** | **$4,300,000** |

---

[8]    The Debtors and the non-debtor affiliates offer similar benefits to Employees located outside of the United States.    Such benefit programs are governed by the laws of the relevant non-U.S. jurisdictions in which the Debtors and the non-debtor affiliates operate.

31.     By this Motion, the Debtors seek authority to pay any unpaid amounts due with respect to the Health and Welfare Programs and continue to provide the Health and Welfare Programs post-petition in the ordinary course of business during the administration of these chapter 11 cases.

### 1.     Health Insurance Programs

32.     The Debtors offer complete medical coverage to the Full-Time Employees through three plan options: the "Core Plan," a high-deductible health plan (the "HDP"), and a "Buy Up Plan" collectively, (the "Medical Plans"), all three of which are administered by Blue Cross Blue Shield of Florida ("BCBS"). The three plans are open access and do not require selection of a primary care physician or referrals to seek care from contracted specialists. Medical Plan coverage for Full-Time Employees begins the first date of employment. The Debtors are self-insured. The Debtors maintain a stop-loss insurance policy that covers medical claims.[9] Employees pay semi-monthly premiums with respect to the Medical Plans.[10]

33.     Under the Core Plan, BCBS covers (a) 100% of in-network preventative care services claims and up to 80% of all other in-network claims above the deductible,[11] and (b) up to 50% of all out-of-network claims above the deductible. Under the Buy Up Plan, BCBS covers (a) 100% of in-network preventative services claims and up to 90% of all other in-network

---

[9]     The stop loss insurance policy is described and relief is requested with respect thereto in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition, (B) Enter into New Insurance Policies, (C) Honor Their Prepetition Insurance Premium Financing Agreements, and (D) Renew Their Premium Financing Agreement in the Ordinary Course of Business, and (II) Granting Related Relief* (the "Insurance Motion") filed contemporaneously herewith.

[10]    Employees enrolled in the Core Plan pay a semi-monthly premium between $109.18 and $250.46; Employees enrolled in the Buy Up Plan pay a semi-monthly premium between $129.29 and $303.61; and Employees enrolled in the HDP pay a semi-monthly premium between $84.34 and $184.79.

[11]    Employees enrolled in the Core Plan have an individual deductible of $500 per calendar year or a family deductible of $1,000 per calendar year.

claims above the deductible,[12] and (b) up to 60% of all out-of-network claims above the deductible. Under the HDP Plan, BCBS covers (a) 100% of in-network preventative care service claims and up to 80% of all other in-network claims above the deductible and (b) up to 50% percent of all out-of-network claims above the deductible.[13] Additionally, Employees enrolled in all Plans have access to a prescription plan administered by BCBS as well as a flexible spending account and health savings account administered by TASC, which can be used to cover incidental medical costs and also dependent child care (the "FSA"). Currently, approximately 232 Employees use the FSA, for which the Debtors pay approximately $1,250.00 per month in administration costs. As of the Petition Date, the Debtors do not have any obligations accrued but unpaid on account of the FSA. TASC is also the third party provider for the Debtors' COBRA administration, for which Debtors pay approximately $400.00 per month. As of the petition date, the Debtors do not have any obligations accrued but unpaid on account of COBRA administration or COBRA continuation of benefits.

34.    The Debtors also provide dental insurance to Full Time Employees through Aetna Health Insurance Company (the "Dental Plan")[14] and vision insurance through EyeMed Vision Care (A Luxottica Group Corporation) (the "Vision Plan," and together with the Medical Plan, the Dental Plan, and the FSA, the "Health Insurance Programs"). Enrolled Employees pay twice monthly premiums of between $7.56 and $37.18 on account of the Dental Plan and between $2.60 and $6.57 on account of the Vision Plan. The Debtors pay twice monthly premiums of

---

[12]  Employees enrolled in the Buy Up Plan have an individual deductible of $750 per calendar year or a family deductible of $1,500 per calendar year.

[13]  Employees enrolled in the HDP have an individual deductible of $1,250 per calendar year or a family deductible of $2,500 per calendar year.

[14]  Dental Plan coverage for Full-Time Employees begins on the Employee's first date of employment.

14

approximately $40,800 on account of the Dental Plan.  The Vision Plan is 100% Employee

funded, and, as a result, the Debtors do not pay premiums on account of the Vision Plan.

35.    The Debtors pay approximately $185,000 per month in the aggregate for premium

payments and administration on account of the Health Insurance Programs and also incur claims

of approximately $575,000[15] per month (paid in arrears) to cover the costs of medical benefits

received by Full-Time Employees at health care facilities, such as clinics and hospitals.  As of

the Petition Date, the Debtors do not have any accrued, unpaid premium obligations outstanding

with respect to the Health Insurance Programs and estimate that they owe approximately

$1,450,000 to cover the claims submitted by eligible Employees or health care costs.

### 2.    Insurance, Disability, and Workers' Compensation Programs

### a.    Life Insurance Programs

36.    The Debtors provide basic life and accidental death and dismemberment

insurance coverage (the "Basic Life and AD&D Insurance") to the Full-Time Employees through

UNUM ("UNUM"), which provides maximum coverage of $50,000 to such Employees at no

cost to them in the event of a Full-Time Employee's death.  There are additional AD&D benefits

upon an Employee's death or dismemberment, also at no cost to them, in the amount of $50,000

(subject to determination by UNUM).  Full-Time Employees may also purchase voluntary Life

Insurance (the "Voluntary Life Insurance") through UNUM, which provides additional

maximum coverage of $750,000 in the event of death.  The Debtors pay approximately $4,000

per month in premiums with respect to their Basic Life and AD&D Insurance, and approximately

$13,000 per month in premiums with respect to Voluntary Life Insurance (and Spouse and

---

[15]    This amount reflects the 12-month average for calendar year 2014.  The amount of claims actually incurred on a monthly basis for calendar year 2014 ranged from approximately $399,000 to approximately $837,451.

Child(ren) Life Insurance. Full-Time Employees are eligible for Basic Life Insurance, AD&D Insurance, and Voluntary Life Insurance on the first date of employment.

37.    As of the Petition Date, the Debtors estimate that the aggregate amount of unpaid obligations with respect to the Life and AD&D Insurance is approximately $0, and with respect to Voluntary Life is $0. The Debtors do not have any obligations outstanding with respect to the Voluntary Life Insurance as of the Petition Date.

### b.    Disability Benefits

38.    The Debtors provide their Full-Time Employees with short-term and long-term disability benefits (the "Disability Benefits"). Full-Time Employees are eligible for Disability Benefits from the first date of full-time employment. Under the short-term disability benefits program, the Full-Time Employees are entitled to, among other things, continuation of a portion of their base wages in the event of a short-term medical disability due to an illness, injury, or pregnancy related condition (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees and Salaried Employees are entitled to, among other things, continuation of a portion of their wages in the event of a long-term medical disability due to illness or injury (the "Long-Term Disability Benefits"). Full-Time Employees become eligible for Long-Term Disability Benefits after the Employee's Short-Term Disability Benefits terminate.

39.    For Full-Time Employees, the Short-Term Disability Benefits begin after an employee is absent from work for one week and continue for up to 12 weeks of any disability thereafter. Depending on length of an Employee's employment, Full-Time Employees will receive Short-Term Disability Benefits equaling 60% salary.

40.    After an Employees is absent for 12 weeks on account of a disability, Full-Time Employees are entitled to Long-Term Disability Benefits totaling 60% percent of their wages

16

with a maximum monthly benefit of $12,500. The Short-Term Disability Benefits and the Long-Term Disability Benefits are insured and administered by UNUM. The Debtors pay UNUM approximately $22,000 per month in premiums with respect to the Long-Term Disability Benefits, Short-Term, and NY Disability Benefits.

41.    One Full-Time Employee is currently receiving Short-Term Disability Benefits, and one Full-Time Employee is currently receiving Long-Term Disability Benefits.

### c.    Workers' Compensation Programs

42.    The Debtors provide workers' compensation insurance for their Employees at the statutorily-required level for each state in which the Debtors have Employees (collectively, the "Workers' Compensation Program"). Continental Insurance Company ("Continental"), which is responsible for administering and paying the Debtors' workers' compensation claims for all non-monopolistic states, currently provides these benefits to the Debtors' Employees pursuant to certain workers' compensation insurance policies (the "Workers' Compensation Policies"). The Workers' Compensation Policies have a $0 per incident deductible. For monopolistic workers' compensation states (Washington and Ohio, e.g.), Debtors contribute premiums directly to the State agency per law.

43.    The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements. There are no open claims under the Workers' Compensation Policies administered by Continental or any state agency. The Debtors

17

do not have any obligations outstanding on account of administrative fees and loss payments on account of the Workers' Compensation Program as of the Petition Date.[16]

### 3.    401(k) Plan

44.    The Debtors provide all U.S.-based Full-Time Employees with the ability to participate in a 401(k) program (the "401 (k) Plan"). Full-Time Employees are not eligible for the 401(k) Plan until the first of the month following six months of full-time employment. The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. Each Employee's 401(k) contributions are deducted automatically from each paycheck. The Debtors do not match the Employees' 401(k) Plan contributions. The 401(k) Plan with respect to the Employees is provided by Fidelity Investments Company ("Fidelity") to which the Debtors pay no service fees with regard to advisory, administration, and record keeping. All of the above fees are paid through participant assets. Annual Plan Audit conducted by outside CPA is paid from the forfeiture account. Debtors hold no financial liability for expenses specific to the 401(k) Plan. Each month, the Debtors withhold approximately $324,004.00 from Employee paychecks on account of the 401(k) Plan. Approximately $26,000 of these withholdings account for loans Employees have taken against their 401(k) accounts.

45.    As of the Petition Date, the Debtors do not have unpaid obligations to Fidelity on account of the 401(k) Plan.

---

[16]    Portions of the Workers' Compensation Program may change post-petition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program post-petition, including making any changes to current policy and practices that become necessary.

B.      **Vacation Time and PTO.**

46.     The Debtors maintain several paid time-off benefit programs for Full-Time Employees, providing paid time off for Vacation Time and PTO (each as defined below, and together, the "Paid Time Off").

47.     In the ordinary course of business, the Debtors provide vacation time ("Vacation Time") to Full-Time Employees as a Paid Time Off benefit.   Vacation Time accrues at a specified rate based on the Employee's years of service and date of hire.   Vacation Time ranges from 10 to 20 days for U.S.-based Employees and up to 30 days or more for non-US-based Employees annually.   Vacation Time begins accruing upon the date of hire.   Full-Time Employees in the United States may not carry over any Vacation Time into the next calendar year (except in California and certain other jurisdictions), but they are entitled to a cash payment in lieu of accrued but unused Vacation Time at the time of separation from employment for any reason (including resignation).

48.     Eligible Employees are awarded four personal days and five sick days of paid time off ("PTO") per calendar year.   Employees who resign or are terminated are not entitled to any compensation for their accrued and unused PTO.   Unused PTO does not carry over from one year to the next, unless required by local laws.

49.     The Debtors seek authority to honor in the ordinary course of business all pre-petition accrued Paid Time Off of their Employees who continue to be employed by the Debtors after the Petition Date.   Employees will utilize any accrued Vacation Time and PTO in the ordinary course of business.

C.      **Severance**

50.     In the ordinary course of the Debtors' business, the Debtors generally provide severance equal to two weeks of base salary to each Employee who has completed his or her

probationary period and is involuntarily terminated for any reason other than misconduct. Occasionally, the Debtors have provided incremental severance on a case-by-case basis for certain Employees.  All *ex-gratia* severance is conditioned upon an Employee executing a release agreement in favor of the Debtors, the form of which (short or long) differs depending on the number of weeks that severance is provided  (the "Ordinary Course Severance Program").

51.     The Ordinary Course Severance Program applies to all U.S. Employees of the Debtors.  The Ordinary Course Severance Program does not apply if the Employee is covered by an enforceable written employment agreement that provides for severance pay or benefits, the Employee voluntarily resigns, or the Employee is terminated for cause.  Moreover, with respect to the Debtors' non-U.S. Employees, severance, if any, is governed by the laws of the applicable jurisdiction or national collective bargaining unit.

52.     The Debtors believe that the Ordinary Course Severance Program is critical to maintaining Employee morale and loyalty.  Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success.  Permitting the Debtors to pay the unpaid severance payments (the "Severance Payments") will help minimize the adverse effect of the commencement of these chapter 11 cases on their ongoing business operations.  Additionally, implementing such a program is not without tangible benefits.  The Debtors believe that the Ordinary Course Severance Program will help reduce expenses that would likely arise in the absence of the Ordinary Course Severance Program to defend the assertion of claims by severed Employees.

53.     As of the Petition Date, the Debtors owe Severance Payments in the amount of $230,064.00.  By this Motion, the Debtors seek the authority to continue to maintain the

Ordinary Course Severance Program on a post-petition basis and in the ordinary course of business for any non-Insider Employees that may be severed following the Petition Date.[17]

### D.   Other Benefits

54.   In addition to the benefits described herein, the Debtors offer certain other benefit programs to various groups of Employees, including a business travel program to provide important online heath and security resources for Employees on international assignments.   In addition, for certain employees overseas, the Debtors lease vehicles for the employees. Approximately 30 vehicles are currently being leased by the Debtors for the benefit of certain overseas employees. The Debtors believe they are obliged by employment contracts and local law to continue these employment benefits, terms, and conditions.   The Debtors further believe that, despite a legal obligation to honor such terms and conditions, the programs are important to maintaining employee morale and assisting in the retention of the Debtors' workforce.

55.   The cost of such programs for the Debtors each month is negligible.  The Debtors believe that failing to honor such programs would have an adverse effect on the Debtors' Employees and would contravene applicable law. The Debtors request authority to continue such programs in their sole discretion and make payments pursuant to such programs in the ordinary course of business.

---

[17]   For the avoidance of doubt, the Debtors do not seek to make any payments to Insiders, as that term is defined in Bankruptcy Code section 101(31), under the Ordinary Course Severance Program.

DOCS_DE:197449.7 05511/001

## Basis for Relief

I.   **Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits**

   A.   **Certain Employee Compensation and Benefits are Entitled to Priority Treatment**

56.      Bankruptcy Code sections 507(a)(4) and 507(a)(5) entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

   B.   **Payment of Certain Employee Compensation and Benefits is Required by Law**

57.      The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal, state and foreign laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. *See* 26 U.S.C. §§ 6672, 7501(a); *see also City of*

22

*Farrell* v. *Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

58.    Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all workers' compensation amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II.    Payment of the Employee Compensation and Benefits is Proper Pursuant to Bankruptcy Code Section 363(b) and the Doctrine of Necessity

59.    Bankruptcy Code section 363 provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under Bankruptcy Code section 363); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the

debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

60.    In addition, the Court may authorize payment of prepetition claims in appropriate circumstances under Bankruptcy Code section 105(a). Section 105(a), which codifies the inherent equitable powers of a bankruptcy court, empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See* 11 U.S.C. § 105(a). The Court may use its power under section 105(a) to authorize payment of the Employee Compensation and Benefits under the "necessity of payment" rule (also referred to as the "doctrine of necessity").

61.    The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *See id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").

62.    The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is

24

generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process").

63.     Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, the Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits.

64.     Moreover, the Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts – which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical

25

element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood

of retention of their Employees as the Debtors seek to operate their businesses in these chapter

11 cases.

65.     Indeed, courts in this district have recognized the importance of satisfying

employee obligations in cases requesting relief similar to that requested here. *See, e.g., In re*

*Mineral Park*, No. 14-11996 (KG) (Bankr. D. Del. Aug. 27, 2014) (authorizing debtors to

continue employee compensation and benefit programs and pay certain prepetition obligations

related thereto on a post-petition basis); *In re Source Home Entertainment, LLC*, No. 14-11553

(KG) (Bankr. D. Del. June 24, 2014) (same); *In re Coldwater Creek Inc.*, 14-10867 (BLS)

(Bankr. D. Del. Apr. 14, 2014) (same); *In re USEC Inc.*, No. 14-10475 (CSS) (Bankr. D. Del.

Mar. 7, 2014) (same); *In re Dolan Co.*, No. 14-10614 (BLS) (Bankr. D. Del. Mar. 25, 2014)

(same).  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to

pay and continue the Employee Compensation and Benefits in the ordinary course of business

and consistent with past practice.

## III.   A Limited Waiver of the Automatic Stay for Workers' Compensation Programs Is Appropriate in This Case

66.     Bankruptcy Code section 362(a)(1) operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title....

67.     Bankruptcy Code section 362, however, permits a debtor or other parties in

interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C.

§ 362(d)(1).  The Debtors seek authorization, under Bankruptcy Code section 362(d), to permit

their Employees to proceed with their claims against the Workers' Compensation Programs in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Programs, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Programs to proceed, including allowing the assertion of claims against, or pursuant to, such Workers' Compensation Programs.

## IV.    Processing of Checks and Electronic Fund Transfers Should be Authorized

68.    The Debtors have sufficient funds to pay any amounts related to the Employee Compensation and Benefits in the ordinary course of business. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefits, as applicable. The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Thus, the Debtors request that the Court authorize all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Employee Compensation and Benefits.

## The Requirements of Bankruptcy Rule 6003 are Satisfied

69.    Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to pay the Employee

27

Compensation and Benefits and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and to maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Reservation of Rights

70.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under Bankruptcy Code section 365. The Debtors expressly reserve their right to contest any claim related to the relief sought herein. Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

71.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

DOCS_DE:197449.7 05511/001

### Notice

72.    The Debtors will provide notice of this Motion to the following parties, or their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Ad Hoc Committee of Pre-Petition Secured Creditors; (d) the administrative agent for the Domestic Credit Agreement and the Foreign Credit Agreement; (e) the lender and administrative agent under DIP Facility Credit Agreement (as defined in the Plan); (f) the Indenture Trustee for the Notes (each as defined in the Plan); (g) the United States Environmental Protection Agency; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; (j) the office of the attorneys general for the states in which the Debtors operate; (k) the Securities and Exchange Commission; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-l(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

73.    No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Wilmington, Delaware
Dated: February 18, 2015

Laura Davis Jones (DE Bar No. 2436)
Michael R. Seidl (DE Bar No. 3889)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              mseidl@pszjlaw.com
              pkeane@pszjlaw.com

*Proposed Counsel for the*
*Debtors and Debtors in Possession*