## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Allen Systems Group, Inc., *et al.*,[1] | ) Case No. 15-10332(____) |
| | ) |
| | ) (Joint Administration Requested) |
| Debtors. | ) |
| | ) |

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (A) APPROVING POST-PETITION FINANCING, (B) GRANTING FIRST-PRIORITY SENIOR LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) AUTHORIZING USE OF CASH COLLATERAL, (D) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS, (E) MODIFYING THE AUTOMATIC STAY, (F) GRANTING RELATED RELIEF AND (G) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion"), under Sections 105, 361, 362, 363, 364 and 507 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final Order"):

(1)     authorizing the Debtors to enter into a $40 million senior secured, superpriority post-petition revolving loan financing facility (the "DIP Facility") pursuant to the terms and conditions of that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and

---

[1]     The Debtors and the last four digits of each Debtor's federal tax identification number are as follows: Allen Systems Group, Inc. (4496); ASG Federal, Inc. (1773); and Viasoft International, LLC (9761). The mailing address for all of the Debtors is: 708 Goodlette Road North, Naples, Florida 34102.

Security Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "DIP Credit Agreement"), substantially in the form attached hereto as Exhibit A to the Interim Order, by and among Allen Systems Group, Inc., ASG Federal, Inc., and Viasoft International, LLC, as borrowers (collectively, the "Borrowers"), the guarantors party thereto, the lenders from time to time party thereto (the "DIP Lenders" and each a "DIP Lender"), and NewStar Business Credit, LLC, as administrative agent and collateral agent (the "Administrative Agent" and together with the DIP Lenders, the "DIP Credit Parties");

(2)     authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related loan and security documents related to the DIP Facility (each as may be amended, supplemented, restated, or otherwise modified from time to time, and collectively with the DIP Credit Agreement, the "DIP Loan Documents") by and among the Debtors, the Administrative Agent, and the DIP Lenders, and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(3)     granting an allowed superpriority administrative expense claim against each of the Debtors on a joint and several basis pursuant to Bankruptcy Code section 364(c)(1) to the DIP Credit Parties on account of the DIP Facility and all obligations owing thereunder and under the DIP Loan Documents related to the DIP Facility to the DIP Credit Parties (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "DIP Obligations") in each of these chapter 11 cases and any successor cases, which claims shall not be subject to discharge under Bankruptcy Code section 1141;

(4)     pursuant to Bankruptcy Code sections 364(c)(2), 364(c)(3) and 364(d), granting to the Administrative Agent, for the benefit of itself and the DIP Credit Parties, automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including,

2

without limitation, all property constituting "Cash Collateral," as defined in Bankruptcy Code section 363(a), which liens shall be subject to the priorities set forth herein, to secure repayment of the DIP Obligations;

(5)    authorizing and directing the Debtors to pay the principal, interest, reasonable fees, expenses and other amounts payable under the DIP Loan Documents related to the DIP Facility as such become due and payable, including, without limitation (and to the extent applicable), commitment fees, unused line fees, administrative fees, any additional fees set forth in the DIP Loan Documents, the reasonable fees and disbursements of the DIP Credit Parties' attorneys, advisers, accountants, and other consultants, and all related reasonable expenses of the DIP Credit Parties, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents;

(6)    authorizing the Debtors to (1) use Cash Collateral and all other collateral in which the Pre-Petition Secured Creditors (as defined below) have an interest and (2) grant adequate protection to the Pre-Petition Secured Creditors, whose liens and security interests are being primed by the DIP Facility, with respect to, *inter alia*, such use of their Cash Collateral and all use and diminution in value of the Pre-Petition Collateral (as defined below);

(7)    vacating and modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

(8)    scheduling a final hearing within thirty-five (35) days of entry of the Interim Order (the "Final Hearing") to consider the relief requested in this Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(9)    granting related relief.

3

In support of the Motion, the Debtors respectfully state as follows:[2]

## Jurisdiction

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rule 4001-2.

## Background

### A.   General Background

4.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases

---

[2]   The facts and circumstances supporting this Motion are set forth in the *Declaration in Support of First Day Pleadings* (the "First Day Declaration") and the *Declaration of Neil A. Augustine in Support of the Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (A) Approving Post-Petition Financing, (B) Granting First-Priority Senior Liens and Providing Super-Priority Administrative Expense Status, (C) Authorizing Use of Cash Collateral, (D) Granting Adequate Protection to Pre-Petition Secured Creditors, (E) Modifying the Automatic Stay, (F) Granting Related Relief and (G) Scheduling a Final Hearing* (together with the First Day Declaration, the "Declarations") filed contemporaneously herewith and incorporated by reference herein.

pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

**B.    The Debtors' Secured Pre-Petition Indebtedness**

5.    Allen Systems Group, Inc., as borrower ("ASG" or the "Company"), TPG Allison Agent, LLC, succeeded by Wilmington Trust, N.A., as administrative agent (the "Pre-Petition Agent"), and certain lenders (the "Pre-Petition Secured Lenders") are parties to a Credit Agreement, dated as of December 14, 2012 (as amended, modified, supplemented or restated from time to time, the "Domestic Credit Facility", and, together with all other loan documents, security instruments and other documents related to, referenced in or executed in connection with the Domestic Credit Facility prior to the Petition Date, the "Domestic Credit Facility Documents"). The obligations arising under the Domestic Credit Facility are guaranteed by the following five entities: (i) Debtor ASG Federal, Inc.; (ii) Debtor Viasoft International, LLC; (iii) non-debtor ASG Canada, ULC; (iv) non-debtor Viasoft International GmbH; and (v) non-debtor Viasoft Software Development Geschäftsführungs GmbH (collectively, the "Domestic Credit Facility Guarantors"). The Domestic Credit Facility includes a first lien term loan in the original principal amount of $214.4 million and a $25 million revolving credit facility which was fully drawn on closing.

6.    The Domestic Credit Facility obligations are secured by first priority liens (the "Pre-Petition First Liens") on substantially all of the assets of ASG and the Domestic Credit Facility Guarantors (the "Domestic Credit Facility Collateral"), all as set forth in various pledge and security agreements, dated as of December 13-14, 2012, by and among the Pre-Petition Agent, ASG and the Domestic Credit Facility Guarantors, and the other Domestic Credit Facility Documents.

DOCS_DE:198177.3 05511/001

7.    The Debtors used the funds provided by the borrowings under the Domestic Credit Facility to re-finance the term and revolving loans under the Debtors' 2011 credit agreement, to pay certain related fees and expenses and for working capital. The Domestic Credit Facility matures on December 14, 2017.

8.    In addition, ASG (the "Issuer") issued 10.5% Senior Secured Second Lien Notes due 2016 (the "Second Lien Notes") pursuant to an Indenture, dated as of November 22, 2010 (as amended, modified, supplemented or restated from time to time, the "Indenture"), by and among ASG and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent (the "Indenture Trustee;" together with the Pre-Petition Agent, holders of the Second Lien Notes (the "Pre-Petition Holders"), and the Pre-Petition Secured Lenders, the "Pre-Petition Secured Creditors"). The Second Lien Notes require semi-annual interest payments on May 15 and November 15 every year beginning on May 15, 2011. The Second Lien Notes are secured by second-priority liens (the "Pre-Petition Second Liens" and together with the Pre-Petition First Liens, the "Pre-Petition Liens") on substantially all of the assets of the Issuer and the following two guarantors, Debtor ASG Federal, Inc. and Debtor Viasoft International LLC (the "Second Lien Collateral", and, together with the Domestic Credit Facility Collateral, the "Pre-Petition Collateral"). As of the Petition Date, $300 million of Second Lien Notes remain outstanding.

9.    Beginning in April 2014, ASG did not make its scheduled interest payments on the Domestic Credit Facility. As of February 18, 2014, unpaid/deferred interest on the Domestic Credit Facility totaled $44,943,825.05. In addition, ASG was unable to make the interest payments, totaling approximately $32 million, that were due under the Indenture on May 15, 2014 and November 15, 2014. As of January 31, 2015, unpaid interest on the Second Lien Notes totals approximately $40 million.

**C.    Ad Hoc Committee of Pre-Petition Secured Creditors**

10.    During 2014, the Debtors entered into negotiations with an ad hoc committee (the "Ad Hoc Committee of Pre-Petition Secured Creditors") comprised of Pre-Petition Holders holding over 72% of the Second Lien Notes. On or about October 17, 2014, certain members of the Ad Hoc Committee of Pre-Petition Secured Creditors purchased all right, title and interest to all loans made pursuant to the Domestic Credit Facility.

11.    Prior to the Petition Date, the Debtors entered into a Restructuring Support Agreement dated as of January 13, 2015 (the "Support Agreement"), with members of the Ad Hoc Committee of Pre-Petition Secured Creditors, and Arthur L. Allen, ASG's founder and sole shareholder, and his affiliates. The Ad Hoc Committee of Pre-Petition Secured Creditors agreed to support the Debtors' entry into a debtor-in-possession credit facility in the aggregate principal amount of up to $50,000,000 on terms and conditions acceptable to the Ad Hoc Committee of Pre-Petition Secured Creditors.[3]    Pursuant to the terms of the Support Agreement and the Debtors' Joint Prepackaged Chapter 11 Plan, filed concurrently herewith (the "Plan"), the Debtors' obligations under the Domestic Credit Facility will be repaid, including all accrued and unpaid interest, premiums, including the Acceleration Damages Premium (as defined in the Domestic Credit Facility), fees and expenses and other accrued and unpaid amounts and the Pre-Petition Holders will receive 41.5% of the common stock to be issued by reorganized ASG (the "New Common Stock"), subject to dilution from equity issued under the Management Incentive

---

[3] In accordance with the Intercreditor Agreement (the "Intercreditor Agreement"), dated as of November 22, 2010, between the Indenture Trustee, if the Pre-Petition Secured Lenders consent to the use of cash collateral or to the provision of the financing (including financing that primes or takes priority over existing liens) to any Debtor by any third party, each Pre-Petition Holder will be deemed to have consented to, the use of such cash collateral or to such financing. *Section 5.2 of the Intercreditor Agreement.*

Plan, the Warrants and the payment of the Put Option Premium (if payable in stock) (each, as defined in the Plan). In addition, the Support Agreement and the Plan contemplate that the Debtors will consummate a $130 million rights offering (the "Rights Offering"), through which eligible Pre-Petition Holders may subscribe to purchase 58.5% of the New Common Stock, subject to dilution from the Management Incentive Plan, the Warrants and the payment of any Put Option Premium (if payable in stock) associated with the Rights Offering. Proceeds of the Rights Offering, along with the proceeds of new exit term and revolving facilities, will be used to repay the Debtors' Domestic Credit Facility and the DIP Facility and to fund operations going forward.

12.    In order to efficiently manage these chapter 11 cases and ensure an expeditious and consensual resolution, the Debtors and the Ad Hoc Committee of Pre-Petition Secured Creditors also agreed to a timetable for the filing of the Plan and accompanying disclosure statement (the "Disclosure Statement"). The Debtors commenced solicitation of holders of claims regarding the Plan prior to the Petition Date, beginning on February 9, 2015. The goal of all parties is to preserve and maximize going concern value through a prepackaged plan process.

**D.    The Debtors' Efforts to Obtain Post-petition Financing**

13.    The Company retained Huron Consulting Services LLC ("Huron") as restructuring advisor, and John C. DiDonato, a Managing Director of Huron, to act as Chief Restructuring Officer in December 2012, following the closing of a replacement financing transaction. The Company subsequently retained Rothschild Inc. ("Rothschild") as investment banker and financial advisor in April 2014 as its financial flexibility continued to diminish.

14.    In June 2014, the Debtors commenced an extensive exploration of strategic alternatives during which M&A, refinancing and recapitalization alternatives were pursued.

Rothschild worked closely with senior management, Huron and the Debtors' counsel in exploring and assessing potential refinancing, recapitalization and sale opportunities. At the conclusion of the alternatives process, it was determined that the transaction contemplated under the Plan (as defined below) maximized the value of the Debtors' estate and would require ASG to file chapter 11 cases to be effectuated. Given the likelihood of a chapter 11, Rothschild formally explored debtor-in-possession ("DIP") financing, leveraging its prior efforts of exploring various financings during the strategic alternatives process. Rothschild contacted 12 traditional and non-traditional lenders who had previously expressed interest in providing financing (DIP or other forms) and received several proposals in addition to the one from the DIP Lenders. However, only the DIP Lenders provided an underwritten commitment letter; in addition, the economic terms offered by the DIP Lenders were more attractive than the non-binding proposals received.

15.    Ultimately, the DIP financing made available by the DIP Lenders, which has been subject to vigorous, arms-length negotiations wherein numerous modifications of the proposed terms were made for the Debtors' benefit, is the best financing available to the Debtors on economically reasonable terms, and on conditions that allow the Debtors to maintain their operations as they enter into chapter 11, thereby maximizing the value of the Debtors' estates.

**E.    Need for Debtor in Possession Financing and Use of Pre-Petition Collateral**

16.    If this Motion is not approved and the Debtors do not obtain authorization to borrow under the DIP Facility and to use the Cash Collateral, the Debtors will suffer immediate and irreparable harm. Without the funds available under the DIP Facility and the use of the Cash Collateral, the Debtors will not have the liquidity to conduct their business as a going concern. The Debtors do not have and have not had access to their pre-petition credit facilities and/or Cash

DOCS_DE:198177.3 05511/001

Collateral since the commencement of these chapter 11 cases. The Debtors urgently need funds to make payroll, capital expenditures and other expenditures that are critical to their continued viability and ability to reorganize their capital structure.

17.     The Debtors also fund critical operations of their foreign non-Debtor subsidiaries and foreign branches (collectively, the "Foreign Operations"). The Foreign Operations were funded in significant part by the Debtors prior to the Petition Date. Without continued funding from the Debtors, the Foreign Operations could not continue, which would have a devastating effect on the Debtors' business.

18.     With respect to their international operations, the Debtors and their non-Debtor affiliates maintain approximately sixty bank accounts at various foreign banks to support their Foreign Operations, including operations in Argentina, Australia, Brazil, Canada, China, Czech Republic, Denmark, France, Germany, Hong Kong, India, Italy, Japan, The Netherlands, Philippines, Poland, Singapore, South Africa, South Korea, Spain, Sweden and United Kingdom. Each of these foreign bank accounts is centrally managed by the Debtors' financial personnel at their corporate headquarters located in Naples, Florida. The Debtors and their non-Debtor affiliates maintain at least one foreign bank account in each country in which they operate to collect revenues generated in the local currency. These local revenues are then used to cover the expenses owing in those currencies, including payroll expenses, employee obligations, office space leases, office furniture leases, office supplies, trade suppliers, insurance, taxes, governmental fees and other local business expenses. Intercompany transfers from the domestic bank accounts maintained by the Debtors to those maintained by their non-Debtor affiliates are critical to continuing the business of the Foreign Operations and preserving the Debtors' going-concern value.

DOCS_DE:198177.3 05511/001

19.    In the ordinary course of business, the Debtors and their non-Debtor affiliates engage in routine business relationships with each other (the "Intercompany Transactions") resulting in intercompany receivables and payables (the "Intercompany Claims"). The flow of cash in connection with the Intercompany Transactions, at certain times and in certain instances, is in excess of the Debtors' collections from those entities' customers. The Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems. The Intercompany Transactions are critical to ensuring that liquidity is available where and when needed by the Debtors and their non-Debtor affiliates, including the Debtors' foreign subsidiaries. The Debtors, on average, provide approximately $1.5 million per month to or for the benefit of their foreign subsidiaries for payroll expenses, employee obligations, office space leases, office furniture leases, office supplies, trade suppliers, insurance, taxes, governmental fees and other local business expenses.

20.    In order for the Debtors to continue business operations, the Foreign Operations must be adequately funded. The ability of the Debtors to continue in the ordinary course of business and to service their customers' needs would be irreparably harmed if the Foreign Operations were forced to shut down due to a lack of funding as the Foreign Operations are a vital component of the Debtors' overall going concern value.

21.    It is imperative that the Debtors obtain authority to use Cash Collateral and enter into the DIP Facility subject to the terms of this Motion. Accordingly, in order to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral and to enter into the DIP Facility.

### Summary of Relief Requested

22.    The Debtors seek authority to establish the DIP Facility that provides for new money post-petition secured loans in an amount not to exceed $22,500,000 (the "Interim DIP

Loan") on the Closing Date (as defined in the DIP Credit Agreement) and up to an additional

$17,500,000 after entry of the Final Order (the "Final DIP Loan" and together with the Interim

DIP Loan, the "DIP Loans"), subject to the terms and conditions of the DIP Loan Documents.

## Summary of Terms of the DIP Facility

23.    In accordance with the disclosure requirements of Bankruptcy Rule 4001(b) and

(c) and Local Rule 4001-2(a)(i) and (ii), the material terms of the DIP Facility, and certain

highlighted provisions, are as follows:[4]

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | Allen Systems Group, Inc., ASG Federal, Inc., and Viasoft International, LLC (collectively, "Borrowers") |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Escrow Services, Inc. (the "Guarantor") |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | NewStar Business Credit, LLC (the "DIP Lender") |
| **DIP Agent** Bankruptcy Rule 4001(c)(1)(B) NewStar Business | NewStar Business Credit, LLC, as administrative agent and collateral agent (in such capacity, the "Administrative Agent") |
| **Purpose** Bankruptcy Rule 4001(b)(1)(B)(ii), 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | Borrowers will use proceeds of the Loan for: (a) payment of transactional fees, costs and expenses incurred in connection with the Loan Documents, and (b) for working capital and general corporate purposes of Borrowers in the ordinary course of Borrowers' business (including, without limitation, payments of fees and expenses to professionals under Sections 328 and 331 of the Bankruptcy Code and administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business of the Borrowers or otherwise approved by the Bankruptcy Court or provided for in the Financing Orders (and not otherwise prohibited under the DIP Credit Agreement)), in each case, in accordance with the Approved Budget (subject to Permitted Deviation). (DIP Credit Agreement §9.3.) |
| **Total Credit Facility** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001- | $40,000,000 revolving line of credit, to be available as follows: (a) $22,500,000 shall be available on the Closing Date and (b) the remainder shall be available after entry of the Final Financing Order. (DIP Credit Agreement §§ 1.1 (definition of Revolving Credit Limit), 2.1; Interim DIP Order ¶ 4.) |

---

[4]    This summary is qualified in its entirety by the provisions of the DIP Loan Documents. To the extent there are any conflicts between this summary and any DIP Document, the terms of such DIP Document shall govern. Terms used in this summary and not otherwise defined shall have the meanings set forth in the DIP Credit Agreement and the Interim Order, as applicable.

12

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| 2(a)(ii) | |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | Except as otherwise provided herein, all outstanding Loans shall bear interest at a per annum rate equal to the lesser of (1) the Adjusted LIBOR Rate for such Loan and (2) the Maximum Rate. At any time when any Event of Default has occurred and is continuing, effective as of the date on which such Event of Default occurred and continuing for so long as such Event of Default is continuing, all Obligations shall bear interest at a rate per annum equal to the Default Rate applicable thereto. (DIP Credit Agreement §§ 1.1 (definitions of Adjusted LIBOR Rate, Default Rate and Maximum Rate), 3.1 (a), (b).) |
| **Termination Date** Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The earlier of (a) the date which is thirty five (35) days following the date of entry of the Interim Financing Order if the Final Financing Order has not been entered by the Bankruptcy Court on or prior to such date, (b) the Maturity Date, (c) the effective date of a plan of reorganization or liquidation in any Chapter 11 Case that has been confirmed by an order of the Bankruptcy Court, (d) the date of consummation of a sale or other disposition of all or substantially all of the assets of the Borrowers, whether done by one or a series of transactions, and (e) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement (including, without limitation, the provisions of <u>Section 11.1</u>). (DIP Credit Agreement § 1.1 (definition of Termination Date).) |
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement contains certain covenants, including, among other things, (a) the furnishing of certain financial statements and reports to the DIP Lender; (b) the maintenance of Equipment; (c) the keeping of books and records; (d) compliance with the approved Budget; (e) restrictions on the Borrowers' ability to merge, reorganize, consolidate, wind-up, liquidate or dissolve; (f) restrictions on the incurrence or maintenance of Debt; (g) restrictions on the creation, incurrence or assumption of Liens; (h) restrictions on the disposition of assets; and (i) restrictions on the incurrence, creation, and assumption of certain super priority claims or Liens on any Collateral that are *pari passu* with or senior to the Obligations or the Liens securing the Obligations. (DIP Credit Agreement Articles VIII, IX.) |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | <u>Commitment Fee</u>: $400,000<br><br><u>Unused Line Fee</u>: Borrowers agree to pay to Administrative Agent (for the account of the DIP Lender) an unused line fee determined on a daily basis, payable on the first Business Day of each month, in an amount equal to one-half of one percent (0.50%) per annum multiplied by the DIP Lender's Percentage Share of the amount by which the Revolving Credit Limit exceeded the sum of the average daily outstanding amount of Revolving Loans during the immediately preceding calendar month, or shorter period if calculated on the Termination Date. (DIP Credit Agreement §§ 3.2(a), (b).)<br><br><u>DIP and Other Expenses</u>: The Debtors agree to pay (including by means of an advance or charge against its loan account by the DIP Agent) all reasonable out-of-pocket expenses incurred in connection with the DIP Facility (including, without limitation, expenses incurred prior to the Petition Date) by the DIP Credit Parties, including, without limitation, the DIP Credit Parties' pre- and post-petition legal fees and expenses, documentation fees incurred in connection with the negotiation, preparation, execution, and performance of the DIP Loan Documents, UCC search and recording fees, credit reports, collateral auditing costs incurred by the DIP Credit Parties in connection with the transactions contemplated herein, lien perfection fees and expenses, and all other |

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| | reasonable out-of-pocket expenses (including, but not limited to, appraisal and audit fees) incurred by the DIP Credit Parties in connection with the negotiation, preparation, execution, and performance of the DIP Loan Documents. Payment of all such fees and expenses shall not be subject to allowance by the Court and professionals for the DIP Credit Parties shall not be required to comply with the U.S. Trustee fee guidelines. The professionals for the DIP Credit Parties shall deliver a copy of their respective invoices to the Debtors, counsel for any Statutory Committee, counsel to the Ad Hoc Committee of Pre-Petition Secured Creditors, and the U.S. Trustee, redacted as necessary with respect to any privileged or confidential information contained therein. Any objections raised by the Debtors, the U.S. Trustee, the Ad Hoc Committee of Pre-Petition Secured Creditors, or any Statutory Committee with respect to such invoices within ten (10) days of the receipt thereof will be resolved by the Court. Notwithstanding the foregoing, the Debtors are authorized and directed to pay (including by means of an advance or charge against its loan account by the DIP Agent) on the Closing Date all reasonable fees, costs, and expenses of the DIP Credit Parties incurred on or prior to such date without the need for any professional engaged by the DIP Credit Parties to first deliver a copy of its invoice as provided for herein. (Interim DIP Order, ¶ 28.) |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | The Pre-Petition Agent for the benefit of the Pre-Petition Secured Lenders. (Interim DIP Order, ¶ E(1).) |
| **DIP Budget and Related Covenants** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The Debtors have delivered to the DIP Agent and the Ad Hoc Committee of Pre-Petition Secured Creditors the initial 13-week Budget showing all projected cash receipts and all projected cash disbursements (with detail as to sources of cash receipts and identification of cash disbursements) for the Debtors during such initial 13-week period, with inclusion of the following line items: collections, total net cash flow, and available domestic cash, which shall be subject to reasonable approval by the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders. Commencing the second (2nd) full week following the Closing Date (on each Thursday), the Debtors shall deliver to the DIP Agent and the Ad Hoc Committee of Pre-Petition Secured Creditors, every two (2) weeks, an updated, rolling 13-week budget (each a "**Budget**"), which sets forth by line item updated projected receipts and disbursements for the Debtors during the period commencing from the end of the previous two-week period through and including 13 weeks thereafter, which Budget shall be in form similar to the initial Budget and subject to reasonable approval by the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders. The Debtors shall still be subject to and governed by the terms of the immediately preceding Budget approved by the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders and then in effect and the DIP Credit Parties, the Pre-Petition Secured Lenders and the Pre-Petition Holders shall have no obligation to fund to such updated Budget or permit the use of Cash Collateral with respect thereto until such time as the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders notify the Debtors that such updated Budget has been approved; provided that the DIP Credit Parties and the Pre-Petition Secured Creditors shall be deemed to have consented to such updated Budget unless they shall object thereto to the Debtors within five (5) Business Days after having received such updated Budget. By Thursday of the week following (a) the end of the first full calendar week following the Closing Date and (b) each calendar week thereafter the Debtors shall deliver to the DIP Agent and the Ad Hoc Committee of Pre-Petition Secured Creditors a variance report (a "**Variance Report**") showing comparisons of actual results for each operating line item against such line item in the approved Budget for such preceding week and on a cumulative basis for the four immediately preceding weeks (or if fewer than four weeks have lapsed since the |

14

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| | Closing Date, cumulatively from the Closing Date). Each Variance Report shall indicate whether there are any adverse budget variances that exceed the Permitted Variances (it being understood that the initial Variance Report due the first full calendar week following the Closing Date is a report only). Compliance with the Budget shall be tested (i) for the first two (2) weeks following the Closing Date, on a cumulative basis, (ii) for the first three (3) weeks following the Closing Date on a cumulative basis, and (iii) thereafter weekly on a rolling four (4) week basis. (Interim Order ¶ 17.) |
| **Variance Covenant** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | "Permitted Variances" shall mean an adverse variance in an amount not to exceed 15% of the amounts set forth for total receipts or total disbursements on a four-week rolling basis (or if fewer than four weeks have lapsed since the Closing Date, cumulatively from the Closing Date); provided that Permitted Variances of total receipts shall be (A) 25% measured on a cumulative basis for the first two (2) full weeks following the Closing Date and (B) 20% measured on a cumulative basis for the first three (3) full weeks following the Closing Date. (Interim Order ¶ 17.) |
| **Limitation on Use of DIP Facility Proceeds** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(B)(viii) | The DIP Facility, the DIP Collateral, the Cash Collateral, and the DIP Carve-Out may not be used: (a) in connection with or to finance in any way action, suit, arbitration, proceeding, application, motion, or other litigation of any type (i) adverse to or against the interests of the DIP Credit Parties or the Pre-Petition Secured Creditors or their rights and remedies under the DIP Loan Documents, the Pre-Petition Credit Documents, or this Interim Order or the Final Order, including, without limitation, for the payment of any services rendered by the professionals retained by any Statutory Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration, or similar relief, (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, any DIP Obligation or the Pre-Petition Obligations, (iii) for monetary, injunctive, or other affirmative relief against the DIP Credit Parties, the Pre-Petition Secured Creditors, or their collateral, or (iv) preventing, hindering, or otherwise delaying the exercise by the DIP Credit Parties or the Pre-Petition Secured Creditors of any rights and remedies under this Interim Order or the Final Order, the DIP Loan Documents, the Pre-Petition Credit Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court, or otherwise) by the DIP Agent, the Pre-Petition Agent, or the Indenture Trustee upon any of the DIP Collateral or the Pre-Petition Collateral; (b) to make any distribution under a plan of reorganization or liquidation in any Case; (c) to make any payment in settlement of any claim, action, or proceeding before any court, arbitrator, or other governmental body; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors; (e) objecting to, contesting, or interfering with, in any way, the DIP Credit Parties' or the Pre-Petition Secured Creditors' enforcement or realization upon any of the DIP Collateral or the Pre-Petition Collateral once an Event of Default has occurred, except as provided for in this Interim Order or Final Order, or seeking to prevent the DIP Agent, the Pre-Petition Agent, the Indenture Trustee, or the Ad Hoc Committee of Pre-Petition Secured Creditors from credit bidding in connection with any proposed plan or reorganization or liquidation or any proposed transaction pursuant to Section 363 of the Bankruptcy Code; (f) using or seeking to use Cash Collateral while the DIP Obligations or the Pre-Petition Obligations remain outstanding in a manner inconsistent with the Budget and the terms of this Interim Order or the Final Order; (g) using or seeking to use any insurance proceeds constituting DIP Collateral or the Pre-Petition Collateral without the consent of the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders; (h) incurring any obligations or indebtedness outside the ordinary course of business, except as permitted under the DIP Loan Documents and the Pre-Petition |

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| | Credit Documents; (i) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Credit Parties or the Pre-Petition Secured Creditors; (j) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the DIP Credit Parties or the Pre-Petition Secured Creditors; or (k) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the Pre-Petition Obligations, the DIP Liens, the Pre-Petition Liens, or any other rights or interests of the DIP Credit Parties or the Pre-Petition Secured Creditors. (Interim Order ¶ 33.) |
| **Conditions Precedent to Lending** Bankruptcy Rule 4001(c)(1)(B) Local Bankruptcy Rule 4001-2(a)(ii) | The DIP Credit Agreement contains certain conditions precedent to extensions of credit, including, among others: (1) with respect to the Initial Revolving Loan, (a) the provision of certain documents, (b) entry of the Interim Financing Order, (c) Borrowers shall have paid all invoiced Lender Expenses; and (d) since January 1, 2015, no event, circumstance or change has occurred that has caused a Material Adverse Effect and (2) with respect to any credit extension thereafter, (w) there exists no Default or Event of Default, (x) the funding of such Loan shall not be prohibited by any Applicable Law, (y) Administrative Agent shall have received a Borrowing Notice, and (z) Borrowers shall have paid (or will pay with the proceeds of the applicable Loan) all Lender Expenses incurred through the date of the funding of such Loan that are then due and payable. In addition, the obligation of the DIP Lender to make any Loan during the Subsequent Commitment Period shall be subject to entry of the Final Financing Order within a date that is 35 days following the date of entry of the Interim Financing Order. (DIP Credit Agreement Article VI.) |
| **Priority of Claims and Liens** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(xi) Local Bankruptcy Rule 4001-2(a)(i)(D), 4001-2(a)(ii) | Effective immediately upon the entry of this Interim Order, the Administrative Agent (for the benefit of itself and the other DIP Credit Parties under the DIP Loan Documents) is hereby granted, continuing valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition security interests in and liens on (collectively, the "DIP Liens") any and all presently owned and hereafter acquired assets and real and personal property of the Debtors as set forth in the DIP Loan Documents, including, without limitation (a) all Accounts, (b) Inventory, (c) Equipment, (d) General Intangibles, (e) Payment Intangibles, (f) Chattel Paper, (g) letters of credit and Letter of Credit Rights, (h) Proprietary Rights, (i) Instruments and promissory notes, (j) Documents and documents of title, (k) Investment Property, (l) Deposit Accounts, (m) Commercial Tort Claims, (n) all other goods and personal property, whether tangible or intangible including money, cash, cash equivalents, securities and other personal property of any kind (whether held directly or indirectly by such Borrower), (o) all books and records, whether in tangible or intangible form, and (p) all other assets, if any, and, in each case all accessions to, substitutions for and replacements, products, and proceeds (including all "proceeds" as defined in Section 9.102 of the UCC and, including all dividends and other income from the DIP Collateral, collections thereon or distributions with respect thereto) of any of the foregoing; provided, however, that in no event shall the DIP Collateral include any Excluded Property (each term as defined in the DIP Credit Agreement) (collectively, the "DIP Collateral") as follows: (a) a perfected first-priority lien in all unencumbered property of each of the Debtors pursuant to Section 364(c)(2) of the Bankruptcy Code; (f) a perfected junior lien in all property of each of the Debtors subject to (i) valid, perfected, and non-avoidable liens in favor of third parties in existence as of the Petition Date (other than the Pre-Petition Liens), (ii) valid and unavoidable permitted encumbrances in existence as of the Petition Date that are subsequently perfected pursuant to Section 546(b) of the Bankruptcy Code, only to the extent such permitted encumbrance is not otherwise primed by the DIP Facility, and (iii) permitted liens as expressly set forth in the DIP Loan Documents (collectively, the "Permitted Liens"), pursuant to Section 364(c)(3) of the Bankruptcy Code; and (c) a first-priority, senior priming lien on all property of the |

16

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| | Debtors securing the Domestic Credit Facility and Second Lien Notes, including any Cash Collateral thereof, pursuant to Section 364(d)(1) of the Bankruptcy Code, subject to the Permitted Liens.<br><br>Effective upon the entry of the Interim Order and until the payment in full in cash of all DIP Obligations and the termination of the DIP Credit Parties' obligations to extend credit under the DIP Loan Documents, all DIP Liens and the DIP Carve-Out shall each be and remain at all times senior to the Pre-Petition Liens.<br>(Interim Order ¶ 6.)<br><br>Effective upon entry of the Interim order, the Administrative Agent (for the benefit of itself and the other DIP Credit Parties under the DIP Loan Documents) shall be granted, and all DIP Obligations shall constitute, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "DIP Super-Priority Claim") with priority over any and all administrative expenses, diminution claims, rights in Cash Collateral of the Pre-Petition Secured Creditors, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 506(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which DIP Super-Priority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and their estates and all proceeds thereof, subject only to the DIP Liens, the DIP Carve-Out, and Permitted Liens. The DIP Super-Priority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations, the DIP Carve-Out, and amounts secured by the Permitted Liens. Upon entry of the Final Order, the DIP Super-Priority Claim shall be payable from or have recourse to proceeds of all claims or causes of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including, without limitation, Chapter 5 and Section 724(a) of the Bankruptcy Code. (Interim Order ¶ 8.) |
| **Determination Regarding Pre-petition Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Debtors stipulate (i) to the amount, validity, priority, and enforceability of the Pre-Petition Obligations under the Pre-Petition Agreements, (ii) that the Pre-Petition Secured Lenders have a valid, binding, perfected, and enforceable first priority liens in all of the First Lien Collateral, including Cash Collateral, and all proceeds thereof, (iii) that the Pre-Petition Holders have a valid, binding, perfected, and enforceable second priority liens in all of the Second Lien Collateral, including Cash Collateral, and all proceeds thereof, (iv) that no portion of the Pre-Petition Secured Debt is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (v) that the Pre-Petition Agreements and the Pre-Petition Security Documents are valid, binding, and enforceable. (Interim Order ¶ E.) |
| **Adequate Protection**<br>Bankruptcy Rule 4001(b)(1)(B)(iv)<br>4001(c)(1)(B)(ii) | The Pre-Petition Secured Creditors are entitled, pursuant to Sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Pre-Petition Collateral, including the Cash Collateral, including, without limitation, as a result of any diminution in value resulting from the sale, lease, or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the priming of the Pre-Petition Liens in the Pre-Petition Collateral by the DIP Liens and the DIP Carve-Out pursuant to the DIP Loan Documents and this Interim Order, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code. As adequate |

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|

protection, the Pre-Petition Secured Creditors are hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a)    Senior Adequate Protection Liens.  The Pre-Petition Agent (for the benefit of the Pre-Petition Secured Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or other agreements) a senior replacement security interest in and lien upon all the DIP Collateral, subject and subordinate only to the DIP Liens and the DIP Carve-Out (such liens securing the senior Adequate Protection Obligations, the "Senior Adequate Protection Liens").  Without limiting the generality of the foregoing, the Senior Adequate Protection Liens granted to the Pre-Petition Agent hereunder shall be junior in all respects to the DIP Liens and the DIP Carve-Out.

(b)    Second Priority Adequate Protection Liens.  The Indenture Trustee (for the benefit of the Pre-Petition Holders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or other agreements) a junior replacement security interest in and lien upon all the DIP Collateral, subject and subordinate only to the DIP Liens, the DIP Carve-Out, and the Senior Adequate Protection Liens (such liens securing the junior Adequate Protection Obligations, the "Second Priority Adequate Protection Liens," and together with the Senior Adequate Protection Liens, the "Adequate Protection Liens").  Without limiting the generality of the foregoing, the Second Priority Adequate Protection Liens granted to the Indenture Trustee hereunder shall be junior in all respects to the DIP Liens, the DIP Carve-Out, and the Senior Adequate Protection Liens.

(c)    Senior Adequate Protection Claim.  The Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby granted, subject to the DIP Super-Priority Claim and the DIP Carve-Out, a super-priority claim, as provided for in Section 507(b) of the Bankruptcy Code (the "Senior Adequate Protection Claim"), immediately junior to the DIP Super-Priority Claim and payable from and having recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (including, upon entry of the Final Order, proceeds of the Avoidance Actions).

(d)    Second Priority Adequate Protection Claim.  The Indenture Trustee and the Pre-Petition Holders are hereby granted, subject to the DIP Super-Priority Claim, the DIP Carve-Out, and the Senior Adequate Protection Claim, a super-priority claim, as provided for in Section 507(b) of the Bankruptcy Code (the "Second Priority Adequate Protection Claim," and together with the Senior Adequate Protection Claim, the "Adequate Protection Claim"), junior to the DIP Super-Priority Claim and the Senior Adequate Protection Claim, respectively, and payable from and having recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (including, upon entry of the Final Order, proceeds of the Avoidance Actions).

(e)    Fees and Expenses.  As additional adequate protection in accordance with Sections 361 and 363 of the Bankruptcy Code, the Debtors are authorized and directed to pay, subject in all respects to this Interim Order and the Budget, on an ongoing basis any reasonable and documented fees, costs, and expenses reasonably incurred by or payable to the Ad Hoc Committee of Pre-Petition Secured Creditors and the Pre-Petition Agent, or to the applicable professionals, as appropriate, in accordance with the Pre-Petition Agreements and the Support Agreement, reasonable and documented professional fees and expenses of the Ad Hoc Committee of Pre-Petition Secured Creditors, and the Pre-

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| | Petition Agent (both pre- and post-petition) including, without limitation, the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Young Conaway Stargatt & Taylor LLP, and Freshfields Bruckhaus Deringer LLP, as counsel to the Ad Hoc Committee of Pre-Petition Secured Creditors, Blackstone Advisory Partners L.P., as financial advisor to the Ad Hoc Committee of Pre-Petition Secured Creditors, and James Bates Brannan Groover, LLP, as counsel to the Pre-Petition Agent (and any Delaware counsel retained by the Pre-Petition Agent), on a regular monthly basis during these Cases without allowance by the Court, subject to the 10-day notice and objection period set forth below following receipt of any such invoice. Professionals for the Ad Hoc Committee of Pre-Petition Secured Creditors and the Pre-Petition Agent (collectively, the "Ad Hoc Committee Professionals") shall not be required to comply with the U.S. Trustee fee guidelines with regard to such fees and expenses. The Ad Hoc Committee Professionals shall deliver a copy of their respective invoices, redacted as necessary with respect to any privileged or confidential information contained therein, to the Debtors, counsel for any Statutory Committee, and the U.S. Trustee, and, to the extent the amounts requested therein exceed the amounts budgeted therefore during the applicable period set forth in the Budget, to the DIP Agent. Any objections raised by the Debtors, the U.S. Trustee, or any Statutory Committee, or, if applicable, the DIP Agent, with respect to such invoices within ten (10) days of the receipt thereof will be resolved by the Court. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors. (Interim Order ¶ 12.) |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The DIP Credit Agreement contains events of default customarily found in loan agreements for similar debtor-in-possession financings, and shall include (subject to mutually agreed upon carve-outs, thresholds and materiality qualifiers), without limitation: (a) any failure by Borrowers or any Guarantor to timely pay any of the Obligations when due; (b) the dissolution of any Borrower or Guarantor; (c) entry of a judgment against a Borrower or Guarantor involving in the aggregate liability of $150,000 or more; (d) the filing of commencement of any attachment, sequestration, garnishment, execution or other Lien or action against or with respect to any Collateral with an aggregate fair market value in excess of $200,000 and individually in excess of $100,000; (e) any event or circumstance occurs which, in the Permitted Discretion of Administrative Agent exercised in good faith, causes Administrative Agent to reasonably suspect that any Borrower has engaged in fraudulent activity which would result in a Material Adverse Effect; (f) the occurrence of any Material Adverse Effect; (g) an ERISA Termination Event occurs; (h) any Borrower shall seek the appointment of, or an order shall be entered appointing, a trustee or examiner; (i) an order shall be entered converting a Chapter 11 Case to a Chapter 7 Case; (j) an order shall be entered terminating any Borrower's exclusive right to file a Chapter 11 plan of reorganization or liquidation, or any Borrower's exclusive right to file a Chapter 11 plan of reorganization or liquidation otherwise expires; (k) an order shall be entered granting adequate protection not consented to by Administrative Agent in its sole discretion or any Borrower shall propose or support or fail to oppose the entry of any such order; (l) an order shall be entered dismissing any Chapter 11 Case which does not contain a provision for termination of the Commitments and payment in full in cash of all Obligations of the Loan Parties hereunder and under the other Loan Documents upon entry thereof; (m) an order with respect to any Chapter 11 Case shall be entered without the express prior written consent of the Administrative Agent and the DIP Lender, (i) to revoke, reverse, stay, modify, supplement or amend any of the Financing Orders, (ii) to permit any administrative expense or any claim to have administrative priority as to the Borrowers equal or superior to the priority of the Administrative Agent and the DIP Lender in respect of the Obligations, except for allowed administrative expenses to the extent set forth in the Financing Orders, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien; (n) an order or |

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| | orders shall be entered that are not stayed pending appeal granting relief from the automatic stay to any creditor of any Borrower with respect to any claim or assets in an amount equal to or exceeding $500,000 in the aggregate; (o) (i) any Borrower shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of Administrative Agent and/or the DIP Lender, claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any Lien or security interest created by this Agreement or the Financing Orders shall, for any reason, cease to be valid or (iii) any action is commenced by any Borrower which contests the validity, perfection or enforceability of any of the Liens and security interests of Administrative Agent and/or the DIP Lender created by any of the Financing Orders, this Agreement, or any other Loan Document; (p) the determination of any Borrower or Guarantor to suspend the operation of such Person's business in the ordinary course, liquidate all or substantially all of such Person's assets, or employ an agent or other third party to conduct any sales of all or substantially all of such Person's assets, or the filing of a motion or other application in the Chapter 11 Case, seeking authority to do any or the foregoing, in each case, other than in connection with a sale, the net cash proceeds of which will repay all the Obligations in full upon the consummation of such sale(s); or (q) the Financing Orders or any Loan Document, after delivery thereof pursuant hereto, shall for any reason fail or cease to (i) create a valid, perfected and first priority Lien in favor of Administrative Agent for the benefit of the DIP Lender on any Collateral purported to be covered thereby, except to the extent permitted by the terms thereof, or (ii) provide super-priority administrative expense status in favor of Administrative Agent for the benefit of the DIP Lender. (DIP Credit Agreement Article 10.) |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Effective upon entry of the Final Order, the Debtors shall indemnify and hold harmless the Administrative Agent and, each other DIP Credit Party, and each of their respective shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys, and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Loan Documents, or the DIP Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Loan Documents and as further described therein and herein, or in connection with these Cases, any plan, or any action or inaction by the Debtors; provided that such indemnity shall not, as to any indemnified party, be available to the extent that such losses, claims, damages, liabilities, or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such indemnified party. The indemnity includes indemnification for the Administrative Agent's exercise of discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefore, each of the Administrative Agent and each other DIP Credit Party shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel. (Interim Order ¶ 29.) |

DOCS_DE:198177.3 05511/001

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| **Carveout**<br>Local Rule 4001-2(a)(ii) | Notwithstanding anything to the contrary, the DIP Carve-Out shall be senior in right of payment to the obligations under the DIP Credit Facility.<br><br>"<u>DIP Carve-Out</u>" shall mean, collectively: (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "<u>**Case Administration Fees**</u>"); (ii) unpaid professional fees and expenses (the "<u>**Debtor Professional Fees**</u>") payable to each legal or financial advisor, investment banker, or other professional retained by the Debtors (the "<u>**Debtor Professionals**</u>") that are incurred or accrued prior to the date of the occurrence of a Termination Event, but subject to the aggregate amounts set forth in the Budget (subject to Permitted Variances) and ultimately allowed by the Court pursuant to Sections 328, 330, 331, and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event); (iii) unpaid professional fees and expenses (together with the Debtor Professional Fees, the "<u>**Professional Fees**</u>") payable to each legal or financial advisor retained by a Statutory Committee, if any, that are incurred or accrued prior to the date of the occurrence of a Termination Event, but subject to the aggregate amounts set forth in the Budget as of such date (subject to Permitted Variances) and ultimately allowed by the Court pursuant to Section 328, 330, 331, and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event); and (iv) Case Administration Fees and Professional Fees incurred on or after the occurrence of a Termination Event in an aggregate amount not to exceed $2,000,000.00 (the "<u>**Carve-Out Trigger Amount**</u>"). Any Case Administration Fees and Professional Fees owing by the Debtors prior to the occurrence of a Termination Event shall be paid by the Debtors (in accordance with the approved Budget and pursuant to Court order); <u>provided</u> that the Debtor Professional Fees set forth in the Budget shall be funded by the Debtors into segregated accounts for the benefit of the applicable Debtor Professionals or to the applicable Debtor Professionals on a monthly basis, and such accounts or amounts, as applicable, shall be free and clear of all liens, claims, and interests of any party other than the applicable Debtor Professionals (it being understood that notwithstanding the foregoing, any funds remaining in such segregated accounts or any funds returned to the Debtors after payment of Debtor Professional Fees pursuant to Court order shall only be subject to the liens, claims, and interests of the Debtors, the DIP Credit Parties and the Pre-Petition Secured Creditors) and such payments shall not reduce or be deemed to reduce the DIP Carve-Out. Notwithstanding the occurrence of the Termination Date or a Termination Event, nothing in this Interim Order limits, alters, or otherwise relieves the Debtors from paying (including by means of an advance or charge against its loan account by the DIP Agent) all reasonable fees and expenses incurred by any of the DIP Credit Parties as required herein and in the DIP Loan Documents. (Interim Order ¶ 32(a).) |
| **Lien Challenges**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(B) | Notwithstanding the foregoing, the DIP Facility, the DIP Collateral, the Cash Collateral, and the DIP Carve-Out may be used in an amount not to exceed $50,000 in the aggregate for fees incurred by the Statutory Committee, if any, to investigate the validity, enforceability, perfection, priority, or extent of the Pre-Petition Liens or claims (each, a "<u>**Secured Party Claim**</u>") within sixty (60) days following the selection of counsel to the Statutory Committee. (Interim Order ¶ 33.)<br><br>No later than the date (the "<u>**Investigation Termination Date**</u>") that is the earlier of (i) seventy-five (75) days after the entry of this Interim Order and (ii) the last day for filing objections to the confirmation of the Plan, any Statutory Committee or any other party-in-interest with standing granted pursuant to order of Court (other than the Debtors) may commence an appropriate contested matter or adversary proceeding (a "<u>**Challenge**</u>") asserting any Secured Party Claim; provided, for the avoidance of doubt, if the Cases are converted to Chapter 7 cases, then the trustee appointed in connection therewith is |

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| | permitted to bring a Challenge prior to the Investigation Termination Date. If a Challenge is not filed on or before the Investigation Termination Date (or such other later date as extended by the written consent of the Required Pre-Petition Lenders and the Required Pre-Petition Holders, or by order of this Court), then: (a) the agreements, acknowledgements, and stipulations contained in Paragraph E of this Interim Order shall be irrevocably binding on the Debtors, any Statutory Committee, and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, without further action by any party or this Court, and any Statutory Committee and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (b) the Pre-Petition Liens of the Pre-Petition Secured Creditors shall be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (c) the Pre-Petition Obligations shall, subject to this Interim Order, the DIP Liens, and the DIP Super-Priority Claim, be deemed to be allowed claims for all purposes against each of the Debtors, including in any Successor Cases and shall not be subject to challenge by any party-in-interest as to amount, validity, priority, or otherwise. Notwithstanding anything to the contrary herein: (x) if any such Challenge is timely commenced, the stipulations contained in Paragraph E of this Interim Order shall nonetheless remain binding and preclusive on all parties-in-interest (other than the party that has brought such Challenge in connection therewith) except to the extent that such stipulations are successfully challenged in such Challenge; (y) the Pre-Petition Secured Creditors reserve all of their rights to contest on any grounds any Challenge; and (z) the Pre-Petition Secured Creditors shall comply with any and all orders of the Court in connection with a successful Challenge; provided, however, that the Pre-Petition Secured Creditors preserve any and all of their rights to appeal and stay any orders of the Court issued in connection with such successful Challenge. For the avoidance of doubt, nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates. (Interim Order ¶ 34.) |
| **Waiver of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, DIP Super-Priority Claim, the Adequate Protection Liens, and the Adequate Protection Claim; and (b) authorize the Debtors to pay, and the DIP Credit Parties and the Pre-Petition Secured Creditors to retain and apply, payments made in accordance with the terms of this Interim Order. (Interim Order ¶ 16.) <br><br> Any automatic stay otherwise applicable to the Administrative Agent shall be modified so that five (5) days after the occurrence of the Termination Event the Administrative Agent (on behalf of the DIP Credit Parties) shall be entitled to exercise all rights and remedies against the DIP Collateral and shall be permitted to satisfy its liens and super-priority administrative expense claims, subject to the DIP Carve-Out and the Permitted Liens. During such five-day period, the Debtors shall be entitled to seek an emergency hearing. Unless the Court determines otherwise during such five-day period, subject to tolling based on the Court's earliest available date for such hearing, the automatic stay shall automatically be terminated without further application, motion, notice, or order and the Administrative Agent (on behalf of the DIP Credit Parties) shall be permitted to exercise all remedies with regard to the DIP Collateral. Until such hearing occurs, the Debtors shall have the right to continue to use Cash Collateral as set forth in the Budget. The five-day notice period set forth above shall run concurrently with any notice period provided for under the DIP Loan Documents. (Interim Order ¶ 26.) |

| Bankruptcy Code/Local Rule | Summary of Relevant Provisions |
|---|---|
| **Waiver of Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Agent, in its Permitted Discretion, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders, in their reasonable discretion, are authorized to file such financing statements, mortgages, notices of liens, and other similar documents as they deem necessary to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence any of the DIP Liens or the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create, perfect, or enforce the DIP Liens or the Adequate Protection Liens. The Debtors are authorized to execute and deliver promptly upon demand to the DIP Agent, the Pre-Petition Agent, and the Indenture Trustee all such financing statements, mortgages, control agreements, notices, and other documents as the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders may reasonably request. The DIP Agent, in its Permitted Discretion, and the Pre-Petition Agent and the Indenture Trustee, in their reasonable discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument. (Interim Order ¶ 19.) |
| **506(c) waiver** Bankruptcy Rule 4001(c)(1)(B)(x) Local Rule 4001-2(a)(i)(C) | Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Credit Parties, the Pre-Petition Secured Creditors, the DIP Collateral, or the Pre-Petition Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise. (Interim Order ¶ 36.) |
| **Equities of the Case** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(H) | The DIP Credit Parties and the Pre-Petition Secured Creditors shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code. Subject to the entry of the Final Order, the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the DIP Credit Parties or the Pre-Petition Secured Creditors. (Interim Order ¶ 39.) |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) Local Rule 4001-2(a)(i)(D) | The DIP Credit Agreement does not create any liens on Avoidance Actions. However, the DIP Super-Priority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations, the DIP Carve-Out, and amounts secured by the Permitted Liens. Upon entry of the Final Order, the DIP Super-Priority Claim shall be payable from or have recourse to proceeds of all claims or causes of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including, without limitation, Chapter 5 and Section 724(a) of the Bankruptcy Code (the "Avoidance Actions"). (Interim Order ¶ 8(b).) |

24.    In accordance with Local Rule 4001-2(a)(i), the following provisions of the DIP Agreement are highlighted below.

i.    *Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured lenders.* Other

than the Adequate Protection Obligations, there are no provisions that grant cross-collateralization protection to the Debtors' Pre-Petition Secured Creditors.

ii. *Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate.* Any Secured Party Claim (as defined in the Interim DIP Order) regarding the Pre-Petition Liens and Pre-Petition Obligations may be binding on the estate and the parties in interest prior to the 75th day after the Petition Date (or 60th day after the appointment of a Statutory Committee, as applicable) in the event that the objection deadline to the confirmation of a chapter 11 plan for the Debtors occurs prior to such date. Otherwise, the Interim DIP Order provides an official committee of creditors and other parties, if formed, and subject to a determination that such party has standing, sixty (60) days from the date of its formation and other parties in interest, subject to a determination that such party has standing, seventy-five (75) days from the entry of the Interim DIP Order to investigate and assert any Secured Party Claims. *See* Interim DIP Order ¶¶ 33-34.

iii. *Provisions that waive rights of the debtor's estate under section 506(c).* The proposed section 506(c) waiver will only be effective after entry of the Final DIP Order. *See* Interim DIP Order ¶ 37.

iv. *Provisions that immediately grant prepetition secured creditors liens on the debtor's claims and causes of action arising under sections 544, 547, 548, and 549 of the Bankruptcy Code.* DIP Liens will not be granted on Avoidance Actions or the proceeds thereof.

v. *Provisions that deem prepetition secured debt to be postpetition debt or postpetition loans from a prepetition secured lender used to pay part or all of that secured creditor's prepetition debt.* None of the DIP Agreement, the Interim Order or the Final Order contain any provisions that deem prepetition secured debt to be postpetition debt or otherwise "roll up" prepetition loans with postpetition debt.

vi. *Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.* There is no disparate treatment between the Debtors' professionals and those of a Statutory Committee with respect to the professional fee Carve-Out. *See* Interim DIP Order ¶ 32.

vii. *Provisions that prime any secured lien absent consent of the affected lienor.* The Pre-Petition Creditors have consented to the priming of the Pre-Petition Liens and the Adequate Protection Liens through their execution of the Support Agreement and their affirmative votes for the Plan.

viii. *Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. §552(b)(1).* The proposed waiver of "equities of the case"

claims under Bankruptcy Code section 552(b) will only be effective after entry of the Final DIP Order. *See* Interim DIP Order ¶ 39.

**Basis for Relief**

**A.    Standards of Approval Under Bankruptcy Code Sections 364(c) and 364(d)(1)**

25.    Bankruptcy Code section 364(c) requires a finding, made after notice and a hearing, that a debtor seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

26.    In addition, under Bankruptcy Code section 364(d)(1), courts may, after notice and a hearing, authorize a debtor to obtain post-petition credit secured by a "priming" lien from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1). Specifically, Bankruptcy Code section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

27.    In evaluating proposed post-petition financing under Bankruptcy Code sections 364(c) and 364(d)(1), courts perform a qualitative analysis and generally consider various factors including whether:

> i.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

25

ii.   the credit transactions are necessary to preserve assets of the estate;

iii.  the terms of the credit agreement are fair, reasonable, and adequate;

iv.   the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

v.    the proposed financing agreement adequately protects pre-petition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under Bankruptcy Code section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (same).

28.    For the reasons discussed below, the Debtors satisfy the standards required to access post-petition financing on a superpriority claim and priming lien basis under Bankruptcy Code sections 364(c) and 364(d).

i.    **The Debtors Cannot Obtain Financing on More Favorable Terms**

29.    In demonstrating that credit was not available without the protections afforded by Bankruptcy Code sections 364(c) or 364(d), a debtor need only make a good faith effort. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

30.    Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga.

1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

31.    As set forth above and in the Declarations, the Debtors, with the assistance of their financial and other advisors, after conducting marketing efforts and carefully reviewing alternative proposals, determined that the DIP financing made available by the DIP Lenders, which has been subject to vigorous, arms-length negotiations wherein numerous modifications of the proposed terms were made for the Debtors' benefit, is the best financing available to the Debtors on economically reasonable terms, and on conditions that allow the Debtors to maintain their operations as they enter into chapter 11, thereby maximizing the value of the Debtors' estates.

ii.    **The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates**

32.    As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Facility, if approved, will provide working capital critical to funding the continuing operation of the Debtors, including the Foreign Operations. Without access to the DIP Facility, the Debtors would be forced to cease operations, which would result in immediate and irreparable harm to their business and deplete the going concern value of such business. For the year ended December 31, 2013, the Debtors generated total revenue of $276 million, their EBITDA was approximately $52 million and Adjusted EBITDA (EBITDA after taking into account certain adjustments for non-recurring expenses and affiliate payments) was approximately $72 million. Audited financial information for 2014 is not presently available, but the Company projects a reduction in total revenue to approximately $247 million, a reduction

27

in EBITDA to approximately $20 million and a reduction in Adjusted EBITDA to approximately $48 million for 2014.   Because the Debtors' available and projected Cash Collateral is insufficient to fund their operations, the credit to be provided under the DIP Facility is necessary to preserve the value of the Debtors' estates.  Furthermore, the proceeds of the DIP Facility will also be available to help fund the Foreign Operations, subject to the Interim Order and Final Order, whose continued operations are crucial to the Debtors' enterprise value.

### iii.    Terms of the DIP Facility are Fair, Reasonable and Adequate under the Circumstances

33.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.,* 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also In re Ellingsen MacLean Oil Co.,* 65 B.R. 358, 365, n 7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See* Transcript of Final Hearing on Motion for Post-Petition Financing, *In re Lyondell Chem. Co.*, No. 09-10023 (REG), at 740 (Bankr S.D.N.Y. Feb. 27, 2009) ("In any event, by reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of pre-petition secured debt] reasonable here and now.").

34.    Based on the advice of their advisors, the Debtors believe that the financial and other terms of the DIP Facility are reasonable under the circumstances.  Given the urgent need of the Debtors to obtain financial stability for the benefit of all parties in interest, the terms of the DIP Facility are fair, appropriate, reasonable and in the best interests of the Debtors, their estates and their creditors. The DIP Loan Documents were negotiated extensively by the Debtors and

DOCS_DE:198177.3 05511/001

the DIP Lenders, in good faith and at arm's length as required by Bankruptcy Code section 364(e), with all parties represented by experienced counsel.

    **iv.**    **Entry into the DIP Loan Documents Reflects the Debtors' Reasonable Business Judgment**

    35.    A debtor's decision to enter into a post-petition lending facility under Bankruptcy Code section 364 is governed by the business judgment standard. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [, were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("These cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

    36.    Bankruptcy courts typically defer to debtors' business judgment on the decision to borrow money unless such decision is arbitrary and capricious. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

    37.    For the reasons set forth above, the Debtors submit that the entry into the DIP Facility is the exercise of the Debtors' reasonable business judgment.

v.    **Proposed Adequate Protection is Appropriate**

38.    To the extent a secured creditor's interests in collateral constitute valid and perfected security interests and liens as of the Petition Date, Bankruptcy Code section 364(d)(1)(B) requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility.    Bankruptcy Code section 361 delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.")

39.    The proposed adequate protection provided to the Pre-Petition Secured Creditors is comprised of, among other things, adequate protection liens on all of the DIP Collateral subordinate to the DIP Liens and the DIP Carve-Out, a super-priority claim junior to the DIP Super-Priority Claim and the payment of fees and expenses.

40.    The Debtors believe that the adequate protection proposed herein to protect any diminution in value of the Pre-Petition Secured Creditors' interest in the Pre-Petition Collateral is fair and reasonable.    Further, in reliance upon, among other things, such adequate protection, the Ad Hoc Committee of Pre-Petition Secured Creditors has consented to the priming of Pre-Petition First Liens and the Pre-Petition Second Liens.  The consent of the Ad Hoc Committee of Pre-Petition Secured Creditors permits the Debtors to avoid potentially time consuming and unpredictable priming litigation. The consent of the Ad Hoc Committee of Pre-

30

Petition Secured Creditors to the priming of their liens thus permits the Debtors to save considerable resources, not to mention avoid a delay, in obtaining post-petition financing. Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the adequate protection described above to such parties.

**B.      Approval of Use of Cash Collateral is Appropriate**

41.     Bankruptcy Code section 363(c)(2) provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

42.     The Debtors have an urgent need for the immediate use of the Pre-Petition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Loan Documents. The Debtors need the Cash Collateral to pay operating expenses, including funding the Foreign Operations, all in accordance with the Budget (as defined in the DIP Credit Agreement). Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

43.     The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Furthermore, the Ad Hoc Committee of Pre-Petition Secured Creditors has consented to the Debtors' use of the Cash Collateral subject to the terms and conditions of the DIP Loan Documents and the Interim Order. Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Loan Documents.

C.    **Modification of the Automatic Stay**

44.    The proposed Interim Order provides that the automatic stay provisions of Bankruptcy Code section 362 are vacated and modified to the extent necessary to permit the DIP Credit Parties to exercise, upon the occurrence and during the continuation of any Event of Default under the DIP Credit Agreement, all rights and remedies provided in the DIP Credit Agreement without further order of or application to the Court.  However, the DIP Agent must provide the Debtors and various other parties with five (5) days' notice prior to exercising any enforcement rights or remedies in respect of their collateral.  During such period, the Debtors and other parties in interest may contest whether an Event of Default has occurred and is continuing.

45.    Stay modification provisions of this sort are common features of post-petition financing facilities and, in the Debtors' business judgment, are reasonable under these circumstances.  Accordingly, the Debtors request that the Court modify the automatic stay to the extent contemplated by the DIP Credit Agreement and the proposed Interim Order and Final Order.

D.    **Approval of Interim Relief**

46.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2); (c)(2).

47.    As described above in some detail, the Debtors have an urgent and immediate need for cash in order to maintain business relationships, to make payroll, to make capital

expenditures and to satisfy other working capital and operational needs and otherwise finance their operations. Given the immediate and irreparable harm to be suffered by the Debtors, their estates and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within two (2) business days of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in the Motion.

E.    **Request for a Final Hearing**

48.    The DIP Credit Agreement requires that a Final Order approving the Motion be entered within thirty-five (35) days following entry of the Interim Order. As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than thirty-five (35) days following entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

**Reservation of Rights**

49.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under Bankruptcy Code section 365. The Debtors expressly reserve their right to contest any claim related to the relief sought herein.

**Notice**

50.    The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Pre-Petition Agent; (d) local counsel to the Pre-Petition Lien Agent; (e) the Indenture Trustee; (f) Paul, Weiss, Rifkind, Wharton & Garrison LLP (Attn: Alan W. Kornberg and Kelley A. Cornish) and Young Conaway Stargatt &

33

Taylor, LLP (Attn: Pauline Morgan and Maris J. Kandestin), attorneys for the Ad Hoc Committee of Pre-Petition Secured Creditors; (g) the United States Environmental Protection Agency; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; (j) the office of the attorneys general for the states in which the Debtors operate; (k) the Securities and Exchange Commission; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002; (m) Greenberg Traurig, LLP (Attn: Bryan L. Elwood and Heather E. Moulder), attorneys for the DIP Agent; (n) counsel for any Statutory Committee and (o) all parties known, after reasonable inquiry, to have affected a lien, encumbrance, or claim in the DIP Collateral. (collectively, the "Notice Parties").   As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-l(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.   A copy of the Motion is also available on the Debtors' case website at http://dm.epiq11.com/ASG.

51.      If the Court enters an interim order granting this Motion, the Debtors propose to serve notice of such entry on the Notice Parties.  The notice will provide that any objections to the relief granted in the Interim Order must be filed with the Court and served upon counsel for the Debtors no later than seven (7) days prior to the final hearing to be held on the Motion (the "Objection Deadline").  If an objection is timely filed and served prior to the Objection Deadline, such objection will be heard at the Final Hearing on the Motion.  If no objections are timely filed and served, Debtors' counsel will file a certification of counsel to that effect attaching a final form of order.

34

**No Prior Request**

52.    No previous request for the relief sought herein has been made to this Court or

any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the

Interim Order, substantially in the form attached hereto as Exhibit A, (ii) following the Final

Hearing (if such hearing is required), enter the Final Order, and (iii) grant the Debtors such other

and further relief as is just and proper.

Wilmington, Delaware
Dated: February 18, 2015

Laura Davis Jones (DE Bar No. 2436)
Michael R. Seidl (DE Bar No. 3889)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:        (302) 652-4100
Facsimile:        (302) 652-4400
Email:            ljones@pszjlaw.com
                  mseidl@pszjlaw.com
                  pkeane@pszjlaw.com

*Proposed Counsel for the*
*Debtors and Debtors in Possession*

35