# EXHIBIT A

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Allen Systems Group, Inc., *et al.*,[1] | ) Case No. 15-10332 (____) |
| | ) |
| | ) (Joint Administration Requested) |
| Debtors. | ) |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (A) APPROVING POST-PETITION FINANCING, (B) GRANTING FIRST-PRIORITY SENIOR LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS, (E) MODIFYING THE AUTOMATIC STAY, (F) GRANTING RELATED RELIEF, AND (G) SCHEDULING A FINAL HEARING**

This matter having come before the Court upon the motion (the "**Motion**") by Allen Systems Group, Inc. ("**Allen Systems**"), ASG Federal, Inc., and Viasoft International, LLC, the debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-referenced bankruptcy cases (collectively, the "**Cases**"), pursuant to Sections 105, 361, 362, 363, 364, and 507 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking entry of an interim order (this "**Interim Order**"), and a final order, *inter alia*:

1.    Authorizing, under Sections 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtors to obtain, as co-borrowers, secured, super-priority post-petition loans, advances, and other financial accommodations (the "**DIP Facility**"), on an interim basis for a period through and including the date of the Final Hearing (as defined below), which hearing is to be no more than thirty-five (35) days after entry of this Interim Order, and on a final

---

[1]    The Debtors and the last four digits of each Debtor's federal tax identification number are as follows:  Allen Systems Group, Inc. (4496); ASG Federal, Inc. (1773); and Viasoft International, LLC (9761).  The mailing address for all of the Debtors is:  708 Goodlette Road, Naples, Florida 34102.

basis, pursuant to the terms and conditions of that certain *Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement* (as amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**") by and among (a) the Debtors, (b) NewStar Business Credit, LLC, as administrative agent and collateral agent (the "**DIP Agent**"), and (c) the lenders from time to time party thereto (the "**DIP Lenders**" and each a "**DIP Lender**;" the DIP Agent and the DIP Lenders are collectively referred to herein as the "**DIP Credit Parties**"), substantially in the form of Exhibit "A" attached hereto; and

2.      The priming of pre-petition liens by the DIP Liens (as defined below) pursuant to Section 364(d)(1) of the Bankruptcy Code on the Pre-Petition Collateral (as defined below) of the Pre-Petition Secured Creditors (as defined below); and

3.      Authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including, without limitation, security agreements, deposit account control agreements, pledge agreements, guaranties, and promissory notes (each as may be amended, supplemented, restated, or otherwise modified from time to time, and collectively with the DIP Credit Agreement, the "**DIP Loan Documents**")[2] and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents; and

4.      Granting allowed super-priority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in each of the Cases and any Successor Cases (as defined herein) to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "**DIP Obligations**"), subject to the priorities set forth herein; and

---

[2] Capitalized terms used but not defined have the meanings given to them in the DIP Loan Documents and the Motion.

5.      Authorizing the Debtors to (a) use Cash Collateral (as defined below) and all other collateral in which the Pre-Petition Secured Creditors have an interest in and (b) grant adequate protection to the Pre-Petition Secured Creditors, whose liens and security interests are being primed by the DIP Facility, with respect to, *inter alia*, such use of their Cash Collateral and all use and diminution in the value of the Pre-Petition Collateral; and

6.      Granting to the DIP Agent, for the benefit of the DIP Credit Parties, automatically perfected security interests in and liens on all of the DIP Collateral, including, without limitation, all property constituting Cash Collateral, which liens shall be subject to the priorities set forth herein; and

7.      Authorizing and directing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, commitment fees, unused line fees, administrative fees, any additional fees set forth in the DIP Loan Documents, the reasonable fees and disbursements of the DIP Credit Parties' attorneys, advisers, accountants, and other consultants, and all related reasonable expenses of the DIP Credit Parties, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents; and

8.      Vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order; and

9.      Granting related relief; and

10.     Scheduling a final hearing within thirty-five (35) days of entry of this Interim Order (the "**Final Hearing**") to consider the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing.

The Court having considered the *Declaration In Support of First Day Pleadings*, the Motion, the exhibits attached thereto, the declarations filed in support thereof, the DIP Loan Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on the Motion (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d), 9014, and Local Bankruptcy Rule 2002-1; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefore;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, INCLUDING THE SUBMISSION OF ONE OR MORE DECLARATIONS AND THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    Petition Date. On February 18, 2015 (the "**Petition Date**"), each of the Debtors filed a separate voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), commencing these Cases.

B.    Debtors-in-Possession. The Debtors are continuing in the management and operation of their businesses and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Cases.

C.    <u>Jurisdiction and Venue</u>.    This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    <u>Committee Formation</u>.    As of the date hereof, the Office of the United States Trustee (the "**U.S. Trustee**") has not yet appointed any official committee in these Cases pursuant to Section 1102 of the Bankruptcy Code (each, a "**Statutory Committee**").

E.    <u>Pre-Petition Collateral Structure</u>.    Without prejudice to the rights of any other party, the Debtors admit, stipulate, and agree that:

1.    <u>Pre-Petition First Liens and Obligations</u>.    Pursuant to that certain *Credit Agreement* dated as of December 14, 2012 (as amended, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Domestic Credit Facility**"), by and among Allen Systems, as borrower, certain subsidiaries thereof as guarantors, the lenders from time to time party thereto (the "**Pre-Petition Secured Lenders**"), and TPG Allison Agent, LLC, succeeded by Wilmington Trust, N.A., as administrative agent (the "**Pre-Petition Agent**"), the Debtors owe certain pre-petition Obligations (as defined in the Domestic Credit Facility), including principal in the amount of $239,337,000.00, pre-petition accrued and unpaid interest in the amount of $44,943,832.05,[3] premiums, including the Acceleration Damage Premium (as defined in the Domestic Credit Facility), in the amount of $28,720,440.00, and unpaid fees in the amount of $3,647,082.00 (collectively, the "**First Lien Pre-Petition Obligations**"), secured by granted liens (the

---

[3] Calculated as of February 18, 2015.

"**Pre-Petition First Liens**") on substantially all of the assets of the Debtors (the "**Domestic Credit Facility Collateral**").

2.    Pre-Petition Second Liens and Obligations. The Debtors are obligors with respect to the 10½% senior secured second lien notes due 2016 (the "**Second Lien Notes**," and together with the Domestic Credit Facility, the "**Pre-Petition Secured Debt**") issued by Allen Systems pursuant to that certain Indenture (as amended, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Indenture**," and together with the Domestic Credit Facility, the "**Pre-Petition Agreements**"), dated November 22, 2010, with The Bank of New York Mellon Trust Company, N.A., as the indenture trustee thereunder (the "**Indenture Trustee;**" and together with the Pre-Petition Holders (as defined below), the Pre-Petition Secured Lenders, and the Pre-Petition Agent, the "**Pre-Petition Secured Creditors**"), pursuant to which the Debtors owe certain pre-petition Obligations (as defined in the Indenture), including principal in the amount of $300,000,000.00 and pre-petition accrued and unpaid interest in the amount of $41,341,241.48[4] (collectively, the "**Second Lien Pre-Petition Obligations;**" together with the First Lien Pre-Petition Obligations, the "**Pre-Petition Obligations**") secured by second-priority liens (the "**Pre-Petition Second Liens**," and together with the Pre-Petition First Liens, the "**Pre-Petition Liens**") on substantially all of the assets of the Debtors (the "**Second Lien Collateral**," and together with the Domestic Credit Facility Collateral, the "**Pre-Petition Collateral**").

3.    Enforceability. The Pre-Petition Secured Debt constitute legal, valid, and binding obligation of the Debtors, enforceable in accordance with the terms of the Pre-Petition Agreements and no portion of the Pre-Petition Secured Debt is subject to

---

[4]    Calculated as of February 18, 2015.

avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Pre-Petition Agreements and the Pre-Petition Security Documents (as defined below) are valid, binding, and enforceable.

4. <u>Pre-Petition Credit Documents</u>. The Pre-Petition Liens granted to the Pre-Petition Agent and the Indenture Trustee pursuant to and in connection with the Pre-Petition Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust, account control agreements, and other security documents executed by any of the Debtors in favor of the Pre-Petition Agent and Indenture Trustee, for their benefit and for the benefit of the other Pre-Petition Secured Creditors, collectively, the "**Pre-Petition Security Documents**," and together with the Pre-Petition Agreements, the "**Pre-Petition Credit Documents**") are valid, binding, perfected, enforceable, first- and second-priority liens and security interests, as applicable, in the Pre-Petition Collateral and were granted to, or for the benefit of, the Pre-Petition Secured Creditors, as applicable, for fair consideration and reasonably equivalent value, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

5. <u>Consent of the Ad Hoc Committee of Pre-Petition Secured Creditors</u>. The Ad Hoc Committee of Pre-Petition Secured Creditors (as defined in the Motion) has consented to the relief requested in the Motion and provided in this Interim Order, subject to the terms of this Interim Order.

F. <u>Findings Regarding Post-Petition Financing</u>.

1. <u>Request for Post-Petition Financing</u>. The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents, (b) use Cash Collateral on the terms described herein to administer their

Cases and fund their operations, and (c) grant adequate protection to the Pre-Petition Secured Creditors with respect to, *inter alia*, such use of their Cash Collateral and all use and diminution in the value of the Pre-Petition Collateral as their interests appear.  At the Final Hearing, the Debtors will seek final approval of the proposed post-petition financing arrangements, use of Cash Collateral, and adequate protection pursuant to a proposed final order (the "**Final Order**"), which shall be in form and substance acceptable to the DIP Agent, the Pre-Petition Secured Lenders holding directly or indirectly at least 50.1% of the aggregate principal amount of outstanding Domestic Credit Facility Claims (as defined in the *Debtors' Joint Prepackaged Chapter 11 Plan,* dated February 9, 2015 and filed concurrently herewith (as may be amended from time to time, the "**Plan**")) (the "**Required Pre-Petition Lenders**") and the holders of the Second Lien Notes (the "**Pre-Petition Holders**") holding directly or indirectly at least 50.1% of the aggregate principal amount of all Notes Claims (as defined in the Plan) (the "**Required Pre-Petition Holders**").  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

2.    <u>Priming of the Pre-Petition Liens</u>.  The priming of the Pre-Petition Liens on the Pre-Petition Collateral by the DIP Liens will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors.  The Ad Hoc Committee of Pre-Petition Secured Creditors has consented to (a) the financing arrangements contemplated by this Interim Order and the DIP Loan Documents, including such senior priming liens and super-priority administrative expense claims as provided herein, subject to the terms and conditions set forth in this Interim Order, and (b) the Debtors' proposed use of Cash Collateral, subject to the terms and conditions set forth in this Interim Order.

8

3.    <u>Immediate Need for Post-Petition Financing and Use of Cash Collateral</u>. The Debtors' need to use Cash Collateral and obtain post-petition financing pursuant to the DIP Facility is immediate and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, maintain business relationships, pay their employees, protect the value of their assets, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, their creditors, and equity holders, and the possibility for a successful administration of these Cases.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or to maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

4.    <u>No Credit Available on More Favorable Terms</u>.  Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Credit Parties on terms more favorable than the DIP Facility. The Debtors have been unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit:  (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a post-petition basis is not otherwise available without granting the DIP Agent, for the benefit of the DIP Credit

DOCS_DE:198179.2 05511/001

Parties, (i) perfected security interests in and senior priming liens on (each as provided herein) all of the DIP Collateral, (ii) the DIP Super-Priority Claims (as defined herein), and (iii) the other protections set forth in this Interim Order.

5.    Use of Proceeds of the DIP Facility.  As a condition to entry into the DIP Credit Agreement and the extensions of credit under the DIP Facility, the DIP Credit Parties require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Loan Documents and the budget (a copy of which is attached as Exhibit "B" hereto, as the same may be modified from time to time consistent with the terms of the DIP Loan Documents, and subject to such variances as may be permitted thereby, the "**Budget**"), solely for (a) working capital and general corporate purposes of the Debtors, (b) certain specified bankruptcy-related costs and expenses, and (c) any other purpose agreed upon or permitted under the DIP Facility, in each case in accordance with the Budget and as otherwise provided hereunder and under the DIP Loan Documents.

6.    Application of Proceeds of DIP Collateral.  As a condition to entry into the DIP Loan Documents and the extension of credit under the DIP Facility, the Debtors and the DIP Agent have agreed that the proceeds of DIP Collateral shall be applied as set forth in the DIP Credit Agreement and this Interim Order.

G.    Sections 506(c) and 552(b).  In light of the DIP Agent's agreement to subordinate its liens and super-priority claims, as applicable, to the DIP Carve-Out (as defined herein), upon entry of the Final Order, together with the agreement of the DIP Credit Parties to provide the DIP Facility, and the agreement of the Ad Hoc Committee of Pre-Petition Secured Creditors to allow the Pre-Petition Liens to be primed by the DIP Carve-Out and the DIP Liens, each of the DIP Credit Parties and the Pre-Petition Secured Creditors is entitled to a waiver of (a) the provisions

of Section 506(c) of the Bankruptcy Code and (b) any "equities of the case" claims under Section 552(b) of the Bankruptcy Code.

H.    <u>Good Faith of the DIP Credit Parties.</u>

1.    <u>Willingness to Provide Financing.</u>  Each of the DIP Credit Parties has indicated a willingness to provide financing to the Debtors subject to:  (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents as contemplated by this Interim Order; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that each of the DIP Credit Parties is extending credit to the Debtors pursuant to the DIP Loan Documents in good faith, and that each of the DIP Credit Parties' claims, super-priority claims, security interests, liens, rights, and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in Section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order or any other order.

2.    <u>Business Judgment and Good Faith Pursuant to Section 364(e).</u>  The extension of credit under the DIP Facility reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and is supported by reasonably equivalent value and consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Credit Parties, and the Ad Hoc Committee of Pre-Petition Secured Creditors.  The use of Cash Collateral and credit to be extended under the DIP Loan Documents shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses, within the meaning of Section 364(e) of the Bankruptcy Code, and

each of the DIP Credit Parties and the Pre-Petition Secured Creditors is therefore entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code and this Interim Order.

I.    Notice. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, e-mail, overnight courier, or hand delivery, to certain parties-in-interest, including: (1) the U.S. Trustee for the District of Delaware; (2) the Securities and Exchange Commission; (3) the Internal Revenue Service; (4) the parties included on the Debtors' consolidated list of twenty (20) largest unsecured creditors; (5) Greenberg Traurig, LLP (Attn: Bryan L. Elwood and Heather E. Moulder), counsel to the DIP Agent; (6) Paul, Weiss, Rifkind, Wharton & Garrison LLP (Attn: Alan W. Kornberg and Kelley A. Cornish), and Young Conaway Stargatt & Taylor, LLP (Attn: Pauline Morgan and Maris J. Kandestin), counsel to the Ad Hoc Committee of Pre-Petition Secured Creditors; (7) James Bates Brannan-Groover LLP, counsel to the Pre-Petition Agent; (8) the Indenture Trustee; (9) those parties, if any, who have filed a notice of appearance and request for service of pleadings in these Cases pursuant to Bankruptcy Rule 2002; (10) all parties known, after reasonable inquiry, to have affected a lien, encumbrance, or claim in the DIP Collateral; (11) the Environmental Protection Agency, (12) the United States Attorney's Office for the District of Delaware; (13) the office of the attorneys general for the states in which the Debtors operate; and (14) counsel for any Statutory Committee. The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required.

J.    Immediate Entry. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent entry of this Interim

Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed. This Court concludes that entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefore,

IT IS HEREBY ORDERED that:

1.  <u>Interim Financing Approved</u>. The Motion is granted on an interim basis, the Interim Financing (as defined herein) is authorized and approved on an interim basis, and the use of Cash Collateral on an interim basis is authorized, all subject to the terms and conditions set forth in this Interim Order. Unless terminated earlier pursuant to the DIP Loan Documents and this Interim Order, the DIP Facility shall terminate on a date that is thirty-five (35) days after entry of this Interim Order unless the Court shall have entered the Final Order, in form and substance reasonably satisfactory to the DIP Agent in its Permitted Discretion (as defined in the DIP Credit Agreement), the Required Pre-Petition Lenders, and the Required Pre-Petition Holders in their reasonable discretion, by such date (or such other date as may be agreed to by the Debtors, the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders).

2.  <u>Objections Overruled</u>. All objections to the Interim Financing to the extent not withdrawn or resolved are hereby overruled.

3.  <u>Authorization of the DIP Financing and DIP Loan Documents</u>. The Debtors are expressly and immediately authorized and empowered (a) to execute and deliver the DIP Loan Documents, subject to the conditions precedent therein, (b) to incur and to perform the DIP

Obligations in accordance with, and subject to, the terms of this Interim Order, the DIP Loan Documents, and the Budget, and (c) to deliver all instruments and documents that may be necessary or required for performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan Documents.  The Debtors are hereby authorized to pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due and without need to obtain further Court approval, including, without limitation, commitment fees, unused line fees, administrative fees, any additional fees set forth in the DIP Loan Documents, and the reasonable fees and disbursements of the DIP Credit Parties' attorneys, advisers, accountants, and other consultants, all to the extent provided in the DIP Loan Documents, with invoices to be provided in accordance with Paragraph 28 below.  All collections and proceeds, whether from ordinary course collections, asset sales, debt issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents.  Upon execution and delivery, the DIP Loan Documents shall represent valid and binding, and joint and several, obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

      4.    <u>Authorization to Borrow</u>.  Until the Termination Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions, limitations on availability, and reserves set forth in the DIP Loan Documents, the DIP Facility, and this Interim Order, and in order to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to request extensions of credit under the DIP Facility on an interim basis up to an aggregate principal amount of $22,500,000 at any one time outstanding, subject to and in accordance with the Budget, the Interim Order, and the terms of the DIP Loan Documents (the "**Interim Financing**").

5.    <u>DIP Obligations</u>.    The DIP Loan Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Cases, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases (collectively, "**Successor Cases**").    Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Credit Parties under the DIP Loan Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses, and other amounts owed pursuant to the DIP Loan Documents, and shall be joint and several obligations of the Debtors in all respects.

6.    <u>DIP Liens and DIP Collateral</u>.    Effective immediately upon the entry of this Interim Order, the DIP Agent (for the benefit of itself and the other DIP Credit Parties under the DIP Loan Documents) is hereby granted, continuing valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition security interests in and liens on (collectively, the "**DIP Liens**") any and all presently owned and hereafter acquired assets and real and personal property of the Debtors as set forth in the DIP Loan Documents, including, without limitation (a) all Accounts, (b) Inventory, (c) Equipment, (d) General Intangibles, (e) Payment Intangibles, (f) Chattel Paper, (g) letters of credit and Letter of Credit Rights, (h) Proprietary Rights, (i) Instruments and promissory notes, (j) Documents and documents of title, (k) Investment Property, (l) Deposit Accounts, (m) Commercial Tort Claims, (n) all other goods and personal property, whether tangible or intangible including money, cash, cash equivalents, securities and other personal property of any kind (whether held directly or indirectly by such Borrower), (o) all books and records, whether in tangible or intangible form, and (p) all other

assets, if any, and, in each case all accessions to, substitutions for and replacements, products, and proceeds (including all "proceeds" as defined in Section 9.102 of the UCC and, including all dividends and other income from the DIP Collateral, collections thereon or distributions with respect thereto) of any of the foregoing; provided, however, that in no event shall the DIP Collateral include any Excluded Property (each term as defined in the DIP Credit Agreement) (collectively, the "**DIP Collateral**"), as follows:

(a)    A perfected first-priority lien in all unencumbered property of each of the Debtors pursuant to Section 364(c)(2) of the Bankruptcy Code;

(b)    A perfected junior lien in all property of each of the Debtors subject to (i) valid, perfected, and non-avoidable liens in favor of third parties in existence as of the Petition Date (other than the Pre-Petition Liens), (ii) valid and unavoidable permitted encumbrances in existence as of the Petition Date that are subsequently perfected pursuant to Section 546(b) of the Bankruptcy Code, only to the extent such permitted encumbrance is not otherwise primed by the DIP Facility, and (iii) permitted liens as expressly set forth in the DIP Loan Documents (collectively, the "**Permitted Liens**"), pursuant to Section 364(c)(3) of the Bankruptcy Code; and

(c)    A first-priority, senior priming lien on all property of the Debtors securing the Domestic Credit Facility and Second Lien Notes, including any Cash Collateral thereof, pursuant to Section 364(d)(1) of the Bankruptcy Code, subject to the Permitted Liens.

Effective upon the entry of this Interim Order and until the payment in full in cash of all DIP Obligations and the termination of the DIP Credit Parties' obligations to extend credit under the DIP Loan Documents, all DIP Liens and the DIP Carve-Out shall each be and remain at all times senior to the Pre-Petition Liens.

7.    <u>DIP Lien Priority</u>.

(a)    <u>DIP Liens</u>.  The DIP Liens shall be junior only to the (i) DIP Carve-Out and (ii) the Permitted Liens, and shall otherwise be senior in priority and superior to the Pre-Petition Liens and any other security, mortgage, collateral interest, lien, or claim on or to any Debtor's property constituting the DIP Collateral.

(b)    <u>Seniority</u>.  Other than as set forth herein or as further ordered by the Court, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to cases under Chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of any of the Cases or Successor Cases.  The DIP Liens shall not be subject to challenge under Sections 510, 549, 550, or 551 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

(c)    <u>Pre-Petition Senior Liens</u>.  For the avoidance of doubt, the Pre-Petition Liens, including with regard to Cash Collateral, shall be junior to the (i) DIP Carve-Out and (ii) DIP Liens.

8.    <u>DIP Super-Priority Claim</u>.

(a)    <u>DIP Credit Parties' Super-Priority Claim</u>.  Upon entry of this Interim Order, the DIP Agent (for the benefit of itself and the other DIP Credit Parties under the DIP Loan Documents) is hereby granted, and all DIP Obligations shall constitute, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (collectively,

DOCS_DE:198179.2 05511/001

the "**DIP Super-Priority Claim**") with priority over any and all administrative expenses, diminution claims, rights in Cash Collateral of the Pre-Petition Secured Creditors, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 506(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which DIP Super-Priority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and their estates and all proceeds thereof, subject only to the DIP Liens, the DIP Carve-Out, and Permitted Liens.

(b)    Priority of DIP Super-Priority Claim. The DIP Super-Priority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations, the DIP Carve-Out, and amounts secured by the Permitted Liens. Upon entry of the Final Order, the DIP Super-Priority Claim shall be payable from or have recourse to proceeds of all claims or causes of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including, without limitation, Chapter 5 and Section 724(a) of the Bankruptcy Code (the "**Avoidance Actions**").

9.    No Obligation to Extend Credit. No DIP Credit Party shall have any obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Agent in its sole discretion.

10.    <u>Use of DIP Facility Proceeds</u>.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the DIP Loan Documents, and in compliance with the Budget and as otherwise provided hereunder and under the DIP Loan Documents.

11.    <u>Authorization to Use Cash Collateral</u>.  The Pre-Petition Collateral includes cash collateral within the meaning of Section 363(a) of the Bankruptcy Code.  Any proceeds of the Pre-Petition Collateral are cash collateral of the Pre-Petition Secured Creditors within the meaning of Section 363(a) of the Bankruptcy Code.  Except as otherwise specifically provided for herein, cash collateral of any of the Pre-Petition Secured Creditors within the meaning of Section 363(a) of the Bankruptcy Code (including, without limitation, all proceeds of Pre-Petition Collateral) is collectively referred to herein as "**Cash Collateral**."  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in accordance with the Budget and as otherwise provided hereunder and under the DIP Loan Documents, the Debtors are authorized to use Cash Collateral until the Termination Date in accordance with the terms and provisions of the Budget; provided that the Pre-Petition Secured Creditors are granted and provided adequate protection in accordance herewith; provided, further, that notwithstanding the occurrence of the Termination Date, the Debtors may use Cash Collateral to fund the DIP Carve-Out in accordance with the terms of this Interim Order.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business (which shall be subject to further orders of this Court), or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Loan Documents, and in accordance with the Budget and as otherwise provided hereunder and under the DIP Loan Documents.

12.    <u>Adequate Protection</u>. The Pre-Petition Secured Creditors are entitled, pursuant to Sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Pre-Petition Collateral, including the Cash Collateral, including, without limitation, as a result of any diminution in value resulting from the sale, lease, or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the priming of the Pre-Petition Liens in the Pre-Petition Collateral by the DIP Liens and the DIP Carve-Out pursuant to the DIP Loan Documents and this Interim Order, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code. As adequate protection, the Pre-Petition Secured Creditors are hereby granted the following (collectively, the "**Adequate Protection Obligations**"):

(a)    <u>Senior Adequate Protection Liens</u>. The Pre-Petition Agent (for the benefit of the Pre-Petition Secured Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or other agreements) a senior replacement security interest in and lien upon all the DIP Collateral, subject and subordinate only to the DIP Liens and the DIP Carve-Out (such liens securing the senior Adequate Protection Obligations, the "**Senior Adequate Protection Liens**"). Without limiting the generality of the foregoing, the Senior Adequate Protection Liens granted to the Pre-Petition Agent hereunder shall be junior in all respects to the DIP Liens and the DIP Carve-Out.

(b)    <u>Second Priority Adequate Protection Liens</u>. The Indenture Trustee (for the benefit of the Pre-Petition Holders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or other

20

agreements) a junior replacement security interest in and lien upon all the DIP Collateral, subject and subordinate only to the DIP Liens, the DIP Carve-Out, and the Senior Adequate Protection Liens (such liens securing the junior Adequate Protection Obligations, the "**Second Priority Adequate Protection Liens**," and together with the Senior Adequate Protection Liens, the "**Adequate Protection Liens**").  Without limiting the generality of the foregoing, the Second Priority Adequate Protection Liens granted to the Indenture Trustee hereunder shall be junior in all respects to the DIP Liens, the DIP Carve-Out, and the Senior Adequate Protection Liens.

(c)    Senior Adequate Protection Claim.  The Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby granted, subject to the DIP Super-Priority Claim and the DIP Carve-Out, a super-priority claim, as provided for in Section 507(b) of the Bankruptcy Code (the "**Senior Adequate Protection Claim**"), immediately junior to the DIP Super-Priority Claim and payable from and having recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (including, upon entry of the Final Order, proceeds of the Avoidance Actions).

(d)    Second Priority Adequate Protection Claim.  The Indenture Trustee and the Pre-Petition Holders are hereby granted, subject to the DIP Super-Priority Claim, the DIP Carve-Out, and the Senior Adequate Protection Claim, a super-priority claim, as provided for in Section 507(b) of the Bankruptcy Code (the "**Second Priority Adequate Protection Claim**," and together with the Senior Adequate Protection Claim, the "**Adequate Protection Claim**"), junior to the DIP Super-Priority Claim and the Senior Adequate Protection Claim, respectively, and payable from and having recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (including, upon entry of the Final Order, proceeds of the Avoidance Actions).

(e)    Fees and Expenses. As additional adequate protection in accordance with Sections 361 and 363 of the Bankruptcy Code, the Debtors are authorized and directed to pay, subject in all respects to this Interim Order and the Budget, on an ongoing basis any reasonable and documented fees, costs, and expenses reasonably incurred by or payable to the Ad Hoc Committee of Pre-Petition Secured Creditors and the Pre-Petition Agent, or to the applicable professionals, as appropriate, in accordance with the Pre-Petition Agreements and the Support Agreement (as defined in the Motion), reasonable and documented professional fees and expenses of the Ad Hoc Committee of Pre-Petition Secured Creditors, and the Pre-Petition Agent (both pre- and post-petition) including, without limitation, the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Young Conaway Stargatt & Taylor LLP, and Freshfields Bruckhaus Deringer LLP, as counsel to the Ad Hoc Committee of Pre-Petition Secured Creditors, Blackstone Advisory Partners L.P., as financial advisor to the Ad Hoc Committee of Pre-Petition Secured Creditors, and James Bates Brannan Groover, LLP, as counsel to the Pre-Petition Agent (and any Delaware counsel retained by the Pre-Petition Agent), on a regular monthly basis during these Cases without allowance by the Court, subject to the 10-day notice and objection period set forth below following receipt of any such invoice. Professionals for the Ad Hoc Committee of Pre-Petition Secured Creditors and the Pre-Petition Agent (collectively, the "**Ad Hoc Committee Professionals**") shall not be required to comply with the U.S. Trustee fee guidelines with regard to such fees and expenses. The Ad Hoc Committee Professionals shall deliver a copy of their respective invoices, redacted as necessary with respect to any privileged or confidential information contained therein, to the Debtors, counsel for any Statutory Committee, and the U.S. Trustee, and, to the extent the amounts requested therein exceed the amounts budgeted

therefore during the applicable period set forth in the Budget, to the DIP Agent. Any objections raised by the Debtors, the U.S. Trustee, or any Statutory Committee, or, if applicable, the DIP Agent, with respect to such invoices within ten (10) days of the receipt thereof will be resolved by the Court. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors.

(f)    The Adequate Protection Obligations (i) shall not be subject to Sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, Section 506(c) of the Bankruptcy Code or the "equities of the case" exception of Section 552 of the Bankruptcy Code, (ii) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors, and (iii) shall be valid and enforceable against any trustee or any other estate representative appointed in these Cases or any Successor Cases and/or upon the dismissal of any of these Cases.

(g)    Any modification or extension of this Interim Order with respect to the Adequate Protection Obligations shall require the prior written consent of the Required Pre-Petition Lenders and the Required Pre-Petition Holders, unless otherwise ordered by the Court.

13.    <u>Sufficiency of Adequate Protection</u>. The Pre-Petition Agent, the Indenture Trustee and the Ad Hoc Committee of Pre-Petition Secured Creditors, on behalf of themselves and on behalf of the Pre-Petition Secured Creditors, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party-in-interest to the grant of any additional or alternative adequate protection; <u>provided</u>,

however, that any such additional or alternative adequate protection shall at all times be subordinate and junior to the DIP Super-Priority Claim, the DIP Liens, and the DIP Carve-Out.

14.    <u>No Unauthorized Disposition of Assets</u>.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business (which shall be subject to further orders of this Court), or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Loan Documents, and in accordance with the Budget and as otherwise provided hereunder and under the DIP Loan Documents.

15.    <u>Amendments</u>.  The DIP Loan Documents may from time to time be amended, modified, or supplemented by the parties thereto without notice or a hearing if:  (a) in the reasonable judgment of the Debtors, the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders, the amendment, modification, or supplement (i) is in accordance with the DIP Loan Documents, (ii) is not prejudicial in any material respect to the rights of third parties, and (iii) has been consented to by the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders, and (b) a copy (which may be provided through electronic mail or facsimile) of the form of amendment, modification, or supplement is provided to counsel for any Statutory Committee and the U.S. Trustee at least one (1) Business Day prior to the effective date of the amendment, modification, or supplement.

16.    <u>Budget Modifications</u>.  The Budget and any modification to, or amendment or update of, the Budget shall be in form and substance reasonably acceptable to the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders and approved by the DIP Agent in its Permitted Discretion, and the Required Pre-Petition Lenders and the Required Pre-Petition Holders in their reasonable discretion.

17.    <u>Budget Updates</u>. The Debtors shall comply with and update the Budget from time to time in accordance with the DIP Loan Documents (provided that any update shall be in form and substance reasonably acceptable to the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders and approved by the DIP Agent in its Permitted Discretion, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders in their reasonable discretion).  The Debtors have delivered to the DIP Agent and the Ad Hoc Committee of Pre-Petition Secured Creditors the initial 13-week Budget showing all projected cash receipts and all projected cash disbursements (with detail as to sources of cash receipts and identification of cash disbursements) for the Debtors during such initial 13-week period, with inclusion of the following line items:  collections, total net cash flow, and available domestic cash, which shall be subject to reasonable approval by the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders.  Commencing the second (2nd) full week following the Closing Date (on each Thursday), the Debtors shall deliver to the DIP Agent and the Ad Hoc Committee of Pre-Petition Secured Creditors, every two (2) weeks, an updated, rolling 13-week budget (each a "**Budget**"), which sets forth by line item updated projected receipts and disbursements for the Debtors during the period commencing from the end of the previous two-week period through and including 13 weeks thereafter, which Budget shall be in form similar to the initial Budget and subject to reasonable approval by the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders.  The Debtors shall still be subject to and governed by the terms of the immediately preceding Budget approved by the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders and then in effect and the DIP Credit Parties, the Pre-Petition Secured Lenders and the Pre-Petition Holders shall have no obligation to fund to such updated Budget or permit the use of Cash Collateral with respect thereto until such time as the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders

notify the Debtors that such updated Budget has been approved; provided that the DIP Credit Parties and the Pre-Petition Secured Creditors shall be deemed to have consented to such updated Budget unless they shall object thereto to the Debtors within five (5) Business Days after having received such updated Budget. By Thursday of the week following (a) the end of the first full calendar week following the Closing Date and (b) each calendar week thereafter the Debtors shall deliver to the DIP Agent and the Ad Hoc Committee of Pre-Petition Secured Creditors a variance report (a "**Variance Report**") showing comparisons of actual results for each operating line item against such line item in the approved Budget for such preceding week and on a cumulative basis for the four immediately preceding weeks (or if fewer than four weeks have lapsed since the Closing Date, cumulatively from the Closing Date). Each Variance Report shall indicate whether there are any adverse budget variances that exceed the Permitted Variances (it being understood that the initial Variance Report due the first full calendar week following the Closing Date is a report only). Compliance with the Budget shall be tested (i) for the first two (2) weeks following the Closing Date, on a cumulative basis, (ii) for the first three (3) weeks following the Closing Date on a cumulative basis, and (iii) thereafter weekly on a rolling four (4) week basis. "**Permitted Variances**" shall mean an adverse variance in an amount not to exceed 15% of the amounts set forth for total receipts or total disbursements on a four-week rolling basis (or if fewer than four weeks have lapsed since the Closing Date, cumulatively from the Closing Date); provided that Permitted Variances of total receipts shall be (A) 25% measured on a cumulative basis for the first two (2) full weeks following the Closing Date and (B) 20% measured on a cumulative basis for the first three (3) full weeks following the Closing Date.

18.    <u>Modification of Automatic Stay</u>.    The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant

the DIP Liens, DIP Super-Priority Claim, the Adequate Protection Liens, and the Adequate Protection Claim; and (b) authorize the Debtors to pay, and the DIP Credit Parties and the Pre-Petition Secured Creditors to retain and apply, payments made in accordance with the terms of this Interim Order.

19.    Perfection of DIP Liens and Adequate Protection Liens.

(a)    Automatic Perfection of Liens.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, collateral access agreement, customs broker agreement, or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Adequate Protection Liens, or to entitle the DIP Credit Parties or the Pre-Petition Secured Creditors to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent, in its Permitted Discretion, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders, in their reasonable discretion, are authorized to file such financing statements, mortgages, notices of liens, and other similar documents as they deem necessary to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence any of the DIP Liens or the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, perfect, or enforce the DIP Liens or the Adequate Protection

DOCS_DE:198179.2 05511/001

Liens. The Debtors are authorized to execute and deliver promptly upon demand to the DIP Agent, the Pre-Petition Agent, and the Indenture Trustee all such financing statements, mortgages, control agreements, notices, and other documents as the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders may reasonably request. The DIP Agent, in its Permitted Discretion, and the Pre-Petition Agent and the Indenture Trustee, in their reasonable discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

20.    <u>Application of Proceeds of DIP Collateral.</u>

(a)    The proceeds of DIP Collateral shall be applied as follows:  (i) all payments received by the DIP Agent in respect of any DIP Obligations, and (ii) all net proceeds from any disposition of any DIP Collateral, each shall be applied as follows: *first*, to payment of fees, costs, and expenses payable and reimbursable by the Debtors under the DIP Credit Agreement and the other DIP Loan Documents; *second*, to payment of all DIP Obligations in accordance with the DIP Loan Documents; and *third*, to the Debtors' operating account, or for the account of and paid to whoever may be lawfully entitled thereto.

(b)    As between the DIP Agent, the DIP Lenders, and the other DIP Credit Parties, nothing provided herein shall be deemed to modify the allocation of the proceeds of DIP Collateral set forth in the DIP Loan Documents.

(c)    The Debtors shall not, directly or indirectly, voluntarily purchase, redeem, defease, or prepay any principal of, premium, if any, interest, or other amount payable in respect of any indebtedness prior to its scheduled maturity, other than the DIP

Obligations (in accordance with the DIP Loan Documents and this Interim Order) and obligations authorized by an order of the Court.

21.    <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer, or any other estate representative subsequently appointed in these Cases or any Successor Cases shall obtain credit or incur debt pursuant to Sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Credit Parties' obligations to extend credit under the DIP Facility, including subsequent to the confirmation of any plan of reorganization or liquidation with respect to any or all of the Debtors and the Debtors' estates, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth in the DIP Credit Agreement.

22.    <u>Maintenance of DIP Collateral</u>.  Until the payment in full in cash of all DIP Obligations and the termination of the DIP Credit Parties' obligations to extend credit under the DIP Loan Documents, as provided therein, the Debtors shall:  (a) insure the DIP Collateral as required under the DIP Facility; (b) maintain the cash management system which has been agreed to by the DIP Agent, or as otherwise required by the DIP Loan Documents; and (c) comply with any and all obligations with regard to the DIP Collateral as set forth in the DIP Loan Documents.

23.    <u>Disposition of DIP Collateral</u>.  Unless otherwise authorized by the Court, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral except as permitted by the DIP Loan Documents, subject to the terms of this Interim Order.  Nothing provided herein shall limit the right of any DIP Credit Party, the Pre-Petition

Secured Lender, the Indenture Trustee or the Ad Hoc Committee of Pre-Petition Secured Creditors to object to any proposed disposition of the DIP Collateral.

24.    <u>Termination Date</u>.  On the Termination Date, subject to satisfaction of a five-day notice requirement after the occurrence of an Event of Default, (a) all DIP Obligations shall be immediately due and payable and all commitments to extend credit under the DIP Facility will terminate and (b) all authority to use Cash Collateral shall cease.

25.    <u>Events of Default</u>.  The occurrence of an "Event of Default" under the DIP Credit Agreement shall constitute an event of default under this Interim Order (each, an "**Event of Default**").

26.    <u>Rights and Remedies Upon Event of Default</u>.  Upon the earlier of (a) the Termination Date or (b) the Debtors' receipt of notice of the occurrence of any Event of Default (the Debtors' receipt of such notice of an Event of Default, a "**Termination Event**"), the DIP Agent (on behalf of the DIP Credit Parties) may take all or any of the following actions without further order of or application to the Court, and notwithstanding the automatic stay:  (a) declare the principal of, and accrued interest on, any outstanding loans under the DIP Facility to be immediately due and payable; or (b) terminate any further commitment to lend to the Debtors. Upon the Termination Date or the occurrence of a Termination Event, and unless obligations under the DIP Facility shall have been paid in full, the DIP Agent may (i) set-off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Credit Parties), and (ii) take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens granted to the DIP Agent (on behalf of the DIP Credit Parties) under this Interim Order and the DIP Collateral) permitted under the DIP Facility or under applicable law, including, without limitation, exercising any and all rights and remedies with respect to the DIP Collateral or any portion thereof, subject only to

DOCS_DE:198179.2 05511/001

satisfaction of a five-day notice requirement after occurrence of an Event of Default. Any automatic stay otherwise applicable to the DIP Agent shall be modified so that five (5) days after the occurrence of the Termination Event, the DIP Agent (on behalf of the DIP Credit Parties) shall be entitled to exercise all rights and remedies against the DIP Collateral and shall be permitted to satisfy its DIP Liens and DIP Super-Priority Claim, subject to the DIP Carve-Out and the Permitted Liens. During such five-day period, the Debtors shall be entitled to seek an emergency hearing. Unless the Court determines otherwise during such five-day period, subject to tolling based on the Court's earliest available date for such hearing, the automatic stay shall automatically be terminated without further application, motion, notice, or order and the DIP Agent (on behalf of the DIP Credit Parties) shall be permitted to exercise all remedies with regard to the DIP Collateral. Until such hearing occurs, the Debtors shall have the right to continue to use Cash Collateral as set forth in the Budget. The five-day notice period set forth above shall run concurrently with any notice period provided for under the DIP Loan Documents.

27.    <u>Good Faith Under Section 364 of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Credit Parties and the Ad Hoc Committee of Pre-Petition Secured Creditors have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court, or any other court, the DIP Credit Parties and the Ad Hoc Committee of Pre-Petition Secured Creditors are entitled to the protections provided in Section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously

made or made hereunder, or lien, claim, or priority authorized or created hereby, provided that the Interim Order was not stayed by court order after due notice had been given to the DIP Agent, the Pre-Petition Agent, the Indenture Trustee, and the Ad Hoc Committee of Pre-Petition Secured Creditors at the time the advances were made or the liens, claims, or priorities were authorized and/or created. Any liens or claims granted to the DIP Credit Parties and the Pre-Petition Secured Creditors hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

28.  <u>DIP and Other Expenses</u>.  The Debtors are authorized and directed to pay (including by means of an advance or charge against its loan account by the DIP Agent) all reasonable out-of-pocket expenses incurred in connection with the DIP Facility (including, without limitation, expenses incurred prior to the Petition Date) by the DIP Credit Parties, including, without limitation, the DIP Credit Parties' pre- and post-petition legal fees and expenses, documentation fees incurred in connection with the negotiation, preparation, execution, and performance of the DIP Loan Documents, UCC search and recording fees, credit reports, collateral auditing costs incurred by the DIP Credit Parties in connection with the transactions contemplated herein, lien perfection fees and expenses, and all other reasonable out-of-pocket expenses (including, but not limited to, appraisal and audit fees) incurred by the DIP Credit Parties in connection with the negotiation, preparation, execution, and performance of the DIP Loan Documents.  Payment of all such fees and expenses shall not be subject to allowance by the Court and professionals for the DIP Credit Parties shall not be required to comply with the U.S. Trustee fee guidelines.  The professionals for the DIP Credit Parties shall deliver a copy of their respective invoices to the Debtors, counsel for any Statutory Committee, counsel to the Ad

32

Hoc Committee of Pre-Petition Secured Creditors, and the U.S. Trustee, redacted as necessary with respect to any privileged or confidential information contained therein. Any objections raised by the Debtors, the U.S. Trustee, the Ad Hoc Committee of Pre-Petition Secured Creditors, or any Statutory Committee with respect to such invoices within ten (10) days of the receipt thereof will be resolved by the Court. Notwithstanding the foregoing, the Debtors are authorized and directed to pay (including by means of an advance or charge against its loan account by the DIP Agent) on the Closing Date all reasonable fees, costs, and expenses of the DIP Credit Parties incurred on or prior to such date without the need for any professional engaged by the DIP Credit Parties to first deliver a copy of its invoice as provided for herein.

29.    Indemnification. Effective upon entry of the Final Order, the Debtors shall indemnify and hold harmless the DIP Agent and, each other DIP Credit Party, and each of their respective shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys, and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Loan Documents, or the DIP Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Loan Documents and as further described therein and herein, or in connection with these Cases, any plan, or any action or inaction by the Debtors; provided that such indemnity shall not, as to any indemnified party, be available to the extent that such losses, claims, damages, liabilities, or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such indemnified party. The

indemnity includes indemnification for the DIP Agent's exercise of discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefore, each of the DIP Agent and each other DIP Credit Party shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

30.  Proofs of Claim.    Any order entered by the Court in relation to the establishment of a bar date for any claims (including without limitation administrative claims) in any of the Cases or Successor Cases shall not apply to the DIP Credit Parties. None of the DIP Credit Parties will be required to file proofs of claim or requests for approval of administrative expenses in any of the Cases or Successor Cases, and the provisions of this Interim Order relating to the amount of the DIP Obligations and the DIP Super-Priority Claim shall constitute timely filed proofs of claim and/or administrative expense requests.

31.  Rights of Access and Information.    Without limiting the rights of access and information afforded the DIP Credit Parties and the Pre-Petition Secured Creditors under the DIP Loan Documents and the Pre-Petition Credit Documents, as applicable, the Debtors shall be, and hereby are, required to afford representatives, agents, and/or employees of the DIP Agent, and the Ad Hoc Committee of Pre-Petition Secured Creditors access to the Debtors' premises and books and records in accordance with the DIP Loan Documents and the Pre-Petition Credit Documents, respectively, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent and the Ad Hoc Committee of Pre-Petition Secured Creditors to all such information as may be reasonably requested with respect to the business, results of operations, and financial condition of any Debtor.

32.    DIP Carve-Out.

(a)    DIP Carve-Out.  As used in this Interim Order, the term "**DIP Carve-Out**" shall mean, collectively: (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "**Case Administration Fees**"); (ii) unpaid professional fees and expenses (the "**Debtor Professional Fees**") payable to each legal or financial advisor, investment banker, or other professional retained by the Debtors (the "**Debtor Professionals**") that are incurred or accrued prior to the date of the occurrence of a Termination Event, but subject to the aggregate amounts set forth in the Budget (subject to Permitted Variances) and ultimately allowed by the Court pursuant to Sections 328, 330, 331, and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event); (iii) unpaid professional fees and expenses (together with the Debtor Professional Fees, the "**Professional Fees**") payable to each legal or financial advisor retained by a Statutory Committee, if any, that are incurred or accrued prior to the date of the occurrence of a Termination Event, but subject to the aggregate amounts set forth in the Budget as of such date (subject to Permitted Variances) and ultimately allowed by the Court pursuant to Section 328, 330, 331, and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event); and (iv) Case Administration Fees and Professional Fees incurred on or after the occurrence of a Termination Event in an aggregate amount not to exceed $2,000,000.00 (the "**Carve-Out Trigger Amount**").  Any Case Administration Fees and Professional Fees owing by the Debtors prior to the occurrence of a Termination Event shall be paid by the Debtors (in accordance with the approved Budget and pursuant to Court order); provided that the Debtor Professional Fees set forth in the Budget shall be funded by the Debtors into

35

segregated accounts for the benefit of the applicable Debtor Professionals or to the applicable Debtor Professionals on a monthly basis, and such accounts or amounts, as applicable, shall be free and clear of all liens, claims, and interests of any party other than the applicable Debtor Professionals (it being understood that notwithstanding the foregoing, any funds remaining in such segregated accounts or any funds returned to the Debtors after payment of Debtor Professional Fees pursuant to Court order shall only be subject to the liens, claims, and interests of the Debtors, the DIP Credit Parties and the Pre-Petition Secured Creditors) and such payments shall not reduce or be deemed to reduce the DIP Carve-Out. Notwithstanding the occurrence of the Termination Date or a Termination Event, nothing in this Interim Order limits, alters, or otherwise relieves the Debtors from paying (including by means of an advance or charge against its loan account by the DIP Agent) all reasonable fees and expenses incurred by any of the DIP Credit Parties as required herein and in the DIP Loan Documents.

(b)    Carve-Out Trigger Deposit. Within one Business Day after the occurrence of a Termination Event, the DIP Agent shall fund a final revolving loan to the Debtors in the amount of the Carve-Out Trigger Amount. Such amount shall be funded into a single segregated account that has been opened by the Debtors for the benefit of the applicable Debtor Professionals (as identified to the DIP Agent by the Debtors) for use by the Debtor for payment of Case Administration Fees and Professional Fees incurred on or after the occurrence of such Termination Event. Such account and amounts therein shall be free and clear of all liens, claims, and interests of any party other than (a) the U.S. Trustee, the applicable Debtor Professionals, and the applicable legal or financial advisors retained by any Statutory Committee and (b) after the payment of such Case

Administration Fees and Professional Fees pursuant to Court order, the Debtors, the DIP Agent and the Pre-Petition Secured Creditors with respect to any remaining funds.

(c)    <u>No Direct Obligation to Pay Professional Fees or Committee Expenses</u>. Except for funding the Carve-Out Trigger Amount as provided herein, none of the DIP Credit Parties shall be responsible for the funding, direct payment, or reimbursement of any fees or disbursements of any Case Administration Fees or Professionals Fees incurred in connection with the Cases or any Successor Cases. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Credit Parties or the Pre-Petition Secured Creditors in any way to pay compensation to or to reimburse expenses of any Debtor Professional or the professionals of any Statutory Committee (including any Statutory Committee expenses), or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing in this Interim Order or otherwise shall be construed to increase the DIP Carve-Out if actual (a) allowed Professional Fees or (b) any other Case Administration Expenses are higher in fact than the estimated fees and disbursements reflected in the Budget.

(d)    <u>Payment of DIP Carve-Out</u>. The funding of the DIP Carve-Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

33.    <u>Limitations on the Use of the DIP Facility, the DIP Collateral, Cash Collateral, and the DIP Carve-Out</u>. The DIP Facility, the DIP Collateral, the Cash Collateral, and the DIP Carve-Out may not be used:  (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion, or other litigation of any type (i) adverse to or against the interests of the DIP Credit Parties or the Pre-Petition Secured Creditors or their rights

and remedies under the DIP Loan Documents, the Pre-Petition Credit Documents, or this Interim Order or the Final Order, including, without limitation, for the payment of any services rendered by the professionals retained by any Statutory Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration, or similar relief, (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, any DIP Obligation or the Pre-Petition Obligations, (iii) for monetary, injunctive, or other affirmative relief against the DIP Credit Parties, the Pre-Petition Secured Creditors, or their collateral, or (iv) preventing, hindering, or otherwise delaying the exercise by the DIP Credit Parties or the Pre-Petition Secured Creditors of any rights and remedies under this Interim Order or the Final Order, the DIP Loan Documents, the Pre-Petition Credit Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court, or otherwise) by the DIP Agent, the Pre-Petition Agent, or the Indenture Trustee upon any of the DIP Collateral or the Pre-Petition Collateral; (b) to make any distribution under a plan of reorganization or liquidation in any Case; (c) to make any payment in settlement of any claim, action, or proceeding before any court, arbitrator, or other governmental body; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors; (e) objecting to, contesting, or interfering with, in any way, the DIP Credit Parties' or the Pre-Petition Secured Creditors' enforcement or realization upon any of the DIP Collateral or the Pre-Petition Collateral once an Event of Default has occurred, except as provided for in this Interim Order or Final Order, or seeking to prevent the DIP Agent, the Pre-Petition Agent, the Indenture Trustee, or the Ad Hoc Committee of Pre-Petition Secured Creditors from credit bidding in connection with any proposed plan or reorganization or liquidation or any proposed transaction pursuant to

38

Section 363 of the Bankruptcy Code; (f) using or seeking to use Cash Collateral while the DIP

Obligations or the Pre-Petition Obligations remain outstanding in a manner inconsistent with the

Budget and the terms of this Interim Order or the Final Order; (g) using or seeking to use any

insurance proceeds constituting DIP Collateral or the Pre-Petition Collateral without the consent

of the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders; (h)

incurring any obligations or indebtedness outside the ordinary course of business, except as

permitted under the DIP Loan Documents and the Pre-Petition Credit Documents; (i) objecting

to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Credit

Parties or the Pre-Petition Secured Creditors; (j) asserting, commencing, or prosecuting any

claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5

of the Bankruptcy Code, against the DIP Credit Parties or the Pre-Petition Secured Creditors; or

(k) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity,

extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the Pre-

Petition Obligations, the DIP Liens, the Pre-Petition Liens, or any other rights or interests of the

DIP Credit Parties or the Pre-Petition Secured Creditors. Notwithstanding the foregoing, the DIP

Facility, the DIP Collateral, the Cash Collateral, and the DIP Carve-Out may be used in an

amount not to exceed $50,000 in the aggregate for fees incurred by the Statutory Committee, if

any, to investigate the validity, enforceability, perfection, priority, or extent of the Pre-Petition

Liens or claims (each, a "**Secured Party Claim**") within sixty (60) days following the selection

of counsel to the Statutory Committee.

    34.   <u>Reservation of Certain Third-Party Rights</u>.  No later than the date (the

"**Investigation Termination Date**") that is the earlier of (i) seventy-five (75) days after the entry

of this Interim Order and (ii) the last day for filing objections to the confirmation of the Plan, any

Statutory Committee or any other party-in-interest with standing granted pursuant to order of

Court (other than the Debtors) may commence an appropriate contested matter or adversary proceeding (a "**Challenge**") asserting any Secured Party Claim; provided, for the avoidance of doubt, if the Cases are converted to Chapter 7 cases, then the trustee appointed in connection therewith is permitted to bring a Challenge prior to the Investigation Termination Date. If a Challenge is not filed on or before the Investigation Termination Date (or such other later date as extended by the written consent of the Required Pre-Petition Lenders and the Required Pre-Petition Holders, or by order of this Court), then: (a) the agreements, acknowledgements, and stipulations contained in Paragraph E of this Interim Order shall be irrevocably binding on the Debtors, any Statutory Committee, and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, without further action by any party or this Court, and any Statutory Committee and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (b) the Pre-Petition Liens of the Pre-Petition Secured Creditors shall be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (c) the Pre-Petition Obligations shall, subject to this Interim Order, the DIP Liens, and the DIP Super-Priority Claim, be deemed to be finally allowed claims for all purposes against each of the Debtors, including in any Successor Cases and shall not be subject to challenge by any party-in-interest as to amount, validity, priority, or otherwise. Notwithstanding anything to the contrary herein: (x) if any such Challenge is timely commenced, the stipulations contained in Paragraph E of this Interim Order shall nonetheless remain binding and preclusive on all parties-in-interest (other than the party that has brought such Challenge in connection therewith) except to the extent that such stipulations are successfully challenged in such Challenge; (y) the Pre-Petition Secured Creditors reserve all of their rights to contest on any grounds any Challenge;

and (z) the Pre-Petition Secured Creditors shall comply with any and all orders of the Court in connection with a successful Challenge; provided, however, that the Pre-Petition Secured Creditors preserve any and all of their rights to appeal and stay any orders of the Court issued in connection with such successful Challenge. For the avoidance of doubt, nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates.

35.   Payment of Compensation. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any professionals retained in the Cases or shall affect the right of the DIP Credit Parties or the Ad Hoc Committee of Pre-Petition Secured Creditors to object to the allowance and payment of such fees and expenses.

36.   No Third-Party Rights. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

37.   Section 506(c) Claims. Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Credit Parties, the Pre-Petition Secured Creditors, the DIP Collateral, or the Pre-Petition Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

38.   No Marshaling/Applications of Proceeds. Upon entry of the Final Order, none of the DIP Credit Parties or the Pre-Petition Secured Creditors shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Pre-Petition Collateral.

39.   Section 552(b). The DIP Credit Parties and the Pre-Petition Secured Creditors shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code. Subject to the entry of the Final Order, the "equities of the case" exception under Section 552(b)

of the Bankruptcy Code shall not apply to the DIP Credit Parties or the Pre-Petition Secured Creditors.

40.    Joint and Several Liability.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Loan Documents.

41.    Discharge Waiver.  Effective upon entry of the Final Order, the Debtors expressly stipulate, and the Court finds and adjudicates that, none of the DIP Obligations, the DIP Super-Priority Claim, or the DIP Liens shall be discharged by the entry of an order confirming any plan of reorganization or liquidation, notwithstanding the provisions of Section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been paid in full in cash on or before the effective date of a confirmed Chapter 11 plan.  None of the Debtors shall propose or support any plan or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan, of all DIP Obligations.

42.    Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) DIP Credit Parties' and the Pre-Petition Secured Creditors' right to seek any other or supplemental relief in respect of the Debtors or (b) any of the rights of the DIP Credit Parties and the Pre-Petition Secured Creditors under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of Section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions

42

of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans. Other than as expressly set forth in this Interim Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Credit Parties and the Pre-Petition Secured Creditors are preserved.

43.    No Waiver by Failure to Seek Relief. The failure of the DIP Credit Parties or the Pre-Petition Secured Creditors to seek relief or otherwise exercise rights and remedies under this Interim Order, the DIP Loan Documents, the Pre-Petition Credit Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Credit Parties and the Pre-Petition Secured Creditors.

44.    Binding Effect of Interim Order. Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Credit Parties, the Pre-Petition Secured Creditors, and all other creditors of any of the Debtors, any Statutory Committee, any other court-appointed committee appointed in the Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case. Notwithstanding anything contained herein with respect to the obligations or limitations when a Final Order is entered, the terms of the Final Order shall be what are binding on all parties.

45.    No Modification of Interim Order. Until and unless the DIP Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility or the Pre-Petition Agreements which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Agent, the Required Pre-Petition

43

Lenders, and the Required Pre-Petition Holders, (i) any modification, stay, vacatur, or amendment to this Interim Order or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Super-Priority Claim or the Adequate Protection Claim, other than the DIP Carve-Out; (b) any order allowing use of Cash Collateral resulting from DIP Collateral or the Pre-Petition Collateral; and (c) any lien on any of the DIP Collateral or the Pre-Petition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, or the Pre-Petition Liens.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent, the Required Pre-Petition Lenders, and the Required Pre-Petition Holders and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent, the Required Pre-Petition Lenders or the Required Pre-Petition Holders.

46.    _Interim Order Controls_.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents, the Pre-Petition Credit Documents, or this Interim Order, the provisions of this Interim Order shall govern and control.

47.    _Survival_.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization or liquidation in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and

other protections granted to the DIP Credit Parties pursuant to this Interim Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all DIP Obligations have been paid in full and all commitments to extend credit under the DIP Facility are terminated. The terms and provisions in this Interim Order concerning the indemnification shall continue in the Cases and in any Successor Cases, following dismissal of the Cases or any Successor Cases, following termination of the DIP Loan Documents and/or the repayment of the DIP Obligations.

48.    _Final Hearing_. The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2015, at _____ (Eastern) before the Honorable _____, United States Bankruptcy Judge, at _____.

49.    _Notice of Final Hearing_: On or before February ___, 2015, the Debtors shall serve, by United States mail, first-class postage prepaid, a copy of the Motion and this Interim Order upon:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the twenty (20) largest unsecured creditors of the Debtors at their last known addresses; (e) Greenberg Traurig, LLP (Attn: Bryan L. Elwood and Heather E. Moulder), attorneys for the DIP Agent; (f) Paul, Weiss, Rifkind, Wharton & Garrison LLP (Attn: Alan W. Kornberg and Kelley A. Cornish), and Young Conaway Stargatt & Taylor, LLP (Attn: Pauline Morgan and Maris J. Kandestin), attorneys for the Ad Hoc Committee of Pre-Petition Secured Creditors; (g) James Bates Brannan-Groover LLP, counsel to the Pre-Petition Agent; (h) the Indenture Trustee; (i) any party which has filed prior to such date a request for notices under Bankruptcy Rule 2002 with this Court; (j) all parties known, after reasonable inquiry, to have affected a lien, encumbrance, or claim in the DIP Collateral; (k) the Environmental Protection Agency, (l) the United States Attorney's Office

for the District of Delaware; (m) the office of the attorneys general for the states in which the Debtors operate; and (n) counsel for any Statutory Committee.

50.   Objection Deadline: Objections, if any, to the relief sought in the Motion shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the Clerk of the Bankruptcy Court, and personally served upon (a) Pachulski Stang Ziehl & Jones LLP (Attn: Laura Davis Jones, Esq.); (b) the Office of the U.S. Trustee for the District of Delaware; (c) counsel to any Statutory Committee; (d) Greenberg Traurig, LLP (Attn: Bryan L. Elwood and Heather E. Moulder), attorneys for the DIP Agent; (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP (Attn: Alan W. Kornberg and Kelley A. Cornish), and Young Conaway Stargatt & Taylor, LLP (Attn: Pauline Morgan and Maris J. Kandestin), attorneys for the Ad Hoc Committee of Pre-Petition Secured Creditors; (f) James Bates Brannan Groover LLP, counsel to the Pre-Petition Agent; and (g) the Indenture Trustee, so that such objections are filed with the Court and received by said parties on or before 5:00 p.m. (Eastern) on March __, 2015, with respect to entry of the Final Order.

51.   Effect of this Interim Order.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

52.   No Impact on Certain Contracts or Transactions.  No rights of any entity in connection with a contract or transaction of the kind listed in Sections 555, 556, 559, 560, or 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the provisions of this Interim Order.

53.   Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

February __, 2015

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit "A"

**DIP Credit Agreement**



**SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

by and between

**ALLEN SYSTEMS GROUP, INC.,
ASG FEDERAL, INC., and
VIASOFT INTERNATIONAL, LLC**

as Borrowers,

**NEWSTAR BUSINESS CREDIT, LLC,
as Administrative Agent**

and

**THE LENDERS SIGNATORY HERETO**

**Dated as of February ___, 2015**

## Table of Contents

**ARTICLE I DEFINITIONS**............................................................................................**1**

    Section 1.1.    Definitions .................................................................................. 1
    Section 1.2.    Interpretive Provisions ............................................................. 18

**ARTICLE II LOANS**.................................................................................................**18**

    Section 2.1.    Loans .......................................................................................... 18
    Section 2.2.    Request for and Making of Revolving Loans During Commitment Period; Swing Loans.......................................................................... 19
    Section 2.3.    Deemed Request for Revolving Loans....................................... 22
    Section 2.4.    Protective Advances .................................................................. 22
    Section 2.5.    Settlement .................................................................................. 22
    Section 2.6.    Cross Guaranty ......................................................................... 23

**ARTICLE III INTEREST, FEES, REIMBURSEMENTS**..........................................**24**

    Section 3.1.    Interest....................................................................................... 24
    Section 3.2.    Fees............................................................................................ 25
    Section 3.3.    Increased Cost and Reduced Return .......................................... 25
    Section 3.4.    Illegality .................................................................................... 25
    Section 3.5.    Taxes. ........................................................................................ 26
    Section 3.6.    Maximum Interest; Controlling Limitation. .............................. 29

**ARTICLE IV PAYMENT** ..........................................................................................**30**

    Section 4.1.    Interest....................................................................................... 30
    Section 4.2.    Prepayment; Mandatory Payment of Deficiencies ..................... 30
    Section 4.3.    Payment on the Termination Date .............................................. 30
    Section 4.4.    Mandatory Prepayment in Respect of Certain Events................. 30
    Section 4.5.    [Reserved] ................................................................................. 31
    Section 4.6.    General Payment Provisions ...................................................... 31
    Section 4.7.    Application ................................................................................. 31
    Section 4.8.    Reinstatement ............................................................................ 31
    Section 4.9.    Account Stated .......................................................................... 32

**ARTICLE V COLLATERAL** ....................................................................................**32**

    Section 5.1.    Security Interest......................................................................... 32
    Section 5.2.    Perfection and Protection of Administrative Agent's Security Interest ............. 32
    Section 5.3.    Survival .................................................................................... 33
    Section 5.4.    Examinations; Inspections; Verifications................................... 33
    Section 5.5.    [Reserved] ................................................................................. 34
    Section 5.6.    Right to Cure ............................................................................. 34
    Section 5.7.    Power of Attorney ..................................................................... 34
    Section 5.8.    Preservation of Administrative Agent's Rights................................ 35

**ARTICLE VI CONDITIONS** .................................................................................................**35**

| Section 6.1. | Conditions Precedent to Initial Revolving Loan | 35 |
| Section 6.2. | Conditions Precedent to all Loans | 37 |
| Section 6.3. | Conditions Precedent to Loans During the Subsequent Commitment Period | 37 |

**ARTICLE VII REPRESENTATIONS AND WARRANTIES** ...............................................**37**

| Section 7.1. | Fundamental Information | 37 |
| Section 7.2. | Prior Transactions | 38 |
| Section 7.3. | Subsidiaries | 38 |
| Section 7.4. | Authorization, Validity and Enforceability | 38 |
| Section 7.5. | Noncontravention | 38 |
| Section 7.6. | Financial Statements | 38 |
| Section 7.7. | Litigation | 38 |
| Section 7.8. | ERISA and Employee Benefit Plans | 39 |
| Section 7.9. | Compliance with Laws | 39 |
| Section 7.10. | Taxes | 39 |
| Section 7.11. | Location of Collateral and Books and Records | 39 |
| Section 7.12. | Accounts | 39 |
| Section 7.13. | Budget | 40 |
| Section 7.14. | [RESERVED] | 40 |
| Section 7.15. | Proprietary Rights | 40 |
| Section 7.16. | Investment Property | 40 |
| Section 7.17. | Real Property and Leases | 41 |
| Section 7.18. | Material Agreements | 41 |
| Section 7.19. | Bank Accounts | 41 |
| Section 7.20. | Title to Property | 41 |
| Section 7.21. | Debt | 41 |
| Section 7.22. | Liens | 41 |
| Section 7.23. | No Material Adverse Effect | 41 |
| Section 7.24. | Non-Regulated Entities | 41 |
| Section 7.25. | Governmental Authorization | 41 |
| Section 7.26. | Investment Banking or Finder's Fees | 42 |
| Section 7.27. | Full Disclosure | 42 |
| Section 7.28. | Other Obligations and Restrictions | 42 |
| Section 7.29. | Acts of God and Labor Disputes | 42 |
| Section 7.30. | Environmental and Other Laws | 42 |
| Section 7.31. | Security Interests | 43 |
| Section 7.32. | Commercial Tort Claims | 44 |
| Section 7.33. | Commencement of Chapter 11 Case, Appointment of Trustee or Examiner, Liquidation | 44 |
| Section 7.34. | Customers and Suppliers | 44 |
| Section 7.35. | Common Enterprise | 44 |
| Section 7.36. | Continuing Representations | 44 |

**ARTICLE VIII AFFIRMATIVE COVENANTS** ...................................................................**45**

| Section 8.1. | Existence and Good Standing | 45 |
| Section 8.2. | Compliance with Agreements and Laws | 45 |
| Section 8.3. | Books and Records | 45 |

DAL 79432184v8

Section 8.4.    Financial Reporting ................................................................................ 45
Section 8.5.    Collateral Reporting ............................................................................... 46
Section 8.6.    Compliance Certificate ........................................................................... 47
Section 8.7.    Notification to Administrative Agent ..................................................... 47
Section 8.8.    Accounts ................................................................................................. 48
Section 8.9.    Inventory ................................................................................................ 48
Section 8.10.   Equipment .............................................................................................. 48
Section 8.11.   Insurance ................................................................................................ 48
Section 8.12.   Payment of Trade Liabilities, Taxes, Etc .............................................. 49
Section 8.13.   Protective Advances ............................................................................... 49
Section 8.14.   Evidence of Compliance ........................................................................ 49
Section 8.15.   Environmental Matters; Environmental Reviews .................................. 49
Section 8.16.   Subsidiaries; Fundamental Information .................................................. 50
Section 8.17.   Further Assurances ................................................................................. 50
Section 8.18.   Cash Management Systems; Bankruptcy Court Orders .......................... 50

**ARTICLE IX NEGATIVE COVENANTS** .................................................................................... **51**

Section 9.1.    Fundamental Changes ............................................................................ 51
Section 9.2.    Collateral Locations ............................................................................... 51
Section 9.3.    Use of Proceeds ..................................................................................... 51
Section 9.4.    Business .................................................................................................. 52
Section 9.5.    Debt ........................................................................................................ 52
Section 9.6.    Guaranties .............................................................................................. 52
Section 9.7.    Liens ....................................................................................................... 52
Section 9.8.    Disposition of Property .......................................................................... 52
Section 9.9.    Sale and Leaseback ................................................................................ 53
Section 9.10.   Distributions; Capital Contribution; Redemption ................................. 53
Section 9.11.   Restricted Investments ........................................................................... 53
Section 9.12.   Transactions with Affiliates ................................................................... 53
Section 9.13.   New Subsidiaries ................................................................................... 53
Section 9.14.   Material Deviations ................................................................................ 53
Section 9.15.   Fiscal Year ............................................................................................. 53
Section 9.16.   Impairment of Security Interest ............................................................. 53
Section 9.17.   Limitation on Credit Extensions ............................................................ 54
Section 9.18.   Prohibited Contracts .............................................................................. 54
Section 9.19.   Accounts ................................................................................................. 54
Section 9.20.   Compliance with ERISA ........................................................................ 54
Section 9.21.   Bankruptcy Court Orders; Administrative Priority; Lien Priority; Payment
                of Claims ................................................................................................ 54
Section 9.22.   Payments ................................................................................................ 55
Section 9.23.   Budget .................................................................................................... 55

**ARTICLE X EVENT OF DEFAULT** ........................................................................................... **55**

Section 10.1.   Event of Default ..................................................................................... 55

**ARTICLE XI REMEDIES** ........................................................................................................... **58**

Section 11.1.   Remedies ................................................................................................ 58
Section 11.2.   Collateral ................................................................................................ 59

iii

Section 11.3.   Injunctive Relief..............................................................................59
Section 11.4.   Setoff..............................................................................................60

**ARTICLE XII TERM AND TERMINATION**...........................................................**60**

Section 12.1.   Term and Termination......................................................................60

**ARTICLE XIII ADMINISTRATIVE AGENT** ..........................................................**60**

Section 13.1.   Appointment and Authority..............................................................60
Section 13.2.   Exculpatory Provisions.....................................................................60
Section 13.3.   Reliance by Administrative Agent .....................................................61
Section 13.4.   Non-Reliance on Administrative Agent and other Lenders .................62
Section 13.5.   Rights as a Lender ...........................................................................62
Section 13.6.   Sharing of Set-Offs and Other Payments ..........................................62
Section 13.7.   Investments.....................................................................................62
Section 13.8.   Resignation of Administrative Agent .................................................63
Section 13.9.   Delegation of Duties........................................................................63
Section 13.10.  Collateral Matters ...........................................................................64
Section 13.11.  Agency for Perfection ......................................................................64
Section 13.12.  Concerning the Collateral and Related Loan Documents ...................64

**ARTICLE XIV MISCELLANEOUS**........................................................................**65**

Section 14.1.   Waivers & Amendments ...................................................................65
Section 14.2.   Severability.....................................................................................65
Section 14.3.   Governing Law; Venue. ...................................................................65
Section 14.4.   WAIVER OF JURY TRIAL ..............................................................66
Section 14.5.   Fees and Expenses...........................................................................66
Section 14.6.   Notices............................................................................................67
Section 14.7.   Waiver of Notices............................................................................67
Section 14.8.   Non-applicability of Chapter 346 of Texas Finance Code ..................67
Section 14.9.   Binding Effect .................................................................................67
Section 14.10.  INDEMNITY OF LENDERS AND ADMINISTRATIVE AGENT BY
               BORROWERS ...............................................................................68
Section 14.11.  Limitation of Liability .....................................................................68
Section 14.12.  Continuing Rights of Lenders in Respect of Obligations....................68
Section 14.13.  Assignments. ..................................................................................68
Section 14.14.  Confidentiality.................................................................................69
Section 14.15.  Acceptance and Performance ...........................................................70
Section 14.16.  Schedules........................................................................................70
Section 14.17.  Counterparts ...................................................................................70
Section 14.18.  Captions..........................................................................................70

DAL 79432184v8

SCHEDULES

| | | |
|---|---|---|
| Schedule 1.1 | - | Lenders' Commitments |
| Schedule 7.1 | - | Fundamental Information |
| Schedule 7.7 | - | Litigation |
| Schedule 7.11 | - | Location of Collateral |
| Schedule 7.15 | - | Proprietary Rights |
| Schedule 7.16 | - | Investment Property |
| Schedule 7.17 | - | Leases |
| Schedule 7.18 | - | Material Agreements |
| Schedule 7.19 | - | Bank Accounts |
| Schedule 7.21 | - | Debt |
| Schedule 7.30 | - | Release of Hazardous Materials |
| Schedule 7.32 | - | Commercial Tort Claims |

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Compliance Certificate |
| Exhibit B-1 | - | Form of U.S. Tax Compliance Certificate 1 |
| Exhibit B-2 | - | Form of U.S. Tax Compliance Certificate 2 |
| Exhibit B-3 | - | Form of U.S. Tax Compliance Certificate 3 |
| Exhibit B-4 | - | Form of U.S. Tax Compliance Certificate 4 |

DAL 79432184v8

## SENIOR SECURED, SUPER-PRIORITY
## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement is executed and entered into as of February ___, 2015, by and among ALLEN SYSTEMS GROUP, INC., a Delaware corporation ("Parent"), ASG FEDERAL, INC., a Delaware corporation ("ASG Federal"), and VIASOFT INTERNATIONAL LLC, a Delaware limited liability accompany ("Viasoft"; Parent, ASG Federal and Viasoft are herein together with their successors and permitted assigns, called the "Borrowers" and each is a "Borrower"), the lenders from time to time party hereto (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter collectively as the "Lenders" and each is a "Lender") and NEWSTAR BUSINESS CREDIT, LLC, a Delaware limited liability company, as administrative and collateral agent (in such capacity, and including its successors and permitted assigns, the "Administrative Agent") for the Lender Parties (as hereinafter defined).

### RECITALS

On February ___, 2015 (the "Petition Date") the Borrowers commenced cases under Chapter 11 of the Bankruptcy Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), case numbers [_____] (collectively, the "Chapter 11 Case") by filing voluntary petitions for relief under Chapter 11 with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Borrowers continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Borrowers have requested, and the Administrative Agent and the Lenders have agreed, upon the terms and conditions set forth in this Agreement, to make available to the Borrowers a post-petition revolving credit facility according to the terms and provisions as set forth herein below. Therefore, for value received, the receipt and sufficiency of which is hereby acknowledged, together with the mutual benefits provided herein, Administrative Agent, Lenders and Borrowers hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1.    Definitions. The following definitions shall apply throughout this Agreement:

"Account" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, a right to payment of a monetary obligation, whether or not earned by performance, for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, or for services rendered or to be rendered.

"Account Debtor" means a Person obligated on an Account, Chattel Paper, or General Intangible.

"Adjusted LIBOR Rate" means, for any Loan, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) determined by Administrative Agent to be equal to the sum of the LIBOR Rate plus the Applicable Margin for such Loan.

"Administrative Agent" has the meaning given to such term in the preamble hereto.

"Administrative Agent's Liens" means Liens granted or purported to be granted by Borrowers and the Guarantors in favor of Administrative Agent, for the benefit of Lender Parties, pursuant to this Agreement or any of the other Loan Documents.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person or which owns, directly or indirectly, five percent (5.0%) or more of the outstanding Equity Interest of such Person. For this purpose, a Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" means this Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement and all schedules, exhibits and addenda hereto, as may be renewed, extended, amended, supplemented, restated or otherwise modified from time to time.

"Agreement Date" means the date as of which this Agreement is dated as specified in the preamble to this Agreement.

"Applicable Law" means, as to a Person, any law (statutory or common), treaty, ordinance, decree, rule or regulation of a Governmental Authority or judgment, decree, order or determination of a court or binding arbitrator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, including, without limitation, the Fair Labor Standards Act of 1938, the Occupational Safety and Hazard Act of 1970, all applicable laws (including programs, permits and guidance promulgated by regulatory agencies) relating to public health or the protection or pollution of the environment, including all Environmental Laws.

"Applicable Margin" means, for any day, six percent (6.0%) per annum.

"Approved Budget" means the Initial Budget or the most recent Budget (as applicable) delivered to Administrative Agent by Parent pursuant to Section 8.4(b) hereof that has been approved by Administrative Agent pursuant to the terms of Section 8.4(b).

"Approved Budget Variance Report" shall mean a weekly report provided by Parent to the Administrative Agent in accordance with Section 8.4(c), (i) showing a comparison of actual results for each operating line item against such line item in the Approved Budget as of the Friday of the immediately preceding week (including, without limitation, actual receipts/collections, actual disbursement amounts, and actual domestic cash on hand) and on a cumulative basis the four immediately preceding weeks (or if fewer than four weeks, for the weeks that elapsed from the Closing Date) noting therein all variances, on a line-item basis and on a total receipts and total disbursements basis, from amounts set forth for such period in the Approved Budget, and including a narrative explanation, in detail reasonably satisfactory to the Administrative Agent, of each adverse variance in excess of a Permitted Deviation with respect to any such item during such week and (ii) accompanied by a certificate signed by a Responsible Officer of Parent certifying as to the accuracy of such Approved Budget Variance Report.

"Availability" means, with respect to Revolving Loans as of any date of determination, an amount equal to (a) the Revolving Credit Limit less (b) the unpaid balance of Revolving Loans (including Swing Loans), in each case determined as of such day less (c) at all times prior to the Trigger Date, the Reserve Amount.

"Bankruptcy Code" has the meaning specified in the Recitals hereto.

"Bankruptcy Court" has the meaning specified in the Recitals hereto.

"Borrowers" has the meaning set forth in the preamble hereto.

"Borrowing Notice" means a request for a Revolving Loan by Parent in compliance with Section 2.2, including a certification as to the following: (a) that the requested Revolving Loan and intended use thereof are consistent and in compliance with the terms of this Agreement and the Approved Budget, (b) that no Default or Event of Default has occurred and is continuing and the Termination Date has not occurred, (c) that all conditions to the making of such Revolving Loan set forth in Article VI of this Agreement have been satisfied and (d) reflecting therein that sufficient Availability exists for such Revolving Loan.

"Budget" means a thirteen (13) week "rolling" cash budget prepared by Parent and furnished to the Administrative Agent pursuant to Section 8.4(b), setting forth weekly cash receipts and cash disbursements (with detail as to identification of cash disbursements) for the Borrowers for the periods covered thereby, including information on a line item basis as to (a) projected cash receipts, (b) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses), capital expenditures, asset sales and fees and expenses of the Lender Parties (including counsel therefor) and any other fees and expenses relating to the Loan Documents), (c) projected total net cash flow, and (d) projected available domestic cash, in each case in form similar to the Initial Budget.

"Business Day" means (a) any day that is not a Saturday, Sunday or a day on which commercial banks in Dallas, Texas are required or permitted to be closed and (b) with respect to any borrowing, payment or other dealings with respect to any Loan, any day which is a Business Day described in clause (a) preceding and which is also a day on which dealings in Dollar deposits are carried out in the London interbank market.

"Capital Expenditures" has the meaning prescribed for such term by GAAP.

"Capital Lease" means any lease of property by any Borrower which, in accordance with GAAP, should be reflected as a capital lease on the balance sheet of such Borrower.

"Carve-Out" means, collectively, (a) fees payable to the U. S. Trustee pursuant to 28 U.S.C. §1930(a)(6) or to the clerk of the Bankruptcy Court (the "Case Administration Fees"); (b) unpaid professional fees and expenses ("Borrower Professional Fees") payable to each legal or financial advisor, investment banker, or other professionals retained by Borrowers (the "Borrower Professionals") that are incurred or accrued prior to the Trigger Date, but subject to the aggregate amounts set forth in the Approved Budget (subject to Permitted Deviation) and ultimately allowed by the Bankruptcy Court pursuant to Sections 328, 330, 331 and 503 of the Bankruptcy Code or any order of the Bankruptcy Court (whenever such fees may be actually incurred prior to the Trigger Date); (c) unpaid professional fees and expenses (together with the Borrower Professional Fees, the "Professional Fees") payable to each legal or financial advisor retained by a creditors' committee, if any, that are incurred or accrued prior to the Trigger Date, but subject to the aggregate amounts set forth in the Approved Budget as of such date (subject to Permitted Deviation) and ultimately allowed by the Bankruptcy Court pursuant to Sections 328, 330, 331 and 503 of the Bankruptcy Code or any order of the Bankruptcy Court (whenever such fees may be actually incurred prior to the Trigger Date); and (d) Case Administration Fees and Professional Fees incurred on or after the Trigger Date in an aggregate amount not to exceed $2,000,000.

"Carve-Out Expenses" means any payment made in respect of the Carve-Out.

"Chapter 11 Case" has the meaning specified in the Recitals hereto.

"Chattel Paper" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference. "Chattel Paper" includes, without limitation, electronic chattel paper.

"Closing Date" means the date on which all conditions precedent to the making of the initial Revolving Loan have been met in accordance with Article VI hereof.

"Collateral" means all personal property of the Borrowers and the Guarantors in which a Lien is granted (or purported to be granted) to Administrative Agent, for the benefit of Lender Parties, whether pursuant to this Agreement or any other Loan Documents.

"Collateral Access Agreement" means a landlord waiver or subordination, bailee letter, acknowledgment agreement or other agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any of Borrowers' books and records, Equipment, Inventory or other Collateral, in each case, in form and substance satisfactory to Administrative Agent in its Permitted Discretion.

"Commercial Tort Claim" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, in the case of a Borrower, any tort cause of action claimed by such Borrower, including those listed on Schedule 7.32.

"Commitment" means, for each Lender, the obligation of such Lender to make Revolving Loans to Borrowers pursuant to the terms hereof in an aggregate amount not exceeding the commitment amount set forth in Schedule 1.1 attached hereto for such Lender.

"Commitment Period" means either of the Initial Commitment Period or the Subsequent Commitment Period, as the case may be.

"Compliance Certificate" means a certificate substantially in the form of Exhibit A attached hereto, executed by Parent and delivered to Administrative Agent pursuant to Section 8.6.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control Agreement" means, with respect to any deposit account, commodities account or securities account, a control agreement, in form and substance acceptable to Administrative Agent in its reasonable discretion, pursuant to which Administrative Agent obtains "control" pursuant to the UCC over such account.

"Debt" means, with respect to a Person, (a) all obligations for borrowed money of such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other similar financial products, (c) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (d) all obligations of such Person for the deferred purchase price of assets (other than trade debt incurred in the ordinary course of business and repayable in accordance with customary trade practices), (e) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of the type otherwise described in this definition of any other Person, (f) asset securitizations and synthetic leases, (g) Capital Leases, (h) all net indebtedness, liabilities and obligations under interest rate, credit, commodity and foreign exchange swaps or similar transactions

entered into for the purpose of hedging such Person's exposure to fluctuations in interest or exchange rates, currency valuations or commodity prices.

"Default" means an event, condition or occurrence that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"Default Rate" means a rate per annum equal to the lesser of (a) the sum of (i) the Adjusted LIBOR Rate for such Loan (which shall be adjusted, from time to time, simultaneously with any change in the LIBOR Rate) plus (ii) two percent (2.0%) and (b) the Maximum Rate.

"Defaulting Lender" means any Lender that fails to make any advance (or other extension of credit) that it is required to make hereunder on the date that it is required to do so hereunder.

"Defaulting Lender Rate" means the interest rate then applicable to Revolving Loans.

"Deposit Account" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, a nonnegotiable certificate of deposit or a demand, time, savings, passbook, or similar account maintained with a bank.

"Designated Account" means account No. 3200339901 of Parent maintained at Citibank, N.A.

"Distribution" means, for any Person, (a) any dividend, payment or distribution made on any class of such Person's Equity Interests and (b) any payment on account of, or setting apart of assets for a sinking or analogous fund for, the purchase, redemption, retirement, defeasance or acquisition of any (i) shares of its Equity Interests or (ii) options, warrants or other rights to purchase Equity Interests in such Person.

"Document" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, any bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, or any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers, and which purports to be issued by or addressed to a bailee and purporting to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass. "Document" includes, without limitation, electronic documents.

"Dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any direct or indirect Subsidiary of Parent not a Borrower that is organized under the laws of the United States of America, any State thereof or the District of Columbia.

"Environmental Laws" means any and all laws relating to the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment including ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes.

"Equipment" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, with respect to a Person, all personal property used or useable by such Person in its business.

"Equity Interests" means, with respect to a Person, shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person, trade or business (whether or not incorporated) subject to ERISA whose employees are treated as being employed by the same employer as the employees of any Borrower under Section 414(b) of the IRC, (b) any Person, trade or business (whether or not incorporated) subject to ERISA whose employees are treated as being employed by the same employer as the employees of any Borrower under Section 414(c) of the IRC, (c) solely for purposes of  Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Borrower is a member under Section 414(m) of the IRC, or (d) solely for purposes of  Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Borrower and whose employees are aggregated with the employees of any Borrower under Section 414(o) of the IRC.

"ERISA Benefit Plan" means any "employee benefit plan" (as defined in  Section 3(3) of ERISA) subject to Title IV of ERISA or the minimum funding standards of Section 302 of ERISA or Section 412 of the IRC as to which any Borrower or any ERISA Affiliate (a) sponsors, maintains or contributes to on behalf of any of its employees or (b) has (currently or hereafter) any outstanding liability (contingent or otherwise).

"ERISA Termination Event" shall mean (i) a Reportable Event with respect to any ERISA Benefit Plan; (ii) the existence with respect to any ERISA Benefit Plan of a non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the IRC); (iii) the withdrawal of any Borrower or any ERISA Affiliate from an ERISA Benefit Plan or Multiemployer Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iv) the providing of notice of intent to terminate an ERISA Benefit Plan in a distress termination described in Section 4041(c) of ERISA; (v) the institution by the PBGC of proceedings to terminate an ERISA Benefit Plan or Multiemployer Plan; (vi) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any ERISA Benefit Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vii) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA, of any Borrower or any ERISA Affiliate from a Multiemployer Plan.

"Event of Loss" means, with respect to any property, (i) the actual or constructive total loss of such property or the use thereof resulting from destruction, damage beyond repair, or the rendition of such property permanently unfit for normal use from any casualty or similar occurrence whatsoever, (ii) the destruction or damage of a portion of such property from any casualty or similar occurrence whatsoever, (iii) the condemnation, confiscation or seizure of, or requisition of title to or use of, any property, or (iv) in the case of any property located upon a leasehold that is not removed in accordance with the terms of the lease governing such leasehold, the termination or expiration of such leasehold.