**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Allen Systems Group, Inc., *et al*.,[1] | ) Case No. 15-[___] ([___]) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN**

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 RELIEF.**

---

**LATHAM & WATKINS LLP**
Peter M. Gilhuly (*pro hac vice* admission pending)
Ted A. Dillman (*pro hac vice* admission pending)
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email:      peter.gilhuly@lw.com
              ted.dillman@lw.com

Proposed Special Counsel for the Debtors and Debtors in Possession

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Michael R. Seidl (DE Bar No. 3889)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:      ljones@pszjlaw.com
              mseidl@pszjlaw.com
              pkeane@pszjlaw.com

Proposed Counsel for the Debtors and Debtors in Possession

Dated: February 9, 2015

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Allen Systems Group, Inc. (4496); ASG Federal, Inc. (1773); and Viasoft International, LLC. The mailing address for all of the Debtors is: 708 Goodlette Road North, Naples, Florida 34102.

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................ 1

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES** ................................................ 1

    1.1    Defined Terms .......................................................................................... 1
    1.2    Rules of Interpretation ........................................................................... 13
    1.3    Computation of Time ............................................................................. 14
    1.4    Governing Law ....................................................................................... 14
    1.5    Reference to Monetary Figures ............................................................. 14
    1.6    Reference to the Debtors or the Reorganized Debtors .......................... 14

**ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS** ......................................... 14

    2.1    DIP Facility Claims ............................................................................... 14
    2.2    Administrative Claims ........................................................................... 14
    2.3    Professional Claims ............................................................................... 15
    2.4    Priority Tax Claims ................................................................................ 15

**ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS** ..... 15

    3.1    Classification of Claims and Interests ................................................... 15
    3.2    Treatment of Classes of Claims and Interests ....................................... 16
    3.3    Special Provision Governing Unimpaired Claims ................................ 19
    3.4    Voting Classes ....................................................................................... 19
    3.5    Elimination of Vacant Classes .............................................................. 19
    3.6    Confirmation of All Cases ..................................................................... 19

**ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN** .......................... 19

    4.1    General Settlement of Claims and Interests ........................................... 19
    4.2    Restructuring Transactions ..................................................................... 19
    4.3    New Common Stock .............................................................................. 21
    4.4    AA Settlement Agreement; Warrants .................................................... 22
    4.5    Rights Offering ....................................................................................... 22
    4.6    Exit Facilities ......................................................................................... 25
    4.7    Exemption from Registration Requirements ......................................... 26
    4.8    Corporate Existence .............................................................................. 26
    4.9    Vesting of Assets in the Reorganized Debtors; Post-Effective Date Operation ...................... 27
    4.10    Corporate Action .................................................................................. 27
    4.11    Cancelation of Notes, Instruments, Certificates, and Other Documents; Intercompany Claims and Interests ......................................................... 27
    4.12    Cancelation of Liens ............................................................................. 27
    4.13    Amended Organizational Documents ................................................... 28
    4.14    Directors and Officers; Indemnification ............................................... 28
    4.15    Management Agreements and Incentive Plans ...................................... 28
    4.16    Employee and Retiree Benefits ............................................................. 28
    4.17    Section 1146 Exemption ....................................................................... 29
    4.18    Preservation of Rights of Action .......................................................... 29
    4.19    Insurance Preservation and Proceeds .................................................... 29
    4.20    Solicitation of Debtors .......................................................................... 30
    4.21    No Consent to Change of Control Required .......................................... 30
    4.22    Subordination ........................................................................................ 30
    4.23    Dissolution of the Committee ............................................................... 30
    4.24    Effectuating Documents; Further Transactions .................................... 30

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ............... 30

    5.1    Assumption and Rejection of Executory Contracts or Unexpired Leases..................... 30
    5.2    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases.................. 31
    5.3    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases........................... 31
    5.4    AA Settlement Agreement ......................................................................................... 32
    5.5    Indemnification ......................................................................................................... 32
    5.6    Compensation and Benefit Programs......................................................................... 32
    5.7    Workers' Compensation Benefits .............................................................................. 33
    5.8    Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date............. 33
    5.9    Reservation of Rights................................................................................................ 33

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** .............................................. 33

    6.1    Distributions on Account of Claims Allowed as of the Effective Date......................... 33
    6.2    Special Rules for Distributions to Holders of Disputed Claims; Disputed Claims Reserve ..... 34
    6.3    Delivery of Distributions .......................................................................................... 34
    6.4    Claims Paid or Payable by Third Parties................................................................... 36
    6.5    Setoffs ...................................................................................................................... 37
    6.6    Allocation Between Principal and Accrued Interest ................................................... 37

**ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**............... 37

    7.1    Disputed Claims Process............................................................................................ 37
    7.2    Prosecution of Objections to Claims and Interests..................................................... 37
    7.3    Disallowance of Claims and Interests ....................................................................... 37

**ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN** ............................................... 38

    8.1    Discharge of Claims and Termination of Interests..................................................... 38
    8.2    Releases by and of the Debtors ................................................................................. 38
    8.3    Releases by Holders of Claims and Interests ............................................................ 39
    8.4    AA Settlement Releases............................................................................................ 39
    8.5    Exculpation .............................................................................................................. 40
    8.6    Injunction ................................................................................................................. 40
    8.7    Protection Against Discriminatory Treatment ........................................................... 40
    8.8    Recoupment ............................................................................................................. 41
    8.9    Reimbursement or Contribution................................................................................ 41

**ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION AND  EFFECTIVE DATE OF THE PLAN**.............................................................................................. 41

    9.1    Conditions Precedent to the Confirmation of the Plan............................................... 41
    9.2    Conditions Precedent to the Effective Date ............................................................... 41
    9.3    Waiver of Conditions Precedent ............................................................................... 42
    9.4    Effect of Failure of Conditions ................................................................................ 42
    9.5    Vacatur of Confirmation Order ................................................................................ 42

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**........................ 42

    10.1    Modification of Plan ................................................................................................. 42
    10.2    Effect of Confirmation on Modifications................................................................... 42
    10.3    Revocation or Withdrawal of Plan ............................................................................ 43
    10.4    Confirmation of the Plan Pursuant to Section 1129(b) of the Bankruptcy Code ..................... 43

**ARTICLE XI RETENTION OF JURISDICTION** ..................................................................... 43

**ARTICLE XII MISCELLANEOUS PROVISIONS** ................................................................... 44

    12.1    Additional Documents .............................................................................................. 44
    12.2    Payment of Statutory Fees ........................................................................................ 44
    12.3    Reservation of Rights................................................................................................ 45
    12.4    Successors and Assigns............................................................................................. 45

| | | |
|---|---|---|
| 12.5 | Notices | 45 |
| 12.6 | Term of Injunctions or Stays | 46 |
| 12.7 | Entire Agreement | 46 |
| 12.8 | Plan Supplement Exhibits | 46 |
| 12.9 | Inconsistencies | 46 |
| 12.10 | Non-Severability | 46 |

## **LIST OF EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Terms of Backstop of Second Lien Term Loan Exit Facility |
| Exhibit 2 | DIP Facility Commitment Letter |
| Exhibit 3 | Terms of Warrants |
| Exhibit 4 | Rights Offering Backstop Agreement |
| Exhibit 5 | AA Settlement Agreement |

**INTRODUCTION**

ASG and its debtor subsidiaries in the above-captioned Chapter 11 Cases jointly propose the Plan. Capitalized terms used in the Plan and not otherwise defined shall have the meaning ascribed to such terms in ARTICLE I hereof.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against and Interests in each Debtor pursuant to the Bankruptcy Code.  The Debtors seek to consummate the Plan and the transactions contemplated herein on the Effective Date. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in ARTICLE III shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, and certain related matters.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

**1.1** **Defined Terms**

1.      "*Accredited Investor*" has the meaning set forth in Rule 501 of Regulation D promulgated under the Securities Act.

2.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

3.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

4.      "*AA Settlement Agreement*" means that certain Settlement Agreement dated as of December 10, 2014, by and among the Allen Parties, ASG and certain Consenting Creditors attached hereto as Exhibit 5 (without exhibits thereto).

5.      "*Allen Parties*" means Arthur L. Allen, his family members, and his Affiliates, including Allen Investment Group and ALA Services, LLC, but excluding the Debtors and their subsidiaries.

6.      "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest to the extent allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.

7.      "*Amended Organizational Documents*" means the amended and restated certificates of incorporation and bylaws or other applicable organizational documents of the Reorganized Debtors, including the Stockholders Agreement and the Registration Rights Agreement, in substantially the form filed with the Plan Supplement and reasonably acceptable to the Required Consenting Creditors.

8.      "*ASG*" means Allen Systems Group, Inc., a Delaware corporation.

9.      "*ASG Federal*" means ASG Federal, Inc., a Delaware corporation.

10.      "*ASG Interest*" means any Interest in ASG.

11.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

12. "*Backstop Agreement*" means that certain Backstop Commitment Agreement dated as of February 9, 2015, by and among the Debtors and the Backstop Parties attached to the Plan as <u>Exhibit 4</u>, pursuant to which the Backstop Parties agreed to backstop the Rights Offering on the terms set forth therein.

13. "*Backstop Commitment Percentage*" has the meaning set forth in the Backstop Agreement.

14. "*Backstop Parties*" means those Consenting Creditors that are parties to the Backstop Agreement.

15. "*Backstop Payment Amount*" means, with respect to a particular Backstop Party, an amount of Cash (and/or, in the case of a Joint Holder, a Joint Offset) equal to such Backstop Party's Backstop Commitment Percentage times the aggregate purchase price of the Remaining Rights Offering Stock.

16. "*Ballots*" means the ballots upon which certain holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan, which includes the Master Ballots and Beneficial Holder Ballots.

17. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

18. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

19. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

20. "*Beneficial Holder*" means, a beneficial owner of Notes, as reflected in the records maintained by Nominees holding through the Depository Trust Company or other relevant security depository and/or the Indenture Trustee, as of the Voting Record Date or Rights Offering Record Date, as applicable.

21. "*Beneficial Holder Ballots*" means the ballots upon which Beneficial Holders entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

22. "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

23. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

24. "*Causes of Action*" means any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counter-claims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

25. "*Certificate*" means any instrument evidencing a Claim against any Debtor or an Interest.

26. "*Chapter 11 Cases*" means the procedurally consolidated Chapter 11 Cases pending for the Debtors in the Bankruptcy Court.

27. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

28.     "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

29.     "*Committee*" means any official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

30.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

31.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

32.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

33.     "*Confirmation Objection Deadline*" means the deadline established by the Bankruptcy Court for the filing of objections to Confirmation.

34.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement in a form reasonably acceptable to the Required Consenting Creditors.

35.     "*Consenting Creditors*" means the Consenting Lenders and the Consenting Note Holders.

36.     "*Consenting Creditor Professionals*" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, Young Conaway Stargatt & Taylor LLP, Freshfields Bruckhaus Deringer LLP, James Bates Brennan Groover LLP and Blackstone Advisory Partners L.P., the professional advisors retained by the Consenting Creditors in connection with the Chapter 11 Cases.

37.     "*Consenting Lenders*" means the Domestic Lenders and Foreign Lenders from time to time party to the Support Agreement.

38.     "*Consenting Note Holders*" means the holders of Notes from time to time party to the Support Agreement.

39.     "*Consummation*" means the occurrence of the Effective Date.

40.     "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

41.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

42.     "*Debtors*" means, collectively, each of the following: ASG, Viasoft International, and ASG Federal.

43.     "*DIP Agent*" means the administrative agent and collateral agent for the DIP Facility, and any successors thereto.

44.     "*DIP Facility*" means a senior secured superpriority post-petition credit facility made available to the Debtors in an amount up to $40 million pursuant to the DIP Facility Credit Agreement and the DIP Orders.

45.     "*DIP Facility Claim*" means any Claim of the DIP Agent or any DIP Lender arising from, under or in connection with the DIP Facility.

46.     "*DIP Facility Credit Agreement*" means any credit agreement entered into by the Debtors in connection with the DIP Facility (as amended, waived, supplemented, refinanced and as otherwise modified from time to time), which agreement shall be consistent with the Support Agreement and the terms and conditions set

forth on Exhibit 2 hereto and shall otherwise be acceptable to the Debtors and the Required Consenting Creditors and Required Consenting Lenders, as applicable, in their reasonable discretion.

47.    "*DIP Facility Documents*" means, collectively, the DIP Orders, the DIP Facility Credit Agreement, and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents), which shall be consistent with the Support Agreement and otherwise acceptable to the Debtors and the Required Consenting Creditors and Required Consenting Lenders, as applicable, in their reasonable discretion.

48.    "*DIP Lenders*" means the banks, financial institutions and other parties who are lenders under the DIP Facility Credit Agreement.

49.    "*DIP Orders*" means, collectively, the Interim DIP Order and Final DIP Order.

50.    "*Disclosure Statement*" means the disclosure statement for the Plan, as it may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto.

51.    "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable (including any Claim or Interest that (i) is the subject of an objection or filed request for estimation or (ii) is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order); and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

52.    "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

53.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Reorganized Debtors on or after the Effective Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

54.    "*Domestic Credit Agreement*" means that certain Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified) by and among ASG, as borrower, TPG Allison, LLC, as lender, and the First Lien Agent, as administrative agent.

55.    "*Domestic Credit Facility*" means, collectively, the loans made pursuant to the Domestic Credit Agreement, including (a) a term loan in the aggregate principal amount of $214,337,000.00 and (b) a revolving loan in the aggregate principal amount of $25,000,000.00.

56.    "*Domestic Credit Facility Claim*" means any Claim arising under, derived from, or based upon the Domestic Credit Facility Documents.

57.    "*Domestic Credit Facility Documents*" means, collectively, the Domestic Credit Agreement, each other "Loan Document" (as defined in the Domestic Credit Agreement), and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

58.    "*Domestic Lenders*" means each "Lender" under, and as defined in, the Domestic Credit Agreement.  On or about October 17, 2014, the Consenting Lenders acquired all right, title, and interest of TPG Allison, LLC as lender under the Domestic Credit Facility.

59.    "*Effective Date*" means the date on which the Plan becomes effective, which shall be the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Section 9.2 have been satisfied or waived in accordance with Section 9.3, unless otherwise determined by the Debtors in consultation with the Required Consenting Creditors.

60.    "*Eligible Holder*" means a Qualified Institutional Buyer or an Accredited Investor.

61.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

62.     "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code and includes, for the avoidance of doubt, membership interests.

63.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

64.     "*Exculpated Party*" means each of the following in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the parties to the Support Agreement; (d) the First Lien Agent; (e) the Indenture Trustee; (f) the holders of Domestic Credit Facility Claims; (g) the Foreign Lenders; (h) the holders of Notes Claims; (i) each party to the Backstop Agreement; (j) each of the Allen Parties; (k) any Committee and the members thereof (solely in their capacity as such); and (l) with respect to each of the foregoing entities in clauses (a) through (k), such Entity's successors and assigns and current and former Affiliates and its and their subsidiaries, stockholders, members, limited partners, general partners, other equity holders, officers, directors, managers, trustees, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case solely in their capacity as such.

65.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

66.     "*Exit Facilities*" means (a) the First Lien Revolving Loan Exit Facility, (b) the First Lien Term Loan Exit Facility, and (c) the Second Lien Term Loan Exit Facility.

67.     "*Exit Facility Agents*" means the administrative agents and collateral agents for the Exit Facilities.

68.     "*Exit Facility Credit Agreements*" means (a) the First Lien Revolving Loan Exit Credit Agreement, (b) the First Lien Term Loan Exit Credit Agreement, and (c) the Second Lien Term Loan Exit Credit Agreement.

69.     "*Exit Facility Documents*" means, collectively, the Exit Facility Credit Agreements and all other agreements, documents, and instruments to be delivered or entered into in connection with the Exit Facilities (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents), each of which shall be consistent with any specific terms designated herein or in the Support Agreement and otherwise acceptable to the Debtors and the Required Consenting Creditors and, if the Domestic Credit Facility Claims are not paid in full under the Plan, the Required Consenting Lenders, as applicable, in their reasonable discretion.

70.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

71.     "*Final DIP Order*" means the order of the Bankruptcy Court approving the DIP Facility on a final basis, as such order may be amended from time to time.

72.     "*Final Order*" means an order of the Bankruptcy Court as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, no stay pending appeal has been granted or such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

73.    "*First Lien Agent*" means TPG Allison Agent, LLC, the administrative agent for each of the Domestic Credit Facility and Foreign Credit Facility, as succeeded by Wilmington Trust, N.A., together with any successors thereto.

74.    "*First Lien Revolving Loan Exit Credit Agreement*" means the first lien revolving loan credit agreement by and among Reorganized ASG, as borrower, and certain subsidiaries thereof, as guarantors, the financial institutions from time to time party thereto, and the applicable Exit Facility Agent, to be effective on the Effective Date, in substantially the form and substance included in the Plan Supplement, which agreement shall be consistent with the Support Agreement and the terms and conditions set forth herein and shall otherwise be acceptable to the Debtors and the Required Consenting Creditors, and if the Domestic Credit Facility Claims are not paid in full under the Plan, the Required Consenting Lenders, as applicable, in their reasonable discretion.

75.    "*First Lien Revolving Loan Exit Facility*" means the first lien $25,000,000.00 revolving loan facility made pursuant to the First Lien Revolving Loan Exit Credit Agreement.

76.    "*First Lien Term Loan Exit Credit Agreement*" means the first lien term loan credit agreement by and among Reorganized ASG, as borrower, and certain subsidiaries thereof, as guarantors, the financial institutions from time to time party thereto, and the applicable Exit Facility Agent, to be effective on the Effective Date, in substantially the form and substance included in the Plan Supplement, which agreement shall be consistent with the Support Agreement and the terms and conditions set forth herein and shall otherwise be acceptable to the Debtors and the Required Consenting Creditors, and if the Domestic Credit Facility Claims are not paid in full under the Plan, the Required Consenting Lenders, as applicable, in their reasonable discretion.

77.    "*First Lien Term Loan Exit Facility*" means the first lien term loan facility in the minimum principal amount of $150,000,000.00 made pursuant to the First Lien Term Loan Exit Credit Agreement.

78.    "*Foreign Credit Agreement*" means that certain Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified) by and among Atempo SAS, as borrower, Natixis, New York Branch, as lender, and the First Lien Agent, as administrative agent.

79.    "*Foreign Credit Facility*" means, collectively, the loans made pursuant to the Foreign Credit Agreement, including the term loan in the aggregate principal amount of $10,000,000.00.

80.    "*Foreign Lenders*" means each "Lender" under, and as defined in, the Foreign Credit Agreement. On or about October 17, 2014, the Consenting Lenders acquired all right, title and interest of Natixis, New York Branch, as lender under the Foreign Credit Facility.

81.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

82.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

83.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors.

84.    "*Indenture Trustee*" means The Bank of New York Mellon Trust Company, N.A., as trustee (together with its successors and assigns) for the Notes.

85.    "*Initial Subscription Right*" means the right to participate in the Rights Offering to purchase an Eligible Holder's Pro Rata share of the Rights Offering Stock, which right shall be non-certificated and non-transferable, except for, prior to the Subscription Deadline, as provided in <u>Section 4.5(d)</u>.

86.    "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

87.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

6

88.     "*Intercompany Contract*" means a contract between or among two or more Debtors or a contract between or among one or more Debtor-Affiliates (other than the Allen Parties) and one or more Debtors.

89.     "*Intercompany Interest*" means an Interest held by a Debtor or an Affiliate, other than ASG Interests.

90.     "*Interest*" means any Equity Security of a Debtor existing immediately prior to the Effective Date.

91.     "*Interim DIP Order*" means the order of the Bankruptcy Court approving the DIP Facility on an interim basis, as such order may be amended from time to time.

92.     "*Joint Holder*" means a Person that is both a Backstop Party and a holder of Allowed Domestic Credit Facility Claims.

93.     "*Joint Offset*" means the offset, in whole or in part, of distributions that a Joint Holder would receive on account of such Joint Holder's Allowed Domestic Credit Facility Claims against such Joint Holder's obligations to pay Cash pursuant to exercise of its Subscription Rights and its backstop obligations under the Backstop Agreement.

94.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

95.     "*Management Agreements*" means, collectively, those agreements that will be entered into by Reorganized ASG and certain of the Reorganized Debtors, on the one hand, and certain officers of the Reorganized Debtors, on the other hand as determined by the New Board on or after the Effective Date.

96.     "*Management Incentive Plan*" means the management incentive plan(s) that will be established for certain members of management and/or directors of the Reorganized Debtors, which shall provide an aggregate pool of 10.00% of the fully diluted New Common Stock as of the Effective Date (including dilution on account of the Warrants, and the Put Option Premium associated with the Rights Offering, if applicable), with the participants and terms of individual awards to be determined by the New Board on or after the Effective Date.  The Management Incentive Plan may provide for the grant of the full pool of available shares of New Common Stock in the form of incentive stock options within the meaning of Section 422 of the Tax Code.

97.     "*Master Ballot*" means the ballot distributed to the Nominee of each Beneficial Holder to record the votes of the Beneficial Holders as of the Voting Record Date applicable to Notes Claims.

98.     "*New Board*" means the initial board of directors of Reorganized ASG on the Effective Date appointed by the Required Consenting Creditors.

99.     "*New Common Stock*" means the shares of common stock of Reorganized ASG authorized to be issued pursuant to the Plan and the Amended Organizational Documents.

100.     "*Nominee*" means a broker, dealer, commercial bank, trust company, savings and loan, financial institution, or other such party in whose name a beneficial ownership of Notes is registered or held of record as of the Voting Record Date.

101.     "*Nominee Certification*" means the certification of a Beneficial Holder's Nominee as to holdings of Notes Claims of the applicable Beneficial Holder.

102.     "*Notes*" means the $300,000,000.00 in aggregate principal amount 10.5% senior secured second lien notes issued pursuant to the Notes Indenture.

103.     "*Notes Claim*" means any Claim arising under, derived from, or based upon the Notes Documents, including any Secured Notes Claim and any Notes Deficiency Claim.

104.     "*Notes Claims Stock*" means 41.5% of the fully diluted New Common Stock to be issued outside the Rights Offering on the Effective Date, subject to dilution on account of the Management Incentive Plan, the Warrants, and, if applicable, the Put Option Premium associated with the Rights Offering.

105.    "*Notes Deficiency Claim*" means the portion of any Notes Claim that is not Allowed under the Plan as a Secured Notes Claim, which Notes Deficiency Claims total in the aggregate $166,745,359.82 for purposes of the Plan.[2]

106.    "*Notes Documents*" means, collectively, the Notes Indenture and any "Security Document" (as defined in the Notes Indenture), and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

107.    "*Notes Indenture*" means that certain Indenture dated November 22, 2010 (as amended, supplemented or otherwise modified from time to time) by and among ASG, as issuer, the guarantors party thereto, and the Indenture Trustee, as trustee.

108.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

109.    "*Other Secured Claim*" means any Secured Claim other than (a) a Domestic Credit Facility Claim, (b) a Secured Notes Claim, or (c) a Secured Tax Claim.

110.    "*Other Unsecured Claim*" means any Claim against any Debtor, other than a DIP Facility Claim, an Administrative Claim, a Professional Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, any Claim of any of the Allen Parties against any Debtor, a Domestic Credit Facility Claim, a Notes Claim, an Intercompany Claim, or a Section 510(b) Claim.

111.    "*Oversubscription Election Aggregate Amount*" means the aggregate dollar amount for which all Oversubscribing Holders have elected to exercise Oversubscription Rights in accordance with the terms of <u>Section 4.5(c)(3)</u>.

112.    "*Oversubscription Election Amount*" means, with respect to a particular Oversubscribing Holder, the dollar amount for which such Oversubscribing Holder has elected to exercise Oversubscription Rights in accordance with the terms of <u>Section 4.5(c)(3)</u>.

113.    "*Oversubscribing Holders*" means Eligible Holders who have elected to exercise Oversubscription Rights in accordance with the terms of <u>Section 4.5(c)(3)</u>.

114.    "*Oversubscription Payment Amount*" means, with respect to a particular Oversubscribing Holder, (a) if the Oversubscription Election Aggregate Amount is less than or equal to the Remaining Initial Rights Offering Amount, an amount of Cash equal to such Oversubscribing Holder's Oversubscription Election Amount, or (b) if the Oversubscription Election Aggregate Amount is greater than the Remaining Initial Rights Offering Amount, an amount of Cash equal to the Remaining Initial Rights Offering Amount multiplied by the proportion of such Oversubscribing Holder's Oversubscription Election Amount to the Oversubscription Election Aggregate Amount, or, which in either case, in the case of a Joint Holder, may consist in whole or in part of a Joint Offset of this amount.

115.    "*Oversubscription Right*" means the right to elect to participate in the Rights Offering to subscribe for the Remaining Initial Rights Offering Stock, which right shall be non-certificated and non-transferable, except for, prior to the Subscription Deadline, as provided in <u>Section 4.5(d)</u>.

116.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

117.    "*Petition Date*" means the date on which each of the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

---

[2]    The amount of the Notes Deficiency Claim will increase in the event the Debtors receive a Pre-Filing Loan from the Domestic Lenders.

118.     "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof, including the Plan Supplement and all exhibits, supplements, appendices, and schedules, which plan shall be in form and substance reasonably acceptable to the Required Consenting Creditors.

119.     "*Plan Securities*" means any and all Securities offered, issued or distributed under the Plan, including the New Common Stock, the Subscription Rights to participate in the Rights Offering, and the Warrants.

120.     "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors in substantially final form no later than ten (10) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth in the Support Agreement or on the Exhibits attached hereto, where applicable, and shall otherwise be reasonably acceptable to the Required Consenting Creditors and, if the Domestic Credit Facility Claims are not paid in full under the Plan, the Required Consenting Lenders, as applicable.

121.     "*Pre-Filing Loan*" means additional loans pursuant to the Support Agreement in an amount up to $2,500,000.00 that may be advanced by the Domestic Lenders, in their sole discretion, pursuant to the Domestic Credit Facility prior to the Petition Date in the event the Debtors lack adequate liquidity.

122.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

123.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or, with respect to the Rights Offering, the proportion of an Eligible Holder's Notes Claims to the aggregate amount of Notes Claims held by all Eligible Holders.

124.     "*Professional*" means an Entity (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

125.     "*Professional Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. For avoidance of doubt, Professional Claims do not include the Claims of the Consenting Creditor Professionals.

126.     "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in <u>Section 2.3</u> herein.

127.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

128.     "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

129.     "*Put Option Premium*" means the amounts payable to the Backstop Parties or their designees pursuant to the Backstop Agreement in connection with the Rights Offering.  Such amounts shall be paid by Reorganized ASG, and shall equal two percent (2.0%) of such Backstop Party's commitment under the Backstop Agreement, which shall be payable in Cash, unless (a) Reorganized ASG's domestic Cash balance on the Effective Date would be less than $1,000,000.00 (i) after taking into account the payment of such Put Option Premium in Cash and any and all payments or reserves for obligations to be paid under the Plan on or after the Effective Date (including payments or reserves for Administrative Claims, Priority Tax Claims, Other Priority Claims, or

9

Professional Claims) and (ii) without Reorganized ASG drawing on the First Lien Revolving Loan Exit Facility, or (b) otherwise agreed by the Debtors and the Required Consenting Creditors, in which case such amount shall be paid solely in New Common Stock.  For avoidance of doubt, such amount shall be paid either fully in Cash or fully in New Common Stock.

130.    "*Qualified Institutional Buyer*" has the meaning set forth in Rule 144A promulgated under the Securities Act.

131.    "*Registration Rights Agreement*" means the Registration Rights Agreement among Reorganized ASG and each recipient of New Common Stock under the Plan, to be effective on the Effective Date, in substantially the form and substance included in the Plan Supplement, which agreement shall otherwise be acceptable to the Debtors and the Required Consenting Creditors in their reasonable discretion.

132.    "*Regulatory Approvals*" means any and all approvals of any Governmental Unit having regulatory authority or jurisdiction over the Debtors or Reorganized Debtors, as applicable, or any transactions contemplated under the Plan, including under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (and any similar law enforced by any such Governmental Unit regarding preacquisition notifications for the purpose of competition reviews), the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and all other federal, state, foreign, multinational or supranational antitrust, competition or trade regulation statutes, rules, regulations, orders, decrees, administrative and judicial doctrines and other laws that are designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition or effectuating foreign investment.

133.    "*Released Party*" means each of the following in its capacity as such: (a) each Debtor and Reorganized Debtor; (b) the Debtors' current and former officers and directors; (c) the DIP Agent; (d) the DIP Lenders; (e) the parties to the Support Agreement; (f) the First Lien Agent; (g) the holders of Domestic Credit Facility Claims; (h) the Foreign Lenders; (i) the Indenture Trustee; (j) the holders of Notes Claims who vote to accept the Plan; (k) each party to the Backstop Agreement; (l) each of the Allen Parties; (m) any Committee and the members thereof (solely in their capacity as such); and (n) each of the foregoing entities' respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case solely in their capacity as such.

134.    "*Releasing Parties*" means each of the following in its capacity as such: (a) each Debtor and Reorganized Debtor; (b) the Debtors' current and former officers and directors; (c) the DIP Agent; (d) the DIP Lenders; (e) the parties to the Support Agreement; (f) the First Lien Agent; (g) the holders of Domestic Credit Facility Claims; (h) the Foreign Lenders; (i) the Indenture Trustee; (j) the holders of Notes Claims other than those who voted to reject the Plan and have also checked the box on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan; (k) each party to the Backstop Agreement; (l) each of the Allen Parties; (m) any Committee and the members thereof (solely in their capacity as such); (n) any holder of an Allowed Claim that is Unimpaired by the Plan; (o) without limiting the foregoing, each other holder of a Claim or an Interest, in each case other than a holder of a Claim or an Interest that has voted to reject the Plan, has abstained from voting on the Plan and has also checked the box on the applicable Ballot to opt not to grant the releases provided in the Plan, or is a member of a Class that is deemed to reject the Plan; and (p) with respect to each of the foregoing parties under (a) through (o), any successors or assigns thereof.

135.    "*Remaining Initial Rights Offering Amount*" means the Rights Offering Amount that is not subscribed for pursuant to Initial Subscription Rights in the Rights Offering or for which the Subscription Payment Amount is not actually received on or prior to the Subscription Deadline, in each case in accordance with the terms of Section 4.5(c)(2).

136.    "*Remaining Initial Rights Offering Stock*" means the shares of New Common Stock corresponding to the Remaining Initial Rights Offering Amount.

137.    "*Remaining Rights Offering Stock*" means the Remaining Initial Rights Offering Stock that is not subscribed for pursuant to Oversubscription Rights or for which the Oversubscription Payment Amount is not actually received on or prior to the Rights Offering Oversubscription Payment Date, in each case in accordance with the terms of <u>Sections 4.5(c)(2)</u>, <u>(3)</u>, and <u>(4)</u>.

138.    "*Reorganized ASG*" means ASG, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

139.    "*Required Backstop Parties*" means Backstop Parties that have committed to purchase a majority in the aggregate of the Rights Offering Stock pursuant to the Backstop Agreement.

140.    "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

141.    "*Required Consenting Creditors*" means the Consenting Note Holders holding directly or indirectly at least 50.1% of the aggregate principal amount of all Notes Claims.

142.    "*Required Consenting Lenders*" means the Consenting Lenders holding directly or indirectly at least 50.1% of the aggregate principal amount of outstanding Domestic Credit Facility Claims.

143.    "*Rights Offering*" means the $130,000,000.00 rights offering of Rights Offering Stock to be offered to the Eligible Holders of Notes Claims as of the Rights Offering Record Date, the terms of which are set forth in <u>Section 4.5</u> of the Plan.

144.    "*Rights Offering Amount*" means $130,000,000.00.

145.    "*Rights Offering Backstop Notification Date*" means a date that is not later than two (2) Business Days following the Rights Offering Oversubscription Payment Date.

146.    "*Rights Offering Backstop Payment Date*" means a date that is not later than two (2) Business Days following the applicable Rights Offering Backstop Notification Date (or such later date as approved in writing by the Debtors and the Backstop Parties).

147.    "*Rights Offering Investor*" means an Eligible Holder of a Notes Claim as of the Rights Offering Record Date (or a subsequent Eligible Holder of a Notes Claim if transferred in accordance with <u>Section 4.5(d)</u>) who timely and properly executes and delivers the Subscription Form and causes its Nominee to tender its Subscription Payment Amount by wire transfer of immediately available funds to the Debtors or other entity specified in the Subscription Form prior to the expiration of the Subscription Deadline.

148.    "*Rights Offering Oversubscription Notification Date*" means a date that is not later than two (2) Business Days following the Subscription Deadline.

149.    "*Rights Offering Oversubscription Payment Date*" means a date that is not later than two (2) Business Days following the applicable Rights Offering Oversubscription Notification Date (or such later date as approved in writing by the Debtors).

150.    "*Rights Offering Record Date*" means the record date for purposes of determining eligibility to participate in the Rights Offering, which date is February 13, 2015, or such other date as designated in an order of the Bankruptcy Court.

151.    "*Rights Offering Stock*" means 58.5% of the fully diluted New Common Stock (including the Remaining Initial Rights Offering Stock to be issued pursuant to Oversubscription Rights and the Remaining Rights Offering Stock to be issued pursuant to the Backstop Agreement) to be issued on the Effective Date to Eligible Holders of Notes Claims, sold through the Rights Offering, subject to dilution on account of the Management Incentive Plan**,** the Warrants, and, if applicable, the Put Option Premium associated with the Rights Offering.

152.    "*Second Lien Term Loan Exit Credit Agreement*" means the second lien term loan credit agreement by and among Reorganized ASG, as borrower, and certain subsidiaries thereof, as guarantors, the

11

financial institutions from time to time party thereto, and the applicable Exit Facility Agent, to be effective on the Effective Date, in substantially the form and substance included in the Plan Supplement, which agreement shall be consistent in all respects with the terms and conditions set forth on <u>Exhibit 1</u> hereto and shall otherwise be acceptable to the Debtors and the Required Consenting Creditors in their reasonable discretion.

153.     "*Second Lien Term Loan Exit Facility*" means the second lien term loan facility in the maximum principal amount of $90,000,000.00 made pursuant to the Second Lien Term Loan Exit Credit Agreement.

154.     "*Section 510(b) Claim*" means any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

155.     "*Secured Claim*" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

156.     "*Secured Notes Claim*" means the portion of any Notes Claim that is Allowed under the Plan as a Secured Claim, which Secured Notes Claims total in the aggregate $172,948,094.24 for purposes of the Plan.[3]

157.     "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

158.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law.

159.     "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

160.     "*Servicer*" means any indenture trustee, agent, or other authorized representative of holders of Claims or Interests, including the DIP Agent, the First Lien Agent and the Indenture Trustee.

161.     "*Solicitation Agent*" means Epiq Systems, Inc., the claims and solicitation agent retained by the Debtors in the Chapter 11 Cases.

162.     "*Stockholders Agreement*" means, the Stockholders Agreement, to be dated as of the Effective Date, among Reorganized ASG and each recipient of New Common Stock under the Plan, which shall be filed as part of the Plan Supplement and shall otherwise be acceptable to the Debtors and the Required Consenting Creditors in their reasonable discretion.

163.     "*Subscription Agent*" means Epiq Systems, Inc., or any other entity designated as such by the Debtors.

164.     "*Subscription Commencement Date*" means the date on which the Subscription Period commences, which shall be the earliest date reasonably practicable occurring after the Rights Offering Record Date.

165.     "*Subscription Deadline*" means the date on which the Rights Offering shall expire as set forth in the Subscription Form, which date shall be March 11, 2015 at 5:00 p.m. prevailing New York time.

166.     "*Subscription Form*" means, collectively, the subscription form and subscription agreement to be distributed to holders of Notes Claims pursuant to which the holders of Notes Claims may exercise their Subscription Rights.

---

[3]     The amount of the Secured Notes Claim will decrease in the event the Debtors receive a Pre-Filing Loan from the Domestic Lenders.

167.    "*Subscription Payment Amount*" means, with respect to a particular Rights Offering Investor, an amount of Cash equal to the Rights Offering Amount multiplied by such Rights Offering Investor's subscribed for portion of its Pro Rata share of the Rights Offering Stock, or in the case of a Joint Holder, a Joint Offset of this amount.

168.    "*Subscription Period*" means the time period during which the Eligible Holders of Notes Claims may subscribe to purchase the Rights Offering Stock, which period shall commence on the Subscription Commencement Date and expire on the Subscription Deadline.

169.    "*Subscription Right*" means Initial Subscription Right and the Oversubscription Right.

170.    "*Support Agreement*" means the Restructuring Support Agreement dated as of January 13, 2015 by and among the Debtors, the Consenting Creditors, and the Allen Parties.

171.    "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

172.    "*Unclaimed Distribution*"  means any distribution under the Plan on account of an Allowed Claim to a holder that has not (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check, (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution, (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

173.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

174.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

175.    "*Viasoft International*" means Viasoft International, LLC, a Delaware limited liability company.

176.    "*Voting Deadline*" means March 11, 2015 at 5:00 p.m. prevailing New York time, the date and time by which all Ballots must be received by the Solicitation Agent, or such other date and time as may be established by the Bankruptcy Court.

177.    "*Voting Record Date*" means the date for determining which holders of Claims are entitled to receive the Disclosure Statement and vote to accept or reject the Plan, as applicable, which date is February 3, 2015.

178.    "*Warrants*" means the Warrants issued in accordance with the AA Settlement Agreement as described in <u>Section 4.4</u> of the Plan, the terms and conditions of which are set forth on <u>Exhibit 3</u> hereto.

**1.2**    **Rules of Interpretation**

For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**1.3**     **Computation of Time**

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

**1.4**     **Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflict of laws principles.

**1.5**     **Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**1.6**     **Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**ARTICLE II**
**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in <u>ARTICLE III</u>.

**2.1**     **DIP Facility Claims**

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims shall be paid and satisfied in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims.  Upon payment and satisfaction in full of all Allowed DIP Facility Claims, the DIP Facility Documents, and all Liens and security interests granted to secure the DIP Facility Claims, shall be immediately terminated, extinguished and released, and the DIP Agent shall promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.  Notwithstanding the above, any indemnity provisions contained in the DIP Facility Documents shall survive such termination, release and satisfaction in the manner and to the extent set forth therein.

**2.2**     **Administrative Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Effective Date, or as soon as practicable thereafter; (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim.

**2.3**     **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.  Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court.  If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  No funds in the Professional Fee Escrow Account shall be property of the Estates.  Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid will be turned over to Reorganized ASG.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything to the contrary herein, the Debtor and Reorganized Debtors, as applicable, shall pay in full in Cash in the ordinary course of business the actual, documented, reasonable fees and expenses of the Consenting Creditor Professionals without the need for the Consenting Creditor Professionals to file any motions, claims, fee applications or other requests for payment with the Bankruptcy Court.

**2.4**     **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive on the Effective Date, or as soon as practicable thereafter, from the respective Debtor liable for such Allowed Priority Tax Claim, payment in Cash in an amount equal to the amount of such Allowed Priority Tax Claim.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

**ARTICLE III**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

**3.1**     **Classification of Claims and Interests**

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in <u>ARTICLE II</u>, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Other Priority Claims | Unimpaired | Presumed to Accept |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 4 | Domestic Credit Facility Claims | Unimpaired | Presumed to Accept |
| 5 | Notes Claims | Impaired | Entitled to Vote |
| 6 | Other Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | ASG Interests | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 9 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

**3.2**   **Treatment of Classes of Claims and Interests**

Except to the extent that the Debtors and a holder of an Allowed Claim or Interest, as applicable, agree to a less favorable treatment, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest. Unless otherwise indicated, the holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as practicable thereafter.

(a)   **Class 1 — Secured Tax Claims**

(1)   *Classification*: Class 1 consists of all Secured Tax Claims against any Debtor.

(2)   *Treatment*: Each holder of an Allowed Class 1 Claim shall receive, in full satisfaction of such Claim, as applicable:

A.   if the Allowed Class 1 Claim is due and payable on or before the Effective Date, Cash in an amount equal to such Allowed Class 1 Claim; or

B.   if the Allowed Class 1 Claim is not due and payable on or before the Effective Date, Cash in an amount as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

(3)   *Voting*: Class 1 is Unimpaired.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

(b)   **Class 2 — Other Secured Claims**

(1)   *Classification*: Class 2 consists of all Other Secured Claims against any Debtor.

(2)   *Treatment*: Each holder of an Allowed Class 2 Claim shall, in full satisfaction of such Claim, as the Debtors, with the consent of the Required Consenting Creditors, or the Reorganized Debtors, as applicable, determine:

A.   have its Allowed Class 2 Claim reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code; or

B.   receive the collateral securing its Allowed Class 2 Claim and any interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

(3)   *Voting*: Class 2 is Unimpaired.  Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

16

(c)    **Class 3 — Other Priority Claims**

    (1)    *Classification*: Class 3 consists of all Other Priority Claims against any Debtor.

    (2)    *Treatment*: Each holder of an Allowed Class 3 Claim shall, in full satisfaction of such Claim, receive Cash in an amount equal to such Allowed Class 3 Claim.

    (3)    *Voting*: Class 3 is Unimpaired. Holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

(d)    **Class 4 — Domestic Credit Facility Claims**

    (1)    *Classification*: Class 4 consists of all Domestic Credit Facility Claims.

    (2)    *Allowance*: On the Effective Date, Class 4 Claims shall be deemed Allowed in the aggregate principal amount of $239,337,000.00,[4] plus (a) all prepetition accrued and unpaid interest at the default rate, which totals $42,879,550.43 as of January 31, 2015, (b) all applicable premiums, including the Acceleration Damages Premium in the amount of $28,720,440.00, (c) all accrued and unpaid prepetition fees in the amount of $3,647,082.00, and (d) all accrued but unpaid postpetition interest and fees through the Effective Date calculated at the applicable default rate in accordance with the Domestic Credit Agreement.

    (3)    *Treatment*: Each holder of an Allowed Class 4 Claim shall, in full satisfaction of such Claim, receive payment in full in Cash, unless the holders of two-thirds (2/3rds) in amount of Domestic Credit Facility Claims agree to less favorable treatment, including the terms of such less favorable treatment, in which case such less favorable treatment shall be binding on all holders of Domestic Facility Claims.

    (4)    *Voting*: Class 4 is Unimpaired.[5]  Holders of Allowed Class 4 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 4 Claims are not entitled to vote to accept or reject the Plan.

(e)    **Class 5 — Notes Claims**

    (1)    *Classification*: Class 5 consists of all Notes Claims.

    (2)    *Allowance*: On the Effective Date, Class 5 Claims shall be deemed Allowed in the aggregate principal amount of $300,000,000.00, plus (a) all prepetition accrued and unpaid interest to the extent owing under the applicable documents, which totals $39,693,454.06 as of January 31, 2015, and (b) all applicable premiums and prepetition fees to the extent owing under the applicable documents.

    (3)    *Treatment*: Each holder of an Allowed Class 5 Claim shall, in full satisfaction of such Claim, receive (A) its Pro Rata share of the Notes Claims Stock, and (B) Initial Subscription Rights to subscribe for its Pro Rata share of the Rights Offering Stock for an

---

[4]    Pursuant to the Support Agreement, if the Debtors receive a Pre-Filing Loan from the Domestic Lenders, such Pre-Filing Loan is to be repaid upon the closing of the DIP Credit Facility following entry of the Interim DIP Order.  Accordingly, the Pre-Filing Loan, if any, is not included in this amount.

[5]    As provided herein, holders of two-thirds in amount of Domestic Credit Facility Claims may agree to less favorable treatment and bind all holders of Domestic Credit Facility Claims to such treatment.  All holders of Domestic Credit Facility Claims have agreed to such treatment in the Support Agreement.  Accordingly, the votes of such holders of Domestic Credit Facility Claims have not been solicited and are deemed to accept the Plan.

aggregate purchase price equal to the Subscription Payment Amount and Oversubscription Rights to subscribe for any Remaining Initial Unsubscribed Rights Offering Stock; *provided*, that the Subscription Rights shall only be issued to Eligible Holders of Allowed Class 5 Claims.  For avoidance of doubt, no additional distribution shall be made on account of Notes Deficiency Claims.

(4)     *Voting*: Class 5 is Impaired.  Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

(f)     **Class 6 — Other Unsecured Claims**

(1)     *Classification*: Class 6 consists of all Other Unsecured Claims against any Debtor.

(2)     *Treatment*: Each holder of an Allowed Class 6 Claim shall, in full satisfaction of such Claim, receive Cash in an amount equal to such Allowed Class 6 Claim on the later of (A) the Effective Date or (B) in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 6 Claim.

(3)     *Voting*: Class 6 is Unimpaired.  Holders of Allowed Class 6 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan.

(g)     **Class 7 — ASG Interests**

(1)     *Classification*: Class 7 consists of all ASG Interests.

(2)     *Treatment*: Class 7 Interests shall be discharged, canceled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and holders of ASG Interests shall not receive any distribution on account of such Allowed Class 7 Interests.

(3)     *Voting*: Class 7 is Impaired.  Holders of Class 7 Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Class 7 Interests are not entitled to vote to accept or reject the Plan.

(h)     **Class 8 — Intercompany Claims**

(1)     *Classification*: Class 8 consists of all Intercompany Claims.

(2)     *Treatment*: Each holder of a Class 8 Claim shall have its Class 8 Claim left unaltered and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

(3)     *Voting*: Class 8 is Unimpaired.  Holders of Class 8 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and such holders are not entitled to vote to accept or reject the Plan.

(i)     **Class 9 — Intercompany Interests**

(1)     *Classification*: Class 9 consists of all Intercompany Interests.

(2)     *Treatment*: Each holder of a Class 9 Interest shall have its Class 9 Interest left unaltered and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

(3)     *Voting*: Class 9 is Unimpaired.  Holders of Class 9 Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and such holders are not entitled to vote to accept or reject the Plan.

(j)     **Class 10 — Section 510(b) Claims**

18

(1)     *Classification*: Class 10 consists of all Section 510(b) Claims against any Debtor.

(2)     *Treatment*: Class 10 Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and holders of Section 510(b) Claims shall not receive any distribution on account of such Claims.

(3)     *Voting*: Class 10 is Impaired.  Holders (if any) of Class 10 Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code, and such holders (if any) are not entitled to vote to accept or reject the Plan.

### 3.3     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

### 3.4     Voting Classes

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtors may request a ruling at the Confirmation Hearing that the Plan shall be deemed accepted by the holders of such Claims in such Class.

### 3.5     Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 3.6     Confirmation of All Cases

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; *provided*, *however*, that the Debtors, with the consent of the Required Consenting Creditors and the Required Backstop Parties, may at any time waive this requirement.

### ARTICLE IV
### PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### 4.1     General Settlement of Claims and Interests

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

### 4.2     Restructuring Transactions

(a)     **Specified Restructuring Transactions**

On the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, may take such actions as are necessary or appropriate to effectuate the Plan, including:[6]

---

[6]     The Debtors, with the consent of the Required Consenting Creditors, not to be unreasonably withheld, conditioned or delayed, may delineate and/or establish the order of other transactions in the Plan Supplement.

(1)     Pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in the Plan, the property of each Estate shall vest in the applicable Reorganized Debtor, free and clear of all Claims and Interests including any and all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan, the Exit Facilities, the other Plan Documents, or the Confirmation Order.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.  There are certain non-Debtor Affiliates of the Debtors that are not Debtors in the Chapter 11 Cases.  The continued existence, operation and ownership of such non-Debtor Affiliates are a material component of the Debtors' businesses.  All of the Interests and other property interests in such non-Debtor Affiliates held by any Debtor on the Petition Date (other than non-Debtor Affiliates owned by other non-Debtor Affiliates) shall vest in the applicable Reorganized Debtor or its successor on the Effective Date, free and clear of all Claims, Liens, charges, other encumbrances, and interests, except as specifically set forth in the Plan, the Exit Facilities, the other Plan Documents, or the Confirmation Order.

(2)     All existing ASG Interests shall be canceled as of the Effective Date.

(3)     The Amended Organizational Documents shall become effective.

(4)     On, or as soon as reasonably practicable after, the Effective Date, Reorganized ASG or another applicable Distribution Agent shall consummate the Plan by making distributions of Cash and New Common Stock as provided in the Plan.  Reorganized ASG shall issue the New Common Stock to holders of Claims entitled to receive New Common Stock pursuant to the Plan.  Reorganized ASG shall issue the New Common Stock pursuant to the terms of the Plan and the Amended Organizational Documents, and all New Common Stock under the Plan shall be subject to the Stockholders Agreement and the Registration Rights Agreement, and each recipient of New Common Stock shall automatically be deemed to have accepted and be bound by the terms the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common Stock) and to be parties thereto without further action.  The Stockholders Agreement and the Registration Rights Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each holder of New Common Stock shall be bound thereby.

(5)     On, or as soon as reasonably practicable after, the Effective Date, Reorganized ASG shall issue the Warrants to the Allen Parties pursuant to the terms of the AA Settlement Agreement.  Reorganized ASG shall issue the Warrants pursuant to the terms of the Plan and the Amended Organizational Documents and all New Common Stock issued at any time on or after the Effective Date in connection with the Warrants shall be subject to the Stockholders Agreement and the Registration Rights Agreement, and each recipient of such New Common Stock issued in connection with the Warrants shall automatically be deemed to have accepted and be bound by the terms the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common Stock) and to be parties thereto without further action.

(6)     On the Effective Date, the Debtors and Reorganized Debtors, as applicable, shall receive the Rights Offering Amount and on, or as soon as reasonably practicable after, the Effective Date, Reorganized ASG or another applicable Distribution Agent shall distribute the Rights Offering Stock as provided in the Plan.

(7)     The Debtors and Reorganized Debtors, as applicable, shall enter into the Exit Facilities.

(8)     The discharge, releases, exculpation and injunctions set forth in <u>Sections 8.1</u> through <u>8.6</u>, which are an essential element of the Plan, shall become effective.

(9)    The DIP Facility shall be repaid in full in Cash, unless otherwise agreed by the DIP Agent or DIP Lenders.

(10)    On the Effective Date, the Foreign Credit Facility shall be repaid in full in Cash in the aggregate principal amount of $10,000,000.00, plus (a) all accrued and unpaid interest through the Effective Date calculated at the applicable default rate in accordance with the Foreign Credit Agreement, (b) all applicable premiums, including the Acceleration Damages Premium in the amount of $1,200,000.00, and (c) all accrued and unpaid fees through the Effective Date.

(b)    **Additional Restructuring Transactions**

Without limiting the foregoing, on the Effective Date, the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, as applicable, may enter into the following transactions and take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein.    Such restructuring transactions may include one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, as applicable, to be necessary or appropriate.    The actions to effect such restructuring transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such restructuring transactions.    Following the Confirmation Date, the Debtors and Reorganized Debtors are authorized, with the prior written consent of the Required Consenting Creditors, to convert any of ASG's or Reorganized ASG's subsidiaries (including the other Debtors or Reorganized Debtors) that are qualified subchapter S subsidiaries into limited liability companies.

## 4.3    New Common Stock

All existing ASG Interests shall be canceled as of the Effective Date, and Reorganized ASG shall issue the New Common Stock to holders of Claims entitled to receive New Common Stock pursuant to the Plan.    The issuance of New Common Stock, including any options for the purchase thereof and equity awards associated therewith (including those in connection with the Management Incentive Plan and Warrants), is authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable.

All New Common Stock issued under the Plan (including Notes Claims Stock and Rights Offering Stock) shall be duly authorized, validly issued, fully paid, and non-assessable.    All New Common Stock under the Plan shall be subject to the Stockholders Agreement and the Registration Rights Agreement, and recipients of New Common Stock shall be automatically deemed to have accepted and be bound by the terms of the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common Stock) and to be parties thereto without further action.    The Stockholders Agreement and the Registration Rights Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each holder of New Common Stock shall be bound thereby.

The Debtors or Reorganized Debtors, as applicable, may, in their sole discretion, issue the New Common Stock to the Distribution Agent(s) for the benefit of the Rights Offering Investors and holders of Allowed Notes Claims, as applicable.

**4.4**    **AA Settlement Agreement; Warrants**

Pursuant to the Plan, the AA Settlement Agreement shall be assumed by the Reorganized Debtors.  On, or as soon as reasonably practicable after the Effective Date, Reorganized ASG shall issue the Warrants to the Allen Parties in accordance with the AA Settlement Agreement on the terms set forth on <u>Exhibit 3</u> hereto.  Reorganized ASG shall issue the Warrants pursuant to the terms of the Plan and the Amended Organizational Documents, and all New Common Stock issued at any time in connection with the Warrants shall be subject to the Stockholders Agreement and the Registration Rights Agreement, and each recipient of such New Common Stock issued in connection with the Warrants shall automatically be deemed to have accepted and be bound by the terms of the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common Stock) and to be parties thereto without further action.  Any New Common Stock issued in connection with the exercise of the Warrants shall only be issued to Eligible Holders, unless otherwise agreed by the Reorganized Debtors in their sole discretion.

**4.5**    **Rights Offering**

(a)    **Issuance of Rights**

Each Eligible Holder of a Notes Claim as of the Rights Offering Record Date will be provided a Subscription Form giving such Eligible Holder the option, but not the requirement, to exercise (i) its Initial Subscription Rights to subscribe for its Pro Rata share of the Rights Offering Stock for an aggregate purchase price equal to the applicable Subscription Payment Amount and (ii) its Oversubscription Rights to subscribe for any Remaining Initial Rights Offering Stock for an aggregate purchase price equal to the applicable Oversubscription Payment Amount.  In accordance with the Backstop Agreement, the Backstop Parties have committed to purchase all Remaining Rights Offering Stock.  The Rights Offering Stock, including the Remaining Initial Rights Offering Stock and the Remaining Rights Offering Stock, will be issued to the Rights Offering Investors and/or the Backstop Parties, as applicable, for an aggregate purchase price equal to the Rights Offering Amount.  The Backstop Parties, in accordance with the terms and conditions of the Backstop Agreement, shall exercise in full their Initial Subscription Rights.  On the Effective Date, Reorganized ASG shall be authorized to consummate the transactions contemplated by the Rights Offering and the Backstop Agreement, including any agreement or document entered into in connection therewith, and all such agreements and documents shall become effective and binding in accordance with their respective terms (to the extent not effective and binding prior to the Effective Date) and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.

(b)    **Subscription Period**

The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Deadline.  Each Eligible Holder of a Notes Claim as of the Rights Offering Record Date (or a subsequent Eligible Holder of a Notes Claim if transferred in accordance with <u>Section 4.4(d)</u>) that intends or desires to participate in the Rights Offering must affirmatively elect to exercise its Initial Subscription Rights and, if desired, its Oversubscription Rights as set forth in <u>Sections</u> <u>4.5(c)(2)</u> and <u>(3)</u>, respectively.  After the Subscription Deadline, elections to subscribe for the Remaining Initial Rights Offering Stock shall be allocated to and purchased by the Oversubscribing Holders as set forth in <u>Section 4.5(c)(4)</u>.  After such allocations and purchases, all Remaining Rights Offering Stock shall be allocated to and purchased by the Backstop Parties, in accordance with the terms and conditions of the Backstop Agreement.

(c)    **Exercise of Initial Subscription Rights, Oversubscription Rights, and Payment of Subscription Payment Amount and Oversubscription Payment Amount**

(1)    On the Subscription Commencement Date, the Subscription Agent will distribute the Subscription Form and Subscription Procedures to each applicable Nominee known as of the Rights Offering Record Date with instructions to forward the Subscription Form and Subscription Procedures to each Eligible Holder of a Notes Claim. The Subscription Form and Subscription Procedures will contain appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form, as well as instructions for the payment of the Subscription Payment Amount for that portion of the

22

Initial Subscription Rights sought to be exercised by such Person and instructions for the election of Oversubscription Rights sought to be exercised by such Person.  The Debtors, with the consent of the Required Backstop Parties, may adopt such additional detailed procedures consistent with the provisions of the Plan to more efficiently administer the exercise of the Subscription Rights.

(2)     In order to exercise the Initial Subscription Rights, each Eligible Holder of a Notes Claim as of the Rights Offering Record Date must (i) return a duly completed Subscription Form (making a binding and irrevocable commitment to participate in the Rights Offering) to the Subscription Agent as specified in the applicable Subscription Form (including the required Nominee Certification), and (ii) tender its Subscription Payment Amount by wire transfer of immediately available funds to the Subscription Agent (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset), such that the Subscription Form(s) of the Eligible Holder of a Notes Claim and the Subscription Payment Amount (and/or notice of Joint Offset in the case of a Joint Holder) are actually received by the Subscription Agent on or before the Subscription Deadline in accordance with the terms of the Plan and the Subscription Form(s).  All payments for the exercise of Initial Subscription Rights received shall be held by the Subscription Agent in a separate account free and clear of all liens, claims and encumbrances until the Effective Date.  In the event the conditions to the Effective Date are not met or waived, such payments shall be promptly returned, without accrual or payment of any interest thereon, to the applicable Rights Offering Investor, without reduction, offset or counter-claim.  If the Subscription Agent for any reason does not receive from a given holder of Initial Subscription Rights a duly completed Subscription Form (including the Nominee Certification) and the applicable Subscription Payment Amount on or prior to the Subscription Deadline, then such holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering, and the Remaining Initial Rights Offering Stock shall be allocated to the Oversubscribing Holders, if any.  Any notice of Joint Offset must specify whether such Joint Offset will be made with respect to the Subscription Payment Amount. A separate notice of Joint Offset must be provided to specify whether a Joint Offset will be made with respect to any Oversubscription Payment Amount (as provided in clause (3) below). A separate notice of Joint Offset must be provided to specify whether a Joint Offset will be made with respect to any Backstop Payment Amount (as provided in clause (5) below).

(3)     In order to validly exercise Oversubscription Rights, an Eligible Holder of a Notes Claim as of the Rights Offering Record Date must (i) have returned a duly completed Subscription Form in accordance with the terms of Section 4.5(c)(2) which (a) exercises in full its Initial Subscription Rights for its Pro Rata share of the Rights Offering Stock and (b) specifies such Eligible Holder's Oversubscription Election Amount, (ii) have caused its Subscription Payment Amount (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset) to be actually received by the Subscription Agent on or before the Subscription Deadline pursuant to the terms of Section 4.5(c)(2) and (iii) cause its applicable Oversubscription Payment Amount (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset) to be actually received by the Subscription Agent on or prior to the Rights Offering Oversubscription Payment Date.  Each Eligible Holder may only exercise Oversubscription Rights with respect to the Rights Offering Amount that the Backstop Parties are not obligated to purchase pursuant to their Initial Subscription Rights, which is $35.4 million or 27.2% of the Rights Offering Amount.  To the extent that the Oversubscription Aggregate Election Amount exceeds the Remaining Initial Rights Offering Amount, the Remaining Initial Rights Offering Stock will be allocated Pro Rata among all holders of Oversubscription Rights that validly elect to exercise such Oversubscription Rights, based upon the Oversubscription Election Amount elected by each such holder.

23

(4)    On the Rights Offering Oversubscription Notification Date, the Subscription Agent will notify each Oversubscribing Holder of the Oversubscription Payment Amount that such Oversubscribing Holder is obligated to pay pursuant to its election of Oversubscription Rights. Each Oversubscribing Holder must tender its Oversubscription Payment Amount by wire transfer of immediately available funds to the Subscription Agent (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset) so that it is actually received on or prior to the Rights Offering Oversubscription Payment Date. If the Subscription Agent for any reason does not receive from a given holder electing to exercise Oversubscription Rights (i) a duly completed Subscription Form (including the Nominee Certification and a specification of such Eligible Holder's Oversubscription Election Amount) and the applicable Subscription Payment Amount (and/or, in the case of a Joint Holder, written notice to the Subscription Agent of a Joint Offset) on or prior to the Subscription Deadline and (ii) the applicable Oversubscription Payment Amount (and/or, in the case of a Joint Holder, written notice to the Subscription Agent of a Joint Offset) on or prior to the Rights Offering Oversubscription Payment Date, then such holder shall be deemed to have forever and irrevocably relinquished and waived its right to exercise its Oversubscription Rights in the Rights Offering, and the Remaining Rights Offering Stock shall be allocated to the Backstop Parties.

(5)    On the Rights Offering Backstop Notification Date, the Subscription Agent will notify each Backstop Party of its portion of the Remaining Rights Offering Stock that such Backstop Party is obligated to purchase pursuant to the Backstop Agreement and the purchase price therefor. Each Backstop Party must tender its Backstop Payment Amount for its portion of the Remaining Rights Offering Stock by wire transfer of immediately available funds to the Subscription Agent (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset) so that it is actually received on or prior to the Rights Offering Backstop Payment Date in accordance with the terms of the Backstop Agreement.

(d)    **No Transfer; Detachment Restrictions; No Revocation**

The Subscription Rights are not transferable or detachable from the Notes Claims except for, prior to the Subscription Deadline, transfers by a holder of Notes Claims to one or more of its Affiliates with written notice to the Debtors and the Subscription Agent in advance of any such transfer; *provided*, that (i) the Initial Subscription Rights and Oversubscription Rights are not detachable from each other; (ii) the Subscription Rights are issued in connection with each holder's Notes Claims as of the Rights Offering Record Date; and (iii) no transfer, assignment, or other disposition of the Subscription Rights may be made except in connection with the transfer, assignment, or disposition of the corresponding Notes to such Affiliates. Upon any valid exercise of Subscription Rights by any Rights Offering Investor, such Rights Offering Investor shall not thereafter transfer, assign or otherwise dispose of any corresponding Notes on or prior to the Effective Date or the right to receive Rights Offering Stock prior to the distribution of such Rights Offering Stock to the applicable Rights Offering Investor; all such Rights Offering Stock shall be distributed to the party identified in the duly completed Subscription Form. No transfer, assignment or other disposition of the Subscription Rights of any Backstop Party may be made unless such Backstop Party's transferee is an Affiliate of such Backstop Party and agrees to an assignment or transfer of such Backstop Party's commitment, as set forth in the Backstop Agreement, to subscribe for the Rights Offering Stock in connection with such transferred Subscription Rights. Any transfer or detachment, or attempted transfer or detachment, in violation of this restriction will be null and void. Once an Eligible Holder of a Notes Claim has properly exercised any of its Initial Subscription Rights or Oversubscription Rights, or a Backstop Party has purchased its Rights Offering Stock in accordance with the Backstop Agreement, such exercise may only be revoked, rescinded, or annulled in the sole discretion of the Debtors or Reorganized Debtors with the consent of the Required Backstop Parties. No assignment or transfer of a Backstop Party's commitment, as set forth in the Backstop Agreement, may be made without the prior written consent of the Debtors unless such Backstop Party's transferee is an affiliate of such Backstop Party or is another Backstop Party.

(e)      **Distribution of Rights Offering Stock**

On, or as soon as reasonably practicable after, the Effective Date, Reorganized ASG or another applicable Distribution Agent shall distribute the Rights Offering Stock purchased by such Rights Offering Investor or Backstop Party to such Rights Offering Investor or Backstop Party, respectively, as set forth in such Rights Offering Investor's or Backstop Party's duly completed Subscription Form(s).

Each Rights Offering Investor shall be automatically deemed to have accepted and be bound by the terms of the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common Stock) and to be parties thereto without further action. The Stockholders Agreement and the Registration Rights Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding and enforceable in accordance with their terms, and each holder of New Common Stock shall be bound thereby.

For avoidance of doubt, Subscription Rights, and any New Common Stock issued in connection therewith, shall be issued only to Eligible Holders of Notes Claims on the Rights Offering Record Date, and the Debtors or Reorganized Debtors shall require that each Rights Offering Investor certify that such Person is an Eligible Holder. Holders who are not Eligible Holders who attempt to exercise Subscription Rights will not have their subscriptions accepted and any consideration delivered to the Subscription Agent will be returned to such holder.

(f)      **Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights shall be determined by the Debtors or Reorganized Debtors, in consultation with the Backstop Parties, in their sole discretion. The Debtors or Reorganized Debtors, in their sole discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. A Subscription Form shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors or Reorganized Debtors in consultation with the Backstop Parties determine in their sole discretion. The Debtors or Reorganized Debtors will use commercially reasonable efforts to give written notice to any Rights Offering Investor regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; *provided*, *however*, that neither the Debtors and Reorganized Debtors nor any of their Affiliates, directors, officers, employees, agents, advisors and attorneys shall incur any liability for giving, or failing to give, such notification and opportunity to cure.

(g)      **Rights Offering Proceeds**

The proceeds of the Rights Offering will provide $130,000,000.00 in capital to the Reorganized Debtors, which shall be used to fund the payments required under the Plan and for ordinary course operations and general corporate purposes of the Reorganized Debtors after the Effective Date.

(h)      **Rights Offering Put Option Premium**

On the Effective Date, Reorganized ASG shall cause the Put Option Premium payable in conjunction with the Rights Offering to be delivered to the applicable Backstop Parties or their designees pursuant to the terms of the Backstop Agreement.

**4.6      Exit Facilities**

On the Effective Date, the applicable Reorganized Debtors shall enter into the Exit Facilities, and shall be authorized to execute and deliver the Exit Facility Credit Agreements and other Exit Facility Documents. All such documents are incorporated herein by reference, and shall become effective in accordance with their terms and the Plan.

Pursuant to the Support Agreement, the Second Lien Term Loan Exit Facility shall be fully backstopped by the Consenting Creditors on the terms set forth on <u>Exhibit 1</u> hereto and otherwise reasonably acceptable to the Company and the Required Consenting Creditors. The Second Lien Term Loan Exit Facility shall be marketed by

the Company in consultation with the First Lien Term Loan Exit Facility lender (once selected). To the extent the principal amount of the First Lien Term Loan Exit Facility exceeds $150,000,000.00, the maximum principal amount of the Second Lien Term Loan Exit Facility shall be reduced on a dollar-for-dollar basis. If the Debtors are not able to obtain binding commitments for the Second Lien Term Loan Exit Facility reasonably acceptable to the Company and the Required Consenting Creditors on or before the filing of the Plan Supplement, the Second Lien Term Loan Exit Facility shall be provided by the Consenting Creditors, and its terms shall be included in the Plan Supplement (unless otherwise agreed by the Debtors and Required Consenting Creditors).

On the Effective Date, and without further notice to, or order or other approval of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person or Entity, except for the Confirmation Order and as otherwise required by the Exit Facility Documents, the applicable Reorganized Debtors shall, and are authorized to, enter into the Exit Facility Credit Agreements and other Exit Facility Documents, and perform and receive the proceeds of the Exit Facilities, and to execute and deliver the Exit Facility Documents to which the applicable Reorganized Debtors are intended to be a party on the Effective Date, in each case consistent with the terms of the Plan. Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, including any supplemental or additional syndication of the Exit Facilities, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (b) authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be approved, (b) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, and (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. On and after the Effective Date, the priorities of the Liens and security interests securing the Exit Facilities shall be governed by the terms of the applicable Exit Facility Documents.

**4.7**      **Exemption from Registration Requirements**

The offering, issuance, and distribution of any Plan Securities will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. Pursuant to section 4(a)(2) of the Securities Act, the Plan Securities will be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable state or foreign securities laws requiring registration prior to the offering, issuance, distribution, or sale of Securities. Any and all Plan Securities shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred, unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, and in compliance with any applicable state or foreign securities laws and the terms of the Stockholders Agreement and the Registration Rights Agreement.

**4.8**      **Corporate Existence**

The Reorganized Debtors shall continue to exist after the Effective Date as separate legal entities, with all the powers of corporations, memberships, partnerships and other entities, as applicable, pursuant to the applicable law in their states of incorporation or organization and pursuant to the Amended Organizational Documents.

**4.9**      <u>Vesting of Assets in the Reorganized Debtors; Post-Effective Date Operation</u>

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including the Exit Facility Documents), on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**4.10**      <u>Corporate Action</u>

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized and approved in all respects without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors, as applicable.  Such actions may include: (a) the adoption and filing of the Amended Organizational Documents, the Stockholders Agreement, and the Registration Rights Agreement; (b) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the New Board; (c) the adoption and implementation of the Management Incentive Plan or other management incentive programs; (d) the authorization, issuance, and distribution of New Common Stock and other Securities to be authorized, issued, and distributed pursuant to the Plan; (e) the adoption or assumption, as applicable, of Executory Contracts or Unexpired Leases; and (f) the entry into the Exit Facilities and the execution and delivery of the Exit Facility Documents.

**4.11**      <u>Cancelation of Notes, Instruments, Certificates, and Other Documents; Intercompany Claims and Interests</u>

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be canceled, and the obligations of the Debtors or Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing holders of Allowed Claims and Interests to receive distributions under the Plan and (b) allowing and preserving the rights of the DIP Agent, the First Lien Agent, the Indenture Trustee, and any Servicer, as applicable, to make distributions on account of Allowed Claims and Interests as provided herein.

As provided herein, unless otherwise determined by the Debtors or Reorganized Debtors, as applicable, no Intercompany Claims or Intercompany Interests shall be canceled pursuant to the Plan, and all Intercompany Claims and Intercompany Interests shall continue in place following the Effective Date, solely for the purpose of maintaining the existing corporate structure and Intercompany Claims of the Debtors and the Reorganized Debtors.

**4.12**      <u>Cancelation of Liens</u>

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, any Lien securing any Secured Claim that is satisfied in full and discharged hereunder shall be deemed released, and the holder of such Secured Claim, or any agent for such holder, shall be authorized and directed to release any collateral or other property of the Debtors or Reorganized Debtors, as applicable, including any cash collateral held by such holder, or any agent for such holder, and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Reorganized Debtors.  In the event that such holder or any agent for such holder fails to comply with a valid request of the Reorganized Debtors pursuant to this <u>Section 4.12</u>, the Reorganized Debtors are authorized to take any of the foregoing actions on behalf of such holder or agent for such holder.

27

**4.13**    **Amended Organizational Documents**

The Amended Organizational Documents shall amend or succeed the certificates or articles of incorporation, bylaws, membership agreements, partnership agreements and other organizational documents of the Debtors to satisfy the provisions of the Plan and the Bankruptcy Code, and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Common Stock; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation and bylaws, and other applicable organizational documents, as permitted by applicable non-bankruptcy law.

**4.14**    **Directors and Officers; Indemnification**

The existing boards of directors of the Debtors shall be deemed to have resigned on and as of the Effective Date.  The members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date.

The members of the New Board and the officers, directors, and/or managers of each of the Reorganized Debtors will be identified in the Plan Supplement.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the New Board and any Person proposed to serve as an officer of the Reorganized Debtors shall be disclosed at or before the Confirmation Hearing.  From and after the Effective Date, each director, officer or manager of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

To the extent not previously acquired, the Debtors will secure tail liability coverage for the Debtors' directors and officers effective as of the Effective Date that is consistent with the existing directors and officers liability coverage, with such changes as the directors of the Debtors may reasonably request.  Except as otherwise provided herein, all Indemnification Provisions for the officers, directors, and/or managers of the Debtors will be reinstated (or assumed, as the case may be), and shall survive effectiveness of the Plan and shall not thereafter be altered to the detriment of the Debtors' directors and officers.

**4.15**    **Management Agreements and Incentive Plans**

On, or as soon as reasonably practicable after the Effective Date, (a) Reorganized ASG and the other Reorganized Debtors, as applicable, shall execute and deliver the Management Agreements, and (b) the New Board shall adopt the Management Incentive Plan, and make individual awards pursuant thereto, consistent with the Management Agreements and Management Incentive Plan, and otherwise as determined by the New Board. Approval of the Plan shall constitute shareholder approval of the Management Incentive Plan for purposes of Section 422 of the Tax Code.

**4.16**    **Employee and Retiree Benefits**

Except as otherwise provided herein, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the New Board under the Reorganized Debtors' Amended Organizational Documents or applicable non-bankruptcy law, the Reorganized Debtors shall: (a) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for wages and accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.

**4.17**    **Section 1146 Exemption**

To the fullest extent permitted by section 1146 of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or other transfers under, in furtherance of, or in connection with, the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, termination, refinancing and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral as security for any or all of the Exit Facilities; or (e) the making, delivery, or recording of any deed or other instrument of transfer, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**4.18**    **Preservation of Rights of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain Causes of Action. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**4.19**    **Insurance Preservation and Proceeds**

Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any policies of insurance that cover claims against the Debtors, the Reorganized Debtors or any other Person, and all such policies shall vest in the Reorganized Debtors as of and subject to the occurrence of the Effective Date.

**4.20**    **Solicitation of Debtors**

Notwithstanding anything to the contrary herein, each Debtor that would otherwise be entitled to vote to accept or reject the Plan as a holder of a Claim against or Interest in another Debtor shall not be solicited for voting purposes, and such Debtor will be deemed to have voted to accept the Plan.

**4.21**    **No Consent to Change of Control Required**

Notwithstanding anything to the contrary herein, none of (a) the facts or circumstances giving rise to the commencement of, or occurring in connection with, the Chapter 11 Cases, (b) the issuance of the New Common Stock pursuant to the Plan, or (c) implementation or consummation of any other transaction pursuant to the Plan shall constitute a "change in ownership" or "change of control" (or a change in working control) of, or in connection with, any Debtor or Reorganized Debtor requiring the consent of any Person other than the Debtors or the Bankruptcy Court, including in connection with any local municipal licensing arrangement or under any Executory Contract or other agreement (whether entered into before or after the Petition Date) between any Debtor and any third party, or any law (including the common law), statute, rule or any other regulation otherwise applicable to any Debtor.

**4.22**    **Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and be consistent with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**4.23**    **Dissolution of the Committee**

Except with respect to the prosecution of any Professional Fee Claims, any Committee shall be dissolved on the Effective Date.

**4.24**    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Rights Offering, the Exit Facilities, and the New Common Stock and other Securities issued pursuant to the Plan (if any) in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1**    **Assumption and Rejection of Executory Contracts or Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)    have been rejected by order of the Bankruptcy Court;

(ii)    are the subject of a motion to reject pending on the Effective Date;

(iii)    are identified in the Plan Supplement (which exhibit(s) may be amended by the Debtors, with the consent of the Required Consenting Creditors, to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended exhibit and serving it on the affected contract parties prior to the

Effective Date) as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan, which shall be deemed rejected as of the Effective Date; or

(iv)    are rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant hereto shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.

Except as otherwise provided herein or agreed to by the Debtors and with the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

## 5.2    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Claims against the Debtors arising from any Executory Contract or Unexpired Lease that is rejected pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable against the Debtors, the Reorganized Debtors, or the Estates, and the Debtors, the Reorganized Debtors, and their Estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in the Plan.

## 5.3    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 30 days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any

counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is a dispute regarding Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

**5.4    AA Settlement Agreement**

Upon entry of, and pursuant to, the Confirmation Order, the AA Settlement Agreement shall be deemed approved and assumed pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  The Unexpired Leases to be assumed on amended terms or rejected, as applicable, pursuant to the AA Settlement Agreement shall be deemed assumed or rejected, as applicable, upon entry of the Confirmation Order.  No Cures shall be required to be paid in connection with the assumption of such Unexpired Leases, other than payment of the rent amounts, to the extent unpaid, to be paid under the AA Settlement in connection with such Unexpired Leases to be assumed.  Such Unexpired Leases assumed pursuant hereto shall revest in and be fully enforceable by the Reorganized Debtors in accordance with their terms. In the event the Debtors reject the Unexpired Leases set forth in the AA Settlement Agreement, all rejection damages, including all claims for unpaid rent and other amounts allegedly due by the Debtors under such Unexpired Leases, shall be deemed waived and released as set forth in the AA Settlement Agreement.

**5.5    Indemnification**

Except with respect to any claims or Causes of Action asserted or brought by Persons or Entities against the Allen Parties, on and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, or agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors will amend and/or restate their respective governance documents to terminate or materially adversely affect any of the Debtors or Reorganized Debtors' obligations to provide such indemnification rights to such directors, officers, employees, or agents with respect to claims or Causes of Action arising – or based upon or related to acts or omissions occurring – prior to the Effective Date.

**5.6    Compensation and Benefit Programs**

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, and without limiting any authority provided to the New Board under the Reorganized Debtors' Amended Organizational Documents or applicable non-bankruptcy law, all employment and severance policies, plans, and agreements, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its employees, retirees, and non-employee directors, and the employees and retirees of its subsidiaries, including all savings plans, retirement plans, healthcare plans, disability plans, incentive plans, life, accidental death and dismemberment insurance, and other welfare plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the

provisions of sections 365 and 1123 of the Bankruptcy Code; *provided*, *however*, that, to the extent any such employment or benefit agreement, plan, program or policy contains a "change of control" provision, such provision shall be deemed modified such that the consummation of the Plan shall not entitle any Person to exercise any rights, or assert any Claims against the Debtors or the Reorganized Debtors, with respect thereto.

## 5.7    Workers' Compensation Benefits

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate, and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance.  All such contracts and agreements are treated as Executory Contracts under the Plan, and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, confirmation of the Plan shall not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

## 5.8    Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date

Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

## 5.9    Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact as a matter of law an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired as of the Petition Date, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

# ARTICLE VI
# PROVISIONS GOVERNING DISTRIBUTIONS

## 6.1    Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors (as the case may be) and the holder of the applicable Claim, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on or after the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided*, *however*, that (a) Allowed DIP Facility Claims and Allowed Domestic Credit Facility Claims (unless otherwise agreed by two-thirds (2/3rds) in amount of Allowed Domestic Credit Facility Claims) shall be paid in full in Cash on the Effective Date as provided in ARTICLE III hereof, (b) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (c) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in accordance with Sections 2.4 and 3.2(a), respectively, and (d) the Reorganized Debtor or Distribution Agent shall make distributions on account of Allowed Notes Claims on the Effective Date in accordance with Section 3.2(e).  To the extent any Allowed Priority Tax Claim or Allowed Secured Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**6.2**    **Special Rules for Distributions to Holders of Disputed Claims; Disputed Claims Reserve**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order, and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.

**6.3**    **Delivery of Distributions**

(a)    **Record Date for Distributions**

The Distribution Agent shall be authorized and entitled to recognize only those record holders of Claims as of the close of business on the Confirmation Date; *provided, however*, the foregoing shall not apply to any distributions based on a publicly traded security. Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded security, is transferred less than 20 days before the Confirmation Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)    **Distribution Process**

The Distribution Agent shall make all distributions required under the Plan, except that distributions to holders of Allowed Claims or Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims and Interests, including Claims and Interests that become Allowed after the Confirmation Date, shall be made to holders of record as of the Confirmation Date by the Distribution Agent or a Servicer, as appropriate, (1) to the address of such holder as set forth in the books and records of the applicable Debtor (or if the Debtors have been notified in writing, on or before the date that is 14 days before the Confirmation Date, of a change of address, to the changed address), (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtors' books and records, no Proof of Claim has been filed, and the Distribution Agent has not received a written notice of a change of address on or before the date that is 14 days before the Confirmation Date, or (3) to any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Notwithstanding anything to the contrary in the Plan, including this Section 6.3, distributions under the Plan (A) to holders of DIP Facility Claims shall be made to the DIP Agent, (B) to the holders of Domestic Credit Facility Claims or the Foreign Lenders shall be made to the First Lien Agent, and (C) to the holders of Notes Claims shall be made to or at the direction of the Indenture Trustee, respectively, in accordance with the terms of the Plan and the applicable credit documents. In connection with any Notes Claim, the Claim of the Indenture Trustee shall be determined as of the Confirmation Date, but distributions to holders of Notes shall be effected through the exchange of such Notes for Plan treatment on, or as soon as practicable after, the Effective Date. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c)    **Accrual of Dividends and Other Rights**

For purposes of determining the accrual of distributions or other rights after the Effective Date, the New Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; *provided*, *however*, the Reorganized Debtors shall not pay any such distributions or distribute such other rights, if any, until after distributions of the New Common Stock actually take place.

(d)    **Compliance Matters**

34

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. The Debtors and the Reorganized Debtors are authorized (but not required) to request expedited determination of taxes under Section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for all taxable periods (or portions thereof) from the Petition Date through (and including) the Effective Date.

(e)      **Foreign Currency Exchange Rate**

Except as otherwise provided in an order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

(f)      **Fractional, Undeliverable, and Unclaimed Distributions**

    (1)      *Fractional Distributions*.    No fractional shares of New Common Stock shall be distributed. When any distribution would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the shares of the New Common Stock subject to such distribution shall reflect a rounding of such fraction to the nearest whole share (up or down), with half shares or more being rounded up. The total number of shares of New Common Stock to be distributed will be adjusted as necessary to account for the rounding provided for in the Plan. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down. No consideration will be provided in lieu of fractional distributions that are rounded down.

    (2)      *Undeliverable Distributions*.    If any distribution to a holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until the Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Section 6.3(f)(3), and shall not be supplemented with any interest, dividends, or other accruals of any kind.

    (3)      *Reversion*.    Any distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after the Reorganized Debtors' initial attempted distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is New Common Stock, shall be deemed canceled. Upon such revesting, the Claim of any holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

(g)      **Surrender of Canceled Instruments or Securities**

On the Effective Date or as soon as practicable thereafter, each holder of a Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer).  Such Certificate shall be canceled solely with respect to the Debtors and their direct and indirect subsidiaries, and such cancelation shall not alter the obligations or rights of any Entity (other than a Debtor and or a direct or indirect subsidiary of a Debtor) vis-à-vis one another with respect to such Certificate.  No distribution of property pursuant to the Plan shall be made to or on behalf of any such holder unless and until such Certificate is received by the Distribution Agent, unless the Distribution Agent determines otherwise in its sole discretion or as otherwise set forth herein, or the Servicer, or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer pursuant to the provisions of Section 6.3(h).  Any holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date shall have its Claim or Interest discharged with no further action, be forever barred from asserting any such Claim or Interest against the relevant Reorganized Debtor or its property, be deemed to have forfeited all rights, and Claims and Interests with respect to such Certificate, and not participate in any distribution under the Plan.  Furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary.  Notwithstanding the foregoing paragraph, this Section 6.3(g) shall not apply to Intercompany Claims and Intercompany Interests Unimpaired pursuant to the terms of the Plan.

(h)        **Lost, Stolen, Mutilated, or Destroyed Securities**

Any holder of an Allowed Claim or Interest evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Distribution Agent or Servicer, if applicable, an affidavit of loss acceptable to the Distribution Agent or Servicer setting forth the unavailability of the Certificate and such additional indemnity as may be required reasonably by the Distribution Agent or Servicer to hold the Distribution Agent or Servicer harmless from any damages, liabilities, or costs incurred in treating such holder as a holder of an Allowed Claim or Interest.  Upon compliance with this procedure by a holder of an Allowed Claim or Interest evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

**6.4      Claims Paid or Payable by Third Parties**

(a)        **Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the applicable Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)        **Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.

(c)        **Applicability of Insurance Policies**

Except as otherwise provided herein, distributions to holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.5**    <u>Setoffs</u>

Except with respect to the DIP Facility Claims, the Domestic Credit Facility Claims, and the Notes Claims or as otherwise expressly provided for herein, each Reorganized Debtor, may pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

**6.6**    <u>Allocation Between Principal and Accrued Interest</u>

Except as otherwise provided herein, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Effective Date.

**ARTICLE VII**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**

**7.1**    <u>Disputed Claims Process</u>

Except as otherwise provided herein, if a party files a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this <u>ARTICLE VII</u>.

**7.2**    <u>Prosecution of Objections to Claims and Interests</u>

Except with respect to a Claim or Interest that is deemed Allowed under the Plan, the Debtors and the Reorganized Debtors shall be entitled to object to any Claim or Interest.  Any objections to Claims or Interests shall be served and filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.  All Claims and Interests not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended by order of the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to <u>Section 4.18</u>.

**7.3**    <u>Disallowance of Claims and Interests</u>

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code, and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII
## EFFECT OF CONFIRMATION OF THE PLAN

**8.1**     <u>Discharge of Claims and Termination of Interests</u>

    (a)     **Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and of all Interests, or other rights of a holder of an Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, or Interests or other rights of a holder of an equity security or other ownership interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed to have received a discharge under section 1141(d)(1)(A) of the Bankruptcy Code and release from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Interests or other rights of a holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any equity security holder in any of the Debtors and all Equity Interests.**

    (b)     **Except as expressly provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against each of the Debtors, the Debtors' respective assets, property and Estates and the Reorganized Debtors any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and all Interests or other rights of a holder of an Interest, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and estates based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Interests or other rights of a holder of an Interest and termination of all rights of any such holder in any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any holder of any Interest in any of the Debtors or terminated Interest.**

**8.2**     <u>Releases by and of the Debtors</u>

    **Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, to the fullest extent permissible under applicable law, each of the Debtors, the Reorganized Debtors, and the Estates, shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish and discharge each Released Party (and each such Released Party so released shall be deemed fully released and discharged by the Debtors, the Reorganized Debtors, and the Estates) and their respective property from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor and/or a Reorganized Debtor, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would**

have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, any transactions contemplated by the Plan, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, any payments, distributions, or dividends any Debtor or Affiliate paid to or received from any Released Party, fraudulent or preferential transfer or conveyance, tort, contract, breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence, gross negligence, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; *provided, however*, that the foregoing release shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages, remedies, Causes of Action, and liabilities in respect of any Released Party solely to the extent: (1) arising out of or relating to any act or omission of such Released Party that constitutes fraud or willful misconduct as determined by Final Order of a court of competent jurisdiction; or (2) arising under the Exit Facility Documents or other obligations arising under the Plan.

### 8.3    Releases by Holders of Claims and Interests

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Releasing Parties shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge each Released Party (and each such Released Party so discharged and released shall be deemed discharged and released by the Releasing Parties) and their respective property from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor and/or a Reorganized Debtor, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, any transactions contemplated by the Plan, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, any payments, distributions, or dividends any Debtor or Affiliate paid to or received from any Released Party, fraudulent or preferential transfer or conveyance, tort, contract, breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence, gross negligence, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; *provided, however*, that the foregoing release shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages, remedies, Causes of Action, and liabilities in respect of any Released Party, solely to the extent: (1) arising out of or relating to any act or omission of such Released Party that constitutes fraud or willful misconduct as determined by Final Order of a court of competent jurisdiction; (2) arising under the Exit Facility Documents or other obligations arising under the Plan, or (3) with respect to Professionals' final fee applications or accrued Professional compensation claims in the Chapter 11 Cases.

### 8.4    AA Settlement Releases

Notwithstanding anything contained in the Plan to the contrary, the releases set forth in the AA Settlement Agreement are hereby incorporated by reference herein, and, on the Confirmation Date and effective as of the Effective Date, are approved.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing releases under the AA Settlement Agreement, which includes by

reference each of the related provisions and definitions contained in the Plan and the AA Settlement Agreement, *and*, *further*, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for good and valuable consideration; (2) a good faith settlement and compromise of the Claims released by the AA Settlement Agreement; (3) in the best interests of the Debtors and all holders of Claims; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the parties providing releases under the AA Settlement Agreement from asserting any claim or Cause of Action released pursuant to the AA Settlement Agreement.

8.5     Exculpation

Notwithstanding anything contained herein to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to, the Chapter 11 Cases, the formulation, negotiation, solicitation, preparation, dissemination, confirmation, or implementation of the Plan, or consummation of the Plan, the Support Agreement, the Disclosure Statement, the Plan Supplement, the Amended Organizational Documents, the Stockholders Agreement, the Registration Rights Agreement, or other new corporate governance documents, any transactions contemplated by the Plan, the Management Agreements, the Management Incentive Plan, the issuance, distribution, and/or sale of any shares of the New Common Stock, the Warrants (the issuance of New Common Stock in connection therewith), or any other Security offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases, or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided*, *however*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; *provided*, *further*, that the foregoing "Exculpation" shall have no effect on the liability of any Entity solely to the extent resulting from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

8.6     Injunction

Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Section 8.2</u>, <u>Section 8.3</u>, or <u>Section 8.4</u>, discharged pursuant to <u>Section 8.1</u>, or are subject to exculpation pursuant to <u>Section 8.5</u>, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests, unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.

8.7     Protection Against Discriminatory Treatment

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

40

**8.8**    **Recoupment**

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**8.9**    **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim, and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE IX
## CONDITIONS PRECEDENT TO CONFIRMATION AND  EFFECTIVE DATE OF THE PLAN

**9.1**    **Conditions Precedent to the Confirmation of the Plan**

Confirmation of the Plan is subject to satisfaction of the following conditions precedent, unless such conditions are waived pursuant to Section 9.3:

(a)    The Support Agreement shall have been assumed by the Debtor;

(b)    The Debtors shall have complied with applicable consultation requirements related to its French works council;

(c)    The Bankruptcy Court shall have approved the Disclosure Statement; and

(d)    The Plan and Plan Supplement shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Creditors.

**9.2**    **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.3:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Debtors and the Required Consenting Creditors;

(b)    the Support Agreement shall not have been terminated in accordance with its terms;

(c)    with respect to all documents and agreements necessary to implement the Plan: (1) all conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; (2) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; (3) such documents and agreements shall have been effected or executed; and (4) such documents shall be consistent with the applicable terms of the Support Agreement and the Plan and reasonably acceptable to the Required Consenting Creditors;

(d)    the Reorganized Debtors shall have executed the Exit Facility Documents, and the proceeds of the Exit Facilities shall be available to the Reorganized Debtors on the Effective Date;

(e)      the Backstop Agreement shall not have been terminated in accordance with its terms, and the proceeds of the Rights Offering in the Rights Offering Amount shall be available to the Reorganized Debtors on the Effective Date;

(f)      all Regulatory Approvals necessary to consummate the Plan shall have been obtained or the waiting periods related thereto shall have expired (or early termination shall have been granted); and

(g)      there shall not be in effect any law or order of a Governmental Unit having competent jurisdiction over the Debtors or Reorganized Debtors, as applicable, prohibiting the consummation of the transactions contemplated by the Plan.

**9.3      Waiver of Conditions Precedent**

The Debtors, with the prior written consent of the Required Consenting Creditors, may waive any of the conditions to Confirmation set forth in Section 9.1 or the Effective Date set forth in Section 9.2 at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

**9.4      Effect of Failure of Conditions**

In the event that the Effective Date does not occur on or before thirty (30) days after the Confirmation Date, or such longer period as may be agreed upon, in writing, by the Debtors and the Required Consenting Creditors, upon notification submitted by the Debtors to the Bankruptcy Court:  (a) the Confirmation Order shall be deemed vacated; (b) no distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors unless extended by an order of a court of competent jurisdiction.

**9.5      Vacatur of Confirmation Order**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE X**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

**10.1      Modification of Plan**

Subject to and in accordance with the terms of the Support Agreement, effective as of the date hereof: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors, with the consent of the Required Consenting Creditors, or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**10.2      Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**10.3**     **Revocation or Withdrawal of Plan**

The Debtors, subject to and in accordance with the terms of the Support Agreement, reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**10.4**     **Confirmation of the Plan Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan or is deemed to reject the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors, with the consent of the Required Consenting Creditors, reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**ARTICLE XI**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     to issue such orders in aid of implementation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

7.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, unless any

43

such agreements or documents contain express enforcement and dispute resolution provisions to the contrary, in which case, such provisions shall govern;

8.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action that arise in connection with, or are related to, the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or an Interest for amounts not timely repaid pursuant to <u>Section 6.4(a)</u>; or (b) with respect to the releases, injunctions, and other provisions contained in <u>ARTICLE VIII</u>, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

13.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

15.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

16.      enforce all orders previously entered by the Bankruptcy Court; and

17.      hear any other matter not inconsistent with the Bankruptcy Code;

*provided*, *however*, that the Bankruptcy Court shall not retain exclusive jurisdiction with respect to the Exit Facility Documents, the Amended Organizational Documents or other documents  entered into by a Reorganized Debtor on or after the Effective Date that contains an express forum selection clause providing for the resolution of disputes thereunder.

**ARTICLE XII**
**MISCELLANEOUS PROVISIONS**

**12.1      Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, provided that such additional documents contain terms that are materially consistent with the Plan and the Support Agreement unless otherwise agreed by the Debtors and Required Consenting Creditors.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**12.2      Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

44

**12.3**     **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order and the Effective Date has occurred.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**12.4**     **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**12.5**     **Notices**

All notices, requests, and demands in connection herewith to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered to the following parties at the following addresses:

| | |
|---|---|
| **Reorganized Debtors** | **Allen Systems Group, Inc.**<br>708 Goodlette Road North<br>Naples, Florida 94102<br>Attention: Derek S. Eckelman, EVP and General Counsel |
| **Counsel to Debtors** | **Latham & Watkins LLP**<br>355 South Grand Avenue<br>Los Angeles, California 90071-1560<br>Attention: Peter M. Gilhuly and Ted A. Dillman<br><br>**and**<br><br>**Pachulski Stang Ziehl & Jones LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705<br>(Courier 19801)<br>Attn.: Laura Davis Jones, Michael R. Seidl, and Peter J. Keane |
| **Counsel to the First Lien Agent** | **James Bates Brennan Groover LLP**<br>3399 Peachtree Rd NE, Suite 1700<br>Atlanta, GA 30326<br>Attn: Whalen J. Kuller |
| **Counsel to the Consenting Creditors** | **Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attn: Alan W. Kornberg and Kelley A. Cornish<br><br>**and**<br><br>**Young Conway Stargatt & Taylor, LLP**<br>1000 North King Street<br>Wilmington, DE 19801<br>Attn: Pauline K. Morgan<br>Email: |

| United States Trustee | **Office of the United States Trustee** |
|---|---|
| | **for the District of Delaware** |
| | 844 King Street, Suite 2207 |
| | Wilmington, DE 19801 |
| | |
| **Counsel to the Allen Parties** | **Genovese Joblove & Battista, P.A.** |
| | 100 Southeast Second Street, 44th Floor |
| | Miami, FL 33131 |
| | Attn: Paul J. Battista |

**12.6    Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**12.7    Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**12.8    Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://dm.epiq11.com/ASG or the Bankruptcy Court's website at www.deb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

At least ten (10) days before the Confirmation Hearing, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by:  (1) calling the Debtors' restructuring hotline at one of the telephone numbers set forth above; (2) visiting the Debtors' restructuring website, http://dm.epiq11.com/ASG; and/or (3) by writing to Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, New York, NY 10017.

**12.9    Inconsistencies**

To the extent of any inconsistencies between the terms of the Plan and the Support Agreement or the Disclosure Statement, the terms of the Plan shall govern.  In the event of any inconsistencies between the terms of the Plan and the Confirmation Order, the terms of the Confirmation Order shall govern.

**12.10    Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors and the Required Consenting Creditors, not to be unreasonably withheld, conditioned or delayed, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or

invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' and the Required Consenting Creditors' consent, consistent with the terms set forth herein; and (c) nonseverable and mutually dependent.

[*The remainder of this page is intentionally left blank.*]

Dated: February 9, 2015

**ALLEN SYSTEMS GROUP, INC.**
on behalf of itself and all other Debtors

/s/ John C. DiDonato

John C. DiDonato
Chief Restructuring Officer and President
708 Goodlette Road North
Naples, Florida 34102

## EXHIBIT 1

**Terms of Backstop of Second Lien Term Loan Exit Facility**

**Exit Facility**

In the event the Second Lien Term Loan Exit Facility is provided by the Consenting Creditors pursuant to the Support Agreement, the Second Lien Term Loan Exit Facility shall, in addition to other terms and conditions agreed upon by the Company and the Consenting Creditors, contain the following terms and conditions:[7]

| | |
|---|---|
| *Borrower*...................................................... | Allen Systems Group, Inc. (the "Company"). |
| *Description* .................................................. | A second lien term loan facility in the maximum principal amount of $90 million dollars ($90,000,000.00); *provided* that the maximum principal amount of the Second Lien Term Loan Exit Facility shall decrease proportionally for every dollar that the principal amount of the First Lien Term Loan Exit Facility exceeds $150,000,000.00. The Consenting Creditors may, at their sole discretion, fund the Second Lien Term Loan Facility by offsetting distributions the Debtors would owe under the Plan on account of such Consenting Creditors' Allowed Domestic Credit Facility Claims. |
| *Maturity* ...................................................... | Two (2) years after maturity of the First Lien Term Loan Exit Facility. |
| *Interest*........................................................ | 11% per annum, paid in kind semi-annually until maturity. |
| *Commitment Fee*........................................... | TBD |
| *Amortization* ............................................... | TBD |
| *Guarantees* .................................................. | TBD |
| *Collateral*..................................................... | A second priority perfected lien and security interest on substantially all assets of the Company, subject to customary permitted liens and exceptions. |
| *Representations/Warranties/Covenants*......... | TBD |

---

[7]     The definitive documents comprising the Exit Facility Documents will be attached to the Plan Supplement.

**EXHIBIT 2**

**DIP Facility Commitment Letter**



January 31, 2015

Allen Systems Group, Inc.
780 Goodlette Road, North
Naples, FL 34102
Attention:     Ernest Scheidemann
              Executive VP & CFO

Dear Sir,

NewStar Business Credit, LLC ("NSBC") is pleased to present this confidential commitment to provide a $40,000,000 secured debtor-in-possession financing (the "DIP Credit Facility") to Allen Systems Group, Inc. (the "Company") and certain of its domestic subsidiaries listed in the Summary of Terms set forth below, each as a debtor-in-possession under the Bankruptcy Code (the Company and each such subsidiary collectively and individually referred to herein as "Borrower"), which such DIP Credit Facility is subject to the terms and conditions set forth herein. The major terms and conditions of the DIP Credit Facility are as follows:

| **SUMMARY OF TERMS** | |
|---|---|
| Borrower: | Allen Systems Group, Inc. and its domestic subsidiaries who file Chapter 11 bankruptcy, including ASG Federal, Inc. and Viasoft International, LLC, each as a debtor and debtor-in-possession in cases pending under Chapter 11 of the Bankruptcy Code. |
| Guarantors: | All domestic direct and indirect subsidiaries of Allen Systems Group, Inc. who are not Borrowers under the DIP Credit Facility. Additionally, each Borrower shall guarantee the obligations of each other borrower under the DIP Credit Facility. |
| Lender: | NewStar Business Credit, LLC or an affiliate thereof. |
| Purpose: | Proceeds of the DIP Credit Facility will be used for (a) working capital and general corporate purposes of Borrower, (b) bankruptcy-related costs and expenses and (c) any other purpose agreed upon in the DIP Credit Facility, in each case in accordance with the Budget (subject to Permitted Variances). |
| Total Credit Facility: | $40,000,000 revolving line of credit, to be available as follows: (a) $22,500,000 shall be available on the Closing Date and (b) the remainder shall be available after entry of the final order approving the DIP Credit Facility, in each case: (x) at all times prior to the Carve-Out Reserve Trigger Date, less the Carve-Out Trigger Amount (defined below) and (y) on an as-needed basis, in accordance |

DAL 79428187v9

Allen Systems Group, Inc.
**Commitment Letter**
Page 2

| | |
|---|---|
| | with the approved Budget (subject to Permitted Variances). Within one business day after the occurrence of a Termination Event, the Lender shall fund a final revolving loan to Borrower in the amount of the Carve-Out Trigger Amount. Such amount shall be funded into a single segregated account that has been opened by Borrower for the benefit of the applicable Borrower Professionals (as identified to Lender by Borrower) for use by Borrower for payment of Case Administration Fees and Professional Fees incurred on or after the occurrence of such Termination Event. Such account and amounts therein shall be free and clear of all liens, claims and interests of any party other than (1) the United States Trustee, the applicable Borrower Professionals and the applicable legal or financial advisors retained by any official creditors' committee and (2) after the payment of such Case Administration Fees and Professional Fees pursuant to Bankruptcy Court order, the Borrower and Lender with respect to any remaining funds. |
| Closing Date: | The first business day following entry by the Bankruptcy Court of an interim order approving the DIP Credit Facility. |
| Termination Date: | The earliest of: (a) 35 days following entry of an interim order by the Bankruptcy Court approving the DIP Credit Facility, in the event that the Bankruptcy Court has not entered a final order approving the DIP Credit Facility; (b) one (1) year from the date of entry of a final Bankruptcy Court order approving the DIP Credit Facility; or (c) on the effective date of Borrower's confirmed Chapter 11 plan of reorganization or liquidation, any conversion to a Chapter 7 case, or dismissal of the bankruptcy proceedings. |
| Collateral: | Subject to the lien priorities set forth below, a perfected senior lien and security interest in favor of Lender would be taken in all the assets of Borrower now owned or hereafter acquired, including, without limitation: all cash, goods, accounts, notes receivable, inventory, deposit accounts, investment property, securities, chattel paper, machinery and equipment, general intangibles, intellectual property, equity interests in all subsidiaries (both domestic and foreign), causes of action (other than avoidance actions), rights to payments, insurance claims, real estate and all fee and leasehold interest therein, and the proceeds, products, rents and profits of all of the foregoing; provided that Borrower shall not be required to pledge in excess of 65% of the capital stock of Borrower's direct foreign subsidiaries if a pledge of more than 65% would result in adverse tax consequences to Borrower. All such liens and security interests shall be created and perfected pursuant to the interim and final orders approving the DIP Credit Facility. Lender shall be granted the following liens and claims in the bankruptcy proceedings: (i) a super priority administrative expense claim for all obligations owed under the DIP Credit Facility pursuant to 11 U.S.C. § 364(c)(1) superior to any and all administrative expenses of Borrower (it being agreed the proceeds of avoidance actions shall be available to pay the Lender's super priority administrative expense claim); (ii) a perfected first priority lien in all unencumbered property of Borrower pursuant to 11 U.S.C. § 364(c)(2); (iii) a perfected junior lien in all property of Borrower subject to: (a) valid, perfected, and non-avoidable liens in favor of third parties in existence as of the Petition Date (other than liens securing (1) the credit facility evidenced by |

|  | that certain Credit Agreement dated as of December 14, 2012, by and among the Company, as borrower, certain subsidiaries thereof as guarantors, the lenders from time to time party thereto, and TPG Allison Agent, LLC, as administrative agent (as amended, supplemented, or otherwise modified from time to time prior to the date hereof, the "<u>Domestic Credit Facility</u>"), and (2) the 10½ senior secured second lien notes due 2016 (the "<u>Second Lien Notes</u>") issued pursuant to that certain Indenture, dated November 22, 2010); (b) valid and unavoidable permitted encumbrances in existence as of the date Borrower filed bankruptcy that are subsequently perfected pursuant to 11 U.S.C. § 546(b), only to the extent such permitted encumbrance is not otherwise primed by the DIP Credit Facility, and (c) customary permitted liens (collectively, the "<u>Permitted Liens</u>"); and<br><br>(iv) a first priority, senior priming lien on all property of Borrower securing the Domestic Credit Facility and Second Lien Notes pursuant to 11 U.S.C. § 364(d)(1), subject to Permitted Liens.<br><br>Upon entry of a final order approving the DIP Credit Facility, no costs or expenses of administration which have been or may be incurred in Borrower's bankruptcy case shall be charged against the Lender or the Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise. Notwithstanding anything to the contrary, the Carve-Out shall be senior in right of payment to the obligations under the DIP Credit Facility. |
| Carve-Out: | The term "<u>Carve-Out</u>" shall mean, collectively: (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "<u>Case Administration Fees</u>"); (ii) unpaid professional fees and expenses ("<u>Borrower Professional Fees</u>") payable to each legal or financial advisor, investment banker, or other professional retained by Borrower (the "<u>Borrower Professionals</u>") that are incurred or accrued prior to the date of the occurrence of a Termination Event, but subject to the aggregate amounts set forth in the Budget (subject to Permitted Variances) and ultimately allowed by the Bankruptcy Court pursuant to §§ 328, 330, 331 and 503 of the Bankruptcy Code or any order of the Bankruptcy Court (whenever such fees may be actually incurred prior to the Termination Event); (iii) unpaid professional fees and expenses (together with the Borrower Professional Fees, the "<u>Professional Fees</u>") payable to each legal or financial advisor retained by a creditors' committee, if any, that are incurred or accrued prior to the date of the occurrence of a Termination Event but subject to the aggregate amounts set forth in the Budget as of such date (subject to Permitted Variances) and ultimately allowed by the Bankruptcy Court pursuant to §§ 328, 330, 331 and 503 of the Bankruptcy Code or any order of the Bankruptcy Court (whenever such fees may be actually incurred prior to the Termination Event); and (iv) Case Administration Fees and Professional Fees incurred on or after the occurrence of a Termination Event in an aggregate amount not to exceed $2,000,000.00 (the "<u>Carve-Out Trigger Amount</u>"). Any Case Administration Fees and Professional Fees owing by Borrower prior to the occurrence of a Termination Event shall be paid by the Borrower (in accordance with the approved Budget and pursuant to Bankruptcy Court order); <u>provided that</u>, the Borrower Professional Fees set forth in the Budget shall be funded by Borrower into segregated accounts for the benefit of the applicable Borrower Professionals or to the applicable Borrower Professionals on a monthly basis, and such accounts or amounts, as applicable, shall be free and clear of all liens, claims and interests of any party other than the applicable Borrower Professionals (it being understood that notwithstanding the foregoing, any funds remaining in such segregated accounts or any funds returned to Borrower after payment of Borrower Professional Fees pursuant to Bankruptcy Court order shall only be subject to the liens, claims and interests of |

Allen Systems Group, Inc.
**Commitment Letter**
Page 4

| | |
|---|---|
| | the Borrower and Lender). |
| Interest Rate: | The rate equal to the sum of (a) six percent per annum <u>plus</u> (b) the greater of (i) the 30-day LIBOR Rate or (ii) 1.00%. |
| Interest Payments: | Interest is payable monthly in arrears on the first business day of each month. |
| Repayment/Revolver: | Borrower shall pay the entire unpaid principal of the DIP Credit Facility, all accrued and unpaid interest thereon and all other amounts owing to Lender no later than the Termination Date. The DIP Credit Facility may be prepaid at any time at the option of Borrower, without premium or penalty. Prior to the Termination Date, any amounts repaid may be reborrowed (subject to availability under the DIP Credit Facility). |
| Expenses: | Borrower agrees to pay all reasonable out-of-pocket expenses incurred in connection with the DIP Credit Facility by the Lender, including, without limitation: Lender's pre- and post-petition legal fees and expenses, UCC search and recording fees, credit reports, collateral auditing costs incurred by Lender in connection with the transactions contemplated herein, and lien perfection fees and expenses. This obligation will survive the expiration of this commitment letter and shall be payable regardless of whether the DIP Credit Facility closes. |
| Commitment Fee: | $400,000, which shall be due and payable on the Closing Date. |
| Unused Line Fee: | One-half of one percent (0.50%) based on the unused portion of the DIP Credit Facility then available. |
| Financial Covenant: | Compliance with the Budget (subject to Permitted Variances). |
| Budget; Permitted Variances; Variance Reports: | Borrower shall deliver to Lender an initial 13-week budget (the "<u>Initial Budget</u>") showing all projected cash receipts and all projected cash disbursements (with detail as to sources of cash receipts and identification of cash disbursements) for Borrower during such initial 13-week period, with inclusion of the following line items: collections, total net cash flow and available domestic cash, which shall be subject to reasonable approval by Lender.<br><br>Commencing the second (2nd) full week following the Closing Date (on each Thursday), Borrower shall deliver to Lender, every two (2) weeks, an updated, rolling 13-week budget (each a "<u>Budget</u>"), which sets forth by line item updated projected receipts and disbursements for Borrower during the period commencing from the end of the previous two-week period through and including 13 weeks thereafter, which Budget shall be in form similar to the Initial Budget and subject to reasonable approval by Lender. Borrower shall still be subject to and governed by the terms of the immediately preceding Budget approved by Lender and then in effect and Lender shall have no obligation to fund to such updated Budget or permit the use of cash with respect thereto until such time as Lender notifies Borrower that such updated Budget has been approved; <u>provided</u> that the Lender shall be deemed to have consented to such updated Budget unless it shall object thereto to Borrower within five (5) business days after having received such updated Budget.<br><br>By Thursday of the week following (a) the end of the first full calendar week following the Closing Date, and (b) each calendar week thereafter, Borrower shall deliver to the Lender a variance report (a "<u>Variance Report</u>"), showing comparisons of actual results for each operating line item against such line item in the approved Budget for such preceding week and on a cumulative basis for |

Allen Systems Group, Inc.
Commitment Letter
Page 5

|  | the four immediately preceding weeks (or if fewer than four weeks have lapsed since the Closing Date, cumulatively from the Closing Date).

Each Variance Report shall indicate whether there are any adverse budget variances that exceed the Permitted Variances (it being understood that the initial Variance Report due the first full calendar week following the Closing Date is a report only). Compliance with the Budget shall be tested (a) for the first two (2) weeks following the Closing Date, on a cumulative basis, (b) for the first three (3) weeks following the Closing Date on a cumulative basis, and (c) thereafter weekly on a rolling four (4) week basis.

"Permitted Variances" shall mean an adverse variance in an amount not to exceed 15% of the amounts set forth for total receipts or total disbursements on a 4 week rolling basis (or if fewer than four weeks have lapsed since the Closing Date, cumulatively from the Closing Date); provided that Permitted Variances of total receipts shall be (i) 25% measured on a cumulative basis for the first two (2) full weeks following the Closing Date and (ii) 20% measured on a cumulative basis for the first three (3) full weeks following the Closing Date. |
|---|---|
| Financial/Collateral Reporting: | The final loan agreement shall contain financial and collateral reporting covenants customarily found in loan agreements for similar debtor-in-possession financings, and shall at a minimum include:

  (a) monthly accounts receivable listing and aging within 15 days of each month end;

  (b) monthly internally prepared financial statements within 30 days of each month end;

  (c) monthly accounts payable aging within 15 days of each month end; and

  (d) any other information Lender may reasonably request, including any reports submitted to the Bankruptcy Court. |
| Representations and Warranties: | The loan agreement shall contain representations and warranties customarily found in loan agreements for similar debtor-in-possession financings (subject to mutually agreed upon carve-outs, thresholds and materiality qualifiers). |
| Affirmative and Negative Covenants: | The loan agreement shall contain affirmative and negative covenants customarily found in loan agreements for similar debtor-in-possession financings (subject to mutually agreed upon carve-outs, thresholds and materiality qualifiers). |
| Events of Default: | The loan agreement shall contain events of default customarily found in loan agreements for similar debtor-in-possession financings, and shall include (subject to mutually agreed upon carve-outs, thresholds and materiality qualifiers), without limitation:

  (a) material impairment of the security interest created in favor of the Lender;

  (b) dismissal of the Chapter 11 case or conversion to a Chapter 7 case;

  (c) approval of any other claim or lien having priority senior or pari passu with the claims of the Lender, other than (i) Permitted Liens or the Carve-Out, |

Allen Systems Group, Inc.
**Commitment Letter**
Page 6

|  | (ii) liens securing post-petition capital leases and purchase money debt in an amount to be determined and (iii) other liens securing debt outstanding in an aggregate principal amount not to exceed $500,000; |
|---|---|
|  | (d) the entry of an order or orders granting relief from the automatic stay with respect to any assets having an aggregate value in excess of $500,000; |
|  | (e) the appointment of Chapter 11 trustee or an examiner with enlarged powers relating to the operations of Borrower; |
|  | (f) the failure to provide any Budget to the Lender within three (3) days of the date due; and |
|  | (g) the failure by Borrower to meet the Financial Covenant. |
| Remedies Upon Event of Default/Termination Date: | Upon the earlier of (i) the Termination Date or (ii) Borrower's receipt of notice of the occurrence of any Event of Default (Borrower's receipt of such notice of an Event of Default, a "Termination Event"), the Lender may take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay:

(i) declare the principal of, and accrued interest on, any outstanding loans under the DIP Credit Facility to be immediately due and payable; or

(ii) terminate any further commitment to lend to Borrower.

Upon the Termination Date or the occurrence of a Termination Event, and unless obligations under the DIP Credit Facility shall have been paid in full, the Lender may (x) set-off any amounts held as cash collateral (including, without limitation, in any cash collateral account held for the benefit of the Lender), and (y) take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens granted to the Lender under the interim and/or final order of the Bankruptcy Court and Collateral) permitted under the DIP Credit Facility or under applicable law, including, without limitation, exercising any and all rights and remedies with respect to the Collateral or any portion thereof, subject only to satisfaction of a five-day notice requirement after occurrence of an Event of Default to be set forth in the orders of the Bankruptcy Court approving the DIP Credit Facility. Any automatic stay otherwise applicable to the Lender shall be modified so that five (5) days after the occurrence of the Termination Event the Lender shall be entitled to exercise all rights and remedies against the Collateral and shall be permitted to satisfy its liens and super-priority administrative expense claims, subject to the Carve-Out and the Permitted Liens. During such five-day period, Borrower shall be entitled to seek an emergency hearing. Unless the Bankruptcy Court determines otherwise during such five-day period, subject to tolling based on the Bankruptcy Court's earliest available date for such hearing, the interim and final orders approving the DIP Credit Facility shall provide that the automatic stay shall automatically be terminated without further application, motion, notice or order and the Lender permitted to exercise all remedies with regard to the Collateral. Until such hearing occurs, Borrower shall have the right to continue to use cash collateral as set forth in the Budget. |
| Conditions Precedent: | The DIP Credit Facility will be subject to:

(a) loan documents and certificates as are requested by Lender, in accordance with the terms set forth herein and otherwise in form reasonably acceptable to Lender; |



(b) entry of an order of the Bankruptcy Court approving the DIP Credit Facility on an interim basis and authorizing Borrower to enter into the DIP Credit Facility, execution of the documents described in this commitment letter, and pay all fees outlined hereunder;

(c) delivery of the Initial Budget to Lender, in form and substance reasonably acceptable to Lender;

(d) delivery of internally prepared unaudited financial statements to Lender for Borrower and its consolidated subsidiaries as of December 31, 2014, in form and substance reasonably acceptable to Lender; and

(e) since January 1, 2015, no material adverse change in the financial condition of Borrower.

The Company hereby agrees to reimburse or pay NSBC for all reasonable pre- and post-petition legal fees and expenses and documentation fees incurred in connection with the negotiation, preparation, execution and performance of the loan documents evidencing or otherwise relating to the DIP Credit Facility and all other reasonable out-of-pocket expenses (including, but not limited to, appraisal and audit fees) incurred by NSBC in connection with the negotiation, preparation, execution and performance of the loan documents.

The Company hereby agrees to indemnify and hold harmless NSBC and its subsidiaries, affiliates, directors, officers, employees, managers, agents, representatives, attorneys, consultants and advisors (each an "Indemnitee") from and against any and all claims, damages, liabilities, obligations, losses, penalties, actions, judgments, suits, costs, disbursements and expenses of any kind or nature (including reasonable fees and disbursements of counsel) which may be imposed on, incurred by or asserted against such Indemnitee in connection with, arising out of or in any manner relating to this commitment letter, the DIP Credit Facility or any act, event or transaction related or attendant to any thereof, or the use or intended use of the proceeds of the DIP Credit Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted for the Indemnitee's gross negligence or willful misconduct.

All legal aspects of the DIP Credit Facility, and of this commitment letter, shall be governed by and construed in accordance with the laws of the State of Texas.

This commitment letter is intended for you only and may not be disclosed to, discussed with or relied upon by, any third party, nor may you provide copies to any third party other than (i) your attorneys and advisors, (ii) the lenders under the Domestic Credit Facility and holders of Second Lien Notes (and their attorneys and advisors), and (iii) as required by applicable law. Notwithstanding the foregoing, following execution of this commitment letter by the Company, the Company shall be permitted to attach a summary and/or a copy of this commitment letter to any pre- or post-petition solicitation materials distributed in connection with the restructuring to be effectuated through the bankruptcy proceedings referenced herein. This commitment letter may not be assigned by Borrower and may not be amended, waived or modified, except in writing signed by NSBC and Borrower.

This commitment letter will be of no force and effect unless and until: (a) NSBC receives an initial expense deposit in the amount of $125,000 (to be applied by NSBC to out-of-pocket

Allen Systems Group, Inc.
Commitment Letter
Page 8

expenses relating to due diligence, collateral audit and documentation and negotiation of loan documents in connection with the DIP Credit Facility, including without limitation fees and expenses of counsel), and (b) a counterpart hereof is accepted and agreed to by the Company and received by NSBC on or prior to 5:00 p.m. Central Standard time on February 2, 2015. In the event that the DIP Credit Facility does not close, any expense deposit remaining after application to all out-of-pocket fees and expenses shall be promptly refunded to the Company. In the event that the DIP Credit Facility closes, any security deposit remaining after application to all out-of-pocket fees and expenses shall be credited to the Borrower's account.

The commitment of NSBC under this commitment letter, if timely accepted and agreed to by Borrower, will terminate as of the close of business of NSBC on February 23, 2015, if the initial borrowings under the DIP Credit Facility have not occurred on or prior to such date. All indemnities of the Company hereunder shall survive any such termination.

We look forward to working with you in the future. Thank you.

Sincerely,

**NEWSTAR BUSINESS CREDIT**

Greg Gentry
Senior Vice President

Accepted this __2ⁿᵈ__ day of February, 2015

ALLEN SYSTEMS GROUP, INC.

ASG FEDERAL, INC.

VIASOFT INTERNATIONAL, LLC

By: _____

Name: _Ernest Scheidemann_

Title: _EVP & CFO_

DAL 79428187v9

**EXHIBIT 3**

**Terms of Warrants**

| | |
|---|---|
| **Warrants** | The Warrants shall have the following terms and conditions:[8] |

---

| | |
|---|---|
| **Warrants Issued:** | The Company will issue warrants (the "***Warrants***") entitling Arthur Allen (the "***Holder***") to purchase 10% of the New Common Stock, assuming exercise of all Warrants, as of the Effective Date. |
| **Strike Price:** | The strike price of the Warrants (the "***Strike Price***") shall be based upon an assumed initial total enterprise value of the Company of $700 million and assumed equity valuations of $460 million, $490 million, $520 million and $550 million as of the plan effective date and first, second and third anniversaries of the Effective Date, respectively. |
| | Assuming 10 million shares of New Common Stock outstanding, not giving effect to the exercise of the Warrants, the Strike Price per share will be: |
| | • $46.00 from the Effective Date to the day prior to the first anniversary of the Effective Date; <br> • $49.00 from the first anniversary of the Effective Date to the day prior to the second anniversary of the Effective Date; <br> • $52.00 from the second anniversary of the Effective Date to the day prior to the third anniversary of the Effective Date; and <br> • $55.00 from the third anniversary of the Effective Date until expiration. |
| **Term:** | The Warrants will expire on the fourth anniversary of the Effective Date. |
| **Rights:** | The Holder will have no right to vote or to consent as a stockholder in respect of the meetings of stockholders or for the election of directors of the Company or any other matter, or any rights whatsoever as stockholder of the Company. |
| **Obligations:** | The Holder will be subject to the same obligations as those assumed by stockholders of the Company under the Company's articles of incorporation and bylaws (such as transfer restrictions), with such restrictions built into the warrant agreement. |
| **Adjustments:** | The Strike Price shall be increased by the per share amount of incremental capital invested in the Company (calculated taking into account the additional capital and additional shares issued, if any).  For avoidance of doubt, incremental capital shall exclude capital invested to repay already invested debt or equity. |
| | The Holder will also be entitled to adjustments to the Strike Price and the number of Warrants upon the subdivision or combination of the New Common Stock underlying the Warrants, upon the payment by the Company of dividends (or other distributions) on the outstanding New Common Stock of the Company payable in New Common Stock of the Company and upon a recapitalization, business combination or reorganization. |
| **Exercise; Payment of Exercise Price:** | The Warrants shall be exercisable, at the option of the Holder thereof, at any time and from time to time prior to the expiration date, in whole or in part, into New Common Stock, by delivering to the Company such Warrant(s), together with a notice of exercise of such Warrant(s).  The issuance of New Common Stock pursuant to the exercise of Warrants (collectively, the "***Warrant Common Shares***") shall be subject to payment in full by the Holder of the applicable Strike Price either (i) by delivery to the Company of a certified or official bank check or by wire transfer of immediately available funds in the amount of the aggregate Strike Price for such Warrant Common |

---

[8]    The definitive documents for the Warrants will be attached to the Plan Supplement.

Shares or (ii) if exercising in connection with a Sale Transaction (as defined below) or within thirty days of a Board Valuation (as defined below), by instructing the Company to withhold from the Warrant Common Shares issuable to the Holder upon such exercise a number of Warrant Common Shares (the "**Withheld Common Shares**") equal in value to the aggregate Strike Price payable with respect to such exercise.

A "**Board Valuation**" shall mean the fair market value per share of New Common Stock as determined by the Board of Directors of the Company (the "**Board**") in its sole discretion, provided that such determination shall be made in good faith, and provided further that such determination shall be final and shall be used solely for the purpose of determining the number of Withheld Common Shares and may not be disclosed to any other party and may not be relied upon by any other party for any purpose whatsoever.  The Holder shall have the right to demand that the Board make such a Board Valuation twice during the period beginning one year after the date of the AA Settlement Agreement and ending thirty (30) days prior to the expiration of the Warrants, and each such Board Valuation shall be valid for exercising the Warrants pursuant to clause (ii) above for thirty days after the date of the Board Valuation.  The number of Withheld Common Shares will be calculated based on such Board Valuation.

A "**Sale Transaction**" shall mean (i) a merger, consolidation or similar transaction in which the Company is not the surviving party or in which the holders of the New Common Stock of the Company immediately prior to such transaction represent less than 50% of the New Common Stock outstanding immediately following such transaction, (ii) the sale or other disposition of all or substantially all of the consolidated assets of the Company, or (iii) a sale, other disposition or issuance of 100% of the then outstanding New Common Stock.  The number of Withheld Common Shares will be calculated based on the fair market value implied by the consideration paid per share in the Sale Transaction (the "**Sale Price**").  Upon consummation of any Sale Transaction involving the sale or other disposition, solely for cash, of all of the outstanding New Common Stock or all or substantially all of the assets of the Company to a purchaser that is not, as of the date of this Agreement or as of the date of the Sale Transaction, an Affiliate of the Company, or a shareholder of the Company or any of its Affiliates, the Company shall pay (or cause to be paid) to the Holder of the Warrants, with respect to each unexercised Warrant outstanding prior to the closing of such Sale Transaction, cash in an amount equal to the excess, if any, of the Sale Price over the Strike Price, and such Warrants shall be terminated and canceled.

| | |
|---|---|
| **Transferability:** | Non-transferable. |
| **Governing Law:** | Delaware. |

2

**EXHIBIT 4**

**Rights Offering Backstop Agreement**

EXECUTION VERSION

BACKSTOP COMMITMENT AGREEMENT

AMONG

ALLEN SYSTEMS GROUP, INC.

AND

THE BACKSTOP PARTIES PARTY HERETO

Dated as of February 9, 2015

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................... 2

    Section 1.1    Definitions ................................................................. 2

    Section 1.2    Additional Defined Terms ........................................ 11

    Section 1.3    Construction ............................................................. 13

ARTICLE II BACKSTOP COMMITMENT ......................................................... 14

    Section 2.1    The Rights Offering ................................................. 14

    Section 2.2    The Backstop Commitment ...................................... 14

    Section 2.3    Backstop Party Default ............................................ 15

    Section 2.4    Funding Notice and Backstop Account Funding ..................................... 16

    Section 2.5    Closing .................................................................... 17

    Section 2.6    Designation and Assignment Rights ........................ 17

ARTICLE III PUT OPTION PREMIUM AND EXPENSE REIMBURSEMENT ..................... 18

    Section 3.1    Amounts Payable by the Company ........................... 18

    Section 3.2    Payment of Amounts ................................................ 19

    Section 3.3    Expense Reimbursement .......................................... 19

    Section 3.4    Cooperation ............................................................. 20

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE DEBTORS ................. 20

    Section 4.1    Organization and Qualification ................................ 20

    Section 4.2    Corporate Power and Authority ............................... 20

    Section 4.3    Execution and Delivery; Enforceability ................... 21

    Section 4.4    Authorized and Issued Capital Stock ....................... 21

    Section 4.5    Issuance ................................................................... 22

    Section 4.6    No Conflict .............................................................. 22

    Section 4.7    Consents and Approvals .......................................... 22

    Section 4.8    Arm's Length .......................................................... 23

    Section 4.9    Financial Statements ............................................... 23

    Section 4.10    Company Disclosure Documents ............................. 23

    Section 4.11    Absence of Certain Changes .................................... 23

    Section 4.12    Compliance with Laws ............................................ 23

    Section 4.13    Legal Proceedings .................................................. 23

    Section 4.14    Labor Relations ....................................................... 24

Section 4.15    Intellectual Property ................................................................. 24

Section 4.16    Title to Real and Personal Property ........................................... 25

Section 4.17    Reserved .................................................................................... 25

Section 4.18    Licenses and Permits ................................................................. 25

Section 4.19    Tax Matters ............................................................................... 25

Section 4.20    Company Plans .......................................................................... 27

Section 4.21    Internal Control Over Financial Reporting ................................ 28

Section 4.22    Reserved .................................................................................... 28

Section 4.23    Material Contracts ..................................................................... 28

Section 4.24    No Unlawful Payments .............................................................. 28

Section 4.25    Compliance with Money Laundering Laws ................................ 29

Section 4.26    Compliance with Sanctions Laws .............................................. 29

Section 4.27    No Broker's Fees ....................................................................... 29

Section 4.28    No Registration Rights .............................................................. 29

Section 4.29    Takeover Statutes ...................................................................... 29

Section 4.30    Insurance ................................................................................... 29

Section 4.31    Investment Company Act ........................................................... 30

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP
PARTIES ....................................................................................................... 30

Section 5.1    Incorporation .............................................................................. 30

Section 5.2    Power and Authority .................................................................... 30

Section 5.3    Execution and Delivery ............................................................... 30

Section 5.4    No Conflict .................................................................................. 30

Section 5.5    Consents and Approvals .............................................................. 31

Section 5.6    No Registration ........................................................................... 31

Section 5.7    Purchasing Intent ........................................................................ 31

Section 5.8    Sophistication; Investigation ....................................................... 31

Section 5.9    No Broker's Fees ......................................................................... 32

Section 5.10    Owned Claims ........................................................................... 32

Section 5.11    Sufficiency of Funds .................................................................. 32

Section 5.12    Legal Proceedings ..................................................................... 32

Section 5.13    Arm's Length ............................................................................. 33

ARTICLE VI ADDITIONAL COVENANTS ............................................................. 33

Section 6.1    Reserved ...................................................................................... 33

Section 6.2    Confirmation Order ..................................................................... 33

Section 6.3    Conduct of Business ................................................................. 33

Section 6.4    Antitrust Approval .................................................................. 34

Section 6.5    Access to Information ............................................................. 36

Section 6.6    Financial Information .............................................................. 36

Section 6.7    Reasonable Efforts ................................................................. 37

Section 6.8    Exit Facilities ........................................................................ 38

Section 6.9    New Board ............................................................................ 38

Section 6.10    Blue Sky ............................................................................. 38

Section 6.11    No Integration; No General Solicitation ................................... 38

Section 6.12    Reserved ............................................................................. 38

Section 6.13    Use of Proceeds ................................................................... 38

Section 6.14    Share Legend ...................................................................... 39

Section 6.15    Cooperation Regarding Corporate and Tax Planning .................. 39

Section 6.16    WARN Act Compliance ......................................................... 39

Section 6.17    Management Incentive Plan .................................................... 39

Section 6.18    Registration Rights Agreement ............................................... 39

ARTICLE VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES ........................ 39

Section 7.1    Conditions to the Obligations of Each of the Parties .................... 39

Section 7.2    Conditions to the Obligations of the Backstop Parties .................. 40

Section 7.3    Waiver of Conditions to Obligation of Backstop Parties ............... 42

Section 7.4    Conditions to the Obligation of the Company ............................. 42

ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION ..................................... 43

Section 8.1    Indemnification Obligations ................................................... 43

Section 8.2    Indemnification Procedure ..................................................... 44

Section 8.3    Settlement of Indemnified Claims ............................................ 45

Section 8.4    Contribution ........................................................................ 45

Section 8.5    Treatment of Indemnification Payments .................................... 46

Section 8.6    No Survival ......................................................................... 46

ARTICLE IX TERMINATION ........................................................................ 46

Section 9.1    Termination Rights ............................................................... 46

Section 9.2    Effect of Termination ............................................................ 49

ARTICLE X GENERAL PROVISIONS .............................................................. 49

Section 10.1    Notices .............................................................................. 49

Section 10.2    Assignment; Third Party Beneficiaries ..................................... 50

Section 10.3   Prior Negotiations; Entire Agreement ......................................................... 50

Section 10.4   Governing Law; Venue ................................................................................. 51

Section 10.5   Waiver of Jury Trial ..................................................................................... 51

Section 10.6   Counterparts ................................................................................................. 52

Section 10.7   Waivers and Amendments; Rights Cumulative ............................................ 52

Section 10.8   Headings ...................................................................................................... 52

Section 10.9   Specific Performance ................................................................................... 52

Section 10.10  Damages ...................................................................................................... 53

Section 10.11  No Reliance .................................................................................................. 53

Section 10.12  Publicity ...................................................................................................... 53

Section 10.13  Settlement Discussions ................................................................................ 53

# BACKSTOP COMMITMENT AGREEMENT

THIS BACKSTOP COMMITMENT AGREEMENT (this "**Commitment Agreement**"), dated as of February 9, 2015, is made by and among Allen Systems Group, Inc. "**ASG**" and its subsidiaries ASG Federal Inc. and Viasoft International, LLC (together with ASG, the "**Company**" or the "**Debtors**"), on the one hand, and the Backstop Parties set forth on Schedule 1 hereto (each referred to herein, individually, as a "**Backstop Party**" and, collectively, as the "**Backstop Parties**"), on the other hand.  Each Debtor and each Backstop Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

## RECITALS

WHEREAS, the Consenting Creditors (as defined in that certain Restructuring Support Agreement, dated as of January 13, 2015 (the "**RSA**")), among the Company, Consenting Creditors, and Arthur L. Allen) have engaged in arm's length, good-faith discussions regarding the reorganization of the Company (collectively, the "**Restructuring**") pursuant to a chapter 11 plan of reorganization consistent with the term sheet attached as Exhibit A to the RSA (as such term sheet may be modified in accordance with the RSA, the "**Plan Term Sheet**");

WHEREAS, the Company and the Consenting Creditors have negotiated the terms of the Debtors' Joint Prepackaged Chapter 11 Plan (the "**Plan**"), to which this Commitment Agreement is annexed as an Exhibit, and, pursuant to the RSA, certain of the Consenting Creditors agreed to Backstop the Rights Offering on the terms and conditions set forth herein;

WHEREAS, the Debtor and the Consenting Creditors (which also comprise the Backstop Parties) have entered into the RSA, which (a) provides for the restructuring of the Debtors' capital structure and financial obligations pursuant to a "prepackaged" or "prenegotiated" plan of reorganization to be filed in jointly administered cases (the "**Chapter 11 Cases**") under Title 11 of the United States Code, 11 U.S.C. §§ 101- 1532, as may be amended from time to time (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), implementing the terms and conditions of the Plan Term Sheet and (b) requires that such plan of reorganization be consistent with the RSA and otherwise in form and substance mutually acceptable to the Company and the Consenting Creditors;

WHEREAS, the Debtors plan to file with the Bankruptcy Court, in accordance with the terms of the RSA, one or more motions seeking entry of an order approving the Disclosure Statement and confirming the Plan pursuant to Section 1129 of the Bankruptcy Code and authorizing the consummation of the transactions contemplated by the Restructuring (the "**Confirmation Order**");

WHEREAS, in connection with the transactions contemplated by the Plan and the Restructuring, each Backstop Party has entered into this Commitment Agreement and become a party hereto and has agreed (on a several and not joint basis) in connection with a $130,000,000 (the "**Rights Offering Amount**") Rights Offering of New Common Stock, to purchase (x) its *pro rata* portion of the Primary Initial Shares, based upon the proportion of Notes Claims held by

such Backstop Party to the aggregate principal amount of all Notes Claims and (y) its Backstop Commitment Percentage of the Unsubscribed Shares, if any.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the Parties hereby agrees as follows:

# ARTICLE I

# DEFINITIONS

Section 1.1    Definitions.  Except as otherwise provided herein, capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Plan. Except as otherwise provided in this Commitment Agreement, whenever used in this Commitment Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code (including any Affiliated Funds of such Person); provided, that for purposes of this Commitment Agreement, no Backstop Party shall be deemed an Affiliate of the Company.

"**Affiliated Fund**" means any investment fund, the fund manager, primary investment advisor, sub-advisor or similar such party to which such Backstop Party is an Affiliate thereof.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Unit having jurisdiction pursuant to the Antitrust Laws.

"**Antitrust Laws**" mean the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, and any other Law governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct.

"**Available Shares**" means the Backstop Shares that any Backstop Party fails to purchase as a result of a Backstop Party Default by any Backstop Party.

"**ASG Bylaws**" means the amended and restated bylaws of ASG as of the Closing Date, which shall be substantially consistent with the terms set forth in the Plan and otherwise be in form and substance reasonably satisfactory to the Required Backstop Parties.

"**ASG Certificate of Incorporation**" means the amended and restated certificate of incorporation of ASG as of the Closing Date, which shall be substantially consistent with the terms set forth in the Plan (or any supplement thereto) and otherwise be in form and substance reasonably satisfactory to the Required Backstop Parties.

2

"**Backstop Account**" means the account established pursuant hereto pursuant to which Backstop Parties are required to fund the Cash portion of their respective Backstop Payment Amounts.

"**Backstop Commitment Percentage**" means, with respect to any Backstop Party, such Backstop Party's percentage of the Backstop Commitment as set forth opposite such Backstop Party's name under the column titled "Backstop Commitment Percentage" on Schedule 1 (as it may be amended, supplemented or otherwise modified from time to time in accordance with this Commitment Agreement).

"**Backstop Party Default**" means the failure by any Backstop Party to (a) deliver and pay the aggregate Purchase Price for such Backstop Party's Backstop Shares by the Rights Offering Backstop Payment Date in accordance with Section 2.4(b) or (b) exercise its Initial Subscription Rights and purchase such Backstop Party's Primary Initial Shares by the Subscription Deadline pursuant to, in accordance with, and as required by the Plan and Section 2.1.

"**Backstop Payment Amount**" has the meaning set forth in the Plan.

"**Backstop Shares**" means the Unsubscribed Shares that may be issued and sold by Reorganized ASG to the Backstop Parties in accordance with their respective Backstop Commitment Percentages pursuant to this Commitment Agreement.

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Claim**" means any "claim" against the Debtors as defined in section 101(5) of the Bankruptcy Code.

"**Collective Bargaining Agreements**" means any and all written agreements, memoranda of understanding, contracts, letters, side letters and contractual obligations of any kind, nature and description, that have been entered into between, or that involve or apply to, any employer and any Employee Representative.

"**Company Disclosure Documents**" means all of the reports, schedules, forms, statements and other documents (including the Financial Statements, exhibits and other information incorporated therein) posted by the Company to the Investor Website or otherwise provided to or made available to the Consenting Creditors or their advisors on or prior to the date hereof.

"**Company Disclosure Schedules Date**" means the date on which the Plan Supplement is filed.

"**Company Disclosure Schedules**" means the disclosure schedules for the DIP Facility and such additional schedules as reasonably requested by the Required Backstop Parties delivered by the Company to the Backstop Parties on or prior to the Company Disclosure Schedules Date, in form and substance reasonably satisfactory to the Requisite Backstop Parties.

3

"**Company Plans**" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA and all other material compensation and benefits plans, policies, programs, arrangements or payroll practices, and each other material equity compensation, severance, retention, change-of-control, collective bargaining, bonus, incentive, deferred compensation, employee loan, retirement, fringe benefit and other benefit plan, agreement, program, policy, commitment or other arrangement, whether or not subject to ERISA (including any related funding mechanism now in effect or required in the future), whether formal or informal, oral or written, in each case, that is sponsored, maintained, contributed to or required to be contributed to by the Company or any of its Subsidiaries, or under which the Company or any of its Subsidiaries has any current or potential liability.

"**Confirmation Order**" means the Order to be entered by the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and authorizing all of the transactions and agreements contemplated by the Plan, in form and substance reasonably satisfactory to the Required Backstop Parties.

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, binding letter of intent, binding memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding any Company Plan and the Plan.

"**Cover Transaction**" means a circumstance in which the Company funds all or a portion of the Deficiency Amount through available cash and/or the Company arranges for the sale of all or any portion of the Available Shares to any other Person, in each case during the Cover Transaction Period.

"**Cover Transaction Period**" means the seven (7) day period following expiration of the Backstop Party Replacement Period.

"**Defaulting Backstop Party**" means, at any time, any Backstop Party that caused a Backstop Party Default that is continuing at such time.

"**Deficiency Amount**" means the difference between (x) the Rights Offering Amount and (y) the aggregate amount on deposit in the Rights Offering Accounts, calculated as of the first (1st) Business Day following the expiration of the Backstop Party Replacement Period (after giving effect to a Backstop Party Replacement).

"**DIP Facility**" has the meaning set forth in the Plan.

"**DIP Facility Documents**" has the meaning set forth in the Plan.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan approved pursuant to the Confirmation Order (including all exhibits and schedules thereto), in form and substance reasonably satisfactory to the Required Backstop Parties.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

4

"**Event**" means any event, development, occurrence, circumstance or change.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Exit Facilities**" has the meaning set forth in the Plan.

"**Expense Reimbursement**" has the meaning set forth in <u>Section 3.3</u>.

"**Final Order**" has the meaning set forth in the Plan; <u>provided</u> that, upon mutual written agreement, the Company and the Required Backstop Parties may deem an order or judgment to be a "Final Order" for purposes hereof.

"**Financial Statements**" means the consolidated financial statements of the Company as of and for the fiscal year ended December 31, 2013, audited by Grant Thornton LLP, as of and for the nine-month period ended September 30, 2014, reviewed by Grant Thornton LLP, as of and for the fiscal year ended December 31, 2014, audited by an independent public accounting firm, upon the availability of such statements, and as of and for any quarter upon the availability of such statements, each as posted to the Investor Website.

"**First Lien Revolving Loan Exit Facility**" has the meaning set forth in the Plan.

"**General Rights Offering Account**" means the account established pursuant to the Rights Offering Procedures pursuant to which Rights Offering Investors are required to fund the Cash portion of the Subscription Payment Amount and Oversubscription Payment Amount corresponding to Subscription Rights.

"**Governmental** Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Indenture Trustee**" means The Bank of New York Mellon Trust Company, N.A., as trustee (together with its successors and assigns) for the Notes.

"**Initial Subscription Rights**" has the meaning set forth in the Plan.

"**Investor Website**" means the password-protected internet dataroom website on which the Company has made the Financial Statements and other reports prepared pursuant to the Notes Indenture available to the Backstop Parties or their advisors.

"**Intellectual Property**" means all U.S. or foreign intellectual or industrial property or proprietary rights, including any: (i) trademarks, service marks, trade dress, domain names, social media identifiers, corporate and trade names, logos and all other indicia of source or origin, together with all associated goodwill, (ii) patents, inventions, invention disclosures, technology, know-how, processes and methods, (iii) copyrights and copyrighted works, (including software, applications, source and object code, databases and compilations, online,

5

advertising and promotional materials, mobile and social media content and documentation), (iv) trade secrets and confidential or proprietary information or content, and (v) all registrations, applications, renewals, re-issues, continuations, continuations-in-part, divisions, extensions, re-examinations and foreign counterparts of any of the foregoing.

"**IRS**" means the United States Internal Revenue Service.

"**Joint Holder**" has the meaning set forth in the Plan.

"**Joint Offset**" has the meaning set forth in the Plan.

"**Knowledge of the Company**" means the knowledge, after reasonable inquiry, of any of the following members of ASG's management team: ASG's Chief Restructuring Officer and President, Chief Financial Officer and General Counsel.

"**Law**" means any law, statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Unit.

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Material Adverse Effect**" means any Event which individually, or together with all other Events, has had or could reasonably be expected to have a material adverse effect on the (i) business, assets, capitalization, liabilities, finances, properties, results of operations, or condition (financial or otherwise) or the prospects for the five year forecast period of the Company, individually, or the Company and its Subsidiaries, taken as a whole, (ii) the projections included in the Disclosure Statement approved by the Confirmation Order or (iii) the ability of the Company, individually, or the Company and its Subsidiaries, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, this Commitment Agreement, the RSA or the Plan, including the Rights Offering, it being understood that any public announcement by any Governmental Unit that the Company or any of its senior management is a target of, has been indicted by, or any criminal action is being pursued against the Company or any of its senior management by any Governmental Unit, or any Governmental Unit pursues any indictment of, or any criminal action against, the Company or any of its senior management (in each case including only activities directly related to ASG or activities chargeable as a felony or as a crime involving moral turpitude), shall constitute a Material Adverse Effect on the Company; provided that no Event primarily arising or resulting from the announcement, filing and/or prosecution of the Chapter 11 Cases shall constitute a Material Adverse Effect.

"**Material Entity**" means ASG and any Subsidiary of ASG that is a "significant subsidiary" as defined in Rule 1-02(w) of Regulation S-X promulgated pursuant to the Exchange Act.

"**Management Incentive Plan**" has the meaning set forth in the Plan.

"**New Board**" has the meaning set forth in the Plan.

"**New Common Stock**" means the new common stock of Reorganized ASG.

"**Notes Claims**" means the Claims on account of the Notes.

"**Notes**" means the $300,000,000 in aggregate principal amount 10.5% senior secured second-lien notes issued pursuant to the Notes Indenture.

"**Notes Indenture**" means that certain Indenture dated November 22, 2010 (as amended, supplemented or otherwise modified from time to time) by and among ASG, as issuer, the guarantors party thereto, and the Indenture Trustee, as trustee.

"**Order**" means any judgment, order, award, injunction, writ, or decree of any Governmental Unit or arbitrator.

"**Oversubscription Payment Amount**" has the meaning set forth in the Plan.

"**Oversubscription Rights**" has the meaning set forth in the Plan.

"**Owned Claims**" means those Claims beneficially owned by any Backstop Party or of which such Backstop Party is the nominee, investment manager, advisor or sub-advisor for the beneficial owners of such Claims, as reflected on Schedule 2 attached hereto.

"**Owned Real Property**" means all real property and interests in real property owned, in whole or in part, directly or indirectly by ASG and its Subsidiaries, together with all buildings, fixtures and improvements located thereon, and all appurtenances thereto.

"**Permitted Liens**" means (i) Liens for Taxes, assessments, and other governmental levies, fees or charges that (A) are not due and payable or (B) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (ii) mechanics liens, rights of set off of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen, customs brokers or agencies, suppliers and materialmen and similar liens for labor, materials or supplies provided with respect to any Owned Real Property or personal property, in each case incurred in the ordinary course of business consistent with past practice and as otherwise not prohibited under this Commitment Agreement, for amounts that (A) do not materially detract from the value of, or materially impair the use of, any of the Owned Real Property or personal property of the Company or any of its Subsidiaries or (B) are being contested in good faith by appropriate proceedings; (iii) zoning, building codes and other land use Laws regulating the use or occupancy of any Owned Real Property or the activities conducted thereon that are imposed by any Governmental Unit having jurisdiction over such real property; provided, that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Owned Real Property; (iv) minor deficiencies in title, survey exceptions, easements, covenants, conditions, restrictions and other similar matters affecting title to any Owned Real Property and other title defects that do not or would not materially impair the use or occupancy of such real property or the operation of the Company's or any of its Subsidiaries' business; (v) Liens that affect Owned Real Property, the underlying fee interest of any Real Property Lease, or tangible personal property that do not materially impair the use of such property in the ordinary course of the Company's or any of its Subsidiaries' business, as currently conducted; (vi) all licenses, agreements, settlements, consents, and covenants not to assert, including licenses of or grants of rights to use Intellectual Property, in each case that were entered into in the ordinary course of business consistent with past practice; (vii) the interests of

7

lessors under operating leases and licensors under license agreements; (viii) Liens on amounts deposited to secure the Company's and its Subsidiaries' obligations in connection with workers' compensation insurance unemployment insurance or other types of social security; (ix) Liens on amounts deposited to secure the Company's and its Subsidiaries' obligations in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money, purchase money security interests and Liens arising in connection with the sales, transfers, dispositions and factoring of accounts receivable; (x) Liens on amounts deposited to secure the Company's and its Subsidiaries' obligations with respect to statutory obligations, surety and customs bonds, statutory bonds, government contracts, trade contracts, completion and performance guarantees, performance bonds, stay or appeal bonds, progress payments and other similar obligations incurred in the ordinary course of business; (xi) Liens in connection with subsurface mineral and oil and gas rights that do not materially interfere with or impair the use or operation thereof; (xii) on or after the occurrence of the Plan Effective Date, Liens granted in connection with or permitted under the documentation governing the Exit Facilities and any other proposed exit financing facility; (xiii) Liens granted on assets not to exceed $500,000 in value that are not reasonably expected to materially interfere with the operation of the Post-Effective Date Business; (xiv) Liens reinstated under the terms of the Plan with the consent of the Required Consenting Creditors; and (xv) Liens that, pursuant to the Confirmation Order, will not survive beyond the Plan Effective Date.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, associate, trust, Governmental Unit or other entity or organization.

"**Petition Date**" has the meaning set forth in the Plan.

"**Plan Documents**" means the Plan, the Disclosure Statement and the written agreements, documents, contracts, letters, side letters, and contractual obligations included in the Plan Supplements.

"**Plan Supplement**" has the meaning set forth in the Plan.

"**Plan Effective Date**" means the Effective Date (as defined in the Plan).

"**Primary Initial Shares**" means the New Common Stock issuable by ASG upon exercise of Initial Subscription Rights in the Rights Offering and payment of the Subscription Payment Amount.

"**Primary Shares**" means the New Common Stock issuable by ASG upon exercise of Subscription Rights (including the Primary Initial Shares and Rights Offering Stock sold pursuant to Oversubscription Rights) in the Rights Offering and payment of the Subscription Payment Amount and Oversubscription Payment Amount, as applicable.

"**Post-Effective Date Business**" means the businesses, assets and properties of the Company and its Subsidiaries, taken as a whole, as of the Plan Effective Date after giving effect to the Restructuring and the other transactions contemplated by the Plan.

"**Purchase Price**" means, as to any Backstop Party, the purchase price to be paid for Rights Offering Stock purchased by such Backstop Party, including the Subscription Payment Amount, the Oversubscription Payment Amount (if applicable) and the Backstop Payment Amount.  To the extent that a Backstop Party is a Joint Holder, such Backstop Party may pay the applicable Purchase Price by way of a Joint Offset.

"**Real Property Leases**" means those leases, subleases, licenses, concessions and other agreements, as amended, modified or restated, pursuant to which the Company or one of its Subsidiaries holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, any land, buildings, structures, improvements, fixtures or other interest in real property used in the Company's or its Subsidiaries' business.

"**Registration Rights Agreement**" has the meaning set forth in the Plan.

"**Related Party**" means, with respect to any Person, (i) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of such Person and (ii) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing.

"**Reorganized ASG**" means ASG, on and after the Plan Effective Date, as reorganized pursuant to the confirmed Plan.

"**Reorganized ASG Corporate Documents**" means the ASG Bylaws, the ASG Certificate of Incorporation and the bylaws and certificate of incorporation (or comparable constituent documents) of any Subsidiaries of ASG, each in form and substance reasonably satisfactory to the Required Consenting Creditors.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, limited partners, general partners, shareholders, managers, management company, investment manager, affiliates, employees, agents, investment bankers, attorneys, accountants, advisors, financial advisor and other Professionals of such Person, in each case, in such capacity, serving on or after the date hereof and other representatives.

"**Required Backstop Parties**" means Backstop Parties holding a majority in the aggregate of the Backstop Commitment.

"**Rights Offering**" means the rights offering of the Rights Offering Amount of Rights Offering Stock to be offered to the Eligible Holders of Notes Claims as of the Rights Offering Record Date, the terms of which are set forth in Section 4.5 of the Plan.

"**Rights Offering Amount**" means an amount equal to $130,000,000.

"**Rights Offering Accounts**" means, collectively, the Backstop Account and the General Rights Offering Account established in accordance with Section 2.4.

"**Rights Offering Investors**" has the meaning set forth in the Plan.

9

"**Rights Offering Procedures**" means the procedures with respect to the Rights Offering , which procedures shall be consistent with the Plan and otherwise in form and substance reasonably satisfactory to the Company and the Required Backstop Parties.

"**Rights Offering Procedures Order**" means an Order entered by the Bankruptcy Court, in form and substance reasonably satisfactory to the Required Backstop Parties, approving the Rights Offering Procedures.

"**Rights Offering Stock**" has the meaning set forth in the Plan.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Solicitation Materials**" means the solicitation materials in respect of the Plan and the Rights Offering Procedures, in form and substance reasonably satisfactory to the Required Backstop Parties.

"**Stockholders Agreement**" has the meaning set forth in the Plan.

"**Subscription Agent**" means Epiq Systems, Inc. or another similar entity appointed by the Company and reasonably satisfactory to the Required Backstop Parties.

"**Subscription Form**" means, collectively, the subscription form and subscription agreement to be distributed to Eligible Holders of Notes Claims pursuant to which Eligible Holders of Notes Claims may exercise their Subscription Rights.

"**Subscription Rights**" has the meaning set forth in the Plan.

"**Subscription Payment Amount**" has the meaning set forth in the Plan.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (i) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (ii) has the power to elect a majority of the board of directors or similar governing body or (iii) has the power to direct the business and policies.

"**Takeover Statute**" means any restrictions contained in any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Taxes**" means (i) any and all federal, state, provincial, local, foreign and other taxes, levies, fees, imposts, duties, and similar governmental charges (including any interest, fines, assessments, penalties or additions to tax imposed in connection therewith or with respect thereto) including (x) taxes imposed on, or measured by, income, franchise, profits or gross

10

receipts, and (y) ad valorem, value added, capital gains, sales, goods and services, use, real or personal property, capital stock, license, branch, payroll, estimated withholding, employment, social security (or similar), unemployment, compensation, utility, severance, production, excise, stamp, occupation, premium, windfall profits, transfer and gains taxes, and customs duties, (ii) any and all liability for the payment of any items described in clause (i) above as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary or aggregate group (or being included (or being required to be included) in any Tax Return related to such group and (iii) any and all liability for the payment of any amounts as a result of any express or implied obligation to indemnify any other person, or any successor or transferee liability, in respect of any items described in clause (i) or (ii) above.

"**Tax Returns**" means any and all reports, returns, declarations, claims for refund, elections, disclosures, estimates, information reports or returns or statements required to be supplied to a Governmental Unit in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"**Transfer**" means sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of.

"**Treasury Regulations**" means the Treasury regulations promulgated under the Tax Code.

"**Unsubscribed Shares**" means the shares of Rights Offering Stock that have not been duly purchased by the Rights Offering Investors pursuant to Subscription Rights (including pursuant to any Oversubscription Rights) in accordance with the Rights Offering Procedures and the Plan.

"**Warrants**" has the meaning set forth in the Plan.

Section 1.2    Additional Defined Terms.  In addition to the terms defined in Section 1.1, additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated in the table below.

| **Term** | **Section** |
| --- | --- |
| Applicable Consent | 4.7 |
| ASG | Preamble |
| Backstop Commitment | 2.2 |
| Backstop Parties | Preamble |
| Backstop Party | Preamble |
| Backstop Party Replacement | 2.3(a) |
| Backstop Party Replacement Period | 2.3(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Chapter 11 Cases | Recitals |
| Closing | 2.5(a) |
| Closing Date | 2.5(a) |
| Commitment Agreement | Preamble |

11

| **Term** | **Section** |
|---|---|
| Company | Preamble |
| Confirmation Order | Recitals |
| Debtors | Preamble |
| Employee Representatives | 4.14(a) |
| Expense Reimbursement | 3.3 |
| FCPA | 4.24 |
| Filing Party | 6.4(b) |
| Financial Reports | 6.6(a) |
| Foreign Benefit Plans | 4.20(f) |
| Funding Notice | 2.4(a) |
| GAAP | 4.9 |
| Indemnified Claim | 8.2 |
| Indemnified Person | 8.1 |
| Indemnifying Party | 8.1 |
| Infringed | 4.15 |
| Joint Filing Party | 6.4(c) |
| Legal Proceedings | 4.13 |
| Legend | 6.14 |
| Long Pole Jurisdiction | 6.4(f) |
| Losses | 8.1 |
| Material Contract | 4.23 |
| MIP Shares | 6.17 |
| Money Laundering Laws | 4.25 |
| Non-Waiving Backstop Parties | 7.3 |
| OFAC | 4.26 |
| Outside Date | 9.1(f) |
| Parties | Preamble |
| Party | Preamble |
| Plan | Recitals |
| Plan Term Sheet | Recitals |
| Pre-Closing Period | 6.3 |
| Put Option | 2.2 |
| Put Option Premium | 3.1 |
| Regulation S | 5.8 |
| Related Purchaser | 2.6(a) |
| Replacing Backstop Parties | 2.3(a) |
| Restructuring | Recitals |
| Rights Offering Amount | Recitals |
| RSA | Recitals |
| Sanction Persons | 4.26 |
| Sanctions | 4.26 |
| Waiving Backstop Parties | 7.3 |
| WARN Act | 4.14(c) |

Doc#: US1:9815113v12

Section 1.3    Construction.

(a)    In this Commitment Agreement, unless the context otherwise requires:

(i)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Commitment Agreement;

(ii)    the descriptive headings of the Articles and Sections of this Commitment Agreement are inserted for convenience only, do not constitute a part of this Commitment Agreement and shall not affect in any way the meaning or interpretation of this Commitment Agreement;

(iii)    references in this Commitment Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(iv)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(v)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Commitment Agreement, shall refer to this Commitment Agreement as a whole, including all Exhibits and Schedules attached to this Commitment Agreement, and not to any provision of this Commitment Agreement;

(vi)    the term this "Commitment Agreement" shall be construed as a reference to this Commitment Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(vii)    "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(viii)    references to "day" or "days" are to calendar days;

(ix)    references to "the date hereof" means as of the date of this Commitment Agreement;

(x)    unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder in effect on the date of this Commitment Agreement; and

(xi)    references to "dollars" or "$" are to United States of America dollars.

13

(b)    This Commitment Agreement is the product of extensive discussions and negotiations between and among the Debtors, the Backstop Parties and certain other creditors and constituencies.  Each of the foregoing was represented by counsel, who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, this Commitment Agreement and the documents ancillary hereto.  Accordingly, the general rule of contract construction known as "contra preferentem" shall not apply to the construction or interpretation of any provision of this Commitment Agreement or any contract, instrument, release, indenture, exhibit, or other agreement or document generated in connection herewith.

## ARTICLE II

## BACKSTOP COMMITMENT

Section 2.1    The Rights Offering.  On the terms and subject to the conditions hereof, (a) the Company shall conduct the Rights Offering pursuant to and in accordance with the Rights Offering Procedures, this Commitment Agreement, and the Plan; and (b) in connection with the Rights Offering, each Backstop Party agrees, severally and not jointly, to exercise its Initial Subscription Rights and shall purchase, and ASG agrees to issue and sell to such Backstop Party and shall sell to such Backstop Party, on the Closing Date, all of such Backstop Party's Primary Initial Shares at such Backstop Party's Subscription Payment Amount. The Subscription Payment Amount for each Backstop Party's Primary Initial Shares is set forth opposite such Backstop Party's name under the column titled "Subscription Payment Amount" on Schedule 1.  Each Backstop Party may, in its sole discretion, but shall not be required to, exercise its Oversubscription Rights.  To the extent that a Backstop Party is a Joint Holder, such Backstop Party may pay the Subscription Payment Amount and the Oversubscription Payment Amount, if applicable, by way of a Joint Offset.  On or before the Subscription Deadline, each Backstop Party shall pay the Subscription Payment Amount by a Joint Offset, if applicable, or by wire transfer of immediately available funds in U.S. dollars into the General Rights Offering Account.  The funds in the Rights Offering Accounts shall be paid to the Debtors at Closing or, if the Closing does not occur, shall be returned to the applicable Backstop Parties, as set forth in the Plan.

Section 2.2    The Backstop Commitment.  On the terms and subject to the conditions hereof, each Backstop Party hereby grants to the Company an option (collectively, the "Put Option") to require such Backstop Party to purchase all Unsubscribed Shares on the Closing Date subject to the terms and conditions of this Commitment Agreement. Upon the exercise of the Put Option, each Backstop Party agrees, severally and not jointly, to purchase and shall purchase, and ASG agrees to issue and sell to such Backstop Party and shall sell to such Backstop Party, on the Closing Date and for the applicable Purchase Price, the number of Unsubscribed Shares equal to such Backstop Party's Backstop Commitment Percentage of the total amount of Unsubscribed Shares, rounded between the Backstop Parties solely to avoid fractional shares (such obligation to purchase the Unsubscribed Shares, the "**Backstop Commitment**"); provided that in no event shall the Unsubscribed Shares each Backstop Party is committing to purchase include those Primary Initial Shares that were not purchased in the Rights Offering by a Defaulting Backstop Party upon the occurrence of a Backstop Party

14

Default, except insofar as and only to the extent that a Backstop Party exercises its Oversubscription Rights.

On or before the Rights Offering Backstop Notification Date, the Company shall exercise the Put Option by delivery to each Backstop Party of a written put election notice ("**Put Notice**"); provided, that the Put Option shall automatically and irrevocably be deemed to have been exercised in full by the Company on the Rights Offering Backstop Notification Date, without the need for delivery of written notice or the taking of any further action by the Company or any other Person, if no violation of the conditions set forth in Sections 7.2(a) and 7.2(b) exists that has not been waived in accordance with this Commitment Agreement. On or before the Rights Offering Backstop Notification Date, the Put Notice shall be delivered by the Company, or other written notice shall be delivered by the Company or Subscription Agent, to each Backstop Party notifying such Backstop Party in writing of the amount of Unsubscribed Shares such Backstop Party must purchase pursuant to its Backstop Commitment. On or before the Rights Offering Backstop Payment Date, each Backstop Party shall pay its Backstop Payment Amount by a Joint Offset, if applicable, or by wire transfer of immediately available funds in U.S dollars into the Backstop Account. The funds in the Rights Offering Accounts shall be paid to the Debtors at Closing, or, if the Closing does not occur, shall be returned to the applicable Backstop Parties, as set forth in the Plan.

Section 2.3    Backstop Party Default.

(a)    Upon the occurrence of a Backstop Party Default, the Backstop Parties (other than any Defaulting Backstop Party) shall have the right, but shall not be obligated to, within five (5) Business Days after receipt of written notice from the Company to all Backstop Parties of such Backstop Party Default (which notice shall be given promptly following the occurrence of such Backstop Party Default and substantially concurrently to all Backstop Parties) (such five (5) Business Day period, the "**Backstop Party Replacement Period**") to request that one or more of the Backstop Parties (other than the Defaulting Backstop Party) purchase all or any portion of the Available Shares at the Purchase Price (any such purchase, a "**Backstop Party Replacement**") on the terms and subject to the conditions set forth in this Commitment Agreement and in such amounts based upon the applicable Backstop Commitment Percentage with respect to such Replacing Backstop Party, or as may otherwise be agreed upon by the Company and all of the Backstop Parties electing to purchase all or any portion of the Available Shares (such Backstop Parties, the "**Replacing Backstop Parties**"). The Backstop Parties are not obligated to provide a Backstop Party Replacement unless a Backstop Party affirmatively consents in writing. Any such Available Shares purchased by a Replacing Backstop Party shall be included in the determination of (y) the Backstop Shares of such Replacing Backstop Party for all purposes hereunder and (z) the Backstop Commitment Percentage of such Backstop Party for all purposes hereunder, including for purposes of Section 3.1. Any such Available Shares not purchased by a Defaulting Backstop Party shall be removed in the determination of (x) the Backstop Shares of such Defaulting Backstop Party for all purposes hereunder and (y) the Backstop Commitment Percentage of such Defaulting Backstop Party for all purposes hereunder, including for purposes of Section 3.1 and the definition of Required Backstop Parties. If a Backstop Party Default occurs, the Closing and the Outside Date shall be delayed only to the extent necessary to allow for (A) the Backstop Party Replacement to be completed within the Backstop Party Replacement Period or (B) the consummation of a

15

Cover Transaction within the Cover Transaction Period. If the Backstop Party Replacement has not been consummated upon expiration of the Backstop Party Replacement Period, and a Cover Transaction has not been consummated prior to the expiration of the Cover Transaction Period, each Backstop Party may terminate its obligations under this Commitment Agreement by written notice to ASG, or this Commitment Agreement may be terminated by ASG by written notice to each Backstop Party.

(b)    If a Backstop Party is or becomes a Defaulting Backstop Party, it shall be in breach of this Commitment Agreement and shall not be entitled to the Put Option Premium hereunder and shall pay its portion of the Put Option Premium (to the extent received from the Debtors) (i) if a Backstop Party Replacement has been consummated, to the Replacing Backstop Parties (if any) *pro rata* based upon the number of Available Shares purchased by each such Replacing Backstop Party within one (1) Business Day after receiving written notice by the Company or any other Backstop Party of the consummation of such Backstop Party Replacement, or (ii) if this Commitment Agreement has been terminated pursuant to Section 2.3(a) due to such Backstop Party's Backstop Party Default, to the Company promptly upon receipt of written notice by the Company or any other Backstop Party of such termination.

(c)    Nothing in this Commitment Agreement shall be deemed to require a Backstop Party to purchase more than its Backstop Commitment Percentage of the Unsubscribed Shares.

(d)    Subject to Section 10.10, no provision of this Commitment Agreement shall relieve any Defaulting Backstop Party from liability hereunder in connection with such Defaulting Backstop Party's Backstop Party Default.

Section 2.4    Funding Notice and Backstop Account Funding.

(a)    Funding Notice. No later than the Rights Offering Backstop Notification Date, the Company, or the Subscription Agent on behalf of the Company, shall deliver to each Backstop Party a written notice (the "**Funding Notice**") of (i) the aggregate number of shares of Rights Offering Stock elected to be purchased by the Rights Offering Investors and the aggregate Subscription Payment Amount and Oversubscription Payment Amount, if any, therefor; (ii) the aggregate number of Unsubscribed Shares, if any, and the aggregate Purchase Price therefor; (iii) the number of Backstop Shares to be issued and sold by ASG to such Backstop Party in accordance with Section 2.2 and the aggregate Purchase Price therefor; and (iv) the wire instructions for the Backstop Account to which such Backstop Party shall deliver and pay the aggregate Purchase Price for such Backstop Shares. The Company, or the Subscription Agent on behalf of the Company, shall as promptly as practicable provide any written backup, information and documentation relating to the information contained in the Funding Notice as any Backstop Party may reasonably request.

(b)    Backstop Account Funding. No later than the Rights Offering Backstop Payment Date, each Backstop Party shall deliver and pay the aggregate Purchase Price for such Backstop Party's Backstop Shares by a Joint Offset, if applicable, or by wire transfer of immediately available funds in U.S. dollars into the Backstop Account in satisfaction of such Backstop Party's Backstop Commitment. The Backstop Account shall be established with the

16

Subscription Agent or another agent reasonably satisfactory to the Required Backstop Parties and the Company.  The funds held in the Backstop Account shall be released to the Backstop Parties, and each Backstop Party shall receive from the Backstop Account the cash amount actually funded to the Backstop Account by such Backstop Party, without reduction, offset or counterclaim, promptly following the earlier to occur of (i) termination of this Commitment Agreement in accordance with its terms and (ii) the Outside Date, if the Closing has not occurred on or before such date.

Section 2.5    Closing.

(a)    Subject to Article VII, unless otherwise mutually agreed in writing between the Company and the Required Backstop Parties, the closing of the Backstop Commitments (the "**Closing**") shall take place at such place and time as the Company and the Required Backstop Parties may reasonably agree, on the date on which all of the conditions set forth in Article VII shall have been satisfied or waived in accordance with this Commitment Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**" which shall be the same date as the Plan Effective Date.

(b)    At the Closing, the funds held in the Backstop Account shall be released and utilized as set forth and in accordance with Section 6.13 and the Plan.

(c)    At the Closing, issuance of the Primary Shares and the Backstop Shares will be made by ASG to the account of each Backstop Party (or to such other accounts as any Backstop Party may designate in accordance with this Commitment Agreement) against payment of the aggregate Purchase Price for the Primary Shares and the Backstop Shares of such Backstop Party.  Unless a Backstop Party requests in writing delivery of a physical stock certificate, the entry of any Primary Shares and Backstop Shares to be delivered pursuant to this Section 2.5(c) into the account of a Backstop Party pursuant to ASG's book entry procedures and delivery to such Backstop Party of an account statement reflecting the book entry of such Primary Shares and Backstop Shares shall be deemed delivery of such Primary Shares and Backstop Shares for purposes of this Commitment Agreement.  Notwithstanding anything to the contrary in this Commitment Agreement, subject to Section 1146(a) of the Bankruptcy Code, all Primary Shares and Backstop Shares will be delivered with all issue, stamp, transfer, sales and use, or similar Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Debtors only if such delivery is made to a Backstop Party or its designee.

Section 2.6    Designation and Assignment Rights.

(a)    Each Backstop Party shall have the right to designate by written notice to the Company no later than two (2) Business Days prior to the Closing Date that some or all of its Primary Shares or Backstop Shares be issued in the name of (or for the benefit of), and delivered to (or on behalf of), one or more of its Affiliates or Affiliated Funds (other than portfolio companies) (each a "**Related Purchaser**") upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Backstop Party and each such Related Purchaser; (ii) specify

17

the number of Primary Shares and Backstop Shares to be delivered to or issued in the name of (or on behalf of) each such Related Purchaser; and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations set forth in Article V as applied to such Related Purchaser, if applicable.  No designation of a Related Purchaser pursuant to this Section 2.6(a) shall relieve such Backstop Party from its obligations under this Commitment Agreement.

(b)     Each Backstop Party shall have the right to sell, transfer and assign all or any portion of its Backstop Commitment to a Related Purchaser or another Backstop Party that agrees in a writing addressed to the Company to purchase such portion of such Backstop Party's Backstop Commitment, and, in the case of a sale, transfer or assignment to a Related Purchaser, to (a) be fully bound by, and subject to, this Commitment Agreement as a Backstop Party for all purposes hereto (including for purposes of determining the Required Backstop Parties), and (b) attach an executed joinder of the Related Purchaser to the RSA.  No such sale, transfer or assignment pursuant to this Section 2.6(b) shall relieve such Backstop Party from its obligations under this Commitment Agreement.

(c)     Each Backstop Party, severally and not jointly, agrees that it will not, directly or indirectly, Transfer, at any time prior to the Closing Date or the earlier termination of this Commitment Agreement in accordance with its terms, any of its rights and obligations under this Commitment Agreement to any Person other than in accordance with Sections 2.3, 2.6(a), 2.6(b), 7.2, 10.7 or any other provision of this Commitment Agreement which expressly permits such Transfer.  After the Closing Date, nothing in this Commitment Agreement shall limit or restrict in any way any Backstop Party's ability to Transfer any of its New Common Stock or any interest therein; provided that any such Transfer shall be made pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable securities Laws and in accordance with the Registration Rights Agreement, the Stockholders Agreement and the Reorganized ASG Corporate Documents.

## ARTICLE III

### PUT OPTION PREMIUM AND EXPENSE REIMBURSEMENT

Section 3.1     Amounts Payable by the Company.  Subject to Section 3.2, as consideration for the Backstop Commitment, at the Closing Reorganized ASG shall pay or cause to be paid a nonrefundable aggregate fee in an amount equal to 2.0% of the Rights Offering Amount (the "**Put Option Premium**"), which shall be paid in cash unless (a) Reorganized ASG's domestic cash balance on the Effective Date would be less than $1.0 million (i) after taking into account such payment in cash of the Put Option Premium and any and all payments or reserves for obligations to be paid under the Plan on or after the Effective Date (including payments or reserves for Administrative Claims, Priority Tax Claims, Other Priority Claims or Professional Claims) and (ii) without Reorganized ASG drawing on the First Lien Revolving Loan Exit Facility, or (b) otherwise agreed by the Company and the Required Backstop Parties, in which case such fee shall be paid solely in New Common Stock.  The Put Option Premium shall be calculated and paid in accordance with Section 3.2 to the Backstop Parties (including, in accordance with Section 2.3(a), any Replacing Backstop Parties and Related Purchasers, but

18

excluding any Defaulting Backstop Parties) or their designees based upon their respective Backstop Commitment Percentages, and to be paid as set forth in this Article III.

The provisions for the payment of the Put Option Premium and Expense Reimbursement (as set forth in Section 3.3), and the indemnification provided herein, are an integral part of the transactions contemplated by this Commitment Agreement and without these provisions the Backstop Parties would not have entered into this Commitment Agreement, and the Put Option Premium and Expense Reimbursement shall constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code, subject in all instances to the DIP Facility and any carve-out for Administrative Claims and Professional Claims provided for in connection with the DIP Facility Documents.

Section 3.2    Payment of Amounts.  The Put Option Premium shall be fully earned upon entry of the Rights Offering Procedures Order and shall be paid or caused to be paid by Reorganized ASG, free and clear of any withholding or deduction for any applicable Taxes on the Closing Date, or, if the Closing Date does not occur, on the date of the earlier to occur of the consummation of any Alternative Transaction occurring at any time, whether before or after the Outside Date, or the occurrence of the termination of this Commitment Agreement; provided, however, that the Put Option Premium shall not be payable to (i) a Defaulting Backstop Party or (ii) any Backstop Party whose breach of this Agreement caused this Agreement to be terminated. For the avoidance of doubt, the Put Option Premium will be payable regardless of the number of Unsubscribed Shares (if any) including any shares subscribed for pursuant to any Oversubscription Rights (if any).  Except as provided for in Section 2.3(b), the Put Option Premium will be nonrefundable and non-avoidable when paid.

Section 3.3    Expense Reimbursement.  Until the earlier to occur of (x) the Closing and (y) the termination of this Commitment Agreement, the Debtors agree to pay on a joint and several basis (without duplication) (i) the reasonable fees and expenses of the Consenting Creditor Professionals and such other professionals as may be reasonably retained by the Required Backstop Parties, in each case that have been and are incurred in connection with the negotiation, preparation and implementation of the Backstop Commitment and the Rights Offering, including the Backstop Parties' negotiation, preparation and implementation of this Commitment Agreement (including the Backstop Commitment and the other transactions contemplated hereby), the Plan Documents and the other agreements contemplated hereby and thereby, and (ii) all filing fees, if any, required by the HSR Act or any other Antitrust Law and all reasonable documented expenses related thereto (the "**Expense Reimbursement**").  The Expense Reimbursement accrued through the date on which the Rights Offering Procedures Order is entered shall be paid within five (5) Business Days of such date, to the extent not ordered otherwise by the Bankruptcy Court.  The Expense Reimbursement shall thereafter be payable by the Debtors as soon as practicable after receipt of monthly invoices therefor; provided, that the final payment owed by the Debtors shall be made contemporaneously with the Closing or the termination of this Commitment Agreement pursuant to Article IX or, if the Closing does not occur, upon the earlier to occur of the Outside Date and the termination of this Commitment Agreement; provided, further, that the Expense Reimbursement shall not be subject to compliance with local guidelines issued by the Bankruptcy Court with respect to payment of professional fees.  The Debtors shall pay or cause to be paid such invoices within five (5) Business Days of receipt thereof, to the extent not ordered otherwise by the Bankruptcy Court.

Doc#: US1:9815113v12

Section 3.4    Cooperation.  The Backstop Parties (including, in accordance with Section 2.3(a), any Replacing Backstop Parties and Related Purchasers) shall cooperate with the Debtors to the extent reasonably requested by the Debtors to obtain reduction of or relief from any withholding or deduction of Taxes in connection with any payments made by the Debtors pursuant to this Article III.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE DEBTORS

Except as set forth in (i) the Disclosure Statement (excluding any risk factor disclosure and disclosure of risks included in any "forward-looking statements" disclaimer or other statements included in the Disclosure Statement that are forward-looking in nature), or (ii) the Company Disclosure Schedules or Company Disclosure Documents, which in each case shall be deemed to qualify the Company's representations and warranties set forth below, the Company hereby represents and warrants to the Backstop Parties as set forth below.  Any disclosure in the Disclosure Statement, the Company Disclosure Schedules or Company Disclosure Documents that is deemed to qualify a representation or warranty shall also be deemed to qualify each and every other representation and warranty to the extent that the relevance of such disclosure to such other representations and warranties is reasonably apparent on its face.

Section 4.1    Organization and Qualification.  Each Material Entity is a legal entity duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of its respective jurisdiction of incorporation or organization and, subject to the entry of any applicable order of the Bankruptcy Court, has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently conducted and presently proposed to be conducted.  Each Material Entity is duly qualified or licensed to do business under the Laws of each other jurisdiction in which it owns, leases or operates properties or conducts any business where the failure to be so qualified would reasonably be expected to result in a Material Adverse Effect.

Section 4.2    Corporate Power and Authority.  The Company has the requisite corporate power and authority (i) (A) to enter into, execute and deliver this Commitment Agreement and to perform its obligations hereunder and (B) subject to entry of the Confirmation Order, to perform each of its other obligations hereunder and (ii) subject to entry of the Confirmation Order, to consummate the transactions contemplated herein and in the Plan, to enter into, execute and deliver the Plan Documents and all other agreements to which it will be a party as contemplated by this Commitment Agreement and the Plan, and to perform its obligations under each of the Plan Documents, other than this Commitment Agreement.  Subject to the entry of the foregoing Orders, as applicable, the execution and delivery of this Commitment Agreement and each of the other Plan Documents and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company, and no other corporate proceedings on the part of the Company are or will be necessary to authorize this Commitment Agreement or any of the other Plan Documents or to consummate the transactions contemplated hereby or thereby.

20

Section 4.3    <u>Execution and Delivery; Enforceability</u>.  This Commitment Agreement will have been, and subject to the entry of the Confirmation Order, each other Plan Document will be, duly executed and delivered by each Debtor party thereto.  Assuming this Commitment Agreement has been duly authorized, executed and delivered by the Backstop Parties, the Commitment Agreement will constitute the valid and legally binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity. Assuming this Commitment Agreement has been duly authorized, executed and delivered by the Backstop Parties and the other parties thereto, each of the other obligations hereunder will constitute the valid and legally binding obligations of the Debtors, enforceable against the Debtors in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity.

Section 4.4    <u>Authorized and Issued Capital Stock</u>.

(a)    On the Closing Date, (i)(A) the authorized capital stock of ASG will consist of 20,000,000 shares of New Common Stock and (B) the outstanding capital stock of ASG will consist of 10,768,000 issued and outstanding shares of New Common Stock and (ii)(A) 1,208,113 shares of New Common Stock will be reserved for issuance upon the exercise of the Warrants, (B) 1,342,347 shares of New Common Stock will be reserved for issuance in connection with the Management Incentive Plan, as well as any other shares of New Common Stock issued or reserved in connection with any other employment arrangement approved by the Company and the Required Backstop Parties, and (C) 105,014 shares of New Common Stock will be reserved for issuance on account of the Put Option Premium (if such amount is payable in New Common Stock pursuant to the terms hereof).

(b)    Except as set forth in this <u>Section 4.4</u>, as of the Closing Date, no shares of capital stock or other equity or voting interest in ASG, or any security exercisable for or convertible or exchangeable into any capital stock of or other equity or voting interest in ASG, will have been issued, reserved for issuance or outstanding.

(c)    Except as described in this <u>Section 4.4</u> and except as set forth in the Registration Rights Agreement, the Stockholders Agreement, the Reorganized ASG Corporate Documents, the Warrants, the Management Incentive Plan, key employee retention plan, or supplemental executive retirement plan adopted by the Company or other employment agreement or compensation arrangement that would be in effect immediately after the Closing with respect to each individual serving as a member of the senior management of ASG on the date hereof, the documentation governing the Exit Facilities or any other proposed exit financing facility or any employment agreement entered into in accordance with <u>Section 7.1(d)</u>, as of the Closing Date, neither the Company nor any of its Subsidiaries will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, contract, arrangement or undertaking (including any preemptive right) that (i) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed

21

or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any of its Subsidiaries or any security exercisable for or convertible or exchangeable into any capital stock of, or other equity or voting interest in, the Company or any of its Subsidiaries, (ii) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (iii) restricts the Transfer of any shares of capital stock of the Company or any of its Subsidiaries or (iv) relates to the voting of any shares of capital stock of the Company or any of its Subsidiaries.

Section 4.5    <u>Issuance</u>.  The shares of New Common Stock to be issued pursuant to the Plan, including the shares of New Common Stock to be issued in connection with the consummation of the Rights Offering, will, when issued and delivered on the Closing Date, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, Liens (other than transfer restrictions imposed hereunder, under the Registration Rights Agreement, under the Stockholders Agreement, or under the Reorganized ASG Corporate Documents or by applicable Law), preemptive rights, subscription and similar rights, other than any rights set forth in the Reorganized ASG Corporate Documents, the Registration Rights Agreement and the Stockholders Agreement.

Section 4.6    <u>No Conflict</u>.  Assuming the consents described in clauses (i) through (vii) of <u>Section 4.7</u> are obtained, the execution and delivery by the Company and, if applicable, its Subsidiaries, of this Commitment Agreement, the Plan and the other Plan Documents, the compliance by the Company and, if applicable, its Subsidiaries, with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, including the Rights Offering, (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under, any Contract to which the Company or any of its Subsidiaries will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of the Company or any of its Subsidiaries will be subject as of the Closing Date after giving effect to the Plan other than Permitted Liens, except to the extent that any such conflict, breach, violation, or default would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; (ii) will not result in any violation of the provisions of the Reorganized ASG Corporate Documents or any of the organization documents of any Subsidiary of the Company except to the extent that any such violation would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; and (iii) will not result in any material violation of any Law or Order applicable to the Company or any of its Subsidiaries or any of their properties.

Section 4.7    <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Unit having jurisdiction over the Company or any of its Subsidiaries or any of their properties (each an "**Applicable Consent**") is required for the execution and delivery by the Company and, if applicable, its Subsidiaries of this Commitment Agreement, the Plan and the other Plan Documents, the compliance by the Company and, if applicable, its Subsidiaries with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, including the Rights

Offering, except for (i) the entry of the Rights Offering Procedures Order, (ii) the entry of the Confirmation Order, (iii) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable notification, authorization, approval or consent under any other Antitrust Laws in connection with the transactions contemplated by this Commitment Agreement, (iv) the filing with the Secretary of State of the State of Delaware of the ASG Certificate of Incorporation and the filing of any other corporate documents with applicable state filing agencies, (v) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase of the Primary Shares and the Backstop Shares by the Backstop Parties or the issuance of the Subscription Rights and the Rights Offering Stock pursuant to the exercise of the Subscription Rights, and (vi) any other Applicable Consent.

Section 4.8      Arm's Length.  The Company acknowledges and agrees that (a) each of the Backstop Parties is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any of their Subsidiaries and (b) no Backstop Party is advising the Company or any of their Subsidiaries as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 4.9      Financial Statements.  The Financial Statements present fairly in all material respects the financial position, results of operations and cash flows of the Company and its consolidated subsidiaries, taken as a whole, as of the dates indicated and for the periods specified therein.  The Financial Statements, including the related schedules and notes thereto, have been prepared in conformity with U.S. generally accepted accounting principles ("**GAAP**") applied on a consistent basis throughout the periods and at the dates covered thereby.

Section 4.10     Company Disclosure Documents .  The Company Disclosure Documents, taken together and after giving effect to any amendments or supplements thereto and to any subsequently posted Company Disclosure Documents, in each case posted prior to the date of this Commitment Agreement, did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 4.11     Absence of Certain Changes.  From September 30, 2014 to the date hereof, no Event has occurred or exists that constitutes a Material Adverse Effect.

Section 4.12     Compliance with Laws.  Neither the Company nor any of its Subsidiaries is or has been at any time since September 30, 2014 in violation of any Law or Order (other than Laws relating to Company Plans and Foreign Benefit Plans, which are addressed in Section 4.20), except for any such violation that would not reasonably be expected to result in a Material Adverse Effect.

Section 4.13     Legal Proceedings.  Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, and other than as set forth in the Company Disclosure Documents, there are no legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations,

23

demands, demand letters, notices of non-compliance or violations, or proceedings ("**Legal Proceedings**") pending or, to the Knowledge of the Company, threatened in writing to which the Company or any of its Subsidiaries is a party or to which any property of the Company or any of its Subsidiaries is the subject that would reasonably be expected to result in a Material Adverse Effect.

Section 4.14   Labor Relations.

(a)   There is no labor or employment-related Legal Proceeding pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries, by or on behalf of any of their respective employees or such employees' labor organization, works council, workers' committee, union representatives or any other type of employees' representatives appointed for collective bargaining purposes (collectively "**Employee Representatives**"), or by any Governmental Unit, except to the extent that any such Legal Proceedings would not reasonably be expected to result in a Material Adverse Effect.

(b)   The Company Disclosure Schedules list all Collective Bargaining Agreements applicable to persons employed by the Company or any of its Subsidiaries in effect and the status of any negotiations, in each case as of the Company Disclosure Schedules Date. The Company Disclosure Schedules list any jurisdiction in which the employees of the Company are represented by a works council or similar entity as of the Company Disclosure Schedules Date and, to the Knowledge of the Company, no other union organizing efforts or Employee Representatives' elections are underway or threatened with respect to any such employees. There is no strike, lockout, material labor dispute or, to the Knowledge of the Company, threat in writing thereof, by or with respect to any employees of the Company or any of its Subsidiaries, except to the extent that any such strike, lockout, or material labor dispute would not reasonably be expected to result in a Material Adverse Effect. Neither the Company nor any of its Subsidiaries is subject to any obligation (whether pursuant to Law or Contract) to notify, inform and/or consult with, or obtain consent from, any Employee Representative regarding the transactions contemplated by this Commitment Agreement that has not already occurred prior to entering into this Commitment Agreement, except as would not reasonably be expected to result in a Material Adverse Effect.

(c)   Neither the Company nor any of its Subsidiaries has, during the ninety (90) day period preceding the date hereof, effectuated a "plant closing" or a "mass lay-off" (as such terms are defined in the Worker Adjustment and Retraining Notification Act of 1988 (the "**WARN Act**"), in accordance with the WARN Act.

Section 4.15   Intellectual Property. The Company or its Subsidiaries own, or hold licenses in, all Intellectual Property that are necessary to the conduct of its business, and have obtained assignments of all material leases, licenses and other rights of whatever nature, in each case other than Permitted Liens, necessary for the conduct of the Company's business. Except as would not reasonably be expected to result in a Material Adverse Effect, to the Knowledge of the Company there is no material Intellectual Property owned by the Company or any of its Subsidiaries that is being infringed, misappropriated or violated ("**Infringed**") by any other Person. Except as would not reasonably be expected to result in a Material Adverse Effect, to the Knowledge of the Company, neither the Company nor its Subsidiaries presently Infringes

24

any material Intellectual Property of any other Person and no Person has alleged same in writing, except for allegations that have since been resolved or in connection with the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith.

Section 4.16    <u>Title to Real and Personal Property</u>.

(a)    <u>Owned Real Property</u>.  The Company does not own any Owned Real Property.

(b)    <u>Leased Real Property</u>.  All Real Property Leases necessary for the operation of the Post-Effective Date Business are valid and binding on the Company or its relevant Subsidiaries and enforceable in accordance with their terms (subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity).  Neither the Company nor any of its Subsidiaries is in material default or breach under the terms of any material Real Property Lease necessary for the operation of the Post-Effective Date Business, except (i) as would not reasonably be expected to result in a Material Adverse Effect, (ii) as subject to an applicable order of the Bankruptcy Court with respect to such leases, or (iii) as a result of the filing of the Chapter 11 Cases.

(c)    <u>Personal Property</u>.  The Company or its Subsidiaries has good title or, in the case of leased assets, a valid leasehold interest, free and clear of all Liens, to all of the material tangible personal property and assets, except for (i) Liens that are described in (x) the Company Disclosure Documents posted prior to the date hereof, (y) the Plan or (z) the Disclosure Statement or (ii) Permitted Liens.

Section 4.17    <u>Reserved</u>.

Section 4.18    <u>Licenses and Permits</u>.  The Company and its Subsidiaries possess all material licenses, certificates, permits and other authorizations issued by, and have made all material declarations, and filings with, the appropriate Governmental Units that are necessary for the ownership or lease of their respective properties and the conduct of the Post-Effective Date Business.  Neither the Company nor any of its Subsidiaries has received written notice of any revocation or modification of any such material license, certificate, permit or authorization.

Section 4.19    <u>Tax Matters</u>.

(a)    All material Tax Returns required to be filed by or with respect to the Company or any of its Subsidiaries have been properly prepared and timely filed, and all such Tax Returns (including information provided therewith or with respect to thereto) are true, complete and correct in all material respects.

(b)    The Company and its Subsidiaries have fully and timely paid or will fully and timely pay pursuant to the Plan all material Taxes owed by such companies (whether or not shown on any Tax Return), or, to the extent any material Taxes are not yet due, such Taxes have been accrued and fully provided for in accordance with GAAP, or will be provided for when required under GAAP on the Financial Statements.

(c)    Except for audits in the United States, Germany and France with respect to the Company or its Subsidiaries which were ongoing as of the date hereof and which are not expected to have a Material Adverse Effect individually or in the aggregate, no material audit or other proceeding by any Governmental Unit is pending or threatened in writing with respect to any Taxes due from or with respect to the Company or any of its Subsidiaries, no Governmental Unit has given written notice of any intention to assert any material deficiency or claim for additional Taxes against the Company or any of its Subsidiaries, no written claim has been made by any Governmental Unit in a jurisdiction where the Company and its Subsidiaries do not file Tax Returns that they are or may be subject to taxation by that jurisdiction, and all deficiencies for material Taxes asserted or assessed against the Company or any of its Subsidiaries  have been fully and timely paid, settled or properly reflected in the Financial Statements.

(d)    The Company and its Subsidiaries have each withheld from their respective employees, creditors, stockholders and third parties and timely paid to the appropriate Governmental Unit proper and accurate amounts in all material respects in compliance with all Tax withholding and remitting provisions of applicable laws and have each complied in all material respects with all Tax information reporting provisions of all applicable laws.

(e)    Neither the Company nor any of its Subsidiaries is a party to any agreement relating to the sharing, allocation or indemnification of Taxes, or any similar agreement, contract or arrangement (other than such agreements (i) that are entered in the ordinary course of business and (ii) that are not expected to result in a liability for Taxes that is material to the Company and its Subsidiaries) or has any liability for Taxes of any Person (other than members of the affiliated group, within the meaning of Section 1504(a) of the Tax Code, filing consolidated federal income Tax returns of which ASG is the common parent) under Treasury Regulations Section 1.1502-6, Treasury Regulations Section 1.1502-78 or similar provision of state, local or foreign Tax law, as a transferee or successor, by contract, or otherwise.

(f)    The Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Tax Code at any time during the five (5)-year period ending on the date of this Commitment Agreement.

(g)    Neither the Company nor any of its Subsidiaries has participated in any listed transaction within the meaning of Treasury Regulations Section 1.6011-4(b) (or any similar provision of state, local or foreign Tax law).

(h)    Neither the Company nor any of its Subsidiaries has constituted a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Tax Code) in a distribution of shares qualifying for tax-free treatment under Section 355 of the Tax Code (i) in the two (2) years prior to the date of this Commitment Agreement or (ii) in a distribution that could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Tax Code) in conjunction with this acquisition.

(i)    There are no material Liens with respect to Taxes upon any of the assets or properties of the Company and its Subsidiaries, other than Permitted Liens.

Section 4.20    Company Plans.

(a)    (i) Each Company Plan is in compliance with all applicable Laws and its governing documents, except to the extent any such non-compliance would not reasonably be expected to result in a Material Adverse Effect.  (ii) Except as would not reasonably be expected to result in a Material Adverse Effect, (1)  all contributions required to be made under the terms of any Company Plan have been timely made or have been (A) reflected in the Financial Statements or (B) described in the Plan or Disclosure Statement; and (2) no liability, claim, action, litigation, audit, examination, investigation or administrative proceeding has been made, commenced or, to the Knowledge of the Company, threatened in writing with respect to any Company Plan (other than (A) routine claims for benefits payable in the ordinary course, or (B) otherwise in relation to the Chapter 11 Cases).

(b)    Except as would not reasonably be expected to result in a Material Adverse Effect, no Company Plan provides for post-employment or retiree health, life insurance or other welfare benefits, except for (A) death benefits, (B) benefits required by Section 4980B of the Tax Code or similar Law, or (C) benefits for which the covered individual pays the full premium cost.

(c)    Except as would not reasonably be expected to result in a Material Adverse Effect, neither the execution of this Commitment Agreement or the other Plan Documents, nor the consummation of the transactions contemplated hereby or thereby will (A) entitle any employees of the Company or any of its Subsidiaries to severance pay or any increase in severance pay upon any termination of employment after the date hereof, (B) accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the Company Plans, or (C) limit or restrict the right of the Company to merge, amend or terminate any of the Company Plans.

(d)    Except as would not reasonably be expected to result in a Material Adverse Effect, the execution, delivery of and performance by the Company and its Subsidiaries of its obligations under this Commitment Agreement will not (either alone or upon the occurrence of any additional or subsequent events) result in "excess parachute payments" within the meaning of Section 280G(b)(1) of the Tax Code or any payments under any other applicable Laws that would be treated in such similar nature to such section of the Tax Code, with respect to any Company Plan that would be in effect immediately after the Closing.

(e)    Except as would not reasonably be expected to result in a Material Adverse Effect, and except as required to maintain the tax-qualified status of any Company Plan intended to qualify under Section 401(a) of the Tax Code, to the Knowledge of the Company, no condition or circumstance exists that would prevent the amendment or termination of any Company Plan other than a Company Plan between the Company or any of its Subsidiaries, on the one hand, and an individual employee or director thereof, on the other hand.

27

(f)      Except as would not reasonably be expected to result in a Material Adverse Effect, each Company Plan that is maintained outside the jurisdiction of the United States, or that covers any employee residing or working outside the United States (any such Company Plan, "**Foreign Benefit Plans**"), which, under the Laws of any jurisdiction outside of the United States, is required or approved by any Governmental Unit, has been so registered and approved and, to the Knowledge of the Company, has been maintained in good standing with applicable material requirements of the Governmental Units, and if intended to qualify for special tax treatment, to the Knowledge of the Company, there are no existing circumstances or events that have occurred that could reasonably be expected to adversely affect the special tax treatment with respect to such Foreign Benefit Plans.

Section 4.21    Internal Control Over Financial Reporting.  The Company's internal controls and procedures are sufficient to ensure that the latest reviewed and audited Financial Statements fairly present in all material respects the financial condition and results of operations of the Company and, with respect to Financials Statements that are internally prepared monthly, quarterly and annual financial statements, are in accordance with U.S. GAAP.  The accounts, books and ledgers related to the business of the Company are properly kept, are accurate and complete in all material respects, and there are no material inaccuracies or discrepancies contained or reflected therein.

Section 4.22    Reserved.

Section 4.23    Material Contracts.  All Material Contracts are valid, binding and enforceable by and against the Company or its relevant Subsidiary (except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability), and no written notice to terminate, in whole or part, any Material Contract has been delivered to the Company or any of its Subsidiaries.  Other than as a result of the filing of the Chapter 11 Cases, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party to any Material Contract, is in default or breach under the terms thereof.  For purposes of this Commitment Agreement, "**Material Contract**" means any Contract necessary for the operation of the Post-Effective Date Business that would be a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC or would be required to be disclosed on a Current Report on Form 8-K).

Section 4.24    No Unlawful Payments.  Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any director, officer, agent, employee or Affiliate of the Company or any of its Subsidiaries is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "**FCPA**"), including making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA; and the Company, its Subsidiaries and, to the Knowledge of the Company, its Affiliates have conducted their businesses in compliance with the FCPA and have instituted and maintain policies and

procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

Section 4.25    Compliance with Money Laundering Laws.  The operations of the Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Unit (collectively, the "**Money Laundering Laws**") and no Legal Proceedings by or before any court or Governmental Unit, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

Section 4.26    Compliance with Sanctions Laws.  Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any director, officer, agent, employee or Affiliate of the Company or any of its Subsidiaries (i) is currently subject to any sanctions administered imposed by the United States (including any administered or enforced by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") or (ii) will, directly or indirectly, use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other person in any manner that will result in a violation of any economic sanctions imposed by the United States (including any administered or enforced by OFAC, the U.S. Department of State, or the Bureau of Industry and Security of the U.S. Department of Commerce), the United Nations Security Council, the European Union, or the United Kingdom (including sanctions administered or controlled by Her Majesty's Treasury) (collectively, "**Sanctions**" and such persons, "**Sanction Persons**") by, or could result in the imposition of Sanctions against, any person (including any person participating in the offering, whether as underwriter, advisor, investor or otherwise).

Section 4.27    No Broker's Fees.  Neither the Company nor any of its Subsidiaries is a party to any Contract with any Person (other than this Commitment Agreement) that would give rise to a valid claim against the Backstop Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Backstop Shares.

Section 4.28    No Registration Rights.  Except as provided for pursuant to the Registration Rights Agreement and the Stockholders Agreement, no Person has the right to require the Company or any of its Subsidiaries to register the offering and sale of any of their respective securities under the Securities Act.

Section 4.29    Takeover Statutes.  No Takeover Statute is applicable to this Commitment Agreement and the transactions contemplated herein.

Section 4.30    Insurance.  The Company and its Subsidiaries have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses.  All premiums due and payable in respect of material insurance policies maintained by the Company and its Subsidiaries have been paid.  The Company reasonably believes that the insurance maintained by or on behalf of the Company and its

Subsidiaries is adequate in all material respects.  Since September 30, 2014, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries has received written notice from any insurer or agent of such insurer with respect to any material insurance policies of the Company and its Subsidiaries of cancellation or termination of such policies, other than such notices that have been rescinded, are received in the ordinary course of business, for policies that have expired on their terms or that relate to policies that the Company has or is working in good faith to replace promptly and the cancellation of which would not be expected to have a Material Adverse Effect individually or in the aggregate.

Section 4.31    Investment Company Act.  Neither the Company nor any of its Subsidiaries is required to register as an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP PARTIES

Each Backstop Party represents and warrants as to itself only as set forth below.

Section 5.1    Incorporation.  To the extent applicable, such Backstop Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the laws of its jurisdiction of incorporation or organization.

Section 5.2    Power and Authority.  Such Backstop Party has the requisite corporate, limited partnership or limited liability company power and authority to enter into, execute and deliver this Commitment Agreement and each other Plan Documents to which such Backstop Party is a party and to perform its obligations hereunder and thereunder and has taken (or will take) all necessary corporate, limited partnership or limited liability company action required for the due authorization, execution, delivery and performance by it of this Commitment Agreement and the other Plan Documents and the consummation of the transactions contemplated hereby and thereby, and no other corporate, limited partnership or limited liability company proceedings on the part of such Backstop Party are or will be necessary to authorize this Commitment Agreement or any of the other Plan Documents or to consummate the transactions contemplated hereby or thereby.

Section 5.3    Execution and Delivery.  This Commitment Agreement and each other Plan Document to which such Backstop Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Backstop Party and (b) assuming due and valid execution and delivery hereof and thereof by the Company, will constitute the valid and legally binding obligations of such Backstop Party, enforceable against such Backstop Party in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity.

Section 5.4    No Conflict.  Assuming that the consents referred to in clauses (i) and (ii) of Section 5.5 are obtained, the execution and delivery by such Backstop Party of this

30

Commitment Agreement and, to the extent applicable, the other Plan Documents, the compliance by such Backstop Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Backstop Party is a party or by which such Backstop Party is bound or to which any of the properties or assets of such Backstop Party are subject, (ii) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Backstop Party and (iii) will not result in any material violation of any Law or Order applicable to such Backstop Party or any of its properties, except, in each of the cases described in clauses (i) and (iii), for any conflict, breach, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Backstop Party's performance of its obligations under this Commitment Agreement.

Section 5.5    <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Unit having jurisdiction over such Backstop Party or any of its properties is required for the execution and delivery by such Backstop Party of this Commitment Agreement and, to the extent applicable, the Plan Documents, the compliance by such Backstop Party with all of the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Backstop Party of its Backstop Shares) contemplated herein and therein, except (i) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable notification, authorization, approval or consent under any other Antitrust Laws in connection with the transactions contemplated by this Commitment Agreement, and (ii) any consent, approval, authorization, order, registration or qualification which, if not made or obtained, will not prohibit, materially delay or materially and adversely impact such Backstop Party's performance of its obligations under this Commitment Agreement or the Plan Documents.

Section 5.6    <u>No Registration</u>.  Such Backstop Party understands that (a) the issuance of the New Common Stock has not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Backstop Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the foregoing shares cannot be sold unless such sale is subsequently registered under the Securities Act or an exemption from registration is available.

Section 5.7    <u>Purchasing Intent</u>.  Such Backstop Party is acquiring the Primary Shares and the Backstop Shares for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and such Backstop Party has no present intention of selling, granting any participation in, or otherwise distributing the same.

Section 5.8    <u>Sophistication; Investigation</u>.  Such Backstop Party acknowledges that the issuance of the New Common Stock has not been registered pursuant to the Securities Act.  Such Backstop Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the New Common

31

Stock being acquired hereunder.  Such Backstop Party is (i) an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of the Securities Act, (ii) a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act, or (iii) a "non-U.S. Person" within the meaning of Regulation S under the Securities Act ("**Regulation S**") who will acquire any New Common Stock outside of the United States within the meaning of Regulation S.  Such Backstop Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares of New Common Stock for an indefinite period of time).  Such Backstop Party has conducted and relied on its own independent investigation of, and judgment with respect to, the Company and the advice of its own legal, tax, economic, and other advisors.

Section 5.9    No Broker's Fees.  Such Backstop Party is not a party to any Contract with any Person (other than this Commitment Agreement and any Contract giving rise to the Expense Reimbursement hereunder) that would give rise to a valid claim against the Company for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Backstop Shares.

Section 5.10    Owned Claims.

(a)    As of the date hereof, such Backstop Party and its Affiliates were, collectively, the beneficial owner of, or the investment advisor or sub-advisor or manager for the beneficial owner of, the aggregate principal amount of Owned Claims as set forth opposite such Backstop Party's name under the column titled "Beneficially Controlled Owned Principal Claims" on Schedule 2 attached hereto;

(b)    As of the date hereof, such Backstop Party or its applicable Affiliate has the full power to vote, dispose of and compromise at least the aggregate principal amount of the Owned Claims listed as beneficially owned by such Backstop Party under the column titled "Beneficially Controlled Owned Principal Claims" on Schedule 2 attached hereto;

(c)    Each Backstop Party and its Affiliates agree to be bound by this Agreement and the RSA, in their capacities as holders of any Owned Claims; and

(d)    Other than the RSA, and any agreements or transactions contemplated thereby, such Backstop Party has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title or interest in such Owned Claims where such assignment, sale, participation, grant, conveyance or transfer would prohibit such Backstop Party from complying with the terms of this Commitment Agreement or the RSA.

Section 5.11    Sufficiency of Funds.  Such Backstop Party has, and such Backstop Party on the applicable payment dates will have, sufficient immediately available funds to make and complete the payment of the aggregate Purchase Price for its Primary Shares and Backstop Shares.

Section 5.12    Legal Proceedings.  As of the date hereof, there are no Legal Proceedings pending or threatened to which such Backstop Party is a party or to which any property of such Backstop Party is the subject that would reasonably be expected to prevent,

32

materially delay or materially impair the ability of such Backstop Party to consummate the transactions contemplated hereby.

Section 5.13    Arm's Length.  Such Backstop Party acknowledges and agrees that the Company is acting solely in the capacity of an arm's length contractual counterparty to such Backstop Party with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).

## ARTICLE VI

## ADDITIONAL COVENANTS

Section 6.1    Reserved.

Section 6.2    Confirmation Order.  To the extent required by the RSA, the Company shall use its reasonable best efforts to obtain entry of the Confirmation Order.  To the extent required by the RSA, the Company shall provide to each of the Backstop Parties and the Consenting Creditor Professionals a copy of the Plan and the Disclosure Statement and any proposed amendment, modification, supplement or change to any of the foregoing and a reasonable opportunity to review and comment on such documents and each such amendment, modification, supplement or change to any of the foregoing, when filed and upon entry by the Bankruptcy Court (as applicable), shall be in form and substance reasonably satisfactory to the Required Backstop Parties and the Company.  To the extent required by the RSA, the Company shall provide to each of the Backstop Parties and its counsel a copy of the proposed Confirmation Order (together with copies of any briefs, pleadings and motions related thereto) and a reasonable opportunity to review and comment on such order, briefs, pleadings and motions prior to such order, briefs pleadings and motions being filed with the Bankruptcy Court, and such order, briefs, pleadings and motions, when filed and upon entry by the Bankruptcy Court (as applicable), shall be in form and substance reasonably satisfactory to the Required Backstop Parties.

Section 6.3    Conduct of Business.  Except (i) as explicitly set forth in this Commitment Agreement or otherwise contemplated by the Company Disclosure Schedules, the Disclosure Statement, or the Plan or (ii) with the prior written consent of Required Backstop Parties, not to be unreasonably withheld, conditioned or delayed, during the period from the date of this Commitment Agreement to the earlier of the Closing Date and the date on which this Commitment Agreement is terminated in accordance with its terms (the "**Pre-Closing Period**"), (A) the Company shall, and shall cause each of its Subsidiaries to carry on its business in the ordinary course (subject to any restrictions resulting from the Chapter 11 Cases) and use its commercially reasonable efforts to (1) preserve intact its Post-Effective Date Business, (2) keep available the services of its officers and employees and (3) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its Subsidiaries in connection with the Post-Effective Date Business and (B) the Company shall not, and shall not permit any of its Subsidiaries to, enter into any transaction that is material to the Post-Effective Date Business other than (w) in the ordinary course of business or to the extent necessary to conduct the Company's operations in a manner consistent with the financial and business projections provided to the Backstop Parties prior to

the date hereof, (x) other transactions after prior notice to the Backstop Parties to implement tax planning which transactions are not reasonably expected to materially adversely affect any Backstop Party, (y) transactions expressly contemplated by the RSA, the Plan, this Commitment Agreement, or the other Plan Documents and (z) such other transactions as are disclosed in the Company Disclosure Schedules or Disclosure Statement.  Notwithstanding any other provision in this Commitment Agreement, nothing in this Commitment Agreement shall give the Backstop Parties, directly or indirectly, any right to control or direct the operations of the Company prior to the Closing Date.  Prior to the Closing Date, the Company shall exercise, consistent with the terms and conditions of this Commitment Agreement, complete control and supervision of the business of the Company.

Section 6.4    Antitrust Approval.

(a)    Each Party agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Commitment Agreement, the Plan, and the other Plan Documents, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Commitment Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Commitment Agreement as soon as reasonably practicable following the date hereof and (ii) promptly furnishing documents or information reasonably requested by any Antitrust Authority.

(b)    The Company and each Backstop Party subject to an obligation pursuant to the Antitrust Laws to notify any transaction contemplated by this Commitment Agreement, the Plan or the other Plan Documents that has notified the Company in writing of such obligation (each such Backstop Party, a "**Filing Party**") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content.  The Company and each Filing Party shall, to the extent permitted by applicable Law: (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all correspondence, filings and communications between such Filing Party or the Company and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Required Backstop Parties and the Company.

(c)    Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "**Joint Filing**

**Party**") a transaction contemplated by this Commitment Agreement, the Plan or the other Plan Documents, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(d)     Subject to the second sentence of Section 6.4(e), the Company and each Filing Party shall use commercially reasonable efforts to cause the waiting periods under the applicable Antitrust Laws to terminate or expire at the earliest possible date after the date of filing.  The communications contemplated by this Section 6.4 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.  The obligations in this Section 6.4 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Commitment Agreement, the Plan and the other Plan Documents.

(e)     Notwithstanding anything in this Commitment Agreement to the contrary, nothing shall require any Backstop Party or any of its Affiliates to (i) dispose of, license or hold separate any of its or its Subsidiaries' or Affiliates' assets, (ii) limit its freedom of action or the conduct of its or its Subsidiaries' or Affiliates' businesses or make any other behavioral commitments with respect to itself or any of its Subsidiaries or Affiliates, (iii) divest any of its Subsidiaries or its Affiliates, or (iv) commit or agree to any of the foregoing.  Without the prior written consent of the Required Backstop Parties, neither the Company nor any of its Subsidiaries shall commit or agree to (i) dispose of, license or hold separate any of its assets or (ii) limit its freedom of action with respect to any of its businesses or commit or agree to any of the foregoing, in each case, in order to secure any necessary consent or approvals for the transactions contemplated hereby under the Antitrust Laws.  Notwithstanding anything to the contrary herein, neither the Backstop Parties, nor any of their Affiliates, nor the Company or any of its Subsidiaries, shall be required as a result of this Commitment Agreement, to initiate any legal action against, or defend any litigation brought by, the United States Department of Justice, the United States Federal Trade Commission, or any other Governmental Unit in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any suit or proceeding which would otherwise have the effect of preventing or materially delaying the transactions contemplated hereby, or which may require any undertaking or condition set forth in the preceding sentence.

(f)     Given the uncertainty that the condition set forth in Section 7.1(e) may not be satisfied by the Outside Date with respect to certain jurisdictions outside of the United States (each, a "**Long Pole Jurisdiction**"), the Company and the Backstop Parties will consult in good faith regarding alternative structures with respect to the Company's operations in such Long Pole Jurisdiction(s) so as to facilitate the satisfaction of such condition by the Outside Date, including by changing the manner in which the Company or its Subsidiaries hold assets or businesses in the Long Pole Jurisdiction(s), disposing or committing to dispose of assets or businesses in the Long Pole Jurisdiction(s), agreeing to limit its business or change its business practices relating to the Long Pole Jurisdiction(s) in any manner, modifying supply, customer or other arrangements relating to the Long Pole Jurisdiction(s), or taking any other action with respect to the Long Pole Jurisdiction(s), and, notwithstanding anything to the contrary in this Commitment Agreement, following such consultation the Company may take such actions in

35

each case to the extent, but only to the extent, that (i) such actions comply with applicable Law and do not expose the Company or any Backstop Party, in their respective good faith judgment, to the risk of not being in compliance with applicable Law in the event of a Closing in the absence of requisite approval from such Long Pole Jurisdiction(s) and (ii) there is a reasonable expectation that such actions are necessary to permit a timely Closing in a manner that satisfies Section 7.1(e).

Section 6.5     Access to Information.   Subject to applicable Law and appropriate assurance of confidential treatment, upon reasonable notice during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) afford the Backstop Parties and their Representatives upon request reasonable access, during normal business hours and without unreasonable disruption or interference with its business or operations, to its relevant properties, books, contracts, commitments, records, management personnel and advisors of the Debtors and, to a commercially reasonable extent, the lenders of the Debtors, and, during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to such parties all reasonable information concerning its business, properties and personnel as may reasonably be requested by any such party; provided, that the foregoing shall not require the Company (a) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company or any of its Subsidiaries to violate any of their respective obligations with respect to confidentiality to a third party, (b) to disclose any legally privileged information of the Company or any of its Subsidiaries or (c) to violate any applicable Laws; provided, further, that the Company shall deliver to the Backstop Parties a schedule setting forth a description of any requested information not provided to the Backstop Parties pursuant to clauses (a) through (c) above (in the case of clause (a), to the extent not prohibited from doing so).

Section 6.6     Financial Information.

(a)     At all times prior to the Closing Date, the Company shall deliver to each Backstop Party (and its Representatives) that so requests, subject to appropriate assurance of confidential treatment, (i) internally prepared monthly, quarterly and annual financial statements and (ii) such statements and reports as the Backstop Parties may reasonably request and as reasonably consented to by the Company (together, the "**Financial Reports**"), as and when available.

(b)     Financial Reports that are internally prepared monthly, quarterly and annual financial statements (i) shall be complete and correct in all material respects, (ii) shall be prepared in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods in a manner consistent with past practice and (iii) shall comply, as to the information provided, with the requirements of (A) the first sentence of Section 4.03(a), (B) Section 4.03(a)(1) and (C) Section 4.03(d) of the Indenture.

(c)     At all times prior to the Closing Date, the Company shall timely post to the Investor Website all Financial Statements (i) as to any quarterly Financial Statement, within 60 days of the end of the applicable fiscal quarter, and (ii) as to any annual Financial Statement, within 105 days of the end of the applicable fiscal year, and which Financial Statements shall include all information included in such reports consistent with past practice.

36

Section 6.7    <u>Reasonable Efforts</u>.

(a)    Without in any way limiting any other respective obligation of the Company or any Backstop Party in this Commitment Agreement, the Company shall use (and shall cause its Subsidiaries to use), and each Backstop Party shall use, commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Commitment Agreement and the Plan, including using commercially reasonable efforts in:

(i)    timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Party and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Unit;

(ii)    except as set forth in <u>Section 6.4(c)</u>, defending any Legal Proceedings challenging (A) this Commitment Agreement, the Plan or any other Plan Document, (B) the Rights Offering Procedures Order, or the Confirmation Order or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining order entered by any Governmental Unit vacated or reversed; and

(iii)    working together in good faith to finalize the New Common Stock, Registration Rights Agreement, Stockholders Agreement, Reorganized ASG Corporate Documents, Plan Documents and all other documents relating thereto for timely inclusion in the supplements to the Plan and filing with the Bankruptcy Court.

(b)    To the extent required by the RSA and subject to applicable Laws relating to the exchange of information, the Backstop Parties and the Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to the Backstop Parties or the Company, as the case may be, and any of their respective Affiliates or the Company and its Subsidiaries that appears in any filing made with, or written materials submitted to, any Governmental Unit, or any material filings made with, or material written materials submitted to, any third party, in each case in connection with the transactions contemplated by this Commitment Agreement, the Plan, or the other Plan Documents; <u>provided</u>, <u>however</u>, that neither the Company nor the Backstop Parties are required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  In exercising the foregoing rights, each of the Company and the Backstop Parties shall act reasonably and as promptly as practicable.

(c)    To the extent required by the RSA, to the extent exigencies permit, the Company shall provide or cause to be provided to counsel to the Backstop Parties a draft of all motions, applications, pleadings, schedules, orders, reports or other material papers (including all material memoranda, exhibits, supporting affidavits or declarations and evidence and other supporting documentation) in the Chapter 11 Cases relating to or affecting the Plan Documents in advance of filing the same with the Bankruptcy Court.

(d)    Nothing contained in this <u>Section 6.7</u> shall limit the ability of any Backstop Party to consult with the Company, to appear and be heard, or to file objections,

37

concerning any matter arising in the Chapter 11 Cases to the extent not inconsistent with the RSA or this Commitment Agreement.

Section 6.8    Exit Facilities.  The Company shall have obtained the commitment for or other reasonable assurance of availability of the Exit Facilities and agrees to work in good faith to obtain documentation for the Exit Facilities and any other proposed exit financing facility on terms in form and substance acceptable to the Required Consenting Creditors and the Required Backstop Parties.  Each of the Backstop Parties shall have the right to receive, upon reasonable request, an update by the Company on, and a summary of, any material meetings, discussions or negotiations relating to the Exit Facilities and any other proposed exit financing facility.

Section 6.9    New Board.  On the Plan Effective Date, The New Board shall be appointed in accordance with the RSA and the Plan.  The boards of directors for the direct and indirect subsidiaries of Reorganized ASG shall be identified and selected by the New Board.

Section 6.10    Blue Sky.  The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Primary Shares and Backstop Shares issued hereunder for, sale or issuance to the Backstop Parties pursuant to this Commitment Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Backstop Parties on or prior to the Closing Date upon the reasonable request of the Required Backstop Parties.  The Company shall timely make all filings and reports relating to the offer and sale or issuance of the Primary Shares and Backstop Shares issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States following the Closing Date.  The Company shall pay all fees and expenses in connection with satisfying the obligations set forth under this Section 6.10.

Section 6.11    No Integration; No General Solicitation.  Neither the Company nor any of its Affiliates will, directly or through any agent, sell, offer for sale, solicit offers to buy or otherwise negotiate in respect of, any security (as defined in the Securities Act), that is or will be integrated with the sale of the Rights Offering Stock, the Rights Offering and this Commitment Agreement in a manner that would require registration of the New Common Stock to be issued by the Company on the Plan Effective Date under the Securities Act.  None of the Company or any of its Affiliates or any other Person acting on its or their behalf will solicit offers for, or offer or sell, any Rights Offering Stock by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D promulgated under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

Section 6.12    Reserved.

Section 6.13    Use of Proceeds.  The Company will apply the proceeds from the Rights Offering in accordance with and pursuant to the Plan.

Section 6.14    Share Legend.

Each stock certificate, if any, evidencing shares of New Common Stock shall be stamped or otherwise imprinted with legends that are customary or required by applicable law or regulation, including those describing transfer restrictions, if any, applicable to such stock (the "**Legend**").

In the event of any uncertificated shares, such shares shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by ASG or its transfer agent and the term "**Legend**" shall include such restrictive notation. The Legend shall be removed from the certificates evidencing any such securities (or the records, in the case of uncertificated shares) at any time after the restrictions described in such Legend cease to be applicable. The Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply.

Section 6.15    Cooperation Regarding Corporate and Tax Planning.  The Company and its Subsidiaries shall cooperate with the Required Backstop Parties in developing, adopting and implementing a corporate and tax planning strategy reasonably satisfactory to the Required Backstop Parties.

Section 6.16    WARN Act Compliance.  To the extent requested by the Required Backstop Parties, the Company shall provide a schedule as of the Closing Date that sets forth a list of each employee (if any) who has been terminated involuntarily within the ninety (90) day period prior to the Closing Date, together with such former employee's work location.

Section 6.17    Management Incentive Plan.  Upon the Plan Effective Date, the New Board shall adopt the Management Incentive Plan providing for an aggregate pool of 10.00% of the fully diluted New Common Stock as of the Effective Date (including dilution on account of the Warrants and the Put Option Premium, if applicable) (collectively, the "**MIP Shares**").  The participants (including directors) and terms of individual awards of the MIP Shares shall be determined by the New Board on or after the Effective Date.

Section 6.18    Registration Rights Agreement.  On the Plan Effective Date, the Registration Rights Agreement shall become effective.  The Registration Rights Agreement shall provide that each holder of New Common Stock shall have customary demand, shelf and piggyback registration rights with respect to all shares of New Common Stock beneficially owned by such holder (whether acquired at the Plan Effective Date or thereafter) and shall also have customary provisions with respect to indemnification, lock-up agreements, suspension periods, plan of distribution and underwriting cooperation.

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1    Conditions to the Obligations of Each of the Parties.  The respective obligations of the Company on the one hand, and the Backstop Parties on the other hand, to consummate the transactions contemplated hereby shall (unless waived by the Company and the Required Backstop Parties) be subject to the satisfaction of the following conditions:

Doc#: US1:9815113v12

(a)    Commitment Agreement.  This Commitment Agreement shall not have been validly terminated in accordance with its terms.

(b)    Rights Offering Procedures Order.  The Bankruptcy Court shall have entered the Rights Offering Procedures Order, and such order shall be a Final Order and in form and substance reasonably satisfactory to the Company and the Required Backstop Parties.

(c)    Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Company and the Required Backstop Parties, and the Confirmation Order shall not have been stayed, modified or vacated on appeals.

(d)    Exit Facilities.  The Company (i) shall have executed and delivered the documentation governing the Exit Facilities and any other proposed exit financing facility, each of which shall be in form and substance reasonably satisfactory to the Company and the Required Backstop Parties, and (ii) all conditions to effectiveness of the documentation governing the Exit Facilities and any other proposed exit financing facility (other than any required receipt of equity funding) shall have been satisfied or waived (or will be satisfied and waived substantially concurrently with the occurrence of the Closing Date).

(e)    Antitrust Approvals.  All terminations or expirations of waiting periods imposed by any Governmental Unit necessary for the consummation of the transactions contemplated by this Commitment Agreement, including under the HSR Act and any other Antitrust Laws, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any Governmental Unit under any Antitrust Law shall have been made or obtained for the transactions contemplated by this Commitment Agreement.

(f)    Consents.  All governmental and third party notifications, filings, consents, waivers and approvals and required for the consummation of the transactions contemplated by this Commitment Agreement and the Plan shall have been made or received.

(g)    No Legal Impediment to Issuance.  No Law or Order shall have been enacted, adopted or issued by any Governmental Unit that prohibits the implementation of the Plan or the transactions contemplated by this Commitment Agreement.

Section 7.2    Conditions to the Obligations of the Backstop Parties.  The obligations of each Backstop Party to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with Section 7.3) the satisfaction of the following conditions:

(a)    Plan and Plan Documents.  The Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Plan Effective Date and the conditions to the occurrence of the Plan Effective Date set forth in the Plan shall have been satisfied or, with the prior consent of the Required Backstop Parties, waived in accordance with the terms thereof and the Plan, and the Plan and other Plan Documents shall be consistent with the RSA and otherwise reasonably acceptable to the Required Backstop Parties.

40

(b)    <u>Rights Offering</u>.  The Rights Offering shall have been conducted, in all material respects, in accordance with the Rights Offering Procedures Order and this Commitment Agreement.

(c)    <u>Board of Directors</u>.  On the Plan Effective Date, the New Board shall be comprised of directors in accordance with <u>Section 6.9</u>.

(d)    Reserved.

(e)    <u>D&O Policies</u>.  The terms and conditions of the director and officer liability insurance policies of the Company provided for in the Plan and in effect from and after the Plan Effective Date shall be reasonably satisfactory to the Required Backstop Parties.

(f)    <u>Registration Rights Agreement; Stockholders Agreement</u>.  Each of the Registration Rights Agreement and the Stockholders Agreement shall have become effective as of the Plan Effective Date as provided in the Plan.

(g)    <u>Expense Reimbursement</u>.  The Debtors shall have paid all Expense Reimbursement accrued through the Closing Date pursuant to <u>Section 3.3</u>.

(h)    <u>Disclosure Schedules</u>.  The Company has delivered the Company Disclosure Schedules in form and substance reasonably satisfactory to the Required Backstop Parties.

(i)    <u>Representations and Warranties</u>.  (1) The representations and warranties of the Company contained in this Commitment Agreement that are qualified as to materiality or similar qualifiers, and the representation and warranty contained in <u>Section 4.11</u>, shall be true and correct in all respects both on and as of the date hereof and as of the Closing Date, with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all respects as of such specified date) and (2) the representations and warranties of the Company contained in this Commitment Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and as of the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date).

(j)    <u>Covenants</u>.  The Company shall have performed or complied with, or caused its Subsidiaries to have performed or complied with, in all material respects, all covenants and agreements required to be performed or complied with under this Commitment Agreement and in connection with the transactions contemplated by this Commitment Agreement.

(k)    <u>Officer's Certificate</u>.  The Backstop Parties shall have received on and as of the Closing Date a certificate of the Company in form and substance satisfactory to the Required Backstop Parties, signed on behalf of the Company by each of the chief restructuring

41

officer and chief financial officer of Reorganized ASG, to the effect that the conditions set forth in Sections 7.2(i), 7.2(j) and 7.2(m) have been satisfied.

(l)    Discharge of DIP Facility.  As of the Closing Date, the DIP Facility shall have been fully discharged and the Company shall have no obligations remaining thereunder except for indemnification obligations and the Company shall provide a payoff letter to this effect or other similar evidence in form and substance satisfactory to the Required Backstop Parties.

(m)    Material Adverse Effect.  From the date hereof to the Closing Date, no Material Adverse Effect shall have occurred.

(n)    RSA.  The RSA shall be in full force and effect and shall not have been terminated in accordance with its terms.

(o)    Equity Securities of ASG.  On the Closing Date, no options, warrants or other rights to acquire equity securities of ASG will be outstanding, other than any options, warrants or other rights to acquire equity securities of ASG pursuant to the Management Incentive Plan, the Warrants and the shares of New Common Stock contemplated in the Plan.

Section 7.3    Waiver of Conditions to Obligation of Backstop Parties.  All or any of the conditions set forth in Section 7.2 may only be waived in whole or in part with respect to all Backstop Parties by a written instrument executed by the Required Backstop Parties in their sole discretion and if so waived, all Backstop Parties shall be bound by such waiver; provided, that notwithstanding the foregoing, any one or more Required Backstop Parties that desire to waive all or any of the conditions set forth in Section 7.1 (such Backstop Party or Backstop Parties, the "**Waiving Backstop Parties**") may require any other Backstop Parties that are not willing to waive the applicable conditions (the "**Non-Waiving Backstop Parties**"), and such Non-Waiving Backstop Parties shall upon written request by the Waiving Backstop Parties be so required, to transfer and assign to the Waiving Backstop Parties all of the Non-Waiving Backstop Parties' Backstop Commitment in accordance with the Waiving Backstop Parties' pro rata share (based on the aggregate Commitment of the Waiving Backstop Parties) of the Non-Waiving Backstop Parties' Backstop Commitment or as otherwise reasonably agreed upon by such Waiving Backstop Parties.

Section 7.4    Conditions to the Obligation of the Company.  The obligation of the Company to consummate the transactions contemplated hereby is subject to (unless waived by the Company) the satisfaction of each of the following conditions:

(a)    Conditions to the Plan.  The conditions to the occurrence of the Plan Effective Date as set forth in the Plan and in the Confirmation Order shall have been satisfied or waived in accordance with the terms thereof and the Plan.

(b)    RSA.  The RSA shall be in full force and effect and shall not have been terminated in accordance with its terms.

(c)    Representations and Warranties.  (1) The representations and warranties of the Backstop Parties contained in this Commitment Agreement that are qualified as

42

to materiality or similar qualifiers shall be true and correct in all respects both on and as of the date hereof and as of the Closing Date, with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all respects as of such specified date) and (2) the representations and warranties of the Backstop Parties contained in this Commitment Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and as of the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date).

(d)     Covenants.  Each of the Backstop Parties shall have performed and complied, in all material respects, with all of its covenants and agreements contained in this Commitment Agreement and in any other document delivered pursuant to this Commitment Agreement.

(e)     Registration Rights Agreement; Stockholders Agreement.  Each of the Registration Rights Agreement and the Stockholders Agreement shall have become effective as of the Plan Effective Date as provided in the Plan.

## ARTICLE VIII

## INDEMNIFICATION AND CONTRIBUTION

Section 8.1     Indemnification Obligations.  The Company (the "**Indemnifying Party**") shall indemnify and hold harmless each Backstop Party, its Affiliates, shareholders, members, partners and other equity holders, general partners, managers, and its and their respective Representatives, agents and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Backstop Parties, except to the extent otherwise provided for in this Commitment Agreement) (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of this Commitment Agreement, the Plan and the transactions contemplated hereby and thereby, including the Backstop Commitment, the Rights Offering, the payment of the Put Option Premium or the use of the proceeds of the Rights Offering, or any breach by the Company or any of its Subsidiaries of this Commitment Agreement, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, its equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable and documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Commitment Agreement or the Plan are consummated or whether or not this Commitment Agreement is terminated; provided, that the foregoing indemnity will not, as to

43

any Indemnified Person, apply to Losses (a) as to a Defaulting Backstop Party and its Related Parties, to the extent caused by a Backstop Party Default by such Backstop Party, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the fraud, willful misconduct, gross negligence or primarily and directly resulting from breach of this Commitment Agreement or the RSA of or by such Indemnified Person. Notwithstanding anything to the contrary in this Commitment Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.  Any Indemnified Person shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnified Person was not entitled to indemnification with respect to such payment pursuant to this <u>Article VIII</u>.

Section 8.2    <u>Indemnification Procedure</u>.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; <u>provided</u>, that (i) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure and (ii) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this <u>Article VIII</u>.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; <u>provided</u>, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (A) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required) and that all such expenses shall be reimbursed as they occur), (B) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (C) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person

determines in good faith that the Indemnifying Party has failed or is failing to defend such claim, and provides written notice of such determination and the basis for such determination and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (D) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.  Notwithstanding anything herein to the contrary, the Company and its Subsidiaries shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company and its Subsidiaries.

Section 8.3    Settlement of Indemnified Claims.  In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this Article VIII, the Indemnifying Party shall not be liable for any settlement, compromise or consent to the entry of any judgment with respect to any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).  If any settlement, compromise or consent to the entry of any judgment with respect to any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement, compromise, consent or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, the provisions of this Article VIII.  Notwithstanding anything in this Article VIII to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses in connection with investigating, responding to or defending any Indemnified Claims as contemplated by this Article VIII, the Indemnifying Party shall be liable for any settlement, compromise or consent to the entry of judgment with respect to any Indemnified Claims effected without its written consent if (i) such settlement, compromise or consent is entered into more than forty-five (45) days after receipt by the Indemnifying Party of such request for reimbursement and (ii) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement, compromise or consent.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement, compromise or consent to the entry of judgment with respect to any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (A) such settlement, compromise or consent includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (B) such settlement, compromise or consent does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.  No Indemnified Person shall be liable to the Company or any of its Affiliates for any damages arising from the use by unauthorized persons of any information made available to the Backstop Parties by the Company or any of its representatives through electronic telecommunications or other information transmissions systems that are intercepted by such persons.

Section 8.4    Contribution.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are

45

subject to indemnification pursuant to <u>Section 8.1</u>, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the Rights Offering Stock in the Rights Offering as contemplated by this Commitment Agreement and the Plan bears to (b) the Put Option Premium paid or proposed to be paid to the Backstop Parties (applying a liquidity discount as appropriate).  The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.  The amount paid or payable by an Indemnified Person as a result of Losses referred to above in this <u>Section 8.4</u> shall be deemed to include, for purposes of this <u>Section 8.4</u>, any legal or other expenses reasonably incurred by such Indemnified Person in connection with investigating or defending any such action or claim.

Section 8.5    <u>Treatment of Indemnification Payments</u>.  All amounts paid by the Indemnifying Party to an Indemnified Person under this <u>Article VIII</u> shall, to the extent permitted by applicable Law, be treated as adjustments to the Purchase Price for all Tax purposes.  The provisions of this <u>Article VIII</u> are an integral part of the transactions contemplated by this Commitment Agreement and without these provisions the Backstop Parties would not have entered into this Commitment Agreement, and the obligations of the Company under this <u>Article VIII</u> shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code (subject in all instances to the DIP Facility and any carve-out for Administrative Claims and Professional Claims provided for in connection with the DIP Facility Documents) and are payable without further Order of the Bankruptcy Court, and the Company may comply with the requirements of this <u>Article VIII</u> without further order of the Bankruptcy Court.

Section 8.6    <u>No Survival</u>.  All representations, warranties, covenants and agreements made in this Commitment Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms, and except as set forth in <u>Section 9.2</u> of this Commitment Agreement.

## ARTICLE IX

## TERMINATION

Section 9.1    <u>Termination Rights</u>.  This Commitment Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

Doc#: US1:9815113v12

(a)      by mutual written consent of the Company and the Required Backstop Parties;

(b)      pursuant to <u>Section 2.3(a)</u>, by the Company by written notice to each Backstop Party;

(c)      by the Company by written notice to each Backstop Party or by the Required Backstop Parties by written notice to the Company if any Law or Order shall have been enacted, adopted or issued by any Governmental Unit, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Commitment Agreement or the other Plan Documents;

(d)      by the Required Backstop Parties upon written notice to the Company:

(i)      if the Rights Offering Procedures Order does not become a Final Order by the Outside Date;

(ii)      if any of the Rights Offering Procedures Order, or the Confirmation Order is not entered, is entered in form and substance that is not reasonably satisfactory to the Required Backstop Parties, or is not effective;

(iii)      if any of the Rights Offering Procedures Order or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is modified or amended after entry in a manner that is not reasonably satisfactory to the Required Backstop Parties;

(iv)      if an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver or other responsible officer shall have been appointed in the Chapter 11 Cases;

(v)      if the entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction which, in each case, would have the effect of preventing consummation of or that would materially alter the treatment of the Backstop Parties under the Plan; <u>provided</u>, <u>however</u>, that the Company shall have ten (10) days after issuance of such injunction, judgment, decree, charge or ruling or order to obtain relief that would allow consummation of the Restructuring that (i) does not prevent or diminish in a material way compliance with the terms of this Commitment Agreement or (is) is otherwise reasonably satisfactory to the Required Backstop Parties; and;

(vi)      if any of the Plan Documents shall have been modified in any material respect or withdrawn, without the prior written consent of the Required Backstop Parties such that any of such Plan Documents are not consistent with the RSA and otherwise in form and substance reasonably satisfactory to the Required Backstop Parties;

(vii)      if the Company shall have breached any representation, warranty, covenant or other agreement made by the Company in this Commitment Agreement or any such representation and warranty shall have become inaccurate after the date of this

Commitment Agreement, and such breach or inaccuracy would, individually or in the aggregate, result in a failure of a condition set forth in Section 7.2(i) or Section 7.2(j), if continuing on the Closing Date, being satisfied and such breach or inaccuracy is not cured by the Company by the earlier of (A) the seventh (7th) day after the giving of notice thereof to the Company by any Backstop Party and (B) the Outside Date; provided, that the Backstop Parties shall not have the right to terminate this Commitment Agreement pursuant to this Section 9.1(d)(vii) if they are then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in Section 7.3 being satisfied;

(viii)    if the RSA is validly terminated in accordance with its terms;

(ix)    if any of this Commitment Agreement, the RSA, Rights Offering Procedures, Disclosure Statement, Plan or any documents related to the Plan, including notices, exhibits or appendices, or any of the Plan Documents is amended or modified in any material respect or withdrawn without the prior written consent of the Required Backstop Parties such that any such document is not in form and substance reasonably satisfactory to the Required Backstop Parties;

(x)    if the Company elects to (under the Plan or otherwise) pursue, or the Bankruptcy Court approves, a sale of a material amount of the Company's assets that is not satisfactory to each Backstop Party, in its sole discretion;

(xi)    if the Company (a) pursues any Alternative Transaction (as defined in the RSA), or (b) files, propounds, or otherwise publicly supports or announces that the Company or any of its Subsidiaries will support any sale of a material amount of the Company's assets not acceptable to each Backstop Party, in its sole discretion, an Alternative Transaction, or files any motion or application seeking authority to sell any material assets, without the prior written consent of each Backstop Party; or

(xii)    upon the occurrence of a Material Adverse Effect;

(e)    by any Backstop Party pursuant to Section 2.3(a) by written notice to ASG;

(f)    by the Company or the Required Backstop Parties (other than a Defaulting Backstop Party) if the Closing Date has not occurred by 11:59 p.m., New York City time on or before the date that is ninety (90) days following commencement of the Chapter 11 Cases (as it may be extended pursuant to this Section 9.1(f), the "**Outside Date**"); provided that, upon the occurrence of a Backstop Party Default, the Outside Date shall be extended in accordance with Section 2.3(a) during a Cover Transaction Period;

(g)    by the Company upon written notice to each Backstop Party if, subject to the right of the Backstop Parties to arrange a Backstop Party Replacement in accordance with Section 2.3(a), any Backstop Party shall have breached any representation, warranty, covenant or other agreement made by such Backstop Party in this Commitment Agreement or any such representation and warranty shall have become inaccurate after the date of this Commitment Agreement, and such breach or inaccuracy would, individually or in the

48

aggregate, result in a failure of a condition set forth in Section 7.1 or Section 7.2, if continuing on the Closing Date, being satisfied and such breach or inaccuracy is not cured by such Backstop Party by the earlier of (A) the seventh (7th) day after the giving of notice thereof to such Backstop Party by the Company and (B) the Outside Date; provided, that the Company shall not have the right to terminate this Commitment Agreement pursuant to this Section 9.1(g) if it is then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in Section 7.1 or Section 7.2 being satisfied; or

> (h)    by the Company, if the RSA is validly terminated in accordance with its terms.

> Section 9.2    Effect of Termination.  Upon termination of this Commitment Agreement pursuant to this Article IX, this Commitment Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Company or the Backstop Parties; provided, that (i) the obligations of the Debtors to pay the Expense Reimbursement pursuant to Article III and to satisfy their indemnification obligations pursuant to Article VIII and to pay the Put Option Premium pursuant to Section 3.2 shall survive the termination of this Commitment Agreement indefinitely and shall remain in full force and effect, in each case, until such obligations have been satisfied, (ii) the provisions set forth in this Section 9.2 and Article X shall survive the termination of this Commitment Agreement in accordance with their terms and (iii) subject to Section 10.10, nothing in this Section 9.2 shall relieve any Party from liability for any willful or intentional breach of this Commitment Agreement.  For purposes of this Commitment Agreement, "willful or intentional breach" shall mean a breach of this Commitment Agreement that is a consequence of an act undertaken by the breaching party with the knowledge (actual or constructive) that the taking of such act would, or would reasonably be expected to, cause a breach of this Commitment Agreement.

## ARTICLE X

## GENERAL PROVISIONS

> Section 10.1    Notices.  All notices and other communications in connection with this Commitment Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested), sent via e-mail or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as will be specified by like notice):

> (a)    If to the Company, to:

> Allen Systems Group, Inc.
> 708 Goodlette Road
> Naples, Florida 94102
> Attention: Derek S. Eckelman, EVP and General Counsel
> Email: derek.eckelman@asg.com

49

with copies (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Attention: Peter M. Gilhuly and Ted A. Dillman
Email: peter.gilhuly@lw.com; ted.dillman@lw.com

and

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Attention: Laura Davis Jones
Email: ljones@pszjlaw.com

(b)     If to any of the Backstop Parties, to counsel for the Backstop Parties:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention: Kelley A. Cornish and Lawrence G. Wee
Email: kcornish@paulweiss.com and lwee@paulweiss.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

Section 10.2     <u>Assignment; Third Party Beneficiaries</u>.  Neither this Commitment Agreement nor any of the rights, interests or obligations under this Commitment Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Company and the Required Backstop Parties, other than an assignment by a Backstop Party expressly permitted by <u>Section 2.3</u>, <u>2.6</u>, <u>7.2</u> or <u>10.7</u>, and any purported assignment in violation of this <u>Section 10.2</u> shall be void *ab initio*.  Except as provided in <u>Article VIII</u> with respect to the Indemnified Persons, this Commitment Agreement (including the documents and instruments referred to in this Commitment Agreement) is not intended to and does not confer upon any Person other than the Parties any rights or remedies under this Commitment Agreement.

Section 10.3     <u>Prior Negotiations; Entire Agreement</u>.

(a)     This Commitment Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Commitment Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter

50

of this Commitment Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties and the RSA (including the Plan) will each continue in full force and effect.

(b)    Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Backstop Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Backstop Parties under this Commitment Agreement unless such alteration, amendment or modification has been made in accordance with Section 10.7.

Section 10.4    Governing Law; Venue.  THIS COMMITMENT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  THE PARTIES CONSENT AND AGREE THAT ANY ACTION TO ENFORCE THIS COMMITMENT AGREEMENT OR ANY DISPUTE, WHETHER SUCH DISPUTES ARISE IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS COMMITMENT AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT; PROVIDED THAT, IF THE BANKRUPTCY COURT LACKS JURISDICTION, THE PARTIES CONSENT AND AGREE THAT ANY SUCH ACTION OR DISPUTE SHALL BE BROUGHT EXCLUSIVELY IN A COURT OF THE STATE OF NEW YORK OR A U.S. FEDERAL COURT LOCATED IN THE STATE OF NEW YORK.  THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT.  EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, (II) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY THE BANKRUPTCY COURT OR (III) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN THE BANKRUPTCY COURT IS BROUGHT IN AN INCONVENIENT FORUM.  THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.5    Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS COMMITMENT AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6    Counterparts.  This Commitment Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 10.7    Waivers and Amendments; Rights Cumulative.  This Commitment Agreement may be amended, restated, modified, supplemented, or changed only by a written instrument signed by the Company and the Required Backstop Parties (other than a Defaulting Backstop Party); provided, that each Backstop Party's prior written consent shall be required for any amendment, restatement, modification, supplement or change that would have the effect of: (i) modifying such Backstop Party's Backstop Commitment Percentage, (ii) increasing the Purchase Price to be paid in respect of the Backstop Shares, (iii) changing the definition of Required Backstop Parties, (iv) changing the terms of or conditions to the payment of the Put Option Premium, (v) changing any of the termination rights available to any Backstop Party under Section 9.1(e), (vi) otherwise disproportionately and materially adversely affecting such Backstop Party.  Subject to the foregoing, the terms and conditions of this Commitment Agreement (other than the conditions set forth in Sections 7.2 and 7.4, the waiver of which shall be governed solely by Article VII) may be waived (x) by the Company only by a written instrument executed by the Company and (y) by the Required Backstop Parties only by a written instrument executed by such Required Backstop Parties.  Notwithstanding anything to the contrary contained in this Commitment Agreement, and subject to Section 2.6, the Backstop Parties may agree, among themselves, to reallocate their Backstop Commitment Percentages without any consent or approval of any other Party; provided, however, any such agreement among the Backstop Parties shall require the consent or approval of all Backstop Parties affected by such reallocation.  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Commitment Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Commitment Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Commitment Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Commitment Agreement.  Except as otherwise provided in this Commitment Agreement, the rights and remedies provided pursuant to this Commitment Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have at law or in equity.

Section 10.8    Headings.  The headings in this Commitment Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Commitment Agreement.

Section 10.9    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Commitment Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Commitment Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Commitment Agreement, no right or remedy described or provided in this Commitment

Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Commitment Agreement, at law or in equity.

Section 10.10  <u>Damages</u>.  Notwithstanding anything to the contrary in this Commitment Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

Section 10.11  <u>No Reliance</u>.  No Backstop Party or any of its Related Parties shall have any duties or obligations to the other Backstop Parties in respect of this Commitment Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Backstop Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Backstop Parties, (b) no Backstop Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Backstop Party, (c) (i) no Backstop Party or any of its Related Parties shall have any duty to the other Backstop Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Backstop Parties any information relating to the Company or any of its Subsidiaries that may have been communicated to or obtained by such Backstop Party or any of its Affiliates in any capacity and (ii) no Backstop Party may rely, and confirms that it has not relied, on any due diligence investigation that any other Backstop Party or any Person acting on behalf of such other Backstop Party may have conducted with respect to the Company or any of its Affiliates or any of its securities and (d) each Backstop Party acknowledges that no other Backstop Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Backstop Shares or Backstop Commitment Percentage of its Backstop Commitment.

Section 10.12  <u>Publicity</u>.  At all times prior to the Closing Date or the earlier termination of this Commitment Agreement in accordance with its terms, the Company and the Backstop Parties shall, to the extent reasonably practicable, consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Commitment Agreement.  No Party shall issue any such press release or make any such public statement prior to such consultation, except to the extent the disclosing Party determines it is required to do so by applicable Law, in which case such Party shall use all reasonable efforts to consult with the other Party (or Parties) before issuing any such release or making any such public statement.

Section 10.13  <u>Settlement Discussions</u>.  This Commitment Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind nor does anything herein reflect the views of any party as to the valuation of the Company and its Subsidiaries.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Commitment Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases (other than a proceeding to approve or enforce the terms of this Commitment Agreement).

[*Signature Pages Follow*]

Doc#: US1:9815113v12

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

ALLEN SYSTEMS GROUP, INC.

By: _____

    Name: John C. DiDonato
    Title: Chief Restructuring Officer and President

ASG FEDERAL INC.

By: _____

    Name: John C. DiDonato
    Title: Chief Restructuring Officer and President

VIASOFT INTERNATIONAL, LLC

By: _____

    Name: John C. DiDonato
    Title: Chief Restructuring Officer and President

Agree and Acknowledged:

By:                              KKR Credit Advisors (US) LLC, acting on behalf of its
                                 managed funds and accounts

Signature Line:
Name:                            Jeffrey M. Smith
Title:                           Authorized Signatory
Address:                         555 California Street, 50th Floor
                                 San Francisco, CA 94104
Attn.:                           jeff.smith@kkr.com

By:                                Locust Street Funding LLC
By: FS INVESTMENT CORPORATION, as Sole Member
By: GSO/BLACKSTONE DEBT FUNDS
MANAGEMENT LLC, as Sub-Adviser

Signature Line:
Name:                          Marisa Beeney
Title:                           Authorized Signatory
Address:                    345 Park Avenue
New York, NY 10154
Attn.:                         Brad.Marshall@gsocap.com

By:                                  Lehigh River LLC
By: FS INVESTMENT CORPORATION II,
as Sole Member
By: GSO/BLACKSTONE DEBT FUNDS
MANAGEMENT LLC, as Sub-Adviser

Signature Line:
Name:                          Marisa Beeney
Title:                           Authorized Signatory
Address:                    345 Park Avenue
New York, NY 10154
Attn.:                         Brad.Marshall@gsocap.com

By:                                  Cobbs Creek LLC
By: FS INVESTMENT CORPORATION II,
as Sole Member
By: GSO/BLACKSTONE DEBT FUNDS
MANAGEMENT LLC, as Sub-Adviser

Signature Line:
Name:                          Marisa Beeney
Title:                           Authorized Signatory
Address:                    345 Park Avenue
New York, NY 10154
Attn.:                         Brad.Marshall@gsocap.com

By:       FS INVESTMENT CORPORATION
         By: GSO/BLACKSTONE DEBT FUNDS
         MANAGEMENT LLC, as Sub-Adviser

Signature Line:   _____
Name:     Marisa Beeney
Title:     Authorized Signatory
Address:    345 Park Avenue
       New York, NY 10154
Attn.:     Brad.Marshall@gsocap.com


By:       FS INVESTMENT CORPORATION II
         By: GSO/BLACKSTONE DEBT FUNDS
         MANAGEMENT LLC, as Sub-Adviser

Signature Line:   _____
Name:     Marisa Beeney
Title:     Authorized Signatory
Address:    345 Park Avenue
       New York, NY 10154
Attn.:     Brad.Marshall@gsocap.com


By:       FS INVESTMENT CORPORATION III
         By: GSO/BLACKSTONE DEBT FUNDS
         MANAGEMENT LLC, as Sub-Adviser

Signature Line:   _____
Name:     Marisa Beeney
Title:     Authorized Signatory
Address:    345 Park Avenue
       New York, NY 10154
Attn.:     Brad.Marshall@gsocap.com

By:                              SG Distressed Fund, L.P.

Signature Line:
Name:                            Richard Maybaum
Title:                           Managing Director
Address:                         8 Sound Shore Dr.
                                 Suite 303
                                 Greenwich, CT 06830
        Attn.:                   hsen@cetuscap.com


By:                              Cetus Capital II, LLC

Signature Line:
Name:                            Richard Maybaum
Title:                           Managing Director
Address:                         8 Sound Shore Dr.
                                 Suite 303
                                 Greenwich, CT 06830
        Attn.:                   hsen@cetuscap.com


By:                              Littlejohn Opportunities Master Fund, L.P.

Signature Line:
Name:                            Richard Maybaum
Title:                           Managing Director
Address:                         8 Sound Shore Dr.
                                 Suite 303
                                 Greenwich, CT 06830
        Attn.:                   hsen@cetuscap.com

By:                          Ellis Lake Master Fund, L.P.

Signature Line:              _____
Name:                        Gabriel Nechamkin
Title:                       Authorized Signatory
Address:                     444 Madison Avenue, 40th Floor
                             New York, NY 10025
Attn.:                       scrocombe@ellislake.com

By:                          Stone Lion Portfolio L.P.

**Stone Lion Portfolio L.P.**
**By: Stone Lion Capital Partners L.P.,**
**Its Investment Manager**

Signature Line:
Name:                        Gregory Hanley
Title:                       Managing Principal
Address:                     555 5th Avenue, 18th Floor
                             New York, NY 10017
Attn.:                       Claudia Borg
                             cborg@stonelioncapital.com


By:                          Permal Stone Lion Fund Ltd.

**Permal Stone Lion Fund Ltd.**
**By: Stone Lion Capital Partners L.P.,**
**Investment Manager**

Signature Line:
Name:                        Gregory Hanley
Title:                       Authorized Signatory
Address:                     555 5th Avenue, 18th Floor
                             New York, NY 10017
Attn.:                       Claudia Borg
                             cborg@stonelioncapital.com

Signature Page to Backstop Commitment Agreement

## SCHEDULE 1

| Backstop Party | Subscription Payment Amount | Backstop Commitment Percentage |
|---|---|---|
| GSO / Blackstone Debt Funds Management LLC | $22,824,967 | 24.13% |
| KKR Credit Advisors (US) LLC | $31,420,567 | 33.22% |
| Cetus Capital, LLC | $16,087,500 | 17.01% |
| Ellis Lake Master Fund L.P. | $19,046,733 | 20.14% |
| Stone Lion Portfolio L.P. | $4,576,867 | 4.84% |
| Permal Stone Lion Fund Ltd. | $624,000 | 0.66% |

## SCHEDULE 2

| Backstop Party | Beneficially Controlled Owned Principal Claims as of February 9, 2015 | |
|---|---|---|
| | First Lien Principal | Second Lien Principal |
| GSO / Blackstone Debt Funds Management LLC | $125,915,185 | $52,673,000 |
| KKR Credit Advisors (US) LLC | $51,180,517 | $72,509,000 |
| Cetus Capital, LLC | $33,088,204 | $37,125,000 |
| Ellis Lake Master Fund L.P. | $39,153,094 | $43,954,000 |
| Stone Lion Portfolio L.P. | — | $10,562,000 |
| Permal Stone Lion Fund Ltd. | — | $1,440,000 |

**EXHIBIT 5**

**AA Settlement Agreement**

**EXECUTION COPY**

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT is made and entered into as of December 10, 2014 (the "**Settlement Agreement**") by and among (i) Allen Systems Group, Inc., a Delaware corporation (the "**Company**"), (ii) Arthur L. Allen ("**Arthur Allen**"), (iii) Allen Investment Group ("**Investment Group**"), ALA Services, LLC ("**ALA Services**"), (iv) each of the undersigned lenders (the "**Consenting Lenders**") of the Loans (as defined below) under (a) that certain Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified, the "**Credit Agreement**") by and among the Company, as borrower, TPG Allison, LLC as lender, and TPG Allison Agent, LLC, as administrative agent, and (b) that certain Credit Agreement dated as of December 14, 2012 (as further amended, supplemented or otherwise modified, the "**Foreign Credit Agreement**" and together with the Credit Agreement, the "**First Lien Credit Agreements**") by and among Atempo SAS ("**Atempo**"), as borrower, Natixis, New York Branch, as lender, and TPG Allison Agent, LLC, as administrative agent, and (v) each of the undersigned holders (the "**Consenting Noteholders**", and together with the Consenting Lenders, the "**Consenting Creditors**") of the Notes (as defined below) under that certain Indenture dated November 22, 2010 (as amended, supplemented or otherwise modified from time to time, the "**Indenture**", and together with the First Lien Credit Agreements and other documents related thereto, the "**Prepetition Debt Documents**") by and among the Company as issuer, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A., as trustee. The Company, Arthur Allen, Investment Group and the Consenting Creditors are each referred to herein as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.    **WHEREAS**, Arthur Allen is the founder, sole shareholder, Chief Executive Officer and President of the Company;

B.    **WHEREAS**, Investment Group, an entity owned and operated by Arthur Allen, and the Company entered into that certain Building Lease dated November 14, 1996 (as further amended, supplemented or otherwise modified, the "**1333 Building Lease**"), whereby the Company leased from Investment Group that certain real property located at 1333 Third Avenue South, Naples, Florida;

C.    **WHEREAS**, Arthur Allen and the Company entered into that certain Triple Net Building Lease dated November 1, 2004 (as further amended, supplemented or otherwise modified, the "**704 Building Lease**"), whereby the Company leased from Arthur Allen that certain real property located at 704 Goodlette Road, Naples, Florida;

D.    **WHEREAS**, Arthur Allen and the Company entered into that certain Triple Net Building Lease dated May 31, 2002 (as further amended, supplemented or otherwise modified, the "**708 Building Lease**"), whereby the Company leased from Arthur Allen that certain real property located at 708 Goodlette Road, Naples, Florida;

E.      **WHEREAS**, Arthur Allen and the Company entered into that certain Triple Net Building Lease dated April 1, 2005 (as further amended, supplemented or otherwise modified, the "**Hangar Lease**"), whereby the Company leased from Arthur Allen that certain real property located at 300 Freedom Way, Naples, Florida;

F.      **WHEREAS**, ALA Services, an entity owned and operated by Arthur Allen, and the Company entered into that certain Aircraft Lease Agreement dated November 17, 2005 (as further amended, supplemented or otherwise modified, the "**Aircraft Lease**" and, together with the 1333 Building Lease, the 704 Building Lease, the 708 Building Lease and the Hangar Lease, the "**AA Leases**"), whereby the Company leased an aircraft from ALA Services, LLC;

G.      **WHEREAS**, Arthur Allen asserts that as of November 30, 2014, the Company owes Arthur Allen substantial amounts under the AA Leases;

H.      **WHEREAS**, the Consenting Creditors assert that the Company has claims and causes of action against Arthur Allen and his affiliated entities arising from or related to the AA Leases and that certain Salary and Advance and Repayment Agreement dated August 19, 2013 (the "**Salary and Advance Agreement**");

I.      **WHEREAS,** Arthur Allen disputes the existence and validity of the alleged claims or causes of action that the Consenting Creditors and Company assert against Arthur Allen;

J.      **WHEREAS**, the Company asserts that as of November 30, 2014, not less than $295,648.06 remains due and owing to the Company under the Salary and Advance Agreement and for various personal services the Company provided to Arthur Allen and his family;

K.      **WHEREAS**, as of November 30, 2014, the aggregate principal amount of the loans outstanding under the First Lien Credit Agreements was $249,337,000.00 (the "**Loans**"), and the aggregate principal amount of the notes outstanding under the Indenture was $300,000,000.00 (the "**Notes**", and together with the Loans, the "**Debt**"); the Consenting Creditors hold 100% of the Loans outstanding under the First Lien Credit Agreements and approximately 68.8% of the Notes outstanding under the Indenture and various outstanding events of default exist under the Prepetition Debt Documents;

L.      **WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations and have agreed to support and effectuate a restructuring (the "**Restructuring**") of the Company's capital structure and outstanding obligations under the Prepetition Debt Documents to be implemented pursuant to a pre-packaged chapter 11 plan (the "**Plan**"), the principal terms of which (i) are described in the draft Restructuring Support Agreement attached hereto as **Exhibit A** (the "**RSA**") and the draft Plan Term Sheet attached hereto as **Exhibit B** (the "**Plan Term Sheet**"), which contemplate, among other things, a deleveraging of the Company through a debt-for-equity exchange, whereby the holders of the Notes under the Indenture will receive, on account of their Notes and/or through participation in a rights offering, 100 percent of the

2

common stock to be issued by the reorganized Company (subject to dilution as provided in the Plan and this Settlement Agreement), and (ii) shall incorporate the terms of, and provide for the assumption or approval of, this Settlement Agreement;

M.    **WHEREAS**, the Parties intend that the Company and certain of its subsidiaries will effectuate the Restructuring by commencing voluntary chapter 11 cases (collectively, the "**Chapter 11 Cases**," and the entities filing the Chapter 11 Cases, the "**Debtors**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

N.    **WHEREAS**, the Parties desire to compromise and settle any and all claims and disputes the Parties may have against each other to avoid the risks, costs and delay of potential litigation that could be commenced between the Parties;

O.    **WHEREAS**, as a result of extensive good faith, arm's-length negotiations, the Parties have resolved to enter into this Settlement Agreement to amend the AA Leases and settle all disputes, claims and causes of action between Arthur Allen, ALA Services and Investment Group, on the one hand (the "**AA Claims**"), and the Company and the Consenting Creditors, on the other hand, including, among other things, those arising with respect to the AA Leases and the Salary and Advance Agreement; and

**NOW, THEREFORE**, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE I
## PROVISIONS REGARDING ARTHUR ALLEN RESIGNATION

1.1    **Resignation**.

(a)    On the Settlement Effective Date (as defined in Section 3.1 below), Arthur Allen shall be deemed to have resigned from any and all positions he holds with the Company and its affiliates (including non-Debtor affiliates), including, without limitation, as a director, officer, employee, representative, or agent, and any other positions held in any other capacity, and hereby acknowledges and agrees to take any further actions required or reasonably requested by the Company or the Debtors to effectuate such resignations.

(b)    As of the Settlement Effective Date, Arthur Allen shall have no authority to act on behalf of the Company or any of its affiliates (including non-Debtor affiliates), and shall not hold himself out as having such authority, nor shall he enter into any agreement or incur any obligations on behalf of the Company or any affiliates.  Notwithstanding the foregoing, from the Settlement Effective Date until January 20, 2015, Arthur Allen shall have the non-exclusive right to engage in negotiations with those third parties listed in that separate side letter dated as of the date hereof (each such third party, an "**Approved Third Party**") regarding a potential

transaction that would refinance in full in cash all amounts due and owing under the Prepetition Debt Documents (the "**Alternative Negotiations**"); provided, however, that Arthur Allen shall notify and provide the Company and the Consenting Creditors with the opportunity, and the Company and Consenting Creditors shall have the absolute right, in their sole discretion, to participate in any Alternative Negotiations.  Arthur Allen shall not, without the express written consent of the Company and the Consenting Creditors, (i) engage in any Alternative Negotiations with any third party that is not an Approved Third Party, or (ii) communicate with any current officers or employees of the Company or use any Company resources with respect to Alternative Negotiations.

(c)    Within three (3) business days after the Settlement Effective Date, Arthur Allen shall cause Carole Allen and Jean Luc Derouet to resign as employees of the Company in such a manner as to avoid all cost to the Company in connection with such separation.  On the Settlement Effective Date, all employees of the Company who primarily provide personal services to Arthur Allen or his affiliates or family shall be terminated.

**1.2**    **Salary and Benefits**.  Effective as of the Settlement Effective Date, Arthur Allen shall not be entitled to any further salary or other compensation or to participate in any Company employee benefits programs and plans (other than as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1985 or other law) and shall have no further rights to receive any salary, bonus, equity, benefits, perquisites or other compensation from the Company or any of its affiliates, except as otherwise expressly provided herein.  Except as specifically provided in Section 1.8, any and all services, benefits and other support provided by the Company to Arthur Allen or his affiliates or family shall be terminated as of the Settlement Effective Date.

**1.3**    **The RSA.**  Arthur Allen shall execute the RSA at such time as the Company and the Consenting Creditors execute the RSA, provided that the RSA shall be consistent with the terms hereof and shall be otherwise substantially in the form attached hereto as **Exhibit A**.  Arthur Allen acknowledges and agrees that the Company and Consenting Creditors may, in their sole discretion, modify or amend the RSA at any time. If such modification or amendment would have a material adverse effect on Arthur Allen's rights hereunder, Arthur Allen shall have the right, upon ten (10) business days' written notice to the Company and Consenting Lenders, to terminate this Settlement Agreement.  Moreover, the Company and the Consenting Creditors reserve the right to implement a restructuring outside of a chapter 11 proceeding, and Arthur Allen covenants and agrees that he shall take all actions reasonably requested by the Company and/or the Consenting Creditors, necessary or expedient to implement such out-of-court restructuring, and shall not, directly or indirectly, take any action that would delay, hinder, or obstruct such out-of-court restructuring, provided that such out-of-court restructuring does not materially and adversely affect his economic recovery provided under this Agreement.  In such event, all events referenced herein that are triggered by consummation of the Plan, the Plan Effective Date, or substantially similar triggering events, shall be deemed to occur at the closing of such out-of-court restructuring.

For the avoidance of doubt, the RSA and Plan Term Sheet remain subject to negotiation by the Company and nothing herein shall be construed as an obligation on the part of the Company to enter into the RSA or Plan Term Sheet in the forms attached hereto, or to implement the Restructuring as described herein.  If prior to the execution of the RSA, the Company determines that it will not be able to reach agreement on the terms of the RSA or the Plan Term Sheet, then the Company may terminate this Settlement Agreement upon ten (10) business days' notice to the other Parties without further obligation.

       **1.4**     **The Plan.**  Arthur Allen shall support any actions undertaken by the Company and Consenting Creditors in furtherance of effectuating the Restructuring and shall not, directly or indirectly, take any action that would delay, hinder, or obstruct the solicitation, confirmation, or consummation of the Plan, or cause or encourage any other person or entity, directly or indirectly, to do so.  Arthur Allen acknowledges and agrees that the Company and Consenting Lenders may, in their sole discretion, modify or amend the Plan at any time.  If such modification or amendment would have a material adverse effect on Arthur Allen's rights hereunder, Arthur Allen shall have the right, upon ten (10) business days' written notice to the Company and Consenting Lenders, to terminate this Settlement Agreement.

       **1.5**     **Non-Solicitation; Non-Disparagement; Non-Competition.**

       (a)     **Non-Solicitation**.  Arthur Allen agrees that from the Settlement Effective Date until the first anniversary thereof, he shall not, without the express written consent of the Company, directly or indirectly, on behalf of himself or any other person or entity (i) solicit, induce, or encourage the resignation of any person who is a director, officer, employee, representative, or agent of the Company or any of its affiliates, (ii) interfere in any way with the relationship between the Company or any of its affiliates and any person who is a director, officer, employee, representative, or agent of the Company or any of its affiliates, or (iii) hire any person who serves a director, officer, employee, representative, or agent of the Company or any of its affiliates, provided, however, that the restrictions set forth in this Section 1.5(a)(iii) shall not apply to Arthur Allen hiring any person who previously served as a director, officer, employee, representative, or agent of the Company or an affiliate of the Company from and after three (3) months since the date such person has ceased to be a director, officer, employee, representative, or agent of the Company or an affiliate of the Company, so long as such cessation did not result from a violation of this Section 1.5(a).

       (b)     **Non-Disparagement**.  Arthur Allen agrees that he shall not at any time, without limitation, make, publish or communicate, or encourage any other person or entity to make, publish or communicate, any Disparaging (as defined below) remarks, comments, or statements concerning the Company, the Consenting Creditors, affiliates, customers and vendors of the foregoing, or any of their respective directors, officers, employees, representatives, agents, or affiliates.  "**Disparaging**" remarks, comments or statements are those that impugn the character, honesty, integrity, morality, or business acumen, business strategy, or abilities, or reflect negatively upon, the individual or entity being disparaged.  Nothing in this provision shall be construed to

preclude truthful disclosures in response to lawful process as required by applicable law, regulation, or order or directive of a court, governmental agency, or regulatory organization.

      (c)    **Non-Competition**.  Arthur Allen agrees that from the Settlement Effective Date until the first anniversary thereof, Arthur Allen shall not, directly or indirectly, without the prior written consent of the Company: (i) engage in activities or businesses (including without limitation by owning any interest in, managing, controlling, participating in, consulting with, advising, rendering services for, or in any manner engaging in the business of owning, operating or managing any business) in any geographic location in which the Company or any of its affiliates engage in activity or business, that competes directly or indirectly with the Company or any of its affiliates ("**Competitive Activities**"); (ii) solicit or attempt to solicit any customer, client, supplier, licensee, licensor or other business relation (or any actively sought prospective customer, client, supplier, licensee, licensor or other business relation) of the Company or any of its affiliates, to purchase any goods or services manufactured, sold or provided by the Company or any of its affiliates from anyone other than the Company or any of its affiliates; (iii) knowingly perform any action, activity or course of conduct which is substantially detrimental to the businesses or business reputations of the Company or any of its affiliates, including but not limited to intentionally interfering with the relationship of the Company or any of its affiliates with any customer, client, supplier, licensee, licensor or other business relation of, the Company or any of its affiliates; or (iv) assist any person in any way to do, or attempt to do, anything prohibited by Section 1.5(c)(i) above; provided, that, the provisions of Section 1.5(c) shall not be deemed breached as a result of Arthur Allen's passive ownership of less than an aggregate of 2% of any class of securities of a person engaged, directly or indirectly, in Competitive Activities, so long as Arthur Allen does not actively participate in the business of such person; provided, however, that such stock is listed on a national securities exchange.

      **1.6**    **Confidential Information**.  Arthur Allen acknowledges that during his employment by the Company, he had access to and possession of non-public and/or proprietary information and materials concerning the Company and its affiliates, including, but not limited to, information concerning (i) the Company, its directors, officers, partners, members, employees, clients, customers, service providers, vendors, and investors and their identities and contact information, and (ii) the Company's and its affiliates' operations, systems, services, personnel, marketing, fundraising, financial affairs, philosophies, strategies and techniques, structure, technology, legal affairs, passwords, and other proprietary information concerning the Company and its affiliates ("**Confidential Information**").  Confidential Information shall not include information that the Company or its affiliates previously have disclosed to the general public.  Arthur Allen agrees that all Confidential Information is the exclusive property of the Company and its affiliates and that Arthur Allen will keep all Confidential Information confidential and will not, without the prior written consent of the Company, divulge, furnish, disclose or otherwise make available any Confidential Information to any third person.  Arthur Allen agrees that, if he receives any legal, governmental or regulatory process, notice or request purporting to require disclosure of any Confidential Information, except to the extent advised by qualified counsel that such notice would be unlawful, he will give

6

prompt written notice to the Company of such process, notice, or request, disclose no more information than is required, and will fully cooperate with all efforts of the Company to resist, restrict, or limit the disclosure of such Confidential Information in response to such process, notice, or request.

      **1.7**    <u>**Intellectual Property**</u>.  Arthur Allen acknowledges and agrees that he does not, nor do any of his wholly-owned direct or indirect subsidiaries (other than the Company), have any right, title or interest in or to:

      (a)    Any of the following, as they exist anywhere in the world, whether registered or unregistered: (i) trade names, trademarks, service marks, trade dress, brand names, logos and corporate names and all goodwill related thereto, (ii) copyrights (including all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "**<u>moral rights</u>**"), mask works and designs, (iii) trade secrets, know-how, inventions (whether or not patentable), processes, procedures, databases, confidential business information and other proprietary information and rights, computer software programs, including all source code, object code, specifications, designs and documentation related thereto, (iv) patents, patentable inventions and other patent rights (including any divisions, continuations, continuations-in-part, reissues, reexaminations and interferences thereof), and (v) domain names, social media account identifiers, Internet addresses and other computer identifiers, in each case as owned, used by or held for use by the Company or any of its affiliates in the course of their business at any time, including, the right to sue and recover for any and all past, present, and future infringements and other violations thereof (collectively, the "**<u>Company Intellectual Property</u>**").

      (b)    In the event that Arthur Allen has or any of his wholly-owned direct or indirect subsidiaries have any right, title or interest in or to any Company Intellectual Property, as of the Settlement Effective Date, Arthur Allen on behalf of himself and each of his subsidiaries (other than the Company) shall and hereby do assign, sell, and transfer to the Company his, or its, entire right, title, and interest, if any, in and to any such Company Intellectual Property on a worldwide basis and Arthur Allen on behalf of himself and each of his wholly-owned subsidiaries (other than the Company) does not reserve or retain any rights in any such Company Intellectual Property.

      (c)    Arthur Allen on behalf of himself and each of his wholly-owned direct or indirect subsidiaries (other than the Company) shall not, directly or indirectly, oppose or seek to cancel or otherwise challenge or contest (collectively, "**<u>Challenge</u>**") any of the Company Intellectual Property, including any application or registration concerning or related to the Company Intellectual Property, or cause, assist or encourage any other person or entity, directly or indirectly, to Challenge any application or registration concerning or related to the Company Intellectual Property.

      (d)    Arthur Allen on behalf of himself and each of his wholly-owned direct or indirect subsidiaries (other than the Company) shall not, directly or indirectly, Challenge or deny the validity, ownership, or enforceability of the Company Intellectual Property and/or claim adversely or assist in any claim adverse to the

Company or any Company affiliate concerning any right, title, or interest in or to the Company Intellectual Property.

(e)    Arthur Allen on behalf of himself and each of his wholly-owned direct or indirect subsidiaries (other than the Company) shall not register or use or attempt to register or use, or aid any other person or entity in registering or using, or attempting to register or use, any Company Intellectual Property, including, without limitation, in connection with the formation or operation of any company, partnership, corporation, or any other entity.  Arthur Allen on behalf of himself and each of his wholly-owned direct or indirect subsidiaries (other than the Company) shall not register or attempt to register, or use or attempt to use, any trademark identical to or confusingly similar to that of any of the Company Intellectual Property.

(f)    Arthur Allen further acknowledges and agrees that he is not nor are any of his wholly-owned direct or indirect subsidiaries (other than the Company) entitled to any compensation or other consideration as a result of the Company's ownership or use of any Company Intellectual Property pursuant to any oral or written agreement or course of dealing that may be in existence as of the date hereof and hereby disclaims and releases any claim to any such compensation or consideration.

(g)    Upon each request by the Company, without additional consideration, but at no out-of-pocket cost to Arthur Allen, Arthur Allen agrees promptly to execute documents, testify and take other acts as the Company reasonably may deem necessary or desirable to procure, maintain, perfect, evidence and enforce the full benefits, enjoyment, rights, title and interest, on a worldwide basis of the Company Intellectual Property and all rights assigned hereunder, and render all reasonable necessary assistance, but at no out-of-pocket cost to Arthur Allen, in making application for and obtaining all intellectual property rights related to the Company Intellectual Property in the Company's name and for its benefit.  In the event Arthur Allen, in his individual capacity or in his capacity as an agent for any of his wholly-owned subsidiaries (other than the Company), fails to timely execute and/or deliver any such document, Arthur Allen does hereby irrevocably constitute and appoint the Company and any officer, employee or agent thereof, with full power of substitution, as Arthur Allen's true and lawful attorney-in-fact with full irrevocable power and authority to take all appropriate action and to execute any and all such documents necessary to effectuate the foregoing.

(h)    Arthur Allen hereby represents and warrants that he has all necessary authority to bind each of his wholly-owned direct or indirect subsidiaries (other than the Company) to the covenants and obligations set forth in this Section 1.7.

**1.8    Return of Company Property**.  On or prior to the Settlement Effective Date, Arthur Allen shall return all property of the Company and its affiliates in his possession, custody, or control, including, without limitation, computer software or hardware, credit cards, keys, telephone cards, Company identification cards, compliance manuals, summaries of benefits, and other books or manuals issued by the Company or any of its affiliates; provided, however, that Arthur Allen may retain his laptop, cell

8

phone and blackberry; provided, further, that as of the Settlement Effective Date, Arthur Allen will not have any access to the Company's e-mail, data systems, servers or phone and data plans.  On or before the Plan Effective Date, Arthur Allen shall surrender and/or transfer to the Company or its designee any and all direct or indirect right, title or interest in or to the equity interests (as such equity interests relate solely to the Company's subsidiaries), property or assets of the Company and/or its subsidiaries. For the avoidance of doubt, and without limiting the generality of the foregoing, at any time prior to, on, or after the Settlement Effective Date, the Company may enter any of the premises leased pursuant to the AA Leases and recover any Company property or assets (including art work) located on such premises.

    **1.9**  **Consultation Services; Post-Effective Date Assistance**.  From the Settlement Effective Date through the fourth (4th) month anniversary thereof (the "**Transition Period**"), the Company shall retain Arthur Allen as a consultant to provide advice and assistance to the Company in such matters as the Company, in its sole discretion, may reasonably request.  In consideration of the services Arthur Allen agrees to provide to the Company, at its request during the Transition Period, the Company shall pay Arthur Allen four (4) equal monthly installments of $375,000.00 commencing on the first (1st) business day of the first (1st) month anniversary of the Settlement Effective Date (collectively, the "**Consultation Payments**").  The Consenting Creditors shall support the payment of the Consultation Payments from and after the commencement of the Chapter 11 Cases.  After the Transition Period, Arthur Allen shall, without additional consideration, assist the Company, the Debtors or the reorganized Debtors, as applicable, and the Consenting Creditors in such matters as they may reasonably request but at no out-of-pocket cost to Arthur Allen.  Notwithstanding anything to the contrary contained herein, if Arthur Allen breaches this Settlement Agreement, including, without limitation, the requirements and undertakings set forth in Sections 1.1 and 1.5 through 1.9 hereof, then the Company shall have no further obligation to make any further payment to Arthur Allen, and Arthur Allen shall immediately forfeit and pay over to the Company any payment previously paid to him under this Section 1.9.

    **1.10**  **Cash Payment**.  Subject to the confirmation of the Plan, which includes the assumption or approval of this Settlement Agreement, and Arthur Allen's continued compliance with the terms and conditions of this Settlement Agreement (including the restrictions and undertakings set forth in Sections 1.1 and 1.5 through 1.9 hereof), the Company shall pay the aggregate amount of $6,250,000.00 plus that portion of the Consultation Payments not paid pursuant to Section 1.9 hereof, in cash to Arthur Allen (the "**Settlement Payment**"), of which (i) $2,250,000.00, plus that portion of the Consultation Payments not paid pursuant to Section 1.9 hereof, will be payable on the effective date of the Plan (the "**Plan Effective Date**"), and (ii) the remaining $4,000,000.00 will be payable in cash in two (2) equal installments of $2,000,000.00 each on the last business day of the ninth (9th) month following the Plan Effective Date, and on the last business day of the eighteenth (18th) month following the Plan Effective Date, respectively; provided however, that if the WF Consent (as defined below) is not obtained by the WF Consent Deadline (as defined below) and the AA Leases are rejected by the Company, such $2,000,000.00 installments shall be each reduced by $500,000.00. Notwithstanding anything to the contrary contained herein, if Arthur Allen breaches this

Settlement Agreement, including, without limitation, the requirements and undertakings set forth in Sections 1.1 and 1.5 through 1.9 hereof, then the Company shall have no further obligation to make any further Settlement Payment to Arthur Allen, and Arthur Allen shall immediately forfeit and pay over to the Company any portion of the Settlement Payment previously paid to him.

      **1.11**    **Warrants**.  On the Plan Effective Date, Arthur Allen shall receive warrants of the reorganized Company containing the terms described in **Exhibit C** hereto.

      **1.12**    **Releases.**

      (a)    As of the Plan Effective Date, and subject to the assumption or approval of this Settlement Agreement in connection with the confirmation of the Plan and the Company's compliance with the terms and conditions of this Settlement Agreement on and as of the Plan Effective Date, Arthur Allen and each of his past, present, and future affiliated entities, including Investment Group and ALA Services (except the Company), representatives, attorneys, advisors, agents, successors, assigns, heirs, administrators, executors, and relatives (in their respective capacities as such, collectively, the "**Arthur Allen Releasors**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Company, the Consenting Creditors and the affiliates of the foregoing, and each of their respective past, present and future directors, officers, shareholders, members, executives, employees, representatives, attorneys, advisors, agents, parent companies, subsidiaries, divisions, affiliates, predecessors, successors, assigns, administrators, and executors (collectively, the "**Arthur Allen Releasees**") from any and all claims, demands, obligations, rights, causes of action, liabilities, losses, duties, damages, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, costs, actions, potential actions, suits, agreements, judgments, decrees, matters, issues, and controversies of any kind, nature, or description whatsoever, whether known or unknown, liquidated, unliquidated, fixed, contingent, matured, unmatured, legal, equitable, foreseen, or unforeseen, that the Arthur Allen Releasors ever had, now has, or hereinafter may have arising from or relating to the Company, the Debt, the Prepetition Debt Documents, any and all matters relating to Arthur Allen's ownership of, or employment by, the Company and the cessation thereof, the AA Leases, the Salary and Advance Agreement, the Restructuring, any indemnification obligation of the Company, and all matters arising under any federal, state, or local statute, rule, or regulation or principle of contract law or common law related thereto, including, without limitation, claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.,* the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.,* the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.,* and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.,* all as amended, and any other laws relating to express or implied breach of contract, wrongful discharge, defamation, intentional infliction of emotional distress, and any related claims for attorneys' fees and costs by reason of acts or omissions which have occurred on or prior to the Plan Effective Date, excluding any claims that may not be released as a matter of law and any claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*.  It is understood that this release includes both known and

unknown claims, regardless of any law to the contrary.  The Arthur Allen Releasors will not file, or encourage or knowingly permit another to file, any claim concerning any of the released claims described herein and if any such claim previously was filed, such litigant will take all steps necessary to cause such proceeding to be withdrawn with prejudice and without delay.  Arthur Allen hereby agrees to pay all costs and expenses, including reasonable attorneys' fees, incurred by any Arthur Allen Releasee in connection with defending against any claim filed or prosecuted in violation of this Settlement Agreement.  Arthur Allen acknowledges that he understands that by entering into this Settlement Agreement, he is limiting the availability of certain remedies that he may have against any Arthur Allen Releasee and limiting his ability to pursue certain claims against any Arthur Allen Releasees. Nothing in this Section 1.12 (a) shall release any obligations of the Company and Consenting Creditors under this Settlement Agreement.

(b)    On the Settlement Effective Date, the Arthur Allen Releasors shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Company and its affiliates, and their past, present and future directors, officers, shareholders, members, executives, employees, representatives, attorneys, advisors, agents, parent companies, subsidiaries, divisions, affiliates, predecessors, successors, assigns, administrators, and executors (in their respective capacities as such, collectively, the "**Settlement Effective Date Allen Releasees**") from any and all claims, demands, obligations, rights, causes of action, liabilities, losses, duties, damages, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, costs, actions, potential actions, suits, agreements, judgments, decrees, matters, issues, and controversies of any kind, nature or description whatsoever, whether known or unknown, liquidated, unliquidated, fixed, contingent, matured, unmatured, legal, equitable, foreseen, or unforeseen, that the Arthur Allen Releasors ever had, now have, or hereinafter may have arising from or relating to any and all matters relating to or arising out of the management or governance of the Company or the acts or omissions of the Settlement Effective Date Allen Releasees on or before the Settlement Effective Date.  It is understood that this release includes both known and unknown claims, regardless of any law to the contrary.  The Arthur Allen Releasors will not file, or encourage or knowingly permit another to file, any claim concerning any of the released claims described herein and if any such claim previously was filed, such litigant will take all steps necessary to cause such proceeding to be withdrawn with prejudice and without delay.  Arthur Allen hereby agrees to pay all costs and expenses, including reasonable attorneys' fees, incurred by any Settlement Effective Date Allen Releasee in connection with defending against any claim filed or prosecuted in violation of this Settlement Agreement.  Arthur Allen acknowledges that he understands that by entering into this Settlement Agreement, he is limiting the availability of certain remedies that he may have against any Settlement Effective Date Allen Releasee and limiting his ability to pursue certain claims against any Settlement Effective Date Allen Releasees.  Notwithstanding anything in this Settlement Agreement to the contrary, this release and covenant not to sue will survive termination of the Settlement Agreement.

(c)    On the Plan Effective Date, and subject to the assumption or approval of this Settlement Agreement in connection with the confirmation of the Plan

and Arthur Allen's compliance with the terms and conditions of this Settlement Agreement on and as of the Plan Effective Date, the Company and its affiliates (including non-Debtor affiliates) and the Consenting Creditors and each of their respective past, present and future directors, officers, shareholders, members, executives, employees, representatives, attorneys, advisors, agents, parent companies, subsidiaries, divisions, affiliates, predecessors, successors, assigns, administrators, and executors (collectively, the "**Company Releasors**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged Arthur Allen and each of his past, present, and future affiliated entities (including Investment Group and ALA Services but excluding the Company), representatives, attorneys, advisors, agents, successors, assigns, heirs, administrators, executors, and relatives (in their respective capacities as such, collectively, the "**Company Releasees**") from any and all claims, demands, obligations, rights, causes of action, liabilities, losses, duties, damages, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, costs, actions, potential actions, suits, agreements, judgments, decrees, matters, issues, and controversies of any kind, nature or description whatsoever, including any claim or cause of action under Chapter 5 of the Bankruptcy Code, whether known or unknown, liquidated, unliquidated, fixed, contingent, matured, unmatured, legal, equitable, foreseen, or unforeseen, that the Company Releasors ever had, now have, or hereinafter may have arising from or relating to the Company, the Debt, the Prepetition Debt Documents, the Restructuring, any and all matters relating to or arising out of Arthur Allen's ownership of, or employment by, the Company and the cessation thereof.  Nothing in this Section 1.12 (b) shall release any obligations of Arthur Allen under this Settlement Agreement.

    (d)  The Parties acknowledge that they are familiar with statutory requirements and common law principles such as California Civil Code section 1542, which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

THE PARTIES, BEING AWARE OF SAID CODE SECTION AND OTHER STATUTORY AND COMMON LAW PRINCIPLES OF SIMILAR EFFECT, AND HAVING HAD AND EXERCISED THE OPPORTUNITY TO CONSULT LEGAL COUNSEL, HEREBY EXPRESSLY WAIVE ANY RIGHTS THEY MAY HAVE THEREUNDER.  THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS WAIVER IS AN ESSENTIAL AND MATERIAL TERM OF THIS AGREEMENT, AND THAT WITHOUT SUCH WAIVER, THE PARTIES WOULD NOT HAVE ENTERED INTO THIS AGREEMENT.

Each of the Parties further acknowledge that he, she or it may discover facts different from, or in addition to, those facts which they now know or believe to be true, but agree

that this general release is now and shall remain effective notwithstanding the existence or the discovery of additional or different facts.  The Parties hereby intentionally waive and relinquish all rights and benefits under any law of any jurisdiction providing to the contrary, or any public policy that would limit or render void, voidable or unenforceable any provision of this general release.

## ARTICLE II
## TREATMENT OF AA LEASES AND OTHER AGREEMENTS

### 2.1    Amendment and Assumption of Certain AA Leases.

(a)    Subject to clause 2.1(c) below, on the Settlement Effective Date, the following AA Leases shall be amended as follows:

| AA Lease | Base Rent | Lease Term | Waiver and Release |
|---|---|---|---|
| **1333 Building Lease** | Commencing on the Settlement Effective Date, base rent shall be paid in the amount of $19.00 per rentable square foot, payable in equal monthly installments. | The 1333 Building Lease shall terminate on the last calendar day of the third (3rd) full month following the Settlement Effective Date. | Arthur Allen and Investment Group, shall waive and release all claims arising under or related to the 1333 Building Lease, including all claims for unpaid rent and any other amounts due and owing by the Company through and including the Settlement Effective Date. |
| **704 Building Lease** | Commencing on the Settlement Effective Date, base rent shall be paid in the amount of $19.00 per rentable square foot, payable in equal monthly installments. | The 704 Building Lease shall terminate on the last calendar day of the third (3rd) full month following the Settlement Effective Date. | Arthur Allen shall waive and release all claims arising under or related to the 704 Building Lease, including all claims for unpaid rent and any other amounts due and owing by the Company through and including the Settlement Effective Date. |
| **708 Building Lease** | Commencing on the Settlement Effective Date, base rent shall be paid in the amount of $19.00 per rentable square foot, payable in equal monthly installments. | The 708 Building Lease shall terminate on the last calendar day of the second full 12-month period following the Settlement Effective Date, provided, however, that the Company shall | Arthur Allen shall waive and release all claims arising under or related to the 708 Building Lease, including all claims for unpaid rent and any other amounts due and owing by the |

13

| | | have an option, at its sole discretion, to extend the lease term for two additional two-year periods. | Company through and including the Settlement Effective Date. |
| --- | --- | --- | --- |
| | | | |

(b)     Subject to clause 2.1(c) below, pursuant to and under the Plan, the Company shall seek, and the Consenting Creditors shall support the Company's request, to assume the 1333 Building Lease, the 704 Building Lease and the 708 Building Lease, as amended in accordance with Section 2.1(a) above (unless, in the case of the 1333 Building Lease and 704 Building Lease, such leases as amended have terminated in accordance with their amended terms prior to confirmation of the Plan).

(c)     Arthur Allen shall use his best efforts to promptly obtain consent of Wells Fargo Bank, N.A. under the Amended and Restated Consolidated Mortgage, Assignment of Rents and Security Agreement between Arthur Allen, as mortgagor and debtor, and Wachovia Bank, National Association n/k/a Wells Fargo Bank, N.A., as mortgagee and secured party, dated May 23, 2007 to effectuate amendments of the AA Leases contemplated in clause (a) above (the "**WF Consent**").  If Arthur Allen does not obtain the WF Consent on or before December 31, 2014, or such later date as agreed to in writing by the Company and the Consenting Creditors (such date, the "**WF Consent Deadline**"), then the Company shall seek to reject the 1333 Building Lease, 704 Building Lease and 708 Building Lease on the first day of the Chapter 11 Cases, unless such later date has been agreed by the Consenting Creditors; if the WF Consent is not obtained by the WF Consent Deadline, Arthur Allen and Investment Group, pursuant to the releases set forth in Section 1.12(a) herein, shall waive and release any and all claims arising under or related to the 1333 Building Lease, 704 Building Lease and 708 Building Lease, including, without limitation, all claims for unpaid rent, rejection damages and any other amounts allegedly due by the Company thereunder.

**2.2**     **Termination of Certain AA Leases and Other Agreements.**

(a)     On the Settlement Effective Date, the Hangar Lease and the Aircraft Lease shall be terminated, and Arthur Allen, on behalf of himself and ALA Services, shall waive and release any and all claims arising under or related to the Hangar Lease and the Aircraft Lease, and any other agreements between Arthur Allen or his affiliates or family members, on the one hand, and the Company or its affiliates on the other hand, including all claims for unpaid rent, damages and any other amounts due by the Company.

(b)     On the Settlement Effective Date, the Salary and Advance Agreement shall be terminated, and the Company shall waive and release all claims arising under or related to the Salary and Advance Agreement, including any and all claims for damages or other unpaid amounts owing by Arthur Allen.

14

**ARTICLE III**
**EFFECTIVENESS OF THE SETTLEMENT AGREEMENT**
**AND MISCELLANEOUS PROVISIONS**

      **3.1**    **Effectiveness**. This Settlement Agreement shall become effective and binding upon all Parties immediately upon execution and delivery of this Settlement Agreement by each of the Parties hereto (the "**Settlement Effective Date**"). In the Chapter 11 Cases, the Company shall use its best efforts to assume or seek the approval of this Settlement Agreement pursuant to, under and as part of the Plan, and the Consenting Creditors shall support the assumption or approval of this Settlement Agreement. If the RSA is terminated or this Settlement Agreement is not approved by the Bankruptcy Court pursuant to, under and as part of the Plan, then Arthur Allen's obligations set forth in Sections 1.1 and 1.5 through 1.9 hereof shall be terminated and the releases in Section 1.12 shall not become effective.

      **3.2**    **Incorporation of Recitals**. Each of the Parties acknowledges, declares and agrees that the Recitals contained herein are true and correct as of the Settlement Effective Date, and that such Recitals are incorporated in, and form an integral part of, this Settlement Agreement.

      **3.3**    **Representation and Warranties**. Each of the Parties represents and warrants that:

      **3.3.1**    it has full power and authority and all authorizations, consents and approvals to enter into this Settlement Agreement and to perform as required hereunder, including, but not limited to, all third party consents with respect to amendments of the AA Leases, except for the WF Consent which shall be received by the WF Consent Deadline;

      **3.3.2**    this Settlement Agreement has been duly executed and delivered by such Party and constitutes the legal, valid, and binding obligations of such Party, enforceable against it in accordance with their respective terms;

      **3.3.3**    it is the sole and lawful owner of all right, title and interest in and to every claim, matter and thing released herein, including, without limitation, any and all claims, rights, demands, actions, causes of action, or facts which such Party alleged or asserted or could have alleged or asserted, and it has not assigned, sold, transferred, hypothecated, pledged, encumbered, discharged or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any claims released hereunder;

      **3.3.4**    execution, delivery, and performance of this Settlement Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party;

**3.3.5**    it has had the opportunity to have the legal effect of the provisions of this Agreement explained by independent counsel of such Party's own choice; and

**3.3.6**    it has entered into this Agreement fully and voluntarily without any threat of duress or coercion of any sort.

Each of the representations and warranties set forth in this Section shall survive in perpetuity.

**3.4**    **Counterparts**.  This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Settlement Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement, and each of which may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

**3.5**    **Amendments and Modification**.  This Settlement Agreement may not be amended, modified or supplemented except by written agreement signed by all Parties.

**3.6**    **Entire Agreement, Successors and Assigns, Beneficiaries**.

**3.6.1**    This Settlement Agreement, including the Exhibits annexed hereto, embodies the entire agreement and understanding among the Parties, and supersedes all prior agreements, understandings and arrangements, oral or written, among the Parties with respect to the subject matter hereof.

**3.6.2**    This Settlement Agreement inures to the benefit of, and shall be binding upon, each of the Parties hereto, and their respective successors, heirs, assigns, agents, employees, and representatives.

**3.6.3**    Nothing contained in this Settlement Agreement, express or implied, is intended to confer any rights or benefits upon any party other than the Parties and their successors and assigns, and no such third party shall be entitled to rely on this Settlement Agreement.

**3.7**    **Headings**.  The headings of the articles, sections and subsections of this Settlement Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

**3.8**    **Severability**.  If any provision of this Settlement Agreement is found by any court of competent jurisdiction to be invalid or unenforceable, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the fullest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Settlement Agreement so long as this Settlement Agreement as so modified continues to express, without material change, the original intentions of the Parties as to the subject matter hereof, and the prohibited nature, invalidity or unenforceability of the