IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Allen Systems Group, Inc., *et al.*,[1] | ) | Case No. 15-[___] ([___]) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**

**LATHAM & WATKINS LLP**
Peter M. Gilhuly (*pro hac vice* admission pending)
Ted A. Dillman (*pro hac vice* admission pending)
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Email:       peter.gilhuly@lw.com
               ted.dillman@lw.com

Proposed Special Counsel for the Debtors and Debtors
in Possession

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Michael R. Seidl (DE Bar No. 3889)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:       ljones@pszjlaw.com
               mseidl@pszjlaw.com
               pkeane@pszjlaw.com

Proposed Counsel for the Debtors and Debtors in
Possession

Dated: February 9, 2015

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Allen Systems Group, Inc. (4496); ASG Federal, Inc. (1773); and Viasoft International, LLC (9761). The mailing address for all of the Debtors is: 708 Goodlette Road North, Naples, Florida 34102.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court[2] has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 (as amended, the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority, and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, or other applicable exemptions, to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance and distribution of Securities under the Plan, including the New Common Stock, the Subscription Rights to participate in the Rights Offering, and the Warrants (collectively, the "Plan Securities") prior to the Petition Date.

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code, section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, or other applicable exemptions, to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of Plan Securities.

Each holder of a Notes Claim may exercise Subscription Rights under the Plan only if such holder is an Accredited Investor or Qualified Institutional Buyer (an "Eligible Holder"), and each Rights Offering Investor will be required to certify in its Subscription Form(s) whether it is an Eligible Holder. Any New Common Stock issued on account of the Warrants shall only be issued to the extent the recipient thereof is, at the time of exercise thereof, an Eligible Holder, unless otherwise agreed by the Reorganized Debtors. Any other Securities issued under the Plan shall be issued only to Eligible Holders or otherwise under a valid exemption from registration under the Securities Act.

Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their Subsidiaries, and their respective debt and Securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives through a confidential relationship, from purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the United States Securities Exchange Act of 1934 (as amended, the "Securities Exchange Act") and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to such terms in the *Debtors' Joint Prepackaged Chapter 11 Plan*, which is attached hereto at Exhibit A (the "**Plan**").

## DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and in connection with the exercise of Subscription Rights and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan or to exercise Subscription Rights. All holders of Claims entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting or exercising Subscription Rights. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims and Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. The Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with their advisors, has prepared the financial projections attached hereto as <u>Exhibit B</u> (the "**Financial Projections**") and described in this Disclosure Statement. The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtors caution that no representations can be made as to the accuracy of the Financial Projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to holders of Claims against the Debtors or Interests or any other party in interest. Please refer to <u>ARTICLE VI</u> of this Disclosure Statement, entitled "Certain Factors to be Considered" for a discussion of certain risk factors that holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the Exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein (see Section 6.9(b)) — "Disclosure Statement Disclaimer – Disclosure Statement May Contain Forward-Looking Statements"). When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect," and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

# TABLE OF CONTENTS

**Page**

TRANSACTION OVERVIEW .................................................................................................................. 1

ARTICLE I THE PLAN .......................................................................................................................... 4
1.1    Discharge of Claims and Interests ............................................................................. 4
1.2    New Debt Structure ..................................................................................................... 4
1.3    Unclassified Claims .................................................................................................... 5
1.4    Classification, Treatment, and Voting of Claims and Interests .................................. 6
1.5    Liquidation Analysis ................................................................................................. 11
1.6    Valuation Analysis ................................................................................................... 12
1.7    Financial Information and Projections ...................................................................... 12

ARTICLE II VOTING PROCEDURES AND REQUIREMENTS ..................................................... 13
2.1    Class Entitled to Vote on the Plan ............................................................................ 13
2.2    Votes Required for Acceptance by a Class .............................................................. 13
2.3    Certain Factors To Be Considered Prior to Voting .................................................. 13
2.4    Classes Not Entitled To Vote on the Plan ............................................................... 14
2.5    Solicitation Procedures ............................................................................................. 14
2.6    Voting Procedures .................................................................................................... 15

ARTICLE III BUSINESS DESCRIPTIONS ....................................................................................... 17
3.1    Corporate History, Expansion, and Organizational Structure ................................. 17
3.2    Products and Services ............................................................................................... 20
3.3    Employees ................................................................................................................. 20
3.4    Directors and Officers .............................................................................................. 20
3.5    Prepetition Capital Structure .................................................................................... 21

ARTICLE IV EVENTS LEADING TO THE CHAPTER 11 CASES ................................................ 23
4.1    Escalating Levels of Debt ........................................................................................ 23
4.2    Challenges Leading to Revenue Deterioration ........................................................ 23
4.3    Declining Revenues; Constrained Liquidity ............................................................ 24
4.4    Events Leading to the Formulation of the Plan ........................................................ 24
4.5    The AA Settlement Agreement ................................................................................ 25
4.6    Deferred Purchase Obligation Settlements .............................................................. 25
4.7    DIP Facility .............................................................................................................. 26
4.8    Overview of the Plan ................................................................................................ 26

ARTICLE V KEY ASPECTS OF THE PLAN .................................................................................... 27
5.1    Distributions ............................................................................................................. 27
5.2    Restructuring Transactions ....................................................................................... 28
5.3    New Common Stock ................................................................................................. 30
5.4    AA Settlement Agreement; Warrants ...................................................................... 30
5.5    Rights Offering ......................................................................................................... 31
5.6    Exit Facilities ........................................................................................................... 34
5.7    Treatment of Executory Contracts and Unexpired Leases ...................................... 35
5.8    Exemption from Registration Requirements ........................................................... 38
5.9    Corporate Existence ................................................................................................. 38
5.10    Vesting of Assets in the Reorganized Debtors; Post-Effective Date Operation .............. 38
5.11    Corporate Action ..................................................................................................... 39
5.12    Cancelation of Notes, Instruments, Certificates, and Other Documents; Intercompany
        Claims and Interests ................................................................................................. 39
5.13    Cancelation of Liens ................................................................................................ 39

v

5.14    Amended Organizational Documents ............................................................39
5.15    Directors and Officers; Indemnification .....................................................40
5.16    Management Agreements and Incentive Plans ............................................40
5.17    Release, Injunction, and Related Provisions ...............................................40
5.18    Employee and Retiree Benefits ...................................................................45
5.19    Insurance Preservation and Proceeds ..........................................................45
5.20    Solicitation of Debtors ................................................................................45
5.21    No Consent to Change of Control Required ................................................45
5.22    Subordination ..............................................................................................45
5.23    Dissolution of the Committee .....................................................................45
5.24    Effectuating Documents; Further Transactions............................................45
5.25    Modification of Plan ...................................................................................46
5.26    Effect of Confirmation on Modifications....................................................46
5.27    Revocation or Withdrawal of Plan ..............................................................46
5.28    Confirmation of the Plan Pursuant to Section 1129(b) of the Bankruptcy Code ............46
5.29    Reservation of Rights..................................................................................46
5.30    Plan Supplement Exhibits ...........................................................................46
5.31    Successors and Assigns...............................................................................47
5.32    Conditions Precedent to the Effective Date ................................................47

ARTICLE VI CERTAIN FACTORS TO BE CONSIDERED ...........................................48
6.1    General........................................................................................................48
6.2    Risks Relating to the Plan and Other Bankruptcy Law Considerations .....................48
6.3    Risks Relating to the Transaction ................................................................54
6.4    Risks Relating to the Exit Facilities ............................................................55
6.5    Additional Risks Relating to the Second Lien Term Loan Exit Facility.................57
6.6    Risks Relating to the New Common Stock and other Plan Securities .................59
6.7    Litigation and Labor Risk Factor ................................................................61
6.8    Accounting and Tax Risk Factors ...............................................................62
6.9    Disclosure Statement Disclaimer ................................................................62

ARTICLE VII CONFIRMATION PROCEDURES ...........................................................64
7.1    The Confirmation Hearing ..........................................................................64
7.2    Confirmation Standards ..............................................................................64
7.3    Best Interests Test/Liquidation Analysis .....................................................65
7.4    Feasibility....................................................................................................66
7.5    Confirmation Without Acceptance by All Impaired Classes .....................66
7.6    Alternatives to Confirmation and Consummation of the Plan ...................67

ARTICLE VIII IMPORTANT SECURITIES LAW DISCLOSURE ...............................67
8.1    Plan Securities.............................................................................................67
8.2    Issuance and Resale of Plan Securities Under the Plan................................67

ARTICLE IX CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ...................69
9.1    Introduction.................................................................................................69
9.2    U.S. Federal Income Tax Consequences to the Debtors .............................70
9.3    U.S. Federal Income Tax Consequences to Allowed Class 5 Claim Holders—U.S. Holders........70
9.4    U.S. Federal Income Tax Consequences to Allowed Class 5 Claim Holders—Non-U.S. Holders.................................................................................74
9.5    Additional Withholding Tax on Payments Made to Foreign Accounts .........78

ARTICLE X CONCLUSION AND RECOMMENDATION .............................................78

APPENDIX:  RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES...........................................................80

<u>EXHIBITS</u>

<u>Exhibit A</u>        Debtors' Joint Prepackaged Chapter 11 Plan

<u>Exhibit B</u>        Financial Projections

<u>Exhibit C</u>        Liquidation Analysis

<u>Exhibit D</u>        Valuation Analysis

LA\4007345.1

[*This Page Intentionally Left Blank*]

## TRANSACTION OVERVIEW

Allen Systems Group, Inc. ("**ASG**") and its direct and indirect subsidiaries (collectively, the "**Company**") provide information technology ("**IT**") management software solutions to small, medium, and large companies in a variety of industries around the world.  ASG and two of its U.S. subsidiaries, ASG Federal, Inc. and Viasoft International, LLC, as debtors and debtors in possession (collectively, the "**Debtors**"), intend to file for chapter 11 bankruptcy to obtain approval of the Plan, as more fully set forth herein.  Pursuant to the Support Agreement, the Debtors' primary stakeholders have agreed to support the Plan, as further described herein and in Section 4.4.

The Company's products enable their more than 6,400 customers, including various Fortune 100 and Fortune 500 companies, to manage complex IT environments, align IT spending and performance with business objectives, enhance workforce productivity, and reduce operating costs.  The Debtors generate revenue through the sale of software licenses, software as a service, maintenance contracts, and professional services.  They market over 65 standalone software products in the following three major solutions areas: content, cloud, and systems.  Content solutions reduce cost and risk through the management of content (e.g. documents, reports, and check images), which can be used for business workflows, e-discovery, compliance, records management, output management, integration across organizations and repositories, and customized corporate communications.  Cloud solutions offer end-to-end orchestration from the core of the data center up to the end-user's workspace.  Systems software, from performance management and workload automation to application management and service quality and control, helps companies reduce the cost of managing and running their systems landscape, while allowing IT investments to shift toward innovation, which supports business growth.

As a result of industry challenges and other factors (described further herein), the Company's revenues and earnings have declined in recent years.  Total revenue in 2013 was approximately $22 million lower than in 2012, decreasing from approximately $298 million in 2012 to approximately $276 million in 2013.  Audited financial information for 2014 is not presently available, but the Company projects a significant further reduction in total revenue for 2014 to approximately $247 million.  During the same period, the Company's earnings have also declined.  The Company's earnings before interest, taxes, depreciation and amortization ("**EBITDA**") declined slightly from 2012 to 2013, from approximately $53 million to approximately $52 million, before sharply declining by an estimated $32 million in 2014 to approximately $20 million.  EBITDA, after taking into account certain adjustments for non-recurring expenses and affiliate payments ("**Adjusted EBITDA**"), of approximately $77 million in 2012, declined in 2013 to approximately $72 million, before falling to an estimated $48 million in 2014.

To fund their various acquisitions, research and development, and other operating expenditures, ASG has incurred the following secured indebtedness (which is guaranteed by certain of its Debtor and non-Debtor subsidiaries):

(a)    the Domestic Credit Facility (as defined herein): $239,337,000 in principal amount, plus unpaid interest at the default rate, premiums, including the Acceleration Damage Premium (as defined in the Domestic Credit Facility) and fees; and

(b)    the Notes (as defined herein): $300,000,000 in principal amount, plus unpaid interest and fees.

In addition, Atempo SAS ("**Atempo**"), a wholly-owned French subsidiary of ASG, is the borrower under the Foreign Credit Facility (as defined herein) in the principal amount of $10,000,000, plus unpaid interest at the default rate, premiums, including the Acceleration Damage Premium (as defined in the Foreign Credit Facility) and fees, which is guaranteed by certain non-Debtor foreign subsidiaries.  While the Debtors are not borrowers under the Foreign Credit Facility, this facility includes cross-default provisions.  The Foreign Lenders agreed to forbear from exercising remedies pursuant to the Support Agreement during the Chapter 11 Cases, but the Foreign Credit Facility must be repaid on the Effective Date to avoid exercise of remedies under this facility to the detriment of the Debtors and Reorganized Debtors, as applicable.

The Company also had a number of deferred obligations arising under certain of the purchase agreements related to the Company's various acquisitions (the "**Deferred Purchase Obligations**").  Prior to the Petition Date, as contemplated in the Support Agreement, the Company settled the Deferred Purchase Obligations and made the payments required in connection with such settlements.  The settlement of the Deferred Purchase Obligations

1

enabled the Company to propose the Plan – with the Consenting Creditors' support – providing payment in full to holders of Other Unsecured Claims.

As a result of deteriorating financial performance and substantial secured indebtedness, the Company has faced liquidity constraints and has not been able to pay the interest due on its secured debt.

- Beginning in April 2014, the Company did not make its scheduled interest payments on the Domestic Credit Facility, and in July 2014 missed scheduled interest payments on the Foreign Credit Facility. Since August 15, 2014, the Company has not made interest payments on these obligations. As of January 31, 2015, unpaid/deferred interest at the default rate on these credit facilities totals approximately $44 million.

- In addition, the Debtors missed their May 15, 2014 and November 15, 2014 interest payments on the Notes, totaling approximately $32 million (as of November 15, 2014). As of January 31, 2015, unpaid interest on the Notes totals approximately $40 million.

As the Company's financial condition grew increasingly distressed, the Company engaged Rothschild, Inc. ("**Rothschild**") as its investment banker to evaluate strategic alternatives for the Company. As part of this process, Rothschild conducted an extensive restructuring, recapitalization, and sale process for the Company during 2014 and the beginning of 2015. Simultaneously, the Company entered into negotiations with the Consenting Creditors, who hold over 72% of the Company's Notes. In October 2014, certain of the Consenting Creditors acquired (directly or indirectly) 100% of the Domestic Credit Facility Claims and Foreign Credit Facility. This placed the Consenting Creditor group in control of the vast majority of the Company's overall debt.

On December 10, 2014, the Company, the Consenting Creditors, and the Company's founder and then Chairman of the board, CEO and President, Arthur L. Allen (together with his affiliates, the "**Allen Parties**") entered into a Settlement Agreement (the "**AA Settlement Agreement**"), pursuant to which the Company resolved various Claims asserted by the Allen Parties and negotiated lease amendments for the buildings leased by the Allen Parties to the Company (among other things). A copy of the AA Settlement Agreement, which will be assumed pursuant to the Plan, is attached as Exhibit 5 to the Plan. As part of the AA Settlement Agreement, Mr. Allen resigned from the Company, released substantial claims asserted against the Company, and will receive certain payments, as well as the Warrants for 10% of the New Common Stock, each as further described herein and in the AA Settlement Agreement.

After careful consideration of the various alternatives, the Debtors have determined that it is in the best interests of the Company and all of their stakeholders to commence the Chapter 11 Cases to implement a restructuring supported by the Consenting Creditors, who represent its principal creditor constituencies. Accordingly, the Company negotiated and entered into the Support Agreement dated as of January 13, 2015 with the Consenting Creditors and Allen Parties. Pursuant to the Support Agreement, the Plan is supported by the Consenting Creditors and ASG's sole stockholder.

Accordingly, the Company intends to commence voluntary chapter 11 reorganization proceedings under title 11 of the United States Code (the "**Chapter 11 Cases**"). The Debtors intend to effect a balance sheet restructuring pursuant to the Plan under which, except as otherwise provided in the Plan, the Domestic Credit Facility and Foreign Credit Facility will be repaid in full on the Effective Date, and ASG will cancel the Notes Claims in exchange for the Notes Claims Stock representing 41.5% of Reorganized ASG's New Common Stock; in addition, Eligible Holders of Notes Claims will receive Subscription Rights to participate in the Rights Offering to acquire their Pro Rata share of the Rights Offering Stock, representing the remaining 58.5% of Reorganized ASG's New Common Stock (in each case, subject to dilution as set forth in the Plan).

This Restructuring is expected to reduce the Company's secured debt load from over $666 million (including principal, interest, fees, and the "Acceleration Damages Premium" discussed herein) to approximately $240 million – a reduction of more than 64%. The Company believes that the Restructuring will stabilize the Company's finances and position the Company for long-term success.

In order to fund the Chapter 11 Cases, the Debtors intend to obtain and enter into the DIP Facility in an amount up to $40 million.  The DIP Facility will be secured by Liens senior to the Domestic Credit Facility, Foreign Credit Facility, and Notes.  Pursuant to the Support Agreement, the Consenting Creditors agreed that the Liens securing the Domestic Credit Facility, the Foreign Credit Facility, and the Notes would be subordinate to the Liens securing the DIP Facility, so long as the terms of the DIP Facility are acceptable to the Required Consenting Creditors and Required Consenting Lenders.  Also pursuant to the Support Agreement, (a) no interest shall be paid on the Domestic Credit Facility or the Foreign Credit Facility as adequate protection during the Chapter 11 Cases, without prejudice to the payment of such accrued and unpaid interest as part of the Allowed Domestic Credit Facility Claims or payment in full of the Foreign Credit Facility, and (b) if the Debtors' receive a Pre-Filing Loan from the Domestic Lenders, such Pre-Filing Loan shall be repaid upon the closing of the DIP Facility following entry of the Interim DIP Order.  No interest is payable on the Notes as adequate protection pursuant to the terms of the intercreditor agreement applicable to the Domestic Credit Facility and Notes.

In order to fund the Plan, the Debtors or Reorganized Debtors, as applicable, will:

(a)        enter into the Exit Facilities, consisting of the following:

    (i)    the First Lien Revolving Loan Exit Facility, consisting of a first lien revolving loan facility in the principal amount of twenty-five million dollar ($25,000,000.00), which is expected to be undrawn as of the Effective Date;

    (ii)   the First Lien Term Loan Exit Facility, consisting of a first lien term loan facility in the minimum principal amount of one-hundred-fifty million dollar ($150,000,000.00); and

    (iii)  the Second Lien Term Loan Exit Facility, consisting of a second lien term loan facility in a principal amount of up to ninety million dollars ($90,000,000.00).  The Second Lien Term Loan Exit Facility shall be fully backstopped by the Consenting Creditors on the terms set forth on Exhibit 1 to the Plan and otherwise acceptable to the Company and the Required Consenting Creditors.  The Second Lien Term Loan Exit Facility shall be marketed by the Company in consultation with the First Lien Term Loan Exit Facility lender (once selected).  To the extent the principal amount of the First Lien Term Loan Exit Facility exceeds $150,000,000.00, the maximum principal amount of the Second Lien Term Loan Exit Facility shall be reduced on a dollar-for-dollar basis.  If the Debtors are not able to obtain binding commitments for the Second Lien Term Loan Exit Facility reasonably acceptable to the Company and the Required Consenting Creditors on or before the filing of the Plan Supplement, the Second Lien Term Loan Exit Facility shall be provided by the Consenting Creditors and its terms shall be included in the Plan Supplement (unless otherwise agreed by the Debtors and Required Consenting Creditors);

(b)        consummate the $130,000,000.00 Rights Offering in exchange for the Rights Offering Stock representing 58.5% of the New Common Stock (subject to dilution as set forth in the Plan); and

(c)        utilize other available Cash (including proceeds of the DIP Facility).

**Pursuant to the Support Agreement, the Consenting Lenders, who hold 100% of the Domestic Credit Facility Claims  and 100% of the Foreign Credit Facility), and the Consenting Note Holders, who hold more than 72% in amount of Notes Claims, have agreed to support and vote to accept the Plan.**

The Debtors believe that Confirmation of the Plan is in the best interests of all Holders of Claims and recommend that all holders of Claims entitled to vote on the Plan vote to accept the Plan.

**ARTICLE I**
**THE PLAN**

**1.1    Discharge of Claims and Interests**

The Plan provides for the discharge of Claims and Interests through: (a) the issuance of the New Common Stock; (b) the consummation of the Rights Offering; (c) entry in to the Exit Facilities; and the (d) payment of Cash. As more fully described herein:

(a)    holders of Secured Tax Claims will be paid in full in cash;

(b)    holders of Other Secured Claims will be reinstated or receive collateral;

(c)    holders of Other Priority Claims will be paid in full in cash;

(d)    holders of Domestic Credit Facility Claims will be paid in full in cash, unless the holders of two-thirds (2/3rds) in amount of the Domestic Credit Facility Claims agree to less favorable treatment, including the terms of such less favorable treatment, in which case such less favorable treatment shall be binding on all holders of Domestic Credit Facility Claims;

(e)    holders of Notes Claims will receive their Pro Rata share of (A) Notes Claims Stock and (B) if such holder is an Eligible Holder of Notes Claims, Subscription Rights to subscribe for a Pro Rata share of Rights Offering Stock for an aggregate purchase price equal to the Subscription Payment Amount;

(f)    holders of Allowed Other Unsecured Claims will be paid in full in Cash; *provided*, *however*, that, for the avoidance of doubt, the Notes Deficiency Claims and the Allen Claims do not constitute Other Unsecured Claims and shall not be entitled to any distribution provided to the holders of Allowed Class 6 Claims;

(g)    holders of ASG Interests will have their interests canceled;

(h)    holders of Intercompany Claims will be left unaltered;

(i)    holders of Intercompany Interests will be left unaltered; and

(j)    holders of Section 510(b) Claims will have their interests canceled.

**1.2    New Debt Structure**

On the Effective Date, the Debtors will effectuate their recapitalization and restructuring pursuant to the Plan by entering into the following:

(a)    the First Lien Revolving Loan Exit Facility Documents, providing for the First Lien Revolving Loan Exit Facility in the principal amount of $25,000,000.00 and such other terms reasonably acceptable to the Debtors and Required Consenting Creditors to be determined prior to the Confirmation Hearing and included in the Plan Supplement;

(b)    the First Lien Term Loan Exit Facility Documents, providing for the First Lien Term Loan Exit Facility in the minimum principal amount of $150,000,000.00 and such other terms reasonably acceptable to the Debtors and Required Consenting Creditors to be determined prior to the Confirmation Hearing and included in the Plan Supplement; and

(c)    the Second Lien Term Loan Exit Facility Documents, providing for the Second Lien Term Loan Exit Facility in an amount not less than $90,000,000.00 and such other terms reasonably

acceptable to the Debtors and Required Consenting Creditors to be determined prior to the Confirmation Hearing and included in the Plan Supplement. The Second Lien Term Loan Exit Facility shall be fully backstopped by the Consenting Creditors on the terms set forth on Exhibit 1 to the Plan and otherwise acceptable to the Company and the Required Consenting Creditors. The Second Lien Term Loan Exit Facility shall be marketed by the Company in consultation with the First Lien Term Loan Exit Facility lender (once selected).  To the extent the principal amount of the First Lien Term Loan Exit Facility exceeds $150,000,000.00, the maximum principal amount of the Second Lien Term Loan Exit Facility shall be reduced on a dollar-for-dollar basis.  If the Debtors are not able to obtain binding commitments for the Second Lien Term Loan Exit Facility reasonably acceptable to the Company and the Required Consenting Creditors on or before the filing of the Plan Supplement, the Second Lien Term Loan Exit Facility shall be provided by the Consenting Creditors and its terms shall be included in the Plan Supplement (unless otherwise agreed by the Debtors and Required Consenting Creditors).

Prior to the Petition Date, the Company commenced a marketing process to obtain the Exit Facilities from third-party financing sources.  The Company intends to continue to seek commitments for such Exit Facilities during the Chapter 11 Cases, and will include the final terms of such Exit Facilities in the Plan Supplement.  All such Exit Facility Documents shall become effective in accordance with their terms and the Plan.

### 1.3   Unclassified Claims

(a)   **Unclassified Claims Summary**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III of the Plan.  The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| DIP Facility Claims | Paid in full in Cash | 100% |
| Administrative Claims | Paid in full in Cash | 100% |
| Professional Claims | Paid in full in Cash | 100% |
| Priority Tax Claims | Paid in full in Cash | 100% |

(b)   **Unclassified Claims Detail**

(1)   *DIP Facility Claims*

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims shall be paid and satisfied in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims.  Upon payment and satisfaction in full of all Allowed DIP Facility Claims, the DIP Facility Documents, and all Liens and security interests granted to secure the DIP Facility Claims, shall be immediately terminated, extinguished and released, and the DIP Agent shall promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.  Notwithstanding the above, any indemnity provisions contained in the DIP Facility Documents shall survive such termination, release and satisfaction in the manner and to the extent set forth therein.

(2)   *Administrative Claims*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to

5

the amount of such Allowed Administrative Claim either: (a) on the Effective Date, or as soon as practicable thereafter; (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim.

(3)     *Professional Claims*

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.   The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.   Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court.   If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  No funds in the Professional Fee Escrow Account shall be property of the Estates.  Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid will be turned over to Reorganized ASG.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything to the contrary in the Plan, the Debtor and Reorganized Debtors, as applicable, shall pay in full in Cash in the ordinary course of business the actual, documented, reasonable fees and expenses of the Consenting Creditor Professionals without the need for the Consenting Creditor Professionals to file any motions, claims, fee applications or other requests for payment with the Bankruptcy Court.

(4)     *Priority Tax Claims*

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive on the Effective Date, or as soon as practicable thereafter, from the respective Debtor liable for such Allowed Priority Tax Claim, payment in Cash in an amount equal to the amount of such Allowed Priority Tax Claim.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

**1.4     Classification, Treatment, and Voting of Claims and Interests**

(a)     **Classified Claims and Interests Summary**

The Plan establishes a comprehensive classification of Claims and Interests.  The table below summarizes the classification, treatment, voting rights, and estimated recoveries of the Claims and Interests, by Class, under the Plan.  Amounts assumed in the liquidation recovery analysis are estimates only.  The projected liquidation recoveries are based on certain assumptions described herein.  Accordingly, recoveries received by holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

| Class | Claim or Interest | Voting Rights | Treatment | Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash | 100% | 100% |
| 2 | Other Secured Claims | Not Entitled to Vote / Presumed to Accept | Reinstated or receive collateral | 100% | 0% – 100% |
| 3 | Other Priority Claims | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash | 100% | 0% |
| 4 | Domestic Credit Facility Claims | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash, unless the holders of two-thirds (2/3) in amount of the Domestic Credit Facility Claims agree to less favorable treatment, including the terms of such less favorable treatment, in which case such less favorable treatment shall be binding on all holders of Domestic Credit Facility Claims | 100% | 24% – 46% |
| 5 | Notes Claims | Entitled to Vote | Receive Pro Rata share of (A) Notes Claims Stock, and (B) Subscription Rights to subscribe for Pro Rata share of Rights Offering Stock for an aggregate purchase price equal to the Subscription Payment Amount; *provided*, that the Subscription Rights shall only be issued to Eligible Holders of Allowed Class 5 Claims. | 41.0% | 0% |
| 6 | Other Unsecured Claims | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash | 100% | 0% |
| 7 | ASG Interests | Not Entitled to Vote / Deemed to Reject | Canceled | 0% | 0% |
| 8 | Intercompany Claims | Not Entitled to Vote / Presumed to Accept | Unaltered | 100% | 0% |
| 9 | Intercompany Interests | Not Entitled to Vote / Presumed to Accept | Unaltered | 100% | 0% |
| 10 | Section 510(b) Claims | Not Entitled to Vote / Deemed to Reject | Canceled | 0% | 0% |

7

(b)        **Classified Claims and Interests Details**

Except to the extent that the Debtors and a holder of an Allowed Claim or Interest, as applicable, agree to a less favorable treatment, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest. Unless otherwise indicated, the holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as practicable thereafter.

(1)        *Class 1 — Secured Tax Claims*

A.        *Classification*: Class 1 consists of all Secured Tax Claims against any Debtor.

B.        *Treatment*: Each holder of an Allowed Class 1 Claim shall receive, in full satisfaction of such Claim, as applicable:

i.        if the Allowed Class 1 Claim is due and payable on or before the Effective Date, Cash in an amount equal to such Allowed Class 1 Claim; or

ii.        if the Allowed Class 1 Claim is not due and payable on or before the Effective Date, Cash in an amount as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

C.        *Voting*: Class 1 is Unimpaired.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

(2)        *Class 2 — Other Secured Claims*

A.        *Classification*: Class 2 consists of all Other Secured Claims against any Debtor.

B.        *Treatment*: Each holder of an Allowed Class 2 Claim shall, in full satisfaction of such Claim, as the Debtors, with the consent of the Required Consenting Creditors, or the Reorganized Debtors, as applicable, determine:

i.        have its Allowed Class 2 Claim reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code; or

ii.        receive the collateral securing its Allowed Class 2 Claim and any interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

C.        *Voting*: Class 2 is Unimpaired.  Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

(3)        *Class 3 — Other Priority Claims*

A.        *Classification*: Class 3 consists of all Other Priority Claims against any Debtor.

B.        *Treatment*: Each holder of an Allowed Class 3 Claim shall, in full satisfaction of such Claim, receive Cash in an amount equal to such Allowed Class 3 Claim.

8

C.     *Voting*: Class 3 is Unimpaired. Holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

(4)     *Class 4 — Domestic Credit Facility Claims*

A.     *Classification*: Class 4 consists of all Domestic Credit Facility Claims.

B.     *Allowance*: On the Effective Date, Class 4 Claims shall be deemed Allowed in the aggregate principal amount of $239,337,000.00,[3] plus (a) all prepetition accrued and unpaid interest at the default rate, which totals $42,879,550.43 as of January 31, 2015, (b) all applicable premiums, including the Acceleration Damages Premium in the amount of $28,720,440.00, (c) all accrued and unpaid prepetition fees in the amount of $3,647,082.00, and (d) all accrued but unpaid postpetition interest and fees through the Effective Date calculated at the applicable default rate in accordance with the Domestic Credit Agreement.

C.     *Treatment*: Each holder of an Allowed Class 4 Claim shall, in full satisfaction of such Claim, receive payment in full in Cash, unless the holders of two-thirds (2/3rds) in amount of Domestic Credit Facility Claims agree to less favorable treatment, including the terms of such less favorable treatment, in which case such less favorable treatment shall be binding on all holders of Domestic Facility Claims.

D.     *Voting*: Class 4 is Unimpaired.[4]  Holders of Allowed Class 4 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 4 Claims are not entitled to vote to accept or reject the Plan.

(5)     *Class 5 — Notes Claims*

A.     *Classification*: Class 5 consists of all Notes Claims.

B.     *Allowance*: On the Effective Date, Class 5 Claims shall be deemed Allowed in the aggregate principal amount of $300,000,000.00, plus (a) all prepetition accrued and unpaid interest to the extent owing under the applicable documents, which totals $39,693,454.06 as of January 31, 2015, and (b) all applicable premiums and prepetition fees to the extent owing under the applicable documents.

C.     *Treatment*: Each holder of an Allowed Class 5 Claim shall, in full satisfaction of such Claim, receive (A) its Pro Rata share of the Notes Claims Stock, and (B) Initial Subscription Rights to subscribe for its Pro Rata share of the Rights Offering Stock for an aggregate purchase price equal to the Subscription Payment Amount and Oversubscription Rights to subscribe for any Remaining Initial Unsubscribed Rights Offering Stock; *provided*, that the Subscription

---

[3]     Pursuant to the Support Agreement, if the Debtors receive a Pre-Filing Loan from the Domestic Lenders, such Pre-Filing Loan is to be repaid upon the closing of the DIP Credit Facility following entry of the Interim DIP Order. Accordingly, the Pre-Filing Loan, if any, is not included in this amount.

[4]     As provided in the Plan, holders of two-thirds in amount of Domestic Credit Facility Claims may agree to less favorable treatment and bind all holders of Domestic Credit Facility Claims to such treatment. All holders of Domestic Credit Facility Claims have agreed to such treatment in the Support Agreement. Accordingly, the votes of such holders of Domestic Credit Facility Claims have not been solicited and are deemed to accept the Plan.

9

Rights shall only be issued to Eligible Holders of Allowed Class 5 Claims. For avoidance of doubt, no additional distribution shall be made on account of Notes Deficiency Claims.

D.    *Voting*: Class 5 is Impaired. Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

(6)    *Class 6 — Other Unsecured Claims*

A.    *Classification*: Class 6 consists of all Other Unsecured Claims against any Debtor.

B.    *Treatment*: Each holder of an Allowed Class 6 Claim shall, in full satisfaction of such Claim, receive Cash in an amount equal to such Allowed Class 6 Claim on the later of (A) the Effective Date or (B) in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 6 Claim.

C.    *Voting*: Class 6 is Unimpaired. Holders of Allowed Class 6 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan.

(7)    *Class 7 — ASG Interests*

A.    *Classification*: Class 7 consists of all ASG Interests.

B.    *Treatment*: Class 7 Interests shall be discharged, canceled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and holders of ASG Interests shall not receive any distribution on account of such Allowed Class 7 Interests.

C.    *Voting*: Class 7 is Impaired. Holders of Class 7 Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Holders of Class 7 Interests are not entitled to vote to accept or reject the Plan.

(8)    *Class 8 — Intercompany Claims*

A.    *Classification*: Class 8 consists of all Intercompany Claims.

B.    *Treatment*: Each holder of a Class 8 Claim shall have its Class 8 Claim left unaltered and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

C.    *Voting*: Class 8 is Unimpaired. Holders of Class 8 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and such holders are not entitled to vote to accept or reject the Plan.

(9)    *Class 9 — Intercompany Interests*

A.    *Classification*: Class 9 consists of all Intercompany Interests.

B.    *Treatment*: Each holder of a Class 9 Interest shall have its Class 9 Interest left unaltered and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

C.    *Voting*: Class 9 is Unimpaired.  Holders of Class 9 Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and such holders are not entitled to vote to accept or reject the Plan.

(10)    *Class 10 — Section 510(b) Claims*

A.    *Classification*: Class 10 consists of all Section 510(b) Claims against any Debtor.

B.    *Treatment*: Class 10 Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and holders of Section 510(b) Claims shall not receive any distribution on account of such Claims.

C.    *Voting*: Class 10 is Impaired.  Holders (if any) of Class 10 Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code, and such holders (if any) are not entitled to vote to accept or reject the Plan.

(a)    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

(b)    **Voting Classes**

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtors may request a ruling at the Confirmation Hearing that the Plan shall be deemed accepted by the holders of such Claims in such Class.

(c)    **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(d)    **Confirmation of All Cases**

Except as otherwise specified in the Plan, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; *provided*, *however*, that the Debtors, with the consent of the Required Consenting Creditors and the Required Backstop Parties, may at any time waive this requirement.

**1.5**    <u>**Liquidation Analysis**</u>

The Debtors believe that the Plan provides the same or a greater recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including: (a) that a substantial portion of the Debtors' assets are intangible and include goodwill and customer relationships, which would have little to no value in a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case and any related costs in connection with a chapter 7 liquidation; and (c) the absence of a robust market for the sale of the Debtors' assets and services in which such assets and services could be marketed and sold in the context of a chapter 7 liquidation.

LA\4007345.1

The Debtors, with the assistance of Huron Consulting Group ("**Huron**"), have prepared an unaudited liquidation analysis, which is attached hereto as Exhibit C (the "**Liquidation Analysis**"), to assist holders of Claims against the Debtors and Interests in evaluating the Plan.  The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims against the Debtors and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided by Huron in the Liquidation Analysis.  In addition, nothing contained in the Liquidation Analysis is intended to or may be asserted to constitute a concession or admission of the Debtors for any other purpose.

**1.6**     **Valuation Analysis**

The Plan provides for the distribution of the New Common Stock and Subscription Rights to holders of Claims in Class 5 upon consummation of the transactions contemplated by the Plan.  The allocation of New Common Stock between Notes Claims and the Rights Offering is based on an assumed total enterprise value ("**TEV**") of the Company of $500 million.

Rothschild, at the request of the Debtors, has performed an analysis, which is attached hereto as Exhibit D, of the estimated implied TEV of Reorganized ASG and its subsidiaries on a going-concern basis as of January 2, 2015 (the "**Valuation Analysis**").  The Valuation Analysis, including the methodology and procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with ARTICLE VI of this Disclosure Statement, entitled "Certain Factors to be Considered."  The Valuation Analysis is dated January 2, 2015 and is based on data and information as of that date or as otherwise specified in their report.  Rothschild makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

The valuation methodology and procedures, assumptions made, qualifications, and limitations on review undertaken are set forth in the Valuation Analysis.  Estimates of reorganizational value of the Reorganized Debtors do not purport to be appraisals or necessarily reflect the values that may be realized if assets are sold as a going concern, in liquidation, or otherwise. However, as noted herein, prior to the Petition Date, Rothschild conducted an extensive restructuring, recapitalization, and sale process for the Company.  The only final bids received by the Company in this process were for less than the $500 million TEV of the Company in the Plan.  Accordingly, the Debtors submit that the Plan represents a fair and reasonable – if not superior – valuation of the Company and its assets compared to the value that could be obtained for the Estates through a sale of the Company and/or its assets.

**1.7**     **Financial Information and Projections**

In connection with the planning and development of the Plan, the Debtors prepared the Financial Projections  for May 2015 through the end of calendar year 2018 based on the pre-packaged plan scenario described in Exhibit B hereto to present the anticipated impact of the Plan.  The Debtors' Financial Projections from May 2015 through the end of calendar year 2018, including management's assumptions related thereto, are attached hereto as Exhibit B.  For purposes of the financial projections, the Debtors have assumed an Effective Date of April 30, 2015.

The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties.  Therefore, such Financial Projections, estimates, and assumptions are not necessarily

indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and other financial information.

## ARTICLE II
## VOTING PROCEDURES AND REQUIREMENTS

**2.1**     **Class Entitled to Vote on the Plan**

The following Class is the only Class entitled to vote to accept or reject the Plan (the "**Voting Class**"):

| Class | Claim | Status |
|-------|-------|--------|
| 5 | Notes Claims | Impaired |

If your Claim is not included in the Voting Class, you are not entitled to vote and you will not receive a Solicitation Package, including a ballot setting forth detailed voting instructions.  If your Claim is included in the Voting Class, you should read your ballot and carefully follow the instructions included in the ballot.  Please use only the ballot that accompanies this Disclosure Statement or the ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provided to you.

**2.2**     **Votes Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the amount and, if a class of claims, the number, of claims voting to accept, as a percentage of the allowed claims, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.

**2.3**     **Certain Factors To Be Considered Prior to Voting**

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include:

(a)     unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

(b)     although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

(c)     the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

(d)     any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to ARTICLE VI, entitled "Certain Factors to be Considered," of this Disclosure Statement.

**2.4**    **Classes Not Entitled To Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 4 | Domestic Credit Facility Claims | Unimpaired | Presumed to Accept |
| 6 | Other Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | ASG Interests | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 9 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

**2.5**    **Solicitation Procedures**

(a)    **Solicitation Agent**

The Debtors retained Epiq Systems, Inc. ("**Epiq**") to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

(b)    **Solicitation Package**

The following materials constitute the solicitation package (the "**Solicitation Package**") distributed to holders of Claims in the Voting Classes:

(1)    the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

(2)    this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

(c)    **Distribution of the Solicitation Package and Plan Supplement**

The Debtors caused Epiq to distribute the Solicitation Packages to holders of Claims in the Voting Classes on February 9, 2015, which is 30 days before the Voting Deadline at 5:00 p.m. prevailing Eastern Time on March 11, 2015.

The Solicitation Package (except the ballots) may also be obtained from Epiq. You may contact Epiq in one of the following ways: (1) via telephone within the U.S. and Canada by calling (866) 734-9393, or by calling +1 (646) 282-2500, (2) via email to tabulation@epiqsystems.com and reference "ASG" in the subject line, or (3) by writing to Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, New York, NY 10017, Attn: ASG Balloting. When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, http://dm.epiq11.com/ASG, or for a fee via PACER at http://www.deb.uscourts.gov.

At least ten (10) days before the Confirmation Hearing, the Debtors intend to file the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper or CD-ROM copies of the

Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by: (1) calling the Debtors' restructuring hotline at one of the telephone numbers set forth above; (2) visiting the Debtors' restructuring website, http://dm.epiq11.com/ASG; and/or (3) by writing to Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, New York, NY 10017.

## 2.6    Voting Procedures

**The Voting Record Date is February 3, 2015**, which is the date that was used for determining which holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

A Beneficial Holder[5] holding Notes in "street name" through a Nominee[6] may vote on the Plan by one of the following two methods as selected by such Beneficial Holder's Nominee and consistent with customary practices:

(a)    Pre-validated Ballots: the Nominee may "pre-validate" a Beneficial Holder Ballot by (i) signing the Beneficial Holder Ballot; (ii) indicating on the Beneficial Holder Ballot the Nominee's DTC participant number and name, the amount of Notes held by the Nominee for the Beneficial Holder, and the account numbers for the accounts in which such Notes are held by the Nominee; and (iii) forwarding such Beneficial Holder Ballot, together with the Disclosure Statement and Plan, a preaddressed, postage-paid return envelope addressed to, and provided by, the Solicitation Agent, and other materials requested to be forwarded, to the Beneficial Holder for voting.  The Beneficial Holder must then complete the information requested on the Beneficial Holder Ballot, review the certifications contained on the Beneficial Holder Ballot, and return the Beneficial Holder Ballot directly to the Solicitation Agent in the pre-addressed, postage-paid return envelope so that it is received by the Solicitation Agent by the Voting Deadline.  A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date.

(b)    Master Ballots: if the Nominee elects not to pre-validate Beneficial Holder Ballots, the Nominee may obtain the votes of Beneficial Holders by forwarding to the Beneficial Holders the unsigned Beneficial Holder Ballots, together with the Disclosure Statement and Plan, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded.  Each such Beneficial Holder must then indicate his, her or its vote on the Beneficial Holder Ballot, complete the information requested on the Beneficial Holder Ballot, review the certifications contained on the Beneficial Holder Ballot, execute the Beneficial Holder Ballot and return the Beneficial Holder Ballot to the Nominee.  After collecting the Beneficial Holder Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Holder Ballots, execute the Master Ballot, and deliver the Master Ballot to the Solicitation Agent so that it is RECEIVED by the Solicitation Agent by the Voting Deadline.  All Beneficial Holder Ballots returned to a Nominee by Beneficial Holders should be retained by Nominees for inspection for at least one year from the Effective Date.

If your Nominee has not pre-validated your Beneficial Holder Ballot, complete and sign the enclosed Beneficial Holder Ballot, return the Beneficial Holder Ballot to your Nominee in the self-addressed postage prepaid envelope as promptly as possible and in sufficient time to allow such Nominee to process the Beneficial Holder  Ballot and include its vote on a Master Ballot and

---

[5]    A "**Beneficial Holder**" is a beneficial owner of Notes, as reflected in the records maintained by Nominees (as defined herein) holding through the Depository Trust Company ("**DTC**") or other relevant security depository and/or the Indenture Trustee, as of the Voting Record Date.

[6]    "**Nominee**" means a broker, dealer, commercial bank, trust company, savings and loan, financial institution, or other such party in whose name a beneficial ownership of Notes is registered or held of record as of the Voting Record Date.

return it to the Solicitation Agent by the Voting Deadline. If no self-addressed, postage paid envelope was enclosed for this purpose, please contact the Solicitation Agent for instructions; or

If your Nominee has pre-validated your Beneficial Holder Ballot, complete the pre-validated Beneficial Holder Ballot provided by such Beneficial Holder's Nominee. Return the pre-validated Beneficial Holder Ballot to the Solicitation Agent by the Voting Deadline using the return envelope provided with the Solicitation Package.

Any Beneficial Holder Ballot returned to a Nominee by a Beneficial Holder will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Solicitation Agent a Master Ballot that includes the vote of such Beneficial Holder. If any Beneficial Holder owns through more than one Nominee, such Beneficial Holder may receive multiple mailings containing the Beneficial Holder Ballots.

(c)     Votes cast by a Beneficial Holder on a pre-validated Beneficial Holder Ballot or on a Master Ballot through a Nominee will be applied against the positions held by such entities in the applicable security as of the Voting Record Date, as evidenced by the record and depository listings. Votes submitted by a Nominee, pursuant to the Master Ballots or pre-validated Beneficial Holder Ballots, will not be counted in excess of the principal amount of such securities held by such Nominee;

(d)     To the extent that conflicting votes or "overvotes" are submitted by a Nominee, the Solicitation Agent, in good faith, will attempt to reconcile discrepancies with the Nominee;

(e)     To the extent that overvotes on the Master Ballot are not reconcilable prior to the preparation of the vote certification, the Solicitation Agent will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballots or pre-validated Beneficial Holder Ballots that contained the overvote, but only to the extent of the Nominee's position in the applicable security;

(f)     For the purposes of tabulating votes, each Beneficial Holder will be deemed to have voted the principal amount relating to such security, although the Solicitation Agent may adjust such principal amount to reflect the claim amount, including prepetition interest.

(g)     A single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots. Votes reflected on multiple Master Ballots shall be counted except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the last properly completed Master Ballot received prior to the Voting Deadline shall, to the extent of such inconsistency, supersede any prior Master Ballot.

In order for the holder of a Claim in a Voting Class to have such holder's Ballot counted as a vote to accept or reject the Plan, a Beneficial Holder Ballot or Master Ballot containing such holder's vote must be properly completed, executed, and delivered by first class mail, using the return envelope provided, or via courier or personal delivery to Epiq at the address below so that it is **actually received by the Solicitation Agent on or before the Voting Deadline**. Please carefully review your Ballot instructions, as you may be required to submit your Ballot to your Nominee prior to the Voting Deadline so that your Nominee has sufficient time to record your vote on a Master Ballot and submit the Master Ballot to the Solicitation Agent by the Voting Deadline.

> Allen Systems Group, Inc.
> Ballot Processing
> c/o Epiq Systems, Inc.
> 757 Third Avenue, 3rd Floor
> New York, NY  10017

In the event of a purchase of Notes after the Voting Record Date, the purchaser may, to the extent it is aware of the identity of the holder as of the Voting Record Date, seek to obtain a proxy from the Nominee of the holder as of the Voting Record Date, and the holder as of the Voting Record Date and its Nominee are instructed to cooperate with such request. The purchaser's Nominee may then append such proxy to a Master Ballot in order to cast a vote on behalf of the purchaser; and the vote of the purchaser shall supersede any vote that may be cast by the holder as of the Voting Record Date. For the avoidance of doubt, any such proxy is transferable to any subsequent holder, until the Voting Deadline. Unless such proxy is obtained and appended to the Master Ballot as set forth above, any vote of such purchaser shall not be counted unless the Debtors determine otherwise.

The Debtors intend to utilize the following procedure with respect to ascertaining the intent of certain creditors who cast ballots: whenever a creditor casts more than one Ballot voting the same claim(s) before the Voting Deadline, the last properly completed Ballot actually received before the Voting Deadline shall be deemed to reflect the voter's intent and, thus, to supersede any prior Ballots.

The following Ballots shall not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected, unless otherwise agreed to by the Debtors: (i) any ballot received after the Voting Deadline unless the Debtors have granted an extension with respect to such Ballot; (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant; (iii) any Ballot cast by a person or entity that does not hold a claim in a class entitled to vote to accept or reject the Plan; (iv) any unsigned Ballot; (v) any Ballot without an original signature; (vi) any Ballot that is properly executed but that does not indicate an acceptance or rejection of the Plan; (vi) any Ballot, other than a Master Ballot, that is properly executed but indicates both an acceptance and a rejection of the Plan; and (vii) any Ballot transmitted to the Solicitation Agent by facsimile, electronic mail, or other means not specifically set forth herein or approved by the Bankruptcy Court, unless otherwise approved by the Debtors in writing.

A HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS, AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, ONLY THE LAST PROPERLY COMPLETED BALLOT WILL BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASS FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

The Debtors further propose that, subject to any contrary order of the Bankruptcy Court and except as otherwise set forth herein, the Debtors may waive any defects or irregularities as to any particular Ballot at any time, either before or after the Voting Deadline, and any such waivers shall be documented in the vote tabulation certification prepared by the Solicitation Agent.

Any Ballots that are not counted or otherwise invalidated as set forth herein shall be documented in the vote tabulation certification prepared by the Solicitation Agent.

## ARTICLE III
## BUSINESS DESCRIPTIONS

**3.1    Corporate History, Expansion, and Organizational Structure**

ASG and its direct and indirect subsidiaries provide IT management software solutions to small, medium, and large companies in a variety of industries around the world. The Company's products enable their more than 6,400 customers, including various Fortune 100 and Fortune 500 companies, to manage complex IT environments,

align IT spending and performance with business objectives, enhance workforce productivity, and reduce operating costs.

ASG was founded in 1986 by Arthur L. Allen in Naples, Florida.  By the end of the 1980s, ASG had accumulated a varied line of automation and performance software products supporting IBM mainframes and had opened sales and technical offices throughout the U.S., Canada, Denmark, Norway, the United Kingdom and Sweden.

After establishing a solid base in the mainframe marketplace, ASG sought to expand its portfolio to offer IT organizations a significant portion of their software requirements and expand into distributed environments, which were beginning to supplement mainframes.  From the mid-1990s until 2012, ASG embarked on a strategic acquisition campaign in which it significantly increased its enterprise software portfolio and expanded into a number of adjacent markets, mid-range platform, and cloud markets to meet perceived shifting market demand and to create ASG's unique positioning in the enterprise software industry as a company with truly differentiated solutions that could support Fortune 1000 clients.  Beginning in 2004, ASG began opening direct sales and support offices in Latin America and Asia Pacific, as well as other parts of Europe and ending relationships with distributors who were focused on a narrow solution set and content within the existing maintenance base.  These acquisitions and the sales and support presence expansion resulted in ASG having over 100 offices worldwide, primarily in the U.S. and Europe.

[*Remainder of Page Intentionally Left Blank*]

## Organizational Chart



[*Remainder of Page Intentionally Left Blank*]

LA\4007345.1

**3.2**     **Products and Services**

ASG provides mission-critical enterprise IT management software solutions to large enterprises and small and medium-sized businesses in a variety of industries.  Its comprehensive product suite, which is typically deeply integrated within a customer's IT environment, includes solutions for managing applications, databases, and process management functions and so enables customers to manage their complex IT environments and align IT spending and performance with business objectives.  ASG generates revenue through the sale of software licenses, software as a service, maintenance contracts, and professional services.  ASG markets over 65 standalone software products in the following three major solutions areas: content, cloud, and systems.

Content solutions reduce cost and risk and so allow users to maximize the value of their IT investments.  The suite provides for the capture and management of content (e.g. documents, reports, check images) from any data source across multiple archiving, backup, and compliance systems.  The captured content can be brought to the user for timely querying, viewing, reporting, analysis, classification, and distribution – and used to support business workflows, e-discovery, compliance, records management, output management, integration across organizations and repositories, and customized corporate communications.  The suite automatically captures context (i.e., metadata) across an organization's infrastructure, applications, data, and business processes.  The suite also determines the relationships between these systems in order to create an integrated "blueprint" of how the data, process, and physical systems are interconnected.  The Company's product suite enhances an organization's understanding of business processes and expedites business and technical decision making.

Cloud solutions offer end-to-end orchestration from the core of the data center up to the end-user's workspace and are servicing roughly 500,000 enterprise users in some of the world's largest companies.  The integrated and flexible design of the software improves efficiency through automated processes that reduce risky, error-prone, manual IT procedures.  ASG is one of the six key leaders in the Workspace Aggregation Cloud segment, which enables IT departments to control and orchestrate the delivery of PC, Web, and mobile applications and data in a managed, secure and context-aware manner to PCs, tablets and smartphones.

Systems software, from performance management and workload automation to application management and service quality and control, help companies reduce the cost of managing and running their systems landscape, while allowing IT investments to be shifted toward innovation, which supports business growth.

**3.3**     **Employees**

As of February 2, 2015, the Company had approximately 1068 employees in 102 locations in 25 countries (including the United States).  Approximately 49% of the Company's employees are located in the United States, where ASG is organized, and 51% are located outside of the United States.  Approximately 40% of the Company's worldwide employee headcount is located in four European countries – France (18%) Germany (12.6%), Spain (6%), and the United Kingdom (3%).

**3.4**     **Directors and Officers**

As of the date of this Disclosure Statement, ASG's board of directors is comprised of the following individuals: (a) Richard E. Newsted, who serves as Chairman of the board, (b) James B. Shein, and (c) Richard L. Vance.

As of the date of this Disclosure Statement, the Debtors' officers[7] include: (a) John C. DiDonato, Chief Restructuring Officer and President; (b) Derek Eckelman, EVP and General Counsel; (c) Ernest Scheidemann, EVP and Chief Financial Officer; (d) Richard Vance, EVP of Operations; (e) Alan Bolt, EVP and CIO; (f) Licia Williams, EVP of Human Resources; (g) Dietmar Wendt, EVP of Sales and Marketing; (h) Alex Derby, EVP of Sales Operations; and (i) Tatiana Lawson, VP and Corporate Controller.

---

[7]     For purposes of this Section, "officer" means an employee holding the position of Executive Vice President ("**EVP**") or higher as well as the Corporate Controller.

The existing boards of directors of the Debtors shall be deemed to have resigned on and as of the Effective Date.  The members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date.

The members of the New Board and the officers, directors, and/or managers of each of the Reorganized Debtors will be identified in the Plan Supplement.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the New Board and any Person proposed to serve as an officer of the Reorganized Debtors shall be disclosed at or before the Confirmation Hearing.  From and after the Effective Date, each director, officer or manager of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

In connection with the Plan, the Debtors will, with the prior written consent of the Required Consenting Creditors, secure tail liability coverage for the Debtors' directors and officers effective as of the Effective Date that is consistent with the existing directors' and officers' liability coverage, with such changes as the directors of the Debtors may reasonably request.  Except as otherwise provided herein, all Indemnification Provisions for the officers, directors, and/or managers of the Debtors will be reinstated (or assumed, as the case may be), and shall survive effectiveness of the Plan and shall not thereafter be altered to the detriment of the Debtors' directors and officers.

## 3.5    Prepetition Capital Structure

As of the Petition Date, the Debtors' funded debt is comprised of the Domestic Credit Facility (as defined below), the Foreign Credit Facility (as defined below), and the Notes issued by ASG.  Outstanding principal balances as of the Petition Date are approximately $239,337,000.00, $10,000,000.00, and $300,000,000.00 under the Domestic Credit Facility, the Foreign Credit Facility, and Notes, respectively.  Additional details regarding the Debtors' prepetition funded debt are provided below.

(a)    **First Lien**

ASG, as borrower, certain of its subsidiaries, as guarantors, and TPG Allison, LLC, as lender, and the First Lien Agent are parties to the Domestic Credit Agreement, pursuant to which TPG Allison, LLC made (a) a term loan in the aggregate principal amount of $214,337,000.00 (the "**Domestic Term Loan**") and (b) a revolving loan in the aggregate principal amount of $25,000,000.00 (the "**Domestic Revolving Loan**" and together with the Domestic Term Loan, the "**Domestic Credit Facility**")) to ASG, which loans and other Obligations (as defined in the Domestic Credit Agreement) are secured by first priority liens on, among other things, all or substantially all of the Debtors' assets, as well as the assets of certain of the Debtors' foreign non-Debtor subsidiaries that are guarantors of the Domestic Credit Facility.  On or about October 17, 2014, the Consenting Lenders acquired all right, title, and interest of TPG Allison, LLC as lender under the Domestic Credit Facility.  Wilmington Trust, N.A. succeeded TPG Allison Agent, LLC as the First Lien Agent for the Domestic Credit Facility.

Atempo, a wholly-owned non-Debtor subsidiary of ASG, as borrower, certain other direct or indirect non-Debtor foreign subsidiaries of the Company, as guarantors, and Natixis, as lender, and the First Lien Agent are parties to the Foreign Credit Agreement pursuant to which Natixis, New York Branch made a term loan in the aggregate principal amount of $10,000,000.00 (the "**Foreign Credit Facility**") to Atempo, which loans and other Obligations (as defined in the Foreign Credit Agreement) are secured by first priority liens on, among things, all or substantially all the assets of Atempo and certain of ASG's foreign subsidiaries who are guarantors of the Foreign Credit Facility.  On or about October 17, 2014, the Consenting Lenders acquired and became the beneficial holders of all right, title and interest to the Foreign Credit Facility.  Wilmington Trust, N.A. succeeded TPG Allison Agent, LLC as the First Lien Agent for the Foreign Credit Facility.

Beginning in April 2014, the Company did not make its scheduled interest payments on the Domestic Credit Facility, and in July 2014 missed scheduled interest payments on the Foreign Credit Facility.  Since August 15, 2014, the Company has not made interest payments on these obligations.  As of January 31, 2015, accrued and unpaid interest at the default rate on these credit facilities totals approximately $43 million on the

Domestic Credit Facility and $1 million on the Foreign Credit Facility, which consists of deferred interest, default interest, and accrued cash pay interest.

In addition to the foregoing, the Domestic Credit Agreement provides that:

> Notwithstanding anything to the contrary in this Agreement, in the event of any acceleration of the Facilities, whether automatically in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Debtor Relief Laws or the occurrence of an Event of Default under Section 8.01(q) or by action of the Administrative Agent, there will be payable to the Administrative Agent, for the benefit of the Lenders, as a liquidated damages premium and not as a penalty, an amount equal to (i) 12% of the amount of the Facilities then outstanding and 12% of the aggregate unused Revolving Credit Commitments if such acceleration occurs prior to the third anniversary of the Closing Date and (ii) 4% of the amount of the Facilities then outstanding and 4% of the aggregate unused Revolving Credit Commitments if such acceleration occurs on or after the third anniversary of the Closing Date and prior to the fourth anniversary of the Closing Date (each of the amounts referred to in clauses (i) and (ii), an "Acceleration Damage Premium") . . . .

The Domestic Credit Facility will be automatically accelerated upon the commencement of the Chapter 11 Cases.  Accordingly, pursuant to the Domestic Credit Agreement, an "Acceleration Damage Premium" equal to 12% of the amount of the credit facilities outstanding shall be due and owing upon commencement of the Chapter 11 Cases to the First Lien Agent for the benefit of the Domestic Lenders.  Such Acceleration Damages Premium equals $28,720,440 under the Domestic Credit Facility.

The Domestic Credit Agreement further provides that "the Borrower shall pay all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or  negotiations in respect of such Loans."  Prior to the Consenting Lenders' acquisition of 100% of the loans under the Domestic Credit Facility, the then-lenders incurred $3,647,082 in fees and expenses which were reimbursable by the Company under the Domestic Credit Facility.  As an accommodation to the Company, the Consenting Lenders agreed to pay these outstanding fees and expenses; in connection with the Consenting Lenders' acquisition of the loans under the Domestic Credit Facility, the Company acknowledged that such amounts constitute "Obligations" under the Domestic Credit Agreement that would remain due and owing to the Consenting Lenders.

Accordingly, as of January 31, 2015, the amounts owing under the Domestic Credit Facility total approximately $315 million (which includes unpaid interest, the unpaid fees and expenses, and the "Acceleration Damage Premium", and approximately $12 million under the Foreign Credit Facility (which includes unpaid interest, unpaid fees, and the applicable "Acceleration Damage Premium").

If the Company and Consenting Lenders agree that the Company lacks adequate liquidity prior to the Petition Date, the Consenting Lenders may, in their sole discretion, fund an additional Pre-Filing Loan in an amount up to $2,500,000.00 under the Domestic Credit Facility.  In the event the Consenting Lenders extend such Pre-Filing Loans to the Company, such amounts, plus all interest, fees and other amounts owing in connection therewith, shall be added to the amounts owing under the Domestic Credit Facility as of January 31, 2015.

    (b)    **Notes**

ASG also issued $300,000,000.00 of 10½% senior secured second lien notes due 2016 (the "**Notes**") pursuant to an Indenture, dated as of November 22, 2010 (as amended, modified, supplemented or restated from time to time, the "**Notes Indenture**"), by and among ASG and The Bank of New York Mellon Trust

Company, N.A., as Trustee and Collateral Agent (the "**Indenture Trustee**").  The Notes are secured by a second-priority lien on substantially all of the assets of ASG and certain of its subsidiaries, as guarantors.

        The Company missed its May 15, 2014, and November 15, 2014 interest payments on the Notes, totaling approximately $32 million (as of November 15, 2014).  Through January 31, 2015, accrued interest on Notes totals approximately $40 million.

        Accordingly, as of January 31, 2015, the amounts owing on account of the Notes totals approximately $340 million.

## ARTICLE IV
## EVENTS LEADING TO THE CHAPTER 11 CASES

**4.1**      **Escalating Levels of Debt**

        The Company historically utilized a highly leveraged capital structure to execute growth strategies during the 2000s, finishing 2008 with greater than $300 million in worldwide revenues.  The Company amassed debts that required multiple refinancings beginning in 2009, and finished 2010 with more than $350 million in secured debt.

        During 2011, the Company completed several acquisitions.  Although some were acquired using the Company's available cash, many were financed through a combination of availability under revolving credit facilities, incremental secured term loans, and a new unsecured term loan, increasing the Company's indebtedness by more than $150 million.  This additional indebtedness and pre-existing debt was replaced in 2012 with the Domestic Credit Facility.

**4.2**      **Challenges Leading to Revenue Deterioration**

      (a)      **Acquisition Integration Issues**

        The Company struggled to integrate several of its acquisitions, particularly those undertaken in 2011 and 2012.  Certain acquired cloud technologies, which involve longer sales cycles, have been adopted more slowly by customers than anticipated.  Other acquisitions also experienced rapid customer losses and revenue declines, as sales staff turnover and customer support issues have impaired the Debtors' ability to sustain certain revenue streams.

      (b)      **Increased Competition**

        In addition, the markets for the Debtors' products and services are highly competitive and diverse. New products are frequently introduced and existing products are continually enhanced.  The Debtors compete against a wide range of companies in the enterprise management software market, including a number of larger companies, such as IBM, Oracle, CA Technologies, BMC Software, EMC Corporation, Hewlett-Packard, VMware, Citrix Systems, Compuware Corporation, Macro4, and Micro Focus, as well as numerous independent software companies.

        Although the Debtors believe that they are market leaders in certain segments of the applications, data and information, infrastructure and operations, and cloud management areas and that their ability to combine offerings to meet specific customer needs is a significant competitive strength, several of the Debtors' existing competitors have, and many of their future competitors may have, greater financial, personnel, research and development and other resources, more well-established brands or reputations, and broader customer bases than do the Debtors.  As a result, these competitors tend to be better positioned to respond quickly to potential acquisitions and other market opportunities, new or emerging technologies, and changes in customer requirements.  Competitors with greater resources may also be able to offer lower prices, additional products or services, or other incentives that the Debtors cannot offer.  Furthermore, consolidations in various industries have created competitors with broader geographic coverage and the ability to reach enterprises through communications service providers.  Thus, the Debtors face competition from not only their traditional adversaries, but also established companies, who have not

previously entered the enterprise management software market, and emerging software companies, as barriers to entry in the distributed systems software market are relatively low.

        (c)        **Concerns About ASG's Long-Term Viability**

The Company's declining financial performance in 2014 accelerated as information about its financial distress spread into the marketplace and customers grew increasingly concerned about the Company's long-term viability. The Company believes that the consummation of the Plan will stabilize the Company and mitigate this obstacle to revenue generation.

## 4.3    Declining Revenues; Constrained Liquidity

As noted herein, the Company's revenues are generated through the sale of software licenses and from software as a service, maintenance contracts, and professional services. As a result of industry challenges and other factors (described further herein), the Company's revenues have declined in recent years. Total revenue in 2013 was approximately $22 million lower than in 2012, decreasing from approximately $298 million in 2012 to approximately $276 million in 2013. Audited financial information for 2014 is not presently available, but the Company projects a significant further reduction in total revenue to approximately $247 million for 2014.

During the same period, the Company's earnings have also declined. The Company's EBITDA declined slightly from 2012 to 2013, from approximately $53 million to approximately $52 million, before sharply declining by an estimated $32 million in 2014 to approximately $20 million. Adjusted EBITDA (EBITDA after taking into account certain adjustments for non-recurring expenses and affiliate payments) of approximately $77 million in 2012, declined in 2013 to approximately $72 million, before falling to an estimated $48 million in 2014.

As a result of deteriorating financial performance and substantial secured indebtedness, the Company has faced liquidity constraints and, as noted above, has not been able to make required interest payments on its funded debt starting in April of 2014.

## 4.4    Events Leading to the Formulation of the Plan

While the Company believes its performance will improve in the future, it does not believe the existing level of its secured indebtedness is sustainable. The Company engaged Rothschild in 2014 as its investment banker to evaluate strategic alternatives for the Company. As part of this process, Rothschild conducted an extensive restructuring, recapitalization, and sale process for the Company. Also during the Summer of 2014, the Company entered into negotiations with the Consenting Creditors, who hold 100% of the Domestic Credit Facility Claims and Foreign Credit Facility and over 72% of the Company's Notes.

In connection with the sale process, in early June 2014, Rothschild commenced an exhaustive campaign to solicit potential buyers of the Company. Over the course of five (5) months, Rothschild and the Company contacted 161 strategic and financial investors, executed 48 nondisclosure agreements, and distributed 48 confidential information memoranda describing the Company's operations and financial performance. Nine (9) potential investors submitted preliminary indications of interest for the purchase of the entire company in early August 2014. Additionally, five (5) other bidders submitted preliminary indications of interest for the purchase of specific segments or products of the Company; however, these bids were economically unattractive and were not pursued by the Company. Following assessment of the submissions, six (6) of the nine (9) parties that submitted bids for the entire company were selected to move forward with full due diligence and management presentations. Following the due diligence period and a bid reaffirmation date in mid-September, final bids were submitted in mid-October. The Company received two (2) binding letters of intent, both of which had financing conditions and would not have been sufficient for the Company to repay the Company's second lien obligations under the Notes. Further, each bid was for less than (a) Rothschild's valuation range and (b) the $500 million TEV of the Company under the Plan. Moreover, through early January 2015, the Company has continued to respond to inquiries from potential purchasers; however, none of these inquiries resulted in formal or actionable bids. Accordingly, the Debtors submit that the Plan represents a superior valuation to the result that could be obtained through a sale of the Company and/or its assets at this time.

After careful consideration of various alternatives, the Company determined that the best path for the Company and its stakeholders was to implement the restructuring set forth in the Plan with the support of the Consenting Creditors. Accordingly, on or about January 13, 2015, the ASG, the Consenting Creditors, and the Allen Parties entered into the Support Agreement pursuant to which the parties thereto agreed to support and, subject to Bankruptcy Court approval, implement the transactions contemplated by the Plan. Consummation of the Plan is expected to reduce the Company's funded indebtedness from approximately $666 million (including principal, interest, fees, and the "Acceleration Damages Premium" discussed herein) to approximately $240 million, a reduction of more than 64%.

The Plan is the outcome of extensive arms'-length negotiations between independent and sophisticated parties. In deciding to pursue the transactions to be effectuated pursuant to the Plan, the Debtors carefully considered all viable alternatives, including any alternatives that emerged from the Rothschild-led restructuring, recapitalization, and sale process. The Company believes that effectuating the Plan will stabilize the Company's finances and position the Company for long-term growth and profitability, which will inure to the benefit of the Company's stakeholders.

### 4.5    The AA Settlement Agreement

On December 10, 2014, the Company, the Consenting Creditors, and the Allen Parties entered into the AA Settlement Agreement, pursuant to which the Company and the Allen Parties agreed to amend the AA Leases (as defined in the AA Settlement Agreement) and to settle all disputes, claims and causes of action between the Allen Parties, on the one hand, and the Company and the Consenting Creditors, on the other hand. Pursuant to the Plan, the AA Settlement Agreement will be assumed on the Confirmation Date and approved under Bankruptcy Rule 9019.

The AA Settlement Agreement provided substantial value to the Debtors and the Consenting Creditors, and prevented substantial litigation and associated costs that may have otherwise arisen in the Debtors' Chapter 11 Cases. Pursuant to the settlement, the Company amended the terms on which it leased three buildings from the Allen Parties. These lease amendments allowed the Company to consolidate its headquarters in Naples, Florida, from three buildings (leased from the Allen Parties), to one building, dramatically shortened the terms of the leases (the leases for the two buildings vacated by the Company will expire on March 31, 2015 instead of in 2022, and the Company will not have further obligations with respect to such leases), and substantially improved economic terms of all leases from over $34 per square foot to $19 per square foot; the Allen Parties obtained necessary consents and agreed to waive all claims for rent that was unpaid since May 2014. The Company also negotiated for the termination of certain other leases and agreements with the Allen Parties, which upon assumption of the AA Settlement Agreement and consummation of the Plan, will significantly reduce claims against the Debtors, as well as the Company's future expenses. In addition, the Allen Parties agreed to waive all claims arising from such terminated leases and agreements. Moreover, Arthur Allen, who was then the Company's founder, Chairman of the board of directors, CEO and President, agreed to immediately resign all of his positions with the Company, and to broad non-compete, non-solicitation and non-disparagement provisions that protect the Company's interests. Finally, the Allen Parties agreed to support the Plan and the restructuring transactions contemplated thereby. In consideration of the foregoing, Mr. Allen will receive certain payments from the Company, as well as the Warrants for 10% of the New Common Stock, as further described herein and in the AA Settlement Agreement.

### 4.6    Deferred Purchase Obligation Settlements

As noted herein, starting in the mid-1990s, and particularly in the several years prior to the Petition Date, the Company grew through a number of strategic acquisitions. The Deferred Purchase Obligations arose out of such acquisitions and, prior to the Petition Date, represented the majority of claims owed to the Company's non-affiliated unsecured creditors. As contemplated in the Support Agreement, the Company's ability to settle the Deferred Purchase Obligations with the consent of the Required Consenting Creditors was a prerequisite to the Company's ability to propose a Plan supported by the Consenting Creditors that paid Other Unsecured Claims in full.

Prior to the Petition Date, the Company was able to settle the Deferred Purchase Obligations on terms acceptable to the Required Consenting Creditors and was able to satisfy its obligations under such settlements prior to the Petition Date.

LA\4007345.1

**4.7**    **DIP Facility**

In order to fund the Chapter 11 Cases, the Debtors intend to obtain and enter into the DIP Facility in an amount up to $40 million.  The DIP Facility will be secured by Liens senior to the Domestic Credit Facility, Foreign Credit Facility, and Notes.  Pursuant to the Support Agreement, the Consenting Creditors agreed that the Liens securing the Domestic Credit Facility, the Foreign Credit Facility, and the Notes would be subordinate to the Liens securing the DIP Facility, so long as the terms of the DIP Facility are acceptable to the Required Consenting Creditors and Required Consenting Lenders.  Also pursuant to the Support Agreement, (a) no interest shall be paid on the Domestic Credit Facility or the Foreign Credit Facility as adequate protection during the Chapter 11 Cases, without prejudice to the payment of such accrued and unpaid interest as part of the Allowed Domestic Credit Facility Claims or payment in full of the Foreign Credit Facility pursuant to the Plan, and (b) if the Debtors receive a Pre-Filing Loan from the Domestic Lenders, such Pre-Filing Loan shall be repaid upon the closing of the DIP Facility following entry of the Interim DIP Order.  No interest is payable on the Notes as adequate protection pursuant to the terms of the intercreditor agreement applicable to the Domestic Credit Facility and Notes.

**4.8**    **Overview of the Plan**

The Plan provides, among other things, that the Debtors or Reorganized Debtors, as applicable, will:

(a)    enter into the Exit Facilities, on terms reasonably acceptable to the Debtors and Required Consenting Creditors, consisting of the following:

(1)    the First Lien Revolving Loan Exit Facility, consisting of a first lien revolving loan facility in the principal amount of twenty-five million dollar ($25,000,000.00), which is expected to be undrawn as of the Effective Date;

(2)    the First Lien Term Loan Exit Facility, consisting of a first lien term loan facility in the minimum principal amount of one-hundred-fifty million dollar ($150,000,000.00); and

(b)    enter into the Second Lien Term Loan Exit Facility, consisting of a second lien term loan facility in a principal amount of up to ninety million dollars ($90,000,000.00). The Second Lien Term Loan Exit Facility shall be fully backstopped by the Consenting Creditors on the terms set forth on Exhibit 1 to the Plan and otherwise acceptable to the Company and the Required Consenting Creditors.  The Second Lien Term Loan Exit Facility shall be marketed by the Company in consultation with the First Lien Term Loan Exit Facility lender (once selected).  To the extent the principal amount of the First Lien Term Loan Exit Facility exceeds $150,000,000.00, the maximum principal amount of the Second Lien Term Loan Exit Facility shall be reduced on a dollar-for-dollar basis.  If the Debtors are not able to obtain binding commitments for the Second Lien Term Loan Exit Facility reasonably acceptable to the Company and the Required Consenting Creditors on or before the filing of the Plan Supplement, the Second Lien Term Loan Exit Facility shall be provided by the Consenting Creditors and its terms shall be included in the Plan Supplement (unless otherwise agreed by the Debtors and Required Consenting Creditors); consummate the $130,000,000.00 Rights Offering in exchange for the Rights Offering Stock representing 58.5% of the fully diluted New Common Stock to be issued on the Effective Date, subject to dilution on account of the Management Incentive Plan, the Warrants, and, if applicable, equity issued in connection with the Put Option Premium, which Rights Offering shall be backstopped in full by the Backstop Parties pursuant to the Backstop Agreement;

(c)    pay all DIP Facility Claims in full on the Effective Date, unless the DIP Facility lenders agree to less favorable treatment;

(d)    pay all Domestic Credit Facility Claims in full on the Effective Date, unless the holders of two-thirds (2/3) in amount of the Domestic Credit Facility Claims agree to less favorable treatment, including the terms of such less favorable treatment, in which case such less favorable treatment shall be binding on all holders of Domestic Facility Claims;

26

(e)     exchange Notes Claims for a Pro Rata share of (1) Notes Claims Stock, comprising 41.5% of Reorganized ASG's New Common Stock, and (2) Subscription Rights to subscribe for a Pro Rata share of a Rights Offering Stock for an aggregate purchase price equal to the Subscription Payment Amount of $130,000,000.00, subject to dilution on account of the Management Incentive Plan, the Warrants, and, if applicable, equity issued in connection with the Put Option Premium. The Rights Offering shall be backstopped in full by the Backstop Parties pursuant to the Backstop Agreement;

(f)     Other Unsecured Claims will be paid in full in Cash; *provided*, *however*, that, for the avoidance of doubt, the Notes Deficiency Claims and the Allen Claims do not constitute Other Unsecured Claims and shall not be entitled to any distribution provided to the holders of Allowed Class 6 Claims;

(g)     holders of Other Secured Claims have their claims reinstated or receive collateral;

(h)     holders of Other Priority Claims are unimpaired under the Plan and shall be paid in full in Cash on the Effective Date;

(i)     the AA Settlement Agreement shall be assumed pursuant to the Plan and the Allen Claims shall be treated in accordance therewith; and

(j)     the Foreign Credit Facility shall be paid in full in Cash on the Effective Date.

If consummated, the Plan will substantially de-lever the Debtors, while providing cost savings, operational efficiency and additional needed liquidity.  The Debtors believe the Plan represents their best option to maximize value for the Estates, exit from chapter 11 as expeditiously as possible, and provide their reorganized enterprise with the capital needed to implement their post-reorganization business plan.

## ARTICLE V
## KEY ASPECTS OF THE PLAN

**5.1     Distributions**

One of the key concepts under the Bankruptcy Code is that only claims and interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim or Interest, and the amount thereof, is in fact a valid obligation of or Interest in the Debtors.

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors (as the case may be) and the holder of the applicable Claim, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on or after the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided*, *however*, that (a) Allowed DIP Facility Claims and Allowed Domestic Credit Facility Claims (unless otherwise agreed by two-thirds (2/3rds) in amount of Allowed Domestic Credit Facility Claims) shall be paid in full in Cash on the Effective Date as provided in ARTICLE III of the Plan, (b) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (c) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in accordance with Sections 2.4 and 3.2(a) of the Plan, respectively, and (d) the Reorganized Debtor or Distribution Agent shall make distributions on account of Allowed Notes Claims on the Effective Date in accordance with Section 3.2(e) of the Plan.  To the extent any Allowed Priority Tax Claim or Allowed Secured Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

27

(a)        **Disputed Claims Process**

Except as otherwise provided in the Plan, if a party files a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in ARTICLE VII of the Plan.

(b)        **Prosecution of Objections to Claims and Interests**

Except with respect to a Claim or Interest that is deemed Allowed under the Plan, the Debtors and the Reorganized Debtors shall be entitled to object to any Claim or Interest.  Any objections to Claims or Interests shall be served and filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.  All Claims and Interests not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended by order of the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Section 4.18 of the Plan.

(c)        **Disallowance of Claims and Interests**

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code, and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**5.2    Restructuring Transactions**

(a)        **Specified Restructuring Transactions**

On the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, may take such actions as are necessary or appropriate to effectuate the Plan, including:[8]

(1)        Pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in the Plan, the property of each Estate shall vest in the applicable Reorganized Debtor, free and clear of all Claims and Interests including any and all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan, the Exit Facilities, the other Plan Documents, or the Confirmation Order.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.  There are certain non-Debtor Affiliates of the Debtors that are not Debtors in the Chapter 11 Cases.  The continued existence, operation and ownership of such non-Debtor Affiliates are a material component of the Debtors' businesses.  All of the Interests and other property interests in such non-Debtor Affiliates held by any Debtor on the Petition Date (other than non-Debtor Affiliates owned by other non-Debtor Affiliates) shall vest in the applicable Reorganized Debtor or its successor on the Effective Date, free and clear of all Claims, Liens, charges, other encumbrances, and

---

[8]        The Debtors, with the consent of the Required Consenting Creditors, not to be unreasonably withheld, conditioned or delayed, may delineate and/or establish the order of other transactions in the Plan Supplement.

interests, except as specifically set forth in the Plan, the Exit Facilities, the other Plan Documents, or the Confirmation Order.

(2)     All existing ASG Interests shall be canceled as of the Effective Date.

(3)     The Amended Organizational Documents shall become effective.

(4)     On, or as soon as reasonably practicable after, the Effective Date, Reorganized ASG or another applicable Distribution Agent shall consummate the Plan by making distributions of Cash and New Common Stock as provided in the Plan.  Reorganized ASG shall issue the New Common Stock to holders of Claims entitled to receive New Common Stock pursuant to the Plan.  Reorganized ASG shall issue the New Common Stock pursuant to the terms of the Plan and the Amended Organizational Documents, and all New Common Stock under the Plan shall be subject to the Stockholders Agreement and the Registration Rights Agreement, and each recipient of New Common Stock shall automatically be deemed to have accepted and be bound by the terms the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common Stock) and to be parties thereto without further action.   The Stockholders Agreement and the Registration Rights Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each holder of New Common Stock shall be bound thereby.

(5)     On, or as soon as reasonably practicable after, the Effective Date, Reorganized ASG shall issue the Warrants to the Allen Parties pursuant to the terms of the AA Settlement Agreement.  Reorganized ASG shall issue the Warrants pursuant to the terms of the Plan and the Amended Organizational Documents and all New Common Stock issued at any time on or after the Effective Date in connection with the Warrants shall be subject to the Stockholders Agreement and the Registration Rights Agreement, and each recipient of such New Common Stock issued in connection with the Warrants shall automatically be deemed to have accepted and be bound by the terms the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common Stock) and to be parties thereto without further action.

(6)     On the Effective Date, the Debtors and Reorganized Debtors, as applicable, shall receive the Rights Offering Amount and on, or as soon as reasonably practicable after, the Effective Date, Reorganized ASG or another applicable Distribution Agent shall distribute the Rights Offering Stock as provided in the Plan.

(7)     The Debtors and Reorganized Debtors, as applicable, shall enter into the Exit Facilities.

(8)     The discharge, releases, exculpation, and injunctions set forth in Sections 8.1 through 8.6 of the Plan, which are an essential element of the Plan, shall become effective.

(9)     The DIP Facility shall be repaid in full in Cash, unless otherwise agreed by the DIP Agent or DIP Lenders.

(10)    On the Effective Date, the Foreign Credit Facility shall be repaid in full in Cash in the aggregate principal amount of $10,000,000.00, plus (a) all accrued and unpaid interest through the Effective Date calculated at the applicable default rate in accordance with the Foreign Credit Agreement, (b) all applicable premiums, including the Acceleration Damages Premium in the amount of $1,200,000.00, and (c) all accrued and unpaid fees through the Effective Date.

(b)        **Additional Restructuring Transactions**

Without limiting the foregoing, on the Effective Date, the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, as applicable, may enter into the following transactions and take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein.    Such restructuring transactions may include one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, as applicable, to be necessary or appropriate.    The actions to effect such restructuring transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such restructuring transactions.    Following the Confirmation Date, the Debtors and Reorganized Debtors are authorized, with the prior written consent of the Required Consenting Creditors, to convert any of ASG's or Reorganized ASG's subsidiaries (including the other Debtors or Reorganized Debtors) that are qualified subchapter S subsidiaries into limited liability companies.

## 5.3      New Common Stock

All existing ASG Interests shall be canceled as of the Effective Date, and Reorganized ASG shall issue the New Common Stock to holders of Claims entitled to receive New Common Stock pursuant to the Plan.    The issuance of New Common Stock, including any options for the purchase thereof and equity awards associated therewith (including those in connection with the Management Incentive Plan and Warrants), is authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable.

All New Common Stock issued under the Plan (including Notes Claims Stock and Rights Offering Stock) shall be duly authorized, validly issued, fully paid, and non-assessable.    All New Common Stock under the Plan shall be subject to the Stockholders Agreement and the Registration Rights Agreement, and recipients of New Common Stock shall be automatically deemed to have accepted and be bound by the terms of the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common Stock) and to be parties thereto without further action.    The Stockholders Agreement and the Registration Rights Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each holder of New Common Stock shall be bound thereby.

The Debtors or Reorganized Debtors, as applicable, may, in their sole discretion, issue the New Common Stock to the Distribution Agent(s) for the benefit of the Rights Offering Investors and holders of Allowed Notes Claims, as applicable.

## 5.4      AA Settlement Agreement; Warrants

Pursuant to the Plan, the AA Settlement Agreement shall be assumed by the Reorganized Debtors.    On, or as soon as reasonably practicable after the Effective Date, Reorganized ASG shall issue the Warrants to the Allen Parties in accordance with the AA Settlement Agreement on the terms set forth on <u>Exhibit 3</u> to the Plan. Reorganized ASG shall issue the Warrants pursuant to the terms of the Plan and the Amended Organizational Documents, and all New Common Stock issued at any time in connection with the Warrants shall be subject to the Stockholders Agreement and the Registration Rights Agreement, and each recipient of such New Common Stock issued in connection with the Warrants shall automatically be deemed to have accepted and be bound by the terms of the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common

Stock) and to be parties thereto without further action. Any New Common Stock issued in connection with the exercise of the Warrants shall only be issued to Eligible Holders, unless otherwise agreed by the Reorganized Debtors in their sole discretion.

**5.5     Rights Offering**

(a)     **Issuance of Rights**

Each Eligible Holder of a Notes Claim as of the Rights Offering Record Date will be provided a Subscription Form giving such Eligible Holder the option, but not the requirement, to exercise (i) its Initial Subscription Rights to subscribe for its Pro Rata share of the Rights Offering Stock for an aggregate purchase price equal to the applicable Subscription Payment Amount and (ii) its Oversubscription Rights to subscribe for any Remaining Initial Rights Offering Stock for an aggregate purchase price equal to the applicable Oversubscription Payment Amount. In accordance with the Backstop Agreement, the Backstop Parties have committed to purchase all Remaining Rights Offering Stock. The Rights Offering Stock, including the Remaining Initial Rights Offering Stock and the Remaining Rights Offering Stock, will be issued to the Rights Offering Investors and/or the Backstop Parties, as applicable, for an aggregate purchase price equal to the Rights Offering Amount. The Backstop Parties, in accordance with the terms and conditions of the Backstop Agreement, shall exercise in full their Initial Subscription Rights. On the Effective Date, Reorganized ASG shall be authorized to consummate the transactions contemplated by the Rights Offering and the Backstop Agreement, including any agreement or document entered into in connection therewith, and all such agreements and documents shall become effective and binding in accordance with their respective terms (to the extent not effective and binding prior to the Effective Date) and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.

(b)     **Subscription Period**

The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Deadline. Each Eligible Holder of a Notes Claim as of the Rights Offering Record Date (or a subsequent Eligible Holder of a Notes Claim if transferred in accordance with Section 4.4(d) of the Plan) that intends or desires to participate in the Rights Offering must affirmatively elect to exercise its Initial Subscription Rights and, if desired, its Oversubscription Rights as set forth in Sections 4.5(c)(2) and (3) of the Plan, respectively. After the Subscription Deadline, elections to subscribe for the Remaining Initial Rights Offering Stock shall be allocated to and purchased by the Oversubscribing Holders as set forth in Section 4.5(c)(4) of the Plan. After such allocations and purchases, all Remaining Rights Offering Stock shall be allocated to and purchased by the Backstop Parties, in accordance with the terms and conditions of the Backstop Agreement.

(c)     **Exercise of Initial Subscription Rights, Oversubscription Rights, and Payment of Subscription Payment Amount and Oversubscription Payment Amount**

(1)     On the Subscription Commencement Date, the Subscription Agent will distribute the Subscription Form and Subscription Procedures to each applicable Nominee known as of the Rights Offering Record Date with instructions to forward the Subscription Form and Subscription Procedures to each Eligible Holder of a Notes Claim. The Subscription Form and Subscription Procedures will contain appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form, as well as instructions for the payment of the Subscription Payment Amount for that portion of the Initial Subscription Rights sought to be exercised by such Person and instructions for the election of Oversubscription Rights sought to be exercised by such Person. The Debtors, with the consent of the Required Backstop Parties, may adopt such additional detailed procedures consistent with the provisions of the Plan to more efficiently administer the exercise of the Subscription Rights.

(2)     In order to exercise the Initial Subscription Rights, each Eligible Holder of a Notes Claim as of the Rights Offering Record Date must (i) return a duly completed Subscription Form (making a binding and irrevocable commitment to participate in the Rights

31

Offering) to the Subscription Agent as specified in the applicable Subscription Form (including the required Nominee Certification), and (ii) tender its Subscription Payment Amount by wire transfer of immediately available funds to the Subscription Agent (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset), such that the Subscription Form(s) of the Eligible Holder of a Notes Claim and the Subscription Payment Amount (and/or notice of Joint Offset in the case of a Joint Holder) are actually received by the Subscription Agent on or before the Subscription Deadline in accordance with the terms of the Plan and the Subscription Form(s).  All payments for the exercise of Initial Subscription Rights received shall be held by the Subscription Agent in a separate account free and clear of all liens, claims and encumbrances until the Effective Date.  In the event the conditions to the Effective Date are not met or waived, such payments shall be promptly returned, without accrual or payment of any interest thereon, to the applicable Rights Offering Investor, without reduction, offset or counter-claim.  If the Subscription Agent for any reason does not receive from a given holder of Initial Subscription Rights a duly completed Subscription Form (including the Nominee Certification) and the applicable Subscription Payment Amount on or prior to the Subscription Deadline, then such holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering, and the Remaining Initial Rights Offering Stock shall be allocated to the Oversubscribing Holders, if any.  Any notice of Joint Offset must specify whether such Joint Offset will be made with respect to the Subscription Payment Amount. A separate notice of Joint Offset must be provided to specify whether a Joint Offset will be made with respect to any Oversubscription Payment Amount (as provided in clause (3) below). A separate notice of Joint Offset must be provided to specify whether a Joint Offset will be made with respect to any Backstop Payment Amount (as provided in clause (5) below).

(3)     In order to validly exercise Oversubscription Rights, an Eligible Holder of a Notes Claim as of the Rights Offering Record Date must (i) have returned a duly completed Subscription Form in accordance with the terms of <u>Section 4.5(c)(2)</u> of the Plan which (a) exercises in full its Initial Subscription Rights for its Pro Rata share of the Rights Offering Stock and (b) specifies such Eligible Holder's Oversubscription Election Amount, (ii) have caused its Subscription Payment Amount (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset) to be actually received by the Subscription Agent on or before the Subscription Deadline pursuant to the terms of <u>Section 4.5(c)(2)</u> of the Plan and (iii) cause its applicable Oversubscription Payment Amount (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset) to be actually received by the Subscription Agent on or prior to the Rights Offering Oversubscription Payment Date.  Each Eligible Holder may only exercise Oversubscription Rights with respect to the Rights Offering Amount that the Backstop Parties are not obligated to purchase pursuant to their Initial Subscription Rights, which is $35.4 million or 27.2% of the Rights Offering Amount.  To the extent that the Oversubscription Aggregate Election Amount exceeds the Remaining Initial Rights Offering Amount, the Remaining Initial Rights Offering Stock will be allocated Pro Rata among all holders of Oversubscription Rights that validly elect to exercise such Oversubscription Rights, based upon the Oversubscription Election Amount elected by each such holder.

(4)     On the Rights Offering Oversubscription Notification Date, the Subscription Agent will notify each Oversubscribing Holder of the Oversubscription Payment Amount that such Oversubscribing Holder is obligated to pay pursuant to its election of Oversubscription Rights.  Each Oversubscribing Holder must tender its Oversubscription Payment Amount by wire transfer of immediately available funds to the Subscription Agent (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset) so that it is actually received on or prior to the Rights Offering Oversubscription Payment Date.  If the Subscription Agent for any reason does not receive from a given holder

electing to exercise Oversubscription Rights (i) a duly completed Subscription Form (including the Nominee Certification and a specification of such Eligible Holder's Oversubscription Election Amount) and the applicable Subscription Payment Amount (and/or, in the case of a Joint Holder, written notice to the Subscription Agent of a Joint Offset) on or prior to the Subscription Deadline and (ii) the applicable Oversubscription Payment Amount (and/or, in the case of a Joint Holder, written notice to the Subscription Agent of a Joint Offset) on or prior to the Rights Offering Oversubscription Payment Date, then such holder shall be deemed to have forever and irrevocably relinquished and waived its right to exercise its Oversubscription Rights in the Rights Offering, and the Remaining Rights Offering Stock shall be allocated to the Backstop Parties.

(5)     On the Rights Offering Backstop Notification Date, the Subscription Agent will notify each Backstop Party of its portion of the Remaining Rights Offering Stock that such Backstop Party is obligated to purchase pursuant to the Backstop Agreement and the purchase price therefor. Each Backstop Party must tender its Backstop Payment Amount for its portion of the Remaining Rights Offering Stock by wire transfer of immediately available funds to the Subscription Agent (and/or, in the case of a Joint Holder, provide written notice to the Subscription Agent of a Joint Offset) so that it is actually received on or prior to the Rights Offering Backstop Payment Date in accordance with the terms of the Backstop Agreement.

(d)     **No Transfer; Detachment Restrictions; No Revocation**

The Subscription Rights are not transferable or detachable from the Notes Claims except for, prior to the Subscription Deadline, transfers by a holder of Notes Claims to one or more of its Affiliates with written notice to the Debtors and the Subscription Agent in advance of any such transfer; *provided*, that (i) the Initial Subscription Rights and Oversubscription Rights are not detachable from each other; (ii) the Subscription Rights are issued in connection with each holder's Notes Claims as of the Rights Offering Record Date; and (iii) no transfer, assignment, or other disposition of the Subscription Rights may be made except in connection with the transfer, assignment, or disposition of the corresponding Notes to such Affiliates. Upon any valid exercise of Subscription Rights by any Rights Offering Investor, such Rights Offering Investor shall not thereafter transfer, assign or otherwise dispose of any corresponding Notes on or prior to the Effective Date or the right to receive Rights Offering Stock prior to the distribution of such Rights Offering Stock to the applicable Rights Offering Investor; all such Rights Offering Stock shall be distributed to the party identified in the duly completed Subscription Form. No transfer, assignment or other disposition of the Subscription Rights of any Backstop Party may be made unless such Backstop Party's transferee is an Affiliate of such Backstop Party and agrees to an assignment or transfer of such Backstop Party's commitment, as set forth in the Backstop Agreement, to subscribe for the Rights Offering Stock in connection with such transferred Subscription Rights. Any transfer or detachment, or attempted transfer or detachment, in violation of this restriction will be null and void. Once an Eligible Holder of a Notes Claim has properly exercised any of its Initial Subscription Rights or Oversubscription Rights, or a Backstop Party has purchased its Rights Offering Stock in accordance with the Backstop Agreement, such exercise may only be revoked, rescinded, or annulled in the sole discretion of the Debtors or Reorganized Debtors with the consent of the Required Backstop Parties. No assignment or transfer of a Backstop Party's commitment, as set forth in the Backstop Agreement, may be made without the prior written consent of the Debtors unless such Backstop Party's transferee is an affiliate of such Backstop Party or is another Backstop Party.

(e)     **Distribution of Rights Offering Stock**

On, or as soon as reasonably practicable after, the Effective Date, Reorganized ASG or another applicable Distribution Agent shall distribute the Rights Offering Stock purchased by such Rights Offering Investor or Backstop Party to such Rights Offering Investor or Backstop Party, respectively, as set forth in such Rights Offering Investor's or Backstop Party's duly completed Subscription Form(s).

Each Rights Offering Investor shall be automatically deemed to have accepted and be bound by the terms of the Stockholders Agreement and the Registration Rights Agreement (in their capacity as holders of New Common Stock) and to be parties thereto without further action. The Stockholders Agreement and the Registration

Rights Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding and enforceable in accordance with their terms, and each holder of New Common Stock shall be bound thereby.

For avoidance of doubt, Subscription Rights, and any New Common Stock issued in connection therewith, shall be issued only to Eligible Holders of Notes Claims on the Rights Offering Record Date, and the Debtors or Reorganized Debtors shall require that each Rights Offering Investor certify that such Person is an Eligible Holder. Holders who are not Eligible Holders who attempt to exercise Subscription Rights will not have their subscriptions accepted and any consideration delivered to the Subscription Agent will be returned to such holder.

(f)    **Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights shall be determined by the Debtors or Reorganized Debtors, in consultation with the Backstop Parties, in their sole discretion. The Debtors or Reorganized Debtors, in their sole discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. A Subscription Form shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors or Reorganized Debtors in consultation with the Backstop Parties determine in their sole discretion. The Debtors or Reorganized Debtors will use commercially reasonable efforts to give written notice to any Rights Offering Investor regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; *provided*, *however*, that neither the Debtors and Reorganized Debtors nor any of their Affiliates, directors, officers, employees, agents, advisors and attorneys shall incur any liability for giving, or failing to give, such notification and opportunity to cure.

(g)    **Rights Offering Proceeds**

The proceeds of the Rights Offering will provide $130,000,000.00 in capital to the Reorganized Debtors, which shall be used to fund the payments required under the Plan and for ordinary course operations and general corporate purposes of the Reorganized Debtors after the Effective Date.

(h)    **Rights Offering Put Option Premium**

On the Effective Date, Reorganized ASG shall cause the Put Option Premium payable in conjunction with the Rights Offering to be delivered to the applicable Backstop Parties or their designees pursuant to the terms of the Backstop Agreement.

**5.6    Exit Facilities**

On the Effective Date, the applicable Reorganized Debtors shall enter into the Exit Facilities, and shall be authorized to execute and deliver the Exit Facility Credit Agreements and other Exit Facility Documents. All such documents are incorporated herein and into the Plan by reference, and shall become effective in accordance with their terms and the Plan.

Pursuant to the Support Agreement, the Second Lien Term Loan Exit Facility shall be fully backstopped by the Consenting Creditors on the terms set forth on Exhibit 1 to the Plan and otherwise reasonably acceptable to the Company and the Required Consenting Creditors. The Second Lien Term Loan Exit Facility shall be marketed by the Company in consultation with the First Lien Term Loan Exit Facility lender (once selected). To the extent the principal amount of the First Lien Term Loan Exit Facility exceeds $150,000,000.00, the maximum principal amount of the Second Lien Term Loan Exit Facility shall be reduced on a dollar-for-dollar basis. If the Debtors are not able to obtain binding commitments for the Second Lien Term Loan Exit Facility reasonably acceptable to the Company and the Required Consenting Creditors on or before the filing of the Plan Supplement, the Second Lien Term Loan Exit Facility shall be provided by the Consenting Creditors, and its terms shall be included in the Plan Supplement (unless otherwise agreed by the Debtors and Required Consenting Creditors).

On the Effective Date, and without further notice to, or order or other approval of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person or Entity, except for the Confirmation Order and as otherwise required by the Exit Facility Documents, the applicable Reorganized Debtors shall, and are authorized to, enter into the Exit Facility Credit Agreements and other Exit Facility Documents, and perform and receive the proceeds of the Exit Facilities, and to execute and deliver the Exit Facility Documents to which the applicable Reorganized Debtors are intended to be a party on the Effective Date, in each case consistent with the terms of the Plan. Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, including any supplemental or additional syndication of the Exit Facilities, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (b) authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be approved, (b) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, and (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. On and after the Effective Date, the priorities of the Liens and security interests securing the Exit Facilities shall be governed by the terms of the applicable Exit Facility Documents.

**5.7    Treatment of Executory Contracts and Unexpired Leases**

(a)    **Assumption and Rejection of Executory Contracts or Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(1)    have been rejected by order of the Bankruptcy Court;

(2)    are the subject of a motion to reject pending on the Effective Date;

(3)    are identified in the Plan Supplement (which exhibit(s) may be amended by the Debtors, with the consent of the Required Consenting Creditors, to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended exhibit and serving it on the affected contract parties prior to the Effective Date) as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan, which shall be deemed rejected as of the Effective Date; or

(4)    are rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to

the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.

Except as otherwise provided in the Plan or agreed to by the Debtors and with the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)    **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

All Claims against the Debtors arising from any Executory Contract or Unexpired Lease that is rejected pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim, and such Claim shall not be enforceable against the Debtors, the Reorganized Debtors, or the Estates, and the Debtors, the Reorganized Debtors, and their Estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in the Plan.

(c)    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 30 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing in the Plan shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is a dispute regarding Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as practicable after entry of a

36

Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

(d)     **AA Settlement Agreement**

Upon entry of, and pursuant to, the Confirmation Order, the AA Settlement Agreement shall be deemed approved and assumed pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The Unexpired Leases to be assumed on amended terms or rejected, as applicable, pursuant to the AA Settlement Agreement shall be deemed assumed or rejected, as applicable, upon entry of the Confirmation Order. No Cures shall be required to be paid in connection with the assumption of such Unexpired Leases, other than payment of the rent amounts, to the extent unpaid, to be paid under the AA Settlement in connection with such Unexpired Leases to be assumed. Such Unexpired Leases assumed pursuant to the Plan shall revest in and be fully enforceable by the Reorganized Debtors in accordance with their terms. In the event the Debtors reject the Unexpired Leases set forth in the AA Settlement Agreement, all rejection damages, including all claims for unpaid rent and other amounts allegedly due by the Debtors under such Unexpired Leases, shall be deemed waived and released as set forth in the AA Settlement Agreement.

(e)     **Indemnification**

Except with respect to any claims or Causes of Action asserted or brought by Persons or Entities against the Allen Parties, on and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the reimbursement, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, or agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors will amend and/or restate their respective governance documents to terminate or materially adversely affect any of the Debtors or Reorganized Debtors' obligations to provide such indemnification rights to such directors, officers, employees, or agents with respect to claims or Causes of Action arising – or based upon or related to acts or omissions occurring – prior to the Effective Date.

(f)     **Compensation and Benefit Programs**

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, and without limiting any authority provided to the New Board under the Reorganized Debtors' Amended Organizational Documents or applicable non-bankruptcy law, all employment and severance policies, plans, and agreements, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its employees, retirees, and non-employee directors, and the employees and retirees of its subsidiaries, including all savings plans, retirement plans, healthcare plans, disability plans, incentive plans, life, accidental death and dismemberment insurance, and other welfare plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; *provided*, *however*, that, to the extent any such employment or benefit agreement, plan, program or policy contains a "change of control" provision, such provision shall be deemed modified such that the consummation of the Plan shall not entitle any Person to exercise any rights, or assert any Claims against the Debtors or the Reorganized Debtors, with respect thereto.

(g)     **Workers' Compensation Benefits**

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate, and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance.  All such contracts and agreements are treated as Executory Contracts under the Plan, and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

(h)     **Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date**

Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

(i)     **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact as a matter of law an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired as of the Petition Date, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**5.8     Exemption from Registration Requirements**

The offering, issuance, and distribution of any Plan Securities will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. Pursuant to section 4(a)(2) of the Securities Act, the Plan Securities will be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable state or foreign securities laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.  Any and all Plan Securities shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred, unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, and in compliance with any applicable state or foreign securities laws and the terms of the Stockholders Agreement and the Registration Rights Agreement.

**5.9     Corporate Existence**

The Reorganized Debtors shall continue to exist after the Effective Date as separate legal entities, with all the powers of corporations, memberships, partnerships and other entities, as applicable, pursuant to the applicable law in their states of incorporation or organization and pursuant to the Amended Organizational Documents.

**5.10     Vesting of Assets in the Reorganized Debtors; Post-Effective Date Operation**

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan (including the Exit Facility Documents), on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or

Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**5.11**     **Corporate Action**

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized and approved in all respects without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors, as applicable.  Such actions may include: (a) the adoption and filing of the Amended Organizational Documents, the Stockholders Agreement, and the Registration Rights Agreement; (b) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the New Board; (c) the adoption and implementation of the Management Incentive Plan or other management incentive programs; (d) the authorization, issuance, and distribution of New Common Stock and other Securities to be authorized, issued, and distributed pursuant to the Plan; (e) the adoption or assumption, as applicable, of Executory Contracts or Unexpired Leases; and (f) the entry into the Exit Facilities and the execution and delivery of the Exit Facility Documents.

**5.12**     **Cancelation of Notes, Instruments, Certificates, and Other Documents; Intercompany Claims and Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be canceled, and the obligations of the Debtors or Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing holders of Allowed Claims and Interests to receive distributions under the Plan and (b) allowing and preserving the rights of the DIP Agent, the First Lien Agent, the Indenture Trustee, and any Servicer, as applicable, to make distributions on account of Allowed Claims and Interests as provided in the Plan.

As provided in the Plan, unless otherwise determined by the Debtors or Reorganized Debtors, as applicable, no Intercompany Claims or Intercompany Interests shall be canceled pursuant to the Plan, and all Intercompany Claims and Intercompany Interests shall continue in place following the Effective Date, solely for the purpose of maintaining the existing corporate structure and Intercompany Claims of the Debtors and the Reorganized Debtors.

**5.13**     **Cancelation of Liens**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, any Lien securing any Secured Claim that is satisfied in full and discharged under the Plan shall be deemed released, and the holder of such Secured Claim, or any agent for such holder, shall be authorized and directed to release any collateral or other property of the Debtors or Reorganized Debtors, as applicable, including any cash collateral held by such holder, or any agent for such holder, and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Reorganized Debtors.  In the event that such holder or any agent for such holder fails to comply with a valid request of the Reorganized Debtors pursuant to Section 4.12 of the Plan, the Reorganized Debtors are authorized to take any of the foregoing actions on behalf of such holder or agent for such holder.

**5.14**     **Amended Organizational Documents**

The Amended Organizational Documents shall amend or succeed the certificates or articles of incorporation, bylaws, membership agreements, partnership agreements and other organizational documents of the Debtors to satisfy the provisions of the Plan and the Bankruptcy Code, and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required

or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Common Stock; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated in the Plan.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation and bylaws, and other applicable organizational documents, as permitted by applicable non-bankruptcy law.

**5.15**      **Directors and Officers; Indemnification**

The existing boards of directors of the Debtors shall be deemed to have resigned on and as of the Effective Date.  The members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date.

The members of the New Board and the officers, directors, and/or managers of each of the Reorganized Debtors will be identified in the Plan Supplement.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the New Board and any Person proposed to serve as an officer of the Reorganized Debtors shall be disclosed at or before the Confirmation Hearing.  From and after the Effective Date, each director, officer or manager of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

To the extent not previously acquired, the Debtors will secure tail liability coverage for the Debtors' directors and officers effective as of the Effective Date that is consistent with the existing directors and officers liability coverage, with such changes as the directors of the Debtors may reasonably request.  Except as otherwise provided in the Plan, all Indemnification Provisions for the officers, directors, and/or managers of the Debtors will be reinstated (or assumed, as the case may be), and shall survive effectiveness of the Plan and shall not thereafter be altered to the detriment of the Debtors' directors and officers.

**5.16**      **Management Agreements and Incentive Plans**

On, or as soon as reasonably practicable after the Effective Date, (a) Reorganized ASG and the other Reorganized Debtors, as applicable, shall execute and deliver the Management Agreements, and (b) the New Board shall adopt the Management Incentive Plan, and make individual awards pursuant thereto, consistent with the Management Agreements and Management Incentive Plan, and otherwise as determined by the New Board. Approval of the Plan shall constitute shareholder approval of the Management Incentive Plan for purposes of Section 422 of the Tax Code.

**5.17**      **Release, Injunction, and Related Provisions**

(a)      **Discharge of Claims and Termination of Interests**

(1)      **Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and of all Interests, or other rights of a holder of an Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, or Interests or other rights of a holder of an equity security or other ownership interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed to have received a discharge under section 1141(d)(1)(A) of the Bankruptcy Code and**

release from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Interests or other rights of a holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any equity security holder in any of the Debtors and all Equity Interests.

(2)     Except as expressly provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against each of the Debtors, the Debtors' respective assets, property and Estates and the Reorganized Debtors any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and all Interests or other rights of a holder of an Interest, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and estates based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Interests or other rights of a holder of an Interest and termination of all rights of any such holder in any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any holder of any Interest in any of the Debtors or terminated Interest.

(b)     **Releases by and of the Debtors**

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, to the fullest extent permissible under applicable law, each of the Debtors, the Reorganized Debtors, and the Estates, shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish and discharge each Released Party (and each such Released Party so released shall be deemed fully released and discharged by the Debtors, the Reorganized Debtors, and the Estates) and their respective property from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor and/or a Reorganized Debtor, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, any transactions contemplated by the Plan, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, any payments, distributions, or dividends any Debtor or Affiliate paid to or received from any Released Party, fraudulent or preferential transfer or conveyance, tort, contract, breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence, gross negligence, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of

41

Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; *provided*, *however*, that the foregoing release shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages, remedies, Causes of Action, and liabilities in respect of any Released Party solely to the extent: (1) arising out of or relating to any act or omission of such Released Party that constitutes fraud or willful misconduct as determined by Final Order of a court of competent jurisdiction; or (2) arising under the Exit Facility Documents or other obligations arising under the Plan.

(c)     Releases by Holders of Claims and Interests

Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Releasing Parties shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge each Released Party (and each such Released Party so discharged and released shall be deemed discharged and released by the Releasing Parties) and their respective property from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor and/or a Reorganized Debtor, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, any transactions contemplated by the Plan, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, any payments, distributions, or dividends any Debtor or Affiliate paid to or received from any Released Party, fraudulent or preferential transfer or conveyance, tort, contract, breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence, gross negligence, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; *provided*, *however*, that the foregoing release shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages, remedies, Causes of Action, and liabilities in respect of any Released Party, solely to the extent: (1) arising out of or relating to any act or omission of such Released Party that constitutes fraud or willful misconduct as determined by Final Order of a court of competent jurisdiction; (2) arising under the Exit Facility Documents or other obligations arising under the Plan, or (3) with respect to Professionals' final fee applications or accrued Professional compensation claims in the Chapter 11 Cases.

(d)     AA Settlement Releases

Notwithstanding anything contained in the Plan to the contrary, the releases set forth in the AA Settlement Agreement are hereby incorporated by reference in to the Plan, and, on the Confirmation Date and effective as of the Effective Date, are approved.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing releases under the AA Settlement Agreement, which includes by reference each of the related provisions and definitions contained in the Plan and the AA Settlement Agreement, *and*, *further*, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for good and valuable consideration; (2) a good faith settlement and compromise of the Claims released by the AA Settlement Agreement; (3) in the best interests of the Debtors and all holders of Claims; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the parties providing releases under the AA Settlement Agreement from asserting any claim or Cause of Action released pursuant to the AA Settlement Agreement.

(e)      **Exculpation**

**Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to, the Chapter 11 Cases, the formulation, negotiation, solicitation, preparation, dissemination, confirmation, or implementation of the Plan, or consummation of the Plan, the Support Agreement, the Disclosure Statement, the Plan Supplement, the Amended Organizational Documents, the Stockholders Agreement, the Registration Rights Agreement, or other new corporate governance documents, any transactions contemplated by the Plan, the Management Agreements, the Management Incentive Plan, the issuance, distribution, and/or sale of any shares of the New Common Stock, the Warrants (the issuance of New Common Stock in connection therewith), or any other Security offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases, or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors;** *provided, however,* **that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement;** *provided, further,* **that the foregoing "Exculpation" shall have no effect on the liability of any Entity solely to the extent resulting from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.**

(f)      **Preservation of Rights of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain Causes of Action. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

(g)      **Injunction**

**Except as otherwise provided in the Plan or for obligations issued pursuant thereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 8.2, Section 8.3, or Section 8.4 of the Plan, discharged pursuant to Section 8.1 of the Plan, or are subject to exculpation pursuant to Section 8.5 of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests;**

(b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests, unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.

        (h)        **Protection Against Discriminatory Treatment**

        In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

        (i)        **Indemnification**

        Except with respect to any claims or Causes of Action asserted or brought by Persons or Entities against the Allen Parties, on and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, or agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors will amend and/or restate their respective governance documents to terminate or materially adversely affect any of the Debtors or Reorganized Debtors' obligations to provide such indemnification rights to such directors, officers, employees, or agents with respect to claims or Causes of Action arising – or based upon or related to acts or omissions occurring – prior to the Effective Date.

        (j)        **Recoupment**

        In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

        (k)        **Reimbursement or Contribution**

        If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim, and a Final Order has been entered determining such Claim as no longer contingent.

**5.18**    **Employee and Retiree Benefits**

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the New Board under the Reorganized Debtors' Amended Organizational Documents or applicable non-bankruptcy law, the Reorganized Debtors shall: (a) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for wages and accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.

**5.19**    **Insurance Preservation and Proceeds**

Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any policies of insurance that cover claims against the Debtors, the Reorganized Debtors or any other Person, and all such policies shall vest in the Reorganized Debtors as of and subject to the occurrence of the Effective Date.

**5.20**    **Solicitation of Debtors**

Notwithstanding anything to the contrary in the Plan, each Debtor that would otherwise be entitled to vote to accept or reject the Plan as a holder of a Claim against or Interest in another Debtor shall not be solicited for voting purposes, and such Debtor will be deemed to have voted to accept the Plan.

**5.21**    **No Consent to Change of Control Required**

Notwithstanding anything to the contrary in the Plan, none of (a) the facts or circumstances giving rise to the commencement of, or occurring in connection with, the Chapter 11 Cases, (b) the issuance of the New Common Stock pursuant to the Plan, or (c) implementation or consummation of any other transaction pursuant to the Plan shall constitute a "change in ownership" or "change of control" (or a change in working control) of, or in connection with, any Debtor or Reorganized Debtor requiring the consent of any Person other than the Debtors or the Bankruptcy Court, including in connection with any local municipal licensing arrangement or under any Executory Contract or other agreement (whether entered into before or after the Petition Date) between any Debtor and any third party, or any law (including the common law), statute, rule or any other regulation otherwise applicable to any Debtor.

**5.22**    **Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and be consistent with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided in the Plan, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**5.23**    **Dissolution of the Committee**

Except with respect to the prosecution of any Professional Fee Claims, any Committee shall be dissolved on the Effective Date.

**5.24**    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or

appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Rights Offering, the Exit Facilities, and the New Common Stock and other Securities issued pursuant to the Plan (if any) in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**5.25**     **Modification of Plan**

Subject to and in accordance with the terms of the Support Agreement, effective as of the date of the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors, with the consent of the Required Consenting Creditors, or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth in the Plan.

**5.26**     **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**5.27**     **Revocation or Withdrawal of Plan**

The Debtors, subject to and in accordance with the terms of the Support Agreement, reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**5.28**     **Confirmation of the Plan Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan or is deemed to reject the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors, with the consent of the Required Consenting Creditors, reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**5.29**     **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order and the Effective Date has occurred.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**5.30**     **Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://dm.epiq11.com/ASG or the Bankruptcy Court's website at www.deb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in

the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

At least ten (10) days before the Confirmation Hearing, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by:  (1) calling the Debtors' restructuring hotline at one of the telephone numbers set forth above; (2) visiting the Debtors' restructuring website, http://dm.epiq11.com/ASG; and/or (3) by writing to Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, New York, NY 10017.

**5.31    Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**5.32    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.3 of the Plan:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Debtors and the Required Consenting Creditors;

(b)    the Support Agreement shall not have been terminated in accordance with its terms;

(c)    with respect to all documents and agreements necessary to implement the Plan: (1) all conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; (2) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; (3) such documents and agreements shall have been effected or executed; and (4) such documents shall be consistent with the applicable terms of the Support Agreement and the Plan and reasonably acceptable to the Required Consenting Creditors;

(d)    the Reorganized Debtors shall have executed the Exit Facility Documents, and the proceeds of the Exit Facilities shall be available to the Reorganized Debtors on the Effective Date;

(e)    the Backstop Agreement shall not have been terminated in accordance with its terms, and the proceeds of the Rights Offering in the Rights Offering Amount shall be available to the Reorganized Debtors on the Effective Date;

(f)    all Regulatory Approvals necessary to consummate the Plan shall have been obtained or the waiting periods related thereto shall have expired (or early termination shall have been granted); and

(g)    there shall not be in effect any law or order of a Governmental Unit having competent jurisdiction over the Debtors or Reorganized Debtors, as applicable, prohibiting the consummation of the transactions contemplated by the Plan.

47

# ARTICLE VI
## CERTAIN FACTORS TO BE CONSIDERED

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.

**6.1    General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote to accept or reject the Plan, holders of Claims should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

**6.2    Risks Relating to the Plan and Other Bankruptcy Law Considerations**

(a)    **A Claim or Interest Holder May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created ten (10) Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. However, a Claim or Interest holder could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

(b)    **The Debtors May Not Be Able To Satisfy the Voting Requirements for Confirmation of the Plan**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation. If the Plan does not receive the required support from Class 5, then the Debtors may elect to amend the Plan, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.

(c)    **The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors To Re-Solicit Votes with Respect to the Plan**

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy

Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Plan.

If the Plan is filed, there can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

Moreover, the Bankruptcy Court could fail to approve this Disclosure Statement and determine that the votes in favor of the Plan should be disregarded.  The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement.  Typically, this process involves a 60- to 90-day period and includes a Bankruptcy Court hearing with respect to the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the Bankruptcy Court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of claims and interests and the Debtors' liquidation analysis are set forth under the unaudited Liquidation Analysis, attached hereto as <u>Exhibit C</u>.  The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest holders than those provided for in the Plan because of:

    (1)    the absence of a market for the Debtors' assets on a going concern basis;

    (2)    additional administrative expenses involved in the appointment of a trustee; and

    (3)    additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other Executory Contracts in connection with a cessation of the Debtors' operations.

    (d)    **The Debtors May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

    (e)    **The Debtors May Fail to Obtain the Proceeds of the DIP Facility, the Exit Facilities or the Rights Offering Amount, and the applicable Backstop Agreement(s) May Terminate, or the Bankruptcy Court May Not Approve the Rights Offering as presently contemplated**

The Debtors' ability to fund administrative and operating expenses during the Chapter 11 Cases is predicated upon, among other things, obtaining the proceeds of the DIP Facility.  Because final documentation related to the DIP Facility has not yet been executed, there can be no assurance that the Debtors will be able to obtain the proceeds of the DIP Facility.  In addition, under the DIP Facility, the DIP Credit Agreement is expected to establish various conditions precedent to the closing of the DIP Facility.  If the Company does not receive the proceeds of the DIP Facility, the Debtors will not be able to consummate the Plan in its current form.

The Plan is predicated on, among other things, ASG's receipt of proceeds of the Exit Facilities and the Rights Offering Amount.  The Debtors have not yet obtained binding commitments related to the First Lien Revolving Loan Exit Facility or the First Lien Term Loan Exit Facility, and there can be no assurance that the Debtors will be able to do so.  Moreover, notwithstanding the Backstop Agreement applicable to the Second Lien Term Loan Exit Facility and the Rights Offering, because the Second Lien Term Loan Exit Facility has not been

obtained and the Rights Offering has not been completed, there can be no assurance that the Debtors will receive any or all of the proceeds of the Second Lien term Loan Exit Facility or the Rights Offering Amount.  In addition, under the Backstop Agreement, the Backstop Parties have the contractual right to terminate the Backstop Agreement if, among other reasons, the deadlines set forth in such agreement or the various conditions precedent to enforcement of the Backstop Parties' obligations are not satisfied.  If ASG does not receive the proceeds of the Exit Facilities or the Rights Offering Amount, the Debtors would not be able to consummate the Plan in its current form.

The Rights Offering is a funding mechanism and not a distribution on account of Claims.  Holders of Notes Claims are receiving New Common Stock, not new debt on account of their Notes Claims.  The Debtors chose the Rights Offering as a funding mechanism because, among other reasons, they believed it was the cheapest available source of funds and the Debtors chose to make it available to only accredited investors to comply with applicable securities laws.  Accordingly, the Debtors do not believe any holder of a Notes Claim that is not an Eligible Holder has any right to participate in the Rights Offering; however, the Bankruptcy Court may not agree with this characterization.  If the Rights Offering is not consummated, the Debtors would not be able to consummate the Plan in its current form.

(f)    **Even if the Debtors Receive All Necessary Acceptances for the Plan To Become Effective, the Debtors May Fail To Meet All Conditions Precedent to Effectiveness of the Plan**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.

(g)    **Contingencies May Affect Distributions to Holders of Allowed Claims and Interests**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions under the Plan.

(h)    **The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

(1)    solicitation comply with applicable nonbankruptcy law;

(2)    the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

(3)    the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.  Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (ii) there is no such law, rule, or regulation, and such acceptance or rejection

50

was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). Although the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

        (i)        **The United States Trustee or Other Parties May Object to the Plan on Account of the Third-Party Release Provisions or the assumption of the AA Settlement Agreement**

        Any party in interest, including the United States Trustee (the "**U.S. Trustee**"), could object to the Plan on the grounds that the Third-Party Release is not given consensually or in a permissible non-consensual manner. In response to such an objection, the Bankruptcy Court could determine that the Third-Party Release is not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the Third-Party Release. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

        Any party in interest, including the U.S. Trustee, could object to the Plan on the grounds that the assumption of the AA Settlement Agreement under the Plan does not meet applicable standards on the Bankruptcy Code and Bankruptcy Rules. In response to such an objection, the Bankruptcy Court could refuse to confirm the Plan in its present form. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the assumption of the AA Settlement Agreement. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

        (j)        **The Debtors May Seek To Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation**

        Subject to and in accordance with the terms of the Support Agreement: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests, or is otherwise permitted by the Bankruptcy Code.

        (k)        **The Plan May Have a Material Adverse Effects on the Debtors' Operations**

        The solicitation of acceptances of the Plan and commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective customers, vendors, users, employees, partners, and other parties. Such adverse effects could materially impair the Debtors' operations, including their ability to provide products and services to their customers.

LA\4007345.1

(l)     **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately 45 to 60 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.  Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses.  There is a risk, due to uncertainty about the Debtors' futures that, among other things:

(1)     customers could move to the Debtors' competitors;

(2)     employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

(3)     business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses, as well as create concerns for employees, suppliers, and users.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases.  If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed.  A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

(m)     **Other Parties in Interest Might Be Permitted To Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the Petition Date.  However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court.  If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing holders of Interests and may seek to exclude such holders from retaining any equity under their proposed plan.  An alternative plan of reorganization also may treat less favorably the Claims of a number of other constituencies, including the holders of Claims in Class 5.  The Debtors consider maintaining relationships with their secured creditors, common stockholders, employees, and users as critical to maintaining the value of ASG following the Effective Date and have sought to treat those constituencies accordingly.  However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims or Interests of such constituencies to a greater degree.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive.  If this were to occur, or if the Debtors' employees or other

52

constituencies important to the Debtors' business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing Section 6.2(l) also could occur.

      (n)      **The Debtors' Business May Be Negatively Affected if the Debtors Are Unable To Assume Their Executory Contracts**

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases other than those (1) that have been rejected by order of the Bankruptcy Court; (2) are the subject of a motion to reject pending on the Effective Date; (3) are identified in the Plan Supplement (which Exhibit(s) may be amended by the Debtors to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Exhibit and serving it on the affected contract parties prior to the Effective Date) as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan, which shall be deemed rejected as of the Effective Date; or (4) are rejected pursuant to the terms of the Plan. The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as possible. However, with respect to some limited classes of Executory Contracts, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

      (o)      **Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers**

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within 90 days before the petition date or one year before the petition date, if the creditor, at the time of such transfer, was an insider. If any transfer were challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtors' material transactions, the Bankruptcy court could order the recovery of all amounts received by the recipient of the transfer.

      (p)      **The Debtors May Be Unsuccessful in Obtaining First Day Orders To Permit Them To Pay Their Vendors, Employees, or To Continue To Operate Their Businesses, in the Ordinary Course of Business**

The Debtors have tried to address potential concerns of their users, vendors, employees, and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate Bankruptcy Court orders to permit the Debtors to pay their prepetition and postpetition accounts payable to parties in interest in the ordinary course. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

      (q)      **The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral**

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the lenders under the prepetition credit agreements, which requests will be in accordance with the terms of the Support Agreement. Such access to cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

    (r)    **The Plan May Be Confirmed Over the Objection of the Holders of Impaired Claims and Interests**

Under the "cram down" provisions of the Bankruptcy Code, the Plan may be confirmed even if the holders of Impaired Claims and Interests do not vote to accept or are deemed to reject the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly, and is fair and equitable, regarding each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan. If the requisite votes of the Notes Claims of the Debtors to accept the Plan are obtained, the Debtors may seek to have the Plan confirmed under the cram down provisions of the Bankruptcy Code.

**6.3**    <u>Risks Relating to the Transaction</u>

    (a)    **The Debtors Will Be Subject to Business Uncertainties and Contractual Restrictions Prior to the Effective Date**

Uncertainty about the effects of the Plan on employees and customers may have an adverse effect on the Debtors. These uncertainties may impair the Debtors' ability to retain and motivate key personnel and could cause customers and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors. In addition, if key employees depart because of uncertainty about their future roles and the potential complexities of the Chapter 11 Cases, the Debtors' businesses could be harmed.

    (b)    **Inherent Uncertainty of the Debtors' Financial Projections**

The Financial Projections attached hereto as <u>Exhibit B</u> include projections covering the Debtors' operations through 2018. The Financial Projections are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guaranty or other assurance of the actual results that will occur.

Further, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the Board of Directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation from the attached Financial Projections, and could result in materially different outcomes from those projected.

    (c)    **The Debtors Must Continue To Retain, Motivate, and Recruit Executives and Other Key Employees, Which May Be Difficult in Light of Uncertainty Regarding the Plan, and Failure to do so Could Negatively Affect ASG**

For the Debtors' restructuring to be successful, during the period before the Effective Date, the Debtors must continue to retain, motivate, recruit executives and other key employees and maintain employee morale. Moreover, the Debtors must be successful at retaining and motivating key employees following the Effective Date. Employees of the Debtors may feel uncertainty about their future roles with ASG until, or even after, future strategies are announced or executed. The potential distractions of the Chapter 11 Cases may adversely affect the ability of the Debtors to retain, motivate, and recruit executives and other key employees and keep them focused on applicable strategies and goals. Additionally, the Debtors' employees could seek employment with one of the Debtors' competitors, which, in light of the Chapter 11 Cases, may seek to lure employees at a time when they may be fearful about the Debtors' future. The Debtors' failure to attract, retain, and motivate executives and

other employees during the period prior to or after the Effective Date could have a negative impact on the Debtors' businesses.

(d)  **Failure To Confirm and Consummate the Plan Could Negatively Impact the Debtors**

If the Plan is not confirmed and consummated, the Debtors' ongoing businesses may be adversely affected, and there may be various consequences, including:

(1)  the adverse impact to the Debtors' businesses caused by the failure to pursue other beneficial opportunities due to the focus on the Plan, without realizing any of the anticipated benefits of the Plan;

(2)  the incurrence of substantial costs by the Debtors in connection with the Plan, without realizing any of the anticipated benefits of the Plan;

(3)  the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

(4)  the possibility that the Debtors pursue traditional chapter 11 or chapter 7 proceedings that result in recoveries for creditors and interest holders that are less than contemplated under the Plan, or result in no recovery for certain creditors and interest holders.

## 6.4    Risks Relating to the Exit Facilities

(a)  **The Reorganized Debtors' Substantial Debt and Lease Obligations Could Adversely Affect Their Financial Condition and Prevent Them From Fulfilling Their Obligations Under the Exit Facilities and Prevent Them from Capitalizing on Business Opportunities**

At emergence, the Reorganized Debtors may have approximately $240 million aggregate principal amount of indebtedness outstanding, consisting of at least $150 million of outstanding indebtedness under the First Lien Term Loan Exit Facility and up to $90 million of outstanding indebtedness under the Second Lien Term Loan Exit Facility.  An additional $25 million of unused commitments may be available under the First Lien Revolving Loan Exit Facility.  This indebtedness may require significant interest and principal payments.  Subject to the limits contained in Exit Facility Documents, the Reorganized Debtors may be able to incur additional debt from time to time to finance working capital, capital expenditures, investments or acquisitions, or for other purposes.  If the Reorganized Debtors do so, the risks related to their high level of debt could intensify.  The Reorganized Debtors' high level of debt and lease obligations could have important consequences to the lenders under the Exit Facilities, including the following:

(1)  making it more difficult for the Reorganized Debtors to satisfy their obligations with respect to the Exit Facilities, and their other debt;

(2)  limiting the Reorganized Debtors' ability to obtain additional financing for working capital, capital expenditures, acquisitions, and general corporate purposes;

(3)  requiring a substantial portion of the Reorganized Debtors' cash flows to be dedicated to debt service payments and lease obligations instead of other purposes;

(4)  increasing the Reorganized Debtors' vulnerability to general adverse regulatory, economic, and industry conditions;

(5)  limiting the Reorganized Debtors' flexibility in planning for and reacting to changes in the industry in which they compete;

(6)      placing the Reorganized Debtors at a disadvantage compared to other, less leveraged competitors; and

(7)      increasing their cost of borrowing.

In addition, the Exit Facility Documents may contain financial and other restrictive covenants that could limit the Reorganized Debtors' ability to conduct their business, make new investments, raise additional debt or equity financing, and compete effectively or take advantage of new business opportunities.  The terms of any future indebtedness that the Reorganized Debtors may incur could include more restrictive covenants.  The Debtors and Reorganized Debtors, as applicable, cannot assure you that the Reorganized Debtors will be able to maintain compliance with these covenants in the future, and if the Reorganized Debtors fail to do so, they may not be able to obtain waivers from the lenders, and/or amend the covenants.  The Reorganized Debtors' failure to comply with those potential covenants could result in an event of default, which, if not cured or waived, could result in the acceleration of their debt, including the Exit Facilities.  If the Reorganized Debtors are forced to refinance these borrowings on less favorable terms, their results of operations and financial conditions could be adversely affected.

(b)      **Despite Current Indebtedness Levels, the Reorganized Debtors May Still Be Able to Incur Substantially More Debt**

The Debtors may be able to incur substantial additional indebtedness in the future.  Although the terms of the Exit Facility Documents may limit the Reorganized Debtors' ability to incur additional indebtedness in many respects, the terms of the Exit Facility Documents may nonetheless permit them to incur significant additional indebtedness.  In addition, it is anticipated that the Exit Facility Documents will not prevent the Reorganized Debtors from incurring obligations that do not constitute indebtedness as defined in those documents.  If new debt is incurred by the Reorganized Debtors, the related risks that they now face could intensify.

(c)      **To Service Their Indebtedness, the Reorganized Debtors Will Require a Significant Amount of Cash**

The Reorganized Debtors' ability to make payments on and to refinance their indebtedness and to fund working capital needs and planned capital expenditures will depend on their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, financial, competitive, business, legislative, regulatory, and other factors that are beyond their control.

If the Reorganized Debtors' businesses do not generate sufficient cash flow from operations, or if future borrowings are not available to them in an amount sufficient to enable them to pay their potential indebtedness or to fund their other liquidity needs, the Reorganized Debtors may need to refinance all or a portion of their future indebtedness on or before the maturity thereof, sell assets, reduce or delay capital investments, or seek to raise additional capital, any of which could have a material adverse effect on their operations.  In addition, the Reorganized Debtors may not be able to affect any of these actions, if necessary, on commercially reasonable terms or at all.  The Reorganized Debtors' ability to restructure or refinance their future indebtedness will depend on the condition of the capital markets and the Reorganized Debtors' financial condition at such time.  Any refinancing of the Reorganized Debtors' debt could be at higher interest rates and may require them to comply with more onerous covenants, which could further restrict their business operations.  The terms of existing or future debt instruments may limit or prevent them from taking any of these actions.  In addition, any failure to make scheduled payments of interest and principal on their outstanding indebtedness would likely result in a reduction of their credit rating, which could harm their ability to incur additional indebtedness on commercially reasonable terms or at all.  The Reorganized Debtors' inability to generate sufficient cash flow to satisfy their debt service obligations, or to refinance or restructure their obligations on commercially reasonable terms or at all, would have an adverse effect, which could be material, on their business, financial condition, and results of operations, as well as on their ability to satisfy their potential obligations in respect of the Exit Facilities.

In addition, if the Reorganized Debtors are unable to meet their debt service obligations under the proposed terms of the Exit Facilities, the lenders under of the Exit Facilities may have the right to cause the entire principal amount of the Exit Facilities to become immediately due and payable.  If the amounts outstanding under

those instruments are accelerated, the Reorganized Debtors cannot assure you that their assets will be sufficient to repay in full the money owed to their debt holders.

(d)    **The Reorganized Debtors' Failure To Comply With the Agreements Relating to Their Outstanding Indebtedness Could Result in Events of Default**

If there were an event of default under any of the agreements relating to the Reorganized Debtors' outstanding indebtedness (including any of the Exit Facilities), the holders of the defaulted debt may be able to cause all amounts outstanding with respect to that debt to be due and payable immediately.  To the extent provided in the Exit Facility Documents, upon acceleration of the Reorganized Debtors' other indebtedness, lenders under the Exit Facilities may be able to declare all amounts outstanding under the Exit Facilities immediately due and payable. The Debtors cannot assure you that the Reorganized Debtors' assets or cash flow would be sufficient to fully repay borrowings under their outstanding debt instruments if accelerated upon an event of default.  Further, if the Reorganized Debtors are unable to repay, refinance, or restructure their indebtedness under their secured debt, the holders of such debt could proceed against the collateral securing that indebtedness.  In addition, any event of default or declaration of acceleration under one debt instrument may also result in an event of default under one or more of the Reorganized Debtors' other debt instruments.

(e)    **ASG Relies on Revenue Generated by Its Subsidiaries, Including Dividends Paid by Its Subsidiaries, Loans, and Other Payments and Distributions to Meet its Debt Service and Other Obligations**

Although ASG engages in its own business and is responsible for the majority of the revenue of the consolidated group, it also relies on revenue from its subsidiaries.  Accordingly, Reorganized ASG's repayment of its indebtedness, including the Exit Facilities, may be dependent, to a significant extent, on the Reorganized ASG's subsidiaries generation of cash flow and their ability to make such cash available to Reorganized ASG by dividend, distribution, loan, debt repayment or otherwise.

Reorganized ASG's earnings will depend somewhat on the subsidiaries' financial and operating results, which will be affected by prevailing economic and competitive conditions and by financial, business and other factors beyond the Reorganized ASG's control.  The Reorganized Debtors may not generate sufficient cash from operations to enable Reorganized ASG to make principal and interest payments on its indebtedness or to fund its other cash obligations.

(f)    **The Collateral is Subject To Casualty Risks**

The Exit Facility Credit Agreements and the security documents governing the Exit Facilities may require the Reorganized Debtors and the guarantors to maintain adequate insurance or otherwise insure against risks to the extent customary with companies in the same or similar businesses operating in the same or similar locations as the Debtors.  There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part.  As a result, the Debtors cannot assure you that the insurance proceeds will compensate the Reorganized Debtors fully for their losses.  If there is a total or partial loss of any collateral securing the Exit Facilities, the Debtors cannot be sure that any insurance proceeds received by them will be sufficient to satisfy their obligations, including the Exit Facilities.

**6.5    Additional Risks Relating to the Second Lien Term Loan Exit Facility**

(a)    **The Value of the Collateral is Uncertain, and May Not Be Sufficient to Pay All or Any of the Second Lien Term Loan Exit Facility**

The Second Lien Term Loan Exit Facility and any related loan guarantees may be secured by a second-priority lien on substantially all of the assets, other than certain excluded assets, directly owned by Reorganized ASG and any guarantors.  The obligations under the First Lien Revolving Loan Exit Facility, the First Lien Term Loan Exit Facility, and any related loan guarantees, may be secured on a first-priority basis by these same assets.  In the event of a bankruptcy, liquidation, dissolution, reorganization, or similar proceeding against the

Reorganized Debtors or any existing or future domestic subsidiary, the Reorganized Debtors' assets must be used first to pay the applicable first-priority lien obligations in full before making any payments on the Second Lien Term Loan Exit Facility.

The First Lien Revolving Loan Exit Facility Credit Agreement, the First Lien Term Loan Exit Facility Credit Agreement, and the Second Lien Term Loan Exit Facility Credit Agreement each may allow the Reorganized Debtors to incur additional obligations secured by liens on the Reorganized Debtors' assets in amounts that may be significant.  Any additional indebtedness or obligations secured by a lien on collateral securing the Second Lien Term Loan Exit Facility (whether senior to or on parity with the liens securing the Second Lien Term Loan Exit Facility) may adversely affect the relative position of the lenders under the Second Lien Term Loan Exit Facility with respect to the collateral securing the Second Lien Term Loan Exit Facility.

Collateral may be subject to exceptions, defects, encumbrances, liens and other imperfections.  No appraisal of the fair market value of collateral has been made in connection with the Plan.  Further, the value of any collateral at any time will depend on market and other economic conditions, including the availability of suitable buyers for such collateral.  By their nature, some or all of the pledged assets may be illiquid and may have no readily ascertainable market value.  The value of the assets pledged as collateral for the Second Lien Term Loan Exit Facility could be impaired in the future as a result of changing economic conditions, the Reorganized Debtors' failure to implement their business strategy, competition, and other future trends.  No assurance can be given that the proceeds from any sale or liquidation of any collateral will be sufficient to pay the Reorganized Debtors' potential obligations under the Second Lien Term Loan Exit Facility, in full or at all, after first satisfying the Reorganized Debtors' obligations in full under the first-priority lien obligations and any other obligations secured by a first-priority lien on any collateral.  To the extent the value of collateral is insufficient to satisfy the Reorganized Debtors' potential obligations under the Second Lien Term Loan Exit Facility, holders of the Second Lien Term Loan Exit Facility may have unsecured claims against the Reorganized Debtors' remaining assets.

Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the Second Lien Term Loan Exit Facility.  Any claim for the difference between the amount, if any, realized by holders of the Second Lien Term Loan Exit Facility from the sale of any collateral securing the Second Lien Term Loan Exit Facility and the obligations under the Second Lien Term Loan Exit Facility will rank equally in right of payment with all of the Reorganized Debtors' other unsecured unsubordinated indebtedness and other obligations, including trade payables.

(b)     **The Lien Ranking Provisions of an Intercreditor Agreement May Limit the Ability of the Second Lien Term Loan Exit Facility Lenders to Exercise Rights and Remedies With Respect to the Collateral**

The First Lien Revolving Loan Exit Facility and the First Lien Term Loan Exit Facility lenders are expected to enter an intercreditor agreement with the Second Lien Term Loan Exit Facility creditors.  Such an intercreditor agreement will likely impact the ability of the Second Lien Term Loan Exit Facility creditors to reach the collateral.  For so long as any first-priority lien obligations remain outstanding, the holders of first-priority lien obligations may control substantially all matters related to any collateral securing the first-priority lien obligations and the Second Lien Term Loan Exit Facility.  The Exit Facility Agent(s) will act in accordance with the terms of any intercreditor agreement, including any lien ranking provisions contained therein, with respect to all collateral, if any, held by it on behalf of the holders of the first-priority lien obligations and holders of second-priority lien obligations.  Pursuant to the terms of any intercreditor agreement, the holders of the first-priority lien obligations may, under most circumstances, cause the collateral agent under the First Lien Revolving Loan Exit Facility and the First Lien Term Loan Exit Facility to take actions with respect to the collateral with which holders of the Second Lien Term Loan Exit Facility may disagree or that may be contrary to the interests of holders of the Second Lien Term Loan Exit Facility.  Additionally, any intercreditor agreement may contain provisions that restrict the collateral agent on behalf of the Second Lien Term Loan Exit Facility from objecting to a number of important matters involving any collateral.  In addition, any intercreditor agreement and security documents may generally provide that, so long as any first-priority lien obligations remain outstanding, the holders of the first-priority lien obligations may amend or supplement the security documents without the consent of the holders of the Second Lien Term Loan Exit Facility, provided that any such amendment or supplement does not reduce, impair, or adversely

affect the rights of the holders of the Second Lien Term Loan Exit Facility and not the other secured creditors in a like or similar manner.

>    (c)    **Interest on the Second Lien Term Loan Exit Facility may be Paid in Kind Rather than Cash**

>    Under the Second Lien Term Loan Exit Facility, the Debtors are expected to be able (or required) to pay interest on the Second Lien Term Loan Exit Facility "in kind" rather than in Cash, either by increasing the principal amount of the outstanding Second Lien Term Loan Exit Facility or by issuing additional Second Lien Term Loan Exit Facility debt as paid in kind ("**PIK**") interest.  As a result, the Debtors cannot assure you that the Reorganized Debtors will be required (or able) to make cash interest payments on the Second Lien Term Loan Exit Facility.  The payment of interest as PIK interest will increase the amount of the Reorganized Debtors' indebtedness and would exacerbate the risks associated with the Debtors' level of indebtedness.

**6.6**    **Risks Relating to the New Common Stock and other Plan Securities**

>    (a)    **The Debtors may not be able to Achieve Their Projected Financial Results**

>    The Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Debtors have assumed in projecting their future business prospects.  If the Debtors do not achieve these projected revenue or cash flow levels, the Debtors may lack sufficient liquidity to continue operating as planned after emergence.  The Financial Projections represent management's view based on currently known facts and hypothetical assumptions about their future operations.  They do not, however, guarantee the Debtors' future financial performance.

>    (b)    **The Plan Exchanges Senior Securities for Junior Securities**

>    If the Plan is confirmed and consummated, holders of Allowed Notes Claims will receive New Common Stock of the Reorganized Debtors.  Thus, in agreeing to the Plan, such holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, and a security interest in the assets of the Debtors, for shares of Reorganized ASG, which will be subordinate to all future creditor claims.

>    (c)    **Restrictions on Transfer**

>    Recipients of New Common Stock issued under section 1145 of the Bankruptcy Code who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities.  These Persons will be permitted to transfer or sell such securities only pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration statement under the Securities Act, or (c) the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act.  Reorganized ASG has no current plans to register at a later date, post-emergence, any of its securities under the Securities Act or under equivalent state securities laws such that the recipients of the New Common Stock would be able to resell their securities pursuant to an effective registration statement.  Moreover, Reorganized ASG does not currently intend to make publicly available the information required by Rule 144, thereby limiting the ability of holders of New Common Stock to avail themselves of Rule 144.

>    In addition, the Amended Certificate will contain restrictions on stockholders' ability to transfer the New Common Stock designed to ensure that there will be less than 2,000 holders of New Common Stock or 500 holders of New Common Stock who are not accredited investors (determined pursuant to the Securities Exchange Act).  The Amended Certificate will require notice to Reorganized ASG of any proposed transfer of New Common Stock to a third party and will restrict such transfer if Reorganized ASG reasonably determines that the transfer would, if effected, result in Reorganized ASG having 2,000 or more holders of record, or 500 or more holders of record who are not accredited investors (determined pursuant to the Securities Exchange Act).

Certain transfers, including pursuant to a merger, that meet certain requirements are not subject to such a condition on transfer.  In addition to the foregoing transfer restrictions, the stockholder that proposes to effect a transfer must submit a written request that includes, among other things, if applicable, reasonably sufficient information to establish that the transfer does not violate or result in registration being required under applicable securities laws or laws relating to investment companies or advisors.

*See* ARTICLE VIII "Important Securities Law Disclosure" for additional information regarding restrictions on resale of the New Common Stock.

(d)    **The Debtors Do Not Intend to Offer to Register any Plan Securities or to Exchange the Plan Securities in a Registered Exchange Offer**

The offering, issuance, and distribution of any Plan Securities pursuant to the Plan will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.  Pursuant to section 4(a)(2) of the Securities Act, the Plan Securities will be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable state or foreign securities laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.  Any and all Plan Securities may be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred, unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, and in compliance with any applicable state or foreign securities laws and the terms of the Stockholders Agreement and Registration Rights Agreement, if applicable. The information which the Debtors or Reorganized Debtors, as applicable, are required to provide holders of the Plan Securities may be less than the Debtors or Reorganized Debtors, as applicable, would be required to provide if such Securities were registered.  Among other things, the Debtors or Reorganized Debtors, as applicable, may not be required to provide: (i) separate financial information for any subsidiary whose securities constitute collateral for such Securities; (ii) footnotes in the Debtors' financial statements that show condensed consolidating financial information for ASG and the potential guarantors of the Securities; (iii) selected historical consolidated financial data of ASG; (iv) selected quarterly financial data of ASG; (v) certain information about the Debtors' or Reorganized Debtors', as applicable, disclosure controls and procedures and their internal control over financial reporting; and (vi) certain information regarding the Debtors' or Reorganized Debtors, as applicable, executive compensation policies and practices and historical compensation information for their executive officers.  This lack of information could impair your ability to evaluate your ownership of the Plan Securities.

(e)    **There Is No Established Market for Plan Securities, and the Plan Securities May be Subject to Transfer Restrictions Preventing Trading in such Securities**

The Plan Securities will be new issues of Securities, and there is no established trading market for such securities.  Neither the Debtors nor Reorganized Debtors, as applicable, intend to apply for such Securities to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system.  You may not be able to sell your Plan Securities at a particular time or at favorable prices.  As a result, the Debtors cannot assure you as to the liquidity of any trading market for such Plan Securities.  Accordingly, you may be required to bear the financial risk of your ownership of such Plan Securities indefinitely.  If a trading market were to develop, future trading prices of such Plan Securities may be volatile and will depend on many factors, including:

(1)    the Debtors' or Reorganized Debtors' operating performance and financial condition;

(2)    the interest of securities dealers in making a market for them; and

(3)    the market for similar securities.

However, the New Common Stock and Subscription Rights will be subject to transfer restrictions; accordingly, a liquid and public trading market for the New Common Stock is not expected to develop.  The Warrants are non-transferrable according to their terms; accordingly, no market for the Warrants is expected to develop.

60

In addition, the Debtors do not expect that the Plan Securities will be rated in the future by any ratings agency.

(f)     **The Valuation of New Common Stock or other Plan Securities is Not Intended to Represent the Trading Value of the New Common Stock or other Securities issued under the Plan**

The Valuation Analysis of the Reorganized Debtors, which is annexed hereto as <u>Exhibit D</u> and based on the Financial Projections developed by the Debtors is not intended to represent the trading values of New Common Stock or other Plan Securities in public or private markets.

(g)     **The Reorganized Debtors May Be Controlled by Significant Holders**

Under the Plan, certain holders of Allowed Claims shall receive New Common Stock.  If holders of a significant number of shares of New Common Stock were to act as a group, such holders might be in a position to control the outcome of actions requiring shareholder approval, including the election of directors.

(h)     **The Debtors' Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based**

The Debtors' financial projections are based on numerous assumptions including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of the Debtors; industry performance; general business and economic conditions; and other matters, many of which are beyond the control of the Debtors, and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the ability of the Debtors to make payments with respect to indebtedness following Consummation.  Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur.  Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement.  Such events may have a material impact on the information contained in the Disclosure Statement.  The Debtors do not intend to update the projections, and therefore the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections.

(i)     **The Reorganized Debtors May Not Pay Cash Dividends on the New Common Stock for the Foreseeable Future**

The terms of the Exit Facilities may limit, among other things, the Debtors' ability to pay dividends, and it is not anticipated that any cash dividends will be paid on the New Common Stock in the near future.

**6.7     <u>Litigation and Labor Risk Factor</u>**

(a)     **Litigation Matters**

The Debtors are currently engaged in litigation in a number of foreign jurisdictions, which may adversely affect the Reorganized Debtors.  Although they believe they have strong defenses and counterclaims in certain of such actions, they cannot guarantee success in the litigation.  Accordingly, there is risk of an adverse judgment, which may have an effect on the Reorganized Debtors' future operations.

(b)     **Labor Matters**

Certain of the Company's employees are subject to collective bargaining agreements, particularly employees outside of the United States.  If the Company is unable to renew expiring collective bargaining agreements, or otherwise fails to comply with collective bargaining agreements or other labor-related obligations, it

is possible that the affected unions could take action in the form of strikes or work stoppages or commence other actions that would increase the Company's expenses and potentially negatively impact the transactions contemplated in the Plan and/or the Company's business.

**6.8    Accounting and Tax Risk Factors**

(a)    **Use of Historical Financial Information**

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtors believe they will be subject to the fresh-start accounting rules.  Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued.  This process is guided by purchase price allocation standards under GAAP.  The Financial Projections developed by the Debtors attached as Exhibit D do not reflect any fresh-start accounting adjustments.

(b)    **Certain Tax Implications of the Chapter 11 Cases**

Holders of Allowed Claims and Interests should carefully review ARTICLE IX herein, "Certain U.S. Federal Income Tax Consequences," to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Reorganized Debtors and holders of Claims and Interests.

**6.9    Disclosure Statement Disclaimer**

(a)    **No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement**

**THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation or in connection with the exercise of Subscription Rights.

(b)    **Disclosure Statement May Contain Forward-Looking Statements**

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

| | |
|---|---|
| • ANY FUTURE EFFECTS AS A RESULT OF THE FILING OR PENDENCY OF THE CHAPTER 11 CASES; | • GROWTH OPPORTUNITIES FOR EXISTING PRODUCTS AND SERVICES; |
| • financing plans; | • results of litigation; |
| • competitive position; | • disruption of operations; |
| • business strategy; | • contractual obligations; |
| • budgets; | • projected general market conditions; |

62

- projected cost reductions;

- projected dividends;

- projected price increases;

- effect of changes in accounting due to recently issued accounting standards;

- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation;

- plans and objectives of management for future operations;

- benefits from new technology;

- off-balance sheet arrangements;

- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows; and

Statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Valuation Analysis, the Liquidation Analysis, the recovery projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

     (c)        **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties-in-interest.

     (d)        **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. All Parties, including the Debtors, reserve the right to continue to investigate Claims and Interests and file and prosecute objections to Claims and Interests.

     (e)        **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Allowed Claim or Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

     (f)        **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(g)        **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(h)        **No Representations Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the Office of the U.S. Trustee.

# ARTICLE VII
# CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

## 7.1    **The Confirmation Hearing**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  On the Petition Date, the Debtors will file a motion requesting that the Bankruptcy Court set a date and time approximately 30 days after the Petition Date for the Confirmation Hearing.  In this case, the Debtors will also request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing.  The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code and the Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections.  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections as set forth therein.

## 7.2    **Confirmation Standards**

Among the requirements for Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization.  The Plan fully complies with the statutory requirements for Confirmation listed below.

(a)        The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

(b)      The Plan has been proposed in good faith and not by any means forbidden by law.

(c)      Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

(d)      The Debtors (or any other proponent of the Plan) have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, or officer of the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to or continuance in such office of such individual is consistent with the interests of Creditors and holders of Interests and with public policies.

(e)      The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

(f)      With respect to each holder within an Impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

(g)      With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan, or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

(h)      The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

(i)      If a Class of Claims or Interests is Impaired under the Plan, at least one Class of Claims or Interests that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

(j)      Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

(k)      All fees payable under 28 U.S.C. § 1930 have been paid, or the Plan provides for the payment of all such fees on the Effective Date.

## 7.3      Best Interests Test/Liquidation Analysis

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Based on the Debtors' Liquidation Analysis, the Debtors believe that the value of any distributions if the Debtors' Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan. As a result, the Debtors believe holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the liquidation analysis attached hereto as Exhibit C. The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The liquidation analysis provided in Exhibit C is solely for the purpose of

disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.

There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

**7.4     Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared projections, which, together with the assumptions on which they are based, are attached hereto as Exhibit B.  Based on such projections, the Debtors believe that they will be able to make all payments required under the Plan.  Therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**7.5     Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

(a)     **No Unfair Discrimination**

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

(b)     **Fair and Equitable Test**

This test applies to Classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims or Interests in such Class.  As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests of the Debtor in such Class.  In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

(1)     Secured Creditors: Each holder of a secured claim: (1) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim; (2) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (3) receives the "indubitable equivalent" of its allowed secured claim.

(2)     Unsecured Creditors: Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

(3)     Equity Interests: Either (1) each holder of an impaired interest will receive or retain under the chapter 11 plan, property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such

66

holder is entitled, or the value of the interest or (2) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 10 (Section 510(b) Claims) is deemed to reject the Plan, because, as to such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Class will receive or retain any property on account of the Claims in such Class. To the best of the Debtors knowledge, there are no Class 10 Claims as of the date hereof.

**7.6      Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, the Debtors may seek to (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (2) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (3) liquidate the Debtors under chapter 7 of the Bankruptcy Code. If the Debtors were to pursue a liquidation, the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code, and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on Creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis, attached hereto as Exhibit C.

## ARTICLE VIII
## IMPORTANT SECURITIES LAW DISCLOSURE

**8.1      Plan Securities**

The Plan provides for the Reorganized Debtors to offer, issue, and distribute the Plan Securities. The Debtors believe that the New Common Stock, the Warrants, and the Subscription Rights constitute Securities. The Debtors do not expect that obligations under the Exit Facilities will constitute Securities.

**8.2      Issuance and Resale of Plan Securities Under the Plan**

(a)      **Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws**

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitation, section 4(a)(2) thereof, to exempt (i) the offer of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on the Plan, and (ii) the issuance and distribution of the Plan Securities to the applicable parties. Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act ("**Reg. D**") provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as Eligible Holders. The Debtors believe that the holders of Notes Claims receiving Plan Securities and Arthur L. Allen are Eligible Holders and the Subscription Form(s) and other applicable documents include certifications that the applicable recipient is an Eligible Holder. In reliance upon these exemptions, the offer, issuance, and distribution of the Plan Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if: (x) the offer or sale occurs under a plan of reorganization; (y) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (z) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon these exemptions, the offer, issuance, and distribution of the Plan Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws.

The issuance of certain of the Plan Securities may be covered by section 1145 of the Bankruptcy Code. Accordingly, such Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such Securities, as that term is defined in 1145 of the Bankruptcy Code. In addition, the Plan Securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to the Plan Securities and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

(b)        **Resales of Plan Securities; Definition of Underwriter**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer" (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities and, in turn, whether any Person may freely resell Plan Securities. The Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without registration under the federal and applicable state Blue Sky Laws.

Notwithstanding the foregoing, the Plan Securities may be subject to restrictions on transfer as set forth in the governing documents applicable to such Plan Securities in addition to restrictions required by applicable

law or regulation.  The New Common Stock will be stamped or otherwise imprinted with any legends, or, in the event of any uncertificated shares, will be subject to any restrictive notations, that are customary or required by applicable law or regulation.

The Warrants are not transferrable pursuant to their terms.

## ARTICLE IX
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

**9.1**    **Introduction**

The following summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan as they relate to the Debtors and to the Beneficial Holders entitled to vote on the Plan. This summary is intended for general information purposes only, is not a complete analysis of all potential U.S. federal income tax consequences that may be relevant to any particular Beneficial Holder and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement.  These authorities may change, possibly with retroactive effect, resulting in U.S. federal income tax consequences different from those discussed below.  No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below.  There can be no assurance the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion assumes that Beneficial Holders have held Claims as "capital assets" within the meaning of Section 1221 of the Tax Code (generally, property held for investment) and will hold, as applicable, the New Common Stock (which, for purposes of this discussion, includes any Put Option Premiums received as New Common Stock) and the Subscription Rights (together with the New Common Stock, the "**New Equity**") as capital assets.  In addition, this discussion assumes the Claims constitute debt for U.S. federal tax purposes.

This summary addresses only Beneficial Holders of Allowed Class 5 Claims because they are the only holders of Claims or Interests entitled to vote on the Plan.

This summary does not address all of the U.S. federal income tax considerations that may be relevant to a particular Beneficial Holder in light of that Beneficial Holder's particular circumstances, including the impact of the Medicare contribution tax on net investment income, or to Beneficial Holders otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, and Persons who received Interests in connection with the performance of services).

Holders should consult their tax advisors regarding the U.S. federal income tax consequences of the consummation of the Plan and the ownership and disposition of the New Equity received pursuant to the Plan, as well as any tax consequences arising under any state, local or foreign tax laws, or any other U.S. federal tax laws.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATION PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM.  ALL HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.  NEITHER THE DEBTORS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE DISCUSSION BELOW.**

**9.2**     **U.S. Federal Income Tax Consequences to the Debtors**

ASG is treated as an S corporation for U.S. federal income tax purposes, and the other Debtors are disregarded as separate entities from ASG.  Prior to the Effective Date, ASG Federal, Inc. will convert to a limited liability company that is disregarded as a separate entity from ASG.  As such, all of the Debtors' assets and liabilities are treated as assets and liabilities of ASG.  The Debtors do not have any net operating loss ("**NOL**") carryforwards for U.S. federal income tax purposes.  Upon consummation of the Plan, Reorganized ASG will not qualify as an S corporation and, thus, will be treated as a C corporation for U.S. federal income tax purposes.  The tax consequences of this conversion are complex and beyond the scope of this tax disclosure.

The discharge of a debt obligation for an amount less than the remaining amount due on the obligation (as determined for U.S. federal income tax purposes) generally will give rise to cancelation of indebtedness ("**COD**") income that must be included in the debtor's taxable income (or, in the case of an S corporation, included in the taxable income of the S corporation's stockholders), subject to certain exceptions. In particular, under Section 108 of the Tax Code, COD income will not be subject to the foregoing rules if the discharge of the debt obligation occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**").  The Debtors expect the consummation of the Plan will produce a significant amount of COD income.  Because the cancelation of the Debtors' indebtedness will occur in a case brought under the Bankruptcy Code, the Debtors will be under the jurisdiction of the Bankruptcy Court in such case and the cancelation of the Claims will be pursuant to the Plan, the Debtors will not be required to include any COD income realized as a result of the implementation of the Plan in taxable income under the Bankruptcy Exception, nor will ASG's sole stockholder be required to include any such COD income in taxable income.

Under the Tax Code, a debtor that excludes COD income from taxable income under the Bankruptcy Exception generally must reduce certain tax attributes by a corresponding amount.  Attributes subject to reduction include NOLs, NOL carryforwards and certain other losses, credits and carryforwards attributable to the debtor and the debtor's tax basis in its assets (including stock of subsidiaries).  A debtor's tax basis in its assets generally may not be reduced below the amount of its liabilities remaining immediately after the discharge of indebtedness.  If the debtor is an S corporation, any loss or deduction which is disallowed in the year of discharge because such loss or deduction is in excess of the stockholder's adjusted basis in its stock and indebtedness of the S corporation is treated as an NOL for purposes of this attribute reduction for such taxable year and subject to reduction.  NOLs for the taxable year of the discharge and then NOL carryforwards to such year generally are the first attributes subject to reduction.  However, a debtor may elect under Section 108(b)(5) of the Tax Code (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first.  If a debtor makes a Section 108(b)(5) Election, the limitation on reducing the debtor's basis in its assets below the amount of its remaining liabilities does not apply.  The Debtors do not currently intend to make the Section 108(b)(5) Election.  The Debtors expect that attribute reduction required by reason of COD income produced pursuant to consummation of the Plan will effectively eliminate losses and deductions, if any, treated as NOLs under the rules applicable to S corporations.  However, the precise effect of the attribute reduction rules on all of the tax attributes of the Debtors is uncertain because, among other things, it will depend on the amount of COD income realized by the Debtors, which will depend on the value of the New Common Stock on the Effective Date.

**9.3**     **U.S. Federal Income Tax Consequences to Allowed Class 5 Claim Holders—U.S. Holders**

For purposes of this discussion, a "U.S. Holder" is a Beneficial Holder that, for U.S. federal income tax purposes, is or is treated as:

        (1)     an individual who is a citizen or resident of the United States;

        (2)     a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;

        (3)     an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

(4)    a trust that (i) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Tax Code), or (ii) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

The U.S. federal income tax consequences of the transactions contemplated by the Plan to U.S. Holders (including the character, timing and amount of income, gain or loss recognized) will depend significantly on such Holder's individual circumstances.  Therefore, U.S. Holders should consult their tax advisors to determine the particular tax consequences to them of the transactions contemplated by the Plan.

(a)    **Allocation of Payments Between Principal and Interest**

To the extent any Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position, and the Plan provides that, for U.S. federal income tax purposes, such distribution should be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.  The IRS, however, may take a contrary position and therefore no assurance can be made in this regard.  If, contrary to the Debtors' intended position, such a distribution were treated as being allocated first to accrued but unpaid interest (or if the consideration received by any Beneficial Holder exceeds the principal amount of the Claim surrendered in exchange therefor), a Beneficial Holder of such a Claim would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Beneficial Holder's method of accounting, regardless of whether the Beneficial Holder otherwise realizes a loss as a result of the Plan.

(b)    **Exchange of Allowed Class 5 Claim for New Common Stock**

In general, for U.S. federal income tax purposes, no gain or loss is recognizable if a taxpayer exchanges securities for stock or securities (with no "excess principal" amount) issued by the same corporation.  Accordingly, the U.S. federal income tax consequences of the Plan to Beneficial Holders of Allowed Class 5 Claims depend, in part, on whether such Claims constitute "securities" for U.S. federal income tax purposes.  The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt constitutes a security depends on an overall evaluation of the nature of the debt, with the term of the obligation usually regarded as one of the most significant factors.  In general, debt obligations issued with a term of five years or less have generally not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities.  Another factor in determining whether a debt obligation is a security is the extent to which the obligation is subordinated to other liabilities of the issuer.  Generally, the more senior the debt obligation, the less likely it is to be a security.

(1)    *Recapitalization Treatment*

Although the matter is not free from doubt, the Debtors intend to take the position the Allowed Class 5 Claims, the New Common Stock and the Subscription Rights constitute securities for U.S. federal income tax purposes and that the exchange of Allowed Class 5 Claims for New Common Stock qualifies as a tax-free recapitalization for U.S. federal income tax purposes.  Under this position, a U.S. Holder of Allowed Class 5 Claims should generally not recognize any gain or loss but will recognize ordinary income to the extent it receives (or is deemed to receive) New Common Stock in respect of accrued interest that has not already been included in income under the Holder's method of accounting (as described above under "Allocation of Payments Between Principal and Interest").  Conversely, a U.S. Holder would generally recognize a deductible loss to the extent any accrued interest was previously included under such Holder's method of accounting and is not paid (or deemed paid) in full.  Any accrued (but unrecognized) market discount on the Allowed Class 5 Claims will not be recognized as income at the time of the tax-free recapitalization.  However, on a subsequent taxable disposition of the New Common Stock received in the tax-free recapitalization, gain would be treated as ordinary income to the extent of market discount accrued prior to the tax-free recapitalization.

A U.S. Holder's aggregate tax basis in any New Common Stock received (or deemed received) in respect of an Allowed Class 5 Claim on the Effective Date (other than New Common Stock attributable to accrued but unpaid interest, the tax basis of which should equal their fair market value) should generally be equal to the adjusted basis of the Allowed Class 5 Claim exchanged (or deemed exchanged) pursuant to the Plan. The holding period for any New Common Stock received (or deemed received) pursuant to the Plan should include the period during which the U.S. Holder held the Allowed Class 5 Claims, except that the holding period of any New Common Stock received with respect to accrued interest should commence on the day after the Effective Date.

        (2)     *No Recapitalization Treatment*

If, contrary to the Debtors' intended position, the Allowed Class 5 Claims do not qualify as "securities" and thus the exchange of Allowed Class 5 Claims for New Common Stock does not qualify as a tax-free recapitalization for U.S. federal income tax purposes, then the tax consequences to U.S. Holders of Allowed Class 5 Claims could differ materially from those described above. In this case, a Beneficial Holder of Allowed Class 5 Claims should, except as described in the next sentence, generally recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) the fair market value of any New Common Stock received on the Effective Date and (2) the U.S. Holder's adjusted tax basis in the Allowed Class 5 Claim. A U.S. Holder should, however, recognize ordinary income to the extent it receives (or is deemed to receive) New Common Stock, in respect of accrued interest or accrued market discount that has not already been included in income under the Beneficial Holder's method of accounting (as described above under "Allocation of Payments Between Principal and Interest"). Conversely, a U.S. Holder would generally recognize a deductible loss to the extent any accrued interest or accrued market discount was previously included under such Beneficial Holder's method of accounting and is not paid (or deemed paid) in full.

A U.S. Holder's aggregate tax basis in any New Common Stock received (or deemed received) in respect of an Allowed Class 5 Claim on the Effective Date should generally be equal to the fair market value of such New Common Stock as of the Effective Date. The holding period for any New Common Stock received (or deemed received) pursuant to the Plan should begin on the day after the Effective Date.

U.S. Holders of Allowed Class 5 Claims should consult their tax advisors regarding whether the exchange of Allowed Class 5 Claims for New Common Stock will qualify as a tax-free recapitalization for U.S. federal income tax purposes. If the exchange does not qualify as a tax-free recapitalization, the character of any gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, will be determined by a number of factors, including (but not limited to) the tax status of the Beneficial Holder, whether such Claims have been held for more than one year and whether such Claims have bond premium or market discount. U.S. Holders should also consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

        (c)     **Consequences of Receiving Subscription Rights and Put Option Premiums**

The U.S. federal income tax consequences of the receipt of the Subscription Rights is uncertain. Such Subscription Rights might be treated as additional consideration for a U.S. Holder's Allowed Class 5 Claim or, alternatively, simply not taken into account. If the Subscription Rights are treated as additional consideration for a U.S. Holder's Allowed Class 5 Claim, then the U.S. federal income tax consequences of receiving the Subscription Rights should be similar to the consequences of receiving New Common Stock, as described above.

In either case, upon the exercise of a Subscription Right by paying the Subscription Payment Amount in cash, a U.S. Holder generally will not recognize income, gain or loss. The U.S. Holder's basis in the New Common Stock received upon exercise will be equal to the sum of (i) the U.S. Holder's adjusted basis in the Subscription Rights and (ii) the Subscription Payment Amount. The U.S. Holder's holding period in the New Common Stock received upon exercise should commence on the date of exercise.

If a U.S. Holder holds a Subscription Right that expires without being exercised, the U.S. Holder will generally recognize a capital loss in an amount equal to the U.S. Holder's basis in the Subscription Right.

The tax treatment of the Put Option Premium is not free from doubt. The Put Option Premium may be taxable to the recipients of the amount as ordinary income, or the Put Option Premium may be treated as payment for an option (a "**Put Option**").

If the payment of the Put Option Premium is treated as payment for a Put Option, a U.S. Holder generally will not recognize income, gain or loss upon receipt of such payment or upon exercise of the Put Option. The U.S. Holder's basis in the New Common Stock received upon exercise will be equal to (i) the amount of the payment for the New Common Stock acquired pursuant to the Put Option less (ii) the amount of the Put Option Premium received by the U.S. Holder. The U.S. Holder's holding period in the New Common Stock received upon exercise should commence on the date of exercise. If the Put Option expires without being exercised, the U.S. Holder will generally recognize a capital gain in an amount equal to the amount of the Put Option Premium received.

    (d)    **Consequences of Holding New Common Stock**

    (1)    *Dividends on New Common Stock*

In general, distributions of cash or other property on the New Common Stock will be treated first as a dividend to the extent of the issuer's current and accumulated earnings and profits (as determined for U.S. federal income tax purposes), and then as a tax-free return of capital to the extent of the U.S. Holder's tax basis, with any excess treated as capital gain from the sale or exchange of the stock. In the case of a corporation (provided that certain holding period requirements are met), any dividend generally should be eligible for the dividends received deduction provided by Section 243(a)(1) of the Tax Code. In addition, if a dividend distribution constitutes an "extraordinary dividend," the benefit of the dividends received deduction to a corporate U.S. Holder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions in Section 1059 of the Tax Code.

    (2)    *Gain or Loss on Disposition of New Common Stock*

Upon a subsequent sale or other taxable disposition of New Common Stock, a U.S. Holder will generally recognize capital gain or loss equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in such New Common Stock. However, as discussed above, if (i) the exchange of Allowed Class 5 Claims for New Common Stock qualifies as a tax-free recapitalization for U.S. federal income tax purposes, and (ii) any Allowed Class 5 Claim held by a U.S. Holder has accrued (but unrecognized) market discount on the Effective Date, then any gain recognized by such U.S. Holder upon the disposition of the New Common Stock would be treated as ordinary income to the extent such accrued market discount is allocated to such New Common Stock on the Effective Date. U.S. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

    (e)    **Information Reporting and Backup Withholding**

The Debtors or their paying agent may be obligated to furnish information to the IRS regarding the consideration received by U.S. Holders pursuant to the Plan. In addition, the Debtors generally will be required to report annually to the IRS, with respect to each U.S. Holder, the amount of dividends paid (or deemed paid) on the New Equity and the amount of any tax withheld from payment thereof.

U.S. Holders may be subject to backup withholding on the consideration received pursuant to the Plan. Backup withholding may also apply to dividends paid on the New Common Stock and to proceeds received upon sale or other disposition of the New Equity. Certain U.S. Holders (including corporations) generally are not subject to backup withholding. A Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Debtors or their paying agent its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the U.S. Holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax.  Taxpayers may use amounts withheld as a credit against their U.S. federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

**9.4      U.S. Federal Income Tax Consequences to Allowed Class 5 Claim Holders—Non-U.S. Holders**

For purposes of this discussion, a "Non-U.S. Holder" is a Beneficial Holder that is neither a U.S. Holder nor an entity treated as a partnership for U.S. federal income tax purposes.

The following discussion includes only certain U.S. federal income tax consequences of the consummation of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

(a)      **Gain Recognition**

Any gain recognized by a Non-U.S. Holder on the exchange of its Allowed Class 5 Claim (such amount excludes any amount allocable to accrued and unpaid interest, which generally will be treated as interest and may be subject to the rules described below under "Interest on Allowed Class 5 Claims"), generally will not be subject to U.S. federal income taxation unless:

(1)      the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such gain is attributable); or

(2)      the Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

Gain described in the first bullet point above generally will be subject to U.S. federal income tax on a net income basis at the regular graduated rates.  A Non-U.S. Holder that is a foreign corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty), which may be offset by U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

Non-U.S. Holders should consult their tax advisors regarding any applicable income tax treaties that may provide for different rules.

(b)      **Consequences of Receiving Subscription Rights and Put Option Premiums**

The U.S. federal income tax consequences of the receipt of the Subscription Rights is uncertain.  Such Subscription Rights might be treated as additional consideration for a Non-U.S. Holder's Allowed Class 5 Claim or, alternatively, simply not taken into account.  If the Subscription Rights are treated as additional consideration for a Non-U.S. Holder's Allowed Class 5 Claim, then any gain recognized should be treated as described above in "Gain Recognition."

74

In either case, upon the exercise of a Subscription Right by paying the Subscription Payment Amount in cash, a Non-U.S. Holder generally will not be subject to U.S. federal income tax.

Although not free from doubt, payment of the Put Option Premium to Non-U.S. Holders generally should not be subject to U.S. federal income tax (unless such Put Option Premium is effectively connected with the conduct of a trade or business of such Non-U.S. Holder within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such Put Option Premium is attributable), in which case such Put Option Premium should be taxable in the same manner as set forth above in connection with U.S. Holders) or U.S. federal withholding tax.  Non-U.S. Holders should consult their tax advisors regarding the U.S. federal income tax consequences relating to receipt of the Put Option Premium.

(c)        **Interest on Allowed Class 5 Claims**

Interest paid (or deemed paid) on an Allowed Class 5 Claim to a Non-U.S. Holder that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income tax, or withholding tax of 30% (or such lower rate specified by an applicable income tax treaty), *provided* that:

(1)        the Non-U.S. Holder does not, actually or constructively, own 10% or more of the total combined voting power of all classes of ASG's voting stock;

(2)        the Non-U.S. Holder is not a controlled foreign corporation related to ASG through actual or constructive stock ownership; and

(3)        either (1) the Non-U.S. Holder certifies in a statement provided to the applicable withholding agent under penalties of perjury that it is not a United States person and provides its name and address; (2) a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and holds the Allowed Class 5 Claim on behalf of the Non-U.S. Holder certifies to the applicable withholding agent under penalties of perjury that it, or the financial institution between it and the Non-U.S. Holder, has received from the Non-U.S. Holder a statement under penalties of perjury that such holder is not a United States person and provides a copy of such statement to the applicable withholding agent; or (3) the Non-U.S. Holder holds its Allowed Class 5 Claim directly through a "qualified intermediary" (within the meaning of applicable Treasury Regulations) and certain conditions are satisfied.

If a Non-U.S. Holder does not satisfy the requirements above, such Non-U.S. Holder may be entitled to a reduction in or an exemption from withholding on such interest as a result of an applicable tax treaty. To claim such entitlement, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established.

If interest paid (or deemed paid) to a Non-U.S. Holder is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such interest is attributable), the Non-U.S. Holder will be exempt from the U.S. federal withholding tax described above.  To claim the exemption, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that interest paid on an Allowed Class 5 Claim is not subject to withholding tax because it is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States.

Any such effectively connected interest generally will be subject to U.S. federal income tax at the regular graduated rates.  A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate

of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected interest, as adjusted for certain items.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

(b)      **Dividends on New Common Stock**

In general, distributions of cash or property on the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent paid from the issuer's current or accumulated earnings and profits, as determined under U.S. federal income tax principles.  Amounts not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and first be applied against and reduce a Non-U.S. Holder's adjusted tax basis in its New Common Stock, but not below zero.  Any excess will be treated as capital gain and will be treated as described below under "Sale or Other Taxable Disposition of New Common Stock."

Subject to the discussion below on effectively connected income, dividends paid to a Non-U.S. Holder of the New Common Stock will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the dividends (or such lower rate specified by an applicable income tax treaty, provided the Non-U.S. Holder furnishes a valid IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) certifying qualification for the lower treaty rate).  If a Non-U.S. Holder holds the stock through a financial institution or other intermediary, the Non-U.S. Holder will be required to provide appropriate documentation to the intermediary, which then will be required to provide certification to the applicable withholding agent, either directly or through other intermediaries.  A Non-U.S. Holder that does not timely furnish the required documentation, but that qualifies for a reduced treaty rate, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

If dividends paid to a Non-U.S. Holder are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such dividends are attributable), the Non-U.S. Holder will be exempt from the U.S. federal withholding tax described above.  To claim the exemption, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States.

Any such effectively connected dividends will be subject to U.S. federal income tax on a net income basis at the regular graduated rates.  A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected dividends, as adjusted for certain items.  Non-U.S. Holders should consult their tax advisors regarding any applicable tax treaties that may provide for different rules.

(c)      **Sale or Other Taxable Disposition of New Common Stock**

A Non-U.S. Holder will not be subject to U.S. federal income tax on any gain realized upon the sale or other taxable disposition of New Common Stock unless:

(1)      the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such gain is attributable);

(2)     the Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met; or

(3)     the New Common Stock constitutes a U.S. real property interest ("**USRPI**") by reason of our status as a U.S. real property holding corporation ("**USRPHC**") for U.S. federal income tax purposes.

Gain described in the first bullet point above generally will be subject to U.S. federal income tax on a net income basis at the regular graduated rates. A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty), which may be offset by U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

With respect to the third bullet point above, the Debtors believe Reorganized ASG will not be a USRPHC. Because the determination of whether Reorganized ASG will be a USRPHC depends, however, on the fair market value of Reorganized ASG's USRPIs relative to the fair market value of its non-U.S. real property interests and its other business assets, there can be no assurance Reorganized ASG will not be a USRPHC. Even if Reorganized ASG would be a USRPHC, gain arising from the sale or other taxable disposition by a Non-U.S. Holder of the New Common Stock will not be subject to U.S. federal income tax if the New Common Stock is "regularly traded," as defined by applicable Treasury Regulations, on an established securities market, and such Non-U.S. Holder owned, actually and constructively, 5% or less of the New Common Stock throughout the shorter of the five-year period ending on the date of the sale or other taxable disposition or the Non-U.S. Holder's holding period.

Non-U.S. Holders should consult their tax advisors regarding potentially applicable income tax treaties that may provide for different rules.

(d)     **Information Reporting and Backup Withholding**

Payments of dividends on the New Common Stock will not be subject to backup withholding, provided the applicable withholding agent does not have actual knowledge or reason to know the holder is a United States person and the holder either certifies its non-U.S. status, such as by furnishing a valid IRS Form W-8BEN, W-8BEN-E or W-8ECI, or otherwise establishes an exemption. However, information returns are required to be filed with the IRS in connection with any dividends on the New Common Stock paid to the Non-U.S. Holder, regardless of whether any tax was actually withheld. In addition, proceeds of the sale or other taxable disposition of the New Common Stock within the United States or conducted through certain U.S.-related brokers generally will not be subject to backup withholding or information reporting, if the applicable withholding agent receives the certification described above and does not have actual knowledge or reason to know that such Beneficial Holder is a United States person, or the Beneficial Holder otherwise establishes an exemption. Proceeds of a disposition of the New Common Stock conducted through a non-U.S. office of a non-U.S. broker generally will not be subject to backup withholding or information reporting.

Copies of information returns that are filed with the IRS may also be made available under the provisions of an applicable treaty or agreement to the tax authorities of the country in which the Non-U.S. Holder resides or is established.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

**9.5**    **Additional Withholding Tax on Payments Made to Foreign Accounts**

Withholding taxes may be imposed under Sections 1471 to 1474 of the Tax Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "**FATCA**") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities.  Specifically, a 30% withholding tax may be imposed on dividends on, or gross proceeds from the sale or other disposition of, the New Common Stock paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Tax Code), unless (1) the foreign financial institution undertakes certain diligence and reporting obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Tax Code) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules.  If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the Tax Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders.  Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations, withholding under FATCA generally applies to payments of dividends on the New Common Stock and will apply to payments of gross proceeds from the sale or other disposition of New Common Stock on or after January 1, 2017.

Beneficial Holders should consult their tax advisors regarding the potential application of withholding under FATCA with respect to the New Common Stock.

## ARTICLE X
## CONCLUSION AND RECOMMENDATION

The Plan effects the restructuring required for the Debtors to continue to operate and provide critical services to their customers.  This financial restructuring also affords the Debtors the opportunity that they need to adjust their businesses to address the economic factors and competition that have impacted their industry.  The Debtors urge all holders of Claims and Interests entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by the Solicitation Agent no later than 5:00 p.m. prevailing Eastern Time on March 11, 2015.

*[Remainder of Page Intentionally Left Blank]*

Dated:  February 9, 2015

Respectfully submitted,

ALLEN SYSTEMS GROUP, INC.
on behalf of itself and all other Debtors

By:    /s/ John C. DiDonato
Name:   John C. DiDonato
Title:    Chief Restructuring Officer and President
          708 Goodlette Road North
          Naples, Florida 34102

Prepared by:

**LATHAM & WATKINS LLP**

Peter M. Gilhuly (*pro hac vice* admission pending)
Ted A. Dilluly (*pro hac vice* admission pending)
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Email:      peter.gilhuly@lw.com
          ted.dillman@lw.com

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
Michael R. Seidl (DE Bar No. 3889)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:      ljones@pszjlaw.com
          mseidl@pszjlaw.com
          pkeane@pszjlaw.com

Proposed Special Counsel for the Debtors and Debtors in Possession

Proposed Counsel for the Debtors and Debtors in Possession

**APPENDIX:**
**RULES OF INTERPRETATION, COMPUTATION OF TIME,**
**GOVERNING LAW, AND OTHER REFERENCES**

<u>**Rules of Interpretation**</u>

For purposes of the Disclosure Statement: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to any particular portion of the Disclosure Statement; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

<u>**Computation of Time**</u>

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

<u>**Governing Law**</u>

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflict of laws principles.

<u>**Reference to Monetary Figures**</u>

All references in the Disclosure Statement to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

<u>**Reference to the Debtors or the Reorganized Debtors**</u>

Except as otherwise specifically provided in the Disclosure Statement to the contrary, references in the Disclosure Statement to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

*[This Page Intentionally Left Blank]*