## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Allen Systems Group, Inc., *et al.* | Case No. 15-10332 (KJC) |
| Debtors. | Jointly Administered |
| | **Hearing Date: March 26, 2015 at 2 p.m.** |
| | **Objections Due: March 19, 2015 at 4 p.m.,** |
| | **extended to March 20, 2015 at noon for the** |
| | **U.S. Trustee** |
| | **Related to Docket No. 17, 115** |

## UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF THE DEBTORS' FIRST AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN, AND TO APPROVAL OF THE DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES FOR THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

Andrew R. Vara, the Acting United States Trustee for Region 3 ("U.S. Trustee"), by and through his undersigned attorneys, hereby submits this Objection to Confirmation of the Debtors' First Amended Joint Prepackaged Chapter 11 Plan (the "Plan"), and to Approval of the Disclosure Statement and Solicitation Procedures for the Debtors' Joint Prepackaged Chapter 11 Plan (the "Disclosure Statement") (Docket Nos. 115 and 17, respectively), and states as follows:

## PRELIMINARY STATEMENT

1. The U. S. Trustee objects to confirmation of the Debtors' Plan, and approval of the Disclosure Statement and solicitation procedures, because, while the Plan purports to be a "pay in full plan" as to numerous classes of claims, including unsecured claims, that is not in fact the reality. Rather, by carefully crafting the definition of the word "Allowed," the Debtors have effectively impaired all priority and non-priority unsecured creditors, as well as certain other

classes of creditors.  Under the definition of "Allowed," a claimant will have to file a proof of claim or a motion to have their claim allowed, yet there is no bar date, and the Debtors have filed no schedules, and seek waiver of their obligation to do.

2.     The Debtors have not informed any of the purportedly unimpaired classes that they will have to file a proof of claim or motion for their claim to be "Allowed," and therefore paid. To the contrary, the only plan-related document served on such claimants was a notice of the combined disclosure statement and confirmation hearing, which merely stated that their claims would be paid in full.  The hearing notice did not even notify claimants that they *could* file a proof of claim, let alone that they *must* do so to ensure their claim is paid.[1]

3.     Nevertheless, under the Plan, upon the Effective Date,[2] the Debtors will obtain an expansive discharge and injunction as to *all* claims, including those that the Debtors will not be required to pay because they do not fall under the definition of "Allowed."  In addition, under the Plan, the unsecured creditors and the other purportedly unimpaired classes, who may never receive one penny on their claims, will be deemed to release the Debtors as well as a long list of non-debtor parties.

4.     The Chapter 11 process is designed for creditors and all parties in interest to have ample time to review a Debtor's assets, liabilities and financial affairs, and have sufficient time to object to a plan proponents' disclosure statement and confirmation of a plan.  The combined hearing in these cases circumvents this process.  Rather than seek to expedite the procedure

---

[1]     Although the Hearing Notice did provide a website address where copies of the Plan and Disclosure statement could be downloaded, such notice is not the equivalent of service. Even if claimants in the purportedly unimpaired classes did download and review the Plan and Disclosure Statement, nowhere in those documents is it disclosed that such claimants need to file proofs of claim or motions to get their claim paid.

[2]     All capitalized terms not defined herein shall have the meaning set forth in the Plan.

because no parties are prejudiced, the evidence suggests the opposite, that the Debtors seek to use the expedited procedures available for a pre-packaged bankruptcy to limit notice and disclosure, accompanied with the onerous plan provisions, all of which acts to the prejudice of the unsecured creditors and others who have not been solicited and have had no opportunity to participate in the process.

5.      Because there are numerous classes in the Plan that were not solicited to vote, even though they were in fact impaired, the Plan is not confirmable, and the solicitation procedures were not proper.

6.      The Debtors' Plan is also not confirmable because it is rife with provisions that are contrary to those of the Bankruptcy Code and Rules and applicable law, including provisions relating to the treatment of executory contracts and leases, the claims objection process, and the stripping of set-off and recoupment rights. These provisions further impair the rights of the purportedly unimpaired classes, without soliciting their votes, and without providing notice of what such claimants must do to preserve their rights.

7.      Finally, the Debtors' Plan is not confirmable because it contains release and exculpation provisions that are beyond the scope of what is permissible under applicable law.

8.      The U.S. Trustee also objects to approval of the Disclosure Statement, because it inaccurately describes numerous classes as unimpaired when they were in fact impaired, and fails to inform the members of such classes as to what steps they have to take to get their claims paid by the Debtors.

9.      For these reasons, and the others set forth below, confirmation of the Debtors' Plan should be denied.

## JURISDICTION

10.     Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine this objection.

11.     Pursuant to 28 U.S.C. § 586(a)(3), the U. S. Trustee is charged with administrative oversight of the bankruptcy system in this District.  Such oversight is part of the U. S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts.  *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the "U. S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the "U. S. Trustee as a "watchdog").

12.     Pursuant to 28 U.S.C. § 586(a)(3)(B), the U. S. Trustee has the duty to monitor plans and disclosure statements filed in Chapter 11 cases and to comment such plans and disclosure statements.

13.     Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Motion and the issues raised in this objection.

### FACTUAL BACKGROUND

14.     On February 18, 2015, the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors filed their Chapter 11 Plan on the same date, along with an accompanying Disclosure Statement.  *See* Dkt. Nos. 16, 17.

15.    No official committee of unsecured creditors has been appointed in these cases.

16.    On the same day their filed their petitions, the Debtors also filed, as an attachment to the declaration of John DiDonato, a Restructuring Support Agreement entered into between the Debtors, their lenders, holders of approximately 72% of the Debtors' second lien notes, and other parties, by which such signatories agreed to support the plan.  See Dkt. No. 3, Ex. B thereto.

17.    At the first day hearing, the Court set March 26, 2015 as the hearing date for a combined hearing to approve the Debtors' Plan and Disclosure Statement ("Combined Hearing"), and approved the Debtors' form of Notice of (A) Commencement of Prepackaged Chapter 11 Bankruptcy Cases, (B) Combined Hearing on the Disclosure Statement, Confirmation of the Joint Prepackaged Chapter 11 Plan, and Related Matters, and (C) Objection Deadlines, and Summary of the Debtors' Joint Prepackaged Chapter 11 Plan ("Hearing Notice"). *See* Order Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, and providing other relief, Dkt. No. 63.  That Order conditionally approved the Disclosure Statement and solicitation procedures, among other documents and procedures, but expressly preserved the rights of all parties in interest to object at the Combined Hearing, to the Disclosure Statement, solicitation procedures and any other documents or procedures that were conditionally approved by such Order.  *See id.*

18.    On March 18, 2015, the Debtors filed their First Amended Joint Prepackaged Chapter 11 Plan (hereinafter the "Plan").  Dkt. No. 115.

19.    The Debtors have not filed their schedules of assets or liabilities, or statement of financial affairs, and have filed a motion seeking to waive the requirements for the same, provided that the Plan is confirmed by no later than April 3, 2015.  *See* Dkt. Nos. 23 and 72.

20.     No bar date has been set in these cases, and it does not appear that the Debtors intend to seek one.   To the best of the knowledge of counsel to the U.S. Trustee, no creditors have been provided with proof of claims forms.

21.     The Plan provides for only one voting class, Class 5, which is comprised of Note Claims.   Approximately 72% of such class are the "Consenting Note Holders," who are among the signatories to the Plan Support Agreement.

22.     Under the Plan, all classes other than Class 5 are purported to be either (a) unimpaired, and presumed to accept the Plan, or (b) impaired and presumed to reject the Plan. The following classes are purported to be unimpaired (the "Purportedly Unimpaired Classes"): Priority Tax Claims, Secured Tax Claims, Other Secured Claims (consisting of secured claims other than those of the Debtors' lenders), Other Priority Claims, and Other Unsecured Claims (consisting of general unsecured claims).  *See* Plan, §§ 2.4, 3.2 (a),(b),(c) and (f).  Class 3, consisting of Other Priority Claims, would include certain claims by the Debtors' employees for wages and other compensation under section 507(a)(4) and (5) of the Code.   The Debtors have asserted that, as of the petition date, they had approximately 1,054 employees in 25 countries. Over half of such employees are located outside of the United States.[3]  *See* Declaration of John DiDonato, Dkt. No. 3, ¶ 17.

23.     As to the Purportedly Unimpaired Classes, the Plan provides that it will pay all "Allowed" claims in each class in full, either on the Effective Date, or, with respect to certain of such classes, in the ordinary course of business.  *See* Plan, §§ 2.4, 3.2 (a), and (f).

---

[3]     As of date, at least four former employees of the Debtors in France have filed objections to the treatment of their claims under the Plan, which objections reference a legal proceeding taking place in Versailles, France as to employment related claims. *See, e.g.,* Dkt. No. 107.

24.     It is important to note that the only claims that will be paid in the Purportedly Unimpaired Classes are claims falling under the definition of "Allowed."  That term is defined in the Plan as follows: " 'Allowed' means, as to a Claim or an Interest, a Claim or an Interest to the extent allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable." Plan, § 1.1. 6.

25.     Working through the three ways a claim can be "Allowed" under the Plan, it becomes clear that a majority of the claims included in the Purportedly Unimpaired Classes will actually not be Allowed claims under the Plan:

    a.    The Plan does not deem "Allowed" any of the Purportedly Unimpaired Claims, so that part of the definition does not apply.

    b.    That part of the definition concerning claims "Allowed" under the Bankruptcy Code is not likely to cover many claims, given the absence of schedules, a bar date, or any notice to claimants that they need to file a proof of claim.

    c.    The last part of the definition relates to claims that are allowed by Final Order.  However, for there to be an order, a claimant would either have to file a proof of claim to which the Debtors file an objection, or the claimant would have to file a motion to allow their claim.

**Impairment of Recoupment and Setoff Rights**

26.     There are a number of provisions of the Plan that impair the setoff and recoupment rights of claimants.  Section 6.5 of the Plan requires that any holder of a set-off claim must file a motion seeking Court approval to perform such setoff by the Confirmation Date.  A similar provision is found in the injunction language of section 8.6 of the Plan.

27.     Section 8.8 of the Plan attempts to eliminate the ability of a claimant to assert the defense of recoupment unless such holder "actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has

or intends to preserves any right of recoupment."  Section 8.6 of the Plan also enjoins any party

from asserting any right of recoupment as of the Effective Date.

**Impairment of Rights of Counterparties to Executory Contracts and Leases**

28.    There are a number of provisions in the Plan that impair the rights of

counterparties to executory contracts and leases.  The Plan indicates that those executory

contracts and leases that the Debtors are rejecting will be identified in the Plan Supplement.  *See*

Plan § 5.1 (iii).   However, there is no requirement that the Plan Supplement be served on

contract counterparties.[4]   Section 5.2 of the Plan further provides that any claim for rejection

damages must be filed within thirty days after the date of entry of an order of the Court

(including the Confirmation Order) that approves such rejection.

29.    As to assumed contracts, the Plan provides that "all requests for payment of Cure

that differ from the amounts paid or proposed to be paid by the Debtors or Reorganized Debtors

to a counterparty must be filed with the Solicitation Agent on or before 30 days after the

Effective Date," or be "disallowed and forever barred, estopped and enjoined."  Plan § 5.3.  The

Plan further provides that any objection to the assumption of an executory contract or unexpired

lease must be filed with the Court on or before 30 days after the Effective Date.  *Id.*  Again,

counterparties to such affected contracts or leases are not likely to be noteholders, and therefore

will not have been served with the Plan or Disclosure Statement, and effectively will have no

notice of such deadlines.

30.    Section 5.3 of the Plan also provides for automatic expungement of any proofs of

claim that may have been filed for cure amounts, and provides further that assumption of an

---

[4]    Section 5.1(iii) of the Plan makes reference to service on affected counterparties, but it sounds as though the service will be made only if the list of rejected contacts is amended subsequent to being attached to the Plan Supplement.

executory contract or leases shall result in full release and satisfaction of any Cures or defaults, without requiring that a Cure payment actually be made and, if the amount is disputed, that such dispute be resolved, before the release of the Debtors becomes effective.

**The Plan's Claims Dispute Procedures**

31.    In the absence of schedules or a bar date, there will not likely be many claims filed.  However, any claims that are filed in these cases will be subject to a claims dispute procedure that is contrary to the Bankruptcy Code and Rules, and which will have the effect of denying claimants their due process rights.  The relevant provisions are as follows:

a.    The Debtors reserve the right to object to all claims in the Bankruptcy Court.  *See* Plan, Art. VII.   Section 7.1 of the Plan provides that the Debtors need not file an objection in order for a claim to be considered "Disputed."  Rather, a claim is disputed if the Debtors simply do not agree that it should be deemed Allowed, and the Plan provides that the Debtors may do so "without the need for notice to or action, order or approval of the Bankruptcy Court."  Plan, § 7.1.[5]

b.    A similar provision is found in § 5.3, which provides that proofs of claim based upon Executory Contracts or Unexpired Leases assumed in the cases "shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court."  Plan, § 5.3 (last paragraph).

---

[5]    The Definition of Disputed in section 1.1 (51) of the Plan is objectionable for the same reason, as it includes, in subsection (ii) "otherwise disputed" language.  It is also problematic to have the definition of "disputed" be based on what is not "Allowed" under the Plan, due to the problems with the definition of "Allowed."  Typically, Disputed Claims should be defined as:  (i) listed on the Schedules as unliquidated, disputed, and/or contingent for which no proof of claim in a liquidated and non-contingent  amount has been filed; or (ii) that is the subject of an objection or request for estimation Filed by any of the Debtors or any other party-in-interest.  Where, as here, there are no schedules filed, the definition should be limited to those claims that are the subject of a filed objection or request for estimation.

**Release and Exculpation Provisions**

32.     The Plan provides for broad releases of numerous non-debtor parties.  Such third party releases are consensual only as to those claimants in class 5 who voted in favor of the Plan.  The release are non-consensual as to claimants in the Purportedly Unimpaired Classes, as well as to any claimant in Class 5 who did not submit a ballot.

33.     The provision for the third-party releases is set forth in § 8.3 of the Plan, as follows:

> Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Releasing Parties shall, and shall be deemed to, conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, void, extinguish, and discharge each Released Party (and each such Released Party so discharged and released shall be deemed discharged and released by the Releasing Parties) and their respective property from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, judgments, defenses, counterclaims, and liabilities of any nature whatsoever . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, any transactions contemplated by the Plan, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, any payments, distributions, or dividends any Debtor or Affiliate paid to or received from any Released Party, fraudulent or preferential transfer or conveyance, tort, contract, breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence, gross negligence . . .; provided, however, that the foregoing release shall not operate to waive or release any Claims, . . . solely to the extent: (1) arising out of or relating to any act or omission of such Released Party that constitutes fraud or willful misconduct as determined by Final Order of a court of competent jurisdiction; (2) arising under the Exit Facility Documents or other obligations arising under the Plan, or (3) with respect to Professionals' final fee applications or accrued Professional compensation claims in the Chapter 11 Cases.

34.     The definition of **Released Parties** (Plan § 1.1.139) is as follows:

> "Released Party" means each of the following in its capacity as such: (a) each Debtor and Reorganized Debtor; (b) the Debtors' current and former officers and directors; (c) the DIP Agent; (d) the DIP Lenders; (e) the parties to the Support Agreement; (f) the First Lien Agent; (g) the holders

of Domestic Credit Facility Claims; (h) the Foreign Lenders; (i) the Indenture Trustee; (j) the holders of Notes Claims who vote to accept the Plan; (k) each party to the Backstop Agreement; (l) each of the Allen Parties; (m) any Committee and the members thereof (solely in their capacity as such); and (n) each of the foregoing entities' respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case solely in their capacity as such.

35.    The definition of **Releasing Parties** (Plan § 1.1.140) is as follows:

"Releasing Parties" means each of the following in its capacity as such: (a) each Debtor and Reorganized Debtor; (b) the Debtors' current and former officers and directors; (c) the DIP Agent; (d) the DIP Lenders; (e) the parties to the Support Agreement; (f) the First Lien Agent; (g) the holders of Domestic Credit Facility Claims; (h) the Foreign Lenders; (i) the Indenture Trustee; (j) *the holders of Notes Claims **other than** those who voted to reject the Plan and have also checked the box on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan;* (k) each party to the Backstop Agreement; (l) each of the Allen Parties; (m) any Committee and the members thereof (solely in their capacity as such); (n) *any holder of an Allowed Claim that is **Unimpaired** by the Plan;* (o) without limiting the foregoing, each other holder of a Claim or an Interest, in each case other than a holder of a Claim or an Interest that has voted to reject the Plan, has abstained from voting on the Plan and has also checked the box on the applicable Ballot to opt not to grant the releases provided in the Plan, or is a member of a Class that is deemed to reject the Plan; and (p) with respect to each of the foregoing parties under (a) through (o), any successors or assigns thereof. (emphasis added). [6]

36.    The Plan also includes a broad release given *by* the Debtors in favor of the

"Released Parties," which releases and discharges such parties and their property from any and

---

[6]    The ballots did notify the voting claimants that voting to accept the Plan would result in granting the releases. However, the portion of subsection (j) of the definition of "Releasing Parties" relating to holders of Class 5 claims is inconsistent with the information on the ballot (as well as internally inconsistent with subsection (o) of the definition). Subsection (j) of section 8.2 of the Plan provides that all Class 5 claimants grant releases unless they reject the Plan *and* check the opt-out box, whereas the ballot provided to Class 5 claimants indicated that only those who abstained from voting needed to check the op-out box and return the ballot if they wished not to provide the releases.

all claims, interest and obligations, relating in any manner to the Debtors the Reorganized

Debtors, or any transactions contemplated by the Plan and the Chapter 11 cases, including

"breach of fiduciary duty, violation of state or federal laws, including securities laws, negligence

[and] gross negligence," except for claims of "fraud or willful misconduct as determined by

Final Order," or arising under the Exit Facility Documents or other Plan obligations.  Plan § 8.2.[7]

37.    The Plan (§ 8.5) also includes a provision which exculpates the "Exculpated

Parties," which are defined as follows:

> "Exculpated Party" means each of the following in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the parties to the Support Agreement; (d) the First Lien Agent; (e) the Indenture Trustee; (f) the holders of Domestic Credit Facility Claims; (g) the Foreign Lenders; (h) the holders of Notes Claims; (i) each party to the Backstop Agreement; (j) each of the Allen Parties; (k) any Committee and the members thereof (solely in their capacity as such); and (l) with respect to each of the foregoing entities in clauses (a) through (k), such Entity's successors and assigns and current and former Affiliates and its and their subsidiaries, stockholders, members, limited partners, general partners, other equity holders, officers, directors, managers, trustees, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case solely in their capacity as such.

38.    The Exculpated Parties, which include many parties who are not estate fiduciaries,

are explicitly exculpated for not just acts and omissions during the course of the bankruptcy

cases, but also for prepetition acts and omissions, and prospective acts and omissions that are

related to "transactions contemplated by the Plan."   In addition, while the exculpation does

exclude acts or omissions determined by Final Order to have constituted gross negligence or

willful misconduct, the provision also allows for each Exculpated Party to rely upon advice or

counsel, which could effectively vitiate that exclusion.  *See* Plan, § 8.5.

---

[7]    Section 8.2 of the Plan is titled "Releases by and of the Debtors," but does not appear to include releases of the Debtors.  Releases of the Debtors are included in § 8.3 of the Plan.

**ARGUMENT**

**A.    The Disclosure Statement Fails to Provide Adequate Disclosure**

39.    Section 1125 of the Bankruptcy Code prohibits solicitation of votes on a

reorganization plan prior to court approval of a written disclosure statement, which contains

"adequate information."  *See* 11 U.S.C. § 1125(b).

40.    "Adequate information" is defined in section 1125 as being:

> information of a kind, and in sufficient detail, as far as is
> reasonably practicable in light of the nature and history of the
> debtor and the condition of debtor's books and records, that would
> enable a reasonable hypothetical investor typical of holders of
> claims or interests of the relevant class to make an informed
> judgment about the plan, but adequate information need not
> include such information about any other possible or proposed
> plan.

11 U.S.C. § 1125(a)(1).

41.    The disclosure statement requirement of section 1125 is "crucial to the effective

functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure

cannot be overstated."  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 362

(3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor

Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).

42.    "Adequate information" under section 1125 is "determined by the facts and

circumstances of each case."  *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong.,

2d Sess. 266 (1977)).  The "adequate information" requirement is designed to help creditors in

their negotiations with Debtors over the plan.  *See Century Glove, Inc. v. First American Bank*,

860 F.2d 94 (3d Cir. 1988).

43.    The Disclosure Statement is defective because it inaccurately describes the

Purportedly Unimpaired Classes as unimpaired, when in fact they are impaired in numerous

ways.  The Disclosure Statement further fails to disclose why the votes of members of the Purportedly Unimpaired Classes were not solicited, even though such classes are actually impaired.

44.    The Disclosure Statement also fails to disclose that, for a claim in any of the Purportedly Unimpaired Classes to be paid, the claimant must either file a proof of claim or motion to allow the claim, or risk having such claim be discharged without being paid.

45.    The inadequacies of the Disclosure Statement are amplified by the fact that the Purportedly Unimpaired Classes were not even served with the Plan or Disclosure Statement, but instead received only with the Hearing Notice, which indicated only that their claims would be paid in full, and did not disclose that for such payment to be made, claimants would have to file proofs of claim or motions.

46.    The Hearing Notice also failed to disclose to the claimants in the Purportedly Unimpaired Classes that their rights (including due process rights), would be further impaired by the Plan's stripping away of their recoupment and setoff rights, and by executory contract and claims dispute procedures that violate the Bankruptcy Code, Bankruptcy Rules and applicable law, as detailed below.

47.    Due process requires that notice be reasonably calculated, under all circumstances, to apprise interested parties of the pendency of an action.  *Folger Adam Security v. DeMatteis/MacGregor*, 209 F.3d 252 (3d Cir. 2000).  The Disclosure Statement and Hearing Notice failed to meet that standard with respect to the Purportedly Unimpaired Classes.

### B.  <u>The Plan Is Not Confirmable</u>

48.    In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), the court held that the plan proponent bears the burden of proof with respect to confirmability of a

Plan:  "The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of §1129, regardless of the absence of valid objections to confirmation."  266 B.R. at 599.  The court further stated: "A nonconsensual plan requires the proponent to prove all but one of the thirteen elements [of 11 U.S.C. § 1129(a)], that all classes consent or are unimpaired, 11 U.S.C. § 1129(a)(8), plus the additional requirements of section 1129(b), that the plan does not unfairly discriminate against dissenting classes and that treatment of such dissenting classes is fair and equitable."  266 B.R. at 599.  See, also, *In re Armstrong World Industries, Inc.*, 432 F.3d 507, 511 (3d Cir. 2005). The Debtors fail to meet these standards, as detailed below.

### i.    All Purportedly Unimpaired Classes are Impaired and Entitled to Solicitation

49.    A Class of claims is impaired pursuant to 11 U.S.C. §1124(1) unless the plan: "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."   A Class of impaired claims is entitled to vote on a Plan pursuant to 11 U.S.C. §1126(a).

50.    Self-styled as a pre-packaged plan, the Plan here breaks tradition with the notion of prepackaged bankruptcy cases.  Typically, a prepackaged bankruptcy case is one in which all classes of claims have consented to the plan or are unimpaired.  Classes of claims may be unimpaired by either reinstating them unaffected by the Plan or by providing for unequivocal full payment of claims in affected classes.   Only when all classes of claims have either consented to a plan or are unimpaired, is the expedited process of a pre-packaged bankruptcy appropriate.

51.    The Plan in these cases calls itself a "pay in full" plan with respect to the Purportedly Unimpaired Classes.  However, to work procedurally, a pay in full plan requires the filing of schedules and the setting of a bar date, so that creditors may see how they are scheduled, and file a proof of claim if necessary.  Here, the Debtors have filed no schedules, and have moved for a waiver of the requirement that they do so.  In addition, there is no bar date, and it

does not appear that the Debtors intend to seek one.   Thus, it is unclear how the Debtor will even know the universe of claims they are to pay under the Plan.  Moreover, by defining "Allowed" in such a way as to exclude most claims in the Purportedly Unimpaired Classes, the Debtors have turned a "pay in full" plan into one in which they will be able to pick and choose at their discretion which of their creditor to pay.

52.    In light of the above, the Purportedly Unimpaired Classes are in fact impaired under the Plan, and therefore entitled to vote pursuant to 11 U.S.C. §1126(a).   Because the Purportedly Unimpaired Classes were not solicited to vote on the Plan, the Plan cannot be confirmed.

53.    To ameliorate this situation, the Debtors could change the Plan to have the Purportedly Unimpaired Classes pass through the bankruptcy cases unaffected.[8]  The creditors in those classes would be left to their rights, and none of their claims against the Debtors or non-debtor parties would be discharged, released or enjoined.  In addition, their claims would not be subject to a claims objection process in bankruptcy.  Rather, such creditors would retain their rights in state court, non-bankruptcy federal courts, or other applicable tribunals (including foreign ones) to pursue their claims against the Debtors.[9]

---

[8]    Examples of plans with pass-through provisions include *In re Hilex Poly Co. LLC* (08-10890)(KJC), in which the Plan of Reorganization reinstated unimpaired general unsecured claims according to their terms, preserving all rights as if the bankruptcy had not occurred. The identical treatment was provided to the creditors in *In re Portola Packaging, Inc.* (08-12001)(CSS).

[9]    If a "pass-though" approach is taken, changes would have to be made to many provisions of the Plan, including at least the following: 2.4 (treatment of Priority Tax Claims); 3.2 (introductory language regarding "full and final satisfaction," with respect to all Purportedly Unimpaired Classes); 3.2(a)(b) and (c)(treatment of Secured Tax Claims, Other Secured Claims, and Other Priority Claims); 3.2 (f)(treatment of Other Unsecured Claims); 4.1 (settlement of claims and interests); 4.2(a)(1) (transfer of claims to reorganized debtor "free and  clear of all Claims"); 6.2 (distribution to disputed claims); 7.1, 7.2 and 7.3 (disputed

**Other Impairments**

54.     There are a number of additional impairments to the Purportedly Unimpaired

Classes set forth in the Plan.

   a.        **Impairment of Recoupment and Setoff Rights**

55.     The Plan acts to deprive or severely limit claimants of their setoff and recoupment

rights, in ways that are inconsistent with the Code and applicable law.  Section 6.5 of the Plan

requires that any holder of a setoff claim must file a motion by the Confirmation Date seeking

Court approval to perform such setoff.  A similar provision is found in the injunction language of

section 8.6 of the Plan.   Second, this provisions is inconsistent with section 553 of the Code,

which states that, other than as provided in sections 362 and 363 of the Code, and with certain

enumerated exceptions, "this title does not affect any right of a creditor to offset a mutual debt

owing by such creditor to the debtor that arose before the commencement of the case." 11 U.S.C.

§ 553(a).

56.     Section 8.8 of the Plan attempts to eliminate the ability of a claimant to assert the

defense of recoupment, unless such holder "actually has performed such recoupment and

provided notice thereof in writing to the Debtors on or before the Confirmation Date,

notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has

or intends to preserves any right of recoupment."  Section 8.6 of the Plan also enjoins any party

from asserting any right of recoupment.  This provision seeks to nullify and expunge, without

following the proper procedure, any notice the Debtors have already received by way of any

proof of claim or otherwise, regarding recoupment.  Lastly, recoupment is a defense that cannot

claims procedure, which should not apply to any pass-through claims); 8.1 (to eliminate
discharge of the claims that will pass through); 8.3 (to eliminate releases by claimants whose
claims will pass through);and  8.6 (to eliminate injunctive provisions for pass-through
claims).  The definition of "Releasing Party" in § 1.1 of the Plan also would need to be
changed to exclude pass-through claimants.

be discharged or otherwise stripped from a claimant.  *See Folger Adam Security v.*

*DeMatteis/MacGregor*, 209 F.3d 252 (3d Cir. 2000)(holding that a sale may not be free and clear

of either the defense of recoupment, or of any setoff asserted prior to the petition date).  Because

it is a defense, it also is not appropriate to require a party to "assert" recoupment before the

Debtors assert a claim against such party as to which recoupment would be a defense.

57.     In addition to the above, because the Plan was not solicited to any claimants other

than the noteholders, most if not all parties whose setoff and recoupment rights will be

negatively impacted by the Plan will not learn of such impact until it is too late for them to take

any steps to protect their rights, thereby resulting in another due process deprivation.

b.     **Impairment of  Rights of Counterparties to Executory Contracts  and Leases**

58.     Article V of the Plan raises a myriad of due process issues relating to the treatment

of counterparties to executory contracts and leases.  The Plan provisions impair the rights of such

counterparties as they concern damages claims related to rejected contracts and leases, claims

relating to cure amounts of assumed contracts and leases, and objections to the assumption of the

contracts.

59.     The Plan indicates that the executory contracts and leases that the Debtors are

rejecting will be identified in the Plan Supplement.  *See* Plan § 5.1 (iii).  Not only is there no

requirement that  the Plan Supplement be served on anyone, but unless holders of rejection

damages claims also happen to be noteholders (which is unlikely), they will not have been served

with the Plan, and therefore will not know that they should seek to obtain a copy of the Plan

Supplement to learn whether their contract has been rejected.   Section 5.2 of the Plan further

provides that any claim for rejection damages must be filed within thirty days after the date of

entry of an order of the Court (including the Confirmation Order) approving such rejection.

Even if the Confirmation Order is served on contract counterparties, it is unlikely that such order will specifically address the procedures for filing a rejection damages claim, let alone identify which contracts have been rejected.

60.     There are similar issues with respect to assumed contracts.  The Plan provides that "all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 30 days after the Effective Date," or be "disallowed and forever barred, estopped and enjoined."  Plan § 5.3.  The Plan further provides that any objection to the assumption of an executory contract or unexpired lease must be filed with the Court on or before 30 days after the Effective Date.  *Id.*  Again, counterparties to such affected contracts or leases are not likely to be noteholders, and therefore will not have been served with the Plan or Disclosure Statement, and therefore will have no notice of such deadline.

61.     With respect to both rejected and assumed contracts and leases, the Debtors should be required to serve explicit written notice on the affected parties, informing them that their contract or lease has been rejected or assumed.  For rejected contracts, the Debtors should be required to attach a proof of claim form to the notice, and inform the recipient that they have until a specified date of no less than 30 days after service of such notice to file any rejection damages claim.  For assumed contracts, the Debtors should be required to indicate the amount the Debtors believe is the cure amount, and notify the recipient that they have until a specified date of no less than 30 days after service of such notice to contest the amount of the cure payment, or to object to assumption of their contract.

62.     Finally, section 5.3 of the Plan also impairs the rights of counterparties to assumed contracts by providing for automatic expungement of any proofs of claim they may have filed,

and by providing that assumption of an executory contract or lease shall result in full release and satisfaction of any Cures or defaults, without requiring that a Cure payment actually be made and, if the cure amount is disputed, be resolved, before such release can become effective.

**ii.    The Plan Allows the Debtors to Unfairly Discriminate Between Holders of Claims Within Certain Classes**

63.    Although not visible on its face, the Plan in facts allows the Debtors to unfairly discriminate among holders of claims within each of the Purportedly Unimpaired Classes. The Debtors will be able to discriminate because very few claims in any of the Purportedly Unimpaired Classes will fall under the definition of "Allowed." This will permit the Debtors to pick and choose which claims in these classes they wish to pay, and which they wish not to pay. Thus, the Debtors might choose to pay unsecured claims of vendors with whom they hope to continue to do business, even if such claims may not fall within the definition of "Allowed," but not pay the claims of their former French employees who appear to have brought a proceeding against the Debtors in France (*see, e.g.* Dkt No. 107).

64.    Section 1123(a)(4) provides that a plan must "provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agree s to a less favorable treatment." Because the Plan does not comply with Section 1123(a)(4), it cannot be confirmed under 11 U.S.C. §1129(a)(2).

**iii.    The Plan Has Not Been Proposed in Good Faith**

65.    Bankruptcy Code Section 1129(a)(3) requires, as a condition of confirmation, that "[t]he plan has been proposed in good faith and not by any means forbidden by law." In *Genesis*, the Court held that, "[t]he determination of good faith must be based on the totality of circumstances. [citations omitted]." 266 B.R. at 609. Among the issues for the Court to consider is fundamental

fairness in dealing with the creditors.  The issue of good faith looks to the purposes that would be achieved by the plan.  This plan is not proposed in good faith for multiple reasons.

66.    The Plan is not proposed in good faith to the extent it seeks to use the expedited procedures permitted for prepackaged bankruptcies to prejudice unsolicited impaired classes of claims.  As described above, the notion of a prepackaged bankruptcy is intended to permit expeditious approval of a reorganization plan when all impaired classes of claims have consented to the plan and all other classes of claims are unimpaired.   Here, the Plan actually impairs all Purportedly Unimpaired Classes, yet the vote of only one class of impaired creditors was solicited.

67.    This Plan has been negotiated with, by and through a handful of parties for their benefit and to the exclusion and prejudice of the Debtors' other creditors, and most particularly in this case, of priority and non-priority unsecured creditors.  Use of the expedited procedures applicable to pre-packaged bankruptcy cases in this manner, especially in light of the absence of schedules, and the tricky wording of the definition of "Allowed," results in a denial of due process to many of the Debtors' creditors.

68.    The cumulative effect of these cases proceeding as pre-packaged bankruptcy cases is tantamount to an ex-parte Chapter 11, since the unsecured creditors, and other classes that are not parties to the Plan Support Agreement, have been excluded from the process.

iv.    **The Plan's Claim Dispute Procedures Violate the Bankruptcy Code and Rules**

69.    Although the Plan provides that Purportedly Unimpaired Classes, including priority and non-priority unsecured creditors, will be paid in full, at the same time, the Debtors reserve rights to object to a claim in the Bankruptcy Court.  *See* Plan, Art. VII.   The claims objection process, however, would apply only to those lucky few claimants who filed a proof of

claim, despite having received no notice that they needed to do so.  Yet the Plan contains certain provisions that would strip even those claimants of their rights.

70.    Section 7.1 of the Plan provides that the Debtors need not file an objection in order for a claim to be considered "Disputed."  Rather, a claim is disputed if the Debtors simply do not agree that it should be deemed Allowed, and the Plan provides that the Debtors may do so "without the need for notice to or action, order or approval of the Bankruptcy Court."  Plan, 7.1.

71.    A similar provision of the Plan is found in section 5.3, which, as noted above, provides that proofs of claim based upon Executory Contracts or Unexpired Leases assumed in the cases "shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court."  Plan, section 5.3 (last paragraph).

72.    These provisions run contrary to section 502(a) of the Code, which provides that, "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, . . .  objects."  The only proper method to object to a claim is to follow the procedures contained in Bankruptcy Rule 3007, by filing an objection and providing 30 days' notice to respond.  The provisions of the Plan that allow the Debtors to deem filed claims disallowed, or that provide for automatic expungement and disallowance of claims, are a violation of the Bankruptcy Code and Rules, and deny the holders of these claims due process, especially as such holders would not have been served with the Plan, and therefore would have no knowledge of these punitive provisions.

v.    **The Plan's Releases, Exculpation and Provisions**
**Are Impermissible Under Applicable Law**

73.    There are numerous ways in which the third party releases, the Debtor releases and exculpations set forth in the Plan are contrary to the standards set forth by this Court in *In re Tribune Company,* 464 B.R. 126 (Bankr. D. Del. 2011), *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011), and other applicable law, as detailed below.

**Third-Party Releases**

74.    The third-party releases in the Plan, which benefit the debtors as well as numerous non-debtors, will be given not only by those creditors in Class 5 who voted to accept the Plan, but also any creditor in Class 5 who did not vote on the Plan unless such creditor submits the ballot (despite not voting) with the opt-out box checked.  More importantly, third-party releases of non-debtors will be deemed given by all creditors in the Purportedly Unimpaired Classes, which creditors have been provided with no way to opt-out of the same.  As such, the third-party releases are not consensual, except as to those given by members of Class 5 who voted in favor of the Plan.

75.    Some Courts in this District have determined that third party releases of non-debtors should be allowed only if they are consensual.  *See In re Washington Mutual, Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011), *citing, inter alia, In re Coram Healthcare Corp.,* 315 B.R. 321, 335 (Bankr. D. Del. 2004)(holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999)(release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan); *In re Exide Technologies*,

303 B.R. 48, 74 (Bankr. D. Del. 2003)(approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan).

76.    In *Gillman v. Continental Airlines (In re Continental Airlines),* 203 F.3d 203 (3d Cir. 2000), the Third Circuit surveyed cases from various circuits as to when, if ever, a non-consensual third party release is permissible.  The Court acknowledged that a number of Circuits do not allow such non-consensual releases under any circumstances.  *See id.* at 212.  Other Circuits, the Court found, "have adopted a more flexible approach, albeit in the context of extraordinary cases," such as mass tort cases.  *See id.* at 212, *citing Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. ( In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992); *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 640, 649 (2d Cir. 1988).   *See also*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005)(third party release may be granted "only in rare cases").

77.    The Third Circuit in *Continental Airlines* ultimately determined that the proposed releases in that case, which enjoined shareholder lawsuits against debtors' directors and officers, did "not pass muster under even the most flexible test for the validity of no-debtor releases." *Continental,* 203 F.3d at 214.  Therefore, the Court determined that it "need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration." *Id.* at 214, n.11.   However, the Court did describe the "hallmarks of permissible non-consensual releases" to be "fairness, necessity to the reorganization, and special factual findings to support these conclusions." *Id.* at 214.

78.     *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del 2010), bears some similarity to the present cases, but is distinguishable.  There, the U.S. Trustee objected to third

party releases to the extent they bound parties who were deemed to have accepted the plan, and suggested that such parties should have been provided with ballots to allow them the option to opt out of the releases. *Id.* at 144. This Court overruled that objection, but for reasons that are not applicable to the current cases. First, the unimpaired parties in *Spansion* appeared to be truly unimpaired, which is not true for the Purportedly Unimpaired Classes. Second, in *Spansion*, there was a separate hearing to approve solicitation procedures before solicitation was actually made, and the Court noted that the subject of providing ballots to unimpaired parties for opt-out purposes was not raised at that hearing. *Id.* In contrast, in the present case, solicitation was made prior to the case filing, and any objection as to solicitation procedures has been preserved for the Combined Hearing, which will take place next week. Finally, the Court in *Spansion* noted that no creditor whose rights were affected by the "deemed" acceptance language had objected to the Plan. *Id.* In the present case, at least four former employees, whose claims would appear to fall under one of the Purportedly Unimpaired Classes, have filed objections to the Plan.

79.     There is nothing in the record to indicate that the high threshold necessary for approval of non-consensual third party releases has been met in these cases, especially as to the Purportedly Unimpaired Classes, who are actually significantly impaired. In fact, forcing such creditors to release non-debtor parties further impairs the right of these creditors. Nor should a Class 5 claimant who has not voted on the plan be forced to give releases to non-debtor parties simply because such claimant did not return a ballot.

80.     There are also certain categories of persons and entities included among the Released Parties, such as the Debtors' directors, officers and employees, that the Third Circuit Court of Appeals and this Court have already determined are not entitled to non-consensual third

party releases.  *See Continental,*  203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"); *Washington Mutual*, 442 B.R. at 354 ("[T]here is no basis for granting third party releases of the Debtors' officers and directors ,  . . . . [as] [t]he only 'contribution' made by them was in the negotiation of the Global Settlement and the Plan, [which] activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated) . . . ."); *In re Genesis Health Ventures,* Inc., 266 B.R. 606–07 (Bankr. D. Del. 2001) ("[T]he officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").   The same logic is also applicable to third-party releases of the Debtors' professionals who, like the Debtors' directors and officers, will be protected by the exculpation provision.  *See Washington Mutual,*  442 B.R. at 354.

81.     The non-consensual third-party release also releases all "Affiliates" of the Debtors, including non-debtor affiliates.  The Court in *Washington Mutual* disallowed releases in favor of non-debtor affiliates because no evidence had been offered as to who the affiliates were, or why they should get a discharge without filing their own bankruptcy cases.  442 B.R. at 354. The same is true here.

82.     The Debtors in these cases should not be allowed the unfettered discretion to force creditors to discharge nondebtors from liability, because a permanent injunction limiting the liability of nondebtor parties is a rare thing that should not be considered absent a showing of exceptional circumstances.   *Continental*, 203 F.3d at 213, n. 9, and cases cited therein.

83.     The Debtors have the burden of justifying the validity of the non-consensual third-party releases for each and every party to be released.  Because an evidentiary predicate is necessary to approve the third-party releases, the U.S. Trustee reserves argument on this issue until the record at the confirmation hearing is closed.

**The Releases Provided by the Debtors Are Impermissibly Broad Under Applicable Law**

84.     The Plan provides releases by the Debtors and their estates of many non-debtor parties.  Pursuant to this Court's decision in *Tribune,* 464 B.R. 126 (Bankr. D. Del. 2011),  and *Washington Mutual,* 442 B.R. 314 (Bankr. D. Del. 2011), among others, the five factors set forth in In re *Zenith Elecs. Corp.,* 241 B.R. 92, 110 (Bankr. D. Del 1999) and *In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 937-38 (Bankr. W. D. Mo. 1994) should be considered to determine whether, notwithstanding § 524(e) of the Code, a plan may provide for releases by debtors of non-debtor entities.  *See Tribune* 464 B.R. at 186; *Washington Mutual*, 442 B.R. at 346; *Spansion,*  426 B.R. at 142-43, n. 47; *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004). Those factors are as follows:

1.     identity of interests between debtor and non-debtor releasee, so that a suit against the non-debtor will deplete the estate's resources (e.g., due to a debtor's indemnification of a non-debtor);

2.     substantial contribution to the plan by non-debtor;

3.     necessity of release to the reorganization;

4.     overwhelming acceptance of plan and release by creditors; and

5.     payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*Tribune* 464 B.R. at 186 (citing *Washington Mutual*, 442 B.R. at 346 (citing *Zenith*,  241 B.R. at 110)).  "The factors are neither exclusive nor conjunctive requirements, but simply provide

guidance in the Court's determination of fairness." *Tribune* 464 B.R. at 186 (citing

*Washington Mutual*, 442 B.R. at 346).

85.    In the present cases, neither the Plan nor the Disclosure Statement address whether

any of the *Zenith* factors are met for any of the parties who will receive releases from the

Debtors.  Absent a showing, and appropriate finding by the Court,  that each proposed Released

Party has made a substantial contribution to the Plan,[10] and that the other elements of *Zenith* have

been met, the releases given by the Debtors render the Plan unconfirmable.

86.    The Debtors have the burden to establish whether the *Zenith* factors have been met

as to each of the non-debtors who are the beneficiaries of the Debtor Releases. Because an

evidentiary predicate is necessary to approve the Debtor Releases, the U.S. Trustee reserves

argument on this issue until the record at the confirmation hearing is closed.

## The Plan' Exculpation Provision Is Impermissibly Broad Under Applicable Law

87.    Section 8.5 of the Plan provides an exculpation in favor of numerous parties who

are not estate fiduciaries, including the pre-petition lenders, Foreign Lenders, holders of Notes

Claims, the Allen Parties (Debtors' equity holder and his affiliates), and each such parties'

respective affiliates, stockholder, members, partners, officers, directors, employees, financial

advisors, attorneys, accountants and other representatives.  *See* Plan, 1.1.64 (definition of

Exculpated Party).

88.    As stated by the Court in *In re Washington Mutual, Inc.*, 442 B.R. 314  (Bankr. D.

Del. 2011)*,* an "exculpation clause must be limited to the *fiduciaries* who have served during the

---

[10]    An example of a "substantial contribution" can be found in *Coram*, where this Court, after
examining the *Zenith* factors,  allowed the debtors to release noteholders who had contributed
$56 million in funding to the plan, which funds allowed the debtors to repay in full all
creditors other than the noteholders, as well as make a significant distribution to the debtors'
shareholders.  315 B.R. at 335.

chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors'

directors and officers." *Id.* at 350-51 (emphasis added). The Court in *In re Tribune Company,*

464 B.R. 126 (Bankr. D. Del. 2011), stated agreement with the holding in *Washington Mutual*

relating to exculpated parties, and held that the exculpation clause in *Tribune,* "must exclude

non-fiduciaries." *Id.* at 189, quoting *Washington Mutual,* 422 B.R. at 350 -51. *Accord, In re*

*PTC Holdings LLC,* 55 Bankr. Ct. Dec 206, 2011 Bankr. LEXIS 4436, *38 (Bankr. D. Del. Nov.

10, 2011)(Shannon, J.)(sustaining the U.S. Trustee's objection to the exculpation clause, stating

that such clause "must be reeled in to include only those parties who have acted as estate

fiduciaries and their professionals."), relying on, *inter alia, In re PWS Holding Corp.*, 228 F.3d

224, 246 (3d Cir. 2000).

89.     The Plan's exculpation fails to comply with the applicable case law set forth

above, as it covers many parties who are not estate fiduciaries in these cases. Because there is no

committee in these cases, the only parties that may be covered by the exculpation under

applicable law are: the Debtors, the Debtors' directors and officers and the Debtors'

professionals retained in these cases. Non-debtor affiliates, lenders, the Plan Support Parties,

and those parties' respective officers, directors, affiliates, professionals and the like, are not

estate fiduciaries and should not be exculpated.

90.     Even with respect to the estate fiduciaries that can be covered, the exculpation

clause in the Plan is impermissibly broad, because it is not limited to actions taking place during

the bankruptcy case, but also includes pre-petition activity. *See Washington Mutual,* 442 B.R. at

350 (exculpations cover "actions in the bankruptcy case"), *citing PWS*, 228 F.3d at 246. It also

appears that the exculpation are prospective, seeking to exculpate actions that may be taken after

the Effective Date.  Such actions should not be subject to exculpation, unless they are "in the

bankruptcy case."  *See id.*

91.    The Plan's exculpation does except out gross negligence and willful misconduct,

as required by applicable law.  See *Washington Mutual,* 442 B.R. at 350, *citing PWS*, 228 F.3d at

246.   However, the provision allowing exculpated parties to rely upon counsel should be

omitted.  It is not necessary, because advice of counsel is a defense under common law.  In

addition, the provision effectively elevates a defense to an immunity, and could also act to negate

the exception for gross negligence and willful misconduct.

92.    Unless the Exculpation provision in the Plan is amended so that it covers only

fiduciaries of the Debtors' estates, is limited to acts and omissions during the course of the

bankruptcy cases, and eliminates the "reliance upon counsel" provision, the Plan should not be

confirmed.

  **vi.    <u>Miscellaneous Issues</u>**

93.    **Management Incentive Plan and Compensation, Severance and Benefit**

**Programs (sections 4.15 and 5.6)**.  There are number of provisions in the Plan relating to

management incentive plan and compensation, severance and benefit programs, which are set

forth in section 4.15 and 5.6 of the Plan, and related definitional sections.

> **Section 4.15** of the Plan provides as follows:
>
> On, or as soon as reasonably practicable after the Effective Date, (a)
> Reorganized ASG and the other Reorganized Debtors, as applicable, shall
> execute and deliver the Management Agreements, and (b) the New Board
> shall adopt the Management Incentive Plan, and make individual awards
> pursuant thereto, consistent with the Management Agreements and
> Management Incentive Plan, and otherwise as determined by the New
> Board.  Approval of the Plan shall constitute shareholder approval of the
> Management Incentive Plan for purposes of Section 422 of the Tax Code.

94.    **Section 5.6** of the Plan provides, in principal part, as follows:

Compensation and Benefit Programs

Except as otherwise provided in the Plan or any order of the Bankruptcy
Court, and without limiting any authority provided to the New Board
under the Reorganized Debtors' Amended Organizational Documents or
applicable non-bankruptcy law, all employment and severance policies,
plans, and agreements, and all compensation and benefit plans, policies,
and programs of the Debtors applicable to its employees, retirees, and
non-employee directors, and the employees and retirees of its subsidiaries,
including  . . . incentive plans, . . . are treated as Executory Contracts
under the Plan and on the Effective Date will be assumed pursuant to the
provisions of sections 365 and 1123 of the Bankruptcy Code.

95.    The U.S. Trustee views section 4.15 as an information provision only, and asks

that a clarification be added to the Plan or any order that might be entered confirming the Plan,

or any amended plan, that the Court's confirmation of the Plan in no way approves of or

authorizes the terms of any Management Incentive Plan or Management Agreement, as those

terms are defined in the Plan.

96.    As to section 5.6 of the Plan, the U.S. Trustee notes that it provides for the

assumption of the pre-petition severance plans, as well as compensation and benefit plans that,

upon information provided by Debtors' counsel, includes benefits to insiders, as that term is

denied under the Code.   Depending on the circumstances, the assumption of the severance plans

could implicate 11 U.S.C. § 503(c)(2), which prohibits severance from being allowed or paid to

an "insider" of the Debtors unless certain criteria are met.  If the Debtors contemplate that one or

more of the covered executives will be terminated shortly after the Effective Date, then the

Debtors must comply with 11 U.S.C. § 503(c)(2).  *See e.g., In re AMR Corp.*, 497 B.R. 690, 697-

698 (Bankr. S.D.N.Y. 2013)(in denying approval of executive severance payment that did not

comply with section 503(c)(2), the payment of which was a condition precedent to the plan going effective, the Court noted that "attempts to bypass the requirements of section 503(c) given the history and intent of the section" are disfavored). On the other hand, if it is not contemplated that any of the executives will be terminated shortly after the Effective Date, which appears to be the case based on information provided by the Debtors' counsel, the assumption of severance plans would appear to act simply as an agreement as to how the executives will be treated if they are terminated at some unknown point post-Effective Date, which may not require compliance with section 503(c)(2).

97.     Similarly, the assumption of compensation and benefit plans could also implicate section 503(c) of the Code. Based on the information provided by Debtors' counsel, the compensation and benefit plans that will be assumed were in existence for at least one year prior to the petition date, and in some cases much longer, and therefore may not implicate section 503(c)(2). Counsel for the U.S. Trustee understand that, at the Combined Hearing, the Debtors will put certain information into the record regarding the severance, compensation and benefit plans to be assumed, and the U.S. Trustee reserves all rights until such information is introduced.

98.     **Plan supplement** (Plan, §12.8). Parties in interest did not get sufficient notice of the Plan Supplement. The Plan stated that the Plan Supplement would be filed 10 days prior to the Combined Hearing, meaning it would be filed on March 16. That date was after the voting deadline of March 11, and only three days prior to the general objection deadline of March 19. Moreover, the Plan Supplement was not filed on March 16. Instead, on that date the Debtors filed an amended plan, which changed the date the Plan Supplement would be filed to March 19, which was the objection deadline for the Plan and Disclosure Statement. To the knowledge of counsel to the U.S. Trustee, no party in interest was served with the Plan Supplement. The

Hearing Notice, which is the only Plan-related document served on any of the Purportedly

Unimpaired Classes, did not mention that a Plan Supplement would be filed, let alone direct

parties in interest how they could obtain a copy of such document.  As no Plan Supplement has

yet been served on the U.S. Trustee, the U.S. Trustee reserves all rights to object to the same

once counsel to the U.S. Trustee receives a copy and has an opportunity to review it.

99.    **Professional Claims** (Plan, §2.3) – the last paragraph of this provision should

make payment of the claims of the Consenting Creditor Professional fees subject to the

requirements set forth in the final DIP Financing order regarding the same.

100.    **Inconsistencies** (Plan, §12.9).  The second sentence of this provision should be

revised to state that if there are any inconsistencies between the terms of either the Plan, the Plan

Support Agreement and/or the Disclosure Statement on the one hand, and the Confirmation

Order on the other, then the terms of the Confirmation Order shall govern.

## <u>CONCLUSION</u>

101.    The Disclosure Statement should not be approved, and the Plan should not be

confirmed.  This is a prepackaged bankruptcy case in which the Plan proponent seeks to utilize

the expedited provisions applicable to prepackaged bankruptcy cases to prejudice rather than to

enhance the rights of creditors.  The Disclosure Statement contains numerous material omissions

rendering it inadequate.  The Plan has not been solicited to all classes of impaired claims.   The

claim resolution procedure, as well as the procedures for executory contracts and leases, and

limitations on recoupment and settlement rights of creditors, are contrary to the requirements of

the Bankruptcy Code, Bankruptcy Rules, and applicable law, and deny affected creditors their

due process rights.  The Plan also contains non-consensual third-party releases in favor of non-

debtors, and other release, and exculpation provisions that are contrary to applicable law.

102.    The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE,** the U.S. Trustee respectfully requests that this Court issue an order denying confirmation of the Plan, denying approval of the Disclosure Statement, and/or granting such other relief as this Court deems appropriate, fair and just.

Dated: March 20, 2015
      Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**
**Region 3**

By: */s/ Juliet Sarkessian*
Juliet Sarkessian, Esquire
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)
Juliet.M.Sarkessian@usdoj.gov